AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Generation Now | ) | Case No. **1:20-MJ-00522** |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 16, 2020_____ in the county of _____Hamilton_____ in the
___Southern___ District of _____Ohio_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1962(d) | Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Blane J. Wetzel, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.**via Facetime Video.**

Date: __**Jul 17, 2020**__

_____
*Judge's signature*

City and state: _____Cincinnati, Ohio_____      Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **UNITED STATES** | |
| **V.** | |
| **LARRY HOUSEHOLDER,** | **Case No. 1:20-MJ-00522** |
| **JEFFREY LONGSTRETH,** | |
| **NEIL CLARK,** | **Filed Under Seal** |
| **MATTHEW BORGES,** | |
| **JUAN CESPEDES, and** | |
| **GENERATION NOW** | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Blane J. Wetzel, being first duly sworn, hereby depose and state as follows:

1.     I make this affidavit in support of a criminal complaint against defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK, MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW**.

2.     I am a Special Agent with the Federal Bureau of Investigation, and have been since August 21, 2016.  I am assigned to the Public Corruption Squad of the Cincinnati Division Columbus Resident Agency. In my capacity as a Special Agent, I work on the Southern Ohio Public Corruption Task Force - comprised of various state and federal agencies, and am responsible for investigating violations of federal law, including, but not limited to, public corruption, extortion, bribery, and theft from programs receiving federal funds. I have conducted and participated in public corruption investigations that involved the use of advanced investigative techniques such as the use of: Title III interceptions; confidential human sources; consensually-monitored meetings; execution of search warrants on computers, emails, other electronic communication devices and physical structures; pen register and trap/trace devices; financial record analysis; and physical surveillance. During these investigations, which included bribery, extortion, and efforts to defraud the government, I have participated in monitoring court authorized wire interceptions, conducted consensually recorded conversations, conducted witness interviews, analyzed telephone toll data, and analyzed documents such as legislation and financial records.

3.     By virtue of my training and experience, through conversations with and review of reports from other experienced agents who have conducted numerous public corruption investigations, I have become familiar with how some public officials improperly solicit or accept benefits or other things of value from a private citizen with intent to be influenced or rewarded in connection with the business or transaction of the governmental agency for which they work. I also investigated public officials and their associates who employ various deceptive means to further corrupt activity to include orally and electronically communicating in coded conversation, using a middleman to distance oneself from corrupt activity, and providing false exculpatory

1

information as an attempt to disguise the nature of their corrupt activity. I have had the opportunity to assist in multiple public corruption wiretap investigations, including monitoring and reviewing transcripts of court authorized intercepted communications involving bribery and extortion.

4.     Prior to joining the FBI, I worked as policy director for a member of the Michigan House of Representatives. I performed duties such as: drafting legislation, managing constituent relations, managing legislative issues, and providing strategic political advice to my employer. In addition to working in an official capacity for the State of Michigan, I was also employed by that same legislator as a member of his campaign team. Working on the campaign, I became familiar with the rules, regulations, practices, and norms of campaign finance.

5.     The information set forth in this affidavit was obtained during the course of my employment with the FBI, through personal observations, the statements of witnesses/cooperators, and recordings of conversations. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause that federal crimes have been committed.

6.     As set forth in this affidavit, there is probable cause to believe that, beginning in or about 2016 and continuing to the present, in the Southern District of Ohio and elsewhere, the Defendants, **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, being persons employed by and associated with an enterprise, which engaged in, and the activities of which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

## GENERAL STATEMENT OF THE LAW

7.     Title 18, United States Code, Section 1962(c) and (d) provides as follows:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity  . . . .

(d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection  . . . . (c) of this section.

Section 1961 in turn, defines the terms "enterprise" and "pattern of racketeering activity" as used in Section 1962 as follows:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

Section 1961(1) defines "racketeering activity," in relevant part, as follows:

(A) [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code:  . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

## PROBABLE CAUSE

8.    Defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, constituted an "Enterprise," (hereinafter "Householder's Enterprise") as that term is defined in Title 18, United States Code, Section 1961(4), that is,  a group of individuals and entities associated in fact.  Householder's Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce. As described below, there is probable cause to believe that the named defendants conspired to conduct and participate in the conduct of the affairs of Householder's Enterprise through a pattern of racketeering activity.

3

9.      To summarize, from March 2017 to March 2020, Householder's Enterprise received approximately $60 million from Company A[1] entities,[2] paid through Generation Now and controlled by Householder and the Enterprise.  In exchange for payments from Company A, Householder's Enterprise helped pass House Bill 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with Company A.  The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from Company A Corp. affiliates through multiple entities that it controlled.  Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

## I.      Background

10.     In 2016, Company A Corp.'s nuclear generation future looked grim.  (Company A Corp. is described further below.)  In its November 2016 Annual Report to Shareholders, Ohio-based Company A Corp. and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, Company A-1.  Given this backdrop, Company A announced future options for its generation portfolio as follows:  "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

11.     Consistent with this forecast, Company A actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio.  For example, during Company A's fourth-quarter 2016 earnings conference call, Company A Corp. President and CEO stated:

> In Ohio, we have had meaningful dialogue with our fellow utilities
> and with legislators on solutions that can help ensure Ohio's future
> energy security. Our top priority is the preservation of our two
> nuclear plants in the state and legislation for a zero emission
> nuclear program is expected to be introduced soon. The ZEN
> program is intended to give state lawmakers greater control and
> flexibility to preserve valuable nuclear generation. We believe this

---

[1] I have used pseudonyms for all people and entities except for the Defendants, and the entities registered by the Defendants or for which they are signatories on bank accounts.

[2] As described in this affidavit, "Company A" refers collectively to Company A Corp., Company A-1, and Company A Service Co., all of which are defined below.  Prior to February 2020, Company A-1 and Company A Service Co. were both wholly-owned subsidiaries of Company A Corp.  Company A-1 and its affiliates filed for bankruptcy in 2018 and were divested from Company A Corp. in February 2020.  Notably, all three entities share a common first name, and Enterprise members and associates often just referred generically to the "company" or used the common first name in communications, as quoted below.

> *legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [Company A] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

12.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

13.     While Company A was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019.  Following his January 2017 trip on Company A's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from Company A into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation Now.  In 2017 and 2018, Householder's Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from Company A. Members of Householder's Enterprise used Company A's payments for their own personal benefit and to gain support for Householder's political bid to become Speaker.  In the spring and fall of 2018, the Enterprise spent millions in Company A money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for Company A.

14.     The investigation shows that the plan worked.  Householder-backed candidates that benefitted from Company A money received by Generation Now (described throughout this affidavit as, "Company A-to-Generation-Now" payments[3]) helped elect Householder as the Ohio Speaker of the House in January 2019.  And Householder fulfilled his end of the corrupt bargain shortly thereafter.  Three months into his term as Speaker, HB 6 was introduced to save from closure Company A-1's two failing nuclear power plants.  Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills.  Neil Clark described the legislation as a "bailout" for Company A's nuclear assets, worth $1.3 billion to Company A.

15.     After the introduction of the bailout legislation, Company A began increasing its payments into Generation Now for the benefit of the Enterprise.  On April 30, 2019, roughly two weeks after introduction of the legislation, Company A wired $1.5 million to Generation Now.  In the month of May 2019, while the controversial legislation was pending before lawmakers, Company A wired four additional payments totaling $8 million.  The Enterprise used some of that

---

[3] "Company A-to-Generation-Now" payments is an inclusive label describing payments from accounts controlled by Company A Service Co., Company A-1, and Energy Pass-Through, which, as set forth below, is funded solely by wires from Company A Service Co.

money for mailers and media advertisements to pressure members to support the legislation; the Enterprise also used Company A money for their personal benefit, as described below. In the same month that the Enterprise received $8 million from Company A, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder attempt to gain support for HB 6 from the representative.

16.     On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor. That process took about two months. However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to organize a statewide ballot-initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot. And so, Company A's and the Enterprise's fight continued.

17.     In response, from July 24 to October 22, 2019, Company A-controlled accounts wired over $38 million into Generation Now to defeat the ballot initiative so HB 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the Company A money to enrich themselves and further their personal interests.

18.     Company A entities paid Householder's Enterprise $60,886,835.86 in secret payments[4] over the approximately three-year period in exchange for the billion-dollar-bailout. The Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions paid into the entity are akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny—and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Defendant Neil Clark stated in a 2019 recorded conversation,[5] Company A operated as the Enterprise's "Bank"—Clark explained, "*Generation Now is the Speaker's (c)(4)*," and Company A's "*deep pockets*," and the money to the Enterprise through Generation Now was "*unlimited*." Defendant Matthew Borges similarly described Company A's payments to the Enterprise as "*Monopoly money*."

19.     The Enterprise used some of the Company A money to help enact the bailout legislation. Additionally, the Enterprise used millions of dollars of Company A bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. The Company A payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff. The Defendants also paid themselves personally millions of dollars

---

[4] This includes Company A payments into Generation Now and other Enterprise-controlled entities.
[5] ███████████████████████████████████████████████

in Company A bribe payments, funneled through Generation Now and other entities controlled by the Enterprise. This includes allowing for the payment of at least $500,000 in what appears to be personal benefits to Householder that was passed through Longstreth controlled accounts. In addition, the Enterprise had over $8 million of Company A money in their controlled accounts at the end of 2019, which represents further profit to Enterprise members.

## A. The Defendants and Householder's Enterprise

20. **Larry Householder** is the current Speaker of the Ohio House of Representatives. He previously served as a House member representing Ohio's 72nd District from 1997 to 2004, including as Ohio Speaker of the House from 2001 to 2004. In 2004, Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publically referred to the FBI. He was never charged. Householder won his House seat back in the fall of 2016. He was elected Speaker again in January 2019, after what the media described as a bitter leadership battle that lasted nearly a year.

21. Householder's path to Speakership was unusual. Householder and then-House-member Representative 1, both of whom are Republicans, were both candidates to be Speaker of the House of Representatives for the 133rd General Assembly. After the then-Speaker's resignation in May 2018, a protracted conflict lasting eight weeks began to select a Speaker for the remainder of the 132nd General Assembly. Ultimately, Representative 1 became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite Representative 1's selection in mid-2018 for the remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker. He did so in a number of ways, including by providing financial support, paid for in large part by Company A, for certain candidates running for House seats in the spring 2018 primary and the November 2018 general election. In the end, his strategy was successful, as he won the Speakership despite Representative 1 serving in that role prior to the election.

22. Householder's Enterprise has several purposes, one of which is to increase Householder's political power through corrupt means. In his role, Householder solicited and accepted payments from Company A into his 501(c)(4) account; he used the bribe payments to further his political interests, enrich himself and other members and associates of the Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

23. Householder benefitted personally through the Enterprise. For example, while funded by Company A-to-Generation-Now bribe money, at least $300,000 passed through and funded accounts controlled by Jeff Longstreth, which the Enterprise used to pay legal fees and settle a lawsuit against Householder. Over $100,000 of the Company A-to-Generation-Now bribe money was passed through Longstreth-controlled accounts and used to pay costs associated with Householder's Florida home. In addition, at least $97,000 of the Company A-to-Generation-Now bribe money was used to pay expenses for Householder's 2018 House campaign.

24.     **Jeff Longstreth** is Householder's longtime campaign and political strategist.  Neil Clark identified Longstreth as Householder's "*political guy*," his "*implementer*," and one of his "*closest advisors*," who was instrumental to the Enterprise's efforts to pass HB 6.

25.     The investigation corroborates Clark's statements.  Although Longstreth is not employed by the State of Ohio, he is Householder's chief political strategist.  Longstreth runs Householder's political campaign, and the investigation shows that he and his staff managed the 2018 campaigns for the Enterprise-backed candidates (at times internally referred to by the Enterprise as "Team Householder" candidates).  Householder and Longstreth even shared office space, rented from their Political Advertising Agency.  In addition, Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for Company A.  Phone records show that Householder and Longstreth have communicated on a regular basis for years.

26.     Longstreth also plays a critical role with respect to the Enterprise's finances.  He is a signatory on both of the Generation Now bank accounts and the person who transfers money out of the accounts to other entities to further the Enterprise.  Longstreth also controls entities that receive Company A-through-Generation-Now payments to further the Enterprise.  Among these, Longstreth owns and operates JPL & Associates.  Throughout the relevant period, Longstreth transferred over $10.5 million of Company A's bribe payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account.  In addition, Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity (Front Company, described below) and then into accounts that he controlled.  Longstreth then used Company A payments funneled through Generation Now to further Householder's and Company A's interests and to pay personal benefits to members and associates of the Enterprise.  Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in Company A-to-Generation-Now money during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

27.     **Neil Clark** owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse.  Prior to becoming a lobbyist, Clark served as a budget director for the Ohio Senate Republican Caucus.  During the relevant period, Clark worked as a lobbyist for various interest groups.

28.     Along with Longstreth, Clark is, in his own words, one of Householder's "*closest advisors*."  According to Clark during recorded conversations in 2019, Clark served as Householder's "*proxy*" in the Enterprise's efforts to further the enactment of HB 6 and ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge.  Clark also communicated directly with House members to further the Enterprise.  In 2019, Clark described himself in recorded communications as Householder's "*hit man*" who will do the "*dirty shit*."  Clark stated, "*when [Householder's] busy, I get complete say.  When we're working on stuff, if he says, 'I'm busy,' everyone knows, Neil has the final say, not Jeff.  Jeff is his implementer*."  Borges confirmed Clark's role, and similarly described Clark as Householder's "*proxy*" relating to Company A's matters in a recorded conversation with CHS 1.  Clark benefitted personally from Company A's payments to the Enterprise, receiving at least $290,000 in Company A-to-Generation-Now money.

29. **Matthew Borges** is a registered lobbyist for Company A-1, a subsidiary of Company A. As described below, the investigation has shown that Borges was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive. On August 5, 2019, shortly after the Ballot Campaign was announced, Borges incorporated 17 Consulting Group. Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account. Over the next few months Generation Now wired a total of $1.62 million into the account.

30. There is probable cause to believe that, approximately a month after Generation Now began wiring money into Borges' 17 Consulting account, Borges paid $15,000 to CHS 1 in exchange for inside information about the Ballot Campaign, which Borges would use to help defeat the Ballot Campaign. Bank account records show that the $15,000 paid to CHS 1 came from the 17 Consulting Group account, which was funded by Generation Now wires. Borges also paid another co-conspirator Juan Cespedes, $600,000 of Generation Now money from his account. With the money wired from Generation Now, Borges also paid a private investigator during this period, which, as described below, is consistent with the Enterprise's strategy of investigating signature collectors that worked for the Ballot Campaign.

31. Toll records show Borges had contact with Householder in January 2019 and April 2019—key time-periods, as described below, involving official action by Householder. Borges benefitted directly from the $1.62 million from Generation Now wires. Specifically, he paid himself over $350,000 from Company A-to-Generation-Now proceeds.

32. **Juan Cespedes** served as a key middleman, participating in strategy meetings and communicating with Enterprise members and associates regarding strategic decisions. Cespedes is a multi-client lobbyist, whose services were retained by Company A-1. He was central to Company A-1's efforts to get the bailout legislation passed in Ohio. As explained below, a contract between Company A-1 and Cespedes's lobbying company, the Oxley Group, shows Company A-1 hired Cespedes to pursue the bailout legislation starting in the spring of 2018. Consistent with this, records show that Cespedes was the "lead consultant" relating to Company A-1's attempts to pursue legislation that would save its failing nuclear power plants. In internal documents, Cespedes tracked "Householder camp" candidates who later received Company A-to-Geneartion-Now money, and he advised that if Householder becomes Speaker, the nuclear energy bailout "will likely be led from his Chamber."

33. He was paid by both, receiving approximately $600,000 from the Enterprise[6] and $227,000 from Company A in 2019. He also was in regular contact with both Company A and Enterprise members during the relevant period. As set forth below, Cespedes and Longstreth communicated regularly through text messages discussing the coordination of millions of dollars in Company A payments to the Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot campaign, among other things. In one telling exchange, which is supported by toll

---

[6] The $600,000 paid to Cespedes was passed through the 17 Consulting Group bank account, which was funded exclusively by Generation Now.

records and search warrant returns, Cespedes coordinated the timely payment of $15 million from Company A to Generation Now.

34.    **Generation Now, Inc.**, received approximately $60 million from Company A entities during the relevant period.  As set forth more fully below, Generation Now registered with the IRS as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization.  Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.  The Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny.  Generation Now's accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Enterprise.  As described below, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire from Energy Pass-Through in March 2020, bringing the combined balance of the accounts to approximately $2.29 million, again, money that is a direct benefit to the Enterprise.

## B.    Related Entities Controlled by the Enterprise

35.    The Enterprise used and relied on a number of different entities to further the conspiracy.  The following entities were controlled by, worked directly with, or funneled payments for the benefit of the Enterprise:

a.    **JPL & Associates LLC** is controlled by Longstreth.  Longstreth is the signor on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content."  Bank records show numerous internal money transfers of Generation Now money among Longstreth-controlled accounts.  In total, JPL's main business account received over $10.5 million in Company A–to-Generation-Now wires during the relevant period, which Longstreth then transferred internally to his other accounts.  Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity, ("Front Company," discussed below) and into Longstreth's Constant Content accounts.  Analysis of the accounts shows that the money was used to pay benefits directly to Enterprise members and to further the Enterprise's interests by paying campaign staff for preferred Householder candidates, among other things.  After the ballot initiative campaign failed and HB 6 became law for the benefit of Company A, Longstreth consolidated most of the Enterprise funding into JPL-controlled accounts. As of January 1, 2020 that total balances within JPL-controlled accounts exceeded $6.5 million.  This money is a direct benefit to the Enterprise.

b.    **"PAC"** is a federal PAC through which Generation Now funneled Company A payments in furtherance of the conspiracy.  The Enterprise primarily used the PAC during the May 2018 primary as a way to conceal the source of media buys for Team Householder candidates.  The attorney who is listed as the treasurer for Generation Now and who is a signor on the Generation Now accounts along with Longsreth, is the treasurer and a signor of the PAC.

c.    Although Longstreth was not a signor on the PAC bank account, documents obtained via a search warrant, , confirm Longstreth's control over the PAC.  For example, a Word document titled "Client Information Request Form," last modified by Longstreth in October 2016,

listed Longstreth as the "Executive Director or President" of the PAC.[7]  In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC.  Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's email and phone number.  Toll records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

      d.     In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire and a $750,000 wire from Generation Now, on April 2 and April 12, 2018, respectively.[8]  By April 30, 2018, nearly all of the million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder candidates, including Householder himself, in advance of the May 8, 2018 Ohio primary election.

      e.     The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the fall 2018 election.  Close to $40,000 of that wire was paid to a political strategy group within weeks of the wire.  Aside from payments to the attorney's law firm, the balance remained in the account.

      f.     The account remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of money from Company A to the "Coalition," (described below), which passed through to PAC roughly the same amount of money over the next two months.  Expenditures from the PAC in FEC filings, along with media purchased by PAC, show that the Enterprise used the Company A money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

      g.     **"Coalition"** is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signor for the PAC is the signor on the Coalition's bank account.  The attorney incorporated the Coalition in Delaware one day after he incorporated PAC.  Longstreth's resume states that he oversees political activities for the Coalition.  Search warrant returns indicate that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition.  He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

      h.     For calendar years 2017 through 2019 the Coalition was funded almost exclusively through: A) $90,000 from Company A, B) $300,000 from "Energy Pass-Through" (a Company A pass-through, as set forth below), and C) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid $150,000 to Generation Now during the relevant period.  Outgoing payments from the Coalition account were over $100,000 in two wires to JPL & Associates; $54,000 wired to Generation Now; $191,000 wired to Media Placement Company 1; and $200,000 wired to a public relations firm.

---

[7] ████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[8] Prior to the wire transfers from Generation Now, the PAC's bank account had a balance of $2,703.20.

i.      The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Enterprise used the Coalition as a pass-through for Company A-to-Generation-Now money to PAC, which the Enterprise then used to support Householder-backed candidates in the 2020 primary election.  The benefit of passing the money through the Coalition first, was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now.  The Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained below, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it.

j.      Thus, this account is a mechanism for Generation Now to spend secret money for the benefit of Householder and the Enterprise.

k.      **"Dark Money Group 1"** is an entity used by the Enterprise to conceal the source of media buys during the 2018 general election, similar to the way the Enterprise used PAC for the primaries in 2018 and 2020.  An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018 and opened its bank account on September 25, 2018.

l.      The majority of activity in the account occurred roughly a month later, between October 2018 and Election Day on November 6, 2018.  From October 19 to October 29, 2018, Generation Now wired $670,000 into the account; Company A wired $500,000 into the account; and other corporate interests wired $300,000 into the account, totaling $1,470,000.  From October 22 to November 2, 2018, Media Placement Company 2 then spent $1,438,510 on media buys for ads paid for by Dark Money Group 1 that generally targeted rivals of candidates aligned with Householder.  Since Election Day in 2018, the account has been largely unused.

m.      **"Front Company"** is a pass-through entity used by the Enterprise to fund the campaign against the referendum in furtherance of the conspiracy.  The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began.  "Associate 1" and "Associate 4" of Longstreth and Householder are signers on its bank account.

n.      From August 1, 2019 through October 2019, Company A-controlled accounts wired Generation Now $38 million; Generation Now then wired $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing the Ballot Campaign.  Generation Now was the sole source of money deposited into the Front Company account.  By November 2019, less than $5,000 remained in the Front Company account.

## C. Company A and Its Affiliates

36.      **Company A Corp.**  Incorporated in Ohio, Company A Corp. is a public utility holding company for its subsidiaries.  As a holding company, Company A Corp. directs and controls the various subsidiary entities within Company A Corp.  Per United States Securities and Exchange Commission documents, Company A Service Co. is a principle subsidiary, and

Company A-1 is a wholly-owned subsidiary of Company A Corp. Company A Corp. and its subsidiaries are involved in the generation, transmission, and distribution of electricity.

37. **Company A Service Co.** "provides legal, financial and other corporate support services at cost, in accordance with its cost allocation manual, to affiliated [Company A] companies." Company A Service Co. is under the management of Company A Corp.'s leadership team. The Service Co. does not have its own CEO or board of directors. Among the shared services Company A Service Co. provides to Company A's affiliated companies, including Company A-1, are "external affairs," including "corporate contributions"; "Federal/State/Local Regulatory Affairs"; and "advocacy at the Federal, State, and Local levels." According to Company A's SEC Form 10-K, Company A Service Co. provided: $112 million in shared services for Company A-1 and other debtors from April 1, 2018 to December 31, 2018; and $152 million in shared services to these entities from January 1, 2019 to December 31, 2019. Pursuant to Company A-1's governmental affairs contract with Cespedes relating to its efforts to pass legislation to save Company A's failing nuclear power plants, explained in detail below, Company A Service Co. acted as "*the authorized agent of [Company A-1] for purposes of executing and administering this Agreement and is acting in each such case solely in its capacity as authorized agent.*" As set forth below, Company A Service Co. was the Company A affiliated entity that wired the bulk of the millions of dollars to Generation Now for the benefit of Company A-1.

38. **Company A-1** "provides energy-related products and services to retail and wholesale customers." Company A-1 owns and operates nuclear generating facilities through affiliates, one of which owns two nuclear power plants in Ohio and sells the entire output from these plants to Company A-1. Another affiliate, by agreement, operates the nuclear generation plants. During most of the relevant period, Company A Corp. was the parent company for each of these entities.

39. On March 28, 2018, Company A-1 announced that Company A-1 was closing the two power plants by 2021. Three days later, Company A-1 and other Company A affiliates, filed Chapter 11 bankruptcy. Company A Corp. and Company A Service Co. did not seek bankruptcy protection. Pursuant to the bankruptcy plan, Company A Corp. proposed separating from Company A-1, its nuclear generation arm.[9]

40. Records obtained by the FBI indicate that, on June 4, 2018, a few months after filing Chapter 11 bankruptcy, Company A-1 entered a contract with Oxley Group LLC, which listed Cespedes as the "supplier contact."[10] The term of the contract was from May 1, 2018 to April 30, 2019. Under scope of services, Cespedes was contracted to perform "Government Relations" for Company A-1, which included "*assist[ing] [Company A-1] in attaining necessary funding through government action to allow for the financial stability/sustainability of its two nuclear power plants.*" In other words, Cespedes's job was to help Company A-1 attain

---

[9] In February 2020, Company A-1 emerged from bankruptcy under a new name and Company A Corp. divested its ownership interest in the company.

[10] ███████████████████████████████████████████████

government funding—*i.e.,* legislative help—to save its two nuclear power plants from closure. Pursuant to the contract, among other things, Company A-1 was actively seeking specific legislative help to save the two nuclear plants, including "*getting a resolution*" passed, "*making our issue a campaign priority for incoming elected officials to achieve a solution in the first quarter of 2019,*" and receiving "*consistent updates on the pending House Speaker race,*" a reference to the Speakership race between Householder and Representative 1.

41. These priorities became reality. As described below, on April 12, 2019, just three months after Householder became Speaker with the help of Company A bribe payments, HB 6 was introduced by two freshman, "Team Householder," representatives. HB 6 created a new Ohio Clean Air program to subsidize power plants fueled by nuclear and solar power, which had the effect of saving Company A's nuclear plants from closure with over $1 billion in subsidies for nuclear energy.

42. **"Energy Pass-Through"** is a non-profit 501(c)(4) that was incorporated in Ohio on February 8, 2017—two days after Generation Now was incorporated in Delaware. A week later, on February 16, 2017, Company A wired $5 million into the Energy Pass-Through bank account—the first transaction in the account. The account was thus funded solely by the initial $5 million wire from Company A. The Energy Pass-Through account then made the following transactions:

- $300,000 wire to Generation Now on March 15, 2018 (weeks before Company A filed for bankruptcy);
- $300,000 wire to Coalition on May 1, 2018;
- $100,000 wire to Generation Now on May 4, 2018; and
- $500,000 wire to Generation Now on August 16, 2018.

43. Aside from the initial $5 million seed money, the account received no other deposits until October 10, 2019. On that date, Company A wired $10 million to its Energy Pass-Through account. That same day, Energy Pass-Through wired $10 million to Generation Now. Similarly, on October 18, 2019, Company A wired another $10 million to Energy Pass-Through. On October 22, 2019, the day the ballot initiative failed and HB 6 officially became law, Energy Pass-Through wired $3 million to Generation Now, and wrote a $4,330.86 cashier's check to Generation Now. On March 3, 2020, Energy Pass-Through wired another $2 million to Generation Now. Based on my training and experience, there is probable cause to believe that this account was used as a pass-through from Company A to the Enterprise.

## II.     Enterprise Creates and Uses Generation Now to Receive Bribe Payments

### A.  Creation of Generation Now

44. On or about February 6, 2017, Generation Now, Inc. was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (x3310 and x6847). Subpoenaed bank records show that an attorney and Jeff Longstreth were signatories on both accounts. On or about

July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ('the Code'), or the corresponding section of any future federal tax code." The attorney, signed the application as the treasurer of Generation Now.

45.     Although Householder was not listed on registration documents or in account records for Generation Now, the Enterprise used Generation Now to receive secret payments for Householder. Recorded conversations indicate that the Enterprise intended to use Generation Now, a 501(c)(4), in this way. For example, in a recorded call, Clark discussed with Householder, the use of a 501(c)(4), controlled by Householder, to receive payments: *"what's interesting is that there's a newer solution that didn't occur in, 13 years ago, is that they can give as much or more to the (c)(4) and nobody would ever know. So you don't have to be afraid of anyone because there's a mechanism to change it."* Clark believed that Householder should utilize his 501(c)(4) to gain political support in his campaign for Speaker against Representative 1 because reportable-hard dollars will cause industry groups to give to both sides, the implication being that Householder would obtain larger amounts of cash through a (c)(4).[11]

46.     Similarly, in a recorded conversation in mid-2019, Clark summed up the benefit of 501(c)(4)s to Householder as follows: *"it's secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account, it is controlled by his people, one of his people, and it's not recorded. A (c)(4) is non-recorded."*[12]

### B. Use of Generation Now to Receive Millions in Secret Payments from Company A

47.     At the time it was aggressively lobbying for legislative action to save its two nuclear power plants, Company A was paying millions in secret payments to the Enterprise through Generation Now. Table 1 lists each Company A payment received by Generation Now during the relevant period, starting from March 2017 (shortly after Company A started its ZEN energy legislative campaign and Householder won his House seat back) until March 2020:

Table 1:  Company A Payments to Generation Now Bank Account x3310

| Date | Amount | Method | Source |
|------|--------|--------|--------|
| 3/16/2017 | $250,000 | Wire | Company A Service Co. |
| 5/17/2017 | $250,000 | Wire | Company A Service Co. |
| 8/10/2017 | $250,000 | Wire | Company A Service Co. |
| 12/8/2017 | $250,000 | Wire | Company A Service Co. |
| 3/15/2018 | $300,000 | Wire | Energy Pass-Through |
| 5/4/2018 | $100,000 | Wire | Energy Pass-Through |
| 8/16/2018 | $500,000 | Wire | Energy Pass-Through |

[11]
[12]

15

| Date | Amount | Method | Source |
|------|--------|--------|--------|
| 10/16/2018 | $400,000 | Check | Company A Service Co. |
| 10/29/2018 | $100,000 | Check | Company A Service Co. |
| 4/30/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/7/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/15/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/22/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/29/2019 | $1,500,000 | Wire | Company A Service Co. |
| 6/5/2019 | $2,000,000 | Wire | Company A Service Co. |
| 6/13/2019 | $1,361,899 | Wire | Company A Service Co. |
| 6/20/2019 | $2,116,899 | Wire | Company A Service Co. |
| 7/5/2019 | $1,879,457 | Wire | Company A-1 Corp. |
| 8/2/2019 | $734,250 | Wire | Company A Service Co. |
| 8/7/2019 | $4,390,000 | Wire | Company A Service Co. |
| 8/22/2019 | $653,000 | Wire | Company A Service Co. |
| 8/29/2019 | $2,003,000 | Wire | Company A Service Co. |
| 9/5/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/12/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/19/2019 | $4,695,000 | Wire | Company A Service Co. |
| 9/26/2019 | $2,445,000 | Wire | Company A Service Co. |
| 10/3/2019 | $4,160,000 | Wire | Company A Service Co. |
| 10/8/2019 | $1,600,000 | Wire | Company A Service Co. |
| 10/10/2019 | $10,000,000 | Wire | Energy Pass-Through |
| 10/17/2019 | $248,000 | Wire | Company A Service Co. |
| 10/22/2019 | $3,000,000 $4,330.86 | Wire Cashier Check | Energy Pass-Through |
| 3/3/2020 | $2,000,000 | Wire | Energy Pass-Through |
| **Total:** | **$59,996,835.86** | | |

48.     In addition to the $59,996,835.86 that Company A paid directly to Generation Now, Company A made $890,000 in other timely payments to the Enterprise, to include: Company A payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed below. These payments bring the total amount of direct payments from Company A to the Enterprise during the relevant period as $60,886,835.86. During the time of the conspiracy, other entities besides Company A deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by the Company A payments.

| Generation Now Deposits (2017-2020) | | |
|---|---|---|
| **Funding Entity** | **Total** | **Percentage** |
| Company A & Energy Pass-Through | $59,996,835.86 | 93% |
| Energy Interested Parties | $1,500,000.00 | 2% |
| Other | $2,853,319.82 | 5% |
| **Total** | $64,350,155.68 | |

### C. Householder's Control of Generation Now

49.     Although Householder's name is not on Generation Now's paperwork, Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas shows that Householder controls Generation Now to further the Enterprise's goals.

50.     Clark stated expressly in multiple recorded conversations in 2019 that Generation Now is Householder's entity.[13] In a 2019 recorded meeting, Clark discussed making "soft money" payments to Householder relating to the passage of unrelated legislation. Clark stated that the Speaker would have to see the check before it goes to Generation Now. Clark explained that they could write a check—a "*noticeable number . . . $15-20-25,000*"— to "*Gen Now* and hand deliver the check to *the Speaker*." Clark then made clear: "*Generation Now is the Speaker's (c)(4), that's the one I work for*."

51.     The next day, Clark again referenced "*Gen Now*" as a (c)(4) that works like a PAC but there's "*no reporting.*" Clark stated that he was "*not on any documents*" connected to Generation Now, but they call him "*the overseer*" of Generation Now, explaining further, "*I'm the Speaker's appointed guy to do that. Okay, so, it's like having him in the room.*" Clark then explained an upcoming Generation Now meeting that will be attended by Householder:

> *When I, so like, we have a meeting on Friday, he's going to be in the room, so I'll be just like everyone else, I'll be, I'll be another fucking staffer. When he's out of the room, I'm the guy.*

Later in the conversation, Clark indicated again that "*Gen Now*" "*is the Speaker's (c)(4),*" that Householder created for himself. Clark stated that he spent $450,000 out of the Generation Now account that very day; and Clark further stated that he "*spent close to $20 million in the last eight weeks.*" Bank records corroborate both statements. When asked how much money was in Generation Now, Clark said, "*it's unlimited.*"

---

13 ████████████████████████████████████

52.     Later that day, Clark explained that the $450,000 paid out of Generation Now went to pay off fifteen signature collection firms nationwide so that they would be conflicted out from working on behalf of the Ballot Campaign, which bank records confirm, as described below.

53.     In subsequent recorded calls and meetings, Clark discussed Householder's connection to Generation Now.  For example, in a recorded call on August 8, 2019, Clark stated that Jeff Longstreth was Householder's "*political guy*" who "*could influence the Speaker*."  He similarly explained later in the call, Longstreth is Householder's "*political guy, he's the guy that does, remember that Committee I work for, Generation Now, I've been talking about*."

54.     Clark also discussed the individuals making a payment to Householder into Generation Now.[14]   During a call on August 19, 2019, Clark discussed taking a trip with Householder or his advisors to further the unrelated legislation.  During the call, Clark stated, "[*Longstreth] and I are the two principal advisors to the Speaker*."  According to Clark, "*Jeff actually runs all the races and selects people, etc*."  Clark also stated that the individuals "*might write a check to the (c)(4)*" of the Speaker totaling $50,000.  Clark said it would be ideal if they could hand the check to Householder personally—as Clark explained, "*it's his (c)(4)*"—though Clark explained that typically the (c)(4) money is wired into the account.  Bank records corroborate Clark's assertion that money into Generation Now is usually wired into the account.

55.     Recorded statements by Borges to CHS 1 also show Householder's use of Generation Now, and further confirm Clark's statements.  As explained fully below, in August 2019, Borges received $1.62 million in wire transfers from Generation Now and then used a portion of that money to attempt to bribe CHS 1 to help defeat the ballot initiative.  On September 10, 2019, during a recorded conversation, Borges discussed the divide between the ballot initiative supporters (to include the CHS 1) and the supporters of HB 6 and stated, "*The only people on my side is this fucking company*," which Borges confirmed was "[Company A]."  Borges described the relationship between Company A and Householder to CHS 1 as follows:

> *And, and Larry also, you know, so it's this unholy alliance between Larry and [Company A] and [Borges' firm]. . . . [Borges' firm] doesn't care about Larry; he's helping with the issue our single largest client cares a lot about and [] unless you are somehow affiliated directly to [Company A] or work for one of their interests or you just want to suck up to Larry, you're on your side (as to whether to overturn HB 6).*

56.     Borges also discussed Householder's direct involvement in managing Generation Now.  Specifically, on September 13, 2019, he stated the following about Associate 3, who is Generation Now's public relations spokesperson:

> *Like [Associate 3] who has to, who has to, answer to the press obviously, he wants to quit so bad 'cause he's like "this is my*

---

[14] ██████████████████████████████████████████

*reputation now" you know . . . but he can't because the Speaker won't let him, but he god he hates this shit.*

57.     When CHS 1 asked whether Householder was "*putting the squeeze on [Associate 3]*," Borges responded that, "*Larry thinks that this stuff is good for us.*" When CHS 1 asked Borges why Householder does not just retire, Borges responded, "*No. That's just not how he's wired.*" Borges indicated he was not aware of what Householder was making off the relationship with Company A, but Borges stated it was "*insane*" what "*Jeff and those guys*" are making off the relationship.

58.     Borges also reinforced Clark's role in the Enterprise, specifically his role as Householder's proxy to Generation Now: "*Neil sits in meetings and he'll say 'I'm the proxy for the Speaker in this meeting . . . so anything you tell me' and you kind of think it's typical Neil bullshit stuff except it is not; he's really acting as his proxy.*" This corroborates Clark's own statements that he was acting as Householder's proxy for purposes of passage of HB 6 and the effort to defeat the ballot initiative through the use of Generation Now.

59.     Householder's admissions confirm Clark's and Borges' statements that Householder controls Generation Now. In a January 10, 2018 recorded call[15] with Clark, Householder discussed financial contributions from various industries, including payday lenders and nursing homes, two industries for which Clark is a lobbyist. During the call, the following conversation occurred:

> LH: "*Now switching gears. So we are looking at the payday lenders. And we are expecting big things in (c)(4) money from payday lenders....*
>
> NC: *Right. Right.*
>
> LH: "*So far, I think we are what, fifty? I think* [speaking to someone else in the room]
>
> NC: *Are you, you're checking now with Jeff right?*
>
> LH: *Right.*
>
> NC: *You should have gotten twenty-five or fifty from [owner of firm], correct*?
>
> LH: *Yes.*
> . . . .
>
> LH: [After confirming with someone in the background] *Twenty five total . . . Twenty-five total is what we've got.*"

---

60.     Generation Now's bank records match the description of the checks discussed during ███████████. Subpoenaed bank records from Generation Now's account show, indeed, that at the time of the call, a check for $25,000 from payday lending company (written on October 18, 2017) had been deposited into the Generation Now account. Clark's reference to "[the owner of the firm]" was a reference to president of the company, which wrote the $25,000 check. The reference to "Jeff" during the ██████████ is likely a reference to Jeff Longstreth. During another portion of the same ██████████, Householder and Clark discussed another industry's "501(c)(4)." Householder confirmed to Clark during the call that this entity gave 30,000 to "the (c)(4)." Again, Generation Now's bank account revealed a $30,000 check (written on October 19, 2017) from the entity that was deposited into the Generation Now account prior to the ██████████.

61.     Householder's connection to Generation Now was further clarified during a call on February 5, 2018 between Householder and Clark, during which Householder again inquired about "(c)(4) money." Specifically, Householder stated, "*I'm sitting here with [Associate 2] . . . we're talking about (c)(4) money, and we're trying to figure out where the payday lenders were going to be at. Can you help me with that?*" Associate 2 is the Finance Director for Householder's campaign; text communications show that he/she solicited and collected money for Generation Now, and he/she was paid out of the Generation Now account. This call is consistent with the January 10, 2018 call with Clark where Householder was seeking 501(c)(4) money from Clark's clients.

62.     Text message communications between Householder and Longstreth also show that Householder controlled Generation Now. For example, in a June 12, 2019 text message, Householder asked Longstreth, "*When does the Gen Now TV message change? I think it is burnt in - well burnt in.*" Longstreth responded, "*They are working on a draft now. Polling shows it's working.*" Similarly, on June 23, 2019, Householder texted to Longstreth that "*Gen Now has had issues,*" explaining that "*I've had several members - including members of House leadership come in privately and discuss their concern over next years [sic] House campaigns based on HB 6 messaging, mail, TV and radio.*" In addition, Householder sent messages to Longstreth asking about "*running positive radio*" for a member, explaining, "*[g]ot to protect the troops – especially make sure they believe we are protecting them.*" These text messages show that Householder is involved in Generation Now media buys to further HB 6. They also show that the pressure the Enterprise was putting on House members through Generation Now media efforts to further HB 6 created political problems for some House members, and those members went directly to Householder to voice their "concern" about Generation Now's activities.

63.     Finally, search warrant returns also confirm that Householder is involved directly in Generation Now. For example, a Word document originally created by Longstreth on February 5, 2017 and titled "Friends of LH Meeting Template," listed a meeting agenda for the Friends of Larry Householder campaign, and on the same page of the Word document and directly below, a meeting agenda for Generation Now. According to the template, the Friends of Householder campaign listed Associate 1, Householder, and Staffer[16] as "Attendees" of a Monday meeting that lasted from "11-12:00pm" (highlights in original)[17]:

---

[16] ████████████████████████████████████

[17] The investigation indicates that Enterprise members refer to Householder in writing as "SLH."



64. The meeting involved discussion about fundraising and member recruitment, among other things. The Generation Now meeting—detailed directly below on the same, two-page Word document—listed Householder, Longstreth, and Associate 1 as "Attendees" of that meeting, which was scheduled one hour later from "12:00-1:00":

65. The format of the Generation Now meeting was the same as the Friends of Householder[18] meeting and involved discussion about fundraising, messaging, budget, and campaigns, among other things. This document shows that, immediately after he met with his campaign staff, Householder met personally with his Enterprise members and associates about their collective efforts involving Generation Now, further showing Householder's direct involvement and connection with Generation Now.

### III. Enterprise Used Company A Payments to Increase Householder's Political Power

66. The Householder's Enterprise benefitted from Company A's money by spending Company A-to-Generation Now funds to back Householder-selected candidates who would help elect Householder as Speaker. The Enterprise also used the money to pay for part of Householder's own campaign.

#### A. Building Team Householder

67. Members of the Ohio House of Representatives serve two-year terms, and are limited to four, consecutive, two-year elected terms. At the end of 2018, the then-current Speaker would be term-limited and the legislature would elect a new Speaker to begin the 2019 legislative session. The investigation shows that by the end of 2016, the Enterprise implemented a strategy for Householder to take over the Speakership in 2019.

---

[18] "Friends of Householder" is the name of Householder's public campaign committee.

68.    The Enterprise's strategy included raising money through a "C4" and recruiting candidates who, if elected, would support Householder for Speaker.  Documents such as "Game plan 2018," possessed by Longstreth illustrate this point:

> Hit the ground running with C4 working as the recruitment and fundraising arm.
>
> Most races are over by September of the off year.
>
> The only things that matter right away are raising money and recruiting candidates
>
> Need a couple of really good allies.
>
> Need a kitchen cabinet.
>
> What does the team look like today?
>
> ████████ won it for ████ who is our ████████ ████ ?
>
> What's the sales pitch for Members/Donors?
>
> What's the pitch for Conservatives v Moderates?
>
> Who are the ideal candidates?

69.    That this document was created in October 2016, a few months before Longstreth opened the Generation Now account in February 2017, shows that the Enterprise followed this strategy and its level of commitment in so doing.  The question "who is our [redacted]" is a reference to the wealthy, financial backer of the then-current Speaker; and thus, the Enterprise is asking in its "Game plan 2018" document, "who will be our financial backer?" Longstreth's proposed option, "[redacted]?" is the CEO of Company C, which is a company whose interests align with Company A.

70.    To implement the two-fold strategy of recruitment and fundraising, the Enterprise needed to recruit a team of electable candidates who would support Householder's bid for speakership.  A combination of financial records, documents recovered from search warrants, media reports, legislative records, and witness interviews show that the Enterprise selected a group of candidates to run for open seats in the primary against supporters of Householder's rival, Representative 1, who was backed by the then-current Speaker.  The Enterprise managed the selected candidates' campaigns, paid to staff them, and designed and paid for their mailers and commercials. The Enterprise spent Generation Now money on approximately 21 different candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.[19]  Most of these candidates won the 2018 general election.  All who won voted for Householder as Speaker; and all but two, voted for the legislative bailout for Company A.[20]

---

[19] Some of the candidates supported in the primary election were not supported in the general election, which based on my training and experience is likely because the candidates were in safe districts and would prevail without spending resources on the campaign.

[20] ████████████████████████████████████████████████
████████████████████ .

71. Additionally, Householder's political campaign benefited from Company A-to-Generation Now money directly in two ways. First, Company A-to-Generation Now money was used to pay for staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder. Not having to pay staff salaries using campaign dollars gave Householder a competitive advantage against his opponents. Secondly, Householder benefited because Company A-to-Generation Now money, which passed through the PAC, purchased advertisements for Householder's race for the 72nd district. In total, at least $97,000 was spent by the Enterprise on Ohio house district 72 between April 16th and April 25th to purchase direct mail and radio advertisements.

72. Documents recovered from Longstreth show the Enterprise's planning and preparation in building Team Householder. For example, a document entitled "Team Skills," which was last modified in February 2018, proposed a list of individuals for a leadership team for 2019, including Speaker of the House, Speaker Pro Tempore, Majority Floor Leader, Assistant Majority Leader, Majority Whip, and Assistant Majority Whip. After Householder was elected Speaker in 2019, all of the individuals, except for one, became part of Householder's leadership team. (The exception was a representative who did not support Householder for Speaker).

73. In terms of the actual candidates selected to be part of Householder's team, agents recovered numerous documents from Longstreth, which listed largely the same select group of candidates, such as one entitled "2018 Official Primary Matchups," that provide evidence of the recruitment and vetting process. Agents recovered dozens of similar documents, which referred to this group of candidates as "recruitment updates," "our team," or "Team Householder." Regardless of the name, however, it is clear the Enterprise considered the election of these candidates an integral part of its strategy for a Householder Speakership.

74. Notably, Longstreth's list mirrored House members that Company A intended to support in the 2018 election. For example, a Word document in Cespedes' possession, titled "Householder" and created May 8, 2018 at 10:49pm—after polls closed the night of the Ohio Primary—listed the Householder candidates versus the Representative 1 candidates.

## B. Funding "Team Householder"

75. Based on my training and experience, I know that in order to execute its strategy of electing Team Householder candidates, the Enterprise needed to raise a substantial amount of money. The House's then-current Speaker had picked Representative 1, not Householder, to be his successor. As Cespedes explained in a document created March 18, 2018, "[Redacted] is a lame duck Speaker but is heavily involved in the campaign to elect [Representative 1] as the next Ohio Speaker." This meant that the war chest of the then-current Speaker had accumulated through the Ohio House Republican Organizational Committee (OHROC) would be spent on Speaker/Representative 1-backed candidates.[21] Based on my training, experience, and the

---

[21] Media reports indicate that the then-current Speaker controlled OHROC and determined how funds were dispersed. *E.g.* https://www.dispatch.com/news/2018051 O/householder-flexes-muscles-within-ohio-house-gop. Bank records show funds controlled by representatives were deposited into OHROC and that corporate contributions also were deposited into the fund.

investigation, to beat the OHROC-backed candidates in the primaries, the Enterprise needed to out-fundraise them and execute successful campaign messaging for the "Team Householder" candidates.

76. An excel spreadsheet recovered from Longstreth, titled "Campaign Budget 2017-18" and last edited in September 2017, shows that the Enterprise estimated the amount needed to implement its strategy was more than $2 million:

| Position | Salary | Team Lead | FT/PT/IND | Overhead factor | Employment factor | Total Cost to employ |
|---|---|---|---|---|---|---|
| Driver | $ 10,000.00 | | IND | 1 | 1 | $ 10,000.00 |
| Research/Content | $ 108,000.00 | | FT | 1.7 | 1.25 | $ 229,500.00 |
| Finance Team | $ 72,000.00 | | IND | 1 | 1 | $ 72,000.00 |
| Political Team | $ 65,000.00 | | FT | 1.7 | 1.25 | $ 138,125.00 |
| Communications Team | $ 150,000.00 | | FT | 1.7 | 1.25 | $ 318,750.00 |
| Creative Team | $ 72,000.00 | | IND | 1 | 1 | $ 72,000.00 |
| Field/Grassroots Directo | $ 80,000.00 | | FT | 1.7 | 1.25 | $ 170,000.00 |
| Digital Media Team | $ 300,000.00 | | FT | 1.7 | 1.25 | $ 637,500.00 |
| Administrative | $ 42,000.00 | | FT | 1.7 | 1.25 | $ 89,250.00 |
| Executive Director | $ 120,000.00 | Jeff | IND | 1 | 1 | $ 120,000.00 |
| | | | | | | |
| Transportation | | $ 24,000.00 | | | | |
| Rent | | $ 91,000.00 | | | | |
| Office Supplies | | $ 12,000.00 | | | | |
| Legal | | $ 36,000.00 | | | | |
| Misc. | | $ 36,000.00 | | | | |
| i360 Data | | $ 48,000.00 | | | | |
| | | | | | | |
| | $ 1,019,000.00 | $ 247,000.00 | ######### | | | $ 1,857,125.00 |

77. Similarly, during a January 10, 2018 recorded conversation, Clark and Householder discussed their plan to "*orchestrate (c)(4) checks*" to help Householder fund campaigns for his benefit. Specifically, Clark estimated that Householder would "*need a hundred and twenty thousand per race*," to which Householder responded, "*I'd say one fifty, but yeah, you're in the ballpark.*" They then discussed how to raise the amount they need in 501(c)(4) checks to fund candidate campaigns. Clark also mentioned that, "*some people decided to help [Representative 1]*" for Speaker, to which Householder responded, "*yeah, we can fuck them over later.*"

78. Ultimately, the Enterprise funded approximately twenty-one candidate campaigns, which, using the metric discussed by Clark and Householder in the January 2018 call, meant that Householder would need to raise between roughly $2.5 million and $3.0 million to fund the campaigns.

**C. Volume and Timing of Company A Payments to Enterprise during 2018 Election Cycle**

79. At the same time the Enterprise worked on a "game plan" to secure Householder's ascension to Speakership, Company A needed a solution for its Ohio nuclear plants. The investigation shows that the Enterprise and Company A formed, what Company A-1 lobbyist

Borges called, "an unholy alliance."  Company A funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants.

80.     The volume of Company A's payments, the timing of these payments, communications and coordination amongst co-conspirators and Company A, the official action taken by Householder, and the actions to maintain the official action, show the corrupt arrangement was Company A  funding Householder's speakership bid in exchange for a legislative fix.

81.     As described above, the vehicle to collect the vast amounts of money needed for Householder's Speakership bid was Generation Now.  From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Enterprise received approximately $4.6 million into Generation Now.  More than half of that money came from Company A or the Energy Pass-Through, fully funded by Company A.  More than a half million of the remaining money came from energy-related entities that either had a relationship with Company A or an interest in the bailout legislation.  The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

82.     The investigation shows Company A made regular, quarterly payments of $250,000 into Generation Now's main bank account almost immediately after Longstreth opened it in 2017.  But, in March 2018, approximately two weeks before Company A's Corp. affiliates filed for bankruptcy, Company A began funneling payments to Generation Now through Energy Pass-Through.  The payments wired from Company A Service Co. into the Energy Pass-Through originated from account x6496, the same account used to wire payments directly from Company A Service Co into Generation Now.  In the final month before the 2018 general election, Company A dropped another $500,000 into the Generation Now account.  This time the money was paid by check from account x4788.[22]  The payments from Company A from 2017-2018 are summarized below.

---

[22] Bank records indicate that x4788 is also a Company A Service Co. account.  For example, the checks to Generation Now from x4788 were signed by the Senior VP and CFO for Company A Service Co, who is now the President of Company A Corp.

| | | | |
|---|---|---|---|
| March 16, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| May 17, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| August 10, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| December 8, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| March 15, 2018 | $300,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| May 4, 2018 | $100,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| August 8, 2018 | $54,000 | wire | Coalition (originally from Co. A Service Co. x6496 through Energy Pass-Through) |
| August 16, 2018 | $500,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| October 9, 2018 | $400,000 | check | Company A Service Co. (x4788) |
| October 29, 2018 | $100,000 | check | Company A Service Co. (x4788) |
| **Total:** | **$2,454,000** | | |

83.    In addition, Company A Service Co. paid the Enterprise an additional $500,000 to Dark Money Group 1 on October 29, 2018, bringing the total that Company A paid to the Enterprise through Generation Now in 2017-2018 as $2,954,000.[23]

84.    Toll records corroborate the close coordination between the Enterprise and Company A during the 2018 primary, even though the payments were sent via Energy Pass-Through.  For example, several days before a $300,000 payment through Energy Pass-Through on March 15, 2018, multiple communications between Householder and Company A occurred:

| Date | Time | Caller | Called Party | Duration |
|---|---|---|---|---|
| March 12, 2018 | 14:03 | Householder | Sr. VP of External Affairs for Company A Service Co. | 24 seconds |
| March 12, 2018 | 15:06 | Sr. VP of External Affairs for Company A Service Co. | Householder | 3:03 minutes |
| March 12, 2018 | 15:11 | Sr. VP of External Affairs for Company A Service Co. | Householder | 9 seconds |
| March 12, 2018 | 16:59 | Householder | Ohio Director of State Affairs, Company A Corp.[24] | 11:34 minutes |

---

[23] This number does not include $90,000 that Company A paid to the Coalition on March 21, 2017 and $300,000 that Company A paid to the Coalition on May 1, 2018 (through Energy Pass-Through).

[24]

| Date | Time | Caller | Called Party | Duration |
|---|---|---|---|---|
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 0 seconds |
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 13 seconds |
| March 12, 2018 | 19:55 | Householder | Ohio Director of State Affairs, Company A Corp. | 11:17 minutes |
| March 13, 2018 | 17:22 | Sr. VP of External Affairs for Company A Service Co. | Householder | 1:32 minutes |
| March 13, 2018 | 17:24 | Sr. VP of External Affairs for Company A Service Co. | Householder | 56 seconds |
| March 15, 2018 | Energy Pass-Through Payment for $300,000 | | | |

85.     A similar pattern occurred with respect to the May 4, 2018 payment of $100,000 through Energy Pass-Through, just days before the May primary, this time between Longstreth and Company A:

| Date | Time | Caller | Called Party | Duration |
|---|---|---|---|---|
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 0 seconds |
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 3 seconds |
| April 27, 2018 | 10:55 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:47 minutes |
| April 27, 2018 | 13:37 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:56  minutes |
| April 28, 2018 | 10:38 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 1:30 minutes |
| April 28, 2018 | 11:40 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:14 minutes |
| April 30, 2018 | 9:11 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:11 minutes |

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| May 1, 2018 | 18:41 | Ohio Director of State Affairs, Company A Corp. | Longstreth | 15:49 minutes |
| May 3, 2018 | 22:09 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:10 | Longstreth | Ohio Director of State Affairs, Company A Corp. | Text |
| May 4, 2018 | 6:18 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:25 | Longstreth | Ohio Director of State Affairs, Company A Corp. | 14:12 minutes |
| May 4, 2018 | Energy Pass-Through Payment for $100,000 | | | |

86.     Toll records around this period do not otherwise show regular contact between Householder and Company A employees or Longstreth and Company A employees, further demonstrating the significance of these calls.

**D. Enterprise Spending Company A Money on Spring 2018 Election**

87.     Not only was the volume of the Company A payments critical to the Enterprise's efforts, but the timing was also significant. As noted above, during the 2018 election, the then-current Speaker was a lame duck Speaker, who had picked Representative 1 to be his successor. Thus, the Enterprise needed a substantial amount of money to beat the Representative 1 candidates in the May primary election. Company A came through, paying the Enterprise $1.4 million before the May 8, 2018 primary date.

88.     But the Enterprise's ability to capitalize on an unexpected opportunity that arose a month before the primary election date also demonstrates how critical the volume and timing of payments from Company A was. On April 12, 2018, about a month before the primary, the then-current Speaker abruptly resigned. The Enterprise seized upon this opportunity.

89.     Because of the money accumulated in the Generation Now war chest, the majority of which came from Company A, the Enterprise was able to move close to $1 million in the three weeks before the primary. In fact, the same day that the Speaker resigned, bank records reveal that the Enterprise wired $750,000 to the PAC. (That wire followed a $250,000 wire Generation Now sent to the PAC in early April.) The majority of the $1 million from Generation Now was wired to a media services company and a political strategy firm for media buys and mailers for Team Householder candidates. In addition, Generation Now wired $234,450 to JPL in three increments between April 12 and May 7, adding to the already $775,054 it wired to JPL in the first quarter of 2018. This money also was mostly spent on the campaign to elect Team Householder

candidates. The disbursements from Generation Now and their relative distribution dates to the PAC and JPL leading up to the primary were as follows:

| | | | |
|---|---|---|---|
| Jan. 29, 2018 | Generation Now | $109,513 wire | JPL |
| Jan. 30, 2018 | Generation Now | $14,514 wire | JPL |
| Feb. 21, 2018 | Generation Now | $109,513 wire | JPL |
| Mar. 12, 2018 | Generation Now | $132,000 wire | JPL |
| Mar. 22, 2018 | Generation Now | $200,000 wire | JPL |
| April 2, 2018 | Generation Now | $250,000 wire | PAC |
| April 5, 2018 | Generation Now | $209,513 wire | JPL |
| **April 12, 2018** | **Speaker resigns** | | |
| April 12, 2018 | Generation Now | $750,000 wire | PAC |
| April 12, 2018 | Generation Now | $109,513 wire | JPL |
| April 19, 2018 | Generation Now | $71,337 wire | JPL |
| May 7, 2018 | Generation Now | $53,600 wire | JPL |
| **May 8, 2018** | **Ohio primary** | | |

**Total: over $2 million**

90.     Phone records corroborate the fact that the Speaker's resignation marked a significant moment of mobilization for the Enterprise, which was made possible because of the payments from Company A. On the day of the Speaker's resignation, Householder and Longstreth had a 31-minute call. Shortly thereafter, they both began making the rounds. Householder contacted Company A Service Co.'s Sr. Vice President of External Affairs, and proceeded to have a 5-minute phone call. Longstreth communicated with Company A Corp.'s Ohio Director of State Affairs, and followed immediately with a call to the attorney for the PAC and then communication with an executive of Political Strategy Firm 1. Longstreth and Householder then communicated with many Team Householder candidates throughout the day.

91.     All told, Generation Now spent more than $1.8 million on the Spring 2018 primary races—largely by funneling the Company A-to-Generation-Now money through the PAC.[25] The specific use of the money is confirmed by subpoenaed records. For example, nearly all of the Generation Now money wired into the PAC was sent to either to Media Services Company 1 or the Political Strategy Firm 1. Checks were issued from Media Services Company 1 to various radio stations for media buys. Many of these checks note the House district race related to the buy, and the district races denoted on those checks correspond with Longstreth's lists of Team Householder candidates.

92.     Not only did Generation Now spend $1.8 million on Team Householder candidates, but at least $90,000 of that money funded campaign expenses for Householder's own campaign, thus benefitting him personally, outside the context of his public campaign fund.

---

[25] This figure excludes payments to Associate 2 for salary and Generation Now rent payments to the Political Advertising Agency during the same time frame.

93.     In addition to bank records, the PAC filed an FEC mid-year report in 2018, outlining its expenditures in the primary. Although the report failed to list candidates by name—and those candidates did not report in-kind gifts or contributions from the PAC—the report did list expenditures in connection with certain Ohio House districts. And, those House Districts again corresponded with the Enterprise's candidates. The amounts listed in the PAC's FEC report, which correspond to particular House Districts, total more than $800,000.

94.     While the investigations shows that the PAC paid Media Services Company 1 and Political Strategy Firm 1 nearly the entire million dollars it had received before the Spring 2018 primary, bank records from JPL x9192 show that Longstreth also dispersed approximately $1 million of the money he received from Generation Now to media, communication, and strategy consulting companies, in support of the Enterprise's primary efforts from January to May 2018.

95.     The timing of these payments also evidence money laundering by the Enterprise in furtherance of its purposes with the payments from Company A. For example, on March 12, 2018, Generation Now wired the JPL x9192 account $132,200 for "advertising." The next day, JPL x9192 wired $132,240 to Election Marketing Company 1. Between April 5 and 12, 2018, Generation Now wired a total of $319,026 to JPL x9192, which then wired Direct Mail Company 1 $250,000 between April 6 and April 13, 2018. The evidence of money laundering is even stronger considering that Longstreth is a signatory on the Generation Now and x9192 accounts, demonstrating that he used the JPL account as a pass-through to pay the companies.

96.     Ultimately, the Enterprise's efforts were successful, with most Team Householder candidates winning their primaries. On or about July 24, 2018, a few months after the primaries, $215,000 was wired from Longstreth-controlled accounts to settle a personal lawsuit against Householder. On August 1, 2018, the same day that Householder was meeting with Company A executives in Columbus, according to documents in Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Householder and Householder Ltd. The main JPL account was funded with wire transfers from Generation Now, which was funded in large part by Company A wires. In addition, bank records show that JPL's main account also paid Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000. At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded solely by a $250,000 wire from Company A, a $25,000 deposit from the CEO of Company C, and $200 deposit from Longstreth on the date he opened the account.[26] JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

### E. Fall 2018 Election

97.     The investigation shows that, after the primaries, the Enterprise refocused its efforts on ensuring the Team Householder candidates won the general election in November. As set forth below, the Enterprise used a new corporate entity (Dark Money Group 1) to further its purposes, which was funded by Company A, Generation Now (as funded by Company A), and related interests, and then used almost all of those funds to further the campaigns of Team Householder candidates.

---

[26] As set forth above, Company C has interests aligned with Company A.

98.     First, for its part, from August to October 2018, Company A paid an additional $1.5 million into the Generation Now war chest.  As detailed in the chart above, the payments from Company A came in the form of checks or via Energy Pass-Through.  Prior to these payments, the Enterprise needed money—Generation Now had less than $4,000 in its account just prior to an Energy Pass-Through $500,000 wire in August 2018.  Just like in the primary season, Generation Now funneled a substantial amount of its Company A money through a separate entity—this time Dark Money Group 1—to run negative ads against Team Householder opponents.

99.     Within days of its incorporation in September 2018, Dark Money Group 1 opened a bank account at Huntington Bank, the same bank used by Longstreth.  A few weeks later, Generation Now wired a total of $670,000.  Bank records show that the only deposits in the account were as follows:

| October 19, 2018 | $400,000 | wire | Generation Now |
| October 24, 2018 | $150,000 | wire | Generation Now |
| October 26, 2018 | $100,000 | wire | Company B[27] |
| October 29, 2018 | $500,000 | EFT | Company A Service |
| October 29, 2018 | $120,000 | wire | Generation Now |
| October 29, 2018 | $100,000 | check | CEO of Company C[28] |
| October 30, 2018 | $100,000 | check | Individual 3[29] |
| **Total:** | **$1.47 million** | | |

100.    No other money was paid into Dark Money Group 1's account.  Again, the volume and timing of the payments from Company A proved crucial to the Enterprise's success.  Funneled through Energy Pass-Through to Generation Now, Company A infused over a million dollars into Dark Money Group 1 in the fall of 2018 alone, which allowed the Enterprise to flood the airways with negative ads against its opponents in the final days before the election.

101.    Specifically, bank records show that out of the $1.47 million deposited into the Dark Money Group 1 account, Dark Money Group 1 paid more than $1.438 million to Media Placement Company 2, a firm that bought television and radio ads in Dark Money Group 1's name.  Federal Communications Commission (FCC) records confirm the expenditures.  Specifically, public documents filed with the FCC show Media Placement Company 2 purchased more than $1.3 million worth of advertisements for Dark Money Group 1 in the ten days before the election.  Based on the television and radio stations targeted, the bulk of the media buys were spent on ads in the districts of Team Householder candidates in tight races.

102.    The strategy worked.  The clearest example comes from one highly contested House District race.  Although the Enterprise initially backed Candidate 1 in the primary, Candidate 1 lost in the Spring 2018 primary, beat by Representative 2.  In the general election, Representative 2 faced a tight race against the opposing party's candidate.  However,

---

[27] Company B is an energy company with interests aligned with Company A.

[28] Company C has interests aligned with Company A.

[29] Individual 3 does not appear to be related to Company A or have aligning interests.

Representative 2 ultimately prevailed by 137 votes. Representative 2's victory was credited to a negative ad run by Dark Money Group 1, which showed the opposing candidate taking a field sobriety test, yet only receiving a speeding ticket. The ad essentially accused the candidate of misusing his authority. Although the candidate and the police union condemned the ad, the damage was done—the opposing candidate, who reportedly had a 10-point lead before the ad aired, lost the election. Media reports credited the Dark Money Group 1 ad with tipping the scales.

103. After the election, Householder took credit for the ad against the opposing candidate, remarking to Individual 1, that he (Householder) had put $500,000 into that race in the final weeks. Householder's comment was made during a meeting after the election in November 2018, where Individual 1, who was a prospective Team Householder candidate for the 2020 election, was being interviewed by Householder. Based on this discussion, Individual 1 understood from Householder that if he/she were selected, he/she would have Householder's financial backing, just like Representative 2. This showed Householder's control over Dark Money Group 1 funds. Individual 1 has provided other information relevant to the investigation that has been independently corroborated.

104. A copy of the video ad run against the opposing candidate was recovered by agents from Longstreth. Notably, the video in Longstreth's possession appears to be a "draft" or "rough cut" of the Dark Money Group 1 ad, evidenced by the file name of the video, which appears in the left-hand corner of the recovered video. The fact that this video was recovered from Longstreth also demonstrates the Enterprise's control over Dark Money Group 1, and how the payments from Company A were spent.

105. Representative 2's race exemplifies the benefit Company A provided to the Enterprise by way of its timely payments during election seasons. However, the benefit to the Enterprise was not limited to the cash infused to Dark Money Group 1. Generation Now paid Longstreth another $809,000 between the time of the May primary and November election. Through JPL, Longstreth paid himself, his associates, and a number of campaign managers working on the campaigns of Team Householder candidates. Indeed, CHS 1, who has provided reliable and credible information corroborated by the investigation, advised that he/she was working on the campaign of a Team Householder candidate during the fall 2018 general election, but that CHS 1 was paid by Longstreth. (Subpoenaed records confirm the main JPL account, which had received money from Generation Now, paid the CHS.) This shows that Company A-to-Generation-Now money was used by the Enterprise to benefit Team Householder candidates—thus, providing a benefit to Householder himself. Longstreth also paid several media, communications, strategy and direct mail groups. Besides Dark Money Group 1 and JPL, Generation Now also paid rent to Political Advertising Agency and $10,000 a month to Associate 2 for "fundraising."

106. Ultimately, the Enterprise's "Game plan 2018" worked. By coordinating and financially backing the Team Householder candidates using Company A money, the Enterprise helped elect a group of representatives loyal to Householder. All of the candidates who were financially supported by the Enterprise and won in the 2018 general election voted to make Householder, instead of Representative 1, Speaker. With their votes, Householder secured the

32

Speakership in 2019.  And, as described in the next section, two of the Team Householder candidates carried the Company A legislative bailout for him.

## II.     The Bailout:  Enterprise Passes Legislation for Company A

107.    Having secured Householder's power as Speaker, the Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with Company A—passing nuclear bailout legislation.  In fact, on January 7, 2019, the day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation.[30]  Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

108.    The Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by Company A, through payments to Generation Now. While HB 6 was pending in the House, Company A wired Generation Now $9,500,000.  When the bill was pending in the Senate, Company A wired Generation Now $7,358,255.  And, to fund its efforts to defeat the Ballot Campaign, Company A wired an additional $38,000,000 to Generation Now.  The volume and frequency of these payments provide further evidence of the Enterprise's corrupt arrangement with Company A.  These facts, including the Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and Company A's involvement and coordination funding these efforts, are set forth fully below.

### A.  House Bill 6

109.    Consistent with their agreement, the Enterprise implemented a strategy to pass a legislative fix for Company A shortly after Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation—HB 6—through the House and pushing the Senate to agree.  First, Householder picked freshman representatives, which Householder helped elect by using Company A-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft.  Second, Householder created a new subcommittee to hear the bill, which was comprised mostly of Householder supporters.  Third, the Enterprise engaged in an expensive media blitz, funded by Company A-to-Generation-Now payments, to pressure public officials to support the bill.   Fourth, Householder strong-armed House members, particularly opponents of the bill.  Finally, Householder and the Enterprise pressured Senators to pass the legislation.  The expediency and funding of this legislative effort and the tactics used by the Enterprise—along with timely communications between Enterprise members and agents of Company A—are further evidence of the agreement between Householder and Company A.

110.    This is precisely what Enterprise-member-and-Company A-lobbyist Juan Cespedes planned.  In a Word document agents recovered from Cespedes titled "Ohio Legislator Background" and authored May 3, 2018, Cespedes referenced Householder as a "*current*

---

[30] https://www.daytondailynews.com/news/state--regional-govt--politics/larry-householder-elected-new-ohio-house-speaker/a3ltKxDAm3jT5HTd7vrDWK/

*candidate for Ohio Speaker*," and noted that, "*he is willing to work on energy legislation. Traditionally close to Company A*." In another document titled "Ohio Fundraising Suggestions" and created on September 6, 2018, Cespedes suggested that Company A should continue to support the "Larry Householder Caucus" financially because "*Householder has a history of favorably rewarding those who provide both early and late money into his efforts*." Cespedes mentioned in the document that Company A's CEO had a conversation with Householder "*where [CEO] suggested that we would/should independently support him as Company A-1*." Cespedes also laid out Company A's aspirations for the bailout legislation in a document titled "[Company A-1] Ohio 1st Draft Timeline" and authored by Cespedes on November 20, 2018. In this document, Cespedes wrote that although the next Speaker remains unclear, there should be "Speaker's race clarity mid-December" 2018, and "*[i]f Householder is successful, the effort will likely be led from his Chamber*," with "*potential legislative introduction*" for [Company A-1] in early 2019.

### i. House Bill 6 Background

111. On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced. Although titled "Ohio Clean Air Program," the investigation shows that HB 6 essentially was created to prevent the shutdown of Company A's nuclear plants. HB 6 creates the Ohio Clean Air Program, which allows nuclear or solar clean air resources to apply to be certified clean air resources, and therefore, eligible for a subsidy of $9 per megawatt hour produced. In order to pay for the subsidy, the Ohio Air Quality Development Authority, which is tasked with administering the Ohio Clean Air Program, will institute and collect a monthly fixed charge to all residential, commercial, industrial, and large consumers. The fixed fee is projected to produce $140 million annually for the first year, then $200 million annually thereafter.

112. Ohio currently has six solar facilities over 50 megawatts of nameplate capacity, which serves as the minimum threshold necessary to apply to receive the subsidy. They produce a combined 1,095 megawatts of power. For comparison, the Company A-1 nuclear plants produced a combined 18,315,007 megawatts in 2018. Given the power produced, Company A-1 would collect approximately 94% of the subsidy, which total more than $160 million annually. Newspaper reporting throughout the state characterized HB 6 as a "bailout" for the benefit of Company A-1 specifically.[31] Clark also characterized HB 6 as a bailout for Company A.

113. Under HB 6, the subsidy will be dispersed at the direction of the Ohio Air Quality Development Authority. As passed, HB 6 will add six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen. Pursuant to HB 6, three of those new appointees will be selected by the Speaker of the House.

---

[31] *See* https://www.cincinnati.com/story/news/politics/2019/05/29/ohio-house-passes-nuclear-plant-bailout /1270558001/; https://www.toledoblade.com/local/environment/2019/06/03/Protesters-oppose-House-Bill-6/ stories/20190603170.

ii.    Householder "Crafts" HB 6 and Creates Subcommittee for HB 6

114.    Freshman representatives, Representatives 3 and 4, who were elected in November 2018, sponsored HB 6. Both were "Householder" candidates and Generation Now spent money supporting both by paying for advertising, campaign strategy, and staffing.[32] Although Householder was not a listed sponsor of the legislation, on the day of the introduction, he publically supported the legislation and gave a press conference to explain how it would affect Ohio. During the recorded press conference, Householder characterized HB 6 as "*the mysterious energy bill we've been working on for quite a while in the House of Representatives.*"

115.    Householder further admitted during the April 12, 2019 press conference that he "*crafted*" the legislation with the freshman representatives. Specifically, when Householder was asked where the amount of the subsidy came from, Householder responded, "*it's based on our brains. For me, I look back, for two years I've had this in my head, and I've had various versions on that white board over the last several months. And as I talked with [the freshman representatives], we were able to define it even closer.*" As described above, Householder received his first $250,000 payment from Company A in March 2017, roughly two years prior to introduction of the bill.

116.    HB 6 was referred to the House Energy and Natural Resources Committee after introduction. But during the Committee's first meeting, HB 6 was then referred to a newly created subcommittee, the House Energy and Natural Resources Subcommittee on Energy Generation (the "Energy Generation Subcommittee"). Householder publically announced that he would form a subcommittee on energy generation on February 6, 2019 in conjunction with a press release about House rules for the 133rd General Assembly. Two days later, Householder formalized the Energy Generation Subcommittee in a press release announcing the committee assignments of House members. Since its inception, the subcommittee only has been assigned one bill—HB 6. At the April 12, 2019 press conference, Householder admitted that HB 6 "*is why that Subcommittee was created.*"

117.    Eight House members were assigned to the Energy Generation Subcommittee. Six of the eight members had voted for Householder for Speaker. The two members who did not record votes for Householder signed on to be co-sponsors of HB 6. In the end, all but two members of the subcommittee voted to pass HB 6.

118.    The subcommittee held four meetings on the legislation, before referring the bill back to the full House Energy and Natural Resources Committee on May 2, 2019 with a substitution. HB 6 then had multiple committee meetings within the House Energy and Natural Resources Committee, and was amended further before being referred back to the House floor less than a month later on or about May 23, 2019.

119.    After HB 6 was referred from committee on May 23, 2019, it was subsequently referred to another committee for a substitution—the Rules and Reference Committee, which is run by Householder. Generally every bill going from a substantive committee to a floor vote

---

[32] Representative 3 also received $18,700 in direct contributions to his campaign account from Company A.

passes through the House Rules and Reference Committee to receive a date for a floor vote. However, it is unusual for a bill to be amended during such passage.  Based upon my training and experience, once a bill has been vetted by committee and recommended for passage, it is uncommon for it be amended in another committee.  For context, the House Energy and Natural Resources Committee and Energy Generation Subcommittee held ten committee meetings and heard testimony from dozens of stakeholder groups before amending the legislation, a process lasting just under sixty days.  But, on May 28, 2019, HB 6 was referred to the Rules and Reference committee, and was amended through the introduction of a substitute bill.

120.     Among other things, the substitute bill added a provision permitting an electric company with taxable property that is fueled by nuclear power (a company such as Company A) to file a petition for a reduction in taxable property value.  This provision was an added benefit to Company A Corp.

121.     After its final set of substitutions, HB 6 returned to the House floor—the same day that HB 6 was amended by the Rules and Reference House Committee chaired by Householder— where it was scheduled to be voted out on May 29, 2019.  When a vote was called, the House elected to informally pass, which based on my training and experience, I know is a procedure used by Speakers to reschedule legislation that would have failed to pass if a vote were taken at the time of roll call.  When an informal pass is taken, further negotiations and compromises are necessary for the Speaker to acquire the necessary votes for the bill to pass.  After the informal pass was taken, the House stood at recess.  Based on my training and experience, this shows that Householder did not have support for passage of the bill in the House at that time.

122.     The Speaker gained support for passage later that day, likely through the pressure tactics described below.  Upon returning from the aforementioned pass, HB 6 was amended four additional times.  After those amendments, HB 6 was called to vote by the Speaker and passed 53-43.

### iii.     Generation Now Media Blitz to Provide "Cover"

123.     The uncertain path to passage is significant.  To members of the Enterprise, there was a real possibility, up until the final vote, that HB 6 would not pass.  The investigation shows that, during this time, the Enterprise created a media campaign costing approximately $15 million dollars.

124.     The Enteprise's media campaign demonstrates the significance of HB 6 to the Enterprise, and thus, provides further evidence of the corrupt arrangement with Company A. Documents possessed by Longstreth show that the Enterprise had budgeted for an 8-week campaign, where the "overall budget would be $15-16m for a full burn." The media campaign was designed to pressure legislators to vote for HB 6 by targeting their constituents.  The media campaign urged Ohioans to contact their representatives to save jobs in Ohio and protect their communities from "big oil."  The campaign provided cover for those representatives who were voting for HB 6 and applied constituent pressure to unsupportive House members and those who were undecided.

125.    Bank records and text messages between Longstreth and Cespedes show that Company A funded the entire campaign.  For just the House portion of the media blitz, Company A wired approximately $9.5 million into the main Generation Now account between April and May 2019:

| | | | |
|---|---|---|---|
| April 30, 2019 | $1,500,000 | wire | Company A Service Co |
| May 7, 2019 | $1,500,000 | wire | Company A Service Co |
| May 15, 2019 | $2,500,000 | wire | Company A Service Co |
| May 22, 2019 | $2,500,000 | wire | Company A Service Co |
| May 29, 2019 | $1,500,000 | wire | Company A Service Co |
| **Total:** | **$9,500,000** | | |

126.    Text messages recovered from Longstreth show communications with Cespedes about the $15 million budget:



127.    The money from Company funded a media blitz—television ads, radio ads, mailers, and digital media—with all of the Company A money running through the Enterprise, which got paid for the work.

128. Based on my training and experience, the fact that Generation Now, the Speaker's 501(c)(4) entity, conducted the media campaign is significant. First, it is further evidence of the corrupt relationship with Company A—the Enterprise likely would not be spending millions of dollars from Company A that was passed through a 501(c)(4) account for the benefit of Company A's main legislative priority absent an agreement with Company A. Second, it allowed the Enterprise to control the messaging in a way that would benefit the Enterprise and provided the autonomy to spend the money how it deemed appropriate. Third, based on my training and experience, it solidified Householder's political power by showing members the strength and reach of his political operation. Finally, the members of the Enterprise financially benefited from this arrangement.

129. The messaging of the media campaign focused on the loss of jobs if HB 6 did not pass, and urged constituents to contact their representatives to support HB 6. The media campaign also claimed that not passing HB 6 would allow "big oil" to harm constituents' communities. In the search warrant return from Longstreth's possession, the FBI recovered a draft script for a Generation Now HB 6 commercial to run in the districts of two representatives from the Cincinnati area (highlights in original):



130. The draft transcript was written on the letterhead of Political Advertising Agency 1, which is consistent with publicly filed FCC documents, showing television ad time purchased

by the Political Advertising Agency or its sister company, Media Placement Company 1 during this timeframe. For example, Media Placement Company 1 purchased $63,105 of airtime on Generation Now's behalf, from WKRC Channel 12 in Cincinnati, beginning on May 24, 2019. WKRC airs in the representatives' districts. The content shows Householder and the Enterprise influencing public officials through the ad buys.

131. The media campaign was successful and provided "cover" for Householder supporters to vote in favor of a bailout they otherwise may not support. In fact, Representative 3, a freshman sponsor of the bill, texted Longstreth after the vote and celebration about "the cover":



132. Likewise, Householder himself acknowledged the importance of "protecting" the representatives who had voted in favor of HB 6. A little more than two weeks following HB 6's passage from the House, Householder texted Longstreth to inquire as to whether "we" were running positive advertisements for Representative 5, who had voted "yes":



133.    The exchange about the representative is particularly interesting given that Representative 5 voted against Householder for Speaker, but supported HB 6. Thus, Householder's message appears to convey a newfound allegiance for a representative who voted for HB 6, thus showing HB 6's significance to Householder. The exchange also showed Householder's direct involvement in the Enterprise's messaging and media campaign and Householder's understanding that public officials know that Householder is behind Generation Now messaging.

134.    The media campaign was effective in using constituents to pressure the targeted representative. For example, even mailers that unexpectedly arrived after the vote prompted constituents of "no" voters to call and complain. For example, Representative 6, angrily contacted Longstreth about a mailer that arrived in his district after the vote, urging Representative 6 to have the "courage" to save jobs and vote for HB 6.





135.    The text exchange also shows that Representative 6 knew exactly who to contact about the Generation Now ads.  The same day, after receiving Representative 6's angry texts,

Longstreth texted Householder to warn him about what had happened in Representative 6's district.



This further shows Householder's involvement in using Generation Now money for mailers targeting public officials to support HB 6.

### iv. Householder Attempts to Gain Votes for Bailout

136. The investigation provides probable cause to believe that Householder and the Enterprise attempted to influence and provide advice to legislators in an effort to pass HB 6 after receiving millions of dollars from Company A.

137. Representative 7 was one such legislator who was contacted directly by Householder to gain support for HB 6. On or about Tuesday, May 28, 2019—the same day that HB 6 was sent to the Rules and Reference House Committee chaired by Householder—I interviewed Representative 7, a current member of the Ohio House of Representatives. Representative 7 advised that HB 6 had been handled unlike any legislation that Representative 7 had seen before. Representative 7 advised that Householder had been attempting to secure yes votes for HB 6 for several weeks. According to Representative 7, despite his efforts, Householder did not have enough votes to pass HB 6. Representative 7 was aware of fourteen Republican Caucus members who had committed to be no votes and was aware of only two Democratic members who would vote yes. Representative 7 felt the bill would not pass unless something drastic changed.

138. Representative 7 also explained that he was in frequent contact with Clark, at the direction of Householder. Representative 7 explained that Clark is a close advisor of Householder, and was working with Representative 7 extensively on a piece of legislation unrelated to HB 6. Representative 7 felt it was unusual and odd that Clark was assigned by Householder to work with a member on legislation, instead of House policy staff, but complied with Householder's request. Clark and Representative 7 had daily contact, and Representative 7 felt that they had become friends.

139. On the day before the meeting with Representative 7, Clark had spoken with Representative 7. According to Representative 7, Clark warned him not to vote against HB 6. Clark told Representative 7 that people who vote against Householder lose a lot, including committee chairmanships, caucus financial aid, and that their legislation may not continue to legislatively progress. Representative 7 relayed that he was unsure if the information from Clark

was meant to be a threat from Householder, passed to him via Clark, or if it was a warning from a friend.

140.    During the interview, Representative 7 received a text message from Householder, which said:



Representative 7 showed FBI Agents, including me, the message when it was received. Representative 7 then responded to the text, addressing Representative 7 by his title, politely reiterating Representative 7's contrary position. Householder immediately responded, "*I just want you to remember – when I needed you – you weren't there. twice.*" These messages show that Householder was attempting to gain legislative support vote for HB 6.

141.    Representative 7, later provided screen shots of the aforementioned text message exchange with Householder. The screen shots matched the messages Representative 7 showed FBI agents during the interview. In addition, Representative 7 provided a screen shot of the stored contact information for the sender of the text messages, Householder. That contact information contains Householder's name and phone number.

142.    The day after I interviewed Representative 7, HB 6 passed.

143.    Representative 7's statements about Householder's active interest in HB 6 were corroborated by a recorded conversation involving Clark referenced above, on or about May 31, 2019. During the call, Clark first confirmed that the "clean air bill" was really "a nuclear plant bailout." Clark then mentioned Representative 7 by name, stating that Householder had called Representative 7 three or four times about the vote and that Clark then had to meet with Representative 7 about the vote. Clark relayed that he told Representative 7 that Householder would not let Representative 7 carry separate legislation unless he voted for the energy bill. Clark then stated that Representative 7 decided to vote against the bill and Householder was very angry.

144.    In a subsequent recorded call, Clark elaborated about Representative 7. Clark stated that Householder had told him (Clark) that Clark was going to have to get Representative 7's vote on HB 6. Clark then called Representative 7, who told Clark he could not vote for HB 6. When Representative 7 tried to explain why, Clark told him, "No one cares about your opinion." Clark further explained that Representative 7 tried to call Householder a few days later and tried to negotiate with him. Householder asked Clark what he should do and Clark told Householder to kill Representative 7's bill.

44

145.    On May 31, 2019, Representative 7 contacted me and indicated that he had been instructed to delete certain messages sent to him by Householder.  This message was delivered to Representative 7 through a third party, ███████████████████████████████████ Individual 2, who communicated a message from Jeff Longstreth.  Representative 7 told me that Longstreth was charged with managing Householder's campaign operations.  That included both his individual campaign, and the campaigns of all Republican candidates throughout the state. This is corroborated by the Enterprise's use of Generation Now to support House member campaigns.

146.    Specifically, Individual 2 told Representative 7 that he (Individual 2) had spoken to Longstreth earlier that day.  During their conversation, Longstreth reportedly told Individual 2 to instruct Representative 7 to delete the text messages that he received about HB 6 from Householder.  If Representative 7 complied with this instruction, all would be forgiven in terms of his vote against HB 6.  Individual 2 then relayed the message to Representative 7.  Upon receiving the message from Individual 2, Representative 7 was immediately concerned and contacted me. Representative 7 relayed the message delivered by Individual 2.

147.    Toll records corroborate the instruction that Representative 7 received to delete his messages.  Specifically, toll records show that Longstreth contacted Individual 2 at 8:29AM, 11:21AM and 8:14PM.  The 8:14PM call lasted for 6 minutes and 53 seconds, immediately after which, Individual 2 contacted Representative 7.  That call lasted for nearly 10 minutes. Immediately after the call with Individual 2 ended, Representative 7 contacted me.

148.    For context, Householder maintained control of the Enterprise and OHROC, which Householder renamed the House Republican Campaign Committee (HRCC).  As outlined in this affidavit, Householder's Enterprise selects political candidates and supports their election efforts. That support comes in a variety of forms, including individual campaign contributions, money and staffing from HRCC, and dark money resources provided by the Enterprise. Overwhelmingly, the candidates selected by the Enterprise are successful in their election or reelection efforts. Therefore, based on my training and experience, not complying with a command from Householder, and as a result losing your support or worse having an opponent supported, would decrease the chances of reelection.

### v.   The Enterprise Pressures Senators to Pass HB 6

149.    HB 6 passed the House on May 29, 2019.  In reference to HB 6, Company A-1 released a statement on May 29, 2019:  "*This bill provides an effective legislative solution to keep [Company A-1's] nuclear power plants open for many years to come, while preserving 4,300 highly-skilled jobs and an important revenue source*."  The statement went on, "*Until the Senate vote, [Company A-1] will continue to engage in a constructive dialogue with legislators about the need to protect 90% of the state's zero-emissions electricity and provide the majority of Ohioans considerable savings on their electricity bills*."

150.    The day after Company A-1's press release, HB 6 was introduced to the Ohio Senate.  Although HB 6 passing the House helped the Enterprise maintain its agreement with Company A, it did not fulfill the agreement.  Rather, the Enterprise needed to ensure HB 6 passed the Senate and was signed into law.

151.    Shortly after the bill was introduced in the Senate, the Enterprise began pressuring for Senate passage.  To fund the effort, Company A wired more than $7 million into Generation Now, which records show used the money, in part, for polls, media buys, and mailers:

| | | |
|---|---|---|
| June 5, 2019 | $2,000,000 | wire from Company A Service Co. |
| June 13, 2019 | $1,361,899 | wire from Company A Service Co. |
| June 20, 2019 | $2,116,899 | wire from Company A Service Co. |
| July 5, 2019 | $1,879,457 | wire from Company A-1. |
| **Total:** | **$7,358,255** | |

152.    Text messages from Longstreth recovered during the investigation show that Company A had budgeted for, and was paying for the costs associated with the campaign to pass HB 6 through Senate.

153.    The Enterprise's efforts regarding the Senate began a few days after HB 6's House passage.  On June 3, 2019, Longstreth pulled the "whole HB 6 team" together for a strategy session.  This meeting appears to have been partially prompted by Householder's response to the negative press the passage of HB received.





154.    Following the above message and phone call from Householder, Longstreth texted Company A-1 lobbyist Cespedes: "*Speaker has asked me to pull together the whole HB 6 team on Monday. Are you available?*" Longstreth added, the "*Speaker is on a rampage.*" Cespedes responded, "*Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol.*" After Longstreth stated that Householder "*was pissed*" about a newspaper article, Cespedes replied, "*Aw fuck. Sorry to hear that. I've got your back. You have been great. Let's just regroup and get the rest of the deal done.*" Consistent with the investigation, the context of these messages indicates that the Longstreth and Householder's "win" is the same "deal" referenced by Company A-lobbyist Cespedes—successful passage of HB 6.

155.    Based on text messages recovered during the investigation, the meeting went forward as planned, and Associate 1 drafted meeting minutes, which were sent to Longstreth and were recovered by agents. Portions of the minutes are excerpted below.



**Generation Now, Inc. Meeting**
**Monday, June 3, 2019**

I.  Recap HB 6 strategy for House
    A. Member feedback: what worked, what didn't
        1. What didn't work: our calls, the TV was weak (didn't mention the members' names) – new strategy needs to be targeted cable mentioning the names.
        2. What didn't work: the bill repeatedly changing, which meant the message repeatedly changed.
        3. What did work: calls for "on the fence" members (          relayed she was feeling the heat from calls, talked to          and he was feeling an influence by proxy).
        4. What did work: their names. Anything that mentioned their names, they got lots of feedback from friends, family, district people: radio, mail.

II. Senate strategy
    A. Senator-by-Senator game plan: hyper local
    B. Change in media/ digital approach
    C. Timeline
        **1. Hard stop June 30 (based off refueling for the Nukes)**

Need to develop a 10-day plan to decide what we're doing going forward. If we're not successful in the next 10 days, the Nukes need to be stripped out and put into the budget. Have 10 days to run through a media strategy and see where we are.
• Sub bill introduced June 10-11
• Conference committee will begin June 15

Run through a direct mail piece (named), direct cable (named), direct radio (named), continue our broadcast strategy

156.    These meeting minutes not only outline the Senate campaign, but confirm what Generation Now did during the House's consideration of the bill.  The investigation showed that the Enterprise followed the steps outlined in the notes, and that Householder remained engaged during the process.  For example, the same day as the June 3, 2019 meeting, Householder and Longstreth had the following exchange:



157.    Longstreth attempted to call Householder directly after these text messages. The next morning at 8:04 a.m., Householder and Longstreth had a call lasting 34 minutes and 39 seconds.

158.    Householder then followed up with Neil Clark regarding the June 3 meeting that same day:

49



159.    These exchanges show Householder directly involved in the Enterprise's efforts to persuade Ohio senators to pass HB 6.

160.    The messages also show that Householder was chief decision maker regarding Generation Now, even providing direction with respect to the Generation Now ads. On June 12, 2019, about a week after the HB 6 team meeting, Householder reached out to Longstreth regarding the Generation Now television ads, essentially telling Longstreth to change them. Moreover, Longstreth acquiesced to Householder, indicating that he would change them the following week, thus demonstrating that Householder had the final word as to Generation Now messaging:



+17407072500 SLH

When does the Gen Now TV message change ?

Status: Read
Read: 6/12/2019 10:14:37 AM(UTC+0)

6/12/2019 10:14:25 AM(UTC+0)

Source Extraction:
Legacy (5)

+17407072500 SLH

I think it is burnt in - well burnt in

Status: Read
Read: 6/12/2019 10:15:03 AM(UTC+0)

6/12/2019 10:15:02 AM(UTC+0)

Source Extraction:
Legacy (5)

+16143781107 Jeff Longstreth

They are working on a draft now. Polling shows it's working.

Status: Sent
Delivered: 6/12/2019 10:15:20 AM(UTC+0)

6/12/2019 10:15:19 AM(UTC+0)

Source Extraction:



+17407072500 SLH

I agree - it's funny though - in district the number one question is - just what the hell is this House Bill 6 ?

Status: Read
Read: 6/12/2019 10:16:38 AM(UTC+0)

6/12/2019 10:16:31 AM(UTC+0)

Source Extraction:
Legacy (5)

+17407072500 SLH

Nobody knows what it is or what it does including the Senate

Status: Read
Read: 6/12/2019 10:17:02 AM(UTC+0)

6/12/2019 10:17:01 AM(UTC+0)

Source Extraction:
Legacy (5)

+16143781107 Jeff Longstreth

Polling shows the more we explain it, the worse it does.

Status: Sent
Delivered: 6/12/2019 10:17:16 AM(UTC+0)

6/12/2019 10:17:16 AM(UTC+0)



161. Householder's mention of the "*poor sum bitch*" driving his pickup truck and crying about losing his job is likely a reference to an HB 6 advertisement paid for by Generation Now, which depicts an employee at one of Company A-1's nuclear power plants describing job losses if the plant closes, while he drives his pickup truck down a road. This further shows Householder's involvement in the Generation Now media buys supporting the Company A bailout.

162. Consistent with the strategy outlined in the June 3 team meeting, numerous commercials "*paid for by Generation Now*" began airing while HB 6 was in the Senate under consideration. These commercials featured the same actors depicted in the May commercials, however, consistent with the June 3rd meeting notes, the commercials targeted particular senators and urged voters to call the particular senator and urge them to support HB 6 so thousands of Ohioans will not lose their jobs. For example, one ad targeted Senator 1, The ad states in part, "*Senator [1] can save our jobs in Ohio for Ohio . . . Senator [1], Ohio families need your help before June 30... ask Senator [1] to pass HB 6 before summer break . . . more jobs, lower bills, for Ohio.*" The commercial ends with "*Paid for by Generation Now, Inc.*"

163. A document recovered by agents from Longstreth's possession appears to be a draft script, complete with redlining and highlights, for a set of commercials targeting senators, including Senator 1. The text is similar to the commercial described above. Senator 1, and the

other senators on the draft transcript, were the same senators identified in the June 3rd meeting minutes as senators to target with messaging. Direct mail pieces were recovered from Longstreth's possession that targeted other senators identified in the June 3rd meeting minutes. For example, Senator 2 was identified as a senator to target with a message of saving jobs and money and to convey a sense of urgency. Messages recovered from Longstreth state that the Enterprise was spending $68,000 per week in Senator 2's district.

164.  Mock mailers targeting Senator 2's district were also recovered from Longstreth's possession, consistent with the messages discussed at the meeting:





165.    In addition to the draft mailers copied above, budget documents recovered from Longstreth that track Generation Now's spending per week of 20 senators, including Senator 2, corroborate Longstreth's statement that he was spending $68,000 in Senator 2's district.  For example, the following excel spreadsheet entitled "HB 6 Paid Media Week 6 June 2019" (copied below), shows that the Enterprise spent approximately $45,780 on radio, social, and mail advertisements during that week.  The $45,780 does not include the amount spent on television ads, which the spreadsheet depicts as $500,000 for all 20 senators.  If that $500,000 amount were divided equally amongst the 20 senators, $25,000 would be added to Senator 2's amount, totaling $70,780—which is close to what Longstreth approximated in his text message.

| DIST | LAST | FIRST | CALLS | CABLE | RADIO | SOCIAL | MAIL | NOTES |
|------|------|-------|-------|-------|-------|--------|------|-------|
| | | | | | $ 7,177 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,279 | $ 5,500 | $ 30,000 | |
| | | | | | $ 12,805 | $ 5,500 | $ 30,000 | |
| | | | | | $ 10,525 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,304 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,304 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,425 | $ 5,500 | $ 30,000 | |
| | | | | | $ 8,260 | $ 5,500 | $ 30,000 | |
| | | | | | $ 13,127 | $ 5,500 | $ 30,000 | |
| | | | | | $ 10,280 | $ 5,500 | $ 30,000 | |
| | | | | | $ 18,417 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,400 | $ 5,500 | $ 30,000 | |
| | | | | | $ 19,417 | $ 5,500 | $ 30,000 | |
| | | | | | $ 19,318 | $ 5,500 | $ 30,000 | |
| | | | | | $ 9,081 | $ 5,500 | $ 30,000 | |
| | | | See Separate Sheet | | $ 7,870 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,212 | $ 5,500 | $ 30,000 | |
| | | | | | $ 8,938 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,600 | $ 5,500 | $ 30,000 | |
| | | | | | $ 9,800 | $ 5,500 | $ 30,000 | |
| | | | $ 66,160 | $ 500,000 | $ 233,539 | $ 110,000 | $ 600,000 | |

Week 6 June 7-14

| | | | | |
|---|---|---|---|---|
| | | Survey | $0 | |
| Cincinnati | $122,500 | | | |
| Columbus | $134,400 | GRAND TOTAL: | $ 1,961,899 | |
| Cleveland | $195,300 | | | |
| TOTAL | $452,200 | | | |

166.    Like the media campaign during the House's consideration of HB 6, the costly media campaign targeting Senators provides further evidence of the corrupt arrangement.

167.    In addition to a media blitz, Householder continued to use his Team-Householder-candidate-turned-sponsor-of-HB 6, Representative 3, to support the bill through the Senate.  On June 10, 2019, Longstreth and Householder had the following exchange:



168.    Consistent with this exchange, Representative 3 testified before the Senate Energy and Public Utilities Committee as a proponent of HB 6 the next day. This shows Householder working with "the team" to coordinate support for passage of HB 6 by using Team Householder candidates to influence public officials in the Senate.

169.    While in the Senate, HB 6 was further amended. Those amendments included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple its energy rates. Decoupling is the dissociation of annual revenue from volume of energy sales. The decoupling mechanism was based upon the baseline revenue the company received in 2018. Therefore, if a given year's annual revenue is less than it was in 2018, the company may charge retail customers a rider, or surcharge, to compensate for the lost revenue. Company A Corp.'s CEO referred to this provision, in a call with investors on November 4 2019, as addressing company risk. In response to an investor question, the CEO stated "*[decoupling] fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof. So, I get a question a lot about where I'm worried about a future recession. It's 2 million customers in Ohio that this is going to help make sure that that doesn't impact us.*" This addition was a further benefit to Company A Corp., and, based on my training, experience, and the investigation in this matter, likely came as a result of the successful influence campaign waged by Company A and the Enterprise.

170.    The Enterprise's strategy, funded by Company A, worked.  The Senate passed HB 6 approximately a month and half after it was introduced.  The House, which concurred in the Senate's amendments, adopted the Senate's version of HB 6 on July 23, 2019.  It was signed by the governor later that same day (July 23, 2019).

171.    In a press release the next day, Company A-1 stated that it "*applauded the enactment of House Bill 6 into law, a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio*."  Company A-1 CEO commended the legislature for "*drafting a bill that preserves the state's nuclear assets*," and stated specifically that Company A-1 was "*thankful for the support and commitment by Speaker Householder and Senate President [Redacted]*."

172.    As explained in detail below, a campaign to overturn the legislation through a ballot initiative began immediately after passage and continued until the campaign to overturn HB 6 failed on October 21, 2019, at which point the bailout legislation became law, saving the two nuclear power plants from closure.

### vi.    The Enterprise and Company A's Coordination

173.    Enterprise members and associates coordinated with Company A executives and lobbyists while it was receiving millions of secret dollars from Company A and pressuring public officials to support the bailout.

174.    According to a review of text messages and toll records, Cespedes was in regular contact with Company A and served as a conduit between Company A and other members and associates of the Enterprise while the Enterprise pushed for passage of HB 6.  For example, the aforementioned exchange between Cespedes and Longstreth, where, in the context of planning an HB 6 team meeting, Cespedes told Longsteth "*Let's just regroup and get the rest of the deal done*[,]" illustrates this point.  These messages, which were premised on the Speaker's "*rampage*" also show Householder's direct involvement in Company A's and Generation Now's efforts to get the "*the rest of the deal done*"—specifically, passage of HB 6.

175.    Longstreth and Cespedes also discussed Generation Now mailers supporting HB 6. On June 3, 2019, Cespedes texted "*gen now mail is still dropping.  We are getting reports that's [sic] it's been hitting late,*" to which Longstreth responded that "*90% was delivered by the vote*" and "*Members like seeing the mail because voters don't know when the vote was*."  Several days later, Cespedes told Longstreth, "*Mail and radio looks good to me*."  These communications show that Company A—through Cespedes—was involved directly in Generation Now's media strategy to promote member support of HB 6.

176.    In addition, Longstreth and Cespedes discussed coordinating Company A payments to Generation Now.  On June 4, 2019, Cespedes texted to Longstreth, "*Text me the # I need an invoice for $2M*"; Longstreth responded, "*working on it now*."  On June 10, 2019, Cespedes texted, "*Make sure I get the invoice for this week as early as possible, please. Thanks.*"  Longstreth

responded, "*Yeah, I'm thinking it will be lower this week. Probably 1.3 ish.*" Cespdedes replied, "*Ok, thanks. I appreciate everything that you are doing. <u>Let's keeping pushing this group</u>.*"

      177.    On June 12, Cespedes and Longstreth had the following exchange:



      178.    Two days later, Cespedes followed up:



179.    One minute later, Longstreth texted the Chief Operating Officer of Political Advertising Company, to check on Company A's media spend, as requested by Cespedes:



180.    After sending the message to COO, Longstreth immediately resumed his text exchange with Cespedes:



**+16145781107 Jeff Longstreth**

Yes, I'll have [REDACTED] send me everything they've done and I'll compile the mail info.

Status: Sent
Delivered: 6/14/2019 3:00:02 PM(UTC+0)

6/14/2019 3:00:02 PM(UTC+0)

Source Extraction:
Legacy (6)

**+16145815826 Juan Cespedes**

Thanks

Status: Read
Read: 6/14/2019 3:00:29 PM(UTC+0)

6/14/2019 3:00:24 PM(UTC+0)

Source Extraction:
Legacy (6)

**+16145815826 Juan Cespedes**

Also, what have we given you spend so far. I've lost track. Trying to subtract against $15M budget to see how much room I have left

Status: Read
Read: 6/14/2019 3:04:47 PM(UTC+0)

6/14/2019 3:01:11 PM(UTC+0)

Source Extraction:
Legacy (6)

**+16143781107 Jeff Longstreth**

I'll get that. I think we are pretty close to on budget.

Status: Sent
Delivered: 6/14/2019 3:05:17 PM(UTC+0)

6/14/2019 3:05:16 PM(UTC+0)

Source Extraction:
Legacy (6)

**+16145815826 Juan Cespedes**

Yes, you are doing a great job managing budget.

Status: Read
Read: 6/14/2019 3:45:21 PM(UTC+0)

6/14/2019 3:17:49 PM(UTC+0)

Source Extraction:
Legacy (6)



181.    After further discussion between Cespedes and Longstreth in the following days about coordinating payment, public officials' support for the bailout, hiring signature firms to defeat the Ballot Campaign, and media and mailers, Longstreth and Cespedes again discussed Company A payments to Generation Now.   For example, on June 18, 2019, Cespedes to Longstreth, "*I think we have to shave off the 33k, but I'll check*," and "*Just confirmed to round down to $16M even*."

182.     The combination of phone records, bank records, and text messages paint a clear picture of the partnership between the Enterprise and Company A in working towards their agreement.  Indeed, key Enterprise members had regular and timely phone contact with Company A executives as Householder was taking official action on Company A's behalf while the Enterprise received millions from Company A.  For example, toll records show that Householder had 30 phone contacts with Company A Corp.'s CEO from January 2019 to July 2019—the period from when Householder became Speaker until HB 6 was introduced and signed into law.  This includes a phone call on January 7, 2019, the day Householder was elected Speaker; and multiple, lengthy phone calls in the weeks leading up to introduction of HB 6 and shortly after passage of the bill.  Indeed, over the period from February 2017 to July 2019, Householder had 84 phone contacts with the Company A Corp.'s CEO, 14 phone contacts with Company A Service Co.'s VP of External Affairs, and 188 contacts with Company A Corp.'s Ohio Director of State Affairs.  Similarly, Longstreth had timely phone contact in the first half of 2019 with Company A Service Co.'s VP of External Affairs and Company A-1's VP of Government Affairs.  Longstreth's contact with Company A exceeded even Householder's over the course of the conspiracy, to include significant phone contacts with Company A executives during the period from February 2017 to October 2019.[33]

183.     Clark described Householder's corrupt arrangement with Company A during a recorded meeting in June 2019.[34]  Clark first described how another Ohio public official received money from Company A into that public official's 501(c)(4) but did not come through for Company A when they needed help passing HB 6.  Clark stated, when that public official "*knew that Larry did not have his votes, ran away from him.*"  Clark then stated that Householder, on the other hand, took millions from Company A "*but he went to war for them.*"  Clark concluded that he wanted to be around politicians like Householder who "*will go to the wall, but those guys that go to the wall can only do it once a year because if they do it all the time <u>everybody knows they're pay to play</u>.*"  Clark explained that the way politicians get exposed for "pay to play" is through "stupidity" or "people who get aggrieved leak it."

184.     Householder admitted his official action for the benefit of Company A in text messages with Longstreth.  In a June 10, 2019 exchange, Longstreth told Householder that one of the "*biggest issues we've heard from the Senate*" was "*Does [Company A-1] really need the money?*"; Householder responded, for the Company A-1 "subsidy":  "*we only put in what they need*"—showing Householder and the Enterprise drafted the bill for Company A's benefit and with Company A's specific interests in mind.  Similarly, in a June 25, 2019 exchange, after Longstreth referenced the potential ballot referendum that could overturn HB 6, Householder stated, "*Stay on the good side of [Company A-1] and we'll do the defend*" of the referendum, exactly what the Enterprise did.

185.     Because Company A appeared to provide whatever the Enterprise needed to achieve its goals, the Enterprise members referred to Company A as their "Bank" for the benefit

---

[33] These toll records likely underrepresent the total volume of phone contacts between the Enterprise and Company A because messages from iPhone to iPhone are not captured in toll records due to end-to-end encryption.  For example, most text messages between Cespedes and Longstreth, the content of which are captured in search warrant returns, are not contained in toll records because they are both iPhone users.

[34] ████████████████████████████████████████████████

of the Enterprise. As Clark stated in a recorded conversation[35] in July 2019: "*We call Company A 'the Bank' because they can do, they can do, they can fund these things for 20 years if they want to. . . . They've got too much money, too much power.*" Later in the conversation, Clark discussed the individuals giving a $15,000 to $25,000 check to Householder's 501(c)(4), relative to other contributions into Generation Now, specifically payments by Company A. Clark stated, "*you'll walk in with your check and you'll be respectful, and they'll remember it as that number. Remember, he gets checks from 'the Bank'; remember, I told you what the 'the Bank' is, you know, $1.5 million dollars, $2 million dollars.*"[36]

186. Indeed, according to Clark, the amount of money from Company A to the Enterprise was "*unlimited.*" As he later explained, "*on HB 6, Company got $1.3 billion in subsidies, free payments, . . . so what do they care about putting in $20 million a year for this thing, they don't give a shit.*" Clark went on: "*[Company A] is deep pockets.* Clark explained: *I did this campaign. All we cared about was getting the subsidy.*" In other words, Company A paid the Enterprise millions of dollars in exchange for the Enterprise's efforts to pass HB 6 because it received "*$1.3 billion in subsidies*" in return—the essence of the corrupt exchange.

## III. The Enterprise Fights the Ballot Campaign to Ensure HB 6 Goes Into Effect

187. Immediately after passage of HB 6, "Ballot Campaign" mobilized to repeal HB 6 through a ballot referendum. Under Ohio law, in order to place a referendum on the ballot, a group must collect 1,000 certified signatures and submit proposed ballot language to the Ohio Attorney General for approval.[37] The approval ensures that the description of the referendum meets the "fair and truthful" standard outlined in the Ohio Revised Code.

188. After the Ohio Attorney General approves the language, and the Ohio Secretary of State certifies the signatures collected, the proponents of the ballot referendum must collect signatures from registered voters totaling six percent of the voters who participated in the last gubernatorial election. In this case, six percent equals approximately 265,000 signatures. Those signatures also must be validated by the Ohio Secretary of State. If the requisite number of signatures are collected and validated, the referendum appears on the ballot for a popular vote by the residents of Ohio.

### A. The Enterprise Fights Back

189. Ballot Campaign's original ballot proposal language was submitted on July 29, 2019 and rejected by the Ohio Attorney General on August 12, 2019. A revised petition was filed on August 16, 2019, and subsequently approved by the Ohio Attorney General on August 29, 2019. After approval, the Ballot Campaign had until October 21, 2019 to collect the requisite number of signatures.

---

[35]
[36]
[37] *See* Ohio Rev. Code § 3519.01.

190.    Even before the Governor signed HB 6 into law, and the Ballot Campaign organized, the Enterprise was mobilizing to defeat a ballot initiative in June 2019. On June 19, 2019, Cespedes wrote to Longstreth, "*Borges mentioned this morning that the opposition has engaged signature gatherers. Not sure who or if it's real. Just want u to be aware.*" Longstreth responded, "Thanks for letting me know." Then, on June 27, 2019, Cespedes wrote Longstreth, "*Let's just get all of the signature firms hired tomorrow.*" Longstreth responded, "*We can hire the good ones. We can't hire them all.*" To which Cespedes replied, "*Yeah, let's get all the good ones? If I need to up the budget, I will.*" Cespedes later texted his intent with regards to the ballot initiative, "*I was hoping that we could take out all the big players and limit their chances. It's impossible to referendum proof imo. We can make it tougher.*" This shows Company A actively working with the Enterprise to preserve the HB 6 bailout.

191.    But the investigation indicates that the Enterprise was concerned that a ballot initiative would block HB 6 from taking effect. For example, on July 22, 2019, the day before the bill passed the Senate, Clark discussed a potential referendum during a recorded conversation.[38] He explained that it would "*piss off the Speaker,*" and if the opposition succeeded in getting it on the ballot in 2021, the bill would be "stayed" until then. Clark further explained that he was in charge of the effort to kill the signature collection effort for the Speaker, and estimated that it had a 20% success rate.

## B. Generation Now Takes Heat in the Media for Funding HB 6 Ads

192.    At the same time discussion of a ballot initiative was ramping up, the media was reporting that Generation Now was the source of dark money behind the passage of HB 6.[39] The Cincinnati Enquirer and Dayton Daily News reported that millions of dollars in dark money from Generation Now flooded the airways with television and radio ads supporting HB 6. Although some articles tied Generation Now to Jeff Longstreth, none made the link to Householder or understood that Company A was funding Generation Now. In fact, the news reports at that time attributed Company A as funding an alliance, which had spent about $275,000 on HB 6 ads. In what appears to be an effort to deflect attention, Householder was quoted in the media as saying:

> It's a priority bill for me because I've always cared about the energy in the state of Ohio. I'll tell you who's paying for these ads: it's working men and women from Ohio, who want to save their jobs and it's Ohio corporations, headquartered in Ohio, that want to stay here. That's who's paying for it.[40]

193.    Householder was also receiving pressure from House members about his use of Generation Now to further HB 6, as Householder told Longstreth in a text exchange:

---

[38] ███████████████████████████████████████████
[39] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343 (July 2, 2019).
[40] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343.

+17407072600 SLH
Gen Now has had issues as well. I've had several members - including members of House leadership come in privately and discuss their concern over next years House campaigns based on HB 6 messaging, mail, TV and radio.
Status: Read
Read: 6/23/2019 1:44:21 PM(UTC+0)
6/23/2019 1:44:16 PM(UTC+0)

194. In addition to showing Householder's knowledge that Generation Now was taking a hit in the media, the message also shows that some public officials knew that Householder was behind the Generation Now campaign to pressure members to support HB 6, particularly relevant given the millions of dollars Householder's Enterprise spent on media buys and ads urging Ohio citizens to pressure public officials to support House Bill 6.

195. In the wake of the negative press and pressure from House leadership relating to Generation Now media buys supporting HB 6, the Enterprise used "Front Company," which was controlled by the Enterprise, to conceal their efforts to combat the referendum. As described below, the Enterprise pumped $23,000,000 of Company A-to-Generation-Now money into Front Company and used the organization to fund criminal acts to defeat the referendum.

### C. The Enterprise Used Front Company to Defeat Ballot Campaign

196. HB 6 was important to the Householder's Enterprise because it received millions of dollars into Generation Now from Company A in exchange for enactment of the bailout legislation. And, thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to Householder's Enterprise. But, the Enterprise also viewed the Ballot Campaign as a threat to its power and territory generally.

197. For example, at the dinner club meeting on September 23, 2019, in the context of a discussion about the Ballot Campaign, Householder told Clark in a recorded meeting[41]: "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*" Staffer followed up, "*it's the beginning of your Speakership; it sets a bad precedent for the next six years, what we need to make them realize is that you (Householder) can't be fucked with.*" Clark then agreed, "*it sends the message to everyone else . . . . if you attack a member, we're going to fucking rip your dick off.*" Enterprise members thus made clear that preserving their legislative victory was necessary to proving the strength of the Enterprise going forward.

198. As set forth above, Front Company—organized and registered under Ohio law on July 30, 2019, less than a week after the bill was signed by the governor—is a pass-through entity through which the Enterprise funneled Company A-to-Generation-Now money to further the conspiracy. Associate 1, along with Associate 4—who had hundreds of phone contacts with Enterprise members from July to October 2019, including regular calls with Clark, Longstreth,

41 [redacted]

and Borges—opened the Fifth-Third Bank checking account for the Front Company on August 12, 2019. Between August 1, 2019 and October 31, 2019, over $23 million was deposited into Front Company's account. Subpoenaed bank records show that *every penny of that $23 million came from Generation Now via Company A entities—specifically, Company A Service Co. and Energy Pass-Through—wired approximately $38 million to Generation Now*.

199. The Enterprise funneled the Company A payments through the Front Company account to defeat the Ballot Campaign. One of the clearest examples, again, comes from Longstreth. On September 26, 2019, Company A wired $2,445,000 to Generation Now (Longstreth-controlled), which wired a total of $2.1 million to Front Company (Associate 1-controlled) (over the next several days), which wired $2.2 million on September 30, 2019 to Constant Content (Longstreth-controlled), which wired $1.22 million to Direct Mail Company the same day. The Enterprise passed the remaining $21 million through Front Company to pay Media Placement Company 1 and the Political Advertising Agency for television commercials[42] (approximately $6.9 million), Petition Signature Services Co 1 (approximately $11 million) and Petition Signature Services Co 2 ($688,000) for ballot petition signature services, Billboard Co for billboards ($150,000), and approximately $3,500 for t-shirts. Front Company also funneled another $2.2 million to a different Constant Content account controlled by Longstreth.

200. In terms of commercials and fliers, the Company A money wired from Generation Now to Front Company funded a media blitz of commercials and fliers orchestrated by the Enterprise. Again, the media campaign against the ballot initiative is indicative of the corrupt exchange with Company A.

201. These advertisements intended to invoke fear by asserting that China was invading Ohio's energy grid, and that signing the petition equated with ceding control of Ohio energy to China. For example, Front Company mailed the following fliers to hundreds of thousands of Ohioans:



---

[42] Public filings on the FCC website show that Media Placement Company 1 bought television ads for Front Company between August 2019 and October 2019.



These above fliers were mailed to voters throughout the state of Ohio.

202. During the September 23, 2019 recorded dinner-party, in which Householder also was present, Clark relayed the story behind the second flier, which Clark and Householder thought was hilarious. Through laughter, Clark described what he termed "*the direct mail piece*" as "*so fucking cold-blooded*." He stated that Jeff designed it. He explained that because 15 out of the 150 signature collectors hired by the opposition had prior arrests, they were technically criminals under the law. When Representative 8 (another representative of the Ohio House of Representatives, who is not known to be part of the Enterprise asked how they knew the signature collectors had prior arrests, Householder explained, "*they have to sign up and when they sign up, we run a background check*." [43] Clark went on to explain, *"[s]o Jeff, of course, designs a piece going 'they're coming to your house, criminals . . . don't answer the door . . . decline to sign.'"* As Clark explained, he later had to explain the direct mail piece to Associate 4—that they were mailing 4.9 million pieces explaining that the people coming to your house for signatures are criminals, and Associate 4 refused to put his name on it. Clark played hardball with Associate 4, and told him that he (Clark) had to get off the phone now and tell his boss (presumably Householder) that Associate 4 didn't want to do it. Clark explained that eventually, Associate 4 agreed on a softer piece.

203. The investigation later revealed that payment for the postage on these same fliers was ultimately paid for by Generation Now, but had been funneled through at least three bank accounts. Specifically, the fliers were sent "presorted standard US Postage PAID Columbus OH Permit 6871." According to U.S. Postal records, a Digital & Print Marketing Group is the account holder of Permit 6871, and the customer reference ID lists a company related to Direct Mail Company 2. Subpoenaed bank records show that the Digital & Print Marketing Group received approximately $3.5 million from Direct Mail Group 2 in October 2019, which received approximately $3.6 million combined from Longstreth's Constant Content bank accounts, which received a combined $4.4 million from Front Company—all of which originally came from

---

[43] Householder was likely referring to Ohio Secretary of State Form 15, which Ohio law requires to be filed by people working being compensated for working on behalf of a statewide ballot petition. *See* Ohio Rev. Code 3501.381.

Company A through Generation Now. In other words, the Enterprise funneled Company A money through three different Enterprise-controlled accounts before purchasing the fliers through third parties. The efforts made by Enterprise members in this regard are further evidence of their intent and the corrupt exchange with Company A.

204. Generation Now money also funded television commercials purportedly sponsored by Front Company, which continued the same theme from the fliers. These ads asserted that China was taking over Ohio's energy, igniting fear that the Chinese government is behind the drive to repeal HB 6 and wanting to take Ohio energy jobs.[44] The ads proposition Ohioans to choose between supporting HB 6 or handing over Ohio's energy to the Chinese Government.

For example, one ad aired in Cincinnati claimed:

> *They took our manufacturing jobs. They shuttered our factories. Now they are coming for our energy jobs. The Chinese government is quietly invading the American electric grid, intertwining them financially in our energy infrastructure. Now a special interest group boosting Chinese financial interests is targeting Ohio energy, taking Ohio money, exporting Ohio jobs, even risking our national security. They are meddling in our elections. In the coming weeks you may be approached on the street or at your door to sign a petition to defund U.S. jobs and energy. They will ask for your name, your address, your signature. Tell them no. Don't sign your name to a plan that kills Ohio jobs, harms Ohio communities, and endangers our energy independence. China turned off the power on Ohio manufacturing. Don't let them do it to you. Don't sign the petition allowing China to control Ohio's power.*

During the commercial, images of the Chinese government and leadership were displayed:

 

---

[44]https://www.cincinnati.com/story/news/politics/2019/09/30/ads-claim-foreign-entities-are-invading-ohios-energy-grid/2423655001/.



The ad ended with a plea to not sign the petition, because doing so would allow China to take control over Ohio's power:



205.    Thus, although the fliers and ads claimed they were paid for by Front Company, in reality, the Enterprise paid for them and concealed that fact by wiring money from Generation Now to Front Company.  By using Front Company for the media campaign, the Enterprise further concealed its corrupt arrangement with Company A

206.    Other evidence demonstrates that the Enterprise used Front Company as a front for Generation Now.  For example, public filings on the FCC website show that Media Placement Company 1, which received approximately $6.9 million from Front Company bank account, bought television airtime between August 2019 and October 2019 across Ohio for Front Company. For instance, for the week of September 5, 2019 to September 9, 2019, records show that Media Placement Company 1 bought approximately $66,300 in television spots from WKRC Cincinnati for Front Company.  (Media Placement Company 1 had purchased airtime slots for Generation Now in the past, including advertisements that supported candidates associated with Householder during the 2018 election cycle.)

207.    The FCC filings also match the commercials' content.  In one disclosure statement that was filed with the FCC, Front Company stated that the issue addressed by the advertisements was "Chinese influence of Ohio Energy."  This description ties both the fliers and commercial content back to Front Company.  Additionally, the content of the commercials themselves contain a clue as to their origin and funding source, tying the Enterprise to Front Company.  Specifically, M.M., pictured below, who served as project manager at one of the Company A-1 nuclear power plants, appeared both in Generation Now advertisements in support of the passage of HB 6 in the

spring of 2019, as well as the aforementioned commercial by Front Company opposing the referendum, which aired in the fall of 2019.



208.    The Generation Now money also was used to buy t-shirts for Front Company. Bank records, subpoena returns, and photos from social media provide the confirmation.

### D. The Enterprise Conflicts Out Signature Firms

209.    Besides paying for advertisements, mailers and t-shirts, Generation Now subverted the Ballot Campaign by hiring signature collection firms in an effort to conflict them from working for the Ballot Campaign.  Bank records show that between July 23, 2019 and July 30, 2019, Generation Now spent over $549,250 retaining the services of national signature collection firms to defeat the ballot initiative. The retention of signature collection firms is in keeping with practices outlined by Clark in multiple recorded conversations.  In those instances, Clark advised his clients that if they would retain as many of the signature collection firms as possible, then those firms could not work for their opposition, which would decrease the likelihood that the referendum would collect the requisite number of signatures for a ballot initiative.

210.    For example, in a meeting on July 24, 2019, which was recorded,[45] Clark stated that he wired about $450,000 today hiring signature collections people to not work.  He repeated that

---

45 ████████████████████████████████

he had "*hired them not to work*." Clark continued, explaining that he had hired 15 companies nationwide—nine of the biggest ones—and sent them all checks ranging $50,000 to $100,000 to not to work, and $10,000 payments to the smaller firms. Clark stated that these people on the phone, "*they are all full of shit. I have been a lobbyist for 39 years, been around a long time. It always goes circular to someone going well we'll give you a kickback*." Clark later confirmed, during the same conversation, that the $450,000 used to pay the collection firms came from Generation Now.

211.    A spreadsheet tracking the hiring and payment of signature firms in July 2019 was recovered from Cespedes' possession. The document's properties reveal that Associate 1 created the spreadsheet on July 26, 2019—two days after Clark's statements detailed directly above. (That it was recovered from Cespedes' possession demonstrates the close coordination between members and associates of the Enterprise and Company A.) The document shows the signature firms that the Enterprise retained, whether the firms are under contract, the contract price, and the status of payments, which reflected payments of $431,750 by July 29, 2019.

212.    A review of Generation Now's subpoenaed bank records and Clark's toll records corroborate his statements and the contents of the spreadsheet. Generation Now bank records confirm that payments were made from the Generation Now bank accounts. The records further show that some of these firms, along with other petition firms, received additional payments in the fall of 2019.

213.    Further, Clark's toll records show contact with some of these firms around the same time period. For example, on July 23, 2019, the same day that Generation Now wired one firm $75,000, Clark's toll records show he had multiple contacts with a founding member of the firm. Similarly, Clark placed calls to an executive of Petitioner Signature Services Co 3 on July 22 and 29, 2019, in close proximity to Generation Now's wire of $50,000.[46]

214.    These wires also are consistent with text message exchanges recovered during the investigation. On June 19, 2019, while HB 6 was still pending in the Ohio Senate, Cespedes told Longstreth that "*Borges mentioned this morning that opposition has engaged signature gathers. Not sure who or if it's real. Just want you to be aware*." As explained above, about a week later, on June 26, 2019, while HB6 was still pending in the Senate, Cespedes and Longstreth discussed the need to hire signature firms and that Cespedes would "up" the budget if necessary:

---

[46]  Petition Signature Services Co 3 received approximately $6,205,154 from Generation Now between July 2019 and October 2019. Phone records also show Jeff Longstreth had phone contact with the same executive during the same time period.



215.    Less than an hour later, Clark sent Longsreth a message stating, *"I have a new list to send you."* Clark then texted Longsreth an excel spreadsheet listing various petition gathering firms, which included firms that received wires from Generation Now a month later as indicated by Clark on the recording.

### E.  The Enterprise Bribes an Employee of Ballot Initiative for Inside Information

216.    Based on my training, experience, and the investigation in this case, in order defeat the Ballot Campaign and ensure HB 6 went into effect in October 2019, the Enterprise would benefit from real-time information about how successful the signature collection effort was in order to best allocate their resources.  However, the investigation revealed that the Enterprise's own daily, internal estimates about the signature collection were not adding up to the numbers claimed by the ballot initiative proponents.

217.    Indeed, during the September 23, 2019 recorded dinner party, Clark explained, in the presence of Householder, how the Enterprise was addressing the ballot campaign:

> *Every day we send out a crew of 235 people and we survey about 2600 sites . . . and we stay there to see if they have people there . . . so then we do every day do a report estimating how many signatures they've done . . . [they now have about 80 people collecting signatures] . . . how many signatures do you think you can collect in an hour;  how many can you collect in a shift; they were working in the first few weeks 10 hours shifts, most people just working 6;  so in all the math that was done, they weren't getting where they were, so we kept saying it wasn't right,  until last week they started advertising they needed more people; they went to some of our subs, they couldn't get any of our A class subs . . .*

71

As this conversation shows, until the previous week, the Enterprise could not determine the reason for the discrepancy between their numbers and the numbers claimed by the signature gatherers. Thus, they needed inside information about the ballot initiative.

218. The Enterprise attempted to obtain such information by utilizing Borges to bribe CHS 1, who was associated with the Ballot Campaign. CHS 1 was employed by Ballot Campaign in its efforts to repeal HB 6 through a ballot initiative. CHS 1 has provided reliable information proven credible through multiple sources. CHS 1 managed signature collectors. As described below, Borges offered to and did pay CHS 1 to provide inside information about the Ballot Campaign such as the number of signatures collected, the number of collectors, and geographic focus of collection efforts. CHS 1 was upset about Borges' solicitation and contacted the FBI after meeting with Borges in early September. Thereafter, CHS 1 recorded his conversations with Borges, including Borges' payment of $15,000 to him.

219. On or about September 1, 2019, Borges contacted CHS 1 and, during a meeting the next day, offered a substantial amount of money for inside information that Borges would use for his client to defeat the referendum campaign. Specifically, according to CHS 1, Borges offered that if CHS 1 provided inside information, Borges would provide CHS 1 with monetary payments, a job, or agree to pay CHS's debts. Borges further indicated that others are getting "fat" off the HB 6 issue, so they might as well benefit, too. Then Borges asked CHS 1 to think about the offer and get back to him. Borges initially reached out to CHS 1 just two days after the Ohio Attorney General approved the ballot language and just weeks after Generation Now wired over a million dollars of Company A money to Borges' LLC, 17 Consulting.

220. In a text message following the meeting, CHS 1 told Borges he could not accept the bribe payment. These text messages were provided to me. Specifically, CHS 1 told Borges, "*I've thought about it. I don't need overnight.*" CHS 1 went on: "*At the beginning of this I thought I could walk my information into Larry's office and sell it for enough to retire on.*'" CHS 1 continued, he "*would LOVE to have those wiped out, to be debt free, and not to have to worry... but, I can't put a price tag on my integrity or my word.*" CHS 1 explained that he could not "*sell this team down the river,*" concluding: "*So. It may not land me in the car, house, job, or financial situation I want to be in – but I couldn't face myself if I did anything but work for this and do it honestly.*" Borges responded that he understood, but made clear his intent: "<u>*No matter what – don't ever tell anyone about our conversation from earlier*</u>."

221. At the direction of the FBI, CHS 1 reconnected with Borges and expressed interest in Borges' offer. During telephonic contact between the two, Borges advised CHS 1 that he would need to evaluate how to move forward. Borges followed up asking for CHS's employment contract and stating, "*I'll make an offer to buy you out. It will be substantial.*" Operating at the direction of agents, CHS 1 responded, "*What will a buyout entail? Like. . . what would I be doing, work-wise?*" Borges responded simply*, "Give me a day or two to figure this out.*" Borges then started soliciting CHS 1 for inside information about Ballot Campaign. For example, Borges texted: "*Have you guys started door to door?*" Borges and CHS 1 then had the following exchange:



CHS 1 then provided a limited amount of inside information—the "ballpark" vote count for one region in the state. Borges responded, "*Got it. I'll get this done.*"

222. These messages indicate that the *substantial* "buy out" Borges previously offered was tied to sensitive information the CHS 1 would provide about the Ballot Campaign. Borges made clear that he was working on behalf of a group of individuals, and that Borges needed inside information—the signature count, for example—to "*nail down the opportunity*" because "*they just want to know they have the right source.*"

223. A series of text message exchanges followed, during which Borges and CHS 1 set a time to meet in person. In one of those messages Borges stated, "*I've gotten more clarity. Protects you.*" In another, Borges texted, "*I promise this will be worth your while.*"

224. CHS 1 eventually met with Borges on September 10, 2019 to discuss the deal. The meeting was recorded. Borges framed the exchange as a private transaction between the two of them that no one would know—despite the prior solicitation and text messages, which made clear that Borges was working on behalf of others. But Borges' true motivations became clear, and demonstrate how much Borges and the Enterprise wanted inside information about the Ballot Campaign. For example, when CHS 1 asked how the deal would work, Borges told CHS 1 that it would help to know locations in advance and they "*really need to know how many signatures you have.*" Borges then asked CHS 1 whether he had access to the statewide numbers or only his region. Borges also stated that he and his firm were working for Company A on the ballot project, and that Householder, Company A, and Borges' firm formed an "*unholy alliance.*"

225.     On September 13, 2019, during a consensually recorded meeting, Borges gave CHS 1 a $15,000 check, funded entirely by Company A-to-Generation-Now money.  Although in initial conversations Borges had indicated that the money was an advance for insider information to defeat Ballot Campaign, when Borges handed the check to CHS 1, he said that it was Borges's own money, that no one knew about the transaction, and that it was for the CHS 1's help in planning a reunion amongst former staffers.  This contradicted what Borges had previously stated. Showing his corrupt intent, Borges also told the CHS that if this transaction came to light, it would be bad for both CHS 1 and Borges—in fact, Borges told CHS 1 he would "blow up" the CHS's house if the information got out, a threat that CHS 1 treated as a joke.  Borges then proceeded to ask CHS 1 about the number of signature collectors working on behalf of the ballot campaign. Borges also made numerous statements about the Enterprise, including identifying Householder, Clark, and Longstreth as being involved.  For example, Borges stated, "*Larry was putting the squeeze*" on Associate 3, Generation Now's spokesperson, and would not allow Associate 3 to quit; Clark was serving as Householder's proxy; and that it was "*insane*" how much Enterprise members were making off Company A.  Borges also described being present when Enterprise members met with Company A executives to look at advertisements, and driving the Company A CEO to see signature collectors who were working on behalf of the Ballot Campaign.

226.     On multiple occasions following the meeting, Borges reached out in recorded phone calls and text messages to CHS 1 to receive the same type of insider information relating to signature collection to repeal HB 6 that Borges offered payment for during their conversation on September 1.  For example, Borges sent CHS 1 the following messages, among others:

> We were told you guys had 120,000 signatures. Any idea if that's right?

> Any idea how many total signatures you guys have? We were told 80,000 today.

> Any intel you have would make me a hero. Thanks.

And, despite repeatedly asking for inside information after paying the CHS 1 $15,000 in Company A-to-Generation-Now money, Borges never again mentioned CHS 1 performing any specific work unrelated to the Ballot Campaign.

227.     Other evidence corroborates that Borges' actions were in furtherance of the Enterprise's efforts to defeat the Ballot Campaign.  Significantly, around the same time that Borges was in contact with the CHS 1, Borges was in contact with Cespedes.  Specifically, on September 1, 2019, Borges' cellphone contacted Cespedes' cellphone around 5:14PM. That call lasted for approximately 28 minutes.  Less than ten minutes after that call, Borges called CHS 1 and spoke to the CHS for nine minutes.  Within one minute of the completion of the call with CHS 1, Borges attempted to call Cespedes, who did not answer.  They eventually connected 10 minutes later and toll records show the call lasted for 25 minutes and 30 seconds.  Within one minute of the

74

completion of that call, Borges then called Associate 4, of Front Company.[47]  Toll records also show that Borges was in regular contact with Clark, Longstreth, and Cepedes during this period.

228.    Moreover, as set forth above, bank records obtained via grand jury subpoena show that the $15,000 came from Generation Now, by way of an account Borges opened in August 2019 under the name of 17 Consulting Group LLC.  Borges registered "17 Consulting Group LLC" with the Ohio Secretary of State on August 5, 2019.  Two days later, Borges opened a bank account under the name "17 Consulting Group LLC."  Bank records indicated that Borges is the only signatory on the account and opened the account as President/Owner/CEO of 17 Consulting Group LLC.  A day after Borges opened the account, Generation Now wired $400,000 into the account.  In fact, Generation Now wired a total of $1.15 million into the account between August 8, 2019, the day the account was opened, and September 13, 2019, the day CHS 1 was given the aforementioned $15,000 check.  During that period, aside from $100 Borges deposited when he opened the account, Generation Now was the sole source of deposits.  In addition to the $15,000 check to CHS 1, the bank records show that, on September 16, 2019, three days after the $15,000 check was given to CHS 1, a check for $100,000 was written to 614 solutions LLC, which is an Ohio business registered to Juan P. Cespedes.

### F.  The Enterprise Bribes Signature Collectors

229.    In addition to attempting to bribe CHS 1, the Enterprise tried to subvert the Ballot Campaign's efforts by bribing signature collectors working on behalf of the Ballot Campaign .  Specifically, through intermediaries, the Enterprise offered Ballot Campaign signature collectors approximately $2500 and plane fare to stop collecting signatures and provide inside information relating to the Ballot Campaign's HB 6 referendum efforts.  The payment was split into two segments—half upon signing a contract with Front Company and half upon proof the plane fare was used to fly home, away from Ohio.  The Enterprise believed that if it could reduce the number of people collecting signatures for the Ballot Campaign, they could ensure the Ballot Campaign would fail to collect the requisite number of signatures.

230.    Clark outlined this very strategy during the recorded dinner conversation on September 23, 2019.  Concerned that the Ballot Campaign would collect enough signatures, Clark explained, "*so we have to go out on the corners and buy out their people every day. We started doing that today and everybody's having a fucking shit fit.*"  When questioned about the logistics of the operation, Clark was very coy, but explained that they have 235 spotters in the field and that the spotters call and say people are here and then others go buy them off.  Clark continued, "*if we knock off 25 people, collecting signatures, it virtually wipes them out in next 20 days; this ends the whole fucking thing, ends in, that's how hard it is, in addition to the TV, the direct mail, and everything else. . . .*"  It was at this point in the conversation, when Householder interrupted, as explained above, and said, "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*"

231.    Toll records show that Clark was not exaggerating during the dinner.  Following the dinner, Clark had 45 contacts with Contractor 1, a principal of Petition Signature Services Co 2, who markets himself/herself as a leading expert in ballot initiative access and strategy.  The

---

[47]    https://www.dispatch.com/news/20190828/nuclear-bailout-supporters-cry-chinese-conspiracy-but-get-funding-from-same-bank.

contacts occurred in October 2019, when as, explained below, "Meghan" and "Marcus" were contacting and trying to bribe signature collectors working for the ballot initiative.

232. With the money wired from Generation Now to Front Company, the Enterprise paid the Petition Signature Services Co 2 over $600,000 in October 2019. The same day as the first wire transfer from Front Company to the Petition Signature Services Co 2, Signature Collector 1 for the Ballot Campaign received the following unsolicited text message from "Meghan," which toll records identify as Contractor 1:



233. The following day, "Marcus" purportedly from Front Company, contacted Signature Collector 1, Signature Collector 2, and Signature Collector 3, via text (copied below) and several other signature collectors. The subscriber records for "Marcus's" telephone number show contact with these signature collectors on the date and time in question. Moreover, "Marcus" had contact with Contractor 1 around the same time



234. The text messages copied above were attached as exhibits to the sworn statements of Signature Collectors 1, 2, and 3 in a lawsuit filed by proponents of the Ballot Campaign, claiming among other things, interference by Front Company. While working for the Ballot Campaign, Signature Collector 2 explained in his/her affidavit that after he/she received the text message, he/she spoke to "Marcus" briefly but hung up before he gave the details of the offer. Signature Collector 3's sworn affidavit states that after he/she received the text, "Marcus" called him/her and offered him/her a plane ticket home and $2500 split into two parts. Three other affidavits were filed in support of the lawsuit, demonstrating similar communications with "Marcus" who identified himself as working on behalf of Front Company, one of which was accompanied by a recording of the call, described the same offer as Signature Collector 3, and included a proposed contract (described below) that "Marcus" sent.

235. The contract attached to one of the affidavits described the "services" to be provided as follows: "*provide statewide ballot issue advice and expert consultation on Ohio statewide ballot measures and the associated petition circulation and signature collection matters related to the referendum of HB 6 related issues, which occurs within a 90 day period upon enactment HB 6.*" This shows that the Enterprise was again paying agents of the ballot campaign for inside information relating to the Ballot Campaign to hurt the campaign's efforts.

236. Each affidavit disclosed that the signature gatherer had completed an Ohio Secretary of State "Form 15" as required by Ohio law, which included their name and telephone number. These forms were filed with the Ohio Secretary of State. Significantly, the investigation shows that the Enterprise likely had access to those forms. During the recorded conversation on September 23, 2019, which preceded the above text messages from "Meghan" and "Marcus," Clark and Householder referred the forms. In the context of explaining the mailer, which alleged the signature gatherers were criminals, Representative 8 asked, "*how do you know they have arrests*?" Householder responded that "*they have to sign up and when they sign up we run a background check.*" Based on my training and experience and the investigation to date, "sign up" is likely a reference to the Form 15.

237. The Enterprise having access to the Form 15s is consistent with subpoenaed records. Bank records for Borges' 17 Consulting account show that he paid a private investigations firm, over $177,880 between September 13 and October 15, 2019. The last check Borges paid to the investigation firm indicated that it was for "10/8/19," which is the same date of Contractor 1's texts to one of the above signature collectors. This information is consistent with what Householder's statements on September 23, 2019.

238. Moreover, any ambiguity as to Marcus' affiliation when he attempted to bribe the signature collectors is resolved by one of the affidavits filed in federal court, which included a copy of the contract sent by "Marcus" to the signature collectors. The contract confirmed that the contracting party was Front Company and confirmed the cash buyout in the affidavits: $2500, split into two payments: One half (50%) immediately upon execution of this Agreement and One half (50%) *immediately following the fulfillment of initial instructions shared with you through additional conversations with a representative from [Front Company]...*" The contract was signed by Longstreth on behalf of Front Company and further required that notices be sent to:

Generation Now
c/o Jeff Longstreth
Columbus, OH
jefflongstreth@gmail.com

239. The contract further had a confidentiality requirement aimed at concealing both Generation Now and the agreement itself, showing the Enterprise's role in bribing the signature collectors. The confidentiality provision prohibited the signature collector from disclosing: "(a*) the identity of GenNow*; (b) that [name] has been engaged by the [Front Company] to perform the Services described herein, or (c) the existence, terms, provisions, or conditions of this Agreement or the agreement with [Front Company]."[48] Again, the "Services" included providing inside information relating to the campaign to overturn HB 6.

240. Like the Enterprise's efforts to pass HB 6, the Enterprise was working closely with Company A to defeat the ballot initiative. For example, in September 2019, while the Enterprise was spending millions trying to defeat the Ballot Campaign, Enterprise-Member-and-Company A-1-Lobbyist Borges referenced a meeting between members of the Enterprise and Company A executives, including "the CEO of the company", a few days earlier:

*I was driving those guys back to the airport and they were like we want to stop and see somebody (a signature gatherer). Well . . . I know for sure there will be one at the Worthington library because there's one there every day. So we stopped and for sure there was one there . . . the guy wants to get out and talk to him. . . . It was the CEO of the company . . . .*

---

[48] Emphasis added.

78

241.    Later during the conversation, Borges again referenced the meeting with Company A, stating, "*I had the Company brass there – and they were up at [redacted] looking at ads, I mean, Dispatch calls our ads a lie today.*"  Again, as set forth above, in a prior conversation, Borges described Householder's interest in the bailout and his firm's relationship with Company A as "*an unholy alliance.*"  This shows the Enterprise working with Company A to discuss strategy for defeating the ballot initiative, to include bribing and paying off employees and signature collectors for the ballot campaign.

242.    Toll records also show frequent and close contact between the Enterprise and Company A during this period in which, Company A paid the Enterprise over $38 million.  For example, on October 10, 2019, Longstreth had multiple phone contacts with a person associated with Energy Pass-Through, the same day that Company A Service Co. wired $10 million to Energy Pass-Through, which then wired $10 million to Generation Now.

243.    The Enterprise's efforts were a success:  on October 21, 2019, the Ballot Campaign failed to collect enough signatures, and HB 6 went into effect.  Householder celebrated enactment of the law through an October 21, 2019 press release, in which he noted expressly that the new law would bailout Company A's failed nuclear power plants.  Specifically, Householder stated:  "*I am pleased that House Bill 6 will go into effect at midnight tonight and am confident it will produce positive results for Ohio.*"  Among the benefits of the bill, Householder highlighted, "*First, HB 6 will save the operation of two Ohio nuclear power plants.*" (Emphasis added.)

244.    The next day, Energy Pass-Through wired $3 million to Generation Now, which wired $2,921,000 to JPL's main account two days later.  That money and some of the Company A-to-Generation Now money remaining in other accounts were consolidated into Longstreth-controlled accounts, which personally benefitted Longstreth and Householder.  For example, on or about January 13, 2020, Longstreth wired $1 million to his brokerage account.  After the transfer, over $5 million remained in Longstreth-controlled accounts.

245.    Similarly, between September and December, Householder used $101,825 in Company A-to-Generation Now payments funneled through Longstreth-controlled accounts to pay for costs associated with his residence in Florida.  This was in addition to payments made to settle Householder's personal lawsuit in 2017 and 2018, and to pay off approximately $20,000 in credit card debt owed by Householder in 2020.

246.    On January 22, 2020 and February 6, 2020, Generation Now wired to the Coalition a total of $1,010,000, which then transferred the money to PAC.  According to FEC filings, PAC spent $1,039,131.11 between February and March on legal services, bank fees, polling, research, direct mail services, advertising via TV, radio and digital, and media production.

247.    Additionally, bank records show that on February 13, 2020, Generation Now wired the Coalition an additional $250,000. Subsequent to that transfer, Generation Now's funds were replenished by a $2,000,000 wire transfer from Energy Pass-Through on March 3, 2020.  This occurred shortly after Company A-1 was divested from Company A Corp. as a result of the bankruptcy proceedings, which was premised in part on the financial solvency of Company A-1 due to HB 6.  In May 2020, Company A-1 announced a $300 million buyback plan, whereby

Company A-1 would spend $300 million repurchasing shares from shareholders thereby boosting stock prices.[49]

## CONCLUSION

248.    The above facts establish probable cause that Householder's Enterprise is an association-in-fact enterprise affecting interstate commerce, and the Defendants conspired to participate in the conduct of the affairs of the enterprise by agreeing that a co-conspirator would commit a pattern of racketeering activity.  To summarize, while operating together—and functioning as Householder's "team"—the Defendants enriched themselves and increased Householder's political power by:  engaging in a scheme to defraud the public of the honest services of Householder, involving the receipt of millions of dollars in secret bribe payments through Householder's 501(c)(4) account in return for Householder taking official action to help pass a legislative bailout for two nuclear power plants; bribing and attempting to bribe individuals working on behalf of the Ballot Campaign in an attempt to receive inside information and defeat the Ballot Campaign; and concealing the scheme, their illegal activity, and the source of the funds by transferring the Company A-to-Generation-Now payments through other controlled entities and knowingly engaging in monetary transactions with the proceeds.

249.    Based on the forgoing, I request that the Court issue the proposed criminal complaint, and arrest warrants for the individuals listed below, as there is probable cause to believe **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW** have violated 18 U.S.C. § 1962(d) (Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity).

---

[49] Ohio nuclear bailout beneficiary OKs extra stock buybacks: Capitol Letter, 2020 WLNR 13486449 (May 13, 2020); https://www.cleveland.com/open/2020/05/with-ohio-bailout-law-secured-firstenergy-solutions-successor-moves-to-increase-share-buybacks-by-300-million.html.

## **REQUEST FOR SEALING**

250.    I further request that the Court order that all papers related to this application, including the affidavit, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Blane J. Wetzel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ July 17 _____, 2020 **via Facetime Video.**

_____
STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE