UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CASE NO. 1:20-CR-77 |
| v. | : | JUDGE BLACK |
| LARRY HOUSEHOLDER, et al., | : | **UNITED STATES' RESPONSE TO DEFENDANT HOUSEHOLDER'S MOTION TO EXCLUDE NOAH DORMADY AND ABBY WOOD** |
| Defendants. | : | |

The United States respectfully submits this response to Larry Householder's motion to exclude certain expert testimony. (Doc. 131.) As set forth in the following memorandum, the Court should deny Defendant Householder's motion and admit the proposed testimony of Dr. Dormady and Dr. Wood at trial.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*s/ Emily N. Glatfelter*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

I.      INTRODUCTION

On September 1, 2022, pursuant to the Court's trial calendar, the United States disclosed five potential experts and provided the proposed testimony of each to defense counsel. As made clear in its notice, the United States anticipates that these five experts will provide necessary background information to the jury to help contextualize the trial evidence. The United States will not ask these potential experts to opine on the Defendants' conduct in this case. Rather, these witnesses will provide testimony akin to teaching a brief, 101 course relevant to certain subject areas at trial in their respective fields of expertise.[1]

Defendant Householder has filed a motion to exclude two of these experts – Dr. Noah Dormady and Dr. Abby Wood. (Doc. 131.) He does not object to their qualifications or the reliability of their testimony. Rather, he contends their testimony is not relevant/unhelpful to the jury and is unfairly prejudicial. As described below, relevancy poses no hurdle, and Householder's other arguments are meritless. At bottom, he simply does not like their opinions. However, the traditional and appropriate means of attacking admissible expert testimony is through cross examination and the presentation of contrary evidence. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 596 (1993). Accordingly, Householder's motion should be denied.

II.     RELEVANT BACKGROUND

A grand jury charged the defendants with conspiring to conduct and participate in the affairs of an enterprise through a pattern of racketeering activity. (Doc 22.) The pattern of racketeering activity charged includes bribery allegations that in exchange for a bailout of nuclear power plants, the defendants received millions of dollars through a 501(c)(4) that the Enterprise funneled through

---

[1] The United States anticipates that the experts' testimony would be akin to that of James Mulvenon in the trial of *United States v. Xu*, 1:18-CR-43, and would be of similar duration (an hour or two).

1

other entities before spending it to increase and expand political power and enrich themselves. *Id.*[2]

The background and status of energy policy in Ohio and the Enterprise's use of dark money entities like Generation Now to conceal the source and nature of the payments are facts the jury will analyze in determining the existence of an agreement and the motivation and intent of the defendants and co-conspirators. A basic understanding of Ohio energy policy and the characteristics of entities that engage in political spending is necessary for the jury to contextualize such evidence. Without a basic primer on energy policy and political spending, the jury will not be able to understand the evidence and carry out their most basic duties.

**Dr. Dormady**

Dr. Dormady, a professor at The Ohio State University, will provide background information and context about energy policy; he will testify regarding energy markets, generally, including how energy is generated, distributed, priced and sold to consumers in Ohio. Dr. Dormady will explain how energy generation, distribution and pricing are regulated. He will also testify about

---

[2] For example, the Indictment alleges that "between on or about March 2017 and March 2020, Householder's Enterprise agreed to receive and accept millions of dollars in bribe payments from Company A Corp. (FirstEnergy), including bribe payments paid through Generation Now, in return for Householder taking specific official action for the benefit of Company A, namely, to help enact into law legislation that would go into effect and save the operation of the Nuclear Plants." (Doc. 22, ¶ 41.) The Indictment further describes Company A's desire for a legislative solution, alleging that Company A Corp. reported substantial losses tied to its nuclear generating assets, and by 2017, indicated that absent a legislative solution, its options were limited to bankruptcy, restructuring debt, or deactivating the nuclear plants. (Doc 22, ¶¶ 22-24.) In 2018, Company A Corp.'s subsidiary, Company A-1 (then FirstEnergy Solutions) filed for bankruptcy and announced it would deactivate the Nuclear Plants absent a legislative solution. (Doc. 22, ¶ 24.) The Indictment goes onto allege that Company A received its legislative solution (HB 6) with assistance in the form of official action from Householder and the Enterprise, in exchange for millions of dollars funneled through a web of entities that the Enterprise used to increase and expand Householder's political power and pay personal benefits. (Doc. 22, *e.g.* 25, 34-53, 75-118.) The Indictment identifies the web of entities used by the Enterprise for these purposes, including 501(c)(4)s, a PAC, and for-profit entities. (Doc. 22, ¶¶ 5, 12-17.)

important context leading up to HB 6, including Ohio's attempt to deregulate (or "restructure") energy generation and distribution in Ohio, and how that, coupled with natural gas prices, led to distribution utilities, like FirstEnergy, recovering lost profits for their affiliated generation companies through riders and surcharges on utility bills. Through his testimony, he will explain energy terminology that the jury will need to have a basic understanding of HB 6. *See* Exhibit A (full disclosure).

**Dr. Wood**

Dr. Wood, a professor at the University of Southern California Gould School of Law, will provide important context and background about the American system of campaign finance, the features and operation of political spending, and the regulation of political spending. She will explain the various entities through which candidates receive financial support and non-traditional entities that have emerged and engage in political spending. Dr. Wood will explain how the disclosure requirements differ according to type of entity engaged in political spending and how some political spending results in a lack of transparency. *See* Exhibit B (full disclosure).[3]

**III.    LEGAL STANDARD**

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise[.]" Fed. R. Evid. 702. The expert testimony is only permitted, however, where four conditions are met:

> [1] the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> [2] the testimony is based on sufficient facts or data;
> [3] the testimony is the product of reliable principles and methods; and

---

[3] Householder has noticed his own expert, Caleb Burns, who will purportedly testify about entities engaged in political spending like 501(c)(4)s and PACs.

> [4] the expert has reliably applied the principles and methods to the facts of the case.

*Id*. at 702(a)–(d). A trial judge acts as a gatekeeper, admitting only that expert testimony that is relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589. When determining the admissibility of expert testimony, "[t]he district court is not obligated to hold a *Daubert* hearing." *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000).

In terms of relevance, under Federal Rule of Evidence 401, "evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevancy "exists only as a relation between an item of evidence and a matter properly provable in the case." Fed. R. Evid. 401, advisory committee's notes (1972). "In a criminal case, a fact is 'of consequence' if it makes it more or less likely that the defendant committed the charged conduct." *United States v. Hazelwood*, 979 F.3d 398, 409 (6th Cir. 2020), *reh'g denied* (Dec. 30, 2020). However, each piece of evidence need not "directly prove or disprove an element of the offense." *Id.* But, "evidence must at least be 'a step on one evidentiary route to the ultimate fact.'" *Id.* (quoting *Old Chief v. United States*, 519 U.S. 172, 179, (1997).)

"To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As such, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted); *United States v. De Oleo*, 697 F.3d 338, 344 (6th Cir. 2012) (background evidence "provides context for the jury"); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (background evidence may "complete the story of the charged

4

offense"). "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir. 1991); *United States v. Sutton*, 769 F. App'x 289, 295 (6th Cir. 2019) (background evidence admissible to show intent and motive).

Here, the Indictment charges a RICO conspiracy in violation of 18 U.S.C. § 1962(d), which requires the United States to prove (1) the existence of an enterprise or an agreement that an enterprise would exist; (2) that the enterprise was or would be engaged in, or its activities affected or would affect, interstate or foreign commerce; (3) that the defendant was associated with or employed by the enterprise, and (4) the defendant conspired to violate 18 U.S.C. § 1962(c), that is, to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. *United States v. Salinas*, 522 U.S. 52, 62-65 (1997). The patten of racketeering alleged in the Indictment includes acts of honest services fraud, bribery, and money laundering. (Doc. 22, ¶ 33). Any piece of evidence bearing on these elements or the pattern of racketeering alleged is a fact of consequence, including motive. *E.g. United States v. Amr*, 132 F. App'x 632, 635 (6th Cir. 2005) (district court properly admitted evidence relevant to establishing the defendant's motive); 23 C.J.S. Criminal Procedure and Rights of Accused § 1016 ("Wide latitude in the admission of evidence of motive is permissible, particularly in cases where a corrupt motive or fraudulent intent is an important element of the crime charged.").

IV.     ARGUMENT

   A. **Dr. Dormady's proposed testimony is relevant, helpful, and not unfairly prejudicial.**

Householder asks the Court to exclude Dr. Dormady's testimony. His request is entirely unfounded. Dr. Dormady will provide relevant and helpful background information to jurors that

5

will assist them in understanding the testimony and exhibits they will receive during trial. *See Gonzalez*, 110 F.3d at 941; *De Oleo*, 697 F.3d at 344.

For example, he will explain the sources of energy generation in Ohio; he will explain what a nuclear power plant is; and he will explain the difference between energy generation (such as FirstEnergy Solutions) and distribution (such as FirstEnergy and its affiliates), who regulates generation and distribution, and how Ohioans pay for energy. It would be unfair to the government and the jurors themselves to expect jurors to understand an alleged agreement about a billion-dollar nuclear bailout without ensuring jurors have a basic understanding of energy policy and energy markets in Ohio.

Householder also urges the Court to exclude Dr. Dormady's testimony because he asserts that this case is not about the wisdom of HB 6. But that is exactly why the United States will not be asking Dr. Dormady to opine on the merits of the HB 6 during direct examination.[4] However, the United States does plan on asking Dr. Dormady to provide background and context information on energy markets in Ohio, including defining technical terms likes "riders" and subsidies" – terms relevant to the HB 6 legislation.[5] Such information will assist the jurors' understanding of other trial testimony and exhibits.

---

[4] While the United States will not elicit such testimony, the defendants could open the door through cross-examination. If that occurs, the United States will seek permission to inquire into such areas on redirect or in rebuttal.

[5] For example, the Indictment identifies some of these technical terms in discussing HB 6. (Doc. 22, ¶ 25 ("HB 6 allowed nuclear or solar resources to apply to be 'qualifying' resources, which would make them eligible for a state subsidy of $9 per megawatt hour produced. The legislation provided for the collection of a monthly-fixed charge to all residential, commercial, industrial, and large customers to pay for the subsidy….As passed, HB 6 also included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple energy rates, which would allow a company to bill retail customers for a surcharge if the company's annual revenue fell below a baseline revenue.").)

Householder asserts that the Court should exclude Dr. Dormady's background testimony about the deregulation/restructuring of Ohio's energy markets, which began in 1999 and continued in 2008 through the relevant time period of the Indictment, because it "cannot possibly be relevant to this criminal case" and Householder was not a legislator in 2008.[6] Householder's arguments in this regard are not well-taken.

As the testimony will show, the previous deregulation/restructuring of the energy markets in Ohio had a direct impact on energy policy in 2016-2017 when FirstEnergy sought a legislative solution for its nuclear plants as alleged in the Indictment. As such, this is significant background and foundational evidence for the jury, and provides motive evidence about the need for the illicit agreement. *See Reifler*, 446 F.3d 92 ("Background evidence may be admitted to . . . furnish an explanation of the understanding or intent with which certain acts were performed"). Moreover, this testimony adds valuable context to "official action" – an element of the federal bribery predicate acts – for the jury, in understanding who regulates energy markets in Ohio and how they are regulated.

Householder claims that even if relevant, Dr. Dormady's proposed testimony should be excluded because he alleges it is unfairly prejudicial under Rule 403. (Doc. 131 at PageId 3625.) However, Federal Rule of Evidence 403 is a "rule of inclusion" – rather than exclusion – and therefore a court "must view the evidence in the light most favorable to its proponent, the government, and maximize its probative value." *United States v. McCutchen,* 150 F. App'x 517, 523 (6th Cir. 2005). Under Federal Rule of Evidence 403, evidence may be excluded only if "its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the

---

[6] While Householder was not a member of the Ohio House of Representatives in 2008, he did serve in the House between 1997 and 2004 when the deregulation (or "restructuring") of energy systems and markets began.

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403 (emphasis added). "'Unfair prejudice,' as used in Rule 403, does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest a decision on an improper basis." *United States v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986).

In support of his Rule 403 argument, Householder argues that "expert opinion testimony that Ohio consumers have paid more in energy costs – would be inviting the jury to convict on improper grounds." (Doc. 131, PageId 3626.) The defendant's argument is skeletal, here, and it is not entirely apparent what part of Dr. Dormady's testimony he is referring to. *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Again, Dr. Dormady will not opine on wisdom or efficacy of HB 6 during the United States' case-in-chief. Consistent with the notice provide to the defendants, Dr. Dormady will testify, however, about the status of the energy market leading up to HB 6 and that the restructuring process had not resulted in lower prices for a large number of Ohio consumers as intended. To the extent this is the basis of Householder's objection, it is difficult to understand how such testimony is any more prejudicial than the allegations of the Indictment – that Householder delivered a billion-dollar bailout born on the backs of taxpayers, regardless of whether they were actually customers of FirstEnergy or its affiliates. Any theoretical prejudice from such testimony could be ameliorated by a simple limiting instruction. *E.g. United States v. Adams*, 722 F.3d 788, 812 (6th Cir. 2013) (rejecting defendants' argument that background evidence was unfairly prejudicial under Rule 403 where district court gave adequate limiting instruction).

### B. Dr. Woods' testimony is relevant, helpful, and not cumulative.

Householder asks the Court to exclude the majority of Dr. Wood's testimony. Each of his arguments are meritless.

Householder contends the last sentence in the second bullet of Dr. Wood's disclosure is not helpful to the jury: "because many of these non-traditional entities do not disclose the sources of their contributions, they prevent the public from detective when public officials favor the preferences of their donors over the preferences of their broader constituency." Householder's argument should be rejected.[7]

To make this argument, Householder plucks the statement from the disclosure in attempt to divorce it from the larger context. For example, this statement is the last sentence of a paragraph about the characteristics of non-traditional entities that engage in political spending, such as 501(c)(4)s. Householder cannot seriously contend that the characteristics of 501(c)(4) entities are within the ken of average jurors for he has noticed his own expert to opine on this very subject. In any case, the differing disclosure requirements for these entities and how they can be manipulated to conceal the trail of money are not facts within common, public knowledge. Further, this testimony will assist the jury by showing the implications of undisclosed, dark money entities. (*See* Doc. 22 ¶¶ 35–41.); *See* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265, at 250 (1997) ("[T]he 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree.").

---

[7] Householder also challenges Dr. Wood's proposed testimony that dark-money entities are "ripe vehicles" to "circumvent limits set for the traditional entities." (Doc. 131, PageID 3626.) The government no longer intends to introduce this opinion through Dr. Wood, so the argument is now moot.

9

Householder also asks the Court to exclude portions of Dr. Woods' testimony as unfairly prejudicial under Rule 403 because her testimony is cumulative of IRS employee, Mr. Walker, another expert disclosed by the United States. However, a comparison of their expertise and disclosures shows this is not the case. Mr. Walker's testimony is based on his training and experience as an IRS employee for the past thirty years. *See* Exhibit C (Walker disclosure). Mr. Walker will explain that a 501(c)(4) entity is not a traditional political spending organization; rather, it is a social welfare organization created by the federal tax code. Mr. Walker will provide background and context regarding 501(c)(4)s, such as their IRS disclosure requirements and the purpose and appropriate use of 501(c)(4)s. Dr. Wood's testimony has a different focus – entities that engage in political spending, including 501(c)(4)s, and general disclosure and disclaimer requirements that come not from IRS – but from the Federal Election Commission or their state equivalents. To the extent that the testimony of Mr. Walker and Dr. Wood overlap, it will be brief, and only to allow Dr. Wood to put her opinions relating to dark money—different than those advanced by Mr. Walker—in the appropriate context.

Householder's reliance on civil cases to assert that Dr. Wood's testimony is cumulative is misplaced and unpersuasive – just as it was when he relied on civil RICO cases in the context of his motion to dismiss. (*See* Doc. 112, PageID 2554 (response to Householder's motion to dismiss).) Federal Rule of Civil Procedure 16(c)(2)(D) directs courts to consider and take appropriate action during a pretrial conference to avoid cumulative expert evidence in civil cases. Fed.R.Civ.P. 16(c)(2)(D) ("At any pretrial conference, the court may consider and take appropriate action on . . .(D) avoiding unnecessary proof and cumulative evidence, and limiting the use of testimony under Federal Rule of Evidence 702"). No similar rule exists in criminal procedure – which is logical considering the different burden of proof for criminal cases. Thus, cases about

10

what constitutes cumulative expert testimony in civil cases is not persuasive authority in this context.

Finally, Householder argues that the Court should exclude Dr. Wood's testimony about campaign finance disclaimers as irrelevant, asserting "it's not clear why the government is even proffering this opinion." (Doc. 131, PageID 3629.) Householder's relevancy argument misses the point.

Campaign finance disclaimers are relevant for several reasons. At trial, the United States must prove the existence of an enterprise. Under *Boyle,* an enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). Among the common purposes alleged in the Indictment, was "obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments." (Doc. 22, ¶ 32(A).) One way the Enterprise worked together was to expand Householder's power by using dark money advertisements that obscured the source and funding of the advertisements. Indeed, the Indictment alleges and the trial evidence will show that Householder's Enterprise used the bribe money, in part, to pay for campaign ads to expand and preserve Householder's political power, by supporting his slate of candidates in the 2018 election, by pressuring legislators to vote for HB 6 and protecting and providing "cover" for those who did vote for HB 6, and to defeat the ballot measure campaign. (Doc. 22, ¶ 91 ("In or around April 2018, after having received $1.3 million in Company A-to-Generation Now payments . . . Householder's Enterprise sent wires totaling $1 million from Generation Now to PAC, which purchased in the PAC's name advertisements benefiting Householder and Householder's Enterprise candidates for the May 8, 2018 Ohio primary election) ¶ 109 ("Through advertisements paid for by Generation Now, Householder's Enterprise provided 'cover' and 'protected' legislators who planned to vote in favor

11

of HB 6 and applied pressure to unsupportive legislators and those who were undecided") ¶ 122 ("Householder's Enterprise laundered approximately $23 million of the $35.7 million received by Generation Now through Front Company, before paying for direct mail, media ads, and other services to defeat the Ballot Campaign.").)

These advertisements did not bear the name of Householder. Rather, they bore the name of Generation Now or other dark money entities funded by Generation Now to further obscure from the public the source and funding of the advertisements. *See* Exhibit D (various flyers from Generation Now and its front company, Ohioans for Energy Security). Dr. Wood's background testimony about campaign finance disclaimers will be helpful to the jury in contextualizing the advertisements they see and hear during trial, which will aid them in determining the existence of an enterprise under RICO.

### C. A *Daubert* hearing is unnecessary.

Finally, the Court should deny Householder's unsupported request for a *Daubert* hearing. "A district court is not required to hold a *Daubert* hearing before admitting expert testimony." *United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015) (citing *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000)). Indeed, "[u]nder normal circumstances, a district court may resolve a *Daubert* motion without holding an evidentiary hearing." *Ilnytskyy v. Equipnet, Inc.*, 2022 WL 4130861, at *4 (E.D. Mich. Sept. 12, 2022) (citing *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001)); *United States v. Bondonno*, 2022 WL 542886, at *2 (W.D. Ky. Feb. 23, 2022) ("A court typically can resolve a *Daubert* motion without holding a hearing."). "A hearing is required only if the record is inadequate to decide the motion." *Bondonno*, 2022 WL 542886, at *2.

Here, Householder requests a hearing without providing *any* grounds explaining why a hearing is necessary to resolve his motion. (*See* Doc. 131, PageID 3629.) Barebones and conclusory arguments are insufficient to support a motion and constitute waiver. *El–Moussa*, 569 F.3d at 257 ("It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones.") (internal quotation marks and alteration omitted); *United States v. Cain*, 2020 WL 3821099, at *4 (E.D. Ky. July 8, 2020) (rejecting outright "conclusory" arguments in pretrial motion); *Navarro v. Procter & Gamble Co.*, 2021 WL 184591, at *46 (S.D. Ohio Jan. 19, 2021) (noting that arguments raised in a skeletal fashion are waived and collecting cases in support).[8] Further, courts often find a *Daubert* hearing unnecessary where the proponent failed to articulate a valid reason for the hearing. *See, e.g., United States v. Stone*, 848 F. Supp. 2d 714, 717 (E.D. Mich. 2012) (*Daubert* hearing unnecessary where "the expertise is familiar[] and no novel objection is raised"); *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) ("Certainly the interests of justice do not require the Court to conduct lengthy hearings when the admissibility of well-established principles can be readily determined at trial.").

In any case the record shows that a hearing is unnecessary. The reports provided by the government detail with specificity the testimony that will be offered through its experts. (*See* Exhibit A (Dormady opinions); Exhibit B (Wood opinions).) The only ground through which Householder seeks exclusion is relevance/helpfulness. As set forth above, the detailed allegations in the Indictment and the specific topics highlighted in the expert reports are more than sufficient for the Court to determine relevance without a hearing. *See Greenwell v. Boatwright*, 184 F.3d 492, 496-98 (6th Cir. 1999) (*Daubert* hearing "is not required" for the trial court to "make an initial

---

[8] Householder may not support his position for the first time in a reply brief. *United States v. Sisco*, 2022 WL 636717, at *10 n.8 (E.D. Ky. Mar. 4, 2022); *United States v. Sisk*, 2022 WL 1616680, at *6 (S.D. Ohio May 23, 2022).

13

assessment of the relevance and reliability of the expert testimony"); *United States v. DeJournett*, 2014 WL 3748935, at *22-23 (N.D. Ohio July 29, 2014) (denying request for Daubert hearing because "the Court finds that it can make the necessary initial assessment of the relevance and reliability of the proposed expert testimony without a hearing"); *United States v. West*, 2009 WL 3874170, at *1 (E.D. Mich. Nov. 18, 2009) ("the Court does not need a formal hearing to assess whether the testimony is relevant and reliable.").

## V. CONCLUSION

The defendant's motion to exclude the testimony of Dr. Dormady and Dr. Wood should be denied without a hearing.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


*s/ Emily N. Glatfelter*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
E-mail: Emily.Glatfelter@usdoj.gov
Email: Matthew.Singer@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Court's CM/ECF System this 17th day of October 2022, which provides electronic notice to all parties.

<em>s/ Emily N. Glatfelter</em><br>
EMILY N. GLATFELTER (0075576)<br>
Assistant United States Attorney