# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-77** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE BLACK** |
| **v.** | : | |
| | : | |
| | : | **PROPOSED JURY INSTRUCTIONS &** |
| **LARRY HOUSEHOLDER and** | : | **VERDICT FORM** |
| **MATTHEW BORGES,** | : | |
| | : | |
| **Defendants.** | : | |

---

## UNITED STATES' PROPOSED
## JURY INSTRUCTIONS AND VERDICT FORM

The United States of America, through the undersigned Assistant United States Attorneys,

hereby submits the following proposed jury instructions and verdict form.

KENNETH L. PARKER
United States Attorney


*s/ Emily N. Glatfelter*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
MEGAN GAFFNEY PAINTER (NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov
E-mail: Megan.Painter@usdoj.gov

## <u>Table of Contents</u>

Sixth Circuit Pattern Instructions – General ........................................................................3

Proposed Government Instructions........................................................................................4

Sixth Circuit Pattern Instructions – Final...........................................................................44

Verdict Form.......................................................................................................................45

## Sixth Circuit Pattern Instructions - General

The United States requests that the Court provide the standard, applicable preliminary and closing instructions to the jury as set forth in the Sixth Circuit Pattern Jury Instruction, including the following Pattern Instructions:

<u>GENERAL INSTRUCTIONS</u>

| | |
|---|---|
| 1.01-1.09 | General Principles |
| 2.01 | Introduction |
| 2.01B | Separate Consideration: Multiple Defendants Charged with Single Crime |
| 2.04 | On or About |
| 2.08 | Inferring Required Mental State |
| 7.02A | Defendant's Election Not to Testify or Present Evidence (If applicable) |
| 7.02B | Defendant's Testimony (if applicable) |
| 7.03 | Opinion Testimony |
| 7.03A | Witness Testifying to Both Facts and Opinions |
| 7.07 | Testimony Under grant of Immunity or Reduced Criminal Liability |
| 7.12 | Summaries and Other Materials Not Admitted in Evidence |
| 7.12A | Secondary-Evidence Summaries Admitted in Evidence |
| 7.13 | Other Acts of the Defendant (if applicable) |
| 7.17 | Transcriptions of Recordings (possible modification pursuant to stipulation) |
| 7.19 | Judicial Notice (if applicable) |
| 7.21 | Stipulations (if applicable) |

## Government's Proposed Instruction No. 1
### (Redactions)

The Court's rules require that certain information be redacted from exhibits. You should not draw any inference from the fact that an exhibit is redacted.

(Government Investigative Techniques)

You have heard evidence obtained from the government's use of undercover agents, informants, and deceptive investigative techniques. The government is permitted to use these techniques. You should consider evidence obtained this way together with and in the same way you consider the other evidence.

**[Seventh Circuit Pattern Instruction 3.19]**

The Indictment charges the defendants with conspiracy to commit racketeering and alleges, in relevant part, as follows:

**The Enterprise:**

Defendants **LARRY HOUSEHOLDER, JEFFREY LONGSTRETH, NEIL CLARK, MATTHEW BORGES, JUAN CESPEDES, and GENERATION NOW**, and others known and unknown to the Grand Jury constituted an "Enterprise" (hereinafter "The Enterprise") as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of The Enterprise, and The Enterprise engaged in, and its activities affected, interstate commerce.

**Roles of the Conspirators:**

Defendant **LARRY HOUSEHOLDER** represents the State of Ohio's 72 District in the Ohio House of Representatives and has done so since January 2017. He also is the current Speaker of the Ohio House of Representatives and has served in that capacity since January 7, 2019.

Defendant **GENERATION NOW** was a self-titled 501(c)(4), organized under the laws of Delaware, registered in Ohio, and purported to be organized primarily for a social welfare purpose under the Internal Revenue Code. The Internal Revenue Code, Title 26, United States Code, Section 501(c)(4), provides for tax exempt status for social welfare organizations. A "501(c)(4)" social welfare organization may "not [be] organized for profit but operated exclusively for the promotion of social welfare[.]" 26 U.S.C. § 501(c)(4)(A). An entity may not qualify for tax-exempt 501(c)(4) status "unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(4)(B). A 501(c)(4) entity must notify

the IRS of its intent to operate as a 501(c)(4) organization. 26 U.S.C. § 506. The names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

**GENERATION NOW** maintained offices in Columbus, Ohio, within the Southern District of Ohio. Although registered as a 501(c)(4), in reality, **GENERATION NOW** operated as **HOUSEHOLDER's** slush fund for the benefit of **HOUSEHOLDER** and his coconspirators. From 2017 to present, **GENERATION NOW** received more than $59 million from "Company A Service Co.," "Company A-1," and "Energy Pass-Through."

Defendant **JEFFREY LONGSTRETH** was **HOUSEHOLDER's** campaign and political strategist since at least in or about 2016. **LONGSTRETH** opened and is a signor on the **GENERATION NOW** bank accounts. **LONGSTRETH** also owns and operates JPL & Associates LLC and Constant Content Co., in Columbus, Ohio, in the Southern District of Ohio. From 2017 through 2020, JPL & Associates received approximately $10.5 million directly from **GENERATION NOW,** and another $4.4 million indirectly through Front Company (described below). **LONGSTRETH** transferred $1,000,000 of the **GENERATION NOW** money to his brokerage account in 2020.

Defendant **NEIL CLARK** owned and operated Grant Street Consultants, a Columbus, Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to starting Grant Street Consultants, **CLARK** served as budget director for the Ohio Senate Republican Caucus. Along with **LONGSTRETH**, **CLARK** served as one of **HOUSEHOLDER's** closest advisors and was **HOUSEHOLDER's** "proxy" in meetings with **The Enterprise** members and associates relating to House Bill 6 (described below) when **HOUSEHOLDER** was unavailable. In 2019, **CLARK** received approximately $290,000 from **GENERATION NOW**, which had been laundered through other accounts.

Defendant **MATTHEW BORGES** was a Columbus-based, lobbyist for Company A-1 (defined below). On or about August 5, 2019, **BORGES** registered with the Ohio Secretary of State, "17 Consulting Group LLC" (hereinafter "17 Consulting") as a for-profit limited liability company. Two days later, on or about August 7, 2019, **BORGES** opened a bank account for 17 Consulting Group LLC. **BORGES** listed himself as the President/Owner/CEO of 17 Consulting Group LLC and as the sole signatory on the account. The day after **BORGES** opened the account, **GENERATION NOW** wired $400,000 into the account. Between in or about August 2019 and October 21, 2019, **The Enterprise** funded the 17 Consulting account with $1.62 million in wire transfers from **GENERATION NOW**. **BORGES** used the bank account to pay himself, pay **CESPEDES**, attempt to bribe an employee and agent of the Ballot Campaign (described below), and pay for other expenses incurred by **The Enterprise** in defeating the Ballot Campaign.

Defendant **JUAN CESPEDES** was an outside lobbyist for Company A-1 who was central to Company A-1's efforts and **The Enterprise** to get the bailout legislation passed in Ohio. **CESPEDES** was paid both by **The Enterprise** and Company A's Service Co. for his efforts and often served as a key middleman. In 2019, **CESPEDES** received $600,000 from **GENERATION NOW** via **BORGES'** account.

**Other Individuals and Entities:**

"Company A Corp." was an Akron-based public utility holding company. Throughout the start of the relevant period until in or around February 2020, Company A Corp. was the parent company to entities involved in nuclear energy generation, including Company A-1. Company A Service Co. is a principle subsidiary of Company A Corp. According to its 2019 annual report, the President and Chief Executive Officer of Company A Corp. also served as the President and Chief Executive Officer of Company A Service Co.

"Company A Service Co." was a principle subsidiary of Company A Corp., and operated as Company A's service company, providing legal, financial, and other corporate support services to Company A and its affiliates, including Company A-1. Services provided by Company A Service Co. included corporate contributions and advocacy on behalf of Company A and its affiliates at the federal, state, and local levels, among other services. The President and Chief Executive Officer of Company A Corp., also serves as the President and Chief Executive Officer of Company A Service Co. Company A Service Co. provides services to Company A-1, as described below, including "external affairs," "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local levels." From in or about March 2017 to October 22, 2019, Company A Service Co. wired millions of dollars to **GENERATION NOW**.

"Company A-1" was a wholly-owned subsidiary of Company A Corp. involved in nuclear energy generation. Through subsidiaries, Company A-1 owned and operated two nuclear plants in Ohio, "Nuclear Plant 1" and "Nuclear Plant 2" (together, the "Nuclear Plants"). In March 2018, Company A-1 filed for Chapter 11 bankruptcy. As a result of the bankruptcy proceedings, Company A-1 separated from Company A Corp. in or around February 2020.

"Energy Pass-Through" was registered as a 501(c)(4) entity in Ohio approximately two days after **GENERATION NOW** registered in Delaware. During the period from its inception in or around February 2017 to October 2019, Energy Pass-Through was funded exclusively by $25 million from Company A Service Co. **GENERATION NOW** then received more than $15 million from Energy Pass-Through between in or around February 2017 through in or around March 2020.

"Company A" refers collectively to Company A Corp., Company A Service Co., and Company A-1. Prior to February 2020, both Company A Service Co. and Company A-1 were

subsidiaries of Company A Corp. Until February 2020, all three entities shared a common first name, and members and associates often referred generically to the "company" or to the common first name ("Company A") in communications.

"Company-A-to-**GENERATION-NOW** payments" refers to money from Company A Corp, Company A-1, Company A Service Co., and Energy Pass-Through that was deposited into **GENERATION NOW's** bank account.

"PAC" was a federal Political Action Committee. During the 2018 election cycle, **The Enterprise** laundered at least $1,000,000 from **GENERATION NOW** through PAC to pay for media buys in PAC's name to help elect candidates loyal to defendant **HOUSEHOLDER**. During the 2020 primary election, **The Enterprise** laundered over $1,000,000 from **GENERATION NOW** to PAC, via Coalition, to pay for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER**.

"Coalition" was a purported 501(c)(4) entity. In 2020, **The Enterprise** wired over $1,000,000 from **GENERATION NOW** to Coalition, which was then wired to PAC to for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER**. According to **LONGSTRETH**, he oversees political activities for Coalition.

"Dark Money Group 1" was incorporated on or about September 21, 2018, less than two months before the 2018 general election. In the weeks before the 2018 general election, **GENERATION NOW** wired $670,000 to Dark Money Group 1, while Energy Pass-Through wired $500,000. Between on or about October 20, 2018 and November 1, 2018, Dark Money Group 1 spent all of this money to pay for television, radio and print advertisements ("media buys") targeting the rivals of **HOUSEHOLDER's** candidates in the name of Dark Money Group 1.

**The Enterprise** employed numerous individuals in various capacities, (designated herein as "Associates"), whom **The Enterprise** paid either through **GENERATION NOW** or by funneling **GENERATION NOW** money through **LONGSTRETH's** accounts.

## The Ohio Legislature:

The Ohio House of Representatives is an elected body of the Ohio General Assembly. Members of the Ohio House of Representatives serve two-year terms and are limited to four consecutive two-year terms. House members propose, advance, and vote on legislation.

The Speaker of Ohio is the leader of the Ohio House of Representatives. The Speaker guides the agenda of the chamber, presides over the House session, and provides direction to House members and staff. The Speaker also decides when bills reach the House floor for a vote and who serves in leadership positions in the Speaker's caucus. The Speaker names all committees and subcommittees, and appoints all members and chairs to committees and subcommittees.

The Speaker is elected at the beginning of every General Assembly, which convenes its first regular session on the first Monday of January in odd-numbered years. To choose a Speaker, representatives-elect of the majority caucus in the House nominate and vote for a candidate for Speaker. The Speaker candidate who receives an absolute majority of those votes is then voted on by all House members during the first session day of the General Assembly.

## Company A's Bail Out:

Beginning in and around 2016, Company A Corp. reported to shareholders billions of dollars in losses, including financial losses by Company A-1 and its nuclear-generating assets. By in and around 2017, Company A Corp. announced publicly that, absent a legislative solution, Company A-1's strategic options were limited to bankruptcy, plant deactivations, and/or restructuring debt.

In or around March 2018, Company A-1 and other nuclear-generation-related affiliates of Company A Corp. filed Chapter 11 bankruptcy. Under Company A-1's proposed restructuring plan, Company A Corp. would divest its interest in Company A-1 and its other nuclear generation assets.

Also in or around March 2018, Company A-1 announced that it would close the Nuclear Plants absent legislative action. Specifically, Company A-1 stated that it would deactivate Nuclear Plant 1 and Nuclear Plant 2 in the next three years but would continue normal operations of the facilities until then. Company A-1 also announced that it was seeking a legislative solution as an alternative to deactivation of the Nuclear Plants.

House Bill 6 ("HB 6") was proposed legislation introduced in the Ohio House of Representatives on or about April 12, 2019, roughly three months after **HOUSEHOLDER** became Speaker of the Ohio House of Representatives. Titled the "Ohio Clean Air Program," HB 6 was referred to the House Energy and Natural Resources Committee, which assigned the bill to a newly created subcommittee, the House Energy and Natural Resources Subcommittee on Energy Generation ("Subcommittee on Energy Generation"). HB 6 allowed nuclear or solar resources to apply to be "qualifying" resources, which would make them eligible for a state subsidy of $9 per megawatt hour produced. The legislation provided for the collection of a monthly-fixed charge to all residential, commercial, industrial, and large consumers to pay for the subsidy. Under the legislation, the subsidy is dispersed at the direction of the Ohio Air Quality Development Authority. As passed, HB 6 added six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen, three of which are selected by the Speaker of the House. As passed, HB 6 also included a provision that gave an electric distribution utility, such as Company A Corp, the ability to decouple energy rates, which would allow a company to bill retail customers for a surcharge if the company's annual revenue fell below a baseline revenue.

HB 6 passed the House on or about May 29, 2019. The bill passed the Senate and, on or about July 23, 2019, the Governor signed the legislation into law.

"Ballot Campaign," was a ballot issue political action committee formed to repeal HB 6 through a ballot referendum. On or about July 29, 2019, Ballot Campaign submitted to the Ohio Attorney General its petition to repeal the legislation through a ballot referendum.

The next day, on or about July 30, 2019, "Front Company" was formed to defeat the Ballot Campaign. "Front Company," operated as a pass-through entity. According to required disclosures, Front Company paid for millions of dollars in direct mailers and television advertisements. However, **The Enterprise** fully funded Front Company through Company-A-to-**GENERATION-NOW** payments. Specifically, between August 2019 and November 2019, **The Enterprise** received over $38 million into **GENERATION NOW** from Company A and then transferred approximately $23 million from **GENERATION NOW** to Front Company.

On or about August 29, 2019, the Ohio Attorney General approved the Ballot Campaign's second proposed summary of its referendum petition. The Ohio Secretary of State validated its initial submission of signatures the next day, meaning that the Ballot Campaign had until on or about October 22, 2019, the effective date of HB 6, to circulate its petition and collect the requisite signatures for a ballot referendum. If the Ballot Campaign was successful, the implementation of HB 6 would be stayed until the following year's general election.

"CHS-1" was employed by and was an agent of the Ballot Campaign as a supervisor, who, among other things, managed signature collectors. After receiving a bribery solicitation in or about September 2019, CHS-1 contacted the Federal Bureau of Investigation ("FBI"), assisted the FBI in its investigation, and acted at FBI's direction.

Signature collectors were employees and agents of the Ballot Campaign, whose duties included collecting signatures in favor of the referendum. Between in or about September 2019 through October 21, 2019, agents of Front Company attempted to bribe signature collectors.

The Ballot Campaign failed to collect enough signatures to put the issue on the ballot for a vote by Ohio citizens, and HB 6 became law effective on or about October 22, 2019.

**The Purposes of the Enterprise:**

The primary purposes of **The Enterprise** included:

A. Obtaining, preserving, and expanding **HOUSEHOLDER's** political power in the State of Ohio through the receipt and use of secret payments;

B. Enriching and benefitting the enterprise, its members, and associates; and

C. Promoting, concealing, and protecting purposes (A) and (B) from public exposure and possible criminal prosecution.

**The Racketeering Conspiracy:**

Beginning in or about 2016 and continuing to the present, the exact date being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, the Defendants, **LARRY HOUSEHOLDER, JEFFREY LONGSTRETH, NEIL CLARK, MATTHEW BORGES, JUAN CESPEDES, and GENERATION NOW**, and others known and unknown to the Grand Jury, being persons employed by and associated with **The Enterprise**, an enterprise, engaged in, and the activities of which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to the Grand Jury to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to

interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02.  It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

**Manner and Means of the Conspiracy:**

It was part of the conspiracy that since at least 2016, members and associates of **The Enterprise** planned for **HOUSEHOLDER's** election as the Speaker of the House for the State of Ohio.

It was part of the conspiracy that **The Enterprise** created an entity called **GENERATION NOW** to solicit, receive, and disburse money obtained in furtherance of its purposes.

It was part of the conspiracy that **HOUSEHOLDER** controlled and directed **GENERATION NOW**, with **LONGSTRETH** and others operating **GENERATION NOW** for the benefit of **The Enterprise** and at **HOUSEHOLDER's** direction.  However, **The Enterprise** concealed **HOUSEHOLDER's** connection to **GENERATION NOW** and its true purpose on documents **The Enterprise** submitted to financial institutions, the State of Ohio, and the IRS, which concealed its criminal activities.

It was part of the conspiracy that, although **GENERATION NOW** claimed to operate as a nonprofit, 501(c)(4) social welfare entity, **The Enterprise** used **GENERATION NOW** as a mechanism to receive and conceal bribe payments for the benefit of **The Enterprise** members, **The Enterprise** associates, and others, both directly and indirectly.

It was part of the conspiracy that **The Enterprise** and its associates solicited and received contributions to **HOUSEHOLDER** through **GENERATION NOW** because the contributions were concealed from public scrutiny and not subject to reporting requirements.

It was part of the conspiracy that **The Enterprise** used **GENERATION NOW** as a vehicle to receive "secret" money because **HOUSEHOLDER's** connection to **GENERATION NOW** and the names of contributors to **GENERATION NOW**, as a purported 501(c)(4), were not made public.

It was part of the conspiracy that **HOUSEHOLDER** and other Enterprise members and associates solicited and received money from individuals and entities into **GENERATION NOW** with the intent that the profit from **GENERATION NOW** would benefit directly **HOUSEHOLDER** and Enterprise members, Enterprise associates, and other private individuals. To conceal the benefits to Enterprise members and associates, **The Enterprise** funneled payments to **GENERATION NOW** through other entities controlled by **The Enterprise** before paying the benefits to Enterprise members and associates.

It was part of the conspiracy that, between on or about March 2017 and March 2020, **The Enterprise** agreed to receive and accept millions of dollars in bribe payments from Company A, including bribe payments paid through **GENERATION NOW,** in return for **HOUSEHOLDER** taking specific official action for the benefit of Company A, namely, to help enact into law legislation that would go into effect and save the operation of the Nuclear Plants. Examples of **HOUSEHOLDER's** specific official action of helping enact into law legislation that would go into effect and save the operation of the Nuclear Plants include: assisting in crafting the legislation; creating a House subcommittee for the legislation and appointing members to the House subcommittee; using his position as Speaker to pressure and advise public officials to take official action to further the legislation and to further efforts to ensure the legislation took effect;

scheduling and arranging for votes to ensure passage of the legislation; and voting in favor of the legislation.

It was further part of the conspiracy that **HOUSEHOLDER** and **The Enterprise** received and accepted payments from Company A corruptly with the intent that **HOUSEHOLDER** would be influenced and rewarded in connection with the legislation that would save the operation of the Nuclear Plants. These payments included millions of dollars in payments from Company A that passed through Energy Pass-Through before being transferred to **The Enterprise** through **GENERATION NOW** and other entities controlled by **The Enterprise** and its associates.

It was part of the conspiracy that **The Enterprise** used the Company-A-to-**GENERATION-NOW** payments to further **The Enterprise's** purposes, including by enriching and benefitting **The Enterprise** members and associates by paying the operating costs of **The Enterprise** (such as wages, rent and legal fees); to advance **HOUSEHOLDER** politically by, for example, paying for media buys and campaign staff for **HOUSEHOLDER's** candidates and for himself; to pressure public officials to support HB 6; and to enrich and benefit members and associates of **The Enterprise**. In so doing, **The Enterprise** laundered Company-A-to-**GENERATION-NOW** payments through other entities controlled by **The Enterprise**.

It was part of the conspiracy that **The Enterprise** used Company-A-to-**GENERATION-NOW** payments to further **The Enterprise's** purposes including obtaining, preserving, and expanding **HOUSEHOLDER's** political power and enriching and benefitting **The Enterprise**, its members and associates.

It was part of the conspiracy that **The Enterprise** used payments into **GENERATION NOW**, including bribe payments from Company A Service Co. and Company A-1, to support candidates for House seats in the 2018 primary and general elections, who would vote for

**HOUSEHOLDER** for Speaker, and would later support HB 6. It was further part of the conspiracy that **The Enterprise** used payments into **GENERATION NOW**, including bribe payments from Company A Service Co. and Company A-1, to support candidates for House seats in the 2020 primary elections**. The Enterprise**, at times, characterized candidates supported by **The Enterprise** as a member of the "team" and "Team Householder" candidates.

It was part of the conspiracy that during the 2018 election cycle and the 2020 primary season, **The Enterprise** laundered payments into **GENERATION NOW**, including Company-A-to-**GENERATION-NOW** bribe payments, through different accounts to further **The Enterprise's** purposes and to enrich and benefit its members and associates.

It was part of the conspiracy that, after his election as Speaker in 2019, **HOUSEHOLDER** promised to perform and performed specific official action on behalf of **The Enterprise** by helping enact into law HB 6 in return for payments from Company A.

It was part of the conspiracy that **The Enterprise** received and accepted millions of dollars in bribe payments into **GENERATION NOW** from Company A while HB 6 was pending before Ohio public officials, which **The Enterprise** used to further the purposes of **The Enterprise** and pass HB 6.

It was part of the conspiracy that **The Enterprise** coordinated with agents of Company A relating to payments into **GENERATION NOW** and the passage of HB 6.

It was part of the conspiracy that, after the passage of HB 6, **The Enterprise** worked to defeat the Ballot Campaign.

It was part of the conspiracy that to conceal the origin of the attacks on the Ballot Campaign, **The Enterprise** created Front Company, which served as a front organization for **The Enterprise**, and through which **The Enterprise** laundered payments from Company A.

It was part of the conspiracy that **The Enterprise** bribed and attempted to bribe employees and agents of the Ballot Campaign to improperly discharge their campaign duties and to obtain information about the Ballot Campaign's organization in order to defeat the Ballot Campaign, and did so by laundering money through various entities, including Front Company.

It was part of the conspiracy that, after the Ballot Campaign failed, **The Enterprise**, its members and associates, used the Company-A-to-**GENERATION-NOW** payments to further **The Enterprise's** purposes, including enriching and benefitting themselves, by laundering the money through various accounts controlled by **The Enterprise**.

As a reminder, the summary of The Enterprise I just read to you from the Indictment contains allegations only, not facts or evidence. You may not consider the allegations from the Indictment as evidence of the defendants' guilt.

* * * * *

The defendants are charged with violating Section 1962(d) of Title 18 of the United States Code. That section reads as follows:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Subsection (c), which I just referred to, provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

**[18 U.S.C. § 1962(c)-(d)]**

RICO Conspiracy: Elements of the Offense

To convict the defendant of racketeering conspiracy, the government must prove each and every one of the following four elements beyond a reasonable doubt:

First: The existence of an enterprise;

Second: That the enterprise was engaged in, or its activities affected, interstate or foreign commerce;

Third: The defendant was employed by or associated with the enterprise; and

Fourth: The defendant knowingly conspired to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

For you to find a defendant guilty of this crime, the government must prove all of these elements beyond a reasonable doubt. If you have a reasonable doubt about any of these elements, then you must find the defendant not guilty.

I will now instruct you on the law applicable to each of these four elements.

**[18 U.S.C. § 1962(c), (d); *Salinas v. United States*, 522 U.S. 52, 63-65 (1997); Seventh Circuit Pattern Instruction for 18 U.S.C. § 1962(c), (d) (modified); Eleventh Circuit Pattern Instructions O75.1 and O75.2 (modified); Third Circuit Pattern Instruction § 6.18.1962D (modified); *United States v. Rios*, 830 F.3d 403, 423-24 (6th Cir. 2016); *United States v. Fowler*, 535 F.3d 408, 420-21 (6th Cir. 2008); *United States v. Rich*, 14 4th 489, 491-92 (6th Cir. 2021).**

<u>**Government's Proposed Instruction No. 5**</u>
RICO Conspiracy: First Element

**First Element – "Enterprise" Defined Generally**

The first element that the government must prove beyond a reasonable doubt is that an enterprise existed, as alleged in the Indictment. An enterprise is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time. This group, in addition to having a common purpose, must have an ongoing organization, either formal or informal, and it must have personnel who function as a continuing unit. However, the group need not have a hierarchical structure and its members need not have fixed roles. Rather, different members may perform different roles at different times. This group does not have to be a legally cognizable entity, such as a partnership or a corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose.

The government has charged that the "common purposes" of the enterprise included:

A. Obtaining, preserving, and expanding **HOUSEHOLDER's** political power in the State of Ohio through the receipt and use of secret payments;

B. Enriching and benefitting the enterprise, its members, and associates; and

C. Promoting, concealing, and protecting purposes (A) and (B) from public exposure and possible criminal prosecution.

If you find that the group was a group of people characterized by (1) a common purpose, (2) an ongoing formal or informal organization, and (3) by personnel who functioned as a continuing unit, then you may find that an enterprise existed.

**[18 U.S.C. § 1961(4);** *Boyle v. United States***, 556 U.S. 938, 944-46 (2009); Third Circuit Pattern Instructions §§ 6.18.1962C-1, 6.18.1962C-2, and 6.18.1962D (2018) (modified);** *United States v. Johnson***, 440 F.3d 832, 839-41 (6th Cir. 2006)]**

21

**Second Element – Effect on Interstate or Foreign Commerce**

The second element that the government must prove beyond a reasonable doubt is that the enterprise was engaged in interstate or foreign commerce, or that the enterprise's activities affected interstate or foreign commerce. This means the government must prove that the enterprise was involved in or affected in some way trade, or business, or travel between two or more states or between the United States and a foreign country.

An enterprise is engaged in interstate or foreign commerce when it is itself directly engaged in the production, distribution, or acquisition of services, money, goods, or other property in interstate or foreign commerce.

Alternatively, an enterprise's activities affected interstate or foreign commerce if its activities in any way interfered with, changed, or altered the movement or transportation or flow of goods, merchandise, money, or other property between or among two or more states or between the United States and a foreign country. The government must prove that the enterprise's activities had some effect on commerce, no matter how minimal or slight. The government need not prove that the defendant knew that the enterprise would engage in, or that the enterprise's activities would affect, interstate or foreign commerce. The government also need not prove that a defendant intended to obstruct, delay, or interfere with interstate or foreign commerce, or that the purpose of the alleged crime generally was to affect interstate or foreign commerce. Moreover, you do not have to decide whether the effect on commerce was harmful or beneficial.

In addition, the government does not have to prove that the pattern or the individual acts of racketeering activity themselves affected interstate or foreign commerce. Rather, it is the enterprise and its activities considered as a whole that must be shown to have that effect. On the

other hand, this effect on interstate or foreign commerce may be established through the effect

caused by the pattern or the individual acts of racketeering activity.

**[Third Circuit Pattern Instructions §§ 6.18.1962C-3 and 6.18.1962D (2018) (modified);** *United States v. Robertson*, **514 U.S. 669, 671-72 (1995) (per curiam);** *United States v. Nascimento*, **491 F.3d 25, 36-39 (1st Cir. 2007);** *United States v. Johnson*, **440 F.3d 832, 841 (6th Cir. 2006)]**

**Third Element – Employed by or Associated with the Enterprise**

The third element that the government must prove beyond a reasonable doubt is that the defendant was "employed by" or "associated with" the enterprise. The government need not prove both.

If you find that the defendant was employed by the enterprise—that is enough to satisfy this element. You should give the phrase "employed by" its common, ordinary meaning. For example, a person is employed by an enterprise when he or she is on the payroll of the enterprise, or performs services for the enterprise, or holds a position in the enterprise.

Alternatively, you may find that a defendant was "associated with" the enterprise, if you find that the government proved that at some time during the period indicated in the Indictment, he was aware of the general existence and nature of the enterprise, that it extended beyond his individual role, and with that awareness participated, aided, or furthered the enterprise's activities.

It is not required that the defendant be employed or associated with the enterprise for the entire time that the enterprise existed. Rather, to prove that a defendant was either employed by or associated with an enterprise, the government must prove beyond a reasonable doubt that the defendant was connected to the enterprise in some meaningful way, and that the defendant knew of the existence of the enterprise and of the general nature of its activities at some time during the period indicated in the Indictment.

**[Third Circuit Pattern Instructions §§ 6.18.1962C-4 and 6.18.1962D (2018) (modified)]**

**Fourth Element – Conspiracy to Violate § 1962(d)**

The fourth element that the government must prove beyond a reasonable doubt is that the defendant knowingly became a member of the conspiracy. The conspiracy in this case was to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

A conspiracy is a kind of criminal partnership. This does not require proof of any formal agreement, written or spoken. Nor does this require proof that everyone involved agreed on all the details. But proof that people simply met together from time to time and talked about common interests, or engaged in similar conduct, is not enough to establish a criminal agreement. These are things that you may consider in deciding whether the government has proved an agreement. But without more they are not enough.

What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people, to cooperate with each other to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. This is essential.

An agreement can be proved indirectly, by facts and circumstances which lead to a conclusion that an agreement existed. But it is up to the government to convince you that such facts and circumstances existed in this particular case.

Now, some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged and prosecuted, or tried together in one proceeding.

The focus of this element is on the defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity, and not on the defendant's agreement

to commit individual criminal acts. The government must prove that the defendant participated in some manner, however slight, in the overall objective of the conspiracy, and that the conspiracy itself involved, or would have involved, the commission of two racketeering acts. A person may be a member of a conspiracy even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor roles. An equal role is not what the law requires.

### Fourth Element – Pattern of Racketeering Activity

As I stated a moment ago, the focus on this element is a defendant's agreement to participate in the objective of the enterprise to engage in a pattern of racketeering activity. The term "racketeering activity" as charged in the Indictment means: (1) public official honest services wire fraud, in violation of federal law; (2) extortion under color of official right, in violation of federal law; (3) private honest services wire fraud, in violation of federal law; (4) bribery, in violation of state law; (5) interstate travel and use of interstate facilities in aid of racketeering enterprises, in violation of federal law (also called, the "Travel Act"); (6) money laundering, in violation of federal law; and (7) engaging in monetary transactions in property derived from specified unlawful activity, in violation of federal law. I will define those crimes in a few minutes.

The phrase "pattern of racketeering" means at least two acts of racketeering activity that are related to the enterprise and to each other and that pose a threat of continued criminal activity.

To prove that the racketeering acts are related to the enterprise, the government must prove that the acts of racketeering activity had a relationship or a meaningful connection to the enterprise. This relationship or connection may be established by evidence that the racketeering activity benefitted the enterprise, was authorized by the enterprise, promoted or furthered the purposes of the enterprise, or was in some other way related to the affairs of the enterprise.

To prove the racketeering acts are related to each other, the government must prove that the acts had the same or similar purposes, results, participants, or methods of commission, or that they are otherwise interrelated by distinguishing characteristics and are not isolated events.

To prove that the racketeering acts pose a threat of continued racketeering activity, the government must establish that the acts are part of a long-term association that existed for criminal purposes. Continuing racketeering activity may be proved by evidence showing a closed period of repeated activity; that is, by evidence of a series of related racketeering acts committed over a substantial period of time. Acts of racketeering activity committed over only a few weeks or months and which do not threaten future criminal conduct do not satisfy this requirement. Continuing racketeering activity or a threat of continuing racketeering activity may also be proved by evidence showing past racketeering activity that by its nature projects into the future with a threat of repetition; for example, when the acts of racketeering activity are part of a long-term association that exists for criminal purposes or when the acts of racketeering activity are shown to be the regular way of conducting the affairs of the enterprise.

The government must prove that a defendant agreed that he, or a conspirator, would commit two or more racketeering acts of the type or types alleged in the Indictment through the conduct of the affairs of the enterprise. To prove racketeering conspiracy, the government is not required to show that a defendant actually committed a racketeering act or any overt act at all. Although the government is not required to prove that a defendant personally committed two racketeering acts, you may conclude that a defendant agreed to participate in the conduct of the affairs of the enterprise from proof that he agreed to personally commit racketeering acts.

It is not necessary for you to find that the objective or purpose of the conspiracy was achieved at all. However, the evidence must establish that the defendant knowingly agreed to

facilitate or further a scheme which, if completed, would include a pattern of racketeering activity committed by at least one other conspirator.

In short, to find a defendant guilty of the RICO conspiracy charged in the indictment, you must find that the government proved beyond a reasonable doubt that a defendant joined in an agreement or conspiracy with another person or persons, knowing that the objective or purpose was to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, and intending to join with the other person or persons to achieve that objective.

The conspiratorial agreement, the defendant's knowledge of it, and the defendant's participation in the enterprise's affairs, may be inferred from circumstantial evidence.

I will now instruct you on the elements of the predicate racketeering offenses as alleged in the Indictment:

**[18 U.S.C. § 1961(5); 18 U.S.C. § 1962(c), (d); Third Circuit Pattern Instructions §§ 6.18.1962C-6 and 6.18.1962D (2018) (modified); Seventh Circuit Pattern Instructions for 18 U.S.C. § 1962(c), (d) (modified); Eleventh Circuit Pattern Instruction O75.2 (modified); Sixth Circuit Pattern Instructions 3.01, 3.02, and 3.06 (modified); *Salinas v. United States*, 522 U.S. 52, 65 (1997)); *United States v. Nicholson*, 716 F. App'x 400, 407 (6th Cir. 2017)]**

### A. Public Official Honest Services Wire Fraud

The elements of honest services wire fraud are: (1) the defendant knowingly devised or participated in a scheme to defraud the public of its right to his honest services as a public official through bribery; (2) the scheme included a material misrepresentation or concealment of a material fact: here, the government alleges that the material misrepresentation or concealment consisted of a failure to disclose the bribery scheme; (3) the defendant had the intent to defraud; and (4) the defendant used wire, radio or television communications or caused another to use wire, radio or television communications in interstate commerce in furtherance of the scheme.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements.

A "scheme" is any plan or course of action formed with the intent to accomplish some purpose. To find the defendant guilty of this offense, you must find that the defendant devised or participated in a plan or course of action involving bribes.

The term "public official" means a person with a formal employment relationship with government. Public officials owe a fiduciary duty to the public. That means that the official has a duty of honesty and loyalty to act in the public's interest, not for his or her own enrichment. When a public official devises or participates in a bribery scheme, that official violates the public's right to his or her honest services. This is because the official outwardly purports to be exercising independent judgment in official work, but instead has received benefits for the outcome or deed. The public is defrauded because the public is not receiving what it expects and is entitled to, namely, the public official's honest services.

As I have been discussing the term "bribery scheme," let me define further what I mean by "bribery." Bribery is a situation where a payor has agreed to provide, or has actually provided, a thing (or things) of value to a public official in return for the public official agreeing to undertake, or undertaking, a specific official action. This is sometimes referred to as a *quid pro quo* (which is a Latin phrase meaning "this for that" or "these for those"). A bribery exchange can include either (1) a public official's solicitations of things of value in exchange for performing or agreeing to perform specific official action, or (2) a public official's receipt of things of value when the public official knows that the person who gave the thing of value was doing so in return for the public official performing or agreeing to perform a specific official action. That is, bribery includes the public official's solicitation,

receipt, acceptance, or agreement to accept a thing of value in exchange for specific official action, whether or not the payor actually provides the thing of value, and whether or not the public official ultimately performs the requested official action or intends to do so.

The public official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. At the same time, though, while the government need not prove that the *quid pro quo* was express, the government must prove that the *quid pro quo* was explicit. In other words, the government must show that the contours of the proposed exchange were clearly understood by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms.

On that front, the government may establish the public official's intent to exchange an official action for the thing of value by circumstantial evidence. This can include, for example, the defendant's words, conduct, acts, and all the other surrounding circumstances disclosed by the evidence, as well as any rational or logical inferences that you may draw from those surrounding circumstances.

While bribery requires either (1) that the public official intended to exchange a thing of value from the payor for specific official action from the public official, or (2) that the public official knew that the payor intended to exchange the thing of value for a specific official act from the public official, there is no requirement that each payment be correlated with a specific official act, so long as the public official understood that the agreement was to take a specific official action on the payor's behalf when the opportunity presented itself.

It is not a defense to bribery for the public official to claim that he would have lawfully performed the official action in question even without the payor having promised to provide, or having provided, the thing of value. In other words, it is not a defense that, in exchange for the offer or promise of a thing of value from the payor, the public official undertook (or promised to undertake) an official action that is actually lawful, desirable, or even beneficial to the public, or is an action that the public official intended to undertake anyway. The offense of "honest services" fraud is not concerned with the wisdom or results of the public official's decisions, but rather with the manner in which the public official makes his or her decisions.

Also, it is not necessary for the government to prove that the scheme actually succeeded, or that any official act was actually taken by the public official in the course of the scheme. What the government must prove is that the defendant knowingly devised or participated in a scheme or artifice to defraud the public and the government of their right to a public official's honest services through bribes.

Also, because people rarely act for a single purpose, the government need not show that the public official undertook, or promised to undertake, the official action *only* because of the offer or acceptance of the thing of value. If you find that a public official solicited or received a thing of value in exchange for the promise of specific official action, then it makes no difference that the public official may also have had another lawful motive for soliciting or accepting the thing of value.

The term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought

before any public official, in such official's official capacity, or in such official's place of trust or profit. This definition of official act has two parts.

First, the evidence must show a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official. A "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power, and it must be something specific and focused.

Second, the government must prove that the public official made a decision or took an action on that question or matter, or agreed to do so. The decision or action may include using an official position to exert pressure on another official to perform an official act or to advise another public official with the intent to pressure the official to perform an official act. Actual authority over the end result is not controlling.

Under this definition, some acts do not count as "official acts." Setting up a meeting, calling another public official, or hosting an event would not, standing alone, qualify as an "official act." The public official need not have a direct role in the official act; an indirect role is sufficient.

As I mentioned, the public official need not have actually performed an official act, or even intended to do so. Rather, it is sufficient if the public official agreed to perform a specific official act in exchange for a thing of value, or if he received payment knowing it was provided to him in exchange for his agreement to perform a specific official act.

Moreover, the public official need not have specified the means that he would use to perform his end of the bargain. You may, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform a specific official act in return.

A "thing of value" includes things possessing intrinsic value, whether tangible or intangible, that the person giving or offering or the person soliciting or receiving considers to

be worth something. A "thing of value" could include a contribution to a 501(c)(4) organization, so long as it was received in exchange for specific official acts.

To act with "intent to defraud" means to act with an intent to deceive or deprive the public and government of their right to a public official's honest services.

A misrepresentation or concealment is "material" if it has a natural tendency to influence or is capable of influencing the decision of the public or government agency that employed the public official.

The fraud or misrepresentation may consist of the concealment or failure to disclose the thing or things of value that the public official has solicited, received, or agreed to receive, or the public official's implicit false pretense to his governmental employer or the public that he remains loyal to the employer's or the public's interest.

Wire communication includes communications that occur by telephone or by banking transactions. To "cause" wire, radio or television communications to be used is to do an act with knowledge that the use of the communications will follow in the ordinary course of business or where such use can reasonably be foreseen.

The term "interstate commerce" includes wire, radio or television communications which crossed a state line.

It is not necessary that the government prove all of the details alleged concerning the precise nature and purpose of the scheme or that the material transmitted by wire, radio or television communications was itself false or fraudulent or that the alleged scheme actually succeeded in defrauding anyone or that the use of the wire, radio or television communications was intended as the specific or exclusive means of accomplishing the alleged fraud or that someone

relied on the misrepresentation or false statement or that the defendant obtained money or property for his own benefit.

**[Sixth Circuit Pattern Instruction 10.02 (modified for honest services fraud); Sixth Circuit Pattern Instruction 17.02;** *McDonnell v. United States,* **579 U.S. 550, 572, 574 (2016);** *Skilling v. United States,* **561 U.S. 358, 407–413 (2010);** *Pasquantino v. United States,* **544 U.S. 349, 371 (2005);** *United States v. Evans,* **504 U.S. 255, 268–74 (1992)***; McCormick v. United States,* **500 U.S. 257, 273 (1991);** *United States v. Brewster,* **408 U.S. 501, 526 (1972);** *United States v. Hills,* **27 F.4th 1155, 1180 (6th Cir. 2022);** *United States v. Abbey,* **560 F.3d 513, 518 (6th Cir. 2009));** *United States v. Terry,* **707 F.3d 607, 611–15 (6th Cir. 2013);***United States v. Silver,* **948 F.3d 538, 550–51 (2d Cir. 2020),** *cert. denied,* **141 S. Ct. 656 (2021);** *United States v. Lee,* **919 F.3d 340, 357 (6th Cir. 2019);** *United States v. Hernandez,* **No. 20-50012, 2021 WL 3579386, at \*1 (9th Cir. Aug. 13, 2021),** *cert. denied,* **142 S. Ct. 716 (2021);** *United States v. Blagojevich,* **794 F.3d 729, 738 (7th Cir. 2015);** *United States v. Ring,* **706 F.3d 460, 466-467 (D.C. Cir. 2013);** *United States v. Langford,* **647 F.3d 1309, 1321, 1322 n.7 (11th Cir. 2011);** *United States v. Sittenfeld,* **Case No. 1:20-cr-142, #202 at 3214]**

### B. Extortion Under Color of Official Right

The elements of extortion under color of official right are: (1) the defendant was a public official; (2) the defendant obtained, accepted, agreed to accept, or received property that he was not lawfully entitled to, from another person with that person's consent; (3) the defendant knew that the property he obtained, accepted, agreed to accept, or received was being offered or provided to him in exchange for either undertaking a specific official action or him agreeing to undertake a specific official action; and (4) as a result, interstate commerce was, or would have been, affected in any way or degree.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements.

The term "public official" means a person with a formal employment relationship with government.

The term "property" means money or other tangible or intangible things of value that can be transferred, including contributions to a 501(c)(4) organization.

The phrase "the defendant knew the property was being obtained, accepted, agreed to accept, or received was being offered or provided to him in exchange for either undertaking a specific official action or him agreeing to undertake a specific official action" may include the conduct of taking a bribe, where the word bribe is defined in the same manner as it was in connection with the instructions I gave you above for Public Official Honest Services Wire Fraud. Consistent with those earlier instructions, I remind you that:

> - Efforts to buy favor or generalized goodwill do not necessarily amount to bribery; bribery does not include gifts given in the hope that at some unknown, unspecified time, a public official might act favorably in the payor's interests.
>
> - Gifts exchanged solely to cultivate friendship are not bribes; things of value given in friendship and without expectation of anything in return are not bribes.
>
> - It is not a defense to bribery that the public official would have done the official act anyway, even without the receipt of the property.

The term "official act" is defined in the same manner as it was in connection with the instructions I gave you above for Public Official Honest Services Wire Fraud.

Conduct affects interstate commerce if it in any way interferes with or changes the movement of goods, merchandise, money, or other property in commerce between different states. Any effect at all on commerce is enough.

This includes obtaining money that belonged to a business which customarily purchased goods from outside the State of Ohio, or that engaged in business outside the State of Ohio if defendant's conduct made that money unavailable to the business entity for the purchase of such goods or the conducting of such business. It is not necessary for you to find that there was an actual effect on interstate commerce.

Finally, the government need not prove:

> - that the bribery agreement was stated in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. A bribery

35

agreement is satisfied by something short of a formalized and thoroughly articulated contractual arrangement. While a bribery agreement need not be express, it must be explicit, by which I mean that the government must show that the contours of the proposed exchange were clearly understood by both the public official and the payor, even if the proposed exchange was not communicated between them in express terms.

- that the public official ultimately performed the official act.

- that the property was exchanged only for an official act. Because people rarely act for a single purpose, if you find that the property was exchanged at least in part for an official act, then it makes no difference that the defendant may have also had another separate lawful purpose for exchanging the property.

- that the defendant had the actual power to effectuate the end for which he accepted or induced payment; it is sufficient that the defendant exploited a reasonable belief that he had the power to do so.

**[Sixth Circuit Pattern Instruction 17.02 (modified pursuant to *McCormick v. United States*, 500 U.S. 257, 273 (1991) and *Evans v. United States*, 504 U.S. 255, 260 (1992))]**

**C. Bribery (State Law)**

The elements of Ohio state law bribery are: (1) the defendant knowingly solicited or accepted for himself any valuable thing or valuable benefit; (2) to corrupt or improperly influence him; (3) with respect to the discharge of his duties as a public servant.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements. A person acts "knowingly," regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact. "To solicit" means to entice, urge, lure or ask. "Valuable thing or valuable benefit" includes a contribution to a 501(c)(4) organization. "To corrupt" means to destroy or undermine the honesty or integrity of another; to taint; to infect. A "public servant" includes any

elected or appointed officer, employee or agent of the state or any political subdivision, whether in a temporary or permanent capacity.

**[Ohio Rev. Code § 2921.02; 2 Crim. Ohio Jury Instr. 521.02 (2020); 2 Crim. Ohio Jury Instr. 417.11 (2022); Ohio Rev. Code § 2921.01(B); Ohio Rev. Code § 2921.01(G); Ohio Rev. Code § 3517.01(B)(5)]**

### D.  Travel Act Violation

The elements of a Travel Act violation are: (1) the defendant used or caused to be used a facility in interstate commerce; (2) the defendant did so with the intent to promote, manage, establish, or carry on unlawful activity; and (3) after the use of a facility in interstate commerce, the defendant did an act, or attempted to do an act, in order to promote, manage, establish, or carry on the unlawful activity.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements.  The term "uses any facility in interstate commerce" means employing or utilizing any method of communication between one state and another. The term "uses any facility in interstate commerce," for example, includes the use of the telephone systems, the banking systems, and the postal service.

The government must prove that the defendant intended the use of interstate facilitates to facilitate or further the unlawful activity. The government does not, however, need to prove that the use of an interstate facility was essential to that activity.  But the government must prove beyond a reasonable doubt that the defendant used a facility in interstate commerce and that one of the reasons for this use was to promote, manage, establish, or carry on the unlawful activity.

"Unlawful activity" means bribery in violation of the laws of the state in which it is committed—here, Ohio.

The bribery was illegal under the state laws of Ohio if the conduct satisfied the elements listed above, in Part C,  Bribery (state law).

The bribery was also illegal under the state laws of Ohio if the defendant, during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters, knowingly and with the intent to affect the outcome of the campaign, promised, offered, or gave any valuable thing or valuable benefit to any person who was employed by or was an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue, for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization.

**[Seventh Circuit Pattern Instruction for 18 U.S.C. § 1952 (modified); *States v. Eisner*, 533 F.2d 987, 992 (6th Cir. 1976); *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988); Ohio Rev. Code § 2921.02; Ohio Rev. Code § 3517.22(a)(2)]**

### E.  Private Honest Services Wire Fraud

The elements of private citizen honest services fraud are: (1) that the defendant knowingly devised or participated in a scheme to defraud an employer of its right to the honest services of its employees through bribery; (2) that the defendant had the intent to defraud; (3) that the defendant foresaw or reasonably should have foreseen that the employer might suffer economic harm as a result of the scheme; and (4) that the defendant used wire, radio or television communications in interstate commerce in furtherance of the scheme.

As I previously described, a "scheme" is any plan or course of action formed with the intent to accomplish some purpose. To find the defendant guilty of this offense, you must find that the defendant devised or participated in a plan or course of action involving bribery.

An employee who works for a private employer has a fiduciary duty to provide honest services to the employer. A fiduciary duty exists where the employee has a duty to act for the benefit of the employer and the employer relies on the employee to carry out his job duties for the benefit of the organization.

When a defendant devises or participates in a bribery scheme involving an employee's breach of his fiduciary duty to his employer, such a scheme is intended to deprive the employer of its right to honest services. The employer is defrauded because it is not receiving what it expects and is entitled to, namely, the employee's honest services.

A defendant need not owe the fiduciary duty personally, so long as he devises or participates in a bribery scheme intended to deprive an employer of its right to the honest services of its employees. In other words, an employee—the holder of the fiduciary duty—may be the attempted target of the bribe and may be entirely innocent. It is not necessary for the employee to accept the thing of value from the payor or to take action violating his fiduciary duty.

The actual or intended breach of the fiduciary duty must be by participation in a bribery scheme—which involves the actual, intended or solicited exchange of a thing of value in exchange for something else, in other words, a *quid pro quo* (a Latin phrase meaning "this for that" or "these for those"). The employee and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. Rather, the intent to exchange may be established by circumstantial evidence, based upon the payor's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

Bribery requires the intent to affect an exchange of something of value, but each payment need not be correlated with specific action, so long as the employee understood that the agreement was to take action on the payor's behalf when the opportunity presented itself. Thus, all that must be shown is that a thing of value was offered or provided to the employee with the intent of securing the employee's action that the defendant foresaw or reasonably should have foreseen might cause the employer to suffer economic harm in return. Also, it is not necessary for the government to prove that the scheme actually succeeded, or that anything of value was actually exchanged. What

the government must prove is that the defendant knowingly devised or participated in a scheme to defraud a private entity of its right to the honest services of an employee through bribes.

When the defendant is the bribe payor, it is sufficient if the defendant intends or solicits the employee to violate his duty of honest services to the employer in exchange for a thing of value and that the defendant foresaw, or should have foreseen, that the employer might suffer economic harm as a result of the intended or solicited breach of fiduciary duty.

A "thing of value" includes things possessing intrinsic value, whether tangible or intangible, that the person giving or offering or the person soliciting or receiving considers to be worth something.

To act with "intent to defraud" means to act with an intent to deceive or deprive a private employer of its right to the honest services of its employees.

Wire communication includes communications that occur by telephone or by banking transactions. To "cause" wire, radio or television communications to be used is to do an act with knowledge that the use of the communications will follow in the ordinary course of business or where such use can reasonably be foreseen.

The term "interstate commerce" includes wire, radio or television communications which crossed a state line.

It is not necessary that the government prove all of the details alleged concerning the precise nature and purpose of the scheme or that the material transmitted by wire, radio or television communications was itself false or fraudulent or that the alleged scheme actually succeeded in defrauding anyone or that the use of the wire, radio or television communications was intended as the specific or exclusive means of accomplishing the alleged fraud or that someone

relied on the misrepresentation or false statement or that the defendant obtained money or property for his own benefit.

**[Sixth Circuit Pattern Instruction 10.02 (modified); Eleventh Circuit Pattern Instruction O50.3 (modified);** *United States v. Skilling,* **561 U.S. 358 (2010);** *United States v. Sun-Diamond Growers of Ca.,* **138 F.3d 961, 974 (D.C. Cir. 1998),** *aff'd,* **526 U.S. 398 (1999);** *United States v. Terry,* **707 F.3d 607, 613-15 (6th Cir. 2013);** *United States v. Frost,* **125 F.3d 346 (6th Cir. 1997);** *United States v. Ring,* **706 F.3d 460, 467 (D.C. Cir. 2013);** *United States v. Milovanic,* **678 F.3d 713, 728-729 (9th Cir. 2012) (en banc)]**

### F.  Money Laundering

The elements of money laundering are: (1) that the defendant conducted a financial transaction; (2) that the financial transaction involved property that represented the proceeds of specified unlawful activity; (3) that the defendant knew that the property involved in the financial transaction represented the proceeds from some form of unlawful activity; and (4) that the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements. "Financial transaction" includes a transaction that affects interstate or foreign commerce involving the movement of funds by wire or other means. "Conducts" includes initiating, concluding, or participating in initiating or concluding a transaction. "Proceeds" means any property derived from, obtained, or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. The term "specified unlawful activity" means any racketeering activity, as those offenses were defined above, that is: public official honest services wire fraud, extortion under color of right, private honest services wire fraud, bribery under state law, and Travel Act violations. These offenses are all felonies.

The government need only establish that the defendant knew that the purpose of the transaction was to conceal or disguise the proceeds, not that the defendant had that intent. The

phrase "knew that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the defendant knew the funds involved in the transaction represented the proceeds of some form, though not necessarily which form, of activity that constitutes a felony under state or federal law. The government does not have to prove the defendant knew the property involved represented proceeds of a felony as long as he knew the property involved represented proceeds of some form of unlawful activity.

**[Sixth Circuit Pattern Instruction 11.02;** *United States v. Chavez*, **951 F.3d 349, 356 (6th Cir. 2020);** *United States v. Corchado-Peralta*, **318 F.3d 255, 258 (1st Cir. 2003)]**

### G. Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity

The elements of this offense are: (1) that the defendant knowingly engaged engage in a monetary transaction; (2) that the monetary transaction was in property derived from specified unlawful activity; (3) that the property had a value greater than $10,000; (4) that the defendant knew that the transaction was in criminally derived property; and (5) that the monetary transaction took place within the United States.

Now I will give you more detailed instructions on some of the terms or phrases used in these elements. "Monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting commerce of funds or a monetary instrument, by, through, or to a financial institution. The term "specified unlawful activity" has the same meaning I provided above in Part F, Money Laundering. "Criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense. While the money must be from a specified unlawful activity, the defendant need only know that the money was criminally derived. In other words, the government need not prove that the defendant knew the property was derived from a particular type of unlawful activity, so long as the government proves the defendant knew it was criminally derived. In order for property to qualify as criminally derived, the underlying criminal activity

must have been completed and the defendant must have obtained or controlled the tainted funds. The funds need not be in the defendant's physical possession or in a personal bank account, as long as he exercised control over the funds.

**[Sixth Circuit Pattern Instruction 11.06; *United States v. Rayborn*, 491 F.3d 513, 517 (6th Cir. 2007)]**

## Fourth Element – Unanimity as to Types of Predicate Racketeering Activity

The Indictment alleges that the defendant committed several types of predicate racketeering activity, the elements of which I have just described for you. To convict a defendant of the RICO conspiracy offense, your verdict must be <u>unanimous</u> as to which <u>*type or types*</u> of predicate racketeering activity a defendant agreed would be committed; for example, at least two acts of either public official honest services wire fraud, extortion under color of right, private honest services wire fraud, bribery under state law, Travel Act violations, money laundering, or monetary transactions in property derived from specified unlawful activity; or one act of any two of these predicates

**[Third Circuit Pattern Instructions § 6.18.1962D (modified); *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014); *United States v. Harris*, 695 F.3d 1125, 1131-32 (10th Cir. 2012); *United States v. Applins*, 637 F.3d 59, 72-75 (2d Cir. 2011)]**

## Sixth Circuit Pattern Instructions – Final

The United States requests that the Court give the following Pattern Instructions from the

Sixth Circuit after closing arguments by counsel:

| | |
|---|---|
| 8.01 | (Introduction) |
| 8.02 | (Experiments, Research, Investigation, and Outside Communications) |
| 8.03 | (Unanimous Verdict) |
| 8.04 | (Duty to Deliberate) |
| 8.05 | (Punishment) |
| 8.06 | (Verdict Form) |
| 8.09 | (Court Has No Opinion) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-77** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE BLACK** |
| **v.** | : | |
| | : | |
| **LARRY HOUSEHOLDER and** | : | **VERDICT FORM** |
| **MATTHEW BORGES,** | : | |
| | : | |
| **Defendants.** | | |

## COUNT ONE
### (18 U.S.C. § 1962(d))

1. How do you find the defendant, Larry Householder, as to Count One, guilty or not guilty?

    Guilty_____          Not Guilty_____

2. How do you find the defendant, Matthew Borges, as to Count One, guilty or not guilty?

    Guilty_____          Not Guilty_____


_____          _____
Date                                    Foreperson (Juror#____)


_____          _____
(Juror #____)                           (Juror #____)


_____          _____
(Juror #____)                           (Juror #____)


_____          _____
(Juror #____)                           (Juror #____)


_____          _____
(Juror #____)                           (Juror #____)


_____          _____
(Juror #____)                           (Juror #____)


_____
(Juror #____)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's Proposed Jury Instructions and Verdict Form was served this 4th day of January 2023, electronically upon all counsel of record:

s/Emily N. Glatfelter
EMILY N. GLATFELTER (0075576)
Assistant United States Attorney