```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION
                             -   -   -
 3
     UNITED STATES OF AMERICA,      : CASE NO. 1:20-CR-0077
 4                                  :
                   Plaintiff,       : JURY TRIAL, DAY 12
 5           vs.                    :
                                    :14th day of February, 2023
 6   LARRY HOUSEHOLDER, et al.      :
                                    :9:30 a.m.
 7              Defendant.          :

 8                           -   -   -
                    TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                             -   -   -
10
     APPEARANCES:
11
     For the Plaintiff:
12                        Emily N. Glatfelter, Esq.
                          Matthew Charles Singer, Esq.
13                        Megan Gaffney Painter, Esq.
                          Assistant United States Attorneys
14                        221 East Fourth Street, Suite 400
                          Cincinnati, Ohio 45202
15
     For the Defendant, Larry Householder:
16
                          Nicholas R. Oleski, Esq.
17                        Robert T. Glickman, Esq.
                          McCarthy, Lebit, Crystal & Liffman Co.
18                        1111 Superior Avenue East, Suite 2700
                          Cleveland, Ohio 44114
19                                  and
                          Mark B. Marein, Esq.
20                        Steven L. Bradley, Esq.
                          Marein and Bradley
21                        526 Superior Avenue, Suite 222
                          Cleveland, Ohio 44114
22

23

24

25
```

12-1971

```
1    For the Defendant, Matthew Borges:

2                         Karl Herbert Schneider, Esq.
                          Todd Aaron Long, Esq.
3                         McNees Wallace & Nurick, LLC
                          21 East State Street, Suite 1700
4                         Columbus, Ohio 43215

5    Also present:       Larry Householder
                         Matthew Borges
6
     Law Clerk:          Cristina V. Frankian, Esq.
7
     Courtroom Deputy:   Rebecca Santoro
8
     Stenographer:       Mary Schweinhagen, RDR, RMR, CRR
9                         United States District Court
                          200 West Second Street
10                        Dayton, Ohio 45402

11                 Proceedings recorded in stenotype.
        Transcript produced with computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

12-1972

```
1                        (PROCEEDINGS)
2         (Proceedings held in open court at 9:30 a.m.)
3              THE COURT:  Good morning.  Here in the open
4    courtroom on the record.  The jury's not yet here.  It looks
5    like all the participants are here.  Happy Valentine's Day.
6         Are we ready for the jury from the government's
7    perspective?
8              MR. SINGER:  Yes, Your Honor.
9              THE COURT:  And Mr. Householder's?
10             MR. BRADLEY:  Yes, Judge.
11             THE COURT:  And Mr. Borges'?
12             MR. SCHNEIDER:  Yes, Judge.
13             THE COURT:  All right.  Let's call for the jury,
14   please.
15        (Pause.)
16        (Jury entered the courtroom at 9:31 a.m.)
17             THE COURT:  You may all be seated.  Thank you.
18        To the 14 jurors in the box, welcome back.  Thank you for
19   being timely.  From the bottom of my heart and on behalf of
20   the community, Happy Valentine's Day.  Not many smiles.
21        We are going to proceed with the testimony of the witness
22   who was on the stand.  If we could call for that witness,
23   please.
24        Good morning.  If you would retake the witness stand.
25        (Witness took the stand.)
```

1          THE COURT:  Take your mask off if you want.  You

2    don't have to.  And you are still under oath, you understand?

3          THE WITNESS:  I do.

4          THE COURT:  Very well.  The government will continue

5    its examination.

6          MR. SINGER:  Thank you, Your Honor.

7          THE COURT:  Very well.

8                          **JUAN CESPEDES**

9    of lawful age, Witness herein, was examined and further

10   testified as follows:

11                   **DIRECT EXAMINATION (CONT.)**

12   BY MR. SINGER:

13   **Q.**   Good morning.

14   **A.**   Good morning.

15   **Q.**   Do you recall when we left off yesterday, you were

16   discussing the ballot referendum effort.  Do you recall that?

17   **A.**   Yes, I do.

18   **Q.**   And do you recall that we discussed a conversation on

19   July 29, 2019, that you had with Mr. Kiani and

20   Mr. Householder?

21   **A.**   Yes, I do.

22   **Q.**   Did you have any conversations with Mr. Borges about your

23   plan relating to the ballot effort?

24   **A.**   Yes.  Again, Mr. Borges and I were very coordinated in

25   our efforts.  He served our issue in our campaign in three

1    different ways, as a consultant to Dewey Square, as a

2    lobbyist, and then from a standpoint of referendum leading

3    multiple efforts.

4    **Q.**    And can you describe Mr. Borges' role in your efforts to

5    defeat the ballot campaign?

6    **A.**    Yes.  As it related to defeating the ballot campaign,

7    his firm, 17 Consulting, was a subcontract of Generation Now

8    and had numerous responsibilities in its silo as it relates

9    to the referendum effort.

10   **Q.**    And what was 17 Consulting?

11   **A.**    17 Consulting is a firm that is owned by Matt Borges.

12   **Q.**    And what was -- how was 17 Consulting used in relation to

13   the ballot campaign?

14   **A.**    Well, money obviously flowed from FirstEnergy Solutions

15   into Generation Now.  Generation Now then supported 17

16   Consulting with financial resources, and those resources

17   were used to support dedicated weekly activities.

18   **Q.**    And why was it funded this way?

19   **A.**    Well, at this point, during the effort and the

20   referendum, there would not have been a way to onboard a new

21   provider in enough time through the bankruptcy based on the

22   information that I was given.  And it was the easiest, most

23   seamless way to continue to allow money to support these

24   efforts without having to reregister or go through any

25   additional hoops.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1975

1    Q.   So that's -- the money went from FirstEnergy Solutions to

2    Generation Now to 17 Consulting; is that right?

3    A.   Correct.

4         MR. SINGER:  May we please publish to the jury

5    what's been previously admitted as Government's Exhibit 605B?

6         THE COURT:  Yes.

7    Q.   Do you recognize this?

8    A.   Yes, I do.

9    Q.   And what is it?

10   A.   This is a text message between Matt Borges and myself.

11   Q.   And what do the blue bubbles represent?

12   A.   The blue bubbles represent my messages and the green

13   represent his.

14        MR. SINGER:  Okay.  Can we please turn to page 12 of

15   this exchange.

16   Q.   What is the date on the first message on page 12?

17   A.   August 4, 2019.

18   Q.   Okay.  Can you please read through this message, this

19   page of messages?

20   A.   Yes.  I write, got your email.  I'm good with it.  Just

21   want to discuss in more detail later this evening.  I think

22   ideal way to pull this -- pull it off is for me to tell the

23   Speaker that I am going to run your LLC through Gen Now so I

24   can appropriate funds easy and fast.

25        Matt's response, cool, thanks.

1      I then respond, help me push back NSC on the call if he

2  starts straying and/or citing incorrect facts and/or setting

3  unrealistic expectations.  I am going to handle our issue

4  directly with NCS and Longstreth tomorrow after I have a

5  better understanding of scope of work and resources.  If

6  anything related to significant challenge comes up related

7  to FieldWorks, I am going to say that you are running point

8  and will think about how they can be utilized.

9      He then responds, yes, he will try to grab this project

10  too, I'm certain.

11  **Q.**   Okay.  So focusing on the question or the exchange of

12  your message at the top, what did you mean by the ideal way to

13  pull this off is for me to tell the Speaker that I'm going to

14  run your LLC through Gen Now?

15  **A.**   So basically this was describing exactly the way that

16  money would flow from FirstEnergy Solutions to Gen Now, 17

17  Consulting group would be a subcontract of Gen Now.  And it

18  would be a seamless way to continue to allow us to fund our

19  effort.

20  **Q.**   And you see in your second message, you see the reference

21  to NSC.  Who are you referring to with NSC?

22  **A.**   Neil Clark.

23  **Q.**   And can you describe what Mr. Clark's role was during the

24  ballot referendum?

25  **A.**   Yes.  Mr. Clark served as a Speaker's proxy

1    particularly during this effort and he helped Jeff manage

2    all things that Generation Now did on this part of the

3    campaign.  Additionally, he took the lead on what was known

4    as the buy-out campaign, which was an effort that we had

5    created to try to prevent the opposition from being able to

6    field enough resources to collect signatures.

7    **Q.**    You mentioned Jeff.  Who are you referring to when you

8    say "Jeff"?

9    **A.**    Jeff is Jeff Longstreth of Generation Now.

10           MR. SINGER:  Next page, please.

11   **Q.**    Okay.  Would you mind reading starting at the top?

12   **A.**    Yes.  My message states, I'm sure he will, but when I

13   tell the Speaker, he, and Longstreth that FES wants you to

14   run it and go through Gen Now, what can he say?

15        His response, right.  I just want to make sure you

16   weren't -- we're anticipating that part which obviously you

17   were.

18        I then respond, the truth of the matter is I don't

19   trust him to do it right.  I then add, and he is getting

20   paid by Gen Now in this effort so he should just shut up.

21        He responds, agreed, but he is a psychopath so he

22   won't.

23   **Q.**    Who are you and Mr. Borges referring to in these

24   exchanges?

25   **A.**    In this exchange, we're speaking about Neil Clark.

1          MR. SINGER:  The next message, please.

2          THE WITNESS:  Matt writes, I know you should not

3    trust him to do it right.  He hasn't been involved in a

4    meaningful way on an actual campaign that his head produced or

5    delivered anything in several decades and you can rest assured

6    he's taking a cut, probably a huge cut on the FieldWorks

7    contract.

8          I then respond, yes, there is no doubt in my mind.  We

9    will negotiate that as well, but even more reason for him to

10   stay out of our lane.

11   **Q.**   And then did Mr. Borges like that message?

12   **A.**   He did like the message.

13   **Q.**   Okay.  Can you describe the conversations that you had

14   with the Speaker's team relating to the agreement that you had

15   with Borges about receiving the funds in the 17 Consulting?

16   **A.**   Yes.  Those conversations primarily took place between

17   myself, Neil Clark, and Jeff Longstreth, and we laid out

18   some of the additional efforts that we felt would be needed

19   on the referendum that were recommended by Matt, and we

20   simply explained that we would be adding resources to the

21   weekly budget in order to satisfy those questions.

22   **Q.**   And can you explain whether you had conversations with

23   Mr. Kiani about paying FirstEnergy money to Generation Now to

24   17 Consulting?

25   **A.**   Yes.  I did have those conversations, not only with

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1979

1    Mr. Kiani but with also John Judge, who was the president

2    and Dave Griffing, the executive vice president.  I sent the

3    request for money every week, and it was noted as to what

4    silos of the money would be spent.

5    **Q.**   And did you discuss with Mr. Kiani how the money would be

6    used?

7    **A.**   I did discuss with Mr. Kiani how the money would be

8    used.

9            MR. SINGER:  Can we please publish what's been

10   previously admitted as Government's Exhibit 605H?

11           THE COURT:  Yes.

12   **Q.**   Do you recognize this?

13   **A.**   Yes, I do.

14   **Q.**   And what is it?

15   **A.**   This is a text message between Matt Borges and myself.

16   **Q.**   And what do the blue boxes represent?

17   **A.**   The blue boxes are my messages and the green boxes are

18   his.

19           MR. SINGER:  Can you please turn to page 3.

20   **Q.**   And can you read the three messages on this page?

21   **A.**   Yes.  Matt writes, the shocking thing about dinner last

22   night and Kiani came from Enron.

23       I respond, oh, yeah, the best when you said it was like

24   the wild, wild, wild west, like, da.

25       And he responded -- his response, when I said I have

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1980

1    seen the documentary, all true.

2    **Q.**   Can you describe your understanding of what these

3    messages represent?

4    **A.**   Well, obviously, you know, Enron, it was a Florida

5    company that had, you know, major issues.

6              MR. BRADLEY:  Objection, Your Honor.

7              THE COURT:  Basis?

8              MR. BRADLEY:  Relevance, 403.

9              THE COURT:  I'm going to sustain the objection.

10   **Q.**   Can you describe whether this represents a meeting that

11   you had with Mr. Kiani and Mr. Borges?

12   **A.**   Yes, it did.

13   **Q.**   And can you describe what Mr. Borges' relationship was

14   with Mr. Kiani based on your understandings and the

15   conversations you were involved in?

16   **A.**   Yes.  Obviously, I worked very hard to try to bridge

17   the gap between John Kiani and Matt Borges since Matt was my

18   most trusted ally on my team.  So I tried to put them in

19   front of each other as much as possible so they would be

20   comfortable with each other, and this was just an example of

21   us having, you know, dinner together, which we did multiple

22   times during the effort.

23   **Q.**   And how often did you and Mr. Borges talk during this

24   period?

25   **A.**   We talked very, very frequently.  Daily.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1981

1    **Q.**   And did you have any conversations with Mr. Borges about

2    why FirstEnergy Solutions was paying money into Generation

3    Now?

4    **A.**   Yes.  Matt was aware of why FES was paying money to

5    Generation Now throughout the efforts.

6    **Q.**   Did you have any conversations with Mr. Borges about

7    alternate legislation that you would discuss with

8    Mr. Householder?

9    **A.**   Yeah.  I shared information with him as I received it,

10   and he was the one person that I tried to be as open as

11   possible with.

12   **Q.**   Can you describe whether Attorney General Yost was part

13   of your plan to defeat the ballot campaign?

14   **A.**   Attorney General Yost had a couple opportunities to be

15   helpful, and he was indeed part of our plan.

16   **Q.**   And can you describe how it is your plan involved

17   Attorney General Yost?

18   **A.**   The first way the Attorney General could be helpful

19   would be to deny the language of the -- of the people

20   seeking the ballot referendum.  It's something his office

21   has to approve, and if he denies that, it gives him less

22   time to actually secure signatures, which is helpful to our

23   side of the campaign.  So we had an effort to lobby him to

24   prevent or to ask him not to approve language.

25   **Q.**   And was there any other way that, based on your plan, the

1   Attorney General would be involved?

2   **A.**    Later in the effort, or actually sort of in a

3   concurrent manner, there was the idea that when our

4   legislation was being tweaked toward the end, to do

5   everything that we could to make it be interpreted as a tax.

6   And there were multiple statewide elected officials who we

7   wanted to -- wanted to interpret it as a tax, the Attorney

8   General being one of them.

9   **Q.**    And who is -- who were the other public officials that

10  you wanted to interpret it as a tax?

11  **A.**    Well, you know, obviously, you know, we wanted both

12  legislative bodies and the executive bodies but also Frank

13  LaRose who was the Secretary of State at the time.

14  **Q.**    Who was involved in the effort to convince Attorney

15  General Yost to deny the language or -- and interpret it as a

16  tax?

17  **A.**    Matt was our point of contact with Attorney General

18  Yost.

19  **Q.**    And was anyone else involved in this effort?

20  **A.**    Not directly.

21  **Q.**    What was Mr. Borges' role?

22  **A.**    Mr. Borges' role, he had a very good relationship with

23  the Attorney General.  He was asked to speak with him on

24  multiple occasions, and convince or persuade him that the

25  language that would be filed, you know, would not meet the

1    barrier to proceed and actually deny the petitioner

2    language.

3        There were also, you know, efforts to let the Attorney

4    General know this was a very important issue to the Speaker.

5    And I believe -- I believe the Speaker and the Attorney

6    General did speak, but Matt was primarily the person that we

7    charged with getting this done.

8    **Q.**   And can you describe what Mr. Householder's role was

9    relating to Attorney General Yost?

10   **A.**   I think from a peer-to-peer perspective, obviously

11   elected officials, sitting elected officials of that caliber

12   respect each other, and I think their -- that the

13   combination between them just revolved around Speaker

14   Householder, letting him know how important the issue was to

15   him.

16            MR. SINGER:  May we please publish to the jury

17   what's been previously admitted as Government's Exhibit 608B?

18            THE COURT:  Yes.

19   **Q.**   Do you recognize this?

20   **A.**   I do.

21   **Q.**   And what is it?

22   **A.**   This is a text exchange between myself and Matt Borges.

23   **Q.**   And what do the blue messages represent?

24   **A.**   The blue messages are my messages and the green are

25   his.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1984

1    Q.   And what is the date on the first message?

2    A.   The date is, appears to be 8-27-2019.

3    Q.   And can you read these messages, please?

4    A.   Yes.  I lead with, DY and SLH connected yesterday.

5         He responds, good.  I'll follow up with Dave.

6         I respond, call me before so I can give you specifics

7    of convo.

8         He responds, okay.  In air.  Will call after 11.

9    Thanks.

10   Q.   What does "DY" represent?

11   A.   DY is Dave Yost.

12   Q.   And SLH?

13   A.   Speaker Larry Householder.

14   Q.   Why were you telling Mr. Borges that Attorney General

15   Yost and Mr. Householder connected yesterday?

16   A.   Well, we had sort of a two-prong approach.  Obviously,

17   I was communicating with Generation Now, who was

18   communicating with the Speaker to coordinate their meeting.

19   And I was following up with Borges who would then follow up

20   with Attorney General Yost to get his feedback from how that

21   meeting went.

22        MR. SINGER:  Okay.  May we please publish to the

23   jury what has been previously admitted as Government's Exhibit

24   608C?

25        THE COURT:  Yes.

1    **Q.**    Do you recognize this?

2    **A.**    Yes, I do.

3    **Q.**    And what is it?

4    **A.**    It's a text exchange between Matt and myself.

5    **Q.**    And what do the blue boxes represent?

6    **A.**    The blue boxes represent my texts and the green

7    represent his.

8    **Q.**    And what is the date on the first message?

9    **A.**    It appears to be 8-28-2019.

10   **Q.**    And can you read this message, please?

11   **A.**    Yes.  I lead with, FYI, SLH is asking if you've spoken

12   with DY yet.

13        He responds, didn't speak with him yesterday.  Will

14   call when I get on the ground in LA.

15        I respond, sounds good.  Just let me know.

16        He responds, called him.  Left him a VM.  Will see what

17   he says.

18             MR. SINGER:  Can we go back to the first page,

19   please.

20   **Q.**    Can you describe whether or not the efforts relating to

21   Attorney General Yost were coordinated with Mr. Householder?

22   **A.**    Yes, absolutely.  As I mentioned before, I was

23   responsible for communicating with Generation Now, and we

24   had a plan obviously for the Speaker to reach out to the

25   Attorney General.  And then I was then obviously

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1986

1    coordinating with Matt who would speak to the Attorney

2    General directly as a follow-up.

3    **Q.**   Based on that, can you describe whether Mr. Borges was

4    aware of the coordination between Mr. Householder and

5    Mr. Yost?

6    **A.**   Yes, he was aware.

7              MR. BRADLEY:  Objection, Your Honor.

8              THE COURT:  Basis?

9              MR. BRADLEY:  No personal knowledge, Judge.

10             MR. SCHNEIDER:  I'll concur with that objection.

11             THE COURT:  Why don't you take another shot at it.

12        Sustained at this time.

13   **Q.**   Can you describe whether based on your conversations with

14   Mr. Borges he was aware of the coordination relating to

15   Mr. Householder and Mr. Yost?

16             MR. BRADLEY:  Objection, Your Honor.  Same grounds.

17             THE COURT:  Overruled.  He can answer it if he can.

18             THE WITNESS:  I think it's important to know that

19   Matt Borges and I spoke every day about this issue, and I

20   shared all information with him as he was my right hand in

21   this process.  So Matt would know everything I knew and I was

22   aware, well aware of our coordination.

23   **Q.**   Do you know whether the Secretary of State had any role

24   in the ballot campaign effort?

25   **A.**   The Secretary of State did have a role.  He was someone

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1987

1    that I had reached out to.  I had met with and Matt also

2    reached out to him as well.

3    Q.   And who was the Secretary of State at this time?

4    A.   His name is Frank LaRose.

5    Q.   And did you plan to have anyone discuss with Mr. LaRose

6    your team's efforts to defeat the ballot campaign?

7    A.   Yes.  Matt and I both spoke with Frank on different

8    occasions about our efforts.

9            MR. SINGER:  May we please publish to the jury

10   what's been previously admitted as Government's Exhibit 608J?

11           THE COURT:  Yes.

12   Q.   Do you recognize this?

13   A.   Yes.  It's a conversation between Matt Borges and

14   myself on text message.

15   Q.   And what do the green messages represent?

16   A.   The green boxes are his messages and the blue are mine.

17   Q.   And what is the date of this?

18   A.   The date appears to be 10-10-2019.

19   Q.   And can you just read the first page of messages?

20   A.   Yes.  He writes, very good conversation with LaRose

21   today.  He gets it and wants to move it quickly.  McTigue

22   and I are going over there Tuesday to iron details out.

23   Will report any problems and if we need big names to

24   reinforce.

25       I respond, thanks.  Very good to hear.  McTigue

1    involvement is very good also.

2         He responds, it may not be exactly what we want, but it

3    will be fine.  I laid it on thick with Frank, and honestly I

4    have never really done that with him before.

5    Q.   Do you recall why Mr. Borges was speaking with

6    Mr. LaRose?

7    A.   It was -- it was obviously an issue related to -- to

8    the referendum.  Frank obviously was a member of the ballot

9    board.  There was a -- there was an ask of Frank to also

10   interpret the initial legislation as a tax.  And I believe

11   this, because of McTigue's involvement, this is what this

12   conversation was about.

13             MR. SINGER:  May we please publish to the jury

14   what's been previously admitted as Government's Exhibit 601I?

15             THE COURT:  Yes.

16   Q.   Do you recognize this?

17   A.   I do.

18   Q.   And what is it?

19   A.   This is a -- a notepad that was on my basement wall,

20   and this is my handwriting detailing contributions.

21   Q.   So who created this?

22   A.   This document was created by myself.

23   Q.   Can you describe what the number at the top represents?

24   A.   Yes.  The number at the top is 60 to 65, which

25   basically is a range.  During the referendum effort, there

1    was a hundred-thousand-dollar check that was issued to

2    myself from 17 Consulting.  The purpose of that check was

3    indeed to fulfill these campaign contributions associated

4    with that number.  60 to 65 basically represents the taxes,

5    the difference in taxes that would be taken out of the

6    hundred thousand obviously.

7    **Q.**    So can you describe the path of the money --

8    **A.**    Yes.

9    **Q.**    -- as it went from where it started to how it ended up --

10   **A.**    Yes.

11   **Q.**    -- to your account?

12   **A.**    Yes.  The money started at FirstEnergy Solutions.  It

13   then moved directly to Generation Now.  The money moved from

14   Generation Now to 17 Consulting.  And the number -- the

15   hundred thousand then moved from 17 Consulting to a firm

16   called 614 Solutions, which I own and operate.

17   **Q.**    And what is 614 Solutions?

18   **A.**    614 Solutions is a consulting group that I created.  I

19   solely own and operate it.

20   **Q.**    Okay.  Can you walk through -- there are three columns on

21   this document.  Can you walk through each of the three

22   columns?

23   **A.**    Yes.  The three columns basically signify different

24   tranches or calibers of elected officials and the

25   contributions that I was planning to associate with them.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1990

1       On the left you see statewide candidates who in most

2   cases were helpful to our issue and that we felt were

3   important to us.

4       In the middle you see names in red, which are sitting

5   state reps at the time, who were helpful to our issue and

6   who were having fundraisers in real time.

7       And to the right there were also a mix of elected

8   officials who were supported at different levels based on

9   events they were having.

10  **Q.**   And did you discuss the content of this doc -- these

11  writings with anyone on your team?

12  **A.**   This is something that Matt was aware of.  Again, money

13  was given from 17 Consulting to 614 Solutions for this

14  direct purpose.  And it was something that we had discussed

15  and something, quite frankly, I felt was necessary to do at

16  the time.

17  **Q.**   And why did you believe this was necessary?

18  **A.**   Well, as I mentioned before, I had not had a lot of

19  look into what FirstEnergy Corp. was doing.  I was aware of

20  what FirstEnergy Solutions was doing, and what we were doing

21  was using up a lot of bandwidth of elected officials.  And

22  elected officials who helped us significantly were having

23  fundraisers, and outside of our contributions to Generation

24  Now, we didn't have any way to help elected officials.

25      So the onus really fell on me, and with a retainer of

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1991

1    $10,000 a month, I would not have been able to fund all

2    these contributions.  So the best way for us to do this was

3    to take that money from the pool we had so that I could

4    distribute it in this manner.

5    **Q.**    What did you mean by, you were using the bandwidth of

6    elected officials?

7    **A.**    House Bill 6 became a full-time job for many of these

8    people.  You know, between sitting on committees, you know,

9    helping, helping us with votes, particularly the committee

10   chairs and the people who sat on the committees who heard

11   the bill.  They spent a significant time not only working to

12   pass the bill on our behalf, but, you know, at times

13   obviously, you know, taking, you know, request of meetings

14   from us.  So I really felt in a lot of ways like I owed it

15   to a lot of these elected officials to support them for a

16   lot of the hard work they had given to us.

17   **Q.**    Let's focus on that left column.  Can you read the names,

18   the individuals on the left column?

19   **A.**    Yes.  DeWine, 10 to 15,000; Yost, 10, signifies 10,000;

20   spread, 10 to 15,000; LaRose, 5,000.

21   **Q.**    And why did -- how did you come to these numbers?

22   **A.**    It was really arbitrary for myself.  I mean, you know,

23   the campaign limits for sitting elected officials are

24   somewhere around, you know, 13,000.  So 10 to 15,000 is kind

25   of, you know -- just signified the max.  In Frank's case, I

JUAN CESPEDES - DIRECT EXAM (CONT.)                     12-1992

1    budgeted 5,000 because I had planned on writing more later.

2    Q.   And why were you paying these specific public officials

3    these amounts?

4    A.   Well, there was a strategy for each that is different.

5    It all relates back, you know, to House Bill 6 and the

6    future of FirstEnergy Solutions, quite frankly.  You know,

7    in the Attorney General's case, in the Secretary of State's

8    case, they obviously had active roles, you know, in trying

9    to help us in the referendum.

10        In the case of Sprague, he was someone who wasn't --

11   wasn't very friendly with our parent company.  And I was

12   trying to get out in front and build a relationship with him

13   that would help separate us from the parent.

14        And in the case of the governor, he obviously signed

15   the bill into law and was someone we wanted to continue to

16   support.

17   Q.   Can you explain whether FirstEnergy Solutions executives

18   knew that the public officials were being paid in this way?

19   A.   They did not.

20   Q.   Did you make any other payments to public officials using

21   FirstEnergy Solutions money that was paid through Generation

22   Now to 17C?

23   A.   Yes.  The only other contribution that is not listed

24   here is a contribution that I made to Speaker Larry

25   Householder.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1993

1   **Q.**    And can you -- can you describe that?

2   **A.**    Yes.  I attended an event in Cleveland for the Speaker,

3   and I wrote a max-out check in that case.

4   **Q.**    What do you mean by a max-out check?

5   **A.**    A max-out is the maximum allowed contribution per

6   individual from an individual.  At the time I believe that

7   was just above $13,000.

8   **Q.**    Is that a contribution that's publicly reported?

9   **A.**    It would be, yes.

10  **Q.**    How did you fund that $13,000 check?

11  **A.**    Well, it was funded through the money that I received,

12  and 614 Solutions from 17 group, or 17 Consulting from Gen

13  Now.  But it was just, it was a written check, personal

14  check.

15          MR. SINGER:  May we please publish to the jury

16  what's been previously admitted into evidence as Government's

17  Exhibit 641?

18          THE COURT:  Yes.

19  **Q.**    Do you recognize this?

20  **A.**    I do recognize this.

21  **Q.**    And what is it?

22  **A.**    This is a fundraiser that I attended and delivered a

23  max-out check for.

24  **Q.**    And did you attend this event?

25  **A.**    I did attend this event.

1   **Q.**    Can you describe -- who do you recall was in attendance

2   at this event?

3   **A.**    This event was really hosted in two separate venues.

4   This particular fundraiser at Crop Bistro, I recognize at

5   least two of the gentlemen on top of the invitation as being

6   there, being Rob Frost and Tony George.  The Speaker

7   obviously was in attendance, as were many lobbyists and also

8   many Cleveland business people.

9        After this particular fundraiser, there was another

10  gathering at the Brown's game in two suites.  That was

11  obviously a part of this fundraiser.

12  **Q.**    And what is the Crop Bistro?

13  **A.**    Crop Bistro is a restaurant in Cleveland, Ohio.

14  **Q.**    And who's the owner of Crop Bistro?

15  **A.**    Tony George owns Crop Bistro.  It's on the west side of

16  town.

17  **Q.**    And who is Tony George?

18  **A.**    Tony George is a -- he's a political operative of

19  sports.  He is someone who's very close with the parent

20  company, FirstEnergy, and also someone who has a very, my

21  understanding has a very good relationship with Larry

22  Householder.

23  **Q.**    Were any FirstEnergy executives at this fundraiser?

24  **A.**    The -- there were FirstEnergy executives at this

25  fundraiser.  Mike Dowling, Ty Pine, and others.  Chuck

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-1995

1    Jones, the CEO, attended the football game.  He was

2    actually -- he actually joined the group later that evening.

3             MR. SINGER:  May we please publish to the jury

4    what's been previously admitted as Government's Exhibit 633A?

5             THE COURT:  Yes.

6    **Q.**   Do you recognize this?

7    **A.**   I do.  The blue messages are my messages to Matt Borges

8    and the green are his messages to me.

9    **Q.**   And what is the date on this?

10   **A.**   The date is 12-23-2019.

11   **Q.**   And can you read the first page of this?

12   **A.**   Yes.  My text reads, have you been able to cut LaRe a

13   check yet.  He wrote, no, I wrote him a small one earlier

14   but I haven't done the rest yet.  I can get that done.

15        I then respond, he has a couple -- he had a couple

16   commitments get pushed till next year so just wanted to make

17   sure his year-end report is solid.

18             MR. SINGER:  Next page, please.

19   **A.**   I then write, he met with Monhollin guys for a couple

20   hours and listened to him bitch.  Apparently he didn't file.

21        Matt responds, oh, yes, I knew that.

22        I then respond, thanks for all your help with Vicks and

23   the rest of those guys.  The Speaker also met with LaRe and

24   Vicks.

25        Matt then responds, yes, I was in touch with LaRe,

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

 1   Longstreth, et cetera, at every step.  Sorry if I haven't

 2   kept you updated on all that.  I'm glad it all worked out.

 3       I responded, no need to keep me updated.  Just glad it

 4   worked out the way it needed to.

 5       I then respond, I just checked in on LaRe to track his

 6   fundraising.  He is on his own going forward but I just owe

 7   him and the Speaker to make sure his bank is good this year.

 8       Matt's response, yes, and I am maxing to the Speaker at

 9   his January 15th event.

10       I wrote down, awesome.  Thanks.

11   **Q.**   Do you know whether Mr. Borges was paying money to public

12   officials at this time?

13   **A.**   That's what we had discussed, as part of our agreement.

14   Is that he would support certain public officials with money

15   that was brought into 17 Consulting.

16   **Q.**   There was a reference to LaRe.  Who is LaRe?

17   **A.**   Jeff LaRe was a newly-appointed state rep who was a yes

18   vote on our issue, someone I had known a long time I wanted

19   support.  He was new to politics, and I took a personal

20   responsibility to try to make sure that his fundraising

21   numbers looked good.

22   **Q.**   And did you know whether Mr. LaRe had a relationship with

23   Mr. Householder at all?

24   **A.**   Well, he was appointed to the House of Representatives,

25   and he -- I mean, he was quickly a Team Householder person.

1    So at the time of these messages, they absolutely had a

2    relationship.

3    Q.   Focusing on your message at the top of page 3, what did

4    you mean by "I owe him and the speaker to make sure his bank

5    is good this year"?

6    A.   Well, Jeff was someone that I had recommended to

7    Generation Now as a potential candidate for appointment in

8    that district.  Generation Now obviously went on to choose

9    him.  And so because I recommended him because he was so

10   helpful, what I am stating in this message is that

11   obviously, you know, as he grows as a state rep, he'll learn

12   to raise money, but initially I felt obligated to help him

13   early in his career.

14   Q.   All right.  Yesterday you spoke about a phone call

15   between Mr. Householder and Mr. Kiani.  Do you recall that?

16   A.   Yes.

17   Q.   Do you recall any other conversations that you had

18   involving Mr. Householder and Mr. Kiani during the effort to

19   defeat the ballot campaign?

20   A.   We had a meeting related to the defeating the ballot

21   campaign, yes.

22            MR. SINGER:  May we please publish to the jury

23   what's been previously admitted as Government's Exhibit 611C?

24            THE COURT:  Yes.

25   Q.   Do you recognize this?

1    **A.**   This is a text message exchange between John Kiani and

2    myself.

3    **Q.**   And what do the green boxes represent?

4    **A.**   The green boxes are my text messages and the blue are

5    his response.

6         MR. SINGER:  Can we go to page 2, please.

7    **Q.**   Could you just read the first three messages?

8    **A.**   Yes.  First message from John Kiani is, what happened

9    to black ops?

10        I respond, we can cover this on the phone.

11        I then respond, I have the Speaker joining this call.

12   **Q.**   What did you understand the reference to black ops to

13   mean?

14   **A.**   Black ops was a -- was a reference to one of the

15   initiatives that we had to approach a member of the

16   opposition to secure private information that would be

17   helpful to our campaign.

18   **Q.**   And who is that individual?

19   **A.**   Tyler Fehrman.

20   **Q.**   Well, we'll discuss Mr. Fehrman in a bit.  What's the

21   date on these messages?

22   **A.**   August 31, 2019.

23   **Q.**   And there is a reference in your last message to the

24   Speaker joining the call.  Do you recall whether or not you

25   had a conversation with Mr. Kiani and Mr. Speaker on this

1    date?

2    **A.**    Yes.  I believe what this is in reference to is a call

3    with our -- with FieldWorks, who was a consulting

4    organization charged with leading a certain aspect of the

5    ballot referendum.  We were not happy with the work they

6    were doing.  John Kiani was very concerned.  So we had the

7    Speaker join the call with Neil Clark, Jeff Longstreth, and

8    this particular group so that we can all get an

9    understanding what was going on and how to best move

10   forward.

11   **Q.**    Why did you ask Mr. Householder to join the call?

12   **A.**    I wanted Mr. Householder to join the call because I

13   wanted some additional accountability.  This was something

14   that Neil and Jeff were managing, and I didn't feel like it

15   was going well.  John didn't feel like it was going well.

16   He was unhappy, so I wanted the Speaker to join so that, you

17   know, we could -- we could have his accountability and be

18   able to talk with him about it later.

19   **Q.**    Can you describe whether Mr. Householder was actively

20   participating in this call?

21   **A.**    He was on the call.  We -- we all did a lot of

22   listening.  After -- after the call, we then spoke, again,

23   as a smaller group, including the Speaker, myself, and John

24   Kiani.  And the Speaker reassured us that he would fix

25   whatever issues existed, and he agreed with us that the tone

JUAN CESPEDES - DIRECT EXAM (CONT.)                12-2000

1    of the call was surprising to him in its unprofessional

2    nature.

3              MR. SINGER:  May we please publish to the jury

4    what's been previously admitted as Government's Exhibit 611F?

5              THE COURT:  Yes.

6    **Q.**   Do you recognize this?

7    **A.**   Yes.  This is a text message between John Kiani and

8    myself.  John's messages are in blue and mine are in green.

9    **Q.**   And what is the date of these messages?

10   **A.**   The date is 9-12-2019.

11   **Q.**   And can you just read the messages on this page?

12   **A.**   He writes, we're in the back.

13        I respond, okay.

14        I then respond, I'm sitting here next to SLH.

15   **Q.**   Do you recall whether you had a meeting involving

16   Mr. Kiani and Mr. Householder on September 12, 2019?

17   **A.**   I did.

18   **Q.**   And can you describe that meeting?

19   **A.**   Yes.  This was actually a breakfast meeting that took

20   place at a Planks Cafe in Columbus, Ohio.  The nature of

21   this meeting was to discuss where our referendum efforts

22   were at this point.  The meeting included myself, John

23   Kiani, Steve Burnazian of FES, Dave Griffing of FES, I

24   believe Neil Clark, Jeff Longstreth, and Speaker

25   Householder.

1   **Q.**   Do you recall any specifics about the conversations that
2   you had during that meeting?
3   **A.**   Yeah.  We spent a lot of time talking about the TV ads
4   that were running at this time.  We also just widely
5   discussed, you know, the campaign and how it was going and
6   what the strategy would be going forward.
7   **Q.**   Was there something specific about the TV ads that you
8   discussed?
9   **A.**   The TV ads at the time had an anti-China vent to them.
10  And we -- we talked about the fact that there may be a
11  little fatigue around those commercials and that they have
12  been up and running.  The company thought it was time to
13  change, but the Speaker wanted to run them for a little
14  longer.
15  **Q.**   Did you have any other meetings on September 12?
16  **A.**   Yes, I did.
17  **Q.**   Can you describe those?
18  **A.**   Yes.  After meeting with the Speaker for breakfast to
19  discuss the referendum, I then took my executive chairman
20  and his team to meet The Strategy Group, which was a media
21  company handling all the ads for our referendum.
22         Additionally, we met with some private investigators
23  who were engaged through 17 Consulting at that time as well.
24  **Q.**   And what role -- what role were the private investigators
25  playing?

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2002

1    **A.**   The private investigators really meant to help us

2    identify where the petitioners were gathering.  One of the

3    things that we were trying to do was prevent them from being

4    successful.  And in order to do that, to create distraction,

5    we had to know where they were.  So the private

6    investigators were really hired for that purpose of

7    understanding how those petitioners were spread out across

8    the state.

9                MR. SINGER:  May we please publish to the jury

10   what's been previously admitted as Government's Exhibit 623A?

11               THE COURT:  Yes.

12   **Q.**   Do you recognize this?

13   **A.**   I do.  It's a text message exchange between Matt Borges

14   and myself.  My text messages are in blue and Matt's are in

15   green.

16   **Q.**   Can you read -- what is the date on this message?

17   **A.**   The date appears to be 9-1-2019.

18   **Q.**   And can you read this first page, please?

19   **A.**   Yes.  I write, the name of your LLC is 17 Consulting?

20   I got approval to bring Culling on to secure 10 op-eds and

21   going to run it through you.  Going to have him draw up

22   contract.

23       Matt responds, yes.

24       Matt then responds, got intel.  It's very good.  Call

25   me.

1    **Q.**   Okay.  What is that image up at the top, the first

2    message at the top?

3    **A.**   I'm having a hard time seeing that on my screen.  I

4    apologize.

5    **Q.**   Does that appear to be an attachment?

6    **A.**   It is an attachment, yes.

7            MR. SINGER:  Your Honor, permission to publish next

8    to this message what's been introduced and admitted as

9    Government's Exhibit 623B?

10           THE COURT:  Yes.

11   **Q.**   Do you recognize 623B?

12   **A.**   I do.

13   **Q.**   What is it?

14   **A.**   It's a text message exchange between the Tyler firm and

15   Matt Borges.

16   **Q.**   And can you describe whether that represents the message

17   that Mr. Borges sent you in the exchange on the left side of

18   your screen?

19   **A.**   It does.

20   **Q.**   And what was your response after Mr. Borges sent this

21   attachment?

22   **A.**   I responded, awesome.  Good luck.  Go for broke.

23   **Q.**   Now, focusing on the message on the right.  Let me ask

24   you this, had you had any conversation -- you mentioned the

25   name Tyler Fehrman.  Had you had any conversations with

1    Mr. Borges about Tyler Fehrman?

2    **A.**    Yes.

3    **Q.**    Could you describe those?

4    **A.**    I previously had not -- had not had a relationship,

5    worked with, spoken to or seen Tyler Fehrman.  Matt called

6    me and mentioned his name as someone who was working for the

7    opposition.  He mentioned having a long-time relationship

8    with him, and he mentioned that he was somebody that he felt

9    comfortable approaching potentially for information.  It was

10   something we discussed.  It was something that we put a

11   price tag on, and it was something that he and I were only

12   supposed to know as I asked him not to share the information

13   with John Kiani.

14        And that accidentally happened in a later call, which

15   then put more pressure on us but initially it started with

16   that one phone call.

17   **Q.**    When you say Mr. Fehrman worked for the opposition, what

18   did you mean by that?

19   **A.**    He was working for the petitioners who were looking to

20   gather signatures to repeal our effort.

21   **Q.**    So they were on the other side?

22   **A.**    They were on the other side.  They were the opposition,

23   correct.

24            MR. SINGER:  Could you go back to page 1 of 623A.

25   **Q.**    The last message on this page, what did you understand

1   the reference to "got intel" to mean?

2   A.   At that -- at that particular time, I interpreted that

3   to mean that he received information from Tyler, I believe.

4   Q.   Did you speak with Mr. Borges about the type of

5   information that you were looking for from Mr. Fehrman?

6   A.   Yes.  It was very specific.  Tyler was a manager who

7   worked for the opposition, so we understood his role to be

8   collecting the signature pages from petitioners.  So the

9   only thing that we were truly interested in was knowing how

10  many signatures they were gathering on a daily basis.  And

11  we felt like he was obviously the person who could give us

12  that information, and we had a unique relationship that may

13  allow us to retrieve that.

14  Q.   And why was that information important?

15  A.   Well, if we would know how many signatures they were

16  gathering, it would really allow us to tailor our defensive

17  efforts, either up or down, you know, depending on if we

18  were having success or not.  There was a limited amount of

19  days that they had to collect these signatures, so it would

20  also help us judge if they were on track, if they were, you

21  know, collecting at a slow pace or a fast pace.  So it would

22  be very, very helpful for us to know if we were going to be

23  successful in this effort.

24       And also if they were simply going to collect enough

25  signatures and there was nothing we could do about it, it

1  would allow us then to move toward that second legislation

2  that we needed to put in place.

3  Q.   And when you say increase, if they were doing well, you

4  would increase your efforts, what did you mean by that?

5  A.   Well, we were doing many things to try to stifle then,

6  you know, including running our own ballot initiative, which

7  we were paying people to work for.  A lot of times we would

8  offer, we'd try to offer more money than they were offering,

9  with the hopes of securing their employees and helping them

10  move over from their effort to our effort.

11       So, again, if we knew how many signatures they were

12  collecting, it would help us make those strategic decisions.

13  Q.   And how did you plan to get this information from

14  Mr. Fehrman?

15  A.   The only person that had the ability to get the

16  information, you know, was Matt, and he did secure

17  information initially.  We don't -- you know, we didn't know

18  if that information was accurate, but he did secure a number

19  initially, which then led to future conversations.  But the

20  idea was that we would compensate Mr. Fehrman, you know, for

21  giving us information that was helpful.

22           MR. SINGER:  May we please publish to the jury

23  what's been previously admitted as Government's Exhibit 602C?

24           THE COURT:  Yes.

25  Q.   Do you recognize this?

1    **A.**    I do.

2    **Q.**    And what is it?

3    **A.**    This is another scratch pad on that wall of my home.

4    In my handwriting, I would use occasionally just to write

5    notes as I was on conference calls most of the day.

6    **Q.**    And could you just describe generally what type of notes

7    you are keeping here?

8    **A.**    Yeah.  In this case -- in this case these are all

9    notes, mostly related to our referendum efforts.  If you

10   look on the left-hand side, you see Form 15 background

11   checks, which was a process that we were taking their

12   employees as their name's readily available at the Secretary

13   of State's website and we were doing background checks to

14   see if we could use those -- use anything in ads that we

15   were running.

16       Alex -- Alex is someone that worked for Matt.  He was

17   obviously in charge of that.  On the right-hand side, you

18   move to more big picture notes as far as who's got

19   responsibilities and who's talking to who.

20       And then as you move towards the bottom, you obviously

21   see the name Tyler with an arrow next to Borges.

22   **Q.**    And what did Tyler represent?

23   **A.**    Well, Tyler represented Tyler Fehrman, who was the

24   gentleman that we were approaching on the opposition end.

25   And obviously my arrow sort of signifies it as Borges'

1    responsibility.

2              MR. SINGER:  May we please publish to the jury

3    what's been previously admitted as Government's Exhibit 602D?

4              THE COURT:  Yes.

5    **Q.**   And what is this?

6    **A.**   This is another notepad on my wall.  It's a document

7    created by myself, and what this was was sort of an initial

8    budget for the work that we thought it would take to assist

9    the referendum as it relates to 17 Consulting.

10   **Q.**   And did you discuss this list with anyone?

11   **A.**   Yeah.  Matt and I discussed this many times.  I mean,

12   he and I strategized over every single one of these issues.

13   The only thing that changed at times was the budget because

14   things became more expensive the longer the campaign went on

15   and the more resources we needed.  But he and I discussed

16   this in depth.

17   **Q.**   And what did the -- at the top right-hand corner, dollar

18   sign, 1M, what does that represent?

19   **A.**   1 million was what we felt would be the budget that we

20   needed to get this project completed.

21   **Q.**   All right.  Can you just go through each of these rows

22   and explain what they represent?

23   **A.**   Yes.  The first role was Culling.  It then has $55,000

24   next to it with a date of September 31st.  Culling is a --

25   was responsible for media, was responsible for securing

1    positive news stories in op-eds and local newspapers.  He

2    was an out-of-state professional who did this work for a

3    living, so this was the budget that we had put in place for

4    him to secure those positive stories.

5         The next line item is Roetzel, who is the law firm that

6    Matt worked for.  That was a payment that was made to

7    Roetzel, and it was explained to Matt or to me by Matt that

8    that would allow his time to be more freed up and his

9    employees time to be more freed up to work on referendum

10   issues.

11        The next line is Stampede.  It says 25,000.  Stampede

12   was a signature-gathering firm who actually volunteered not

13   to work against us and did not -- and initially did not

14   accept any money or any buy-out.  I found them to be a very

15   honorable firm, and I decided to pay them $25,000 so that we

16   could use them as a resource to help us with strategy and

17   intel because they had proven to be trustworthy.

18        Below that the word "digital" signifies digital ads

19   that we planned on running.  Our initial budget was 50,000.

20        Below that, background checks, 25,000.  You then see

21   75,000 afterwards because the budget increased significantly

22   because of the amount of people they had applying to work

23   for them required us to do many more background checks than

24   we initially thought.

25   **Q.**   Why were you running background checks?

JUAN CESPEDES - DIRECT EXAM (CONT.)                     12-2010

1    **A.**   We were running background checks on the opposition's

2    employees hoping that we could, you know, find things that

3    we could use in ads later or that we could, you know, use in

4    media later to discredit their efforts.

5         The next bullet point is contri, which is short for

6    contribution.  As it states, a hundred thousand.  I just

7    wrote pending.  That describes what I described in an

8    earlier exhibit which is the political contributions that I

9    made as an individual.

10        The next line says employ, which stands for employment.

11   Which is 25,000.  It says pending.  That was a line item in

12   the budget that we discussed to be attributed to Tyler

13   Fehrman.

14   **Q.**   Why does it say employ?

15   **A.**   Well, you know, I wasn't going to write bribe.  I

16   wasn't going to write anything nefarious.  So to me

17   describing it as, you know, employment was just a natural

18   way for me to document it.

19   **Q.**   Did you intend to actually employ Tyler Fehrman?

20   **A.**   No.  I mean, Tyler would have had no use to us as an

21   employee.  And also, Tyler had previously worked for the

22   Speaker and Jeff Longstreth and did not have a good

23   relationship with them, so that's something that would have

24   never happened in any scenario.

25   **Q.**   And can you describe why you believe Mr. Fehrman was

1   valuable to the tune of $25,000?

2   **A.**   Yeah.  His value was very singular.  I mean, the one

3   thing that he could do was continue to work for the

4   opposition's effort and provide us with real-time

5   information as to how many signatures they were gathering.

6   **Q.**   The next item on the list?

7   **A.**   The next item says 3rd Rail.  It's listed as $60,000.

8   That is a political blog that existed in Columbus, Ohio,

9   that had a very good following.  And we were looking to put

10  out information, and we considered purchasing this

11  particular blog as it was up for sale at that time.

12      The next item, it just says PI recon work.  That refers

13  to the private investigators.  I have a $50,000 budget

14  listed.  As you can see, the number 485 next to it.  I do

15  know that we spent much more than 50.  I'm not quite sure

16  that we got all the way to 45, but that would signify that

17  there was a bump up in what we intended to spend.

18          MR. SINGER:  May we please publish to the jury

19  what's been previously admitted as Government's Exhibit 602L?

20          THE COURT:  Yes.

21  **Q.**   Do you recognize this?

22  **A.**   Yes.

23  **Q.**   And what is this?

24  **A.**   This would have been a similar spreadsheet that was put

25  on my wall of my home office.  This would have been an

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2012

1   updated version of the previous document that we just ran

2   over.

3        As we were adding and subtracting efforts and things

4   were either working or not working or we decided to back

5   away from things or add to others.

6             MR. SINGER:  May we please publish side by side

7   what's been previously admitted as Government's Exhibit 602F?

8             THE COURT:  Yes.

9   **Q.**   Do you recognize 602F?

10  **A.**   I do recognize 602F.

11  **Q.**   And what is it?

12  **A.**   602F is a notepad of Matt Borges, and this is Matt

13  Borges' handwriting and his sketch of what the budget looked

14  like.

15  **Q.**   And did you do anything with this, what's marked in 602F?

16  **A.**   Yeah.  This, this actually -- we had a quick meeting in

17  his law office to sort of compare notes, and I did not have

18  notes as far as my budget on me.  So I took a picture with

19  my cell phone of this particular page in his notebook so

20  that I could then revisit it later when I was home to

21  compare to my notes.

22  **Q.**   And did you use this, what Mr. Borges created in 602F, at

23  all?

24  **A.**   I used it -- I used it only to compare, you know, where

25  my budget was in comparison to him, which was similar in

1    many ways.

2    **Q.**    And does what's in 602F mirror at all what's in 602L?

3    **A.**    Many of the details mirror each other.  Some are

4    labeled different things, but they correlate.

5    **Q.**    And focusing on 602F, what did you understand political

6    to be, 100,000?  Second line from the bottom.

7    **A.**    That was the contributions that were made by myself,

8    and that was the initial $100,000 that was sent from 17

9    Consulting to 614 Solutions.

10   **Q.**    And so focusing on 602L, is that represented anywhere on

11   602L?

12   **A.**    The $100,000 contribution?  It's represented on both

13   sheets.  It's represented under political on F and it's

14   represented under contribution in L.

15   **Q.**    Is there anything that is in 602L that is not in 602F?

16   **A.**    Yes.  The line item for 25,000, that would have went to

17   Tyler Fehrman, is not listed in F.

18   **Q.**    And did you have any discussions with Mr. Borges about

19   that?

20   **A.**    Yeah.  I mean, at the time, you know, these things were

21   fluid.  And I asked him why it wasn't listed on his budget,

22   and he simply said that it wasn't something that he wanted

23   to write down.

24           MR. SINGER:  May we please publish to the jury

25   what's been previously admitted as 602J?

1             THE COURT:  Yes.

2    **Q.**    Do you recognize this?

3    **A.**    I do.

4    **Q.**    And what is it?

5    **A.**    This is also another document that hangs on my office

6    wall.  This particular list would have been just one, you

7    know, just an iteration as I was trying to manage a lot of

8    different aspects of this campaign.

9    **Q.**    Can you describe the writing at the bottom left-hand

10   corner of this?

11   **A.**    Yes.  The bottom left-hand corner has the letters FES,

12   representing FirstEnergy Solutions, and on the right it says

13   Gen Now, and there is an arrow that connects both of them.

14   **Q.**    And why did you write this?

15   **A.**    I think for the purpose of this particular document, I

16   was -- it was signifying the money, the trail of money, and

17   also just a coordination.  I would write notes sometimes as

18   I was on conference calls, and obviously FirstEnergy

19   Solutions and Gen Now, you know, you know, were working very

20   closely on this issue, and I was the person charged with

21   coordinating the efforts in between the two firms.

22            MR. SINGER:  May we please publish to the jury

23   what's been previously admitted as Government's Exhibit 623C?

24            THE COURT:  Yes.

25   **Q.**    Do you recognize this?

1    **A.**   I do.

2    **Q.**   What is this?

3    **A.**   This is a text message between Matt Borges and myself.

4    Matt's texts are in green, and mine are in blue.

5    **Q.**   And what is the date?

6    **A.**   The date on this appears to be 9-2-2019.

7    **Q.**   And can you read this message, please?

8    **A.**   Yes.  Borges writes, Tyler claims they were indeed in

9    Barberton today.  Sounds like they probably didn't have a

10   great presence.

11        I respond, interesting.  I think it's a good sign he

12   continues to share info.

13        He responds, it was pretty -- it was a pretty simple

14   yes.  We were there.  And I told him I heard they weren't --

15   when I told him I heard they weren't.  I'm sorry.

16   **Q.**   Next page, please.

17   **A.**   I then respond, the only danger of telling Kiani today

18   means that we will have to close him.  I think it was

19   absolutely the right call in hindsight.

20   **Q.**   What did you mean by "the danger of telling Kiani today"

21   characterization?

22   **A.**   As I stated before when Matt brought this issue to me I

23   thought it was clever and thought it was something we should

24   pursue but I wanted to protect my executive chairman.  I did

25   not want John knowing this information.  And also because of

1    the style of his leadership and because he was so demanding

2    and such an aggressive person, I knew that if we told him

3    there was this option about us getting information that was

4    valuable, that he would put a significant amount of pressure

5    on Matt and I to make sure it happened.

6    **Q.**    And did you -- did you ever discuss this with Mr. Kiani?

7    **A.**    We were on a phone call once, Matt, myself, and

8    Mr. Kiani, and we were talking about many of the issues that

9    we were working on.  And Matt did say something on the phone

10   to Mr. Kiani, and obviously, you know, he focused on that.

11   And there were multiple times that he, as a follow-up, asked

12   about, you know, any progress on this issue.

13   **Q.**    And did you discuss with Mr. Kiani, which you previously

14   described as paying money to Mr. Fehrman for the information?

15   **A.**    Yes.  You know, John, I tried to rush him off the

16   phone, to be honest with you, when we were first having the

17   conversation.  But he reiterated for us to do whatever it

18   takes to get it done.

19   **Q.**    You mention in this message that it would mean that you

20   have to close him.  What did you mean by close him?

21   **A.**    Close him means that, you know, at this point in time

22   there was a back and forth sharing of information, but it

23   wasn't clear whether -- to me, whether Tyler had agreed to

24   continue to help us or not.  And if we told John, I knew he

25   would put a lot of pressure on us and it would be viewed as

 1    a failure if Tyler did not continue to help.  So when I say

 2    close him, I just meant that we had to secure, you know, his

 3    services.

 4              MR. SINGER:  May we please publish to the jury

 5    what's been previously admitted as Government's Exhibit 623E?

 6              THE COURT:  Yes.

 7    **Q.**    Do you recognize this?

 8    **A.**    This is a text message exchange between John Kiani and

 9    myself.  My messages are in green, and John's are in blue.

10    **Q.**    And could you just read the first two messages?

11    **A.**    Yes.  I write, call me when you land.  I will be at

12    dinner, but will step out to take a call.  Speaker's team is

13    all over FW, signifying FieldWorks.  I just sent an update

14    to your email regarding yesterday's activities.  You will be

15    receiving an email every afternoon regarding their prior

16    day's activities going forward.

17         He responds, thank you.  I am doing signature mat and

18    worried they will collect enough signatures.

19    **Q.**    What did you understand "signature mat" to mean?

20    **A.**    Well, you know, as we mentioned before, John owned and

21    operated a hedge fund.  He was a finance guy.  So he was

22    very much into doing models.  And when he said "signature

23    mat," you know, he was trying to create a model to see how

24    many signatures the opposition would gather on a daily basis

25    as it was the most important piece of information to us.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2018

1   **Q.**   And did this affect at all your strategy with regards to

2   Mr. Fehrman, this signature mat?

3   **A.**   Yeah.  I mean, it was -- it was obviously something

4   that was extremely important.  Our executive chairman was

5   now aware, you know, that there was an ability to

6   potentially get this information.  So we, you know, we

7   proceeded to try to do that.

8            MR. SINGER:  May we please publish to the jury

9   what's been previously admitted as Government's Exhibit 627C?

10           THE COURT:  Yes.

11  **Q.**   Do you recognize this?

12  **A.**   I do.

13  **Q.**   And what is it?

14  **A.**   This is a text message string between myself, Matt

15  Borges, and Christopher Gill, who was a lead private

16  investigator.

17  **Q.**   And how did -- did Mr. Gill have any relationship to the

18  white board photo that we just saw and you described relating

19  to PI recon work?

20  **A.**   Yes.  He was the person that we had contracted.  He

21  subcontracted many members under -- under himself.  But he

22  was our point of contact, and he was the line item that --

23  that were referenced, recon work, and the budget that was

24  north of $100,000.

25  **Q.**   And how was Mr. Gill's company paid?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **A.**    They were paid directly by 17 Consulting.

2    **Q.**    Okay.

3         MR. SINGER:  Can you move to page 2, please.

4    **Q.**    And can you read your message at the top of the page?

5    **A.**    Yes.  My message states, they are going to keep the

6    team's tracking Tyler and Dave right now I believe.

7         I then write, if we have an extra resource to see where

8    petitioners go end of day, could be helpful.

9    **Q.**    What did you mean by "keep the teams tracking Tyler and

10   Dave right now"?

11   **A.**    We would have at least one private investigator

12   tracking Tyler and Dave.  They were -- Dave was a peer,

13   coworker of Tyler for our opposition, and they had similar

14   roles in different parts of the state.  And we were just

15   trying to track them to see if this would lead us to not

16   only get a better understandings of where their petitioners

17   were gathering, but also how they collected their signatures

18   at the end of the day.

19   **Q.**    And who does -- what does the -- who does the Tyler

20   represent?

21   **A.**    Tyler is Tyler Fehrman.

22   **Q.**    Did Mr. Borges describe with you his interactions with

23   Mr. Fehrman?

24   **A.**    Yeah.  We had multiple conversations about it.

25   **Q.**    And what do you remember about those conversations?

1  **A.**    Well, one in particular, you know, before they were set

2  to have a meeting.  You know, Matt reached out to me by

3  phone, and I remember being at the gym, I left the gym to

4  talk to him, and it was after a period of silence between he

5  and Tyler.  And he had mentioned that Tyler had called him

6  and wanted to meet.

7       So we strategically talked about, you know, how -- you

8  know, what the purpose of the meeting would be, if we still,

9  you know, wanted to, you know, pay him for information, how

10  much would we pay him.

11      We struggled very much with the idea of feeling like we

12  needed the information versus maybe paying him too much and

13  doing something irresponsible.  So -- so we would be

14  spending a lot of our time talking about what would be the

15  right dollar amount to budget for someone like Tyler in

16  order to provide the information that we were looking for.

17  **Q.**    And do you recall what Mr. Borges told you about his

18  meetings with Mr. Fehrman on that call?

19  **A.**    Mr. Borges, when he described the meeting with Tyler

20  Fehrman, he didn't have a -- you know, Tyler was very cagey.

21  I don't think that Matt had a great sense where Tyler's head

22  was.  I don't think that he trusted him.

23      You know, he was very -- he was very speculative in our

24  conversations as to, you know -- you know, as to Tyler, the

25  more he met with him.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2021

1    **Q.**    Did you guys discuss any concerns that you had with

2    moving forward with Mr. Fehrman?

3    **A.**    Yeah.  I mean, you know, we -- you know, we, in a very,

4    you know, jovial manner made jokes about, you know, if we

5    gave him too much money, would he spend it irresponsibly or

6    would he do something, you know, that would embarrass us,

7    buy a luxury car or, you know, whatever it might be.

8    **Q.**    Did you discuss whether or not you had concerns about

9    whether or not the conversations were being recorded?

10   **A.**    Matt -- Matt actually made a comment to me that he made

11   a comment to Tyler about the media.  You know, he had

12   some -- you know, the media or the opposition, you know,

13   asking him if they had put him up to meeting, you know, with

14   him.

15   **Q.**    Ultimately, what did Mr. Borges say about payments

16   relating to Mr. Fehrman?

17   **A.**    I've always assumed that the effort was not successful.

18   You know, obviously, you know, my executive chairman reached

19   out multiple times for information.  Wasn't able to give it

20   to him.  So in my -- from my point of view, that was -- it

21   was a matter that Borges and I stopped communicating about

22   at a certain amount of -- at a certain time, which just

23   meant to me that, you know, it didn't happen, didn't work

24   out, not a problem.

25        When we had finished, you know, our efforts and were

1   doing some accounting and I was going over numbers, that was

2   when I had found out that Matt actually had made a payment

3   to Mr. Fehrman, which I was surprised by because in my

4   opinion, you know, he hadn't obviously done anything to

5   help.  And when I questioned him on that, he just kind of

6   sloughed it off and said I just want to keep him quiet.

7   **Q.**   You previously mentioned in your testimony a buy-out

8   campaign.

9   **A.**   Um-hmm.

10  **Q.**   Can you describe that, please?

11  **A.**   Yeah.  The buy-out campaign was something that was run

12  by Neil Clark.  It was really his brainchild.  It was -- we

13  were getting very nervous towards the end because the amount

14  of firms that do this type of work, the amount of

15  subcontractors is very large.  So people were flying in from

16  all over the country to take these jobs to collect

17  petitioners against us.

18      And one of the strategies of the buy-out campaign was

19  to simply give them enough money and give them a plane

20  ticket to go back to where they came from and have them

21  sign, you know, a nondisclosure, noncompete to not work

22  against us.

23      The other effort we had regarding, you know, buy-out

24  was again to get them to work on the petition that we had

25  actually created, to give them employment on our side so

1    they would not work for the opposition.

2    **Q.**   And did you discuss the buy-out effort at all with

3    Mr. Borges?

4    **A.**   The buy-out effort was something that we were both

5    aware of through our conversations with Neil Clark.

6                MR. SINGER:  Your Honor, I have about 15 or 20

7    minutes.  Would you prefer to take the morning break now?

8                THE COURT:  Do you want to guess?  I think we should

9    take the break now.  It's break time.

10         Members of the Jury, during the break, take a break,

11   don't discuss the case with anyone including among yourselves.

12   No independent research.  Continue to keep an open mind.  We

13   will ask for your presence in 20 minutes.

14         We will rise as you leave.

15                THE COURTROOM DEPUTY:  All rise for the jury.

16         (Jury exited the courtroom at 10:46 a.m.)

17                THE COURT:  Jury's left the room and the doors are

18   closing.  As always, wait in the courtroom until we have been

19   advised that jurors have cleared the floor.  You are welcome

20   to remain standing or be seated as you choose.

21         (Pause.)

22                THE COURT:  We're in recess for 20 minutes.

23                THE COURTROOM DEPUTY:  All rise.  This court is in

24   recess for 20 minutes.

25         (Recess taken from 10:48 a.m. until 11:07 a.m.)

```
 1            THE COURT:  Thank you.  Pleas be seated.
 2       Are we ready for the jury from the government's
 3  perspective?
 4            MR. SINGER:  Yes, Your Honor.
 5            THE COURT:  Mr. Householder's?
 6            MR. BRADLEY:  Yes, Judge.
 7            MR. SCHNEIDER:  Yes, Judge.
 8            MR. SINGER:  Your Honor, may I approach?
 9            THE COURT:  Yes.
10            THE COURTROOM DEPUTY:  All rise for the jury.
11       (Jury entered the courtroom at 11:12 a.m.)
12            THE COURT:  You may all be seated.  Thank you.
13       To the 14 jurors who rejoined us, good midmorning.  Hope
14  you had a decent break.
15       We are going to continue with the testimony that was
16  going on when you took your break.
17       Mr. Singer, you may proceed.
18            MR. SINGER:  Thank you, Your Honor.
19  Q.   Mr. Cespedes, going back to an issue that we've just
20  discussed, you previously testified that you had concern or
21  you discussed Mr. Borges' concern relating to Mr. Fehrman
22  using the money that you would provide to him to buy a luxury
23  automobile.  Do you recall that?
24  A.   Correct.
25  Q.   Can you explain why this was a concern?
```

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2025

1    **A.**    Yes.  Obviously, if we made a payment to Mr. Fehrman,

2    we wanted to conceal the fact that that payment was made.

3    And we did not want him to do something that would raise

4    eyebrows.

5    **Q.**    Now, you previously testified about part of the plan

6    being new legislation from Mr. Householder.  Do you recall

7    that?

8    **A.**    I do.

9    **Q.**    Did there come a time in the fall of 2019 where there was

10   a concern that legislation from Mr. Householder would be

11   necessary?

12   **A.**    Yes, there was.

13            MR. SINGER:  May we please publish to the jury

14   what's been previously admitted as Government's Exhibit 636F?

15            THE COURT:  Yes.

16   **Q.**    Do you recognize this?

17   **A.**    Yes, I do.  It's a text message between myself, Matt

18   Borges, Jon Kiani, and Stephen Burnazian.

19   **Q.**    And we have been discussing Mr. Kiani and Mr. Borges, but

20   can you please explain again to the jury who Mr. Burnazian is?

21   **A.**    Yes, Mr. Burnazian was also a board member.  He's an

22   executive vice president at FirstEnergy Solutions.  He is a

23   close confidante of John Kiani.

24   **Q.**    And what is the date on these messages?

25   **A.**    The date is 10-11-2019.

1    **Q.**   And I'm going to ask you to read the first two-and-a-half

2    pages of this exchange.

3    **A.**   Yes.  Matt writes, Judge is now suggesting he would

4    consider a TRO on the limited idea language in the statute

5    that individuals only engaged in collection of signatures

6    must file a Form 15.

7        Would not have any bearing on enforcement of the

8    timelines moving forward.  We just wouldn't be able to track

9    who their circulators are anymore.

10       But it opens the door for them to try and get the whole

11   statute struck down later.

12       He then adds, okay, he just wrapped up the hearing and

13   said we can expect a decision from him shortly.

14   **Q.**   And can you describe what's going on here?

15   **A.**   Yeah, at the time there's a judge who is considering a

16   temporary retraining order, and this was -- this was

17   something that made John Kiani very nervous.  Matt was, you

18   know, in the hearing room at the time, you know, listening

19   to the arguments, and was going to report back to us what

20   the resolution was.

21   **Q.**   Okay.  Starting on the top of page 2.

22   **A.**   John Kiani writes, oh, Jesus.

23       He then writes, Juan, we need that legislation dropped

24   ASAP today please.

25       He then writes, Matt, can you please elaborate on what

1    opens the door for later means?

2         Matt responds, plaintiffs saying they plan to file

3    another TRO next week.

4         John Kiani responds, fuck.

5    **Q.**   Just the first two messages, please.

6    **A.**   John writes, Juan, please make sure Tully is ready.

7         I write back, let's wait for ruling and then get a

8    small group on phone including Neil and Jeff.

9    **Q.**   What did you understand Mr. Kiani's message, "please make

10   sure Tully is ready"?

11   **A.**   Well, obviously, Pat Tully is the person charged with

12   energy policy, and he had been handling all of the edits on

13   legislation up to this point in the Speaker's office, and he

14   would be the person that would be charged with drafting new

15   legislation if necessary.

16   **Q.**   And can you describe conversations you were having with

17   Mr. Kiani around this time relating to new legislation?

18   **A.**   Yes.  This was -- there were conversations I had with

19   Mr. Kiani, and we also had conversations, one in particular,

20   with the Speaker about new legislation.  Again, the idea was

21   that in new legislation, the subsidy would be split into

22   multiple bills to make it very difficult for opposition to

23   referendum.  That really was the context.

24   **Q.**   And then can you describe what you meant by, "let's wait

25   for ruling and get small group on phone, including Neil and

1    Jeff"?

2    **A.**    Yes.  As I mentioned before, my executive chairman was

3    a very aggressive person.  He, you know, he obviously was

4    very, very engaged, but also, you know, he worried a lot.

5    We weren't sure what the ruling was going to be, so I was

6    just trying to keep him calm and reference getting that

7    smaller group together who was fighting the referendum once

8    we had clarity.

9              MR. SINGER:  Can we go to page 8, please.

10   **Q.**    And can you read this entire page?

11   **A.**    Yes.  Matt writes, a judge can only issue a TRO if he

12   believes the plaintiffs have a good chance of winning at the

13   full hearing or trial level.  And since he would be the

14   judge on this case, issuing any kind of retraining order

15   would not be a good sign.

16        John Kiani responds, Juan, please help with

17   legislation.  Please.

18        John then adds, I'm on a very important call and will

19   be available by 11 a.m., 11 Eastern Time.

20             MR. SINGER:  And then just highlight Mr. Cespedes'

21   response, please.

22             THE WITNESS:  My response is, we have all hands on

23   deck regarding legislation otherwise.

24   **Q.**    What did you mean by, "all hands on deck"?

25   **A.**    Well, I obviously had been in contact with Pat Tully,

1    Neil, and Jeff.  Both were aware of what was happening at

2    this particular point in time in the courts, and legislation

3    was something that was prominently discussed previously and

4    we were all prepared to move forward however we needed to

5    based on the ruling.

6    **Q.**    And can you explain -- can you explain why the new

7    legislation was so important?

8    **A.**    Yeah.  For the -- for the company, what we were told

9    was there was a timeline by when the subsidy would have to

10   be enacted in order to save the plants and keep them in a

11   manner which was profitable.  So because of that timeline,

12   that's really what dictated a lot of our action in trying to

13   get this across the finish line as fast as possible.

14   **Q.**    And if the ballot campaign was successful in gathering

15   enough signatures by the October deadline, can you describe

16   what that would mean relating to the nuclear plant timeline?

17   **A.**    Yeah.  It would be very detrimental because just

18   putting the actual ballot initiative forward and being

19   successful at that point would mean that the legislation

20   would not go into place until the ballot -- or until the

21   referendum actually took place.

22        For us, even if we were to win the referendum a year

23   later, you know, when that election came up, that was much

24   too long.  So the backup legislation was really intended to

25   solve a problem that was happening very quickly, with a much

1    faster timeline.

2    **Q.**   Did you have any conversations with Mr. Kiani about the

3    future of the power plants?

4    **A.**   Yes, I did.

5    **Q.**   And can you describe those?

6    **A.**   Yes.  Mr. Kiani was someone who obviously was an active

7    investor.  He wanted to run the power plants for a short

8    period of time.  He wanted to restructure those power

9    plants, you know, obviously as he secured the new subsidy,

10   and he really was positioning those power plants to sell at

11   a later date.

12   **Q.**   And did you have any conversations relating to how much

13   the sale would be worth to Mr. Kiani personally?

14   **A.**   I had those conversations --

15           MR. BRADLEY:  Objection, Your Honor.

16           THE COURT:  Basis?

17           MR. BRADLEY:  Relevance, 403.

18           THE COURT:  I think it's relevant.  I am going to

19   overrule.

20       You can answer the question.

21           THE WITNESS:  I had those conversations directly

22   with Stephen Burnazian who was John's right hand, and he had

23   inferred to me that John was to make about a hundred million

24   dollars off the sale of the power plants.

25           MR. SINGER:  May we publish to the jury what's been

1    previously admitted to the jury as Government's Exhibit 639N?

2              THE COURT:  Yes.

3              MR. SINGER:  And, Your Honor, may we also publish

4    side by side what's been previously admitted as Government's

5    Exhibit 636O?

6              THE COURT:  Yes.

7    **Q.**   And do you recognize these two documents?

8    **A.**   I do.

9    **Q.**   And what are they?

10   **A.**   On the left is a text message between myself and Neil

11   Clark.  And on the right is the attachment which lies in

12   that document, or in that text message exchange.

13   **Q.**   And can you -- can you just read your first message?

14   **A.**   My first message is just letting Neil, again who is the

15   Speaker's proxy, know about this case filing.

16        And his response, obviously, is, you guys are screwed.

17   **Q.**   And what did you understand the significance of this case

18   filing to be, generally?

19   **A.**   Generally, again, it was an attempt to block our, block

20   our subsidy and cause our legislation not to be enacted.

21   **Q.**   And what is the date of your message?

22   **A.**   The date of my message is 12-24-2019.

23   **Q.**   Does that help you put in place what was going on at this

24   time relating to your efforts?

25   **A.**   Yeah.  It was obviously Christmas Eve, and the judge

1    had put out this ruling that particular day.

2    **Q.**   And did this cause concern amongst you and your team

3    relating to your efforts?

4    **A.**   It caused significant concerns.  We spent most of the

5    day on conference calls that day.  And it was -- it included

6    Neil Clark, Jeff Longstreth, myself, Matt Borges was

7    involved, our lawyers were part of those calls, as was John

8    Kiani, Dave Griffing, and Steve Burnazian.  So it really was

9    all hands on deck that particular day.

10            MR. SINGER:  Can you jump to page 3, please.  And

11   can you just -- can we just highlight the first half of the

12   page.

13   **Q.**   And can you read that, please?

14   **A.**   Yes.  This is a text message between Neil Clark and

15   myself.  The first message is from myself, and what I write

16   is, the only bigger assholes than you are the four justices

17   that did this to me on Christmas Eve, LOL.  I'm going to be

18   on conference calls all day now.

19        His response, I know.

20        He then responded, but like I said, no matter -- no

21   matter, a, what the Speaker will correct an adverse

22   decision.

23            MR. SINGER:  Can we please publish what's been

24   previously admitted as Government's Exhibit 636P?

25            THE COURT:  Yes.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2033

1    **Q.**   Do you recognize this?

2    **A.**   Yes.  This is a message between myself and John Kiani.

3    **Q.**   And what is the date of this message?

4    **A.**   The date is December 24, 2019.

5    **Q.**   And can you read this message, please?

6    **A.**   Yes.  Message from myself, starts, by the way, the

7    Speaker's beyond committed and doubled down this morning.

8    He will not let us fail.

9    **Q.**   And what did you mean by this?

10   **A.**   Well, Mr. Kiani obviously was, you know, very

11   concerned, and it appeared as though we were facing a

12   significant challenge that may derail the legislation.  So I

13   was simply letting him know that regardless of what the

14   outcome was, the Speaker would come up with a solution.  And

15   I was assured of that this morning.

16   **Q.**   Did your efforts ultimately need new legislation?

17   **A.**   It did not.

18   **Q.**   And why is that?

19   **A.**   The effort -- the effort to oppose us was dropped by

20   the other side.

21   **Q.**   Did you personally have any doubt that Mr. Householder

22   would propose additional legislation at FirstEnergy Solutions'

23   request relating to the power plants?

24   **A.**   Not -- not according to the -- what was communicated to

25   me.

1          MR. SINGER:  May we please publish to the jury

2    what's been previously admitted as Government's Exhibit 639A?

3          THE COURT:  Yes.

4    **Q.**   Do you recognize this?

5    **A.**   Yes.  This is a text message between myself and Michael

6    Dowling who is an executive vice president at FirstEnergy

7    parent company.

8    **Q.**   And what's the date on these messages?

9    **A.**   The date is 10-3-2019.

10         MR. SINGER:  Why don't we actually jump to the

11   second page.

12   **Q.**   Okay.  Can we start with your first message?

13   **A.**   Yes.  I write, don't fall off your chair.  We have

14   funded 25 million this round and have been cut off by

15   advisors.  The entire plan through November would require

16   about 18 million more.  We have approximately $4 million a

17   week run rate.  We need to submit the next 4 million to the

18   Speaker by Thursday or else we are dead.

19        I add, there is a little complexity to it because after

20   the 21st -- after 21st costs dip and then ramp up again for

21   final 10 days.  We need a bridge or else it's over.  The

22   Speaker is prepared to talk with CJ.  If you could have him

23   reach out, it would be helpful.

24        I then add, we are winning right now.

25   **Q.**   What did you mean by "CJ"?

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2035

1    **A.**    CJ is a reference to Chuck Jones, the CEO of

2    FirstEnergy, the parent company.

3    **Q.**    And can you remind the jury who Mike Dowling is?

4    **A.**    Mike Dowling is an executive vice president of

5    FirstEnergy, the parent company.

6    **Q.**    Can you continue reading, please?

7    **A.**    Yes.  Mike Dowling text me, what (c)(4) are you using?

8    **Q.**    And the next page, please.

9    **A.**    My response is, Gen Now.

10   **Q.**    Why did you send these series of messages to Mr. Dowling?

11   **A.**    I sent the messages to Mr. Dowling because the

12   referendum effort had become very expensive.  Obviously, we

13   were continuing to fund it on a weekly basis, but the cost

14   had exceeded what we previously believed they would be.

15   We -- based on my knowledge, were denied receiving any more

16   money from, you know, from the Court in order to continue

17   with our effort.  So I had to reach out to Mike in order to

18   try to solicit money from the parent company to finish the

19   effort off.

20   **Q.**    Were your efforts relating to the ballot campaign

21   successful?

22   **A.**    They were.

23   **Q.**    And so what did that mean?

24   **A.**    That meant for us that the legislation was protected,

25   indeed would go into effect, and the company, you know,

1    would benefit significantly.

2    **Q.**   Can you explain whether you had any conversations with

3    Householder's team about raising money after House Bill 6 was

4    signed into law?

5    **A.**   Yes, I did.  I had conversations with two individuals,

6    but as it related to candidates and the Speaker's wishes, it

7    was Jeff Longstreth.  I met with him on the third floor of

8    the Huntington office, which was their political office.  It

9    was for a midmorning meeting.  And he went into detail as

10   what would be expected of us for the upcoming races.

11       What he asked for was that we give $1 million to

12   Generation Now.  He specifically wanted us to earmark our

13   money to Generation Now so that he and the Speaker had

14   flexibility to spend that money on the upcoming races to

15   strengthen his vote count in the legislature.

16       I took the information back to my company.  They agreed

17   to support that effort, and they quickly cut a check that

18   was to be mailed to me.

19   **Q.**   And what did Mr. Longstreth mean by "upcoming races" as

20   you understood it?

21   **A.**   Well, the -- you know, obviously there is legislative

22   races, you know, every couple years.  And the upcoming races

23   would be such that in any open seat or in a seat where there

24   was a particular Republican candidate who was not someone

25   the Speaker -- was on the Speaker's team, they would likely

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2037

1   mount a challenge.  So Jeff needed money in Generation Now

2   in order to fund those races in order to elect future state

3   reps.

4   **Q.**   Did you have any other conversations with Mr. Longstreth

5   about raising money from FirstEnergy Solutions?

6   **A.**   Yes, I did.  In my other conversations with

7   Mr. Longstreth, they also included Neil Clark, and those

8   conversations dovetailed away from electing people into

9   office but actually initiating a referendum campaign of our

10  own really and that referendum campaign was meant to extend

11  term limits specifically allowing Speaker Householder to

12  remain Speaker longer but also -- but also giving the same

13  opportunity to the other sitting members of legislature.

14  **Q.**   And can you describe -- can you describe what Mr. --

15  let's start off -- actually, let me clarify.  Did you have a

16  conversation with Mr. Longstreth about the term limits issue?

17  **A.**   I did.

18  **Q.**   And then did you have a separate conversation with

19  Mr. Clark about the issue?

20  **A.**   I did.

21  **Q.**   Let's start with the conversation that you had with

22  Mr. Longstreth about the term limits issue.  Can you describe

23  that, please?

24  **A.**   Yes.  The conversation with Mr. Longstreth was more

25  focussed on the financials, what we needed to execute a

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JUAN CESPEDES - DIRECT EXAM (CONT.)                12-2038

1    campaign like that.  He referenced multiple utility

2    companies that he expected to support that, but the leading

3    two would be FirstEnergy, parent company, and ourselves.  It

4    would be a multimillion dollar effort that I believe he

5    suggested that we would contribute about $3 million to.

6    **Q.**   And how about the conversation with Mr. Clark, can you

7    describe that, please?

8    **A.**   Yeah.  The conversation with Mr. Clark was less about

9    finances and what would be needed for the campaign.  It was

10   definitely to promote the campaign and to remind me that it

11   was in the company's best interest that we obviously do

12   anything we could to keep Speaker Householder Speaker as

13   long as possible.  But additionally, as we mentioned

14   earlier, we really wanted ten years of a subsidy that had

15   been cut to six years.  So my conversations with Neil were

16   about exchanging our support on this ballot issue for then

17   in the future being able to add those four years back to our

18   legislation.

19   **Q.**   And did Mr. Clark indicate whether or not the additional

20   years on the subsidy would be something that Mr. Householder

21   would support?

22   **A.**   Absolutely.

23   **Q.**   And what did he say?

24   **A.**   Well, as the Speaker's proxy, he -- he really -- he was

25   very strongly worded that the four years would be tied to

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2039

 1    the term limits.  He spoke for the Speaker, obviously, in

 2    every other instance, so I would believe him when he said

 3    that as well.

 4    Q.   And did you discuss this issue with Mr. Kiani?

 5    A.   I did.

 6              MR. SINGER:  May we please publish to the jury what

 7    has been previously admitted as Government's Exhibit 333?

 8              THE COURT:  Yes.

 9    Q.   Do you recognize this?

10    A.   Yes, it's a text exchange between John Kiani and

11    myself.

12    Q.   And what is the date on this message?

13    A.   The date is February 27, 2020.

14    Q.   And can you place in time this date in relation to the

15    conversations with Mr. Clark and Mr. Longstreth that you just

16    described?

17    A.   This would have taken place after those conversations.

18    It's hard for me to determine exactly how much time, but it

19    obviously was afterwards.

20    Q.   Okay.  Can you read these messages, please?

21    A.   The Speaker -- I write, the Speaker needs some time

22    with you today on the phone regarding project.  Let me know

23    when you can make time today.  It would be in the evening

24    if -- it can be in the evening if necessary.

25              John responds, great.  Let's do it soon.

JUAN CESPEDES - DIRECT EXAM (CONT.)                    12-2040

1          I then respond, can we prep first?

2          John responds, yes.

3          What time, please?

4          I then respond, I need to reach out to the Speaker to

5     find out what time he's available.  I'm free for you

6     whenever.

7     **Q.**   Okay.  What were these messages in reference to?

8     **A.**   I was going to relay to John obviously the information

9     that was relayed to me regarding the term limit issue.

10    **Q.**   And did you discuss whether or not FirstEnergy Solutions

11    was prepared to support the term limits initiative by

12    Mr. Householder?

13    **A.**   Yes.

14    **Q.**   Can you describe that, the conversations relating to

15    that?

16    **A.**   Yeah.  At this point, we had a lot of confidence in

17    Speaker Householder, and he was someone that obviously we

18    were loyal to and he was loyal to us.  And this -- this was

19    a no-brainer for John Kiani.  Those four years were

20    extremely important, and he was more than willing to, as he

21    had done before, spend money in exchange for legislation.

22    **Q.**   And did FirstEnergy Solutions ultimately pay the money

23    relating to the terms -- term limits project?

24    **A.**   That did not happen, no.

25    **Q.**   Can you explain why?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **A.**    Yeah.  Obviously, shortly -- shortly after these

2    messages really is when the COVID pandemic picked up, and

3    that really changed the idea of doing any sort of ballot

4    initiative or the idea of signature gatherers going out and

5    collecting signatures would obviously not happen in that

6    kind of environment.  So the plans that we had to move

7    forward in that election cycle would have to be delayed.

8    **Q.**    And can you describe what your plan for FES was with

9    Mr. Householder going forward?

10   **A.**    Yes.  The plan going forward was obviously, you know,

11   obviously to support the candidates and to support

12   Generation Now, but also to support the term limit issue,

13   whenever it was -- whenever it was able to move forward.

14          MR. SINGER:  Your Honor, I have no further questions

15   at this time.

16          THE COURT:  Very well.  The defendants have an

17   opportunity to examine the witness, on behalf of

18   Mr. Householder.

19          MR. BRADLEY:  May I proceed, Judge?

20          THE COURT:  Yes.  Thank you.

21                    **CROSS-EXAMINATION**

22   BY MR. BRADLEY:

23   **Q.**    Good morning, Mr. Cespedes.

24   **A.**    Good morning.

25   **Q.**    My name is Stephen Bradley.  I'm one of the attorneys

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2042

1    representing Mr. Householder, and I've got some questions for

2    you today.

3    **A.**    Thank you.

4    **Q.**    So I want to -- I want to start in March of 2018.  I

5    believe you indicated that's when you were first hired as a

6    lobbyist on behalf of FirstEnergy Solutions; is that right?

7    **A.**    I was hired as a consultant at the time, yes.

8    **Q.**    And -- well, and ultimately, a lobbyist; is that right?

9    **A.**    Absolutely, yes.

10   **Q.**    So it was both roles, a consultant and a lobbyist?

11   **A.**    Yes.  Initially to perform a strategic assessment of

12   the landscape and then to lobby, correct.

13   **Q.**    And one of the first responsibilities was to examine the

14   ZEN legislation that had been previously introduced and was

15   ultimately not successful; is that right?

16   **A.**    Correct.

17   **Q.**    And the ZEN legislation was legislation that was proposed

18   under the leadership of Speaker Cliff Rosenberger?

19   **A.**    I believe that is correct.

20   **Q.**    And that was legislation that was intended to serve as a

21   subsidy to the nuclear power plants?

22   **A.**    I believe that's correct.

23   **Q.**    And do I understand correctly, there were actually two

24   different versions of the ZEN legislation that was introduced?

25   One version introduced in the -- in the House, and then

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2043

1   another version introduced in the Senate?

2   **A.**   I believe that is correct.

3   **Q.**   And ultimately, neither version was successful, neither

4   version was signed into law?

5   **A.**   No.

6   **Q.**   But there clearly was support for the ZEN legislation in

7   both the House and the Senate, right?

8   **A.**   That support was limited to the members who came from

9   the territories where those power plants were from.

10  **Q.**   And there was -- already at the time and place there were

11  subsidies regarding renewable energy that were already in

12  place, right, wind and solar renewable energy?

13  **A.**   I believe so.

14  **Q.**   Making it less attractive for legislators to support an

15  additional subsidy for the nuclear power plants; is that

16  right?

17  **A.**   I can comment on what I have firsthand knowledge of.

18  What you're saying is correct from the standpoint that those

19  subsidies existed.  The reasons why those legislators did

20  not want to support those then legislations, that never came

21  up.

22  **Q.**   So you learned that Larry was one of those individuals,

23  Larry Householder, that was supportive of ZEN legislation,

24  correct?

25  **A.**   Yes.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2044

1    **Q.**   And there were others that were supportive of the

2    legis -- of the proposed legislation besides those legislators

3    from the two districts that had the two power plants, right?

4    It wasn't just limited to those handful of legislators?

5    **A.**   It was a very limited number.  There -- there were some

6    that were outside those jurisdictions, correct.

7    **Q.**   And then-Speaker Rosenberger was one of the persons that

8    did not support the legislation?

9    **A.**   That was my understanding.

10   **Q.**   And you understood that Speaker Rosenberger was going to

11   be term limited out at the end of 2018, right?

12   **A.**   Yes.

13   **Q.**   And that there was going to be a new Speaker in place

14   starting from essentially January 2019 moving forward?

15   **A.**   Correct.

16   **Q.**   And you understood that Speaker Rosenberger, then-Speaker

17   Rosenberger was strongly pushing Ryan Smith to be his

18   successor, correct?

19   **A.**   Correct.  I actually believe that at the time I was

20   engaged, when I was speaking with the legislature, the

21   transition between Speaker Rosenberger and Ryan Smith had

22   taken place to some degree because the complexion obviously

23   changed when Cliff left.

24   **Q.**   Sure.  But that was essentially an interim Speaker role,

25   and ultimately, there would be a new Speaker vote essentially

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2045

1    at the end of 2018, right?

2    **A.**    Well, Ryan would either be elected Speaker or

3    Mr. Householder would defeat him.

4    **Q.**    That's right.  And as part of your efforts to consult and

5    advise FirstEnergy Solutions in and around this time, I'm

6    talking now the middle, essentially, of 2018, you understood

7    that Larry was, I think you used the word "good" on FES'

8    issues, right?  You understood that?

9    **A.**    Yes.

10   **Q.**    And by good he was supportive of the nuclear power plants

11   and seeing that they continued to produce nuclear energy for

12   Ohio.  You understood that?

13   **A.**    I think -- I think what I would describe when I say

14   Larry is good is you have to remember, this is a former

15   Speaker of the House who had served a previous term and had

16   a long-standing working relationship with his company, both

17   politically, you know, and from a legislative standpoint.

18        So as far as the -- as far as the benefits of the

19   plants are concerned, that's -- that's not what I was

20   referring to.  What I was referring to was the relationship

21   between the parent company and Mr. Speaker.

22   **Q.**    Fair enough.  But you specifically said yesterday he was

23   good on our issue.  And our issue referenced the nuclear power

24   plants?

25   **A.**    Our issue referenced the $50 million subsidy we were

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   trying to achieve, yes.

2   **Q.**   So preserving the issue of the nuclear power plants,

3   right?

4   **A.**   Yes.

5   **Q.**   And so Ryan Smith had -- did you understand that Ryan

6   Smith had affiliations with the natural gas industry?

7   **A.**   I heard that, but I did not -- I was not -- I did not

8   delve into that too much because one of the things that I

9   quickly realized was Speaker Householder was obviously our

10  best and only opportunity to get legislation introduced, so

11  that's where I put my focus.

12  **Q.**   That's my point.  So you understood that you had at least

13  heard that or had some information and understanding that Ryan

14  Smith was supportive of the natural gas industry, right?

15  **A.**   Yes.

16  **Q.**   And, thus, not likely to be supportive of, as you say,

17  your issue, namely, preserving the nuclear power plants?

18  **A.**   Not as supportive as Speaker Householder, of course.

19  **Q.**   So it only stands to reason that as you're working as a

20  consultant for FES and advising them moving forward, that you

21  would advise them to throw their political support behind

22  Larry Householder, right?  As opposed to Ryan Smith?

23  **A.**   You also want to support the winner, and at that time

24  we were not sure who the winner was.

25  **Q.**   Sure.  But when you're talking about advising FES, hey,

1    there's an upcoming Speaker's race at the end of 2018, heading

2    into 2019, and it looks like the two candidates are shaping up

3    to be Ryan Smith or Larry Householder, it's a pretty easy call

4    that you would advise FES to throw their political support

5    behind Larry Householder?

6    **A.**    I would.

7    **Q.**    And you did?

8    **A.**    With others, yes.

9    **Q.**    I'm not following, with others?

10   **A.**    Well, you have to remember at the time, you know, I was

11   engaged as a consultant.  I was studying the landscape.  In

12   order to study that landscape, I had to work with

13   FirstEnergy parent company employees, so they educated me on

14   some of the relationships.  They educated me on what their

15   previous effort was, and they helped shape my decision to

16   recommend supporting the Speaker.

17   **Q.**    And that ultimately was the bottom line, that you advised

18   FirstEnergy Solutions that it made sense for them to throw

19   their political support behind Larry Householder as opposed to

20   Ryan Smith?

21   **A.**    Yeah, I did.

22   **Q.**    So to be clear, you keep using this phrase "parent

23   company," and you're referring to FirstEnergy, correct?

24   **A.**    Correct.

25   **Q.**    But FirstEnergy and FirstEnergy Solutions are two

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2048

1    completely separate companies, right?

2    **A.**    They are two companies, but at that time they were

3    operating as one.

4    **Q.**    But two completely separate companies, right?

5    **A.**    My --

6    **Q.**    And what I mean by that, okay, they are two legally

7    separate entities?

8    **A.**    Legally separate, sure.

9    **Q.**    And they have completely independent management, right?

10   **A.**    Being that the management for FirstEnergy Solutions all

11   came from FirstEnergy parent company, yes.

12   **Q.**    John Kiani didn't?

13   **A.**    He was on the chairman of the board.  He wasn't an

14   actual --

15   **Q.**    Fair enough.  And two completely independent boards of

16   directors.

17   **A.**    Yes.

18   **Q.**    Right?

19   **A.**    Yes.

20   **Q.**    And when you were hired, formally hired by FirstEnergy

21   Solutions, it was just that, your contract was with

22   FirstEnergy Solutions, not FirstEnergy?

23   **A.**    Correct.

24   **Q.**    And you, your contractual obligations were to

25   FirstEnergy -- FirstEnergy Solutions, not FirstEnergy, right?

1    **A.**    Contractually maybe.

2    **Q.**    That's right.  You owe them a duty, I'm talking

3    FirstEnergy Solutions, right, to act in their best interests,

4    not FirstEnergy's, fair?

5    **A.**    I did intend to act in their best interests, yes.

6    **Q.**    And I think you indicated that -- that right around March

7    of 2018 is when you first are hired as a consultant/lobbyist,

8    and that was right around the time that FirstEnergy Solutions

9    entered into bankruptcy proceedings?

10   **A.**    Correct.

11   **Q.**    And the bankruptcy -- the bankruptcy proceedings

12   represented the process by which ultimately FE and FES would

13   become completely separated?

14           MR. SINGER:  Objection, Your Honor.

15           THE COURT:  Basis?

16           MR. SINGER:  Requires a legal conclusion.

17           THE COURT:  I agree.  I will sustain the objection.

18   **Q.**    You had conversations with John Kiani that as part of

19   their separation -- they being FE and FES -- that FirstEnergy

20   pledged a billion dollars to FirstEnergy Solutions, true?

21   **A.**    Repeat that.  We are bouncing around a little bit date

22   wise.

23   **Q.**    Sure.

24   **A.**    John Kiani entered the picture a little bit later for

25   me.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2050

1    **Q.**   Sure.  But you had conversations with John Kiani wherein

2    he advised you that FirstEnergy pledged to pay a billion

3    dollars, billion with a B, to FirstEnergy Solutions as part of

4    their separation?

5    **A.**   Yes.

6    **Q.**   And during those same conversations, John Kiani told you

7    that they -- they being FirstEnergy Solutions -- would be

8    willing to spend 30 to $40 million to support the legislative

9    efforts to get -- to pass what would become House Bill 6.  He

10   told you that, didn't he?

11   **A.**   I don't remember the dollar amount but he was obviously

12   willing to spend money to support it.

13   **Q.**   That's right.  And that they had that money to spend in

14   part based upon FirstEnergy's pledging them a billion dollars.

15   You understood that?

16   **A.**   I understood that he wanted to secure the subsidy and

17   was willing to spend money on it.

18   **Q.**   And they were willing to spend huge sums of money in an

19   effort to secure the legislation that would be ultimately be

20   known as House Bill 6?

21   **A.**   Well, we did spend money.  I would say that my

22   knowledge of that money and our ability to spend money was

23   not evident very early in the process.  It was something

24   that I learned as we went on.  And as we spent money at

25   times was surprising to me, up until the end when we were

1   cut off.

2   **Q.**   Until you learned eventually what John Kiani told you,

3   that they -- they had a pledge from FirstEnergy that they were

4   going to receive a billion dollars, and they were willing to

5   spend based upon the fact that that money was coming their

6   way?

7   **A.**   Yes.

8   **Q.**   Yes.

9   **A.**   There was a --

10  **Q.**   Yes.

11  **A.**   There was a --

12  **Q.**   So you were originally hired in March, but it was

13  technically by Akin Gump?

14  **A.**   Yes, that correct.

15  **Q.**   And to be correct, Akin Gump, a huge international law

16  firm --

17          MR. SINGER:  Objection, Your Honor.

18          THE COURT:  On what basis?  I'm sorry.

19          MR. SINGER:  Your Honor, we discussed the issue at

20  sidebar.

21          MR. BRADLEY:  I'm not going anywhere near that,

22  Judge.

23          THE COURT:  Well, that's a credit to you.

24          MR. BRADLEY:  Pardon?

25          THE COURT:  That's a credit to you.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                12-2052

1              MR. BRADLEY:  Thank you.

2              THE COURT:  The objection's overruled.

3    **Q.**   So you were originally in March hired by Akin Gump, which

4    is a huge international law firm, and that Akin Gump had

5    provided legal advice and lobbying services on behalf of

6    FirstEnergy?

7    **A.**   Yes.

8    **Q.**   Or FirstEnergy Solutions, excuse me.

9    **A.**   Yes.

10             THE COURT:  I think we are getting to what we talked

11   about.  I think you need to move on.

12             MR. BRADLEY:  I am.  That was my point, Judge.

13             THE COURT:  Very well.

14   **Q.**   And part of the reason why you were hired by Akin Gump as

15   opposed to initially hired by FirstEnergy Solutions is that

16   they had entered into bankruptcy proceedings and as a result

17   you had to submit significant documentation to the bankruptcy

18   court to get approved to be hired by FirstEnergy Solutions,

19   right?

20   **A.**   I'm not sure that's the exact reason.  I was hired by

21   Akin and Gump, I had a relationship with Akin and Gump where

22   someone recommended me and I interviewed with them.

23   Procedurally you may be correct, but I wasn't aware of those

24   issues.

25             THE COURT:  You said you were moving along.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2053

1             MR. BRADLEY:  I am moving on, Judge.

2             THE COURT:  You are going right into the area we

3    discussed at sidebar.

4             MR. BRADLEY:  So can we show the witness, Your

5    Honor, what is Householder Exhibit 383?

6             THE COURT:  Yes.

7    **Q.**   Are you able to see that on the screen, Mr. Cespedes?

8    **A.**   Yes, I am.

9             MR. BRADLEY:  And, PJ, can we just scroll through

10   the entirety of the exhibit to allow Mr. Cespedes to take a

11   look.

12        Can you go back to page 1, please.

13   **Q.**   Mr. Cespedes, do you recognize the exhibit that is

14   Householder 383 to be your employment contract with

15   FirstEnergy Solutions?

16   **A.**   I do.

17             MR. BRADLEY:  Your Honor, at this time I would move

18   to admit Householder Exhibit 383.

19             THE COURT:  Any objection?

20             MR. SINGER:  No objection, Your Honor.

21             MR. SCHNEIDER:  No.

22             THE COURT:  It's admitted.

23             MR. BRADLEY:  And may we publish?

24             THE COURT:  Yes.

25   **Q.**   So looking at the first page of this employment

1    contract --

2            MR. BRADLEY:  Actually, can we, PJ, go to page 2,

3    please.  And then can you cull out that bottom paragraph.

4    That starts with "The Oxley Group."

5    Q.   So The Oxley Group, I think you previously testified, is

6    your consulting company --

7    A.   Correct.

8    Q.   -- lobbying company?

9    A.   Correct.

10   Q.   And it states that The Oxley Group agrees to perform

11   government relations services for FirstEnergy Solutions,

12   right?

13   A.   Yes.

14   Q.   And they agree to pay you a monthly retainer of $10,000 a

15   month plus any past due expenses that you would incur?

16   A.   Yes.

17   Q.   And then it says refer to the attached scope of services

18   document for additional details of this engagement, right?

19   A.   Correct.

20           MR. BRADLEY:  And then, PJ, can we go to the last

21   page?

22   Q.   And I think you testified about this particular last page

23   of the agreement yesterday.

24   A.   Yes.

25   Q.   Do you recall that?

1           MR. BRADLEY:  And then, PJ, can we cull out that, I

2      guess it would be the third paragraph down that begins with

3      "Assist"?

4      Q.   So there's a number of bullet points here, and I just

5      want to focus on this one, the scope of services includes

6      assisting in crafting a dual strategy approach to achieve the

7      desired goal.  And in simple terms, the desired goal is to

8      secure some legislative solution to FirstEnergy's problems

9      associated with the nuclear power plant?

10     A.   Yes.

11     Q.   And the first strategy geared towards the current

12     administration in getting a resolution in the post-election

13     lame duck session.  So this is now May of 2018, is when you

14     executed this employment agreement, right?

15     A.   Correct.

16     Q.   And by now Ryan Smith is Speaker of the House.  He's

17     taken over from Cliff Rosenberger?

18     A.   Correct.

19     Q.   But as we discussed, that's just essentially an interim

20     position until after the general election in November of 2018,

21     there would be a new vote for the Speaker's position, right?

22     A.   Correct.

23     Q.   So the dual strategy that you're discussing in this, the

24     scope of services in your employment contract, the first is to

25     see that, hey, can we get some sort of legislative solution

1    during this, what would be Speaker Rosenberger's lame duck

2    term?

3         I misspoke, excuse me.

4    **A.**   Ryan Smith.

5    **Q.**   Thank you.  Speaker Smith's lame duck term that would

6    really only be six months or so, right?

7    **A.**   Correct.

8    **Q.**   And -- but ultimately, that is what you had already known

9    at the time you were executing this agreement, is pretty

10   unlikely?

11   **A.**   Correct.

12   **Q.**   Because you understood that Rosenberger and Smith,

13   neither one of them were really supportive of a subsidy of the

14   nuclear power plants?

15   **A.**   Also the timing.

16   **Q.**   Sure.  So the second focus -- the second strategic

17   approach would be to focus on making your issue, our issue,

18   FirstEnergy Solutions' issue, a campaign priority for the

19   incoming elected officials that would -- and you're referring

20   to the newly-elected officials in the general election of

21   November of 2018, right?

22   **A.**   Yes.

23   **Q.**   And looking then to achieve a solution in the first

24   quarter of 2019?

25   **A.**   Correct.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2057

1    **Q.**   And so --

2              MR. BRADLEY:  Can you take that down, please.

3    **Q.**   And, ultimately, that was the focus of your energies

4    moving forward from May of 2018 when you execute this

5    employment contract up through the next six months or so

6    leading up to the general election of November of 2018?  That

7    was the focus, primary focus of your efforts?

8    **A.**   Yes.  Do whatever it took to get the subsidy was and at

9    that point it was analyzing the current state and then

10   looking towards a future state.

11   **Q.**   That's right.  And -- but we just walked through it that

12   you weren't spending a lot of your time and energy on trying

13   to get Ryan Smith to support a legislative solution, right?

14   **A.**   Well, I did -- I did make attempts, but it wasn't -- it

15   wasn't the bulk of what I was doing, yes.

16   **Q.**   Which is what I just said.

17             THE COURT:  Questions.

18   **Q.**   Instead, you're spending the bulk of your time and energy

19   focusing on securing the support of the legislators after the

20   general election of 2019 with the goal of trying to get some

21   legislative solution in, I think you said, the first quarter

22   of 2019?

23   **A.**   Yes.

24   **Q.**   And so what you did there was meet with legislators,

25   right?

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2058

1    **A.**   Correct.

2    **Q.**   And that would be legislators, then sitting legislators

3    as of the summer of 2018, right?

4    **A.**   Right.

5    **Q.**   In both the House and the Senate?

6    **A.**   Yes.

7    **Q.**   And when you're meeting with those legislators, you're

8    essentially lobbying them to support this legislative solution

9    that FES needed?

10   **A.**   To be clear, I was meeting with folks --

11   **Q.**   Yes.

12   **A.**   -- as you mentioned for 2019, a potential solution that

13   didn't exist yet.  So I was still analyzing whether they

14   were supportive or not.

15   **Q.**   Sure.  But I'm not talking about analyzing whether there

16   is support.  You are meeting with these legislators and you

17   are lobbying or put another way you are educating them about,

18   hey, these are all the reasons why you should be supportive of

19   potential legislation that would preserve these nuclear power

20   plants?

21   **A.**   True.

22   **Q.**   And you're doing that -- well, let me ask you.  In that

23   six months or so, second half of 2018, you know, how often are

24   you meeting with legislators?  Daily?  Weekly?  How often?

25   **A.**   It really depended on their schedule.  It was getting

1    towards the end of the calendar, and it was a very, very

2    short window, you know, before they broke.  So when they

3    were in town, I tried to do meetings, but a lot of them were

4    unavailable.  So weekly's fair.

5    **Q.**   And, again, just in somewhat rough terms here, you know,

6    how many different legislators are you meeting with in the

7    second half of 2018?

8    **A.**   At that time there were two consulting groups working

9    on this, so the other consulting group primarily was

10   responsible for meeting with those folks as they had been

11   hired before myself.  But a dozen, dozen or so.

12   **Q.**   And is that, those dozen or so would be members from the

13   House and the Senate?

14   **A.**   Yes.

15         MR. BRADLEY:  Can we see Government's Exhibit 432A?

16   And can we publish it?  And, yes, it's already been admitted,

17   Judge.

18         THE COURT:  Yes.

19         MR. BRADLEY:  And can you cull out -- well, really,

20   all three messages, PJ.

21   **Q.**   So this is a text exchange between you and Pat Tully in

22   February of 2019, right?

23   **A.**   That's correct.

24   **Q.**   So this would, of course, be past the general election of

25   2018, right?

1   **A.**   Yes.

2   **Q.**   And you are referencing -- your discussion is essentially

3   referencing a tour of the Perry nuclear power plant?

4   **A.**   Yes.

5   **Q.**   And that was something that you did as part of educating

6   these legislators, namely, having -- inviting them up to tour

7   the plants?

8   **A.**   Yes.

9   **Q.**   So this particular exchange is involving Pat Tully, but

10  to be clear, there were a number of legislators that you would

11  invite to tour the plant?

12  **A.**   There were multiple legislators that attended this

13  tour, yes.

14  **Q.**   But this wasn't the only tour, right?  There were other

15  tours?

16  **A.**   I believe we had two tours.

17  **Q.**   And one of them -- and one of the attendees, I guess, was

18  the Senate president, right, Larry Obhof?

19  **A.**   There was a separate tour that was directed at the

20  Senate and another for the House if memory serves correct.

21  **Q.**   And the point of touring the legislators was it

22  represented an opportunity for you to get some face time with

23  them and explain to them the importance of preserving the

24  nuclear power plants?

25  **A.**   Sure.

1              MR. BRADLEY:  PJ, can we see Government's Exhibit

2     322A?  And, Your Honor, this has been previously admitted.

3     And may we publish this to the jury?

4              THE COURT:  Yes.  Thank you.

5              MR. BRADLEY:  And can you blow that up for us?

6     **Q.**  You recognize Government's Exhibit 322A as a copy of your

7     calendar from August 1st of 2018, right?

8     **A.**    Correct.

9     **Q.**    And we looked at this or you looked at this yesterday,

10    right?

11    **A.**    Yes.

12    **Q.**    And this would be an example of a schedule of meetings

13    that you had with various legislators?

14    **A.**    Yes.

15    **Q.**    And there is seven meetings scheduled, right, essentially

16    every hour on the hour?

17    **A.**    On this day, yes.

18    **Q.**    And one of them is with, somebody from the ACT Ohio, the

19    first one, Matt, is it?

20    **A.**    Szollosi.

21    **Q.**    Szollosi.  Who is Matt Szollosi?

22    **A.**    ACT Ohio is an organization tied to labor.  Matt

23    Szollosi is a former elected official who I believe now runs

24    this organization as the executive director.

25    **Q.**    And all of these officials, the purpose of the meeting is

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2062

```
 1    essentially to educate them on the issues associated with the
 2    nuclear power plants?
 3    A.   Yes.
 4    Q.   Every single one of them?
 5    A.   Yes.
 6    Q.   And this is just one calendar schedule from August 1st,
 7    but as we discussed, there were a number of other like and
 8    similar schedules, right?
 9    A.   What makes this extremely different is this is a day
10    when I had my executives come down from Akron, so I
11    scheduled a full day for them.  That happened a few times
12    but not very often.  This is an anomaly.
13              MR. BRADLEY:  I'm just looking at the time, Judge.
14              THE COURT:  A good time for a break.  Is that what
15    you were suggesting?
16              MR. BRADLEY:  Yes.
17              THE COURT:  You were suggesting lunch?  I think
18    that's a good idea.
19        We're going to break for an hour and 15 minutes.  During
20    the break, take a break, enjoy lunch.  Don't discuss the case
21    among yourselves or with anyone else.  No independent
22    research, and continue to keep an open mind.  We'll rise as
23    you leave.
24              THE COURTROOM DEPUTY:  All rise for the jury.
25              THE COURT:  We look to bring you back at 1:30.
```

```
 1          (Jury exited the courtroom at 12:10 p.m.)

 2              THE COURT:  Jurors have left the room.  As always,

 3      we will wait until we are advised they have cleared the floor

 4      before we break.

 5          (Pause.)

 6              THE COURT:  Mr. Singer, what color is that tie?

 7              MR. SINGER:  Blue and orange, Your Honor.

 8              THE COURT:  Orange?

 9              MR. SINGER:  Yeah.

10              THE COURT:  I thought it was pink.  I was going to

11      say you were the only male to acknowledge Valentine's Day in

12      your clothing.

13              MR. SINGER:  It has a pinkish hue, Your Honor.

14              THE COURTROOM DEPUTY:  All clear, Judge.

15              THE COURT:  All right.  Break for lunch.

16              THE COURTROOM DEPUTY:  All rise.  This court is in

17      recess until 1:30.

18          (Recess from 12:11 p.m. until 1:30 p.m.)

19              THE COURT:  Are we ready for the jury from the

20      government's perspective?

21              MR. SINGER:  Yes, Your Honor.

22              THE COURT:  Very well.  And from Mr. Householder?

23              MR. BRADLEY:  Yes, Judge.

24              MR. SCHNEIDER:  Yes, Judge.

25              THE COURT:  Very well.  Let's call for the jury.
```

```
 1                THE COURTROOM DEPUTY:  All rise for the jury.

 2           (Jury entered the courtroom at 1:33 p.m.)

 3                THE COURT:  You may all be seated.  Thank you.

 4           Welcome back to the 14 jurors.  Thank you for your

 5      continuing work.

 6           Mr. Bradley, you may continue your examination.

 7                MR. BRADLEY:  Thank you, Judge.

 8                THE COURT:  Very well.

 9      BY MR. BRADLEY:

10      Q.   Good afternoon.

11      A.   Good afternoon.

12                MR. BRADLEY:  Your Honor, may we publish

13      Government's Exhibit 291B, as in "boy"?  And it has been

14      previously admitted.

15                THE COURT:  Yes.  Thank you.

16                MR. BRADLEY:  And can you blow that up, PJ?

17      Q.   Mr. Cespedes, do you recognize Government's Exhibit 291B

18      to be a text exchange between you and Matt Borges on October

19      11th of 2018?

20      A.   I do.

21      Q.   And the blue bubble would represent your text message,

22      right?

23      A.   Correct.

24      Q.   And you write that we had a good day yesterday.  Met with

25      Householder, Obhof, and DeWine/Husted.  All went well, right?
```

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2065

1    **A.**    Correct.

2    **Q.**    And, obviously, you are representing that you had

3    conversations the previous day, which would be October 10th?

4    **A.**    Correct.

5    **Q.**    And when we -- when you refer to Householder, we're

6    talking about Larry Householder?

7    **A.**    Yes.

8    **Q.**    And that was, in fact, you testified that it was October

9    10th that you and others associated with FES met with

10   Mr. Householder at the State Street offices and presented him

11   a check that was made payable to Generation Now for $400,000,

12   right?

13   **A.**    We did.

14   **Q.**    And then Obhof is a reference to Larry Obhof, who is the

15   Senate President?

16   **A.**    Correct.

17   **Q.**    And then DeWine/Husted is, well, at the time, running for

18   governor and lieutenant governor?

19   **A.**    Correct.

20   **Q.**    Mike DeWine, Jon Husted?

21   **A.**    Correct.

22   **Q.**    And where did you meet with Senate President Larry Obhof?

23   **A.**    I believe that day we met in the Senate campaign

24   office, I believe, if my memory serves me correct, but --

25   that's what I believe.

1    **Q.**   And would that have been before or after the Householder

2    meeting?

3    **A.**   I would have to look at my schedule again.  I'm not

4    sure of the order of the meetings.

5    **Q.**   Okay.  And who would have participating -- participated

6    in the meeting with Senate President Larry Obhof?

7    **A.**   It would have been myself, Dave Griffing, on this

8    particular day I believe I had a D.C. consultant, Geoff

9    Verhoff with me, and that's who I can confirm was at that

10   meeting.

11   **Q.**   And was that a scheduled, planned scheduled meeting?

12   **A.**   It was.

13   **Q.**   And what was the purpose of that meeting?

14   **A.**   The purpose of this meeting was to support the Senate

15   President -- I'm sorry -- to support the Senate finance

16   committee.

17   **Q.**   And what do you mean when you say "to support the Senate

18   finance committee"?

19   **A.**   We had a contribution that day that we were giving to

20   the Senate finance committee.

21   **Q.**   And that would have been for the benefit of Larry Obhof?

22   **A.**   Yes.

23   **Q.**   And was he aware that you were going to present a

24   contribution prior to that meeting?

25   **A.**   I'm not sure.  I'd have to -- if you give me an

1    exhibit, that would help me.  That would be helpful.  I do

2    know that the meeting was previously scheduled.  It was for

3    the purpose of supporting him.  I don't know if he expected

4    us to bring support that day, if that's something we

5    communicated.

6    **Q.**    And -- I didn't mean to interrupt.  Finish your thought.

7    **A.**    I did finish.

8    **Q.**    And how much was that contribution?

9          MR. SINGER:  Your Honor, objection.  Can we meet at

10   sidebar?

11         THE COURT:  Sure.

12                   **BEGIN SIDEBAR CONFERENCE**

13         MR. SINGER:  Your Honor, whether or not there were

14   any contributions made that were proper or improper to other

15   public officials is not relevant to whether or not there was a

16   bribe committed in this case.  And we briefed this sort of

17   "everybody's doing it" line of arguments.  The Court has

18   already agreed that that would be improper to present that

19   type of argument in this case, and this is what that evidence

20   goes to.

21         MR. BRADLEY:  So it's our position, Judge, that it

22   is relevant because it's our position that the payments made

23   to all of these public officials on this day, and other days,

24   to Householder and others all represented ordinary campaign

25   contributions that were planned and discussed to be just that,

1    ordinary campaign contributions, and, thus, by definition, not

2    a bribery.  So this was all, again, planned and discussed

3    ahead of time, and payments not just to Mr. Householder but to

4    Obhof, DeWine, and Husted.

5        So we do think it's relevant for the jury to hear this

6    evidence and understand the purpose of all of these meetings

7    and all of these contributions.

8             THE COURT:  I'd rule that we're not going to be

9    talking about common practice.  I'll confer with my law clerk.

10        (Pause.)

11             THE COURT:  I'll see counsel at sidebar.

12        I've already ruled on this.  I ruled in writing, and

13   we're not going to get into what went down with other people,

14   whether it was common practice or focused on what

15   Mr. Householder and Borges did or did not do.  So I'm going to

16   sustain the objection.  It's all of record.

17             MR. BRADLEY:  Just if I could have one last thought

18   to make a record, Judge.

19        We're not presenting this evidence as common practice.

20   We're presenting this evidence specifically as it relates to

21   this October 10th date wherein this witness described that

22   they had extensive meetings with various FES officials, and

23   that all of these were -- the payment to Householder

24   represented ordinary campaign contribution along with all of

25   these other contributions.  So we're looking to limit it in

1    scope just to these contributions that are the subject of that

2    particular text exchange that I'm discussing.

3        We're not intending to go beyond this particular date and

4    these contributions, nor is it our intentions to argue that it

5    is, as you said, common practice.

6            THE COURT:  All right.  Give me a few more minutes

7    by backing off.

8        (Pause.)

9            THE COURT:  I went back to my written order.  It's

10   Document 161, page 9.  Individual instances of non-criminal

11   conduct have no relevance to the charges at issue.  The fact

12   that defendant can point to unrelated, demonstrably aboveboard

13   contributions has no bearing on the guilt or innocence to the

14   charged defense, *U.S. versus Dimora*, 750 F.3d 619 at 630,

15   Sixth Circuit, 2014, which states, in part, quote, "All

16   defendant's evidence would have shown is that, in situations

17   unrelated to the charges, *Dimora* did favors for people who did

18   not take bribes.  Accordingly, such evidence has no probative

19   value, whereas presenting such evidence, perhaps confusing the

20   jury and conflating unrelated incidents.

21       I'm going to stick with that.  It's on the record.

22           MR. BRADLEY:  Just one last point to complete the

23   record, Judge.  The government was permitted to elicit

24   testimony from this witness regarding a number of campaign

25   contributions to a variety of public officials, and we feel

1    like we should be entitled to the same latitude.

2             THE COURT:  Well, you can ask about him --

3             MR. SINGER:  Can I answer that, Your Honor?

4             THE COURT:  Yes.

5             MR. SINGER:  The elements that we must prove in this

6    case is an enterprise, and that the individuals associated

7    with the enterprise were acting for a common purpose.  Even

8    those common purposes don't necessarily have to be illegal in

9    themselves, but the fact that they are working together for

10   that common purpose is relevant to that.

11            THE COURT:  I've made my ruling.  I sustained the

12   objection.

13            MR. BRADLEY:  Very good.

14                       **END SIDEBAR CONFERENCE**

15            MR. BRADLEY:  May I proceed?

16            THE COURT:  Yes.

17   **Q.**   So what was the purpose of meeting with Larry Obhof?

18   **A.**   The purpose of meeting with Larry Obhof was to provide

19   support to the Senate committee.

20   **Q.**   And your recollection is, is that you attended that

21   meeting with Dave Griffing and Geoff Verhoff?

22   **A.**   Correct.

23   **Q.**   And do you recall, how long was that meeting,

24   approximately?

25   **A.**   Half hour.

1    **Q.**   And what sort of things did you discuss?

2    **A.**   At that meeting, strictly the campaigns.  Larry Obhof

3    has a very strict policy when you walk into his campaign

4    office that he will not engage in any conversation related

5    to business or legislation.  So the conversation was

6    strictly focused on the pending races.

7    **Q.**   And -- at some point that same day, again referring to

8    October 10th, you had a meeting with Mike DeWine and Jon

9    Husted?

10   **A.**   Yes.

11   **Q.**   And where did that meeting take place?

12   **A.**   That meeting actually took place at the Columbus Club,

13   which is a private club in Columbus, Ohio.

14   **Q.**   And there was an event there that day?

15   **A.**   Yes.  There was a fundraiser that evening hosted by a

16   national organization called the Republican Governor's

17   Association.

18   **Q.**   And you attended that?

19   **A.**   Yeah, of course.

20   **Q.**   And who else attended that on behalf of FES?

21   **A.**   It would have been myself, Geoff Verhoff, the

22   consultant I additionally mentioned, and also Dave Griffing

23   would have been there as well.

24   **Q.**   And what's Dave Griffing's position at FES?

25   **A.**   He is our director of government relations.

1    **Q.**    And you had a private meeting with Mike DeWine and Jon

2    Husted?

3    **A.**    Yes.  We had a private meeting that preceded the event.

4    **Q.**    And that was all prearranged that you would have a

5    private meeting with these individuals?

6    **A.**    Yes.  It was prearranged.

7    **Q.**    And that was prearranged with Brooke Bodney, correct?

8    **A.**    It was.  And I'm also remembering more members in

9    attendance.

10   **Q.**    And who was that?

11   **A.**    Bob Klaffky was also in attendance.

12   **Q.**    And just looping back for a minute to the meeting with

13   Senate President Obhof, was Mr. Klaffky present for that

14   meeting as well?

15   **A.**    I don't believe so.  If there was a gentleman present,

16   it likely would have been Jason Mauk.

17   **Q.**    And Jason Mauk is a lobbyist?

18   **A.**    A consultant who worked on our behalf.  He was really

19   focused on the Senate.  However, I am not sure he attended.

20   If I had something to refresh me, it would help.  We hired

21   him, I think, maybe at a later date.  And what I'm blurring

22   right now on is I believe his attendance at that time was as

23   an employee of the Senate caucus.

24   **Q.**    So now looping back to the DeWine/Husted meeting.  So

25   prior to this Republican Governor's Association fundraising

1    event, you and/or members of FES had made arrangements in

2    advance with Brooke Brodney and Brooke Brodney being a

3    prominent fundraiser for a number of statewide politicians

4    including but not limited to Mike DeWine, correct?

5    **A.**    In this case, Republican Governor's Association, yes.

6    **Q.**    Yes.  But also for DeWine-Husted, right?

7    **A.**    I don't have firsthand knowledge of that, but it could

8    be true.

9    **Q.**    And so arrangements made ahead of time that you and the

10   rest of the people in your group would have a half hour

11   private meeting with Mike DeWine-Jon Husted immediately before

12   the evening's event?

13   **A.**    Correct.

14   **Q.**    And what sort of things were discussed at this private

15   meeting?

16   **A.**    This was really an opportunity for executive -- or I'm

17   sorry -- government relations director to introduce himself.

18   As I said, Geoff Verhoff was there, Bob Klaffky was there.

19   The governor actually had his wife with him.  She was in

20   attendance as well.  I, my memory serves me, I believe his

21   chief of staff was there as well.  And the dinner really was

22   a get to know -- just an introduction-type dinner.  He had

23   never met them before, and it was a lot of small talk just

24   based around, you know, how the campaign was going and what

25   the current events were as related to that campaign.

1   **Q.**   And as part of those discussions, were discussions of the

2   problem that FES was experiencing relative to the nuclear

3   power plants, right?

4   **A.**   Dave Griffing introduced himself as the vice president

5   of the -- of FES.  So it was clear, you know, who we were.

6   We did not dive into detail of our issue, but it was obvious

7   that, you know, we were there representing our issue.

8   **Q.**   I didn't hear the last part.

9   **A.**   I said it was obvious we were there representing our

10   issue.

11   **Q.**   And so there was some discussion about the issue that a

12   legislative solution was needed to avoid the closure of the

13   nuclear power plants?

14   **A.**   It was -- it was something that was discussed prior

15   that was slightly revisited, but it was not discussed in

16   much length.

17   **Q.**   But it was discussed?

18   **A.**   Yes.

19   **Q.**   And he was generally receptive?

20   **A.**   There was no -- there was no -- there was really no

21   commitment at that time and --

22   **Q.**   I am not saying whether there was a commitment.  He

23   generally acknowledged that he was supportive of the idea of a

24   legislative solution to the nuclear power plant problem?

25   **A.**   It didn't get to that detail.

1    **Q.**   So all of these meetings with leadership, well, soon to

2    be Speaker of the House, Senate president, soon to be governor

3    and lieutenant governor, were all part of a coordinated effort

4    to educate these individuals about the reasons why it's

5    important to preserve the nuclear power plants and ultimately

6    to seek their support for a legislative solution, correct?

7    **A.**   Every meeting had a different objective.  Obviously,

8    the meeting with Speaker Householder was a little bit more

9    granular as we talked about the races.  He obviously had an

10   election, you know, coming up that was competitive.  We also

11   dived deep into the issue, again with Larry Obhof we did not

12   talk about the issue whatsoever.  We simply talked about the

13   campaign.  And with the governor and lieutenant governor it

14   was more of a meet and greet.

15   **Q.**   Sure.  But all of it, again, was planned in advance and

16   discussed between you, Mr. Verhoff, Mr. Griffing, and others

17   associated with FES that this -- this was a day where you were

18   going to meet with all of the leadership in Ohio -- in Ohio

19   government --

20   **A.**   Yes.

21   **Q.**   -- as part of a coordinated effort to seek their support?

22   **A.**   It was part of an effort, yes.

23   **Q.**   Yes.  So you talked about -- and I am now the day before,

24   October 10th.  And you yesterday described a meeting at the

25   State Street offices with Larry Householder?

1  **A.**    Correct.

2  **Q.**    And, again, it was Mr. Klaffky, Mr. Griffing, Mr.

3  Verhoff, you?

4  **A.**    Correct.

5  **Q.**    And Mr. Householder.  Was there anybody else present?

6  **A.**    It's possible, but those are members I remember being

7  there.

8  **Q.**    And who else may have been present at that meeting?

9  **A.**    If I knew who it was, I would have stated it.

10 **Q.**    You're not sure?

11 **A.**    Excuse me?

12 **Q.**    You're not sure?

13 **A.**    My memory doesn't recall right now.

14 **Q.**    And prior to that meeting, you indicated yesterday that

15 you had, I think, a number, extensive conversations about

16 making a campaign contribution for the benefit of Larry

17 Householder?

18 **A.**    Yes.

19 **Q.**    Right?  And how is it that -- when I say you, I really

20 mean you and all of the other people that were part of these

21 discussions -- decided on the figure of $500,000?

22 **A.**    The figure of $500,000 was decided through accordion

23 effort between FirstEnergy parent company, FirstEnergy

24 Solutions, and all the consultants who were engaged at the

25 time, being myself, also our D.C. office of Akin Gump.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                          12-2077

1          And we had conference calls where we threw numbers back

2     and forth.  The parent company took the lead and they

3     actually recommended that we contribute $2 million.  That

4     number was viewed as being a little high for, you know --

5     Akin viewed it as high.  I thought it was high.  Klaffky

6     thought it was high.  So the number was eventually taken

7     down to 500,000.  And the strategy was to give that

8     contribution two installments for maximum exposure.

9     **Q.**   The $2 million recommendation, was that discussed

10    relative to other public officials or Larry Householder?

11    **A.**   Larry Householder.

12    **Q.**   But it was ultimately determined, to your point, that

13    that's too much and the number of $500,000 was agreed upon by,

14    it sounds like, quite a few people participating in those

15    conversations?

16    **A.**   Correct.

17    **Q.**   And you indicate that -- you used the term "maximum

18    exposure."  And I assume that's, in simple words, face time?

19    **A.**   Correct.

20    **Q.**   And that was the reason why the contribution was split up

21    into two checks?

22    **A.**   That, and the fact that money becomes more inherently

23    important as the race nears the end.  So we wanted to be

24    able to come in with late money so really provide it at a

25    necessary time when others are unlikely to contribute.

1    **Q.**   And I think the $400,000 check was delivered on the 10th,

2    and then the $100,000 check was delivered, I think it was, the

3    29th?

4    **A.**   That sounds correct.

5    **Q.**   So the 29th would only be basically a week before the

6    general election?

7    **A.**   Correct.

8    **Q.**   And I recall that you testified yesterday that, again,

9    you -- you meaning anybody in your group that attended this

10   meeting -- as a matter of strategy downplayed the amount of

11   the check?

12   **A.**   What one -- one of the members of our lobbying effort

13   had a conversation with Speaker Householder about what his

14   expectation would be.  That was before we really even knew

15   that we had this pool of money to contribute.  So the

16   expectation from the Speaker was absolutely less than what

17   we delivered.

18   **Q.**   But I think you had indicated that the dollar figure

19   amount, you downplayed it to Mr. Householder?  In other words,

20   you wanted the actual check to be more than what he was

21   expecting?

22   **A.**   Yes.  The check was -- we assumed it was more than he

23   was expecting based on what he had previously recommended to

24   our consultant.

25   **Q.**   And I think you said that you essentially split it up

1  into two looking for more face time, right?

2  **A.**   Correct.

3  **Q.**   And more face time was more of an opportunity to educate

4  him on all of the reasons that were important to preserve

5  these nuclear power plants?

6  **A.**   It was particularly important for him to understand who

7  was giving him those checks.

8  **Q.**   Sure.  But the face time represented an opportunity for

9  you to, in so many words, lobby him?

10  **A.**   The face time put a face with the name on the check.

11  **Q.**   Well, fair enough.  But you used that also as an

12  opportunity to, again, educate him on all the reasons why a

13  legislative solution to preserve the power plants was a good

14  thing?

15  **A.**   Again, the check -- the check was so that he would know

16  who was supporting the election.  He knew what our needs

17  were.  We could frame it -- we could frame it as supporting

18  our cause, yes.

19  **Q.**   So you understood that this contribution that was

20  presented on October 10th, the 400 grand, was the check that

21  was actually made payable to Generation Now, right?

22  **A.**   Correct.

23  **Q.**   And you understood that the check was going to be used to

24  support the campaigns of a number of legislative candidates

25  that were running in open seats for the Ohio House of

1　　Representatives.  You understood that?

2　　**A.**　Those who supported Speaker Householder, yes.

3　　**Q.**　Yes.  But the money would actually be used to support the

4　　legislative -- or the campaigns for the various legislators

5　　that were running in open seats?

6　　**A.**　Yes.

7　　**Q.**　And generally, those legislators that were running in

8　　open seats that benefitted from that financial contribution

9　　were identified as Team Householder candidates?

10　　**A.**　Correct.

11　　**Q.**　And this -- okay.

12　　　　And I think you described that the meeting took place in

13　　a conference room?

14　　**A.**　It did.

15　　**Q.**　And that Mr. Klaffky is the one who presented the check?

16　　**A.**　He did.

17　　**Q.**　And the check was in an envelope?

18　　**A.**　It was.

19　　**Q.**　And I think you described that he essentially slid it

20　　across the table?

21　　**A.**　He did.

22　　**Q.**　And the check -- and I think right under

23　　Mr. Householder's hands I think you described, right?

24　　**A.**　Yes.

25　　**Q.**　And he did not open the check -- or the envelope that

1   contained the check, at least initially?

2   **A.**    Initially, he did not.

3   **Q.**    And what was discussed at that point after the check was

4   slid across the table?

5   **A.**    Well, before and during that process, we were

6   discussing the prospects of the upcoming races.  We were

7   discussing really all the political things that related to

8   what that monetary support would -- would become.  It was

9   only after the check was open and a dollar amount was viewed

10   that we began to discuss the legislative effort and the

11   business associated with our effort.

12   **Q.**    In so many words, the problems associated with the

13   nuclear power plants?

14   **A.**    Our need for a subsidy in legislation.

15   **Q.**    And how long do you think that meeting lasted?

16   **A.**    It's very hard to recall a meeting that took place

17   on -- duration of that meeting.  I'm thinking somewhere

18   between a half hour and 45 minutes.

19   **Q.**    And at some point I think after he opened the envelope

20   with the check you said he called Jeff Longstreth in and he

21   gave him the check?

22   **A.**    He did.

23   **Q.**    So this was, again, discussed by, it sounds like, a large

24   group of people prior to this, that this would represent an

25   ordinary campaign contribution?

1    **A.**   It was a very, very significant campaign contribution.

2    Obviously one that we felt was tied to our legislation.  We

3    had previously had meetings with Speaker Householder about

4    that legislation, and, yes, it was a very, very significant

5    contribution.

6    **Q.**   An ordinary campaign contribution?

7    **A.**   It also constituted our expectation that we would

8    receive this legislation in return.

9    **Q.**   Well, certainly you hoped for that?

10   **A.**   No, it was -- it was -- it was assured upon his

11   victory.

12   **Q.**   I didn't hear you.

13   **A.**   I said upon his victory of being Speaker, it was -- it

14   was assured.

15   **Q.**   He said that?

16   **A.**   He gave us very strong verbals and nonverbals that he

17   would introduce -- in fact, introduce legislation.

18          MR. BRADLEY:  Can we see Householder Exhibit 209 and

19   publish it?  And, yes, this has been previously admitted.

20          THE COURT:  Yes.

21   **Q.**   Do you recognize this email dated November 6th of 2018

22   from Dave Griffing to a large number of individuals, including

23   but not limited to you?

24   **A.**   I recognize the email, yes.  It's been a long time

25   since I viewed it.

1    **Q.**   And there are a number of attachments to this email.  Do

2    you see that?

3    **A.**   I see the initial page.  As far as attachments, yes,

4    yes.

5    **Q.**   I mean --

6    **A.**   I do see that.

7    **Q.**   Not the actual attachments themselves.

8    **A.**   Understood.

9    **Q.**   But that there is a number of attachments to the email,

10   right?

11   **A.**   Yes.

12   **Q.**   And in the body of the email, it looks like there's set

13   forth an agenda for a meeting.  Do you see that?

14   **A.**   Yes.

15   **Q.**   And looking through it, there's a preliminary election

16   update?

17   **A.**   Thank you.

18   **Q.**   Focusing on leadership and potential implications on

19   chair positions.  Do you see that?

20   **A.**   I do.

21   **Q.**   And there is federal Ohio and Pennsylvania political

22   issues that were the subject of this meeting?

23   **A.**   Yes.

24   **Q.**   And then under bullet point 2, legislative/regulatory

25   activities for Ohio, and that includes a whip count.  Do you

1    see that?

2    **A.**    I do.

3    **Q.**    And you're the person responsible -- or you're one of the

4    people responsible for presenting the whip count information

5    at this particular meeting?

6    **A.**    Correct.

7    **Q.**    And there's a couple other people there, a Bob and a

8    Geoff, that are participating as well.  Who's that?

9    **A.**    Bob is reference to, I believe, Bob Klaffky.  And Geoff

10   is a reference to, I believe, Geoff Verhoff.

11   **Q.**    And what is a whip count?

12   **A.**    A whip count?

13   **Q.**    Yes.

14   **A.**    A whip count is a manner in which you evaluate how many

15   votes you have for a particular piece of legislation or how

16   much support you have.  And in our case, we determine our

17   whip count on a scale.  And so we took --

18   **Q.**    What do you --

19   **A.**    We took every member that was currently elected and

20   predicted those who were elected in the future, and we would

21   rank them one through five based on their support on our

22   issue versus nonsupport on our issue.

23          MR. BRADLEY:  Can we go, PJ, to Householder 211, and

24   may we publish it?  And, yes, this has been admitted, Judge.

25          THE COURT:  Yes.

1   **Q.**   Do you recognize at least the first page of this

2   particular exhibit as being the whip count that was the

3   attachment to the email that we were just looking at?

4   **A.**   Yes.

5           MR. BRADLEY:  And can you go to the last page, PJ?

6   And can you cull out the bottom, the key?  Yes.

7   **Q.**   And I think this would be what you were talking about,

8   the ranking system, 1 through 5, correct?

9   **A.**   Correct.

10  **Q.**   1 being a yes, 5 being a no, leaning yes, leaning no, and

11  unknown somewhere in the middle?

12  **A.**   Yes.

13          MR. BRADLEY:  And can we go back to the first page.

14  **Q.**   And so how is it that you are able to assign the rating

15  scale 1 to 5?  In other words, are you meeting with these

16  legislators and gauging what their position would be?  How is

17  it that you are able to make these determinations?

18  **A.**   So for this particular document, the basis of this

19  document actually was created by FirstEnergy, the parent

20  company.  So I met with their government affairs director

21  who created this list and gave me some initial rankings and

22  gave me perspective and comments on some of these members.

23       This list was then put together.  It was managed by our

24  D.C. consultants, and then I and others would have access to

25  it just to update it periodically.

1    **Q.**   So, for example, if you would meet with XYZ legislator

2    and get a better sense of where their vote might be or their

3    support might be, then you would have -- you'd make

4    appropriate changes?

5    **A.**   Yeah.

6         MR. BRADLEY:  Can we go to page 2, PJ?

7    **Q.**   So looking at the second individual down, do you see --

8         MR. BRADLEY:  Well, I'm sorry, PJ.  Could you go

9    back to the first page?

10   **Q.**   And can you just talk us through, you know, the top

11   header line and describe what -- what information is contained

12   in this besides the whip count vote?

13   **A.**   Yes.  From left to right, what you have is the name of

14   legislator.  You then have party affiliation, obviously.

15   Next to it would be district number, and that is the way the

16   list was organized.  The city is in column four.  The media

17   market in column five.  The whip count would be the number

18   that we assign to that person, and obviously, you know, we

19   want 1s and 2s.  We do not want 4s and 5s.  3s we felt were

20   movable.

21        Vendor name, I actually don't have a good recollection

22   of the vendor name at this point.

23        Vendor amount, also not familiar.

24        Policy comments.  These are just things that we picked

25   up from the parent company.  These are comments that they

1   added in this document, and in the political comments were

2   the same.

3       The document obviously pulled information from the

4   first ZEN effort.  So that was really the basis of this

5   document.

6   **Q.**   But, again, you're the one presenting this information at

7   this particular meeting on, I think it was, November 6th --

8   yes, November 6th, right?

9   **A.**   It was myself and two others, correct.

10  **Q.**   Sure.  And you had reviewed this in advance?

11  **A.**   It was -- it was definitely reviewed.  I mean,

12  obviously, it's a fluid, very, very large list, so you're

13  going to get, you know, maybe not necessarily a typo, but

14  there may be some variables on the list.

15  **Q.**   Sure.

16       MR. BRADLEY:  So now can we now go to page 2.  And

17  can you enlarge that for us, PJ?

18  **Q.**   And just as an example, do you see the second line down,

19  which is Thomas Patton?

20  **A.**   Yes, I do.

21  **Q.**   And he's a Republican in the 7th district, right?

22  **A.**   Yeah.

23  **Q.**   And his whip count score is a 1/2?

24  **A.**   Yeah, very strong.

25  **Q.**   And then some of the comments that he was one of a number

1   of co-sponsors of the original ZEN legislation that we

2   discussed earlier that was unsuccessful?

3   **A.**   Right.

4   **Q.**   But that's certainly indicative of the fact that, you

5   know, he's supportive of the issue, right?

6   **A.**   Yeah.  That's why -- a 1 to 2 is very strong.

7   **Q.**   Sure.  But I'm saying the comments that, to the effect

8   that he was a co-sponsor of the ZEN legislation --

9   **A.**   Yes.

10  **Q.**   -- is just further evidence that he's generally

11  supportive of -- of the issue?

12  **A.**   Yes, absolutely.

13  **Q.**   And, in fact, the comments to the right, right there,

14  supportive; met with his staff twice, Patton once; good with

15  the parent company -- and that's referencing FE, right?

16  **A.**   Correct.

17  **Q.**   Yes to keeping the plants.  No to ZEN.  That's his -- his

18  view?

19  **A.**   Regarding Vulcan holdings, I may not actually have

20  inputted it so I don't want to necessarily read it that way.

21  It said regarding Vulcan holdings, yes to keep the plants,

22  no to ZEN.  I don't know the context of that.

23  **Q.**   So back to the whip count score, I think a 1 is a yes?

24  **A.**   1, 2 are yes.

25  **Q.**   Well, but a 2 -- a 2 is a leaning yes, right?

1    A.    Sure.

2    Q.    So a 1 would be a yes, a 1/2 is somewhere between leaning

3    yes and yes?

4    A.    I think it's pretty arbitrary.  It kind of depends on

5    the comments and who inputted that at the time.  Obviously

6    we have multiple people working on this document.  It was

7    something that was actually transcribed and held at Akin, so

8    I would have never physically made an edit.  I had many

9    conversations, as did others based on the document, but,

10   yes, it was generally a 1 or 2 is strong.

11           MR. BRADLEY:  And then can you blow that up?

12   Q.    And second line down, you see Anthony DeVitis.  Do you

13   see that?

14   A.    Yes, I do.

15   Q.    So he's a 1?

16   A.    He is a 1.

17   Q.    Right.

18   A.    And I think he also is a member of the plant community,

19   and he was a sponsor of the first ZEN legislation.

20   Q.    Sure.  But my point is that he -- and he's noted as a

21   champion of the issue, right?

22   A.    Yes.  Again, the document was created specifically for

23   the ZEN legislation so it would carry over.

24   Q.    So my point being the document makes some distinction

25   between a 1 versus a 1/2?

1    **A.**    In some cases.

2    **Q.**    If they are a definite yes, it will be a 1, right?  You

3    do see that?

4    **A.**    I do, yes.

5    **Q.**    And if it's something less than that, it's either going

6    to be a 1/2 or a 2, fair?

7    **A.**    That's fair.

8    **Q.**    And, again, how -- where does the information or how is

9    it determined in the case of Mr. DeVitis that he is a champion

10   on the issue?

11   **A.**    Those aren't my words.  Those are the words of the

12   prior government relations professional who created this

13   document.  So again I think because he was an initial

14   sponsor he was a 1.  And also I think with the rating scale,

15   it initially started as something that was really pointed at

16   that ZEN legislation.  We did not have the solution that we

17   ended up with yet presented.  So this was as it related to

18   how people felt about ZEN.

19         MR. BRADLEY:  Can we go to page 7 -- I'm sorry.  No,

20   PJ, hold on.  Can we go to page 7 for me.

21         Excuse me, Your Honor.

22         Actually can we go to page 14, PJ.

23   **Q.**    And the whip list relates to both House members and

24   Senate members?

25   **A.**    I believe we have multiple tabs, yes.

1   **Q.**   And looking at the second individual down, John Eklund,

2   you recognize him as a member of the Senate, right?

3   **A.**   I do.

4   **Q.**   And his whip count is a 1?

5   **A.**   Yes.

6   **Q.**   Right?  So he's a definite yes?

7   **A.**   He was -- he was a co-sponsor of ZEN.  So I think all

8   of ZEN's who were co-sponsors were pretty solid.

9   **Q.**   In other words, very supportive of the issue of

10  preserving the nuclear power plants?

11  **A.**   Absolutely.

12  **Q.**   And likely to support legislation that would essentially

13  subsidize the plants to ensure their continued operation?

14  **A.**   ZEN being the co-sponsor, for sure.

15          MR. BRADLEY:  And can you go to page 5?

16  **Q.**   And you make reference to ZEN co-sponsors, and you can

17  see there's three of them here on the screen, right?

18  **A.**   I see -- yes, I do see three of them.

19  **Q.**   But they're not scored because they are all term limited

20  out?

21  **A.**   That is correct.

22  **Q.**   And that would be an example of the open seats that

23  would -- that are a common occurrence in the House because of

24  the term limit issues.  There's lots of turnover, right?  And

25  therefore a lot of incoming freshman members?

1    A.   Yes.

2         MR. BRADLEY:  Page 6, PJ.

3    Q.   And looking about two-thirds of the way down, to Dick

4    Stein?

5         MR. BRADLEY:  Can you cull that out for us?

6    Q.   So you can see that Dick Stein, also a co-sponsor of the

7    original ZEN legislation, that his whip score is just a 3?

8    A.   Yeah.  I think -- I think what that was determined by

9    is that we had not had much contact with Dick at that point.

10   And I think occasionally when you are -- in my limited

11   experience occasionally when you are doing a whip list what

12   you do is you start off with a neutral number until you have

13   that clarity.

14        MR. BRADLEY:  And can we go to page 7, PJ?

15        And can you cull out Rick Carfagna?  It's about the

16   middle.

17   Q.   And you can see Rick Carfagna there is scored as a 4 or

18   5, so leaning no/no, right?

19   A.   Correct.

20   Q.   And that's an individual that was very close to the gas

21   lobby.  And as a result, would not likely be supportive of

22   nuclear issues?

23   A.   Correct.

24   Q.   And that's what we were referring to as well regarding

25   Ryan Smith, somebody that had connections to the natural gas

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2093

```
 1    industry and, thus, would not likely be supportive of nuclear

 2    issues?

 3    A.    I don't have a lot of firsthand knowledge about Ryan's

 4    dealings with the gas industry.  But generally speaking, we

 5    prefer Speaker Householder to Ryan Smith.

 6              MR. BRADLEY:  And actually, can you cull up, Larry,

 7    they are three up from the bottom, PJ.

 8    Q.    And there is actually Larry Householder that is noted as

 9    a cosponsor of the original ZEN legislation, right?

10    A.    Right.

11    Q.    And he's not scored as a 1, correct?

12    A.    On this particular document, he's not.

13    Q.    Right.  And, in fact, he scored as somewhere between

14    leaning yes and yes, right?

15    A.    If you're -- if you were to read this document the way

16    it reads, that's what it appears, yes.

17    Q.    Well, that's 1/2, right?

18    A.    That's what it says, yes.

19    Q.    Right.  And we went through some other examples.  John

20    Eklund being one and Anthony DeVitis being a one, which are

21    solid yes votes, right?

22    A.    That is correct.

23    Q.    And so Householder's noted as somewhere between leaning

24    yes and yes, right?

25    A.    On this document, he is.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**   And this -- well, this was presented to FES officials as

2    part of that agenda that we just looked at on November 6th,

3    right?

4    **A.**   Yes.

5    **Q.**   And that would be a week after the second check had been

6    delivered, I think you said it was the second check you

7    delivered to Jeff Longstreth payable to Gen Now --

8    **A.**   Correct.

9    **Q.**   -- part of the $500,000 contribution, right?

10   **A.**   Correct.

11   **Q.**   And so if what you had indicated that -- that you had a

12   clear understanding that that 4 or $500,000 political

13   contribution had a string attached to it and that he had some

14   explicit agreement that he was going to pass legislation,

15   that's not reflected here?

16          THE COURT:  Is there an objection?

17          MR. SINGER:  Objection, Your Honor.  Legal

18   conclusion.

19          THE COURT:  It's the use of the word I am going to

20   have to define.  Maybe you can ask it another way.

21   **Q.**   So one week after the second check was paid, to the

22   benefit of Larry Householder to support his slate of

23   candidates, he's somewhere between leaning yes and yes,

24   according to that whip count, correct?

25   **A.**   That is -- that is what it states.

1   **Q.**   Yes.  And leaning yes, this is somebody that cosponsored

2   the original ZEN bill, right?

3   **A.**   That is correct.

4   **Q.**   And I think you had indicated that almost everybody that

5   was a cosponsor of the ZEN bill would likely be either a

6   leaning yes or a yes vote, right?

7   **A.**   Yes.

8   **Q.**   So you had the opportunity to -- because you were at

9   that, at least, the first meeting on October 10th, right?

10  **A.**   Correct.

11  **Q.**   When the check was presented, right?

12  **A.**   Correct.

13  **Q.**   And you had the opportunity beforehand, before this whip

14  count was presented to the FES officials as part of that --

15  that meeting to change that to a 1, right?

16  **A.**   I --

17  **Q.**   But you didn't?

18  **A.**   I had the opportunity --

19  **Q.**   But you didn't.

20  **A.**   Obviously, I did not.

21  **Q.**   Right.

22          MR. BRADLEY:  Can we move on to Householder Exhibit

23  308?

24      And can we publish it?  And yes, this has been admitted,

25  Judge.

1              THE COURT:  Yes.

2              MR. BRADLEY:  Can you blow that up for us, PJ?

3    **Q.**   So do you recognize this as an email from you, Juan

4    Cespedes, to Dave Griffing -- and, again, remind the jury who

5    Dave Griffing is.

6    **A.**   Dave Griffing is the government relations director for

7    FirstEnergy Solutions.

8    **Q.**   And CC covered on it is Jamie Tucker.  And who's Jamie?

9    **A.**   Jamie works for a firm named Akin Gump.

10   **Q.**   And the date on this would be November 20th of 2018,

11   right?

12   **A.**   That is correct.

13   **Q.**   So two weeks after the whip count documentation we were

14   just looking at, right?  Yes?

15   **A.**   Yes.

16   **Q.**   And you indicate to Dave that you're attaching

17   essentially a one-pager that lightly summarize what the next

18   six months look like, regarding your issue?

19   **A.**   Yes.

20   **Q.**   Right.  And looking at --

21              MR. BRADLEY:  PJ, can you cull out the third

22   paragraph?

23   **Q.**   So by now, it's November 20th.  The general election's

24   passed, right?

25   **A.**   That's correct.

1    **Q.**   And so all those legislative candidates that were running

2    in the general election, we now know the results and some were

3    winners and some weren't?

4    **A.**   Yes.

5    **Q.**   And those that were the winners are the incoming freshman

6    members, right?

7    **A.**   They are.

8    **Q.**   And those are the members that you're referring to that

9    you're starting to meet with them and lobbying them to support

10   your issues that are the legislative solution to keep the

11   plants open?

12   **A.**   Yes.

13        MR. BRADLEY:  What about the next paragraph?

14   **Q.**   And then the next paragraph states, will be back to you

15   with updates on the upcoming RGA Republican Governor's

16   Association event with DeWine.

17        Do you see that?

18   **A.**   I do.

19   **Q.**   And so that's not the same event that we were talking

20   to -- talking about moments ago, correct?

21   **A.**   I don't believe so.  The dates wouldn't match up.

22   **Q.**   Right.  Well, just to remind you, the Republican

23   Governor's Association event we were talking about was October

24   10th, right?

25   **A.**   Correct.

1    **Q.**   So here this date, it's obviously, you know, five weeks

2    or so after that.  And there's -- it looks like there's

3    another Republican Governor's Association event that's going

4    to be attended by now Governor DeWine, right?

5    **A.**   That's -- that's possible, yes.

6    **Q.**   Well, that's what it says.  Will be back to you with

7    updates on the upcoming RGA event with DeWine, right?

8    **A.**   It appears as though there is an upcoming event.  I

9    don't have a recollection.  I am not sure if it was

10   something I attended, something I was passing on.  I don't

11   remember this event with just this in front of me.

12   **Q.**   And then there's the IBEW onboarding process and my

13   interaction with Ryan Smith's current staff.  What's the IB --

14   what's that a reference to?

15   **A.**   The IBEW is a labor union.

16   **Q.**   And then -- and what is that referencing?  That you are

17   going to be meeting with them?

18   **A.**   Yes.  I think as part of our strategy, I believe

19   meeting with them was something that we were doing to help

20   on our issue.

21   **Q.**   And then your interaction with Ryan Smith's staff, now,

22   to be clear, Ryan Smith as of this date remains Speaker of the

23   House, right?

24   **A.**   Correct.

25   **Q.**   On that, we call it, interim basis?

1    **A.**    Yes.

2    **Q.**    And it was not clear who was going to prevail in the

3    Speaker's vote, right?

4    **A.**    Correct.

5    **Q.**    And so, for lack of a better word, hedging your bets,

6    you're still interfacing with Ryan Smith and his staff, right?

7    **A.**    We were, yes.

8    **Q.**    And lobbying them for support?

9    **A.**    Attempting to, um-hmm.

10           MR. BRADLEY:  Can we go to Householder 309?

11           And may we publish it?  And, yes, Judge, this has been

12    previously admitted.

13              THE COURT:  Yes.

14           MR. BRADLEY:  And can you cull out or blow up the

15    first half, PJ?

16    **Q.**    Now, I believe -- do you recognize this document?

17    **A.**    I do.

18    **Q.**    And this is a document that you looked at and testified

19    about yesterday, right?

20    **A.**    Yes.

21    **Q.**    And this is a document that you would have created in

22    late 2018, right?

23    **A.**    That is correct.

24    **Q.**    And let's work through a few things.

25           As of December of 2018, you note that the DeWine-Husted

1   administration will be the top priority post-term sheet.

2   Securing their public support is crucial.

3   A.   Um-hmm.

4   Q.   Do you see that?

5   A.   Yes, I do.

6   Q.   And what do you mean by that?

7   A.   Well, what I meant was, again, we were -- we were

8   pulling for Householder to be successful, and I had -- I had

9   a lot of clarity that, you know, if and when he was, the

10  effort would be led out of his chamber.  So I was less

11  worried about focusing a lot of --

12  Q.   I am asking you about DeWine-Husted, not Larry.

13  A.   I am defining why it's a top priority.

14  Q.   Okay.  Go ahead.

15  A.   What I was trying to do was get them to publicly

16  support the bill because it would help bring along Larry

17  Obhof in the Senate.

18  Q.   And that's a reference to the second bullet point, right?

19  That's Larry Obhof, Senate President?

20  A.   Correct.

21  Q.   And in an ideal situation we are able to promote our

22  agenda, it's something the DeWine administration supports,

23  right?

24  A.   Yes.

25  Q.   And then moving down to the, what would be the fourth

1    bullet point, Speaker's race clarity mid December but not

2    guaranteed.  Do you see that?

3    **A.**    Yes.  Is there a question?

4    **Q.**    No.  I was letting you take a drink.

5         And you know that if Smith, in referencing to Ryan Smith,

6    is successful it will be important to quickly schedule plant

7    tour for him, right?

8    **A.**    Um-hmm.

9    **Q.**    And that's something that we talked about before the

10   lunch break, that you had tours with a number of legislators,

11   including Larry Obhof, at the nuclear power plant, the actual

12   sites, as a part of your effort to educate the legislators on

13   the importance of maintaining your continued operation, right?

14   **A.**    We had two plant tours, I believe.

15   **Q.**    Right.  And so if Ryan Smith wins the Speaker's gavel,

16   then one of your top priorities would be to get him up there

17   to tour the plants and, again, continue to lobby him?

18   **A.**    Yes.

19   **Q.**    And then the next note down says, if Larry is successful,

20   the effort will likely be led from his chambers, right?

21   **A.**    Yes.

22   **Q.**    But if he's not, we're still going to meet with him to

23   secure his votes for our effort, right?

24   **A.**    Correct.

25   **Q.**    So at least by the plain language of the document that

JUAN CESPEDES - CROSS (HOUSEHOLDER)                          12-2102

1   you drafted, it's uncertain that Larry would provide the votes

2   that you need to support that legislative solution?

3   A.   That's not how I read it, but --

4   Q.   Well, let's go through it, okay?

5   A.   Perfect.

6   Q.   If not successful, we will still need to meet with him to

7   secure his votes for our efforts, right?

8   A.   Yes.

9   Q.   So it is uncertain, you still have to engage in work to

10  secure his votes, right?

11  A.   The idea is, if I may, with the Speaker's race, not

12  knowing who's voting for who, he having people who were

13  elected obviously to support him, I was simply making the

14  statement that we would meet with him for his votes if he

15  was not Speaker.

16  Q.   No.  That's not what that says.  We will still need to

17  meet with him to secure his votes.  And if he was in the

18  bag --

19          THE COURT:  Excuse me.  Excuse me.

20  Cross-examination.  Ask your question.  Don't make a speech.

21  Q.   If you had an explicit agreement that he was going to

22  support your legislative solution as of October of 2018, you

23  wouldn't still need to meet with him to secure his votes;

24  isn't that true?

25  A.   It's not true because he wasn't Speaker.  He would have

1    less control of those members.

2    **Q.**   But he would still deliver the votes if he had an

3    agreement with you, correct?

4    **A.**   The question was could he.

5    **Q.**   So this would be -- let me do my math -- roughly a month

6    after that October meeting at the State Street offices, right?

7    Right?

8    **A.**   The date you referred to again?

9    **Q.**   Well, I'm talking roughly a month or so after the October

10   29th check for a hundred grand was delivered.

11   **A.**   Okay.

12   **Q.**   And at least as of a month after that, you indicate that

13   you would still need to work to secure his votes.  That's what

14   that says.  Can we agree that that's what that says?

15   **A.**   If we're just reading words, yes.

16   **Q.**   Well --

17   **A.**   But I think if you read the sentence together.

18   **Q.**   That's right, in terms of what it says, right?

19   **A.**   That's what it says.

20   **Q.**   And you wrote it?

21            THE COURT:  Is there an objection?

22            MR. SINGER:  Your Honor, this has been asked and

23   answered about five times now.

24            THE COURT:  I agree.  Sustained.

25   **Q.**   So as we move into early --

```
 1              MR. BRADLEY:  Judge, before I begin a new topic,
 2     would you want to take a break now?
 3              THE COURT:  Sure.  We typically break a quarter of
 4     and we are inside of that.  We will break for 20 minutes.
 5     Meet you back at 3.  During the break, take a break.  No
 6     discussion of the case amongst yourselves or with anyone.  No
 7     independent research.  Stay away from the media, have a break
 8     and continue to keep an open mind till you have heard all the
 9     evidence.  We'll rise as you leave out of respect for you.
10              THE COURTROOM DEPUTY:  All rise for the jury.
11          (Jury exited the courtroom at 2:39 p.m.)
12              THE COURT:  Jury's left the room.  As always, we'll
13     wait till we're advised that they have cleared the floor until
14     we leave the courtroom.
15          (Pause.)
16              THE COURTROOM DEPUTY:  All clear.
17              THE COURT:  All right.  We're in recess until 3.
18              THE COURTROOM DEPUTY:  This court is in recess until
19     3 o'clock.
20          (Recess taken from 2:40 p.m. until 3:00 p.m.)
21              THE COURT:  Back in the open court at 3 p.m.
22          I understand there is something you want to address
23     outside the presence of the jury, outside the presence of the
24     witness, who we have put back in the witness room.
25          Mr. Singer.
```

1          MR. SINGER:  Yes, Your Honor, thank you.  Twice on

2     this examination, and it's becoming a pattern based on what's

3     happened previously in this trial, the Court has sustained an

4     objection and then the defense proceeds to go and ask

5     questions relating directly to that objection.  For example,

6     we had a sidebar relating to appropriate questions relating to

7     other public officials and their contributions.  That

8     objection was sustained.  Defense counsel proceeded to ask

9     questions directly in contravention of the Court's order.

10         The defense counsel asked the question relating to an

11    explicit agreement.  The Court sustained the objection.

12    Several questions later, asked another question relating to an

13    explicit agreement.  I think there was a situation yesterday

14    where defense counsel pulled up an example of an attorney and

15    asked who the person was despite the fact that this Court has

16    ruled time and again that this is not a relevant issue.

17         This is a pattern now, Your Honor, and we don't want to

18    have to stand up and object every time this happens, but it's

19    reached the point where the government will likely seek a jury

20    instruction if this type of conduct continues.

21         THE COURT:  Mr. Bradley, do you wish to be heard?

22         MR. BRADLEY:  I believe I've honored the Court's

23    rulings on every one of these evidentiary issues.  For

24    example, regarding the issue of the political contributions, I

25    moved on and didn't ask any questions to the best of my

1    recollection.  I asked about the details of the meeting, but I

2    didn't ask any questions -- any additional questions regarding

3    the contributions.

4        I'm not sure what he's referencing from the other day.  I

5    have no independent recollection, but I believe I'm honoring

6    the Court's rulings on all of these objections.

7                THE COURT:  To be perfectly frank, I've noticed the

8    same thing, and it makes it harder for the Court to give the

9    defense any latitude.  I specifically admonished you on an

10   earlier objection.

11       I'm going to become more outspoken if you continue after

12   we discuss something to pursue what I have prohibited.  And

13   with that, I think we're ready for the jury.

14       Are we ready for the jury from the government's

15   perspective?

16               MR. SINGER:  Yes, Your Honor, thank you.

17               THE COURT:  Mr. Bradley, you ready?

18               MR. BRADLEY:  Yes.

19               THE COURT:  And, Mr. Schneider?

20               MR. SCHNEIDER:  Can I just put something on the

21   record?

22               THE COURT:  Yes.  Speak right up.

23               MR. SCHNEIDER:  Right.  So we don't run --

24               THE COURT:  Can you come to a microphone, please.

25   I'm sorry.

1              MR. SCHNEIDER:  There were -- part of the direct

2     examination today dealt with a text exchange between

3     Mr. Borges and Mr. Cespedes.  Now, Mr. Singer glossed over the

4     first page but it dealt with going to meet with Frank LaRose,

5     the Secretary of State, with Don McTigue.  Don McTigue is a

6     lawyer.  The jurors we think ought to know that as opposed to

7     just leaving the inference that Matt met up with somebody

8     unidentified and may have had a conversation or scheduled a

9     meeting with the Secretary of State.

10         Those, that just seems like we're in handcuffs on that.

11    And it's not going to come out now because I don't think I am

12    going to have any cross-examination so I don't think we are

13    going to run into that, but, I mean, maybe I will get up today

14    for cross-examination and we will stay clear of that.  Those I

15    think are the push back here that we are trying to navigate.

16              THE COURT:  Why does the jury need to know that

17    McTigue is a lawyer?  If you'd stay at the microphone please.

18              MR. SCHNEIDER:  Because if the inference is that he

19    is a political consultant, I don't think that's fair.

20              THE COURT:  You would prefer that the inference be

21    that he is an attorney and you are relying on attorney's

22    advice?  That's the purpose of keeping the attorney stuff out.

23              MR. SCHNEIDER:  Okay.  But, you know, he is an

24    elections counsel of some prominence in the state of Ohio.

25              THE COURT:  I am having trouble hearing you.  Use

1    the microphone.

2            MR. SCHNEIDER:  He is a prominent election lawyer.

3            THE COURT:  You are not near the microphone.

4            MR. SCHNEIDER:  He is a prominent elections lawyer.

5    I don't know that it necessarily means we are saying the

6    advice of counsel, but we are also trying to clear up any

7    misconception that he might just be another lobbyist or the

8    term that Mr. Cespedes has used many times, a political

9    operative.  That's it.

10           THE COURT:  Would asking him whether McTigue is a

11   lobbyist satisfy your inquiry?

12           MR. SCHNEIDER:  Could I think about that?

13           THE COURT:  Sure.

14           MR. SCHNEIDER:  Thanks.  I mean, we'll honor the

15   Court's ruling, obviously, in that regard.  And I don't know.

16   There is a suggestion that we are back-dooring on advice of

17   counsel defense, and I disagree with that.

18           THE COURT:  Yes, Ms. Glatfelter.

19           MS. GLATFELTER:  Your Honor, that is precisely why

20   they are identifying lawyers because they want the jury to

21   draw the inference that they consulted with counsel and

22   counsel approved all of this.  Which is not a defense.  There

23   is no other reason to introduce the idea that there were

24   lawyers involved.  The idea that lawyers were involved is

25   irrelevant to any of the issues the jury is going to be tasked

1   with considering.

2            THE COURT:  And that's what I've ruled.

3        Are we ready for the jury, Mr. Schneider?

4            MR. SCHNEIDER:  Yes, Your Honor.

5            THE COURT:  Mr. Bradley?

6            MR. BRADLEY:  Just one last issue, Judge.  In light

7   of the Court's rulings at sidebar regarding getting into the

8   issue or question of political contributions to other elected

9   officials, the witness testified earlier that various FES

10  officials suggested that the campaign contribution to

11  Mr. Householder should be in the amount of $2 million.  And,

12  in fact, during one of his proffers, he indicated that the $2

13  million contribution was suggested be directed to Mike DeWine.

14      And so while I appreciate the Court's ruling regarding

15  that whole subject matter, it would be my intentions to

16  inquire of, do you remember telling the case agent something

17  different regarding that, that, in fact, the $2 million

18  contribution was suggested to go to Mike DeWine.

19      And if he does not recall that, present him with his 302

20  to refresh his recollection and then proceed accordingly.

21           THE COURT:  I, of course, don't know what was

22  proffered.

23      Does the government wish to respond to Mr. Bradley's

24  specific?

25           MR. SINGER:  So if I'm going to understand this

```
 1    correctly, it's that FirstEnergy parent company wanted to pay

 2    $2 million to Mike DeWine and that was the subject of the

 3    questioning relating to payments to Mr. Householder?  I'm not

 4    sure I understand.

 5            THE COURT:  If it's for purposes of impeachment in

 6    that regard, I think it's fine, Mr. Bradley.  I didn't know

 7    that there was a proffer.

 8            MR. BRADLEY:  Fair enough.  And rather than that be

 9    my first line of questioning at the break in light of this

10    conversation, I wanted to bring it to the Court's attention

11    now.

12            THE COURT:  Then that's fair, and I have responded

13    now that I understand it.  If it's for the purposes of

14    impeachment in that regard, I think it's fine.  But move on

15    after your impeachment is accomplished.

16            MR. BRADLEY:  Very good.

17            THE COURT:  Let's get the jury.

18        (Pause.)

19        (Witness took the stand.)

20            THE COURTROOM DEPUTY:  All rise for the jury.

21        (Jury entered the courtroom at 3:11 p.m.)

22            THE COURT:  You may all be seated.  Thank you.

23        Welcome back to the 14 Members of the Jury.

24        Proceed with the taking of testimony.  You may approach,

25    Mr. Bradley.
```

1              MR. BRADLEY:  Thank you, Judge.

2    **Q.**    Prior to our afternoon break, you testified that there

3    were discussions amongst you and other lobbyists and FES

4    officials about the potential dollar figure contribution that

5    would be made to Generation Now to support the Team

6    Householder candidates.  Do you recall generally that?

7    **A.**    I do.

8    **Q.**    And you indicated that it was originally suggested that

9    the dollar figure would be $2 million?

10   **A.**    That is correct.

11   **Q.**    Now, shortly after you were arrested in connection with

12   this case, you met with various government representatives,

13   including an FBI agent, correct?

14   **A.**    That is correct.

15   **Q.**    And during what we would refer to as a proffer session?

16   **A.**    Yes.

17   **Q.**    Where you -- where you're answering a series of questions

18   regarding the event at issue in this case.  Do you recall

19   that?

20   **A.**    Yes.

21   **Q.**    And do you recall during that first proffer session

22   roughly a week after you were arrested that you told Agent

23   Wetzel that, in fact, it was -- the suggestion was that the $2

24   million payment be made to Mike DeWine and not Larry

25   Householder?  Do you recall that?

1    **A.**    I don't recall.

2    **Q.**    Would it refresh your recollection to look at some of the

3    interview notes from that particular proffer session in an

4    attempt to refresh your recollection and see if you could

5    recall?

6    **A.**    It would -- it would help.

7             MR. BRADLEY:  So, PJ, can we just show the

8    witness -- I shouldn't say PJ.  Could we show the witness only

9    what would be the proffer from July 27th of 2020, and

10   specifically, page 2.

11            THE COURT:  Yes.

12   **Q.**    Mr. Cespedes, when it comes up on the screen, I would

13   direct your attention to the second full paragraph that starts

14   "In order."  Do you see where I am referring you to?

15   **A.**    Yes.

16   **Q.**    And would you take a moment and just read that to

17   yourself.

18   **A.**    Where do I start reading?  Because this actually helped

19   my recollection.

20            THE COURT:  I didn't hear you.  What's going on?

21            THE WITNESS:  This was a great exhibit.  It helped

22   my memory, and I now remember.

23            MR. BRADLEY:  Can you take that down, PJ?

24   **Q.**    So now having had the opportunity to review that proffer,

25   does that, in fact, refresh your recollection regarding

1   whether it was, in fact, Mike DeWine that it was suggested

2   would receive the $2 million payment?

3   A.   It was actually both of them.  Mike DeWine was -- it

4   was suggested that Mike DeWine receive 2 million.  It was

5   also suggested that we do 2 million to the Speaker's

6   campaign.

7   Q.   But to be clear, that's not reflected in any of these

8   interview notes you just -- you looked at, right?

9   A.   I did not type any of those notes so I don't -- I don't

10  know what's reflected in those notes.

11  Q.   So it would be your recollection that the suggestion was

12  that 2 million go to DeWine and $2 million go to Householder?

13  A.   Correct.

14  Q.   But ultimately, as we've discussed, that didn't happen,

15  and it was only the $500,000 payment, right?

16  A.   That's somewhat correct.  What actually happened was

17  the parent company, I believe, covered the difference.

18  Q.   The parent company being FirstEnergy?

19  A.   Correct.

20  Q.   And covered that difference to whom?

21  A.   I -- they supported those candidates to the tune of

22  that, that difference.  That was -- that was the suggestion

23  that was made by the parent company after we down -- after

24  we downgraded our contribution to 500,000.

25           MR. BRADLEY:  Moving on, can we see Government's

```
 1    Exhibit -- or can we publish Government's Exhibit 461D?  And,

 2    yes, Judge, this has been admitted.

 3              THE COURT:  Yes.

 4              MR. BRADLEY:  And can you go to page 6?

 5    Q.   And do you recognize this to be a text exchange between

 6    you and Matt Borges on April 30th of 2019?

 7    A.   That's correct.

 8    Q.   And this would have been two to three weeks after House

 9    Bill 6 was introduced into the House?

10    A.   Yes.

11              MR. BRADLEY:  Can you, PJ, cull out the bottom text

12    message?

13    Q.   And this is you, Mr. Cespedes, telling Mr. Borges that, I

14    know that oil and gas has more resources than us, but if the

15    spend is $15 million over the next eight weeks, don't you

16    think we get to a point of saturation?

17         Do you see that?

18    A.   I do.

19    Q.   And, in fact, after House Bill 6 was introduced, the oil

20    and gas industry financially supported a series of

21    advertisements, promotions, et cetera, literature, TV, print,

22    and other media outlets, essentially opposing House Bill 6?

23    A.   Yes.

24    Q.   And so your reference here was the need to -- for FES to

25    spend money, essentially having ads supporting House Bill 6?
```

1   **A.**   What I am referencing here in this text message to Matt

2   is I did not have much campaign experience at the time.  So

3   due to his vast campaign experience, I am asking him if the

4   budget that has been approved will reach saturation, meaning

5   will it accomplish our goal.

6   **Q.**   Sure.  But the point is, is that -- that after House Bill

7   6 was introduced, you and a number of FES officials were

8   meeting multiple times either -- either in person or in

9   conference calls, multiple times a week discussing issues

10  relative to this legislation, right?

11  **A.**   Yes.

12  **Q.**   And a number of people participated in those calls, all

13  of the FES leadership -- John Judge, Dave Griffing, Jamie

14  Tucker, Ty Pine, representatives from Baker & Hostetler, Lori

15  Herf, Brian Durdle, Bob Klaffky, members of The Strategy

16  Group, which is a media company, right?  You were all meeting

17  on a regular basis, i.e., twice a week, correct?

18  **A.**   Correct.

19  **Q.**   And one of the things that you discussed during these

20  meetings was the fact that the oil and gas industry were

21  running ads contra to House Bill 6?

22  **A.**   That would have been natural for us to discuss that,

23  yes.

24  **Q.**   Yes.  And as part of those discussions, it was discussed

25  the need to -- to run advertising and various, you know, media

1    outlets to essentially support House Bill 6?

2    A.    Well, The Strategy Group was employed directly by

3    Generation Now.  So the content and the ads that we put out

4    in support were handled by that organization.

5    Q.    Sure.  But during these meetings with all of these FES

6    officials, et cetera, lobbyists, et cetera, there was

7    discussions that, hey, in light of the fact that there's all

8    these ads anti House Bill 6, we need counter programming,

9    essentially, we need an advertising campaign supporting House

10   Bill 6, right?

11   A.    That group, if I may, is made up of a bunch of

12   different consultants and lobbyists.  The call that I think

13   you're referencing was more of a educational call for

14   Strategy Group to let us know what they were doing on behalf

15   of Generation Now and ourself.  And the group that you

16   mentioned would not have been a party to decisions on media

17   or anything like that.  They would have been simply lobbying

18   elected officials and going out and doing their work in that

19   way.

20   Q.    So ultimately it was decided that it was necessary to run

21   ads statewide supporting House Bill 6, right?

22   A.    Yes.

23   Q.    And that decision was made in part because the oil and

24   gas industry were running ads statewide opposing House Bill 6?

25   A.    That decision was made because Generation Now made that

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2117

1   decision for us.

2   **Q.**    Well, so let me ask you this:  Those ads were all funded

3   by FirstEnergy Solutions, correct?

4   **A.**    They were.

5   **Q.**    And so the decision to spend the money to support these

6   ads was made not by Generation Now but by FES?

7   **A.**    I think what I described yesterday is that we had no

8   choice.

9   **Q.**    But the decision was made by FES?  They're the ones that

10  spent the money, right?

11  **A.**    We transferred money to Generation Now --

12  **Q.**    That's right.  And all of that money gets approved by an

13  independent board of directors at FirstEnergy Solutions,

14  right?

15  **A.**    That may be true.  I don't have any idea of the inner

16  workings of that part of the --

17  **Q.**    You have no idea how that money gets approved?

18  **A.**    My role is to request money on behalf of Generation

19  Now.

20  **Q.**    Um-hmm.

21  **A.**    To FirstEnergy, directly to the president and CEO.  He

22  responds affirmative and would wire that money to Generation

23  Now.  The decisions that took place above the CEO as far as

24  how the money was approved, I just don't know exact detail

25  so I don't want to comment.

1    **Q.**   Fair enough.  So you are not familiar, for example,

2    whether there is a resolution that's approved by the board of

3    directors?

4              THE COURT:  Excuse me, excuse me, excuse me.  Is

5    there an objection?

6              MR. SINGER:  I think the witness just answered this

7    question, Your Honor.

8              THE COURT:  Let's get it nailed down.

9         You can ask the question.

10   **Q.**   So you're saying that you're not aware that the board of

11   directors at FirstEnergy Solutions approved a resolution

12   authorizing the expenditure of $15 million to fund this ad

13   campaign?  You're not aware of that?

14   **A.**   The end result I was aware of.  I didn't realize the

15   process that took place to get there.

16   **Q.**   But you were aware, correct me if I'm wrong, whether it

17   was the FirstEnergy Solutions board of directors or other

18   executive leadership that made the approval?  In other words,

19   if it wasn't the board, you were certainly aware that FES

20   executives were making that final approval?

21   **A.**   Yes, I took them to the meeting with Generation Now.

22             MR. BRADLEY:  And can we see, PJ, and can we publish

23   Householder Exhibit 181?  And, yes, this has been admitted,

24   Judge.

25             THE COURT:  Yes.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2119

```
 1              MR. BRADLEY:  And can you go to the bottom page.

 2      Actually, scroll up a little bit for me.  Stop right there.

 3          And can you blow up that header, PJ?

 4      Q.   This would appear to be a email from you to Jeff --

 5      excuse me -- from Jeff Longstreth to you --

 6      A.   Correct.

 7      Q.   -- dated April 29 of 2019?

 8      A.   Correct.

 9      Q.   And this would be roughly two weeks after House Bill 6

10      had been introduced, right?

11      A.   Correct.

12              MR. BRADLEY:  And then can you cull out the actual

13      language.

14      Q.   And the message from Jeff to you is, thank you very much

15      for your support of House Bill 6.  Attached please find a

16      detailed proposal of our public education campaign.  We'd like

17      to start this project this week and would appreciate your

18      donation of $1.5 million.  Attached you will find a

19      contribution form for wiring instructions for Generation Now.

20          Do you see that?

21      A.   I do.

22              MR. BRADLEY:  And then can you scroll up, PJ?

23      Q.   And then it would appear that the message gets forwarded

24      to Dave Griffing, right?

25      A.   Correct.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**   From you.  And then Dave Griffing forwards that to Chuck

2    Moore and other members of the FES board of directors?

3    **A.**   Okay.

4    **Q.**   Isn't that what that appears?

5    **A.**   Yes, yes, it does.

6              MR. BRADLEY:  Can you scroll up a little bit?  A

7    little bit further, PJ.

8         And then here -- can you blow that up for us?

9    **Q.**   Would be the attachment to Jeff's original email that

10   would be the, essentially, a detailed budget proposal

11   regarding the anticipated costs associated with the public

12   education program?

13   **A.**   Correct.

14   **Q.**   In essence, in simple terms, you know, a statewide media

15   blast promoting the benefits of House Bill 6?

16   **A.**   Yes.

17   **Q.**   And the cost for the entire eight-week program was

18   roughly 15 to $16 million?

19   **A.**   Correct.

20   **Q.**   Right?  And is it not your -- is it your understanding

21   that FES ultimately agreed and approved the expense associated

22   with this public education program?

23   **A.**   Yes, we did.

24   **Q.**   And then the -- once FES approved these expenditures, do

25   I understand that Mr. Longstreth on a weekly basis would

1    forward to you the monies that would needed -- be needed for

2    that upcoming week?

3    A.   Right.

4    Q.   So, in other words, it wasn't a lump sum payment; it was

5    on a weekly basis?

6    A.   Correct.

7    Q.   And all of that money was getting transferred from FES,

8    or paid from FES to Generation Now, right?

9    A.   Correct.

10   Q.   And then Generation Now would then contract out with

11   various vendors, including but not limited to The Strategy

12   Group, and pay them for all of the services that are reflected

13   in this particular budget?

14   A.   They did have relationship with The Strategy Group, and

15   I assume The Strategy Group was paid, yes.

16   Q.   That was your understanding --

17   A.   Yes.

18   Q.   -- of the -- who would be responsible for actually

19   creating the public education program, right?  The Strategy

20   Group.

21   A.   Creating ads.

22   Q.   Yes.

23   A.   Yes.

24   Q.   And you have, in fact, dealt with employees of The

25   Strategy Group directly, right?

1    **A.**    Yes, I have.

2    **Q.**    And certainly, is there any doubt in your mind that The

3    Strategy Group produced and created these ads, right?

4    **A.**    Yes, they did.

5    **Q.**    And they were paid for it?

6    **A.**    Yes, they were paid.

7    **Q.**    And they would have gotten paid from the money that FES

8    paid to Gen Now and in turn paid it out to The Strategy Group

9    and any other vendors associated with this public education

10   campaign?

11   **A.**    I assume that's how they were paid.

12   **Q.**    So in and around the time when House Bill 6 was

13   introduced and through its passage in the House and then on

14   into the Senate, you were participating in these regular

15   meetings with various FES officials to discuss strategy,

16   right?

17   **A.**    Correct.

18   **Q.**    And there -- you were not the only consultant/lobbyist

19   working on behalf of FES regarding this issue, correct?

20   **A.**    I was not.

21   **Q.**    And, in fact, there were a number of lobbyists, right?

22   **A.**    There were.

23   **Q.**    And other people too, to be fair, right?

24   **A.**    Correct.

25   **Q.**    And one of them I think you referred to him earlier, was

1    Jason Mauk?

2    **A.**    Mauk.

3    **Q.**    Is it Mauk?

4    **A.**    Jason Mauk.

5    **Q.**    And Mr. Mauk was hired because of his relationships with

6    people serving on the Ohio Senate committee?

7    **A.**    Correct.

8    **Q.**    And he was previously chief of staff to the Republican

9    Caucus, right?

10   **A.**    That is correct.

11   **Q.**    And had a close relationship with Senate President Larry

12   Obhof?

13   **A.**    He did.

14   **Q.**    And so that's -- FES -- well, did you recommend that FES

15   hire Mr. Mauk?

16   **A.**    I was counseled by Matt Borges that he would be a good

17   hire, so I recommended him after that.

18   **Q.**    And in part because of those relationships with the

19   Senate president and other members of the Senate?

20   **A.**    Correct.

21   **Q.**    And, again, the purpose -- the rationale being that, you

22   know, he would be able to -- assuming House Bill 6 was passed

23   in the House and off to the Senate -- that he would be able to

24   reach out to some of these officials, including Larry Obhof,

25   and lobby them to support the passage of House Bill 6 in the

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2124

1    Senate?

2    **A.**    That is correct.

3    **Q.**    And then another lobbyist, an Adam Hewitt?

4    **A.**    I am familiar, yes.

5    **Q.**    And he was hired due to his relationships with various

6    unions?

7    **A.**    Unions and Democratic members.

8    **Q.**    In the House, the Senate, or both?

9    **A.**    His relationships were in both chambers.

10   **Q.**    And, again, the purpose being that he would be reaching

11   out to the various members in the House, the Senate, and

12   lobbying them to support House Bill 6?

13   **A.**    Correct.

14   **Q.**    What about Matt Davis?  Mr. Davis was a lobbyist that was

15   hired to assist as well?

16   **A.**    Yes, he was.

17   **Q.**    And he had relationships with Ohio Senator Steve Wilson?

18   **A.**    He did.

19   **Q.**    And Mr. Wilson chaired the Senate's Energy and Public

20   Utilities Commission?

21   **A.**    He did.

22   **Q.**    And same thing there, that he would be in a position to

23   lobby Mr. Wilson and/or other Senate members, encouraging them

24   to support the passage of House Bill 6 in the Senate?

25   **A.**    Correct.

1   **Q.**   And then Matt Borges, hired as the lobbyist as well,

2   right?

3   **A.**   Yes.

4   **Q.**   And I think you had indicated that Mr. Borges was a

5   member -- excuse me -- an employee of Roetzel and Andress,

6   which is a law firm that has a lobbying arm?

7   **A.**   Correct.

8   **Q.**   Just to be clear, Mr. Borges isn't a lawyer.

9   **A.**   Correct.

10  **Q.**   And along with Mr. Borges, I think there were two or

11  three other lobbyists from Roetzel that assisted the effort

12  here as well?

13  **A.**   They did.

14       MR. BRADLEY:  And can we see or can we publish

15  Government's Exhibit 437A?  And it has been previously

16  admitted.

17       THE COURT:  Yes.

18       MR. BRADLEY:  And can you cull out that first

19  message, PJ?

20  **Q.**   And do you recognize that Government's Exhibit 437A is a

21  text exchange between you and Matt Borges, right?

22  **A.**   It is.

23  **Q.**   And that's from April 12th of 2019, right?

24  **A.**   Correct.

25  **Q.**   Which is the day that House Bill 6 was introduced into

1    the House, right?

2    **A.**    Yes.

3    **Q.**    And this is you to Matt saying, Griffing and referencing

4    to Dave Griffing, right?

5    **A.**    Correct.

6    **Q.**    Has given you the green light to onboard you -- meaning

7    Matt -- fully, right?

8    **A.**    That is right.

9    **Q.**    And then what, Davis prolly gonna take another week or

10   so.  I communicated it with him.

11        Who's Davis?

12   **A.**    Davis is a reference to Matt Davis.

13   **Q.**    Same thing, that that's referencing that he's been green

14   lighted to bring him on board?

15   **A.**    It's going to take another week or so.  They are still

16   going through the process.  But I was confident that I was

17   able to onboard him, yes.

18   **Q.**    So all of these lobbyists or at least some of them,

19   including Mr. Davis and Mr. Borges, are brought on in and

20   around the time that House Bill 6 is introduced?

21   **A.**    Correct.

22   **Q.**    So eventually House Bill 6 gets passed in the House,

23   right?

24   **A.**    Correct.

25   **Q.**    Off to the Senate and passed in the Senate, right?

1    **A.**    Yes.

2    **Q.**    Goes back to the House for a final vote because there was

3    changes made to the bill in the Senate, right?

4    **A.**    Yes.

5    **Q.**    And then I think the House passes again on July 23, 2019,

6    right?

7    **A.**    I believe that's correct.

8    **Q.**    And that very same day, Governor DeWine signed the bill

9    into law?

10   **A.**    Yes.

11   **Q.**    And I think you indicated that once the bill was signed

12   into law, it did not immediately take effect?

13   **A.**    That's correct.

14   **Q.**    'Cause there's a 90-day waiting period to allow a

15   potential referendum?

16   **A.**    That's right.

17   **Q.**    And just as you and various other members and officials

18   at FES had regular meetings during the legislative process

19   leading up to the House Bill 6 getting signed into law, you

20   continued to have those same meetings with various officials

21   regarding a potential referendum effort?

22   **A.**    Yes.

23   **Q.**    And you were aware that there was a group that was

24   pursuing a referendum?

25   **A.**    Yes, we were.

1    **Q.**   And that group that was pursuing the referendum, again

2    funded by the oil and gas industry?

3    **A.**   I don't have direct knowledge of who funded them, but

4    I --

5    **Q.**   Do you have --

6    **A.**   I would believe that.

7    **Q.**   Do you have any idea who funded them?

8    **A.**   Who funded them?

9    **Q.**   Who funded the referendum effort?

10   **A.**   I don't know.

11   **Q.**   At no point did you learn that during this entire

12   process?

13   **A.**   Well, the assumption -- the assumption was made that it

14   was oil and gas, and I am sure there was oil and gas money,

15   but I don't know who all the donors were is all I am saying.

16   I don't have firsthand knowledge.

17   **Q.**   And when we were looking at one of the earlier text

18   messages between you and Matt, you had indicated that the oil

19   and gas industry probably has more money than FES?

20   **A.**   Yeah, than one company, of course.

21   **Q.**   Sure.  And, thus, there were considerable resources put

22   into play in support of the referendum?

23   **A.**   Yes.

24   **Q.**   And so it became clear that FES would need to devote

25   additional resources to oppose the referendum?

JUAN CESPEDES - CROSS (HOUSEHOLDER)                12-2129

1    **A.**    That's correct.

2    **Q.**    And you're aware, are you not, that FES officials,

3    whether it be their independent board of directors or other

4    executive management, approved an additional $25 million to be

5    spent to oppose the referendum effort?

6    **A.**    I knew that money was approved.  The number is not

7    something that I remember at this moment.  But it's possible

8    I have seen it.

9    **Q.**    And just as we were looking at proposals from

10   Mr. Longstreth, you know, detailing the budgeted expenses

11   associated with opposing the referendum, the same thing

12   happened -- excuse me -- the detailed expenditures associated

13   with the public education program promoting House Bill 6, the

14   same thing in the referendum?  In other words, Jeff Longstreth

15   was involved, correct, as part of the --

16   **A.**    Very much so, yes.

17   **Q.**    Along with a number of individuals, right?  You, John

18   Kiani, Dave Griffing, Burnazian?

19   **A.**    Speaker Householder.

20   **Q.**    Jason Mauk, right, the lobbyist we were referring to;

21   Curt Steiner, Carlo LoParo, right?

22   **A.**    Yeah.

23   **Q.**    And one of the things that was discussed was essentially

24   strategies to try and defeat the referendum effort?

25   **A.**    We did discuss those, yes.

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2130

1   **Q.**   And -- and in simple terms, to get a referendum on the

2   ballot, the organization first has to secure a large number of

3   valid signatures?

4   **A.**   That is correct.

5   **Q.**   And they have a finite period of time in which to do

6   that?

7   **A.**   They do.

8   **Q.**   And do you know how long that is?

9   **A.**   Off the top of my head right now, I couldn't -- I can't

10  recall.

11  **Q.**   And there -- you learned, whether you knew this before or

12  not, you learned that there's companies out there that

13  essentially specialize in collecting these signatures for

14  ballot referendums?

15  **A.**   Yes, that's correct.

16  **Q.**   And so one of the strategies that was employed by FES was

17  to try and hire some of these signature collection firms in an

18  effort to conflict them out, namely, prevent them from being

19  hired by the proponent of the referendum?

20  **A.**   It was -- it was a strategy that was executed by

21  Generation Now, specifically Jeff Longstreth and Neil Clark,

22  to sideline those firms, correct.

23  **Q.**   But that was ultimately something that was discussed with

24  all of these -- those people from FES that I just described

25  that were participating in these regular conference calls or

1    meetings?

2    **A.**    They did participate but, you know, we have to

3    recognize their business is nuclear power plants and energy,

4    and they don't specialize in politics.  So they lean very

5    heavily on those consultants, specifically Generation Now,

6    to make those decisions for them.

7    **Q.**    So they just did whatever Generation Now told them?

8    **A.**    By and large, yes.

9    **Q.**    Now, you -- you weren't involved in any of those

10   decisions to hire some of these signature collection firms and

11   conflict them out?

12   **A.**    Oh, at some point, absolutely I participated.

13   **Q.**    You were aware that that was a strategy that was utilized

14   in referendum efforts, right?  You knew that?

15   **A.**    I did not have any prior experience in referendum

16   efforts.  This is my first legislative client so not

17   something I've worked hands on with before, but I learned

18   very quickly, yes.

19            MR. BRADLEY:  So can we see or can we -- one moment,

20   Your Honor.

21        Your Honor, could we publish Government's Exhibit 451B?

22   And it has been admitted.

23            THE COURT:  Yes.

24            MR. BRADLEY:  Can you blow that up for us, PJ?

25        And can you go down, scroll down, PJ.  Keep going down,

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2132

```
 1   please.  Keep going down.  Keep going, please.

 2       And can you --

 3   Q.  So you recognize this is a text exchange between you and

 4   Matt Borges, right?

 5   A.  That is correct.

 6   Q.  And this was June 19th of 2019, right?

 7   A.  Yes.

 8   Q.  And so this was while the legislation was pending in the

 9   Senate, right?

10   A.  Yes.

11   Q.  And so by definition, before it's signed into law?

12   A.  Yes.

13   Q.  And certainly by definition before any potential

14   referendum effort?

15   A.  Right.  We had been made aware of beforehand.

16   Q.  Sure.

17       MR. BRADLEY:  And can you cull out that last text,

18   PJ?

19   Q.  And this is you -- again, as part of a series of

20   conversations, to be fair?

21   A.  Right.

22   Q.  But this is you telling Matt Borges, I'm going to need to

23   make a decision on whether I lock up ballot signature firms

24   just in case.  Think about it and let me know, right?

25   A.  Correct.
```

1   **Q.**   So, clearly, this is a subject matter, a strategy that

2   you're familiar with because as of June 19th, before it's

3   still in the House -- or Senate, you're still talking about

4   it?

5   **A.**   Well, yes.  A series of text messages showed --

6   **Q.**   My question was, you are certainly, as of June 19th,

7   familiar with that strategy, right?

8   **A.**   Newly familiar, yes.

9   **Q.**   Yes.  And, in fact, you say, "I'm going to need to make

10  the decision on whether to lock up these ballot signature

11  firms," right?  That's what that says?

12  **A.**   It does.

13  **Q.**   So two of those firms --

14        MR. BRADLEY:  You can take that down, PJ.

15  **Q.**   Two of those firms that were hired was a company called

16  Lincoln Strategy, right?

17  **A.**   Correct.

18  **Q.**   And then a second company called FieldWorks?

19  **A.**   Correct.

20  **Q.**   And those are well-respected companies in their industry?

21  **A.**   I believe so, yes.

22  **Q.**   And representatives from each of these companies would

23  participate in many of your strategy sessions with all of the

24  FES officials we just talked about moments ago, right?

25  **A.**   FES and Gen Now, yes.

1   **Q.**   Yes.  And there was Meghan Cox from The Strategy Group,

2   right?

3   **A.**   I'm familiar with the name.  Part of -- this was a part

4   of the campaign that I was not particularly close to.  Your

5   first reference was to buying out campaign companies and

6   keeping them as sidelines.  This effort, particularly I

7   think with -- not FieldWorks, but with Meghan, I never met

8   her and didn't personally have any involvement with her

9   firm.

10          MR. BRADLEY:  Could I have one moment to confer,

11   Judge?

12          THE COURT:  Yes.

13      (Pause.)

14   **Q.**   So you do recall that Meghan, or at least Meghan Cox from

15   Lincoln Strategy and Lou from FieldWorks would participate in

16   some of these group strategy sessions?

17   **A.**   So as far as our group strategy sessions were

18   concerned, my memory is that Lou did participate because I

19   am familiar with FieldWorks.  I do not remember ever meeting

20   or talking to Meghan, though I now know her name in

21   hindsight.

22   **Q.**   Do you recall there being discussions on a daily basis

23   with Meghan and/or Lou regarding their efforts to hire

24   individual signature gatherers to essentially prevent them

25   from working in favor of the referendum effort?

1    **A.**   Those conversations took place with Lou.  From my

2    standpoint, I don't remember having those conversations with

3    Meghan.

4    **Q.**   So -- and those conversations would take place on a daily

5    basis?

6    **A.**   At a certain point in the campaign, yes.

7    **Q.**   And -- and those conversations would essentially be a

8    daily update on, hey, this is how -- how many individual

9    signature gatherers we were able to hire, essentially hire

10   away from the referendum effort?

11   **A.**   Yes, correct.

12   **Q.**   So you were certainly aware of the strategy to hire away

13   individual signature gatherers and to hire signature

14   collection firms in an effort to conflict these individuals

15   out from working in favor of the referendum?

16   **A.**   Yes.  They happen in different phases, and I became

17   aware of them very quickly.

18          MR. BRADLEY:  Just one moment, Your Honor.

19          THE COURT:  Yes.

20   **Q.**   So we talked a little bit earlier about you sat for

21   actually several proffer sessions with Agent Wetzel and other

22   government officials?

23   **A.**   That is correct.

24   **Q.**   And talked about a variety of subjects related to this

25   case, including what we're talking about right here, namely,

1   the efforts to hire away various signature gatherers and/or

2   hire the firms in an effort to conflict them out?

3   **A.**   I did.

4   **Q.**   That's stuff you talked about at the proffers, right?

5   **A.**   I did approximate.

6   **Q.**   And do you recall telling Agent Wetzel at one of these

7   proffer sessions that you had daily calls with Neil Clark,

8   John Kiani, and Meghan and others regarding their efforts to

9   hire away these individuals?

10  **A.**   My recollection is that I was on a call with all those

11  individuals.  I would have replaced Meghan with Lou if my

12  memory serves correct, and that is what I remember.

13  **Q.**   So my point is, is that -- so you do remember those

14  calls?

15  **A.**   Yes.  We had daily calls with Lou, that's what I --

16  that's what I said.

17  **Q.**   And what about Meghan?

18  **A.**   If she was on the call, I simply just don't remember.

19  **Q.**   Would it refresh your recollection to review the

20  interview notes from one of those proffer sessions regarding

21  this issue?

22  **A.**   I obviously did not create those notes.  I'd be happy

23  to look at it.  I'm being as honest as possible.

24  **Q.**   Sure.

25  **A.**   I don't remember Meghan being on those calls.  I don't

```
 1    know that it changes the call very much.  Lou was on the

 2    calls.

 3              MR. BRADLEY:  PJ, can you show the witness from the

 4    8-19-2020 proffer, and specifically page 7.

 5    Q.   Are you able to see that?

 6    A.   Yes, I see the page, correct.

 7    Q.   And could you read to yourself the first paragraph that

 8    begins with your name, Cespedes.

 9    A.   Okay, thank you.

10         I finished reading.

11              THE COURT:  That was fast.

12    Q.   And does that, in fact, refresh your recollection

13    regarding whether you participated in these daily calls with

14    Lou and/or Meghan?

15    A.   I thought I affirmatively said that I did participate

16    in the calls.  My memory just simply remembers Lou being the

17    subject of those calls on their side.  Meghan very well

18    could have been a part of that.  It's just not something

19    that I remember at this point.

20    Q.   But my question; having reviewed the interview notes from

21    your proffer with Agent Wetzel regarding this issue, does that

22    refresh your recollection whether Meghan Cox from Lincoln

23    Strategy participated in these?

24    A.   It did not to the point where I could say right now

25    that she for sure was on the call.  It is very possible.
```

1    There was also a note that I read later in there that said

2    three members and others.  I also believe Stephen Burnazian

3    was on that call but was not mentioned.

4    **Q.**   So --

5              THE COURT:  I think you asked the question and he's

6    responded.

7              MR. BRADLEY:  Yes, I'm moving on, Judge.

8              THE COURT:  So I would move along.

9    **Q.**   So, in fact, it was Lou from FieldWorks and Meghan from

10   Lincoln Strategy Group were the ones that were actually making

11   the calls to these various signature gatherers?

12   **A.**   Yes.

13   **Q.**   And I think that they -- it was your understanding that

14   they enjoyed good reputations in their field, and that made it

15   easier for them to successfully hire away some of these

16   signature gatherers?

17   **A.**    From my perspective being on this call, you see myself

18   and John Kiani, I am purely representing him as he's the

19   chairman.  Neil Clark was the person who really ran the task

20   for the campaign, managed Lou and Meghan.

21   **Q.**   That wasn't my question.

22   **A.**   Will you please ask it again?  I misunderstood.

23   **Q.**   Sure.  First of all, it was your understanding that

24   Meghan from Lincoln Strategy and Lou from FieldWorks were

25   individuals that enjoyed good reputations in their field or

1    industry, right?

2    **A.**    The research done by Generation Now showed that they

3    were, and so --

4    **Q.**    But I am asking you your understanding.  It's a simple

5    question.  Did you understand that?

6    **A.**    After they were hired, I did.

7    **Q.**    Yes.  And was it your understanding that they were the

8    ones, namely Meghan and Lou, that were the ones that were

9    actually making the calls to the various signature gatherers

10    in an attempt to hire them away from working for the

11    referendum?

12    **A.**    I believe so.

13    **Q.**    And that this is a strategy that they endorsed?  In other

14    words, this isn't something that Neil Clark came up with.

15    This is a strategy that these two reputable people in their

16    industries endorsed?

17                THE COURT:  Is there an objection?

18                MR. SINGER:  Objection, Your Honor.  How can this

19    witness testify as to what other people endorsed?

20                THE COURT:  Sustained.

21    **Q.**    Well, you participated in conversations with Lou and

22    Meghan, right?

23    **A.**    Correct.  Lou I did.

24    **Q.**    I'm sorry?

25    **A.**    I did participate in conversations with Lou.  I don't

1　remember if Meghan was on those calls.

2　**Q.**　Just take Lou.  And this is something that he endorsed as

3　a legitimate strategy in their industry?

4　　　　　　MR. SINGER:  Same objection, Your Honor.

5　　　　　　THE COURT:  Sustained.

6　**Q.**　You talked on direct examination about Tyler Fehrman.  Do

7　you recall that?

8　**A.**　I do.

9　**Q.**　And I think that there was conversation between you and

10　Matt about essentially paying money to Tyler Fehrman in

11　exchange for information regarding the referendum efforts?

12　**A.**　That is true.

13　**Q.**　And you indicated that that was something that was

14　discussed, at least initially, only between you and

15　Mr. Borges; is that right?

16　**A.**　Correct.

17　**Q.**　And that I guess inadvertently Mr. Kiani came to learn

18　about it, right?

19　**A.**　Correct.

20　**Q.**　But that -- that was not something that you wanted?

21　**A.**　Right.

22　**Q.**　You wanted to keep that just between the two of you,

23　correct?

24　**A.**　I did.

25　**Q.**　And so fair to say that Mr. Householder had no idea about

```
 1    any of those conversations between you and Mr. Borges?

 2              THE COURT:  Objection?

 3              MR. SINGER:  Objection.  This witness can't testify

 4    as to what Mr. Householder knew.

 5              THE COURT:  Sustained.

 6    Q.  Do you have any reason to believe that Mr. Householder

 7    was aware of any of your conversations with Mr. Borges

 8    regarding Mr. Fehrman?

 9              MR. SINGER:  Same objection, Your Honor.

10              THE COURT:  If he has personal knowledge, he can

11    answer.  Otherwise, move on.

12              THE WITNESS:  May you repeat the question?

13    Q.  Sure.  Do you have any reason to believe or any

14    information that would suggest that Mr. Householder was aware

15    of your conversations between Mr. Borges and yourself

16    concerning Mr. Fehrman?

17    A.  I have no personal knowledge.

18    Q.  And that was something that you and Mr. Borges discussed

19    and specifically said, let's keep this between us?

20    A.  Initially, yes.

21    Q.  Well, you had conversations, let's keep this between us?

22    A.  Yes.

23    Q.  And it was only during a telephone call with -- with

24    Mr. Kiani that -- that he made reference to Mr. Fehrman?

25    A.  Correct.
```

1    **Q.**   So during this referendum effort, FES approved payments

2    of $600,000 essentially to you to use as needed in terms of

3    whatever you felt was needed to defeat the referendum effort?

4    **A.**   FirstEnergy, what they approved was discretionary funds

5    to go through Generation Now to 17 Consulting for whatever

6    purposes were necessary and discretionary.  And, yes --

7    **Q.**   Right.

8    **A.**   -- 600,000 did end up in my possession.

9    **Q.**   And I think you indicated that you, in fact, used some of

10   that money?

11   **A.**   Yes, I did.

12   **Q.**   And -- and FES executives, whether it be Griffing or

13   Kiani or both, knew and approved of those payments to you?

14   **A.**   I did not share the nature of the payments.

15   **Q.**   I meant the 600 grand that was going to you to use on an

16   as-needed basis.  They, FES, was aware that you had that 600

17   grand?

18   **A.**   They would have not been aware that I directly had 600,

19   no.

20   **Q.**   So I want to make sure there's no misunderstanding as to

21   what I'm asking.

22   **A.**   Of course.

23   **Q.**   Ultimately, the referendum period ended sooner than

24   expected, and you kept that 600 grand or what was left of that

25   600 grand, right?

1   **A.**    There was a payment of $500,000 made from Matt Borges

2   to myself after the referendum completed, yes.

3   **Q.**    So to be clear, I'm not asking you about that part.  I'm

4   asking you when the $600,000 was authorized by FES, they knew

5   that they wanted you to have that $600,000 so that you could

6   use that money on an as-needed basis, right?

7   **A.**    This might be semantics, but, no, that's not how it

8   worked.  The money was appropriated to Generation Now.

9   There was a 17 Consulting Group invoice that would also go

10  along with that that included a number of activities that

11  were discretionary.

12       The money that was paid to me initially was used for

13  political contributions.  It was a discretionary call that I

14  made but not something that I would share with FES execs.

15  **Q.**    And was that 600,000?

16  **A.**    No.  There were two payments.  The first payment was

17  100 and the second one was 500.

18  **Q.**    Isn't that 600,000?

19  **A.**    Yes, but they were spent differently is what I am

20  saying.

21  **Q.**    But what I am asking is, did FES approve you receiving

22  that $600,000 to use on an as-needed basis, as you saw fit, to

23  defeat the referendum?

24  **A.**    Yes, they approved the money to be used.

25  **Q.**    On an as-needed basis?

1    **A.**    At my discretion.

2    **Q.**    Yes.  And so that's something they were fully aware and

3    endorsed you having access to those funds, right?

4    **A.**    They trusted me, yes, to spend the money correctly.

5    **Q.**    And then as I referenced, ultimately the referendum

6    failed, right?

7    **A.**    Correct.

8    **Q.**    And there was -- most of that money was unused?

9    **A.**    There was a significant portion that was unused,

10   correct.

11   **Q.**    And can you ballpark for us how much?

12   **A.**    Maybe around 800,000, maybe.

13   **Q.**    I thought there was only 600,000?

14   **A.**    Well, you are not keeping in mind the money that

15   Mr. Borges got.

16   **Q.**    So all together, between the two of you, there was about

17   $800,000 left over?

18   **A.**    I believe so, yes.

19   **Q.**    And what did you do with those unused monies?

20   **A.**    The unused monies were something that I was preparing

21   to support candidates with in the coming election.  Our

22   firm, obviously, still did not have a PAC or the ability to

23   support people individually.  I knew we needed to do so, and

24   I was preparing to do so the following year.

25   **Q.**    So you kept it?

1    **A.**    It was in my possession.  It was taxed and, yes.

2    **Q.**    And was FES aware that you kept that unused money?

3    **A.**    FES would not have been aware of any of the payments

4    that were directed to me.

5    **Q.**    And did you feel that you should have returned that money

6    to FES?

7    **A.**    No.  It was something -- I had an understanding with

8    the executive chairman, and as you've seen in the -- as

9    you've seen there some of the evidence, he's referenced

10   black ops and some things that needed to be done during the

11   campaign, and we did talk about the need for money in the

12   future.  I was very careful not to be specific with him, but

13   I did not feel the need to return it, no.

14   **Q.**    Okay.  So we talked earlier about some of these proffer

15   sessions, right?

16   **A.**    Yes.

17   **Q.**    And roughly a week after you were initially arrested you

18   made a decision to cooperate with the FBI and ultimately

19   entered a guilty plea, correct?

20   **A.**    The timing of that may not -- I mean, it was very

21   quick.  I'm not sure if it was a week or not.

22   **Q.**    But something along those lines?

23   **A.**    Yes, correct.

24   **Q.**    And as part of your plea agreement, you have an agreement

25   with the government where you could potentially avoid a prison

JUAN CESPEDES - CROSS (HOUSEHOLDER)                    12-2146

```
 1    sentence all together; isn't that right?
 2    A.   My understanding of my plea agreement is that I am to
 3    be honest going forward, and if I am honest and I
 4    participate, obviously, they have the ability to make a
 5    recommendation, but ultimately, it is the judge who will
 6    decide my fate.
 7    Q.   That's right.  But you have a plea agreement that would
 8    potentially avoid you serving a prison sentence all together;
 9    isn't that right?
10    A.   By the terms of my plea agreement, I believe there is a
11    range of, my understanding is not that --
12    Q.   From zero to six months.
13    A.   Correct.
14    Q.   Right?  And zero would mean that you could be sentenced
15    to no prison time, right?
16    A.   That would be correct.
17    Q.   And the maximum potential prison sentence you could
18    receive pursuant to your plea agreement is six months, right?
19    A.   If I -- if I'm honest.
20    Q.   Sure.  But so the answer to my question is, you could
21    receive a maximum sentence under the terms of your plea
22    agreement of no more than six months' incarceration, correct?
23              THE COURT:  Is there an objection?
24              MR. SINGER:  Objection.  I believe that
25    misrepresents the facts, Your Honor.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1              THE COURT:  I'm going to instruct the jury at the

2      appropriate time on the agreement.  And it's not now.  So if

3      you want to -- I'm trying to look at the plea agreement now.

4              So the government can move for a reduction in sentencing

5      for cooperation and request no more than six months, but this

6      Judge, the Court has the discretion as to whether to grant it

7      at all, and to what extent.

8              Anything further?

9              MR. BRADLEY:  I mean, I do have some additional

10     questions.

11             THE COURT:  Go ahead.

12             MR. BRADLEY:  Fair enough.

13     **Q.**   So under the terms of your plea agreement, you're

14     required to testify on behalf of the government, right?

15     **A.**   I'm required to testify in an honest capacity.

16     **Q.**   That's right, on behalf of the government?

17     **A.**   On behalf of the facts.  But I am a witness here.

18     **Q.**   On behalf of the government?

19     **A.**   Yes.

20     **Q.**   And prior to -- we know that when you -- you had a series

21     of proffers, in other words, sit-down interviews with the

22     government that took place, you know, within several months

23     after your arrest, right?

24     **A.**   Correct.

25     **Q.**   And then prior to your testimony here today, you've sat

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    with the government to prepare you for courtroom testimony,

2    right?

3    **A.**    Of course.

4    **Q.**    And how many times have you met with the government to

5    prepare for your courtroom testimony?

6    **A.**    Over the course of almost three years, maybe seven.

7    **Q.**    Seven times?

8    **A.**    Six.

9    **Q.**    And those -- are those all in-person meetings?

10   **A.**    I believe -- I believe that I had three initial

11   proffers shortly after being arrested.  My recent meetings,

12   I believe, also equal three.  I may be off by one.  They

13   were all in person except for one.

14   **Q.**    And how long are these meetings with the government to

15   prepare your courtroom testimony?

16   **A.**    They've -- they've ranged time-wise.  In some cases,

17   they're closer to a full workday, six, seven hours.  In

18   other cases they've been one or two.

19   **Q.**    And the decision whether to ask the judge at the time of

20   your sentencing to recommend a sentence as low as zero months

21   of imprisonment is entirely in the discretion of the

22   government, right?

23   **A.**    To make the recommendation, yes.

24   **Q.**    And the decision on whether to make that recommendation

25   depends on whether you had been truthful; is that right?

1    **A.**   That is correct.

2    **Q.**   And the -- the arbiter, the decision maker as to whether

3    you've been truthful is the government?

4    **A.**   I believe the jurors and the judge also have a say in

5    that as well.

6    **Q.**   No, but the jurors aren't making the recommendation?

7             THE COURT:  The question's for the witness.  If I

8    speak up, you stop speaking.  You are almost there and done.

9    Go ahead.

10        What's the question?

11   **Q.**   The decision on whether you are truthful for purposes of

12   making a recommendation to the judge that you receive as

13   little as zero months of imprisonment rests entirely with the

14   government?

15   **A.**   The government would make the recommendation.

16   **Q.**   And the decision on whether you have been truthful is

17   entirely up to the government?

18   **A.**   As far as making a recommendation?

19   **Q.**   On whether you've been truthful, they'll decide that.

20   Isn't that right?

21   **A.**   I believe they'll have an opinion, yes.

22   **Q.**   Well, they're going to make the decision on whether

23   you've been truthful.  And if they believe in their minds

24   you've been truthful, they'll make the recommendation to the

25   judge that you get probation?

 1    **A.**    They have a process.

 2    **Q.**    So you're here with every expectation to please the

 3    government?

 4    **A.**    I'm here with the expectation of telling the truth.

 5    That's something they have asked me to do.

 6    **Q.**    As determined by the government.

 7    **A.**    There is only one truth in these matters.

 8              MR. BRADLEY:  Could I just have a moment, Your

 9    Honor?

10              THE COURT:  Yes.

11              MR. BRADLEY:  Could I have a moment?

12              THE COURT:  Yes.

13         (Pause. )

14              MR. BRADLEY:  I have no further questions at this

15    time, Judge.

16              THE COURT:  Very well.  It's 4:18.  We usually break

17    at 4:30.  Where do we stand from Mr. Borges' counsel's

18    perspective as to cross?

19              MR. SCHNEIDER:  Did you want me to begin, Your

20    Honor?

21              THE COURT:  If you're going to run more than ten

22    minutes, which you are welcome to, I'd just as soon break here

23    and go home.

24              MR. SCHNEIDER:  I would agree.

25              THE COURT:  Very well.  We have completed

```
1    government's direct, Mr. Householder's cross.  Mr. Schneider

2    on behalf of Mr. Borges will have an opportunity to ask

3    questions tomorrow morning.  The government could ask

4    additional redirect.  But we've made progress, and I want you

5    to have a break and go home.  And when you're home, I want you

6    to take a break and put this out of your mind.  Certainly, do

7    not discuss the case with anyone, even among yourselves,

8    absolutely no independent research or media checks.  And as

9    always, continue to keep an open mind until you hear all the

10   evidence.  I want you to have a good break.  Out of respect

11   for you, we will rise as you leave.  Same deal, same time

12   tomorrow morning, come to the same spot at 9:15.

13            MS. SANTORO:  All rise for the jury.

14        (Jury exited the courtroom at 4:20 p.m.)

15            THE COURT:  The jury has left the room.  The door is

16   closing.  As always, we will remain in the courtroom until we

17   have been advised that the jury has cleared the floor, and

18   then we will break for the day with the expectation we will be

19   back at 9:15 in hopes we can get the jury at 9:30.

20        The witness is not to discuss his testimony over the

21   evening break.  And he understands.

22            THE WITNESS:  I do.

23            THE COURT:  Very well.

24        (Pause.)

25            THE COURT:  All right.  They have cleared it.  Have
```

12-2152

1    a good break.  We are in recess until tomorrow morning.

2            THE COURTROOM DEPUTY:  This court is in recess until

3    tomorrow.

4        (Proceedings continued in progress at 4:21 p.m.)

5

6                    CERTIFICATE OF REPORTER

7            I, Mary A. Schweinhagen, Federal Official Realtime
     Court Reporter, in and for the United States District Court
8    for the Southern District of Ohio, do hereby certify that
     pursuant to Section 753, Title 28, United States Code that the
9    foregoing is a true and correct transcript of the
     stenographically reported proceedings held in the
10   above-entitled matter and that the transcript page format is
     in conformance with the regulations of the Judicial Conference
11   of the United States.

12   s/Mary A. Schweinhagen
     _____ 16th of February, 2023
13   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

12-2153

1          **<u>I N D E X</u>**

2                    **<u>EXAMINATIONS</u>**
            **GOVERNMENT WITNESSES**                    **PAGE**
3                    **JUAN CESPEDES**
   Direct Exam by Mr. Singer (Cont.)              1973
4   Cross-Exam by Mr. Bradley                      2041

5

                        **<u>EXHIBITS</u>**
6          **HOUSEHOLDER EXHIBITS**          **PAGE ADMITTED**
   No. 383                                      2053
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25