1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO

2                     WESTERN DIVISION
                       - - -

3

UNITED STATES OF AMERICA,     : **CASE NO. 1:20-CR-0077**

4                          :

              Plaintiff,    : **JURY TRIAL, DAY 13**

5           vs.              :

                          : **15th day of February, 2023**

6  LARRY HOUSEHOLDER, et al.    :

                          : **9:24 a.m.**

7             Defendant.     :

8                      - - -

                **TRANSCRIPT OF PROCEEDINGS**

9      **BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE**

                      - - -

10

APPEARANCES:

11

For the Plaintiff:

12                   Emily N. Glatfelter, Esq.

                   Matthew Charles Singer, Esq.

13                   Megan Gaffney Painter, Esq.

                   Assistant United States Attorneys

14                   221 East Fourth Street, Suite 400

                   Cincinnati, Ohio  45202

15

16  For the Defendant, Larry Householder:

17                   Nicholas R. Oleski, Esq.

                   Robert T. Glickman, Esq.

18                   McCarthy, Lebit, Crystal & Liffman Co.

                   1111 Superior Avenue East, Suite 2700

19                   Cleveland, Ohio 44114

                         and

20                   Steven L. Bradley, Esq.

                   Marein and Bradley

21                   526 Superior Avenue, Suite 222

                   Cleveland, Ohio 44114

22

23

24

25

1    For the Defendant, Matthew Borges:

2                        Karl Herbert Schneider, Esq.
                         Todd Aaron Long, Esq.
3                        McNees Wallace & Nurick, LLC
                         21 East State Street, Suite 1700
4                        Columbus, Ohio 43215

5    Also present:       Larry Householder
                         Matthew Borges
6
     Law Clerk:          Cristina V. Frankian, Esq.
7
     Courtroom Deputy:   Rebecca Santoro
8
     Stenographer:       Mary Schweinhagen, RDR, RMR, CRR
9                        United States District Court
                         200 West Second Street
10                       Dayton, Ohio 45402

11                   Proceedings recorded in stenotype.
         Transcript produced with computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **(PROCEEDINGS)** |
| 2 | (Proceedings held in open court at 9:24 a.m.) |
| 3 | THE COURT:  We are in the open court on the record |
| 4 | outside the presence of the jury and the witnesses aren't |
| 5 | present. |
| 6 | I understand the attorneys want to touch base before we |
| 7 | bring the jury out.  Who wishes to be heard? |
| 8 | MR. BRADLEY:  Judge, we just wanted to briefly |
| 9 | proffer some evidence for the record in light of the Court's |
| 10 | sustaining our objection yesterday to a line of questioning of |
| 11 | Mr. Cespedes, and we would want to proffer for the record that |
| 12 | had the Court not sustained the government's objection, that |
| 13 | Mr. Cespedes would have testified that he was part of a group |
| 14 | that delivered a check in the amount of $500,000 for the |
| 15 | benefit of Mike DeWine at the Republican Governor's |
| 16 | Association, and that a similar size check was delivered for |
| 17 | the benefit of Senate President Larry Obhof; all of these |
| 18 | events took place on the same day, October 10th, that the |
| 19 | check that was delivered for the benefit of Larry Householder |
| 20 | in the amount of $400,000; and that all of these checks were |
| 21 | the subject of discussion between Mr. Cespedes and Mr. Verhoff |
| 22 | and other individuals in advance of this meeting, and it was |
| 23 | all contemplated that they would be ordinary campaign |
| 24 | contributions. |
| 25 | THE COURT:  Very well. |

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1          MR. BRADLEY:  Other than that we are otherwise ready

2    to proceed.

3          THE COURT:  And Mr. Marein is not going to be able

4    to be available today.

5          MR. BRADLEY:  That's correct.  We would ask that he

6    be excused.

7          THE COURT:  Of course.

8          MR. SCHNEIDER:  Your Honor, Mr. Long is going to

9    handle the cross-examination of this witness.

10          THE COURT:  Very well.

11          MR. SCHNEIDER:  Thank you.

12          THE COURT:  Does the government have anything else?

13          MR. SINGER:  The only thing I would mention, Your

14    Honor, is that the government would contest the

15    characterization of any payment as an ordinary campaign

16    contribution.  There is a lot baked into that, and so we would

17    not submit that this witness would testify to that.

18          THE COURT:  Very well.  So proffered.

19       Is the government ready for the jury?

20          MR. SINGER:  Yes, Your Honor.

21          THE COURT:  Mr. Householder's counsel?

22          MR. BRADLEY:  Yes, Judge.

23          THE COURT:  And Mr. Borges'?

24          MR. SCHNEIDER:  Likewise, Your Honor.

25          THE COURT:  Let's call for the jury, please.

1     (Pause.)

2          THE COURTROOM DEPUTY:  All rise for the jury.

3     (Jury entered the courtroom at 9:32 a.m.)

4          THE COURT:  You may all be seated.  Thank you.

5     To the 14 Members of the Jury have rejoined us, good

6     morning.

7          RESPONSE BY ALL:  Good morning.

8          THE COURT:  Happy day after Valentine's Day.  Happy

9     Hump Day.  We appreciate your close attention.

10     If we could call for the witness.  I think someone's gone

11     to do that.

12     Good morning, sir.  If you'd be willing to retake the

13     witness stand.

14     (Witness took the stand.)

15          THE COURT:  Good morning.

16          THE WITNESS:  Good morning.

17          THE COURT:  You remain under oath and you

18     understand?

19          THE WITNESS:  I do.

20          THE COURT:  All right.  I think it's Mr. Borges'

21     counsel's opportunity to examine.

22          MR. LONG:  Yes, Your Honor.  May I approach the

23     podium?

24          THE COURT:  Yes.

25          MR. LONG:  Thank you.

1                          **JUAN CESPEDES**

2     of lawful age, Witness herein, was examined and testified as

3     follows:

4                          **CROSS-EXAMINATION**

5     BY MR. LONG:

6     **Q.**   Good morning.

7     **A.**   Good morning.

8     **Q.**   Sir, I'd like to go back to the October 10, 2018,

9     meeting.  Do you recall that?

10    **A.**   I do, sir.

11    **Q.**   And that was the meeting in which a check for $400,000

12    was given to Mr. Householder, right?

13    **A.**   That is correct, sir.

14    **Q.**   Now, on direct you testified that Mr. Borges was aware of

15    not only that meeting but passing the check and the

16    conversation based on some text messages you had with him,

17    right?

18    **A.**   What I said was he was aware of the information.  I

19    don't believe I said that it was specifically text messages.

20          MR. LONG:  Can we bring up Government's Exhibit

21    291B?  Your Honor, it's already been admitted.

22          THE COURT:  To publish?

23          MR. LONG:  To publish it, yes.

24          THE COURT:  Give us just a moment while the machine

25    warms up.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **Q.**   Do you recognize this exhibit?

2   **A.**   I do.  This is a text message exchange between Matt

3   Borges and myself.

4   **Q.**   And you testified yesterday that "we had a good day

5   yesterday" meant the check was well received.  Do you recall

6   that?

7   **A.**   I do recall this text, correct.

8   **Q.**   Do you recall testifying yesterday that by "good day

9   yesterday," that that meant the check was well received?

10  **A.**   Yes, that is correct.  I misunderstood your first

11  question.

12  **Q.**   Well, you'll agree with me that there is no mention of

13  the check in your text message, correct?

14  **A.**   That's correct.

15  **Q.**   You'll also agree that your message is not just about a

16  meeting with Larry Householder, was it?

17  **A.**   No, it was not.

18  **Q.**   No.  There was a meeting with Obhof and DeWine and

19  Husted, right?

20  **A.**   That is correct.

21  **Q.**   Now, Mr. Bradley asked you about some proffers and prep

22  sessions that you had with the government.  Do you recall

23  that?

24  **A.**   I do, sir.

25  **Q.**   You met with the government on July 27th of 2020, right?

1    **A.**   I believe that to be true, sir.

2    **Q.**   August 19th of 2020, right?

3    **A.**   I assume that is correct, sir.

4    **Q.**   September of 2020?

5    **A.**   That could be true, sir.

6    **Q.**   January 5th, just less than two months ago?

7    **A.**   That is true.

8    **Q.**   That's four, right?

9    **A.**   That is correct.

10   **Q.**   You testified that you had six or seven prep sessions.

11   So after January 5th, when did you have additional prep

12   sessions with the government?

13   **A.**   My prep sessions were approximately between one and two

14   weeks ago in two cases, I believe.  I'd have to refresh my

15   dates, but they were very -- they were leading up to my

16   testimony in trial.

17   **Q.**   So you had two sessions, one to two weeks ago; is that

18   right?

19   **A.**   Two -- two sessions that were in person and one by

20   zoom, sir.

21   **Q.**   So three?

22   **A.**   Yes.

23   **Q.**   So we're at 7 total sessions?

24   **A.**   I believe that's what I said, yes, sir.

25   **Q.**   Well, for each of these meetings, is it fair to say that

1   they wanted you to be complete in what you told them?

2   **A.**    The only requirement of me was to be honest, and,

3   obviously, when you're trying to recall information, in many

4   cases that happened three, four years ago, and when you're

5   looking at as many documents as you have had to look at and

6   I have had to look at, it was obviously helpful and

7   necessary for me to revisit a lot of that information.

8   **Q.**    So you'd agree with me then that your recollection in

9   2020 was probably fresher than it was a week or two ago,

10  right?

11  **A.**    It was very helpful to see the documents.

12  **Q.**    So your recollection was fresher in 2020 than it was a

13  week or two ago, right?

14  **A.**    I would say that's true.

15  **Q.**    Because that's a year or less from the time of these

16  events, right, in some cases?

17  **A.**    That is correct.

18  **Q.**    And now we are 2023, right?

19  **A.**    We are.

20  **Q.**    So when your recollection was fresher in July of 2020,

21  you told Mr. Wetzel about that October 10th meeting, right?

22  Do you recall that?

23  **A.**    I believe that is true, yes.

24  **Q.**    Okay.  And you told him all the details you remembered

25  about that meeting in July of 2020?

1    **A.**    Again, you know, trying to put myself in that

2    particular day a few years ago, my assumption would be that

3    I did.

4    **Q.**    Then in August of 2020, you talked about that meeting

5    again, right?  You probably recalled some additional things?

6    **A.**    That's likely, yes.

7    **Q.**    And again in September of 2020, you talked about that

8    October meeting -- October 10th meeting yet again, right?

9    **A.**    That is possible, yes.

10   **Q.**    Now, the January 5th meeting, did it include Mr. Wetzel

11   as well; Agent Wetzel?

12   **A.**    I do not believe it did.

13   **Q.**    Well --

14   **A.**    Actually -- let me take that back.  It may have.  It

15   may have.

16   **Q.**    You don't recall?

17   **A.**    I believe it -- I believe it did.

18   **Q.**    But you're not certain?

19   **A.**    At this moment, no.

20   **Q.**    And that was six weeks ago, less?

21   **A.**    Approximately.

22   **Q.**    Do you recall that in that January 5th meeting there were

23   a lot of questions about Mr. Borges, right?

24   **A.**    That was a topic of conversation, yes.

25   **Q.**    He was a big topic of your conversation in that meeting,

1   wasn't he?

2   **A.**   That's likely true, yes.

3   **Q.**   Now, in none of those meetings -- July 2020, August 2020,

4   September of 2020, January of 2023 -- did you say -- did you

5   tell the government that Mr. Borges was aware of the $400,000

6   check and the circumstances surrounding it, did you?

7   **A.**   I believe I did.

8   **Q.**   What date?

9   **A.**   It would have taken place on one of those five meetings

10  that you mentioned.

11  **Q.**   So there is no mention of that in any of the 302s, the

12  FBI made a mistake?

13  **A.**   I obviously did not document the meetings.  I was there

14  participating.  Matt and I have had a lot of communication.

15  As you are aware, he was hired in June of that year.  I was

16  trying to get him onboarded in April and May.  He was a

17  member of Dewey Stokes as a consultant so he was working

18  hand in hand with me.  Our conversations are not just

19  limited to texts.  This is someone I saw all the time,

20  either in his office or our athletic club.  So the

21  conversations did take place.  He was very familiar with

22  what was happening on a daily basis.

23  **Q.**   You're talking about April/May of 2019, right?  That's

24  when he was onboarded for --

25  **A.**   He was.

1  **Q.**   -- House Bill 6?

2  **A.**   He would have been onboarded for House Bill 6, I

3  believe -- I believe it would have been '18, but I'd have to

4  look at the dates again.

5  **Q.**   In looking at the 302s, the notes from those proffer

6  sessions help you figure out what day you told the FBI that

7  Matt Borges was aware of the $400,000 check and the

8  circumstances surrounding it?

9  **A.**   Sir, looking at notes that I did, right, is not going

10  to be helpful to me at this time.

11  **Q.**   So you never reviewed Agent Wetzel's 302s in any of the

12  proffer -- the prep sessions for your testimony this week?

13  **A.**   My -- my testimony this week and my review was of

14  documents that I created in most cases, that I participated

15  in, and also my plea deal.

16  **Q.**   In your daily communications with Mr. Borges, right?

17  **A.**   Yes.

18  **Q.**   Calls and texts frequently?

19  **A.**   We did, yes.

20  **Q.**   Matt was your sounding board, wasn't he?

21  **A.**   Very much so.

22       MR. LONG:  Can we bring up Government Exhibit 738?

23       Your Honor, this has already been admitted, and we'd ask

24  that it be published.

25       THE COURT:  Yes.

1    **Q.**    Do you see this document?

2    **A.**    I do, sir.

3            MR. LONG:  PJ, can we bring out the October dates.

4    **Q.**    How many calls did you have with Matt Borges in October

5    of 2018?

6    **A.**    This looks like there were -- I can count -- I'm sorry.

7    That would be two.

8    **Q.**    Two calls between you and Matt Borges in October 2018?

9    **A.**    That's -- am I reading this wrong?  I'm sorry.

10   **Q.**    Well, what is your name?

11   **A.**    Oh, apologize.  I am reading it wrong.  There were no

12   calls at this time.

13   **Q.**    The whole month of October 2018, right?

14   **A.**    That's what it appears.

15           MR. LONG:  PJ, can we bring up the line above

16   September 2018, the lines of September.

17   **Q.**    How many calls did you have with Mr. Borges in September

18   of 2018?

19   **A.**    This particular month, I would have had one call with

20   him.

21   **Q.**    One call?

22   **A.**    Correct.

23           MR. LONG:  You can take that down, please.

24   **Q.**    You testified yesterday that Mr. Kiani was positioning

25   things to eventually sell the company, right?

1   **A.**   I did, yes.

2   **Q.**   And you had discussions with Mr. Kiani about that after

3   the referendum was over but before your arrest in July of

4   2020, right?

5   **A.**   I did.

6   **Q.**   And at that point, FirstEnergy Solutions had become

7   Energy Harbor, right?

8   **A.**   That is correct.

9   **Q.**   And so you learned that there was a plan to sell Energy

10   Harbor and that it may be happening pretty soon, right?

11   **A.**   I did.

12   **Q.**   And that's a year or so or less after the House Bill 6

13   had become law and FirstEnergy Solutions, now Energy Harbor,

14   was getting -- or poised to get this subsidy, right?

15   **A.**   Correct.

16   **Q.**   How do you think that that would be regarded around

17   Capitol Square?

18   **A.**   I did not believe it would be well received.

19   **Q.**   But Energy Harbor, FES, they wanted your help in that

20   regard, right?

21   **A.**   Absolutely.

22   **Q.**   That was a big project they wanted you involved in?

23   **A.**   Yes.

24   **Q.**   They wanted you as their quarterback on Capitol Square,

25   right?

1    **A.**    I had been, yes.

2    **Q.**    They wanted you on that project, right?

3    **A.**    By point of project, you mean continuing to serve as

4    their lead lobbyist and managing the relationship on Cap

5    Square?

6    **Q.**    Regarding the sale of the company.

7    **A.**    Well, obviously, I -- I mean --

8    **Q.**    Let me ask the question a better way.

9    **A.**    Yeah, yeah, yeah, please.

10   **Q.**    Because that may not have been clear.

11        They wanted you during this period where they are

12   preparing to sell the company to be their point person on

13   Capitol Square, right?

14   **A.**    Yes.

15   **Q.**    And after some negotiations, you had agreement to make $3

16   million on that project, right?

17   **A.**    It was not 3 million, but I did have an agreement.

18   **Q.**    Well, it was initially offered at 750,000, right?

19   **A.**    That -- that is correct.

20   **Q.**    And you -- you thought that was too low because you'd

21   burn up too much of your political capital, right?

22   **A.**    That also is correct.

23   **Q.**    And so you upped it to a million and a half, right?

24   **A.**    That's -- that is correct.

25   **Q.**    And they said -- you said 2 million, right?

1   **A.**   I -- I had multiple conversations.  When I upped it to

2   a million and a half, the conversation changed from the

3   executive I was speaking with to his right-hand person.  He

4   basically said that we're going to get this done.  It was

5   open-ended.  But the number did not -- the number was not 3

6   million, but it was in the ballpark.

7   **Q.**   In the ballpark of 3 million?

8   **A.**   Yeah.  I mean, we probably would have settled somewhere

9   around 2.

10  **Q.**   So you didn't tell Agent Wetzel that it was $3 million?

11  **A.**   Well, again, it was a negotiation that had not actually

12  been completed.  It was not documented.  It was not written.

13  It was fluid.  I believe that ultimately, after some

14  negotiation, it would have ended up at 2.  But, you know,

15  for the purpose of this, 2, 3 million, it was a significant

16  amount of money to me.

17  **Q.**   You never told Matt Borges about that, did you?

18  **A.**   I don't remember if we had that conversation.  I

19  believe by that time Matt had been retained by a competitive

20  energy company as a lobbyist, so our communication regarding

21  those issues slowed down a bit.

22  **Q.**   Well, Matt was a -- one of his clients in 2020 was AEP,

23  right?

24  **A.**   Correct.

25  **Q.**   Now, you testified yesterday that you didn't want

1    Mr. Kiani to know about the plan regarding Tyler, right?

2    **A.**   That's correct.

3    **Q.**   Kiani was an aggressive guy, wasn't he?

4    **A.**   He was.

5    **Q.**   You were concerned he'd put a lot of pressure on you if

6    he found out, right?

7    **A.**   Myself and Matt.

8    **Q.**   Kind of guy, he just wouldn't let something go, would he?

9    **A.**   He is very aggressive.

10   **Q.**   And you testified about a text between you and Mr. Kiani.

11           MR. LONG:  Can we bring up, Your Honor, Government's

12   Exhibit 611C?  It's already been admitted, and may we publish?

13           THE COURT:  Yes.

14           MR. LONG:  If we could go to page 2, please.

15   **Q.**   Do you recall this text message?

16           MR. LONG:  If we can blow up the top bubble.

17           THE WITNESS:  I do.

18   **Q.**   Mr. Kiani writes, what happened to black ops.  Did I read

19   that right?

20   **A.**   You did.

21   **Q.**   Now, you testified on direct when Mr. Singer asked you

22   that that was really a reference to Tyler Fehrman and the plan

23   to pay him for private information.  Do you remember that?

24   **A.**   I do remember that.

25   **Q.**   And Mr. Singer said, he'd come back to Tyler in a little

1   bit.  Do you remember that?

2   **A.**   Repeat that, please.

3   **Q.**   And Mr. Singer said he would come back to Tyler in a

4   little bit.  Do you recall that?

5   **A.**   Who is "he"?

6   **Q.**   Mr. Singer.

7   **A.**   Oh, okay.

8   **Q.**   On your direct said we'll come back to Tyler, right?

9   **A.**   That's possible, yes.

10  **Q.**   Okay.  Now, Mr. Kiani did not know about the plan with

11  Tyler until you said Mr. Borges let it slip in a telephone

12  call, right?

13  **A.**   Yeah, it was an accident.

14       MR. LONG:  We can take that exhibit down, please.

15       Your Honor, if we could publish Government's Exhibit

16  623C.  It's already been admitted.

17           THE COURT:  Yes.

18           MR. LONG:  If we could go to page 2, please.

19  **Q.**   What's the date of that text message?

20  **A.**   This date is September 2nd of 2019.

21  **Q.**   And can you please read what you wrote?

22  **A.**   The only danger of telling Kiani today is it means we

23  have to close him.  I think it was absolutely the right call

24  in hindsight.

25  **Q.**   So clearly at that point you had not told Mr. Kiani about

1   Tyler, right?

2   **A.**   It doesn't appear so.

3   **Q.**   You had not told Mr. Kiani at that point, correct?

4   **A.**   It absolutely does not appear so, correct.

5   **Q.**   But you said black ops meant Tyler, in the plan to pay

6   Tyler for information, right?  That's what you testified to,

7   right?

8   **A.**   So black ops, I believe I also testified that it

9   referred to a series of things that we were doing in 17

10  Consulting, including that.  But, yes, black ops absolutely

11  was a reference to Tyler as well.

12  **Q.**   So -- so when Mr. Kiani said black ops, that meant Tyler,

13  right?

14  **A.**   On occasion, yes.

15        MR. LONG:  Your Honor, if we could republish

16  Government's Exhibit 611C, please.

17        THE COURT:  Yes.

18        MR. LONG:  Go to page 2, please.

19  **Q.**   You'd agree with me, that text is August 31, 2019, right?

20  **A.**   That's correct.

21        MR. LONG:  We can take that down, please.

22  **Q.**   Now, regarding Tyler Fehrman, you testified yesterday

23  that you had multiple conversations with Mr. Borges about his

24  conversations with Tyler, right?

25  **A.**   I did.

 1    **Q.**   So you knew that Mr. Borges was talking to Tyler about

 2    his employment contract, right?

 3    **A.**   No.  I knew that Mr. Borges was talking to Tyler about

 4    information we needed.  I was aware that he had referenced

 5    an employment contract.

 6    **Q.**   You were aware of that because Matt actually texted you a

 7    screenshot about, hey, Tyler, send me your employment

 8    contract, right?

 9    **A.**   That is possible.

10    **Q.**   Well, there's a binder on the desk there.  If you could

11    please turn to Exhibit 238.  And if you can go -- it's kind of

12    small.  In the bottom right corner, you will see page numbers.

13    **A.**   I do see them.

14    **Q.**   If you can go to 101 of 192.

15    **A.**   I'm there.

16    **Q.**   Now, take a look at the document in front of you.  Do you

17    recognize this as a series of text messages between you and

18    Mr. Borges?

19    **A.**   I do.

20    **Q.**   And about a third of the way down, there is a screenshot.

21    Do you see that?

22    **A.**   I do.

23    **Q.**   That's kind of small, so if you need to take it out of

24    the binder that's okay.

25         Do you see that in that screenshot it says, "Tyler"?

1   **A.**   I do.

2   **Q.**   Do you see in the gray bubble, just emailed you my

3   contract.  Do you see that?

4   **A.**   I do.

5   **Q.**   Went through it.  Didn't see an NDA.  Do you see that?

6   **A.**   I do.

7   **Q.**   That's a text message you received from Mr. Borges,

8   right?

9   **A.**   It is.

10  **Q.**   So you were aware that Matt had asked Tyler for a copy of

11  his employment contract, right?

12  **A.**   He did ask him for a copy, yes.

13  **Q.**   Do you see where Tyler said he emailed it to him, right?

14  **A.**   Yes.

15  **Q.**   Having multiple conversations with Matt about his

16  conversations with Tyler, you were aware that Matt talked to

17  Tyler about that employment contract, right?

18  **A.**   He did -- he did discuss it.

19  **Q.**   He talked about the noncompete provision of it, right?

20  **A.**   I believe so, yes.

21  **Q.**   And he talked about the nondisclosure agreement provision

22  of it, right?

23  **A.**   I believe so, yes.

24  **Q.**   You said there was absolutely no plan to hire Tyler

25  Fehrman, right?

1    **A.**    There was not.

2            MR. LONG:  Your Honor, if we may publish

3    Government's Exhibit 613D.  It has already been admitted.

4            THE COURT:  Yes.

5            MR. LONG:  If we can scroll to the next page,

6    please.  And the bottom two messages, can you blow those up,

7    please.

8    **Q.**    What's the date of that text message?

9    **A.**    This text message is September 10th of 2019.

10   **Q.**    Can you read what you wrote?

11   **A.**    How are we doing with the employment lawyers?  I'm

12   getting questions there about options.

13           MR. LONG:  You can take that down.

14   **Q.**    You were aware that Matt, Mr. Borges, had a meeting that

15   very day with Tyler Fehrman, didn't you?

16   **A.**    Yes, that's correct.

17   **Q.**    And during that meeting, Matt was talking about options,

18   wasn't he?

19   **A.**    I was not at the meeting, sir.

20   **Q.**    Well, he told you about it, didn't he?

21   **A.**    The options were how do we secure the information that

22   Tyler had that we needed.

23   **Q.**    And the conversation that you say Matt would have told

24   you about, you're aware then that one of the options Matt was

25   talking to Tyler about was hiring him away from his current

1   employer, right?

2   **A.**   That would have not made sense for us.  What we were

3   trying to do was see if we could pull this off in a way

4   which we could not.  So we did go through the exercise of

5   trying to look at his contract, but ultimately, we

6   determined that it was not something that we'd proceed with.

7          MR. LONG:  If we can bring up Government Exhibit

8   622J.

9       Your Honor, it has already been admitted, and we'd ask

10  that it be published.

11         THE COURT:  Yes.

12  **Q.**   So you and Matt came to the conclusion there wasn't a

13  feasible way.  Is that why Matt texted Tyler, let's do a

14  three-month agreement to work on political projects that I

15  need help with?  Is that why you did that?

16         THE COURT:  Excuse me.  Is there an objection?

17         MR. SINGER:  This witness cannot testify why

18  Mr. Borges texted this message to Mr. Clark.

19         THE COURT:  Sustained.  You can take another shot at

20  it.

21  **Q.**   Matt told you that he was going to go a different route,

22  right?

23  **A.**   He did not tell me that.  He -- I read this message as

24  a CYA and not actually what we were trying to accomplish.

25  **Q.**   Well, we can agree that you testified yesterday that you

1    believed it simply didn't work out with Tyler, right?

2    **A.**   We didn't get the information that we were looking for.

3    So it --

4    **Q.**   You never had another conversation with Tyler -- with

5    Matt probably after September 10th about paying Tyler for

6    information, did you?

7    **A.**   At some point, we assumed he was not going to be

8    successful, and we did not revisit that topic, as it was

9    very sensitive.

10   **Q.**   Yesterday, Mr. Bradley --

11             MR. LONG:  We can take that exhibit down, please.

12   **Q.**   Yesterday, Mr. Bradley asked you who funded the

13   referendum effort.  Do you remember that?

14   **A.**   Yes.

15   **Q.**   And you said you didn't know.  You didn't have personal

16   knowledge.  Do you recall that?

17   **A.**   Of who funded the referendum effort?

18   **Q.**   For the opposition that was running the petition effort

19   for the referendum.

20   **A.**   I remember.  Obviously, the assumption was made that

21   oil and gas was opposing us, but I did not know the full

22   complexion of the opposition.

23   **Q.**   Well, do you remember telling Agent Wetzel in September

24   of 2020 that Calpine and Vistra were funding that effort?

25   **A.**   They were two of the many people funding.  As I

1    mentioned, oil and gas were purely our opposition.  It was

2    very obvious as we discussed yesterday.  But the way I

3    answered the question was, the full question, I don't know

4    about everyone.

5    **Q.**   So the complete answer is I don't know everyone but I

6    know Calpine and Vistra, right?

7    **A.**   Correct.

8    **Q.**   But you didn't say that on -- when you were answering

9    Mr. Bradley's question, did you?

10   **A.**   I answered a lot of questions yesterday as honestly as

11   I could, sir.  And I don't remember exactly what my answer

12   was.

13   **Q.**   Well, you didn't volunteer the names Calpine and Vistra

14   when he asked you that question, did you?

15   **A.**   I don't remember saying Calpine and Vistra yesterday.

16   **Q.**   Well, what is Calpine?

17   **A.**   Calpine is an energy company based in Houston, Texas.

18   **Q.**   And what is Vistra?

19   **A.**   Vistra is -- I'm not -- I'm not quite sure where they

20   are headquartered or what they do, but they -- but they also

21   are somewhere in the energy space.

22   **Q.**   Now, you testified pretty extensively yesterday -- maybe

23   the day before -- about your interactions with Pat Tully.

24   **A.**   Yes.

25   **Q.**   That had to do with drafts and edits to what would be

1   introduced as House Bill 6, right?

2   **A.**   That is correct, sir.

3   **Q.**   And you testified that when you saw that draft

4   legislation, it was a surprise, right?

5   **A.**   The -- the initial -- the initial draft of the

6   legislation was something different than we assumed it would

7   be, correct.

8   **Q.**   Wasn't it -- it was unlike anything you were expecting,

9   right?

10   **A.**   Initially, that's correct.

11   **Q.**   It's complex?

12   **A.**   It was very complex.

13   **Q.**   Now, remind us who Pat Tully is at the time.

14   **A.**   Pat Tully is the energy policy director for the Speaker

15   of the House.

16   **Q.**   He's a staffer?

17   **A.**   Correct.

18   **Q.**   And you said that you and Mr. Tully were exchanging paper

19   copies, right?

20   **A.**   We were.

21   **Q.**   And you were really concerned about being seen with

22   drafts of that proposed potential legislation, right?

23   **A.**   I did not want anyone to see it in my possession,

24   correct.

25   **Q.**   And you had a dozen times back and forth with Mr. Tully,

1    right?

2    **A.**    Yes, I would say that.

3    **Q.**    But Pat Tully wasn't the only one working on drafting

4    that legislation, was he?

5    **A.**    There's many people involved in that process.

6    **Q.**    Sam Randazzo was very involved in drafting that

7    legislation, wasn't he?

8    **A.**    I don't have firsthand knowledge of what exactly Sam

9    Randazzo did as it relates to drafting the legislation.  But

10   my assumption is that he had participated in some degree.

11   **Q.**    In July of 2020, didn't you tell Agent Wetzel that

12   Randazzo already had a plan for the legislation?

13   **A.**    What I -- what I told him is that we had had a meeting

14   where Mr. Randazzo laid out ideas that later appeared in

15   legislation, which is why I said I assume.

16   **Q.**    You told Agent Wetzel that Randazzo shepherded Mr. Tully

17   through the process of drafting the legislation, right?

18   **A.**    I -- I don't remember saying that.  But, again, Sam

19   Randazzo at the time was the director of public utilities,

20   and I assume that he did have a role in drafting the

21   legislation, yes.

22   **Q.**    You didn't tell Agent Wetzel that those were just

23   assumptions, though, did you?  You told him that that's what

24   Sam Randazzo did, right?

25   **A.**    My assumption is that that is exactly what happened.

1    **Q.**   You had every opportunity to tell this jury about who all

2    was involved in drafting that legislation, didn't you?

3    **A.**   Well, sir, the Legislative Services Commission was

4    involved, my members of my company were involved.  I don't

5    know if I was asked to describe everyone involved, but the

6    answer is yes.  But I don't remember it coming up.

7    **Q.**   But it was important enough to mention Sam Randazzo when

8    you were meeting with the government in your proffer sessions,

9    wasn't it?

10   **A.**   I don't remember how his name came up, whether it was

11   something I volunteered or if it was a piece of information

12   that I looked at.  But it obviously did.

13   **Q.**   But in your testimony, you just laid it all at the feet

14   of Pat Tully, the staffer, right?

15           MR. SINGER:  Objection.  Can we approach on the

16   side, sidebar, Your Honor?

17           THE COURT:  Yes.

18           MR. LONG:  Your Honor, I can just move on?

19           THE COURT:  Sorry.  You can't come up.  He's going

20   to move on.  Does that vacate your need to chat?

21           MR. SINGER:  Your Honor, we move to strike then.

22           THE COURT:  Stricken.

23   **Q.**   Sir, you'd agree, there is only one truth in these

24   matters, right?

25   **A.**   That's what I said yesterday, yes.

 1          MR. LONG:  Your Honor, I have no further questions

 2   for this witness.

 3          THE COURT:  Very well.  Does the government have

 4   redirect?

 5          MR. SINGER:  Yes, briefly, Your Honor.

 6          THE COURT:  Very well.

 7                  **REDIRECT EXAMINATION**

 8   BY MR. SINGER:

 9   **Q.**   Good morning.

10   **A.**   Good morning.

11   **Q.**   You were just asked some questions about the legislation

12   that was proposed in the spring of 2019.  Do you recall that?

13   **A.**   Yes.

14   **Q.**   That's House Bill 6, right?

15   **A.**   It is.

16   **Q.**   And can you describe whether or not you were happy with

17   the legislation that was passed?

18   **A.**   I was happy with the legislation that was passed.

19   **Q.**   And why is that?

20   **A.**   Because it succeeded in achieving our goals, which was

21   giving up nuclear subsidies that we needed to continue to

22   operate the power plants.

23   **Q.**   You were asked some questions about black ops.  Do you

24   recall that?

25   **A.**   Black ops, I do.

1    Q.    Can you explain the conversations you had with John Kiani

2    relating to black ops?

3    A.    Yes.  We had multiple conversations.  Black ops

4    obviously is short for black operations.  They were things

5    that we were doing as part of 17 Consulting, which were a

6    number of -- of things that were not Generation Now's

7    responsibility.  They were of Matt Borges and myself.  They

8    included the private investigators I discussed and they

9    included attempting to bribe Tyler Fehrman.  So black ops

10   was in reference to multiple things that were happening,

11   although at different points in the conversations I knew

12   what he was talking about because of what was happening in

13   that moment.

14   Q.    Moving to some questions that I received from yesterday.

15   Do you recall you were shown a whip list that was attached to

16   a November 2019 email?  Do you remember that?

17   A.    I do, yes.

18         MR. SINGER:  Your Honor, permission to publish

19   what's been previously admitted as Householder Exhibit 211?

20         THE COURT:  Yes.

21   Q.    Do you recognize this from yesterday?

22   A.    It's not up on my screen yet, but I am aware of what

23   you are discussing.

24         Yes, I'm familiar.

25   Q.    Do you remember yesterday about this document?

1          Now, did you create this list?

2     **A.**    I did not.

3     **Q.**    Did you manage this list?

4     **A.**    I did not manage the list, no.

5     **Q.**    And did you know whether whoever maintained this list had

6     all the information you had about Mr. Householder's position

7     with regards to legislation?

8     **A.**    They did not.  This was managed by someone outside of

9     my firm.

10         MR. SINGER:  May we please publish what's been

11    previously admitted as Government's Exhibit 322E?

12         THE COURT:  Yes.

13    **Q.**    Do you see this document?

14    **A.**    I do.

15    **Q.**    Do you recall discussing this document a couple days ago?

16    **A.**    I do.

17    **Q.**    And what is it?

18    **A.**    This is a -- it is a whip list.  It's a -- it's a

19    sample whip list based on a conversation that I had with the

20    FirstEnergy parent company employee.

21    **Q.**    And who created it?

22    **A.**    This was actually created by myself and Ty Pine.

23    **Q.**    And if you'd go to the third column, what does that

24    represent?

25    **A.**    The third column is the whip number, 1 to 5, 1 meaning,

1    a sure yes and 5 meaning very against.

2            MR. SINGER:  Can you turn to page 2, please.

3    **Q.**   Do you see Larry Householder about two-thirds of the way

4    down the page?

5    **A.**   I do.  He's rep No. 27.

6    **Q.**   And what's the whip number next to Mr. Householder?

7    **A.**   There is no information next to Mr. Householder.

8    **Q.**   And why is that?

9    **A.**   Because it wasn't -- it wasn't even necessary to put

10   down.  We knew that he was a champion of our issue.  We knew

11   that he was going to lead legislation if he was elected

12   Speaker and there was really no conversation or lobbying

13   necessary there.

14   **Q.**   And this is a document you created?

15   **A.**   Yes, correct.

16   **Q.**   Can you explain whether you've had any doubts as to

17   whether Mr. Householder would push for the nuclear ballot

18   legislation as Speaker following the October 10, 2019 meeting?

19   **A.**   I had no doubt.

20   **Q.**   You were asked about the legislative timeline from late

21   2018 that you created.  Do you recall that?

22   **A.**   I was.

23           MR. SINGER:  May we please publish what's been

24   previously admitted as Government's Exhibit 322C?

25           THE COURT:  Yes.

1    **Q.**    Focusing on the fifth bullet down under Speaker's race

2    clarity mid-December, but not guaranteed.  Do you see that?

3    **A.**    Correct.

4    **Q.**    Why did you write, if Householder's successful, the

5    effort will likely be led from his chamber?

6    **A.**    Because I knew that he would introduce legislation, and

7    I knew that that would be the chamber that our legislation

8    would come out of.

9    **Q.**    In the next sentence, there's a reference to his votes.

10   What did that refer to?

11   **A.**    It referred to the candidates that were running for

12   election who were Team Householder who he controlled.

13   **Q.**    And can you explain whether you believe Mr. Householder

14   would have the same ability to secure his votes if he was not

15   the Speaker?

16   **A.**    That was uncertain, but he did still have a significant

17   hold and tight relations with those people.

18   **Q.**    Would it be the same if he was Speaker versus if he was

19   not Speaker?

20   **A.**    No.  If you're not Speaker, you don't have obviously as

21   much influence over members.

22   **Q.**    You were asked about FirstEnergy Solutions continuing

23   lobby activities at your direction even after you paid

24   Mr. Householder the $500,000 in checks.  Do you recall that?

25   **A.**    Yes.

1    **Q.**   And can you explain to the jury again what government

2    bodies are necessary to pass legislation in Ohio?

3    **A.**   In Ohio, the Ohio House, the Ohio Senate, and then a

4    signature from the governor is what's necessary.

5    **Q.**   So if you had support of the Speaker and all 20 or so of

6    his team, could you get legislation to pass fast based on that

7    alone?

8    **A.**   No.

9    **Q.**   If you had 100 percent of all the members of the House of

10   Representatives, could you pass legislation based on that

11   alone?

12   **A.**   No.

13   **Q.**   And can you explain how this impacted your strategy?

14   **A.**   Well, it caused me to hire consultants that specialized

15   in other areas outside the House, which we felt we had

16   strong control of.

17   **Q.**   You were asked yesterday about daily calls that you had

18   with consultants and individuals from companies like

19   FieldWorks and Lincoln Strategy Group who were involved in the

20   referendum campaign.  Do you recall that?

21   **A.**   Correct.

22   **Q.**   Now, were any of these representatives included in the

23   July 29, 2019, call that you had with Mr. Kiani and

24   Mr. Householder?

25   **A.**   No.

1    **Q.**   Did you discuss with those individuals the money that

2    FirstEnergy Solutions was paying to Householder through

3    Generation Now?

4    **A.**   No.

5    **Q.**   Did you discuss with these individuals your conversations

6    with Mr. Householder about passing additional legislation if

7    the number of signatures was attained?

8    **A.**   No.

9    **Q.**   Who did you discuss those things with?

10   **A.**   Those things were discussed with Speaker Householder,

11   myself, Mr. Kiani, and our executive leadership.

12   **Q.**   Did you discuss these things with Mr. Borges?

13   **A.**   Mr. Borges was aware of those things as well, correct.

14          MR. SINGER:  No further questions, Your Honor.

15          THE COURT:  Very well.

16          MR. BRADLEY:  One moment, Your Honor.

17          THE COURT:  I didn't hear you.  I'm sorry.

18          MR. BRADLEY:  Just one moment to confer.

19          THE COURT:  Very well.

20          MR. BRADLEY:  I have no questions, Your Honor.

21   Thank you.

22          THE COURT:  Very well.  Mr. Long?

23          MR. LONG:  No questions, Your Honor.  Thank you.

24          THE COURT:  Sir, you have completed your testimony,

25   and you are free to go.

 1            THE WITNESS:  Thank you, sir.

 2            THE COURT:  Very well.  Where do we stand from the

 3    government's perspective?

 4            MS. GAFFNEY-PAINTER:  Your Honor, we are prepared to

 5    call our next witness.

 6            THE COURT:  Who do you call?

 7            MS. GAFFNEY-PAINTER:  The government calls Special

 8    Agent Nathan Holbrook.

 9        Your Honor, excuse me for interrupting.  One housekeeping

10    matter.  For this next witness we anticipating asking the

11    Court's permission to allow the jury to look at transcripts

12    from their transcript binder.  So we'd request the Court's

13    permission to distribute those binders prior to the

14    commencement of this agent's testimony.

15            THE COURT:  Any objection?

16            MR. GLICKMAN:  No objection.

17            MR. SCHNEIDER:  No, Your Honor.

18            THE COURT:  So act.

19            MS. GAFFNEY-PAINTER:  Thank you.

20        Apologies, Your Honor.  They already have the binders.

21            THE COURT:  Very well.  If the agent would be

22    willing to approach the witness stand.  If you'd be willing to

23    pause where you are and raise your right hand to tell the

24    truth.

25            THE COURTROOM DEPUTY:  You do solemnly swear or

1    affirm that the testimony you are about to give in this case

2    will be the truth, the whole truth, and nothing but the truth.

3    This you do affirm under the pains and penalties of perjury?

4              THE WITNESS:  I do.

5              THE COURT:  You can take the stand.  I tell

6    everybody in the spirit of full disclosure that seat tips

7    back.

8              THE WITNESS:  Thank you, Judge.

9              THE COURT:  You need to get close to that very fancy

10   federal microphone.

11       When you are ready, the government may begin to inquire.

12             MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

13             THE COURT:  Yes.

14                       **NATHAN HOLBROOK,**

15   of lawful age, Witness herein, was examined and testified as

16   follows:

17                    **DIRECT EXAMINATION**

18   BY MS. GAFFNEY-PAINTER:

19   **Q.**   Good morning.

20   **A.**   Good morning, counselor.

21   **Q.**   Would you please state and spell your name for the

22   record.

23   **A.**   My name is Nathan Holbrook, N-A-T-H-A-N

24   H-O-L-B-R-O-O-K.

25   **Q.**   Special Agent Holbrook, where do you work?

1    **A.**    I worked for the Federal Bureau of Investigation.

2    **Q.**    Generally speaking, what are your responsibilities as a

3    special agent?

4    **A.**    My responsibilities as a special agent is to run

5    investigations, specifically investigations involving public

6    corruption.

7    **Q.**    How long have you worked as a special agent with the FBI?

8    **A.**    12 years this month.

9    **Q.**    Again, just generally, what training and education did

10   you complete in order to become an FBI agent?

11   **A.**    Prior to going to the FBI Academy, I obtained a

12   bachelor of science.  After that, I obtained a master of

13   business administration.  Applied to the FBI, was accepted,

14   went to the FBI Academy, which was around 20-some weeks

15   where, you know, we learned various investigative techniques

16   and how to do the job of an agent.

17         Graduated at the FBI Academy in July 6 of 2011, and was

18   assigned to my first duty station.

19   **Q.**    What division are you assigned to currently?

20   **A.**    The Cincinnati Division.

21   **Q.**    And within the Cincinnati Division, do you have an area

22   of focus?

23   **A.**    Yes.

24   **Q.**    What is that area of focus?

25   **A.**    Public corruption.

1    **Q.**    When did you begin working in public corruption?

2    **A.**    I begin working in public corruption in the summer of

3    2011 when I was assigned to a public corruption task force.

4    **Q.**    What is public corruption as it's understood within the

5    FBI?

6    **A.**    Public corruption occurs when a public official abuses

7    their office or their position for personal private gain.

8    **Q.**    And when did you start in the Cincinnati Division of the

9    FBI?

10   **A.**    I was -- I transferred to the Cincinnati Division in

11   January of 2018.

12   **Q.**    And when you started in the division in January of 2018,

13   were you presented at that time with evidence involving an

14   individual known as Neil Clark?

15   **A.**    Yes, I was.

16   **Q.**    What was that evidence?

17   **A.**    That evidence consisted of recorded telephone calls

18   that was captured by the FBI, the Title III wire intercept

19   Court order.

20   **Q.**    What did you do in response to that evidence that you

21   received?

22   **A.**    So I reviewed that evidence and along with other

23   information that was known to me, I opened an investigation.

24   **Q.**    Now, back in 2018, did you have open public corruption

25   investigations into a number of individuals in Ohio?

1    **A.**    Yes.

2    **Q.**    Were you the case agent for those investigations?

3    **A.**    I was.

4    **Q.**    What's a case agent?

5    **A.**    A case agent is, think of as the director or the

6    quarterback of the investigation.  They decide on the

7    direction, the focus of the investigation, what type of

8    investigative techniques will be utilized and how they will

9    be utilized.  They are responsible for securing the

10   appropriate resources and to ensure that those resources are

11   deployed efficiently.  And they are also responsible for

12   communicating with interested third parties, supervisors,

13   FBI headquarters, the United States Attorney's Office.

14   **Q.**    Now, as part of your investigations, did you utilize

15   undercover agents?

16   **A.**    Yes.

17   **Q.**    What are undercover agents generally?

18   **A.**    Undercover agents in the context -- well, in the

19   context of this investigation are FBI agents who -- whose

20   identity and relationship with the FBI is concealed from

21   third parties during the course of the investigation.  And

22   that concealment of their identity is done by a cover and a

23   false alias, and that is done for an official purpose, such

24   as collecting information or evidence.

25   **Q.**    What is the investigative value of using undercover

1    agents in public corruption investigations?

2    **A.**    Public corruption investigations are some of the more

3    complicated investigations that the FBI conducts.  They are

4    typically multiyear investigations that are nuanced that

5    involve multiple sophisticated subjects utilizing various

6    communication channels and money transfer systems, and it

7    really weaves a very complicated web of corruption.

8         The undercover agent using a undercover operation, they

9    are able to penetrate that, that web of corruption.  And by

10   doing so they can have direct interaction with the subjects

11   and begin to unravel that web from the inside out.

12   **Q.**    What is the responsibilities of the case agent with

13   regards to undercover agents working in that case agent's

14   investigations?

15   **A.**    The responsibility of the case agent is running an

16   undercover operation, primarily is to direct the -- direct

17   the undercover operation and the focus of the undercover

18   agents, to make sure that the undercovers have the

19   appropriate backstopping, the appropriate resources to

20   assume their legend.

21        They are also responsible for briefing the undercover

22   agents on information that's necessary for them to portray

23   the role that they are portraying in the investigation.

24   **Q.**    Who were the undercover agents you used in your

25   investigation using their undercover names?

1    **A.**   We referred to them as UC Brian, UC Rob, and UC Vinny.

2    **Q.**   And just so there is no confusion when you say "UC," what

3    are you referring to?

4    **A.**   Undercover.  I may refer to them sometimes as just Rob,

5    Brian, or Vinny.

6    **Q.**   Now, what persona was UC Brian in this investigation?

7    **A.**   UC Brian was an individual, a wealthy individual who

8    owned a green energy company, and he is also part of a

9    investment group along with Rob.

10   **Q.**   What persona was UC Rob in this investigation?

11   **A.**   Rob's persona was also a -- an investor in commercial

12   real estate, and he played the role of kind of the tip of

13   the spear of the investment group, and he was partners in

14   the group with Brian.

15   **Q.**   You mentioned real estate investment.  Was there a

16   specific project that UC Brian and UC Rob were representing

17   they were a part of at that time?

18   **A.**   Yes, there was.  They were representing to be investors

19   in a project that was going to take place in downtown

20   Cincinnati, and that project was -- was a hotel located on

21   435 Elm Street.  It was going to be approximately a 160-key

22   hotel with some apartments as well some mixed use offices,

23   retail space.

24   **Q.**   And what persona was UC Vinny during this investigation?

25   **A.**   UC Vinny played the role of kind of like Brian and

1    Rob's boss.  He also played the role of an investor into

2    sports gaming and he had a sketchy background more or less.

3    **Q.**   Did there come a time in your investigation where you

4    tasked the undercover agents to meet Neil Clark?

5    **A.**   Yes.

6    **Q.**   Now, what relationship did the undercover agents seek

7    from Neil Clark?

8    **A.**   The relationship was a professional relationship as

9    Neil Clark acting as their lobbyist on behalf of their

10   interests.

11   **Q.**   And what services did Mr. Clark offer the undercover

12   agents?

13   **A.**   He acted as their lobbyist to represent them in

14   advancing their interest in sports gaming legislation.

15   **Q.**   Did the undercover agents pay Mr. Clark for that lobbying

16   activity?

17   **A.**   Yes.

18   **Q.**   Now, at the time that the undercover agents were working

19   with Mr. Clark, what was the legislation that they represented

20   they were concerned about?

21   **A.**   They were concerned about sports gaming legislation in

22   the state of Ohio.  Roughly in approximately --

23   approximately May of 2018, the Supreme Court made a ruling

24   which gave each state the ability to legislate sports,

25   sports gambling.  I understood at that time that the Ohio

1   general assembly was open to legalizing sports gaming in the

2   state and that there were bills already -- rough drafted

3   bills already in the general assembly.

4   **Q.**   And, again, generally speaking, what was that legislation

5   going to accomplish if it were successful?

6   **A.**   It would allow the UCs, Rob, Ron and Vinny, to put a

7   sports book into their hotel.

8            MS. GAFFNEY-PAINTER:  Your Honor, may I retrieve a

9   thumb drive from Ms. Terry and then approach the witness?

10           THE COURT:  Yes.

11           MS. GAFFNEY-PAINTER:  Thank you.

12  **Q.**   Special Agent Holbrook, I have placed in front of you a

13  thumb drive inside of an envelope, and contained on this thumb

14  drive are the following exhibits marked for identification:

15  Government Exhibit 521A, Government Exhibit 522A, Government

16  Exhibit 523A, Government Exhibit 524A, Government Exhibit

17  525A, Government Exhibit 526A, Government Exhibit 527A,

18  Government Exhibit 528A, Government Exhibit 529A, Government

19  Exhibit 530A, Government Exhibit 531A, Government Exhibit

20  532A, Government Exhibit 533A, Government Exhibit 534A,

21  Government Exhibit 535A, Government Exhibit 536A, Government's

22  Exhibit 537A, and Government Exhibit 538A.

23       Now, prior to your testimony here today, did you review

24  that thumb drive and those recordings?

25  **A.**   I did.

1   **Q.**   How do you know that the drive in front of you is the

2   drive that you reviewed?

3   **A.**   It has a red tag, and on that red tag I placed my

4   initials.

5   **Q.**   Generally speaking, what are the recordings that are

6   contained on that thumb drive?

7   **A.**   They are recordings of conversations via telephone and

8   in-person meetings between the undercovers referenced and

9   Mr. Clark.

10          MS. GAFFNEY-PAINTER:  Your Honor, at this time the

11  government moves for the admission of Government Exhibit 521A,

12  Government Exhibit 522A, Government Exhibit 523A, Government

13  Exhibit 524A, Government Exhibit 525A, Government Exhibit

14  526A, Government Exhibit 527A, Government Exhibit 528A,

15  Government Exhibit 529A, Government Exhibit 530A, Government

16  Exhibit 531A, Government Exhibit 532A, Government Exhibit

17  533A, Government Exhibit 534A, Government Exhibit 535A,

18  Government Exhibit 536A, Government Exhibit 537A, and

19  Government Exhibit 538A.

20          THE COURT:  These are recordings?

21          MS. GAFFNEY-PAINTER:  These are recordings.

22          THE COURT:  Any objections?

23          MR. GLICKMAN:  Judge, these recordings were subject

24  of pretrial practice between the parties.  As long as the

25  objections that were raised in that practice are preserved, we

1    have no further objections.

2            THE COURT:  They are preserved.

3            MR. SCHNEIDER:  No objection here.

4            THE COURT:  Very well.  They are admitted.

5    **Q.**   Special Agent Holbrook, are some of the recordings that

6    we just admitted into evidence from in-person meetings between

7    the undercover agents and Mr. Clark?

8    **A.**   Yes.

9    **Q.**   Now, describe for us operationally how such recordings

10   are made of in-person meetings?

11   **A.**   So when conducting recordings of in-person meetings

12   with the subjects could be -- individuals you are trying to

13   obtain information from, there is several variables that you

14   need to look at -- the location, how loud the location's

15   going to be, the context of investigation, is it public

16   corruption, is it something that's more of a gang related,

17   and get an understanding of what device is going to be most

18   efficient for that situation.

19           In this case, we used an audio recording device.  It

20   was small, surreptitious.  It can be hidden, and it is in

21   the control of the undercovers during their recordings --

22   the in-person recordings.

23   **Q.**   Directing your attention now to January 29, 2019, was

24   there an in-person meeting that day between UC Rob, UC Brian,

25   and Neil Clark?

1    **A.**   Yes, there was.

2    **Q.**   Where was that meeting held?

3    **A.**   It was a restaurant.

4    **Q.**   Was that meeting recorded?

5    **A.**   It was.

6              MS. GAFFNEY-PAINTER:  Your Honor, we may please have

7    permission to publish what's been admitted as Government's

8    Exhibit 521A?

9              THE COURT:  Yes.

10             MS. GAFFNEY-PAINTER:  Before we begin the

11   publication, we would request the Court's permission to allow

12   the jury to follow along a transcript that has been marked for

13   identification as Government's Exhibit 521B.

14             THE COURT:  Any objection?

15             MR. GLICKMAN:  No objection.

16             THE COURT:  Very well.  So the transcript is what?

17             MS. GAFFNEY-PAINTER:  521B, as in "boy."

18        Before we begin the publication, I would also like to

19   note for the record that we are publishing the following

20   segment:  It is the segment time stamped from 1 hour, 32

21   minutes, and 10 seconds to 1 hour, 39 minutes, and 56 seconds.

22             THE COURT:  Very well.

23        (Recording playing.)

24   **Q.**   Special Agent Holbrook, there was a reference in that

25   recording to Brian Bennett.  Who is that?

1    **A.**    That's UC Brian.

2    **Q.**    There was also a reference in that recording to three

3    (c)(4)s.  Which politicians were mentioned there?

4    **A.**    Clark mentioned Governor DeWine, he mentioned the

5    Speaker, which I believe was Mr. Householder at the time,

6    and he mentioned Matt Huffman.

7    **Q.**    Now, when you heard this recording and heard these

8    references, what did you do next?

9    **A.**    The next step in that investigation was I contacted

10   Agent Wetzel and we coordinated from that point.

11   **Q.**    Did you coordinate with Special Agent Wetzel in the

12   Columbus office throughout your participation in this

13   investigation?

14   **A.**    Yes.

15   **Q.**    What did you view as your role in regards to the Columbus

16   investigations?

17   **A.**    My role in this investigation was to run the undercover

18   operation.  Basically what UC Brian, what UC Rob and what UC

19   Vinny were involved in, that's what I was involved with.

20   And based upon what I was learning from Agent Wetzel

21   regarding Neil Clark's relationship and information

22   surrounding Neil Clark, that's what allowed me to direct the

23   undercovers.  So in terms of the rest of the investigation,

24   I had -- I didn't have a big play in all that, but the

25   undercover I did.

1    **Q.**   At the time you were directing the undercover agents,

2    were they also participating in other public corruption

3    investigations at that time?

4    **A.**   Yes, they were.

5            MS. GAFFNEY-PAINTER:  Your Honor, looking at the

6    clock I see we are close to break time.  So before I enter a

7    new subject, is this a good time for a break?

8            THE COURT:  Yes, ma'am.

9        We have reached our midmorning break.  Members of the

10   Jury, I want you to take a break.  I want you to and order you

11   to not discuss the case among yourselves yet or with anyone

12   else for that matter.  No independent research.  Don't check

13   out the media.  Continue to keep an open mind until you've

14   heard all the evidence.

15       Out of respect for you, we will rise as you leave for 20

16   minutes, and see you at 11:05.

17           THE COURTROOM DEPUTY:  All rise for the jury.

18       (Jury exited the courtroom at 10:43 a.m.)

19           THE COURT:  Jury's left the room.  The door is

20   closing.  We remain on the record and, as always, we'll wait

21   to be advised that the jurors have cleared the hallway,

22   cleared the floor before we break.

23       Counsel, I want to talk to you about tomorrow.  One of

24   the jurors has a personal obligation tomorrow afternoon that

25   cannot be missed.  The juror asked if the Court would be

1    willing to research -- recess early to allow the juror to

2    attend.  The jurors have all consulted and they are willing to

3    forego a full lunch tomorrow in order to preserve and allow

4    the juror to go to the event while also losing as little trial

5    time as possible.

6         So tomorrow the Court intends to proceed as follows:

7    9:30 to 10:45 a.m., testimony; 10:45 to 11:05 20-minute

8    recess; 11:05 to 12:20 p.m., testimony; 12:20 p.m. till 12:45

9    p.m., 25-minute recess; 12:45 to 2 p.m., testimony; and at 2,

10   we will recess for the day.

11        So have a big breakfast and have a good break today until

12   11:05.

13        And the witness is not to discuss his testimony during

14   the break.

15             THE COURTROOM DEPUTY:  All rise.  Court is in

16   recess.

17        (Recess was taken from 10:45 a.m. until 11:06 a.m.)

18             THE COURT:  Are we ready for the jury from the

19   government's perspective?

20             MS. GAFFNEY-PAINTER:  Yes, Your Honor.

21             THE COURT:  Mr. Householder's?

22             MR. GLICKMAN:  Yes, Judge.

23             THE COURT:  Mr. Borges'?

24             MR. SCHNEIDER:  Yes, Judge.

25             THE COURT:  Very well.  Let's call for the jury.

1           (Pause.)

2                 THE COURTROOM DEPUTY:  All rise for the jury.

3           (Jury entered the courtroom at 11:10 a.m.)

4                 THE COURT:  You may all be seated.  Thank you.

5           They are back.  They didn't even need to be told that you

6     could be seated as you come in.  So you're on task and paying

7     attention, and the Court and community and everybody in the

8     room are grateful for your work.  We're going to continue to

9     hear testimony.

10          Ms. Painter, you may proceed when you're ready.

11                MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

12                THE COURT:  Very well.

13    **Q.**   Special Agent Holbrook, directing your attention to May

14    1, 2019, was there an in-person meeting between UC Brian and

15    Neil Clark?

16    **A.**   There was.

17    **Q.**   Where was that meeting held?

18    **A.**   This also occurred at a restaurant.

19    **Q.**   Was that meeting recorded?

20    **A.**   It was.

21                MS. GAFFNEY-PAINTER:  Your Honor, may we please

22    publish what's been admitted as Government Exhibit 522A?

23                THE COURT:  Yes.

24                MS. GAFFNEY-PAINTER:  And with the Court's

25    permission, allow the jury to follow along with the transcript

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    that has been marked for identification as Government Exhibit

2    522B?

3              THE COURT:  Yes.

4              MS. GAFFNEY-PAINTER:  Before the publication of this

5    recording, I will just note for the record we are publishing

6    the following segment, marked at 1 hour, 3 minutes, and 50

7    seconds, to 1 hour, 5 minutes and 35 seconds.

8              THE COURT:  Very well.  And it's 522B?

9              MS. GAFFNEY-PAINTER:  Yes.

10             THE COURT:  Thank you.

11        (Recording playing.)

12   **Q.**   Special Agent Holbrook, there was a reference in that

13   recording to registering pretty soon.  Based on your

14   participation in the investigation and your training and

15   experience, what do you understand "registering pretty soon"

16   to be in reference to?

17   **A.**   To publicly disclosing Clark's relationship with UC

18   Brian as a lobbyist.

19   **Q.**   When listening to recordings of in-person meetings, I

20   want to ask you operationally when there are in-person

21   meetings, are the undercovers in control of the recording

22   devices?

23   **A.**   Yes, they are.

24   **Q.**   Does that control include turning it on and off

25   throughout the meeting?

1    **A.**   They can, but they don't, particularly in this

2    investigation.  Once the recording device was started, it

3    remained operational until they deactivated it at the end of

4    the operation.  So the recording device ran the entire time.

5    To start it and stop it would be -- wouldn't be -- it could

6    be seen.  It could blow their cover if they are trying to

7    handle a recording device during meetings with subjects and

8    other individuals.

9    **Q.**   For the recordings of in-person meetings that we have

10   admitted into evidence, is it the whole recording or just the

11   portions that we are publishing here today?

12   **A.**   I'm sorry.  Could you repeat that?

13   **Q.**   For the recordings of in-person meetings that we have

14   admitted into evidence here today, is the entire recording in

15   evidence or just the portion that we've been publishing to the

16   jury?

17   **A.**   I believe it's the -- what's just been published to the

18   jury.

19   **Q.**   Could you describe for us operationally how phone calls

20   are recorded in comparison to how in-person meetings are

21   recorded?

22   **A.**   There are multiple different ways we can record

23   telephone calls.  In this -- in this scenario, the telephone

24   call's recorded via a consensual Title III intercept.  So

25   the undercover's consent to have their -- all the telephone

1    calls on the number that they are utilizing to be recorded.

2    **Q.**   Turning your attention now to May 31, 2019.  Was there a

3    call between Neil Clark and UC Brian on that day?

4    **A.**   Yes.

5            MS. GAFFNEY-PAINTER:  Your Honor, may we please have

6    permission to publish what's been admitted as Government

7    Exhibit 535A and allow the jury to follow along with what's

8    been marked for identification as Government Exhibit 523B?

9            THE COURT:  Yes.

10       (Recording playing.)

11           THE WITNESS:  Counselor, may I take a moment to

12   correct a previous answer I gave?

13   **Q.**   Of course.

14   **A.**   You had asked me if the recordings are in their

15   entirety going back to the jury.  The recordings in their

16   entirety are going back to the jury.  It's the transcripts

17   that are partial.  I wanted to clear that up.

18   **Q.**   Thank you.

19       Special Agent Holbrook, at the time that this case that

20   we just listened to was recorded, who was the Speaker of the

21   House?

22   **A.**   Mr. Householder.

23   **Q.**   There was reference in that call to casino and lottery.

24   Just generally, what does that refer to with regards to the

25   legislation that the undercover agents were interested in?

1    **A.**    So the legislation was -- was being discussed.  Nothing

2    was decided.  And ultimately, during this investigation, the

3    gambling was going to be controlled by one of two entities.

4    One of the entities was going to be the casino commission,

5    the other was going to be the lottery.

6         The undercover agents wanted it to be controlled by the

7    lottery because that would allow them to then put a sports

8    book in the hotel that they were invested in in downtown

9    Cincinnati.

10   **Q.**    Directing your attention now to June 6, 2019, was there

11   an in-person meeting between UC Brian and Neil Clark?

12   **A.**    Yes, there was.

13   **Q.**    Where was that meeting held?

14   **A.**    This occurred at a restaurant.

15   **Q.**    Was it recorded?

16   **A.**    It was.

17            MS. GAFFNEY-PAINTER:  Your Honor, may we please have

18   permission to publish what's been admitted as Government

19   Exhibits 524A and allow the jury to follow along with what's

20   been marked with -- for identification as Government Exhibit

21   524B?

22            THE COURT:  Yes.

23            MS. GAFFNEY-PAINTER:  And before we begin that

24   publication, just for the record, I would like to note we are

25   publishing the following segments:  From 4 minutes and 0

1    seconds to 25 minutes and 37 seconds; and then a second

2    segment at 29 minutes, 45 seconds, to 39 minutes, 25 seconds.

3         (Recording playing.)

4              MS. GAFFNEY-PAINTER:  You shall, may we please have

5    permission to publish what's been admitted as Government

6    Exhibit 525A and allow the jury to follow along with what's

7    been marked for identification as Government Exhibit 525B?

8              THE COURT:  Yes.

9              MS. GAFFNEY-PAINTER:  And before we publish that,

10   just for the record, we are publishing the following segment:

11   from 6 minutes and 50 seconds to 14 minutes and 24 seconds.

12             THE COURT:  Very well.

13        (Recording playing.)

14   **Q.**   Special Agent Holbrook, there was a reference in that

15   recording to 435 Elm.  Would you please remind us, what is 435

16   Elm?

17   **A.**   435 Elm was the hotel project that the undercover

18   agents were investing in under their role.

19   **Q.**   In your experience investigating public corruption, have

20   you heard the expression "pay to play"?

21   **A.**   Yes.

22   **Q.**   What does that mean?

23   **A.**   Pay to play is -- it's also sometimes referenced as

24   quid pro quo.  It means that --

25             MR. GLICKMAN:  Objection, Judge.

1      THE COURT:  I'll define quid pro quo.  Please

2  proceed.

3      THE WITNESS:  It means that I'll do something for

4  you if you do something for me in return.

5  **Q.**   Directing your attention to June 26, 2019, was there a

6  telephone call between UC Brian and Neil Clark?

7  **A.**   Yes.

8  **Q.**   Was that call recorded?

9  **A.**   It was.

10      MS. GAFFNEY-PAINTER:  Your Honor, may we please have

11  permission to publish what's been admitted as Government

12  Exhibit 526A and allow the jury to follow along with the

13  transcript that's been marked for identification as Government

14  Exhibit 526B?

15      THE COURT:  Yes.

16      (Recording playing.)

17      MS. GAFFNEY-PAINTER:  Your Honor, I see that it's

18  12:15.  This could be a possible time to take the lunch break.

19      THE COURT:  I think that's a good idea.

20      All right.  We're going to take a lunch break, Members of

21  the Jury.  During the lunch break, take a break.  Don't

22  discuss the case among yourselves or with anyone else.  No

23  independent research, no checking out the media.  Continue to

24  keep an open mind.

25      Out of respect for you, we'll rise as you leave for

 1    lunch, and we'll have you back at an appropriate time.

 2              THE COURTROOM DEPUTY:  All rise for the jury.

 3              THE COURT:  1:30.

 4         (Jury exited the room at 12:15 p.m.)

 5              THE COURT:  Jury's left the room.  As always, we'll

 6    remain until we're advised that they've cleared the floor, and

 7    then we'll break for lunch.

 8         All right.  We're in recess till 1:30.

 9              THE COURTROOM DEPUTY:  The Court is in recess till

10    1:30.

11         (Recess taken from 12:16 p.m. until 1:33 p.m.)

12              THE COURT:  We're back in the open courtroom on the

13    record.

14         We ready for the jury from the government's perspective?

15              MS. GAFFNEY-PAINTER:  Yes, Your Honor.

16              THE COURT:  And Mr. Householder's.

17              MR. GLICKMAN:  Yes, Judge.

18              THE COURT:  And Mr. Borges'?

19              MR. SCHNEIDER:  Yes.

20              THE COURT:  Let's call for the jury, please.

21         (Pause.)

22         (Jury entered the courtroom at 1:34 p.m.)

23              THE COURT:  You may all be seated.  Thank you.

24         14 Members of the Jury have rejoined us in the courtroom.

25    Thank you for your timeliness.  We are ready to proceed to

1    hear more testimony.

2         The witness remains on the stand under oath, and counsel

3    may inquire.

4              MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

5              THE COURT:  Yes.

6    **Q.**   Special Agent Holbrook, before the break we listened to a

7    telephone call that referenced Nashville.  Directing your

8    attention to July 23, 2019, was there an in-person meeting

9    between UC Brian, UC Vinny, and Neil Clark?

10   **A.**   Yes.

11   **Q.**   Was that meeting recorded?

12   **A.**   It was.

13   **Q.**   Where was that meeting held?

14   **A.**   This meeting was held in Nashville, Tennessee, at an

15   apartment.

16   **Q.**   And why was the meeting held in Nashville in an

17   apartment?

18   **A.**   The reason for that is to -- and this is kind of a

19   common technique -- is to give the undercovers credibility

20   and allow them to build rapport to advance the

21   investigation.

22   **Q.**   And what did they represent that space in Nashville to

23   be?  What did the undercovers represent that apartment in

24   Nashville to be?

25   **A.**   It was their apartment that they rent.

1    **Q.**   How long was that trip to Nashville?

2    **A.**   Two days.

3    **Q.**   Who went on that trip?

4    **A.**   UC Brian, UV Vinny, UC Rob comes the second day, and

5    then Mr. Clark.

6    **Q.**   How did Neil Clark get there to Nashville?

7    **A.**   Excuse me, counselor.  There is also another

8    individual, a source was also there at that meeting.

9    **Q.**   How did Neil Clark get there?

10   **A.**   He drove himself.

11   **Q.**   And where did Neil Clark stay in Nashville?

12   **A.**   He stayed at the Omni Hotel.

13   **Q.**   Who paid for his hotel?

14   **A.**   Rob did.

15   **Q.**   What are the investigative advantages of trips like this,

16   just generally speaking?

17   **A.**   As I said earlier, it's a -- it's a good opportunity to

18   build credibility, to build rapport, to have conversations

19   that lead to, you know, collecting evidence, information.

20        MS. GAFFNEY-PAINTER:  Your Honor, may we have

21   permission to publish what's been admitted as Government

22   Exhibit 527A and allow the jury to follow along with what's

23   been marked for identification as Government Exhibit 527B?

24        THE COURT:  Yes.

25        MS. GAFFNEY-PAINTER:  And before we publish this

1    exhibit, I would like to note for the record the following

2    segments that we will be publishing:  From 0 minutes and 0

3    seconds to 11 minutes and 27 seconds; from 22 minutes and 30

4    seconds to 27 minutes and 35 seconds; from 30 minutes and 51

5    seconds to 36 minutes, 26 seconds; and from 45 minutes, 25

6    seconds, to 53 minutes, 47 seconds.

7    **Q.**    Now, before we start, there is a reference in the

8    transcript to CHS.  What does that stand for?

9    **A.**    CHS stands for confidential human source.

10   **Q.**    And to be clear, was there a confidential human source

11   present for this in-person meeting that we are about to listen

12   to?

13   **A.**    There was.

14        (Recordings playing.)

15   **Q.**    Special Agent Holbrook, directing your attention to the

16   next day, July 24, 2019, was there an in-person meeting

17   between UC Brian, UC Rob, UC Vinny, and Neil Clark?

18   **A.**    Yes, there was.

19   **Q.**    Was this also in Nashville?

20   **A.**    Yes, it was.

21        MS. GAFFNEY-PAINTER:  Your Honor, may we please

22   publish what's been admitted as Government Exhibit 528A and

23   allow the jury to follow along what's been marked for

24   identification as Government Exhibit 52B?

25        THE COURT:  Yes.

 1          MS. GAFFNEY-PAINTER:  And for the record, before we

 2     publish, we will be publishing the following segments:  From 3

 3     minutes and 21 seconds to 7 minutes and 32 seconds; 49 minutes

 4     and 8 seconds to 50 minutes and 18 seconds; and 58 minutes, 25

 5     seconds, to 1 hour.

 6          (Recordings playing.)

 7     **Q.**    Special Agent Holbrook, directing your attention to

 8     August 8, 2019, after the Nashville trip, was there a phone

 9     call between Neil Clark and UC Brian?

10     **A.**    Yes, there was.

11     **Q.**    Was that call recorded?

12     **A.**    Yes.

13          MS. GAFFNEY-PAINTER:  Your Honor, may we please have

14     permission to publish what's been admitted as Government

15     Exhibit 529A and allow the jury to follow along with the

16     transcript that's been marked for identification as Government

17     Exhibit 529B?

18          THE COURT:  Yes.

19          (Recording playing.)

20     **Q.**    Special Agent Holbrook, directing your attention to

21     August 19, 2019, was there a phone call between Neil Clark and

22     UC Brian?

23     **A.**    Yes.

24     **Q.**    Was that call recorded?

25     **A.**    It was.

1            MS. GAFFNEY-PAINTER:  Your Honor, may we please have

2     permission to publish what's been admitted as Government

3     Exhibit 530A and allow the jury to follow along with what's

4     been marked for identification as Government Exhibit 530B?

5            THE COURT:  Yes.

6         (Recording playing.)

7     **Q.**   Special Agent Holbrook, directing your attention to

8     August 23, 2019, was there a phone call between Neil Clark and

9     UC Brian?

10    **A.**   Yes, there was.

11    **Q.**   Was that call recorded?

12    **A.**   Yes.

13           MS. GAFFNEY-PAINTER:  Your Honor, may we please have

14    permission to publish what's been admitted as Government

15    Exhibit 531A and allow the jury to follow along in their

16    transcript binders with what's been marked for identification

17    as Government Exhibit 531B?

18           THE COURT:  Yes.

19        (Recording playing.)

20    **Q.**   Special Agent Holbrook, directing your attention to

21    August 29, 2019, was there a phone call between Neil Clark and

22    UC Brian?

23    **A.**   Yes, there was.

24    **Q.**   Was that call recorded?

25    **A.**   Yes.

1          MS. GAFFNEY-PAINTER:  Your Honor, may we please have

2     permission to publish what's been admitted as Government

3     Exhibit 532A and allow the jury to follow along in their

4     transcript binder with what's been marked for identification

5     as Government Exhibit 532B?

6          THE COURT:  Yes.

7       (Recording playing.)

8     **Q.**    Special Agent Holbrook, directing your attention to

9     September 19, 2019, was there a phone call between Neil Clark

10    and UC Brian?

11    **A.**    Yes.

12    **Q.**    Was that call recorded?

13    **A.**    It was.

14         MS. GAFFNEY-PAINTER:  Your Honor, may we please have

15    permission to publish what's been admitted as Government

16    Exhibit 533A and allow the jury to follow along with the

17    transcript that has been marked for identification as

18    Government Exhibit 533B?

19         THE COURT:  Yes.

20       (Recording playing.)

21         MS. GAFFNEY-PAINTER:  Your Honor, I'm happy to

22    proceed, but also this would be a good point for a break if

23    the Court is so inclined.

24         THE COURT:  You've got a couple of real short ones

25    coming and then a long one?

 1          MS. GAFFNEY-PAINTER:  Yes.  We have coming up --

 2     well, we're going to be moving into a day that has multiple

 3     events and phone calls.

 4          THE COURT:  If you think this is a good time to

 5     break, we'll break now.  It's the normal time.  It's a little

 6     past a quarter till 3.

 7       The jury, I want you to take a break.  Don't discuss

 8     among yourselves or with anyone else.  Don't do any research,

 9     and continue to keep an open mind.  We will break for 20

10     minutes and find you close to 3:10.  We'll rise as you leave.

11          THE COURTROOM DEPUTY:  All rise for the jury.

12       (Jury exited at 2:47 p.m.)

13          THE COURT:  The jury's left the room.  We will wait

14     till they clear the floor, then we will recess.

15       (Pause.)

16          THE COURT:  All clear.  We'll recess till 3:10.

17          THE COURTROOM DEPUTY:  This court is in recess until

18     3:10.

19       (Recess from 2:48 until 3:10 p.m.)

20          THE COURT:  We ready for the jury from the

21     government's perspective?

22          MS. GAFFNEY-PAINTER:  Yes, Your Honor.

23          THE COURT:  Mr. Householder's?

24          MR. GLICKMAN:  Yes, Judge.

25          THE COURT:  Mr. Borges'?

1           MR. SCHNEIDER:  Yes, Judge.

2           THE COURT:  Very well.  Let's call for the jury.

3      (Pause.)

4           THE COURTROOM DEPUTY:  All rise for the jury.

5      (Jury entered the courtroom at 3:12 p.m.)

6           THE COURT:  You may all be seated.  Thank you.

7      Welcome back.  14 jurors, we have completed our

8  midafternoon break.  Go until the end of the day, and we will

9  continue to hear testimony.

10      Ms. Painter, you may proceed.

11           MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

12           THE COURT:  Very well.

13  **Q.**  Special Agent Holbrook, directing your attention to

14  September 23, 2019, were there phone calls that day between UC

15  Brian and Neil Clark?

16  **A.**   Yes, there were.

17  **Q.**   Were those calls recorded?

18  **A.**   Yes.

19           MS. GAFFNEY-PAINTER:  Your Honor, may we please have

20  permission to publish what's been admitted as Government

21  Exhibit 534A and allow the jury to follow along with what's

22  been marked for identification as Government Exhibit 534B?

23           THE COURT:  Yes.

24      (Recording playing.)

25           MS. GAFFNEY-PAINTER:  Your Honor, may we please have

1    permission to publish what's been admitted as Government

2    Exhibit 353A and allow the jury to follow along in their

3    transcript binder with what's been marked for identification

4    as Government Exhibit 535B?

5              THE COURT:  Yes.

6         (Recording playing.)

7    **Q.**   Special Agent Holbrook, these calls from September 23,

8    2019, did they precede an in-person meeting?

9    **A.**   Yes, they do.

10   **Q.**   Were the conversations at that in-person meeting

11   recorded?

12   **A.**   Yes.

13   **Q.**   Now, where was that meeting held?

14   **A.**   This meeting was held at Aubergine's.

15   **Q.**   What is Aubergine's?

16   **A.**   It's a restaurant in Columbus.

17   **Q.**   Was it open to the public that day?

18   **A.**   It was not.

19   **Q.**   Who attended that dinner?

20   **A.**   Mr. Clark, Bryan Gray, Mr. Householder, Jay Edwards, UC

21   Brian, UC Vinny.

22   **Q.**   Now, before that dinner at Aubergine's, did you provide

23   anything of value to the undercover agents to present at the

24   dinner?

25   **A.**   Yes.  There was a check was provided to the

1    undercovers.

2    **Q.**   And to whom was that check made out?

3    **A.**   It was made out to Generation Now.

4    **Q.**   And for how much was that check?

5    **A.**   50,000.

6    **Q.**   Which of the undercover agents wore recording devices

7    during that dinner?

8    **A.**   Both undercover agents, Vinny and Brian, both wore

9    recording devices.

10   **Q.**   Now, why do you have multiple recording devices during

11   such meetings?

12   **A.**   When we have a meeting of such nature where there is

13   multiple people, different devices can be in different

14   locations because they are attached to different UCs, and

15   you have a greater likelihood of capturing better audio

16   quality of the entire conversations that's going on at the

17   tables.  Some conversations split.  One side of the table

18   have one conversation, another side of the table could be at

19   another conversation.  And by having two recording devices,

20   you have an increased probability of catching both those

21   conversations.

22       In addition to that, if an individual walks to a

23   different location with an undercover, there is a recording

24   device there that can catch that conversation.  So if they

25   split, you can also have a greater likelihood of capturing

1    the conversations that are being held.

2          MS. GAFFNEY-PAINTER:  Your Honor, may we have

3    permission to publish first what's been admitted into evidence

4    as Government Exhibit 536A and allow the jury to follow along

5    with the transcript that's been marked for identification as

6    536B?

7          THE COURT:  Yes.

8          MS. GAFFNEY-PAINTER:  And for the record, we will be

9    publishing the following segments:  from 1 hour, 33 minutes,

10   and 29 seconds, to 1 hour, 59 minutes, and 56 seconds; from 2

11   hours, 16 minutes, and 52 seconds, to 2 hours, 25 minutes, and

12   3 seconds; from 3 hours, 4 minutes, and 48 seconds, to 3

13   hours, 8 minutes, and 35 seconds; from 3 hours, 13 minutes,

14   and 55 seconds, to 3 hours, 18 minutes, and 8 seconds; and

15   finally, 3 hours, 26 minutes, 33 seconds, to 3 hours, 40

16   minutes, 33 seconds.

17         THE COURT:  Very well.

18       (Recordings playing.)

19   **Q.**  Special Agent Holbrook, at the bottom of page 26 to the

20   top of page 27 of this transcript, which is Government Exhibit

21   536B, there was a reference to a separate transcription.

22         MS. GAFFNEY-PAINTER:  Your Honor, may we please have

23   permission to publish what's been admitted as Government

24   Exhibit 537A and allow the jury to follow along with the

25   transcript that's been marked for identification as Government

1    Exhibit 537B?

2            THE COURT:  Yes.

3            MS. GAFFNEY-PAINTER:  For the record, we will be

4    publishing the following segment:  at 3 hours, 5 minutes, and

5    49 seconds, to 3 hours, 8 minutes and 38 seconds.

6        (Recording playing.)

7    **Q.**   Special Agent Holbrook, who paid for the dinner at

8    Aubergine?

9    **A.**   UC Brian paid for the dinner.

10   **Q.**   What was the total amount?

11   **A.**   $2,720.

12   **Q.**   Now, during that dinner, did the undercover officers or

13   agents present the check that you had provided to them before

14   the dinner?

15   **A.**   No.

16           MS. GAFFNEY-PAINTER:  Ms. Santoro, may we please

17   allow the screen to accept input from the witness?

18       Your Honor, may we please have permission to publish what

19   has been admitted as Government Exhibit 79?

20           THE COURT:  Yes.

21           MS. GAFFNEY-PAINTER:  Ms. Terry, if we may please

22   see page 19.

23   **Q.**   Special Agent Holbrook, directing your attention to the

24   line that begins 9-24-2019, the day after the dinner.

25   **A.**   Yes.

1    **Q.**   Will you please circle that line for us.

2    **A.**   (Complies.)

3    **Q.**   Now, what is depicted in this line -- in this line that

4    you circled?

5    **A.**   That indicates a telephone call on September 24, 2019,

6    at 7:51 a.m. between Mr. Householder and Mr. Clark for 36

7    minutes.

8    **Q.**   Now, that same day, September 24, 2019, was there a call

9    between Neil Clark and UC Brian?

10   **A.**   Yes, there was.

11   **Q.**   Was that call recorded?

12   **A.**   Yes.

13          MS. GAFFNEY-PAINTER:  Your Honor, may we please have

14   permission to publish what's been admitted as Government

15   Exhibit 538A and allow the jury to follow along with the

16   transcript that has been marked for identification as

17   Government Exhibit 538B?

18          THE COURT:  Yes.

19     (Recording playing.)

20   **Q.**   Special Agent Holbrook, was the check that you provided

21   to the undercover agents ever cashed?

22   **A.**   No, it was not.

23   **Q.**   Did the undercover-agent engagement with Mr. Clark

24   continue past September of 2019?

25   **A.**   It did, but it was more of a passive engagement.

1   **Q.**   Were there any in-person meetings between the undercover

2   agents and Neil Clark after September of 2019?

3   **A.**   No.

4   **Q.**   You said it was a passive.  Can you just describe what

5   you mean by that?

6   **A.**   Yeah.  So the -- the undercovers would respond if Neil

7   texted them or called them.  They would respond or call him

8   back or text him back, but they weren't setting up meetings.

9        And the reason we were kind of passively engaged with

10  Mr. Clark as opposed to completely disengaging is we were

11  still involved in multiple other undercover investigations

12  with UC Brian and UC Rob and UC Vinny in Ohio.  We didn't

13  want to hurt their credibility in those investigations.

14  **Q.**   So just to be clear, did the undercover agents continue

15  their engagement in other Ohio public corruption

16  investigations after this point in time?

17  **A.**   Yes.

18       MS. GAFFNEY-PAINTER:  Your Honor, may I have a

19  moment to confer?

20       THE COURT:  Yes.

21       MS. GAFFNEY-PAINTER:  No further questions.

22       THE COURT:  Very well.  It's 4:30.  We've reached

23  our breaking point for the day.

24       So, Members of the Jury, that's it for today.  Stick with

25  me on this.  Stay safe, stay healthy, go home and take a

```
 1    break, get a decent dinner.  Do not discuss the case even

 2    among yourselves or with anyone.  No independent research.  Do

 3    not check out the media, and continue to keep an open mind.

 4    Try and be at your spot at 9:15 after being tested.

 5         Out of respect for you, we will rise as you leave for the

 6    day.

 7              THE COURTROOM DEPUTY:  All rise for the jury.

 8         (Jury exited the courtroom at 4:29 p.m.)

 9              THE COURT:  Presumably there is cross?

10              MR. GLICKMAN:  I am sorry, Judge.  I couldn't hear

11    you.

12              THE COURT:  Presumably there is cross to come?

13              MR. GLICKMAN:  Presumably, yes, Judge.

14              THE COURT:  The jury's left the room.  The door's

15    closing.

16         Mr. Glickman, I didn't mean to put you on the spot.  If

17    there is no cross, we could have released him.

18              MR. GLICKMAN:  I understood, Judge.

19              THE COURT:  I thought you were a good lawyer.  You

20    said "presumably."

21              MR. GLICKMAN:  In any event, I think there will be

22    cross, and it will be brief.

23              THE COURT:  I'm pleased to hear the latter.  And

24    that was a joke.

25         And we are now going to adjourn for the day.  Have a good
```

1    break.  See you tomorrow at 9:15.

2              THE COURTROOM DEPUTY:  All rise.  The Court's now

3    adjourned.

4         (Proceedings continued in progress at 4:31 p.m.)

5

6                      CERTIFICATE OF REPORTER

7

8              I, Mary A. Schweinhagen, Federal Official Realtime
     Court Reporter, in and for the United States District Court
     for the Southern District of Ohio, do hereby certify that
9    pursuant to Section 753, Title 28, United States Code that the
     foregoing is a true and correct transcript of the
10   stenographically reported proceedings held in the
     above-entitled matter and that the transcript page format is
11   in conformance with the regulations of the Judicial Conference
     of the United States.

12
     s/Mary A. Schweinhagen
13   _____ 17th of February 2023
     MARY A. SCHWEINHAGEN, RDR, CRR
14   FEDERAL OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATIONS**

| GOVERNMENT WITNESSES | PAGE |
|---|---|
| **JUAN CESPEDES** | |
| Cross-Exam by Long | 2159 |
| Redirect Exam by Mr. Long | 2182 |
| **NATHAN HOLBROOK CESPEDES** | |
| Direct Exam by Ms. Gaffney-Painter | 2190 |

**EXHIBITS**

| GOVERNMENT'S EXHIBITS | PAGE |
|---|---|
| ADMITTED | |
| No. 521A, 522A, 523A, 524A, 525A, 526A, 527A 528A, 529A, 530A, 531A, 532A, 533A, 534A, 535A, 536A, 537A, 538A | 2199 |