```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                               -  -  -
 3
     UNITED STATES OF AMERICA,      : CASE NO. 1:20-CR-0077
 4                                  :
                    Plaintiff,      : JURY TRIAL, DAY 14
 5           vs.                    :
                                    : 16th day of February, 2023
 6   LARRY HOUSEHOLDER, et al.      :
                                    : 9:30 a.m.
 7               Defendant.         :

 8                             -  -  -
                      TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                               -  -  -
10
     APPEARANCES:
11
     For the Plaintiff:
12                            Emily N. Glatfelter, Esq.
                              Matthew Charles Singer, Esq.
13                            Megan Gaffney Painter, Esq.
                              Assistant United States Attorneys
14                            221 East Fourth Street, Suite 400
                              Cincinnati, Ohio 45202
15

16   For the Defendant, Larry Householder:

17                            Nicholas R. Oleski, Esq.
                              Robert T. Glickman, Esq.
18                            McCarthy, Lebit, Crystal & Liffman Co.
                              1111 Superior Avenue East, Suite 2700
19                            Cleveland, Ohio 44114
                                      and
20                            Mark B. Marein, Esq.
                              Steven L. Bradley, Esq.
21                            Marein and Bradley
                              526 Superior Avenue, Suite 222
22                            Cleveland, Ohio 44114

23

24

25
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
1    For the Defendant, Matthew Borges:

2                         Karl Herbert Schneider, Esq.
                          Todd Aaron Long, Esq.
3                         McNees Wallace & Nurick, LLC
                          21 East State Street, Suite 1700
4                         Columbus, Ohio 43215

5    Also present:     Larry Householder
                       Matthew Borges
6
     Law Clerk:        Cristina V. Frankian, Esq.
7
     Courtroom Deputy: Rebecca Santoro
8
     Stenographer:     Mary Schweinhagen, RDR, RMR, CRR
9                      United States District Court
                       200 West Second Street
10                     Dayton, Ohio 45402

11              Proceedings recorded in stenotype.
        Transcript produced with computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings held in open court at 9:41 a.m.)

 2              THE COURT:  Good morning.  The jurors have now

 3    arrived in full.

 4         Are we ready for the jury from the government's

 5    perspective?

 6              MS. GAFFNEY-PAINTER:  Yes, Your Honor.

 7              THE COURT:  And Mr. Householder's?

 8              MR. GLICKMAN:  Yes, Judge.

 9              THE COURT:  And Mr. Borges'?

10              MR. SCHNEIDER:  Yes.

11              THE COURT:  Let's call for the jury.

12         (Pause.)

13              THE COURT:  We can bring the witness in ahead of the

14    jury.

15         Good morning, sir.  If you'd be willing to retake the

16    stand.  The jury is en route.

17         (Witness took the stand.)

18              THE COURTROOM DEPUTY:  All rise for the jury.

19         (Jury entered the courtroom at 9:43 a.m.)

20              THE COURT:  You may all be seated.  Thank you.

21         To the 14 jurors who have arrived back in the courtroom,

22    good morning.

23              RESPONSE BY ALL:  Good morning.

24              THE COURT:  It's been a while since I apologized to

25    you.  I would like to apologize for the rain, but my powers
```

```
 1    are limited.

 2         We are going to continue to hear testimony at this time.

 3         On behalf of Mr. Householder, are there questions?

 4              MR. GLICKMAN:  Yes.  Thank you, Judge.

 5              THE COURT:  Very well.

 6         The witness remains under oath, and he understands.

 7              THE WITNESS:  Yes, Judge.

 8              THE COURT:  Very well.
```

**NATHAN HOLBROOK**

```
10    of lawful age, Witness herein, was further examined and

11    testified as follows:
```

**CROSS-EXAMINATION**

```
13    BY MR. GLICKMAN:

14    Q.   Good morning, Special Agent Holbrook.

15    A.   Good morning.

16    Q.   I am Rob Glickman.  I am one of the attorneys for Larry

17    Householder.  I just have a few questions for you.

18    A.   Okay.

19    Q.   Yesterday when the recordings were playing you were

20    following along with the transcripts, yes?

21    A.   That is correct.

22    Q.   And I know there was a little bit of a miscommunication

23    yesterday.  To be clear, the actual recordings that were

24    submitted into evidence on the flash drive that was marked,

25    those are all the recordings, not just the recordings that
```

1   were played, yes?

2   **A.**   That is correct, yes.

3   **Q.**   All right.  And while you have been an FBI agent for, I

4   think, approaching 13 years?

5   **A.**   12 years.

6   **Q.**   12 years?

7   **A.**   It feels like 13.

8   **Q.**   I aged you.  I apologize.

9        For the last few years you have been doing public

10  corruption cases?

11  **A.**   That's correct.

12  **Q.**   And public corruption cases involve public officials,

13  including but not limited to elected officials, yes?

14  **A.**   That's right.

15  **Q.**   Okay.  And in that time I take it you have come into --

16  you've come into contact with lobbyists?  You know what a

17  lobbyist is, yes?

18  **A.**   I do.  I am running through my mind because I have come

19  in contact with the people who play the role of lobbyists

20  but aren't actually lobbyists, so to answer your question is

21  yes, I have come in contact with lobbyists.

22  **Q.**   And Neil Clark is a lobbyist?

23  **A.**   That's correct.

24  **Q.**   And lobbyists are people who charge money to individuals

25  or companies to attempt to influence, and I don't mean

1    improperly influence, but influence governments on behalf of

2    their respective clients, yes?

3    **A.**    That's my understanding, yes.

4    **Q.**    Okay.  And that's what Mr. Clark does for a living, yes?

5    **A.**    He is a lobbyist, yes.

6    **Q.**    Okay.  And lobbyists convince these clients that they are

7    in a position to assist them with whatever it is they need

8    from the respective government or government agency or elected

9    official, yes?

10   **A.**    I am sorry.  Could you state that one more time,

11   please.

12   **Q.**    Sure.  They have to convince their customer that they are

13   in a position to help them with a government or an elected

14   official or a legislator, yes?

15   **A.**    I don't -- the word convince.  I mean, they have to

16   represent that they have the ability to.

17   **Q.**    Okay.  There's a sales component to it.  Is that fair?

18   **A.**    I would agree with that, yes.

19   **Q.**    Okay.  And Mr. Clark was no different, was he?

20   **A.**    No different?

21   **Q.**    He was a salesman.  He would -- he explained how he

22   had -- he had contacts and -- with various governmental

23   officials who might be able to help, in this instance, your

24   undercover agents with their issues involving sports betting

25   in Ohio?

1    **A.**    He did that.  I just, I don't feel comfortable using

2    the term salesman.  He was explaining what he could offer

3    the undercovers.  Salesman has a different kind of

4    connotation to it that I am not comfortable to agree with.

5    **Q.**    Okay.  I didn't mean -- I don't hold salesmen in ill

6    regard.  I didn't mean to imply that.

7    **A.**    Sure.

8    **Q.**    But in any event, he -- he sold his time, yes?  I would

9    spend time on your project and you will pay me for my time?

10   **A.**    That's correct, yes.

11   **Q.**    Okay.  And Mr. Clark -- and one of -- when you are doing

12   an investigation involving a lobbyist, and a lobbyist is

13   indicating that they have influence or -- over a public

14   official or a government official, you do have to have some

15   concern that they might be exaggerating, don't you?  To get

16   the gig.

17   **A.**    I don't necessarily agree with that, no.

18   **Q.**    No?

19   **A.**    Huh-uh.

20   **Q.**    Okay.  All right.  So in your role investigating public

21   corruption and when lobbyists are involved, do you take steps

22   to corroborate things that those lobbyists may be saying?

23   **A.**    Given the -- given the investigation, that would be

24   true, yes.  We try to corroborate information that we're

25   receiving.

1   **Q.**   Because you are not just going to take them at their

2   word, are you?  You're going to take steps to make sure what

3   they are saying is or is not accurate, yes?

4   **A.**   Yes.

5   **Q.**   And sometimes it could be partly accurate; is that fair?

6   **A.**   That's fair.

7   **Q.**   Okay.  Because a lobbyist who, for example, you know,

8   knows Larry Householder, it can go -- and actually does know

9   him but it can go from knowing him to like all of a sudden

10  he's like one of my best friends.  And that's an exaggeration,

11  not a lie, yes?

12  **A.**   Sorry.  Could you clarify that, please?

13  **Q.**   Sure.  Lobbyists can exaggerate how close they may be to

14  an elected official or a government official?

15  **A.**   Are we speaking generally?

16  **Q.**   Generally.

17  **A.**   I assume a lobbyist could exaggerate.

18  **Q.**   You have never had experience in that regard?

19  **A.**   At this point, I can't say that I have.

20  **Q.**   Okay.  Well, on the recordings that we played yesterday,

21  you heard Mr. Clark talk about his relationship with

22  Mr. Householder, did you not?

23  **A.**   Yes.

24  **Q.**   Okay.  And he talked about telephone communications he

25  had with Mr. Householder, yes?

1    **A.**    He did.

2    **Q.**    Okay.  And earlier in your testimony, you talked about

3    your training with the FBI, and you briefly mentioned Title

4    III warrants, true?

5    **A.**    Yes.

6    **Q.**    Okay.  And a Title III warrant doesn't just get you phone

7    records, does it?  You can actually -- you're recording the

8    telephone call, correct?

9    **A.**    That is correct.

10   **Q.**    To your knowledge, was a Title III warrant obtained in

11   this investigation for Mr. Householder's phone?

12   **A.**    To my knowledge, no.

13   **Q.**    What about Mr. Longstreth?

14   **A.**    No.

15   **Q.**    Had such a warrant been obtained, we'd be able to listen

16   to the conversations between Mr. Householder and Mr. Clark,

17   right?

18   **A.**    Yes.

19   **Q.**    And by listening to them, we'd actually know what was

20   said, fair?

21   **A.**    Fair.

22   **Q.**    We wouldn't just have to take Mr. Clark's word for it,

23   true?

24   **A.**    True.

25   **Q.**    Okay.  Now, a warrant was obtained from Mr. Clark, but

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)           14-2238

1    that was in an unrelated investigation, right?

2    **A.**    That is correct, yes.

3    **Q.**    Okay.  And I'm not going to remember -- I remember the

4    undercover agents' name, Brian, Vinny, and Rob, I definitely

5    remember Rob, but if I conflate them, just please correct me.

6    I am going to do everything I can not to have to play a

7    recording.  Fair enough?

8    **A.**    Fair enough.

9    **Q.**    All right.  So your undercover agents were assigned to

10   engage Neil Clark regarding sports betting legislation in

11   Ohio?

12   **A.**    Yes.

13   **Q.**    Okay.  And effectively see what they could find out.

14   **A.**    Correct.

15   **Q.**    And they paid him, yes?

16   **A.**    Yes.

17   **Q.**    How much?

18   **A.**    They paid him over the course of that interaction,

19   $50,000, $5,000 a month.

20   **Q.**    Okay.  So $5,000 a month retainer?

21   **A.**    Yes.

22   **Q.**    Okay.  And he engaged with them for many months?

23   **A.**    Yes.

24   **Q.**    Okay.  And obviously, each month he was engaged, he got

25   another $5,000, right?

1    A.    Yes.

2    Q.    And during the many months he was engaged, he -- strike

3    that.

4         While engaged, he routinely explained to them that

5    legislation was pending, and he was going to help them with

6    their issue regarding sports betting, right?

7    A.    That's correct.

8    Q.    And he also routinely, at least in the conversations that

9    you played for us yesterday, explained that there were delays.

10   Is that fair?

11   A.    Yes.

12   Q.    And each one-month delay meant another $5,000 for

13   Mr. Clark?

14   A.    Well, subsequent to that, yes.

15   Q.    Okay.  And during the recordings that you played for us,

16   Mr. Clark made numerous claims.  For example, he indicated

17   that there were three (c)(4)s, that it was important that your

18   undercover agents support, right?

19   A.    Yes.

20   Q.    Okay.  And did you -- and the three (c)(4)s involved

21   Mr. Householder, right?

22   A.    Pardon?

23   Q.    The three (c)(4)s, one of them involved Mr. Householder?

24   A.    Yes.  One of them did, yes.

25   Q.    One of them involved the governor?

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)          14-2240

1   A.   Yes.

2   Q.   One of them involved somebody named Huffman?

3   A.   Yes.

4   Q.   He's a senator, right?

5   A.   I believe so.

6   Q.   To get legislation passed in Ohio, you need both the

7   House, the Senate, and the executive branch, right?

8   A.   That's my understanding, yes.

9   Q.   Okay.  So he covered all three, the governor --

10  A.   With the three (c)(4)s, yes.

11  Q.   Okay.  And he made certain claims about Senator Huffman

12  indicating that he had control over 18 Senate votes?

13  A.   Yes.

14  Q.   Okay.  Did you do anything to either confirm or deny that

15  claim?

16  A.   I did not.

17  Q.   To your knowledge, did anybody from the federal

18  government do anything to confirm or deny that claim?

19  A.   Possibly.  I -- I'm not aware of what was done from the

20  Columbus perspective of the investigation.

21  Q.   But as you sit here today, you don't know -- you don't

22  know whether anybody interviewed people at the State House and

23  tried to either confirm or deny the claim that Senator Huffman

24  controlled 18 votes in the Republican Caucus of the Senate?

25  A.   I don't know what was done in regard to that.

1  **Q.**   He made various claims that his clients -- and I'm not

2  going to go through all of them -- made multimillion-dollar

3  donations to various politicians, yes?

4  **A.**   He made that claim, yes.

5  **Q.**   Did you or -- I mean, you were the case agent, yes, sir?

6  **A.**   No, I was not.

7  **Q.**   Well, you were the case agent in your undercover

8  investigation.  I think you said that?

9  **A.**   Yes.  I was controlling the undercover aspect of -- of

10 the investigation.

11 **Q.**   Okay.  To your knowledge, did anybody from the federal

12 government take any steps to confirm or deny that his nursing

13 home client gave $1.5 million to Governor DeWine?

14 **A.**   I wouldn't know if anyone did anything on that.

15 **Q.**   Okay.  What about any of the other donations that were

16 talked about on the tape, to your knowledge, did anybody take

17 any steps to confirm or deny that that actually happened?

18 **A.**   The donations to the (c)(4)s?

19 **Q.**   Any of the -- I'm not going to go through -- I don't want

20 to go through every single one if I can't.

21 **A.**   I was just trying to answer your question.

22 **Q.**   But is there were -- there were numerous conversations on

23 the tapes that various -- there were various donations made to

24 various politicians through (c)(4)s and not through (c)(4)s.

25 Do you know if anybody from the federal government took any

1    steps to confirm or deny that Mr. Clark was telling the truth

2    or just engaging in puffery to placate his client?

3    **A.**    I believe that Agent Wetzel had issued subpoenas for

4    various records of campaign accounts and bank accounts and

5    was corroborating what Mr. Clark was saying in the

6    recordings.  So I do know that that did occur.

7    **Q.**    Well, including, for example, the $1.5 million to

8    Governor DeWine from the -- I forgot -- from the nursing home

9    client?

10    **A.**    I don't know the specifics of all the grand jury

11    subpoenas he issued.  So I can't answer that.

12    **Q.**    Okay.  He indicated to your undercover agents that he was

13    in possession of memos indicating that the Senate bill

14    involving sports betting was unconstitutional.  In fact, he

15    said he had two memos, right?

16    **A.**    Yeah.  I remember him claiming that the sports bill as

17    it would be under the casino commission was

18    unconstitutional.  That's what I remember.

19    **Q.**    Well, did -- to your knowledge, did anybody from the

20    federal government take steps to actually obtain those memos

21    to see if he was telling the truth or not?

22    **A.**    Yeah, I don't know.

23    **Q.**    Okay.  Do you remember him saying words to the effect,

24    once Larry Householder had a negative feeling about something,

25    somebody, that never changed?

1    **A.**    I remember him making that comment, yes.

2    **Q.**    And then in a later call he explained how Larry

3    Householder had a negative feeling towards him, and it did

4    change?

5    **A.**    Yes.

6    **Q.**    There was a -- there was a call on June 6, 2019 -- and

7    just so -- where he indicated the Speaker made a decision on

8    the wheres --

9    **A.**    Who's "he"?

10   **Q.**    Neil Clark said the Speaker made his decision on the,

11   quote, wheres, unquote, for sports gambling.  Do you recall

12   that?

13   **A.**    No, I actually don't recall.  Can you repeat the

14   question one more time?

15   **Q.**    Would it be easier if I just showed you in the transcript

16   to refresh your recollection?

17   **A.**    Yes, please.

18   **Q.**    Can you go to the exhibit in your transcript book 524B?

19         Just tell me --

20   **A.**    Okay.

21   **Q.**    -- when you have the book, sir.

22   **A.**    Yeah, I'm there.

23   **Q.**    Okay.  Go to page 3.  First line.  See where it says,

24   "The Speaker is going to make a decision on the wheres," okay?

25   **A.**    Yes, I see that.

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)                14-2244

1   **Q.**   Okay.  Does that refresh your recollection?

2   **A.**   Yes, it does.

3   **Q.**   And the wheres for sports gambling, that meant like where

4   the sites would be and how many of them there would be, yes?

5   **A.**   Just looking -- I'm not sure if he is referring to what

6   you just said or if he's referring to who's going to control

7   it.

8   **Q.**   Okay.  Well, did -- to your knowledge, did the federal

9   government do anything to corroborate Mr. Clark's statement

10  that Mr. Householder was working on anything regarding either

11  where the sites would be for sports betting or who was going

12  to control it?

13  **A.**   Yeah, I'm not sure why it was done on that, from

14  Columbus' perspective.

15  **Q.**   Okay.  Do you recall him taking credit for Larry

16  Householder becoming Speaker of the House?

17  **A.**   I do.

18  **Q.**   He said words to the effect of, I told him to go to

19  organized labor and the Democrats.  Do you remember that?

20  **A.**   I do.

21  **Q.**   Did you or anyone from the federal government, to your

22  knowledge, interview people at the State House to find out

23  whether there was any veracity to that statement?

24  **A.**   I didn't.

25  **Q.**   Okay.  And he actually took credit for Mr. Householder

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)                    14-2245

1    becoming Speaker of the House the first time all those years

2    ago.  Do you remember that?

3    **A.**    I'm foggy on that.

4    **Q.**    Okay.  Let's go to -- let's take a look at that same

5    exhibit, 524, page 19 and 20.  I'll tell you where.  It's

6    going to take me a minute too.

7         The very last line on 19 going into 20.  Could you just

8    read that to yourself, sir.

9         Just tell me when you're done.

10   **A.**    I'm just reading for context.

11   **Q.**    Oh, sure.  Just take as much time as you need.  Just tell

12   me when you're ready.

13   **A.**    Okay.

14   **Q.**    So Mr. Clark essentially takes credit not only for

15   Mr. Householder becoming Speaker of the House in -- after the

16   2018 election, he takes credit for when he was first elected

17   to the House of Representatives in the early 2000s, yes?

18   **A.**    Well, he claims that people were giving him credit.  He

19   didn't really claim that he took credit for it.  He said

20   that people were giving him credit for the rise.

21   **Q.**    You've listened to all these recordings with Mr. Clark?

22   **A.**    Yes.

23   **Q.**    He does most of the talking, doesn't he?

24   **A.**    Mr. Clark talks a lot.

25   **Q.**    He was a bragger, fair?

1 **A.** I can't really answer that question.  I mean, if what

2 he's saying is truthful, then --

3 **Q.** I'll strike the question.

4  He likes talking about himself and his accomplishments;

5 is that fair?

6 **A.** Yeah, I'd say that's fair.

7 **Q.** Okay.  All right.  Now, again, your undercover agents

8 were meeting with him with nothing to do with energy

9 legislation, correct?  They were there for sports betting.

10 **A.** That's correct.

11 **Q.** He spent a lot of time talking about House Bill 6 and

12 energy legislation, didn't he?

13 **A.** He did.

14 **Q.** All right.  And do you recall him indicating that in

15 House Bill 6 that the mandates in House Bill 6 would be

16 lowered somewhere between 5 percent and 12 percent?

17 **A.** I remember him saying that, yes.

18 **Q.** And in actuality, the mandates were completely eliminated

19 in House Bill 6, weren't they?

20 **A.** I don't know.

21 **Q.** Okay.  In talking about sports betting, he indicates that

22 the passage of a sports betting bill may be pushed from June

23 to September.  Do you remember that?

24 **A.** I do remember that, yes.

25 **Q.** Okay.  Sports bill wasn't passed in June, was it?

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)          14-2247

1    **A.**   It was not.

2    **Q.**   Nor was it passed in September?

3    **A.**   No.

4    **Q.**   But he got $5,000 for those months between June and

5    September?

6    **A.**   That's correct, yes.

7    **Q.**   In fact, it didn't actually pass the entire legislature

8    till 2021?

9    **A.**   I'm not sure when it was.

10   **Q.**   That's well over a year from after your agents disengaged

11   from Mr. Clark, yes?

12   **A.**   That date is after the end of the agents' disengagement

13   with Clark, yes.

14   **Q.**   Well, substantially after, because they disengaged in

15   2019, right?

16   **A.**   Yes.  Well, I'll take your word that that's when sports

17   betting passed.  I'm not familiar with it.

18   **Q.**   Fair enough.

19        We heard a tape regarding the -- the Nashville meeting

20   where Mr. Clark actually drove to Nashville and met in person

21   with your agents, right?

22   **A.**   Yes.

23   **Q.**   And, again, he's there for sports betting but he is

24   talking about nuclear plant subsidies, isn't he?

25   **A.**   Yes.

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)       14-2248

1   **Q.**   And he compares subsidies in New York, Michigan, and

2   Indiana to the proposed subsidy in Ohio.  Do you remember

3   that?

4   **A.**   I do remember that, yes.

5   **Q.**   All right.  And he said that the subsidies in those other

6   states accounted for around $3 billion when Ohio's was only

7   1.2 billion.  Do you remember that?

8   **A.**   I remember him referring to Ohio's was 1.2 billion.

9   **Q.**   You don't remember --

10  **A.**   I don't remember what the other ones were.

11  **Q.**   Fair enough.

12       Will you take a look at Exhibit 527B?

13  **A.**   Yes.

14  **Q.**   Page 7.

15  **A.**   Okay.

16  **Q.**   And last line where Mr. Clark is talking, if you could

17  just read that to yourself, see if that refreshes your

18  recollection.

19  **A.**   Yes.

20  **Q.**   He said $3 billion, yes?

21  **A.**   He did say 3 billion.

22  **Q.**   Did you or anyone to your knowledge from the federal

23  government do anything to confirm or deny his claims regarding

24  the subsidies in those other states?

25  **A.**   I did not.  I don't know what other agents did on it.

1   **Q.**   Okay.  There's -- I'm hoping not to use this book again

2   but if you need to, we can.

3   **A.**   Sure.

4   **Q.**   Do you remember the conversations about a check, about

5   your undercover agents bringing a check to Mr. Householder?

6   **A.**   Yes.

7   **Q.**   And Mr. Clark confirmed to him that he would, in fact,

8   take a check?

9   **A.**   Yes.

10  **Q.**   Okay.  And --

11  **A.**   Well --

12  **Q.**   Go ahead.

13  **A.**   He -- I remember him debating with himself whether he

14  would actually take the check himself, if that's what your

15  question is.  If he would take the check or if -- he wasn't

16  sure if he would actually take the check because typically

17  the money was wired.  That's my recollection, if that's the

18  one you are referring to.

19  **Q.**   Actually, it's mine too.  He talked about both checks and

20  wires?

21  **A.**   Yes.

22  **Q.**   Yes, sir.  But he did have your undercover agents bring a

23  check to the -- I may ruin this pronunciation so if I do

24  correct me -- the Aubergine club?

25  **A.**   Yeah.  I will ruin it just as much as you will but,

1  yes, that's it.  That's the place.

2  **Q.**   And your agents brought a check?

3  **A.**   Yes, they did.

4  **Q.**   And at that meeting -- and we listened to not all of it,

5  but a substantial portion of it -- there sure wasn't a lot of

6  talk about sports betting legislation, was there?

7  **A.**   In the meeting there was, actually.

8  **Q.**   Not what -- well, in the recordings we heard yesterday,

9  there was a lot of talking, can we agree that a minority of it

10  had to do with sports betting legislation?

11  **A.**   Yes.

12  **Q.**   And at this point they are at this private club in

13  Columbus, and you were asked about who paid for that meal, and

14  you indicated your agents did, yes?

15  **A.**   Yes.

16  **Q.**   Well, your agents picked the place, didn't they?

17  **A.**   They recommended it, yes.

18  **Q.**   And during the conversation about -- do you recall the

19  conversation that occurred, the recorded call afterwards,

20  where your undercover agent, I think it was Brian --

21  **A.**   Yes.

22  **Q.**   -- expressed his displeasure and his co-undercover

23  agent's displeasure at how Mr. Householder did not appear

24  engaged on their behalf?

25  **A.**   That's correct, yes.

1   **Q.**   Okay.  And they had been at this now --

2   **A.**   I'm sorry.  Let me back up.  Can you repeat the end of

3   that last question because when I answered it, I think I

4   talked over you.

5   **Q.**   Sure.  I'd be happy to.

6        Do you recall during that conversation where at the

7   beginning undercover agent Brian, speaking on his behalf and

8   for Vinny, expressed their displeasure at how that meeting

9   went?

10  **A.**   Yes.

11  **Q.**   And Mr. Clark defended the meeting and said you don't

12  understand, or words to that effect.  It went really well?

13  **A.**   He believed it went well, yes.

14  **Q.**   Well, you can't tell me whether he believed it went well.

15  He at least said it went well, right?

16  **A.**   He said it went well.

17  **Q.**   Okay.  Because whether he believed it or not, if he could

18  keep this engagement going, the money kept flowing, yes?

19  **A.**   I don't know what his -- what he was thinking.  If --

20  **Q.**   That wasn't my question.

21  **A.**   State it again.

22  **Q.**   If he continued to be engaged, his $5,000 a month

23  retainer would continue to be paid?

24  **A.**   It's a hard question to answer.  I mean, because

25  there -- there are variables that both parties would be

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1  considering.  And after that meeting, whether the UCs are

2  saying, well, we are not going to pay this guy anymore

3  because we are not getting what we want or Clark -- it's a

4  hard question to answer.

5  **Q.**   Well, the UCs at the beginning of the call seemed to

6  express that they weren't getting what they want, right?

7  **A.**   That's correct.

8  **Q.**   And during the call, Mr. Clark essentially explained to

9  them they didn't understand what happened, and they, in fact,

10  were getting what they wanted, right?

11  **A.**   Yes, that's what he explained.

12  **Q.**   Okay.  And presumably, if they were getting what they

13  wanted, that would entice them to continue Mr. Clark's

14  engagement.  Is that fair?

15  **A.**   I'm sorry.  Say it one more time.

16  **Q.**   If they were getting what they wanted, they would

17  continue to engage Mr. Clark, right?

18  **A.**   Oh, you mean from Mr. Clark's perspective?

19  **Q.**   Yes.

20  **A.**   I don't know.  I mean, I --

21  **Q.**   How about from their perspective?

22  **A.**   I mean, their perspective, they're -- they're angry

23  about it.  So would they continue to engage or not is to be

24  determined.  In fact, I can say that we probably wouldn't

25  have -- we didn't continue to engage.

NATHAN HOLBROOK - CROSS (HOUSEHOLDER)               14-2253

1   Q.   Is it fair to say that Mr. Clark tried to placate them?

2   A.   I don't know.  I don't know if Mr. Clark actually

3   believed that, or if he was trying to placate.  I can't

4   answer that question for you.

5   Q.   Sure.  Let me rephrase.  I apologize.

6        Mr. Clark attempted to explain that things were going

7   okay?

8   A.   Yes.

9   Q.   Okay.  And do you recall during that conversation that

10  was recorded that Mr. Clark indicated that Mr. Householder

11  would work on a compromise -- compromise legislation because

12  the sports betting legislation was being held up in the

13  Senate?

14  A.   Yes.

15  Q.   Okay.  And did you or anyone in the federal government,

16  to your knowledge, take any steps to find out whether or not

17  Mr. Householder was, in fact, working through his office on

18  any compromise sports betting legislation?

19  A.   Yeah.  I'm not sure.  I didn't do anything on that.

20  I'm not sure what was done, if Nick did anything.

21  Q.   So you're not aware of --

22  A.   I am not.

23  Q.   Let me just finish my question.

24       You are not aware of any draft compromise legislation

25  that was coming out of Mr. Householder's office or anyone's

1  office at that time that would compromise between the House

2  and the Senate, are you?

3  **A.**  I am not, no.

4  **Q.**  And after this time, I think you indicated that your

5  undercovers would respond to texts if Mr. Clark texts them,

6  but other than that they disengaged?

7  **A.**  That's correct.

8  **Q.**  Okay.  And upon disengagement, after this -- I may have

9  the months wrong -- but I think around nine months; is that

10  right?

11  **A.**  The time that they engaged Mr. Clark was

12  January/February to September/October.  So, yeah.

13  **Q.**  So nine months or thereabout, fair?

14  **A.**  Um-hmm, fair.

15  **Q.**  And after these nine months, as a result of these nine

16  months of undercover investigation, neither yourself or to

17  your knowledge anybody then at that time attempted to get

18  Title III warrants on anybody else's telephone?

19  **A.**  Not to my knowledge.

20  **Q.**  Okay.  Did your undercover agents attempt -- there was --

21  strike that.

22      There were numerous communications during these various

23  calls about an individual named Jeff Longstreth, right?

24  **A.**  Yes.

25  **Q.**  And that Jeff Longstreth could engage with the undercover

1   agents about a donation to a (c)(4) named Generation Now.

2   **A.**   Yes.

3   **Q.**   Do you recall that?

4   **A.**   Yes.

5   **Q.**   Did you -- did your undercover agents make any steps to

6   contact Jeff Longstreth directly to talk to him about

7   Generation Now?

8   **A.**   No.

9   **Q.**   To contact Jeff Longstreth directly to confirm or deny

10  any of the claims made by Mr. Clark?  Did they contact Jeff

11  Longstreth directly at all?  How's that?

12  **A.**   No.

13  **Q.**   Okay.  Did they contact anybody related to Mr. Longstreth

14  or Mr. Householder or Mr. Clark to either confirm or deny the

15  claims made by Mr. Clark?

16  **A.**   No.

17  **Q.**   Or to do anything?

18  **A.**   To do anything, I'm --

19  **Q.**   Related to Mr. Longstreth or Mr. Householder.

20  **A.**   Did the undercovers?

21  **Q.**   Correct.

22  **A.**   I'm sorry.  Please repeat that question.

23  **Q.**   Sure.  Did your -- did your undercover agents or anyone

24  under your control contact anyone else to confirm or deny the

25  claims made by Mr. Clark during the various contacts he had

1   with your undercover agents?

2   **A.**   No.

3   **Q.**   Okay.  And I think you indicated they had moved on.  They

4   were involved in other undercover operations?

5   **A.**   Yes.

6   **Q.**   Okay.  They had better things to do?

7   **A.**   Well, I won't say better things to do, but they had

8   other investigations to work on, yes.

9   **Q.**   More important things to do, how's that?

10  **A.**   I wouldn't say more important either because this was

11  important as well.

12  **Q.**   This is going to be my last question.  How about this:

13  Other things to do?

14  **A.**   Yes.

15  **Q.**   Fair enough, all right.

16          MR. GLICKMAN:  Just one moment, Judge.

17          THE COURT:  Yes.

18          MR. GLICKMAN:  I don't have anything further.

19          THE COURT:  Very well.

20          MR. GLICKMAN:  Judge, can I just have a moment to

21  unplug?

22          THE COURT:  Yes.

23          MR. GLICKMAN:  Thank you.

24          THE COURT:  Very well.

25      Counsel for Mr. Borges have any questions?

**NATHAN HOLBROOK - CROSS (BORGES)**          14-2257

1          MR. SCHNEIDER:  Just -- just one or two, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MR. SCHNEIDER:

4    **Q.**   Agent, just for purposes of the record to make sure, with

5    regard to all of the recorded phone calls and the recorded

6    meets that we listened to yesterday and that the jurors have

7    in front of them, Matt Borges isn't on any of those

8    recordings, nor is he a participant in any of those, correct?

9    **A.**   That's correct.

10          MR. SCHNEIDER:  Thank you.  No further question.

11          THE COURT:  Very well.  Is there any redirect from

12   the government?

13          MS. GAFFNEY-PAINTER:  Very briefly, Your Honor.

14          THE COURT:  Very well.

15          MS. GAFFNEY-PAINTER:  May I approach?

16          THE COURT:  Yes.

17                  **REDIRECT EXAMINATION**

18   BY MS. GAFFNEY-PAINTER:

19   **Q.**   Good morning.

20   **A.**   Good morning.

21   **Q.**   Special Agent Holbrook, you were asked a series of

22   questions on cross-examination about whether you confirmed or

23   corroborated the information that you were receiving from the

24   recordings from the undercover agents.  Do you recall those

25   questions?

NATHAN HOLBROOK - REDIRECT                    14-2258

1    **A.**   I do.

2    **Q.**   What were your responsibilities with regard to this

3    investigation?

4    **A.**   My responsibilities were to direct the focus of the

5    undercover agents and interact with Mr. Clark based upon

6    information I received from Agent Wetzel.  In addition to

7    that, it's important to understand that this is an

8    undercover operation.  And by the very nature of it, it

9    means no one can know about it.  It no longer becomes an

10   undercover operation.

11        So in terms of corroborating things and doing further

12   investigations to determine what someone's telling us is

13   true or not true, it becomes more difficult because we can't

14   go out and talk to individuals during an undercover

15   operation because that can obviously blow the cover of the

16   agents and, you know, kind of end that part of the

17   investigation.  So we do what we can to corroborate things,

18   but this being an undercover operation we're somewhat

19   limited.

20        But to counsel's point, my area of this was -- was very

21   limited just to those interactions with Neil Clark.

22   **Q.**   For the recordings that you were receiving and the

23   interactions that you were aware of through your management of

24   those undercover agents, did you share that information in

25   those recordings with the case agent, Special Agent Wetzel?

NATHAN HOLBROOK - REDIRECT                     14-2259

1    **A.**   Yes, I did.

2    **Q.**   And after you shared that information, did you have any

3    insight into what steps he was taking to further the

4    investigation?

5    **A.**   No.

6    **Q.**   And to be clear, you are not aware of what subpoenas

7    Special Agent Wetzel issued in order to gather more

8    information about this investigation?

9    **A.**   I am not.

10   **Q.**   So you're unaware that he issued a subpoena to get

11   information about, for instance, Ohioans For Energy Security?

12   **A.**   I am not aware of that.

13   **Q.**   You were asked a series of questions about the undercover

14   agents just wanting sports betting.  Do you recall that?

15   **A.**   I do.

16   **Q.**   Now, what was the persona that UC Brian had adopted in

17   this investigation?

18   **A.**   UC Brian was an investor in the hotel in downtown

19   Cincinnati, and he wanted to place a sports book in this

20   hotel --

21   **Q.**   At least --

22   **A.**   -- that was his --

23   **Q.**   I apologize for interrupting you.  Please, finish.

24   **A.**   That was his persona.  That was his role that he was

25   playing.

1   **Q.**   Did he represent himself as a businessman in any other

2   areas beyond real estate investment?

3   **A.**   Other than green energy, no.

4   **Q.**   You were asked a series of questions about the dinner at

5   Aubergine.  Do you recall those questions?

6   **A.**   Yes.

7   **Q.**   Now, approximately how long was that dinner at Aubergine?

8   **A.**   Oh, I would say it was greater than two hours.  I don't

9   know the exact time.

10  **Q.**   Yesterday when we published segments of that recording

11  from the Aubergine dinner, we didn't play two hours worth of

12  recordings, isn't that right?

13  **A.**   No.

14  **Q.**   Just to be clear, Special Agent Wetzel, now, why did the

15  undercover agents take more of a passive role in their

16  relationship with Mr. Clark after September 2019?

17  **A.**   I'm sorry.  Could you repeat that one more time?

18  **Q.**   Why did the undercover agents take more of a passive role

19  in their relationship with Mr. Clark after September of 2019?

20  **A.**   At that point in the investigation, we decided to take

21  a more passive role.  The reason being is the undercover

22  agents had collected a good deal of information about

23  Generation Now and its inner workings.  And based upon the

24  meeting and the subsequent telephone call, to continue that

25  line of investigation, we understood that any check that

NATHAN HOLBROOK - REDIRECT                    14-2261

1   would be given to Mr. Householder to that (c)(4), Generation

2   Now, would go through Mr. Longstreth.

3        And we made the decision that giving a $50,000 check to

4   Mr. Longstreth to deposit in Generation Now wasn't an

5   efficient use of funds and wouldn't add additional evidence

6   of what we already had.

7             MS. GAFFNEY-PAINTER:  May I have a moment to confer,

8   Your Honor?

9             THE COURT:  Yes.

10            MS. GAFFNEY-PAINTER:  No further questions.

11            THE COURT:  Very well.

12       Recross on redirect, if any, from Mr. Householder's

13  counsel?

14            MR. GLICKMAN:  No, thank you, Judge.

15            THE COURT:  Mr. Borges' counsel?

16            MR. SCHNEIDER:  No, Your Honor.

17            THE COURT:  Very well.

18       Sir, your testimony is concluded and you are free to go.

19            THE WITNESS:  Thank you, Judge.

20       (Witness was excused.)

21            THE COURT:  Very well.  Where do we stand from the

22  government's perspective?  We are going to break at 10:45ish.

23            MS. GAFFNEY-PAINTER:  We're prepared to call our

24  next witness, Your Honor.

25            THE COURT:  Very well.  If you would please do so.

```
 1              MS. GAFFNEY-PAINTER:  The government calls Megan

 2    Fitzmartin.

 3              THE COURT:  Very well.

 4         You are going to come to the witness stand.  If you'll

 5    follow Ms. Santoro and would you pause where you are, ma'am,

 6    and raise your right hand for an oath to tell the truth.

 7              THE COURTROOM DEPUTY:  You do solemnly swear or

 8    affirm that the testimony you are about to give in this case

 9    will be the truth, the whole truth, and nothing but the truth.

10    This you do affirm under the pains and penalties of perjury?

11              THE WITNESS:  I do.

12              THE COURT:  Very well.  You can take the witness

13    stand.

14         (Witness took the stand.)

15              THE COURT:  We tell everybody in the spirit of full

16    disclosure the seat tips back.

17              THE WITNESS:  Oh, thank you.

18              THE COURT:  You can take your mask off and we are

19    going to need you close to that expensive federal microphone.

20    And you can close that book.  Maybe.

21              All right.  Counsel for the government will begin

22    examination.

23              MS. GAFFNEY-PAINTER:  Thank you, Your Honor.  May I

24    approach the podium?

25              THE COURT:  Yes.
```

MEGAN FITZMARTIN - DIRECT                    14-2263

```
 1                    MEGAN FITZMARTIN

 2    of lawful age, Witness herein, was examined and testified as

 3    follows:

 4                   DIRECT EXAMINATION

 5    BY MS. GAFFNEY-PAINTER:

 6    Q.    Good morning, Ms. Fitzmartin.

 7    A.    Good morning.

 8    Q.    Where do you work?

 9    A.    State of Ohio.

10    Q.    Generally speaking, what do you do for the state of Ohio?

11    A.    I oversee policy and communications for the House of

12    Representatives.

13    Q.    When did you first become professionally involved in

14    politics?

15    A.    2011.

16    Q.    What was your first professional role in politics?

17    A.    I was an intern on the campaign.

18    Q.    Were you working in politics in 2017?

19    A.    Yes.

20    Q.    Did there come a time in your political professional life

21    where you met someone named Jeff Longstreth?

22    A.    Yes.

23    Q.    And when was that, approximately?

24    A.    September of 2017.

25    Q.    Will you describe for us the circumstances of that first
```

1  meeting with Mr. Longstreth?

2  **A.**   Yes.  A -- an individual mutual friend connected us for

3  a job opportunity.  So I met him for coffee.

4  **Q.**   And what did you discuss with Mr. Longstreth at that

5  coffee?

6  **A.**   There was a job opportunity to work for Speaker

7  Householder, and talk to candidates and help run their

8  campaigns.

9  **Q.**   Now, during that first coffee with Mr. Longstreth, did he

10  offer you the job or conduct any sort of interview?  What was

11  sort of --

12  **A.**   No.

13  **Q.**   -- the nature of that conversation?

14  **A.**   Sorry.

15  **Q.**   No problem.

16  **A.**   It was fairly casual and more conversational, just

17  getting to know each other 'cause I had never met Jeff at

18  that time, or Mr. Longstreth.  And so we just kind of -- he

19  got to know my background, my professional background

20  because I had obviously a career prior to that, as well.

21  And the prompting was that I would meet Mr. Householder

22  after.

23  **Q.**   Did you have, after that initial coffee, any follow-up

24  meetings with Mr. Longstreth?

25  **A.**   I met with Jeff Longstreth and Larry Householder, I

1    believe, the next day, or within the following couple days.

2    **Q.**    Where was that meeting held?

3    **A.**    It was held in Speaker Householder's office.

4    **Q.**    What did you, Mr. Householder, and Mr. Longstreth discuss

5    at that meeting?

6    **A.**    A job opportunity to again run kind of the political

7    campaigns of a number of candidates that were running for

8    the House of Representatives.

9    **Q.**    During that meeting with Mr. Householder, Mr. Longstreth,

10   did they officially hire you?

11   **A.**    No.

12   **Q.**    Did that ultimately happen?  Were you ultimately hired?

13   **A.**    I was ultimately offered a job, and I accepted.

14   **Q.**    And what were the circumstances of that offer and

15   acceptance?

16   **A.**    I was offered to be -- to be honest, I don't recall the

17   exact title.  However, I was offered a job to be a part of

18   the political team for Speaker Householder.

19   **Q.**    When did you officially start that position that you were

20   offered by Mr. Householder and Mr. Longstreth?

21   **A.**    September like 20, 21, 20th or 21st of 2017.

22   **Q.**    And were you an employee or a contractor or some other

23   sort of relationship?

24   **A.**    I was a contractor.

25   **Q.**    And who were you contracting with?

1   **A.**   JPL & Associates.

2   **Q.**   Now, during the time that you were contracted with JPL &

3   Associates, who paid you?

4   **A.**   It's my understanding JPL & Associates.

5   **Q.**   In connection with this position, did you have an office?

6   **A.**   I worked out of my home, but also reported -- like, I

7   was able to go to an office that was at 65 East State.

8   **Q.**   Who else had offices within that space?

9   **A.**   Jeff Longstreth, Friends of Larry Householder, and a

10  couple other people would come in and out.

11  **Q.**   Was there anyone else who had an office, a fixed office

12  in that space?

13  **A.**   Anna Lippincott.

14  **Q.**   Who's Anna Lippincott?

15  **A.**   She was an associate of mine, like and worked kind of

16  as a part of the Team Householder folks.

17  **Q.**   Now, during the time that you were contracted by JPL &

18  Associates, what was the mission of the organization, would

19  you say?

20  **A.**   To elect good people to the House of Representatives

21  and also help Larry Householder become Speaker, again.

22  **Q.**   Now, at that time when you started your position, what

23  did you understand your job to be?

24  **A.**   Talk to candidates every day, help them with whether

25  they needed a walk book or a logo design.  Just helping

MEGAN FITZMARTIN - DIRECT                    14-2267

 1   their -- their campaigns kind of from the ground up.  A lot

 2   of folks, a lot of good people were recruited to run for the

 3   Ohio House, and -- but they needed help obviously putting

 4   together a campaign, and so I was someone who worked with

 5   them daily.

 6   Q.   Let's talk about the period of time from September of

 7   2017 --

 8   A.   Okay.

 9   Q.   -- through February of 2018?

10   A.   Okay.

11   Q.   Please, if you need water.

12        So from September of 2017 through February of 2018, what

13   were your responsibilities during that period of time?

14   A.   There are a number of open seats which means that there

15   is no incumbent running, there is no one who had held the

16   seat that is coming back to the House, and so I worked to

17   kind of secure -- not kind of -- sorry.  I worked to secure

18   candidates that could be good representatives for their --

19   for their districts and help them actually make the ballot.

20   'Cause no one can run for the Ohio House unless they secure

21   50 signatures of registered voters of a specific party or

22   unaffiliated party.  So that was the majority of my work

23   until February 7th.  That was the filing deadline, a snowy

24   day, of that year.

25   Q.   And when you say filing deadline, what are you referring

1    to you filing?

2    **A.**    The filing deadline is the day that you have to submit

3    at least 50 signatures to make it on the ballot for the

4    office that you're seeking.

5    **Q.**    Now, the candidates that you were assisting, how were

6    they identified?

7    **A.**    Can you clarify the question?

8    **Q.**    How did you -- how did JPL & Associates, your

9    organization, identify candidates to support?

10    **A.**    Some folks were already interested in running.  You

11    know the idea is that, you know, the Ohio House of

12    Representatives is a body of 99 members, and to have a good

13    representation of the state, it makes sense to make sure

14    that there's a good kind of overall cross-section of

15    individuals that represent different industries, different

16    backgrounds, et cetera.  So, you know, if someone is

17    interested in running or if there is kind of a void in that

18    representation, like what, you know, it's a good thing to

19    find a good person who is willing to put public service at

20    the forefront.

21    **Q.**    Now, before JPL & Associates and you would work with

22    these identified candidates --

23    **A.**    Um-hmm.

24    **Q.**    -- who had to approve those candidates?

25    **A.**    No one approved a candidate.  We -- we would -- so I

MEGAN FITZMARTIN - DIRECT                    14-2269

1   would meet or someone from the organization would meet with

2   the candidate, but I wouldn't really call it an approval

3   process.  We would meet with folks and -- and see kind of if

4   they -- if they had a -- if they would check their egos and

5   join a team mentality.

6   **Q.**   Now, during this period that we're talking about,

7   September of 2017 through September of 2018, did you have any

8   staff members working for you?

9   **A.**   I did not, no.  I worked with vendors.

10  **Q.**   During this initial period of time, just an estimate, how

11  many hours a week were you working?

12  **A.**   Probably 80 to 100.

13  **Q.**   And during that period of time, what were you using for

14  work communications?

15  **A.**   Certainly, an all, you know, above approach.  So

16  whether it was text, phone, email, conversation, meeting,

17  whatever communications are available.

18  **Q.**   How would you quantify, approximately, the amount of work

19  communications you were receiving during this time?

20  **A.**   The limit does not exist.  I'm not exactly sure of how

21  to quantify other than, you know, I enjoy being busy.  So I

22  worked hard.

23          MS. GAFFNEY-PAINTER:  Your Honor, may we please have

24  permission to publish what's already been admitted as

25  Government Exhibit 256A?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1              THE COURT:  Yes.  It will come up on the screens in

2    a moment.

3         I think it's up.

4    Q.   Thank you.  Ms. Fitzmartin, just directing you to the top

5    of this page, who is this text exchange between?

6    A.   Jeff Longstreth and me.

7    Q.   Let's look, if we could --

8              MS. GAFFNEY-PAINTER:  Thank you, Ms. Terry.

9    Q.   -- at these three texts.

10   A.   Um-hmm.

11   Q.   What is the date of this exchange?

12   A.   January 12, 2018.

13   Q.   You see that first text box there, it's gray?

14   A.   Um-hmm.

15   Q.   There's a reference within that text to CC endorsement

16   committee list with Borges.  What is the CC endorsement

17   committee?

18   A.   The Ohio Republican party has a State Central

19   Committee, which is the governing body, and within that body

20   there is an endorsement committee.  I believe it's at the

21   discretion of the chairman.  I actually don't know those

22   exact details.

23        And so this committee would review the potential

24   endorsements of Republicans seeking office.

25   Q.   And who is Borges?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MEGAN FITZMARTIN - DIRECT                     14-2271

1    **A.**   Matt Borges is the former chairman of the Ohio

2    Republican party, and at that time was a lobbyist.

3    **Q.**   Now, this message from Mr. Longstreth, will you please

4    share the CC endorsement committee list with Borges and see

5    how many friends we have, what was your understanding of what

6    he was asking you to do here?

7    **A.**   Having been the former chairman, Matt Borges had

8    relationships with a number of committee members.  And so it

9    was to work with him to see, you know, who we could talk to

10   for endorsements or for no endorsement.

11   **Q.**   Can you explain no endorsement to us?

12   **A.**   The -- so -- yes.  So the endorsement process comes

13   with a number of benefits.  Obviously, the Ohio Republican

14   party is a brand, and that's helpful.  And no endorsement

15   would mean that no one would have the ability to use that

16   brand and/or benefit of the postage reimbursement.

17   **Q.**   Can you explain a little bit more about postage

18   reimbursement you had just mentioned?

19   **A.**   As a nonprofit, the Ohio Republican party has

20   discounted rates on mail.

21   **Q.**   Now, during this time that you were contracted with JPL &

22   Associates, was there ever in your estimation a time where you

23   were seeking a non-endorsement for one of your candidates?

24   **A.**   Certainly.  It's tradition of the Ohio Republican party

25   not to endorse in a contested primary, especially with

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1  non-incumbents.  And so we were just seeking to ensure the

2  tradition.  And, you know, it's -- at that time there was an

3  opponent in the Speaker's race who was seeking to overturn

4  that traditional stance and seek endorsements.

5          MS. GAFFNEY-PAINTER:  Ms. Terry, may we please

6  advance to the second page.  Thank you.

7      And may we please blow up the top text message there.

8  **Q.**  Now, there's a reference in this text message from

9  Mr. Longstreth to kitchen cabinet.  What is a kitchen cabinet?

10  **A.**  A kitchen cabinet is a group of advisors of any elected

11  official who, you know, again that kind of a cross-section

12  of folks that hope to see an individual succeed and give

13  advice at kind of their request.

14  **Q.**  Who was in Mr. Householder's kitchen cabinet at this

15  time?

16  **A.**  At this time, I would say Bob Klaffky, Doug Price, and

17  Rex Elsass.

18          MS. GAFFNEY-PAINTER:  Now, Ms. Terry, if we could,

19  stay on this page, please, but blow up the middle two texts

20  there.

21  **Q.**  All right.  I'm looking, Ms. Fitzmartin, at your second

22  text here beneath your "okay" text.

23  **A.**  Um-hmm.

24  **Q.**  There are -- would you mind reading this text for us?  It

25  begins with "Frost."

MEGAN FITZMARTIN - DIRECT                    14-2273

1    **A.**    Frost should be able to get to Lamb.  I know Talmage,

2    Carnes, Goodman, Simon.  Obviously, BDM won't be gettable.

3    **Q.**    Can you explain to us what you're referring to here?

4    **A.**    These were members, at the time, of the State Central

5    Committee, and we're just talking about relationships that

6    people have with the members of the State Central Committee,

7    whether it be me or Frost.

8           MS. GAFFNEY-PAINTER:  All right.  Ms. Terry, may we

9    stay on this page and go to the bottom text.

10   **Q.**    And here we see a reference to a non-endorsement.

11   Ms. Fitzmartin, is this related to what you had testified to

12   about seeking a non-endorsement for some of your candidates?

13   **A.**    Correct.  This is just me confirming that we are going

14   the traditional route of a non-endorsement as opposed to

15   seeking an endorsement of the nonincumbent candidates.

16          MS. GAFFNEY-PAINTER:  Your Honor, may we please have

17   permission to publish what's been admitted already as

18   Government Exhibit 240A?

19          THE COURT:  Yes.

20   **Q.**    Now, Ms. Fitzmartin, directing your attention to the top

21   of the page, who is this text exchange between?

22   **A.**    Jeff Longstreth and me.

23          MS. GAFFNEY-PAINTER:  If we could, Ms. Terry, will

24   you please blow up the two green texts that appear on this

25   page?  Thank you.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **Q.**   Ms. Fitzmartin, what is the date on this exchange?

2   **A.**   January 12, 2018.

3   **Q.**   Will you please read for us your texts that you have

4   here?

5   **A.**   If possible, I think SLH should call Daniels.  He's

6   going to be in Shane's group meeting tomorrow.

7   **Q.**   And can you please read the next one as well.

8   **A.**   I can call, if that's helpful too.  Just having another

9   reassuring voice in the room that money/infrastructure will

10  be there would be helpful.

11  **Q.**   What are you talking about here?

12  **A.**   I am talking about a potential candidate who was having

13  their own sort of kitchen cabinet meeting back home in their

14  district, and I was requesting that Speaker Householder

15  reach out to an individual who I thought he may have a prior

16  relationship with.  And then it's no secret that there was

17  a -- an opponent in the Speaker's race who also was, you

18  know, providing infrastructure and fundraising help too, and

19  so this was just kind of allowing for that assurance that

20  just because you're not with the official caucus, that

21  you -- that an individual would have support.

22  **Q.**   Is that what you're referring to in the second text where

23  you say, "money/infrastructure"?

24  **A.**   Yes.

25  **Q.**   Let's turn now to February of 2018.  What, of

1    significance, happens in the election of 2018?

2    **A.**    In February 2018 we did a good job of running races and

3    we won a lot of primaries.

4    **Q.**    I'm talking about February of 2018.

5    **A.**    Oh, sorry.

6    **Q.**    That's okay.  And what of significance in relation to the

7    filing happens in February of 2018?

8    **A.**    In February 2018, we or a number of individuals filed

9    for the Ohio House of Representatives.

10   **Q.**    Now, after the petitions to run are filed in February --

11   **A.**    Um-hmm.

12   **Q.**    -- how did your responsibilities change at that time?

13   **A.**    Well, so the filing deadline signifies 90 days until an

14   election.  And so we, you know -- my duties shifted to

15   running races, meaning coordinating media and grassroots

16   efforts.

17   **Q.**    What month was the primary election in 2018?

18   **A.**    May.

19   **Q.**    All right.  Now, during this February to May 2018 period,

20   how many hours a week would you estimate you were working?

21   **A.**    80 to 100.

22   **Q.**    How many of the Team Householder candidates won their

23   primary in May of 2018?

24   **A.**    20 out of 21.

25   **Q.**    And after that primary election in May of 2018, how did

1   your responsibilities change?

2   **A.**   Then we -- my responsibilities shifted to the general

3   election.  So I recalibrate to the November 2018 election.

4   **Q.**   Now, describe for us what your work was from May of 2018

5   through November of 2018.

6   **A.**   I continued to coordinate media efforts and help

7   support grassroots efforts in a number of Ohio House races.

8   **Q.**   When you say coordinate media, can you explain what you

9   mean to us?

10  **A.**   Sure.  I worked to, you know -- if an individual needed

11  TV, radio, mail, phone calls, just all the kind of tactics

12  that are used in a campaign, I would help them, whether it's

13  with a script or kind of connect them with individuals who

14  could help their campaign.

15  **Q.**   And you mentioned mail.  For the mailers that you helped

16  produce, who had final approval over those mailers?

17  **A.**   The candidates.

18  **Q.**   Was anyone else consulted during that approval process

19  for the mailers?

20  **A.**   Sure.  I worked with a number of individuals, both with

21  the candidates' teams back home, in addition to Speaker

22  Householder and Jeff Longstreth.

23  **Q.**   Are you familiar with an entity called Hardworking

24  Ohioans?

25  **A.**   I've heard of it.

1    **Q.**   In 2018, what was Hardworking Ohioans' role, as far as

2    you're aware?

3    **A.**   I believe that was the super PAC used in the 2018

4    elections.

5    **Q.**   Who ran Hardworking Ohioans, as far as you're aware?

6    **A.**   I do not recall.

7    **Q.**   Now, what role did you have with respect to Hardworking

8    Ohioans?

9    **A.**   I had no role, other than I was able to see a couple of

10   their commercials on my television screen.

11   **Q.**   Did you have any responsibilities related to polling?

12   **A.**   I certainly helped coordinate polling in a number of

13   districts.

14   **Q.**   Did any of your responsibilities including sharing

15   polling information?

16   **A.**   I did help coordinate with our -- or with a website

17   vendor to make sure that polling information was publicly

18   available.

19   **Q.**   Can you explain that to us, what you mean by that?

20   **A.**   In campaigns, you're able to share information if you

21   make it publicly available so it's accessible to anyone, and

22   I did work with a website vendor to ensure that polling

23   information was able to be publicly available.

24   **Q.**   After the general election in November of 2018, how did

25   your responsibilities shift?

MEGAN FITZMARTIN - DIRECT                    14-2278

1          THE COURT:  I'm going to interject myself and ask

2     about, is this a good time to break?

3          MS. GAFFNEY-PAINTER:  Oh, yes.  It would be.  I

4     apologize, Your Honor.

5          THE COURT:  That's all right.  We've reached our

6     traditional breaking point being midmorning and we are going

7     to give the jury a break, and I want you to take a break.  Go

8     upstairs, relax.  As always, do not discuss the case even

9     among yourselves.  Keep an open mind.  Keep away from the

10    media, take a break.  We will be back here shortly after

11    11:05.

12         We will rise out of respect for you as you leave for your

13    20-minute break.

14         THE COURTROOM DEPUTY:  All rise for the jury.

15         (Jury exited the courtroom at 10:46 a.m.)

16         THE COURT:  The jury's left the room.  The door is

17    closing.  As always, we will stay in the courtroom until we

18    have been advised that the jury has cleared the floor and we

19    will break until shortly after 11:05.

20         During the break, the witness is not to discuss her

21    testimony with anyone.  Do you understand?

22         THE WITNESS:  Yes.

23         THE COURT:  Thank you.

24         You can be seated or stand as you choose.

25         We're on break.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1          THE COURTROOM DEPUTY:  All rise.  This Court is in

2    recess.

3        (Recess from 10:47 a.m. until 11:06 a.m.)

4          THE COURT:  Are we ready for the jury from the

5    government's perspective?

6          MS. GAFFNEY-PAINTER:  Yes, Your Honor.

7          THE COURT:  Mr. Householder's?

8          MR. GLICKMAN:  Yes, Judge.

9          THE COURT:  Mr. Borges'?

10          MR. SCHNEIDER:  Yes, Judge.

11          THE COURT:  Let's call for the jury.

12        (Pause.)

13          THE COURT:  We're going to look to break at 12:20.

14        (Pause.)

15          THE COURTROOM DEPUTY:  All rise for the jury.

16        (Jury ended the courtroom at 11:11 a.m.)

17          THE COURT:  Jurors can be seated as they join us.

18        You may all be seated.  Thank you.

19        I hope you had a decent break.  We're going to continue

20    with the taking of testimony.

21        Ms. Painter, you may approach the podium and begin.

22          MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

23          THE COURT:  Very well.

24    **Q.**   Ms. Martin -- excuse me -- Ms. Fitzmartin, before the

25    break, we were discussing some of your responsibilities with

1    regards to polling.

2            MS. GAFFNEY-PAINTER:  Your Honor, may the government

3    have permission, please, to display both Government Exhibit

4    260A and Government Exhibit 260A1, both of which have been

5    admitted into evidence?

6            THE COURT:  Yes.

7    **Q.**   Ms. Fitzmartin, directing your attention to the left side

8    of the screen, this first page, what are we looking at here?

9    **A.**   An email from me to Jeff Longstreth.

10   **Q.**   And what is the date on this email?

11   **A.**   Thursday, October 18, 2018.

12           MS. GAFFNEY-PAINTER:  Ms. Terry, may we please

13   advance to the second page of 260A.

14   **Q.**   Ms. Fitzmartin, what are we looking at here on this

15   second page?

16   **A.**   Poll results.

17   **Q.**   Okay.  Now, if I may, direct your attention to the right

18   side of the screen, what are we looking at here?

19   **A.**   An email from Jeff Longstreth to our website vendor.

20   **Q.**   And who was your website vendor?

21   **A.**   Kevin Bingle.

22   **Q.**   And in the body of the email, can you read the body of

23   the email to us, please?

24   **A.**   This is ready to post on Gen Now News website.  Link

25   should be titled "10-18-2018 Update."

1    **Q.**   And there is a reference there to Gen Now News website.

2    What is that?

3    **A.**   It's a website for Generation Now.

4    **Q.**   When you testified earlier that part of your

5    responsibility was getting polling information put on a

6    publicly available website, was this what you were referring

7    to?

8    **A.**   Yes.

9    **Q.**   All right.  Let's go to the general election of November

10   of 2018.  After that election, how did your responsibilities

11   shift?

12   **A.**   They shifted to helping Larry Householder become

13   Speaker.  So it's a continuation of my responsibilities.

14   **Q.**   When was the vote for Speaker held?

15   **A.**   On January 7th, 2019.

16   **Q.**   And who were the contenders for Speaker at that time?

17   **A.**   Larry Householder and Ryan Smith.

18   **Q.**   Who ultimately won the vote for Speaker?

19   **A.**   Larry Householder.

20   **Q.**   Now, are you familiar with a piece of legislation known

21   as House Bill 6?

22   **A.**   I've heard of it.

23   **Q.**   What responsibilities did you have with relation to House

24   Bill 6?

25   **A.**   As a piece of legislation, I did not have

1    responsibilities as it relates to House Bill 6.

2    **Q.**   Did you have any responsibilities related to the

3    political side of House Bill 6?

4    **A.**   I helped run a public relations campaign for House Bill

5    6.

6    **Q.**   Now, when you say public relations campaign, can you just

7    explain that for us?

8    **A.**   Certainly.  I helped highlight the positive benefits of

9    House Bill 6.

10   **Q.**   And how did you highlight the positive benefits of House

11   Bill 6?

12   **A.**   Using typical campaign tactics -- phone, mail.  I

13   believe that's it, phone and mail.

14   **Q.**   Who assigned those responsibilities to you?

15   **A.**   Jeff Longstreth.

16   **Q.**   Now, were there any other individuals with JPL &

17   Associates working on House Bill 6 advocacy with you?

18   **A.**   Certainly there were other contractors that were to

19   help advance the positive -- the positive items that came

20   with House Bill 6.  Anna Lippincott as well.  And other

21   vendors, mail vendors, phone vendors, et cetera.

22   **Q.**   Now, did you ever attend any meetings about advocacy for

23   House Bill 6?

24   **A.**   Yes.

25   **Q.**   Who was present for those meetings?

MEGAN FITZMARTIN - DIRECT                    14-2283

1    **A.**   Can you clarify the question?  At what time?

2    **Q.**   Well, you tell us.  How frequently did you attend

3    meetings related to the advocacy work for House Bill 6?

4    **A.**   So while it was working through the legislature, every

5    once in a while, but not too often.  There might have been

6    one or two meetings.

7    **Q.**   Do you recall any of the individuals who attended those

8    one or two meetings with you?

9    **A.**   Yes.  Neil Clark, Jeff Longstreth, Anna, and me.

10   **Q.**   Do you recall a meeting about House Bill 6 that you

11   attended on June 3rd, 2019?

12   **A.**   I will need a little bit more information as for the

13   date.  That was a couple years ago.

14   **Q.**   So what happened with House Bill 6 on May 29, 2019, do

15   you recall?

16   **A.**   I do not recall.

17   **Q.**   Do you recall any conference calls held in June of 2019

18   about winning support for House Bill 6 in the Senate?

19   **A.**   No specific conference calls.

20   **Q.**   Now, did House Bill 6 ultimately pass the Senate?

21   **A.**   Yes.

22   **Q.**   And after House Bill 6 was signed into law, were there

23   further efforts made in opposition to it?

24   **A.**   Yes.

25   **Q.**   What was JPL & Associates' role with respect to the

1    repeat referendum?

2    **A.**    JPL & Associates worked to stop the repeal.

3    **Q.**    What was Neil Clark's role with respect to the repeal

4    referendum?

5    **A.**    He advised on stopping the repeal.

6    **Q.**    Do you recall his advice?

7    **A.**    He would provide insight in the media materials, and he

8    also worked to stop signature collectors.

9    **Q.**    During this time of the repeal referendum, did you have

10   any interaction at all with any of the signature collectors?

11   **A.**    There is one individual who came to an office.  The --

12   one of the signature collectors, the business side of the

13   signature collector's name was Megan, and he had completed

14   the two of us.  I never met said Megan, and so upon his

15   arrival, said you have the wrong Megan, and he left.

16   **Q.**    Do you remember what he was seeking from you at that

17   time?

18   **A.**    A plane ticket, I believe.

19   **Q.**    During this period of the ballot referendum, what role

20   did Matt Borges play, as far as you knew?

21   **A.**    He was advising on the effort to stop the repeal.

22   **Q.**    And what role did Larry Householder have as far as you

23   were aware?

24   **A.**    He certainly wanted to keep House Bill 6 as law.  When

25   the Speaker passes a law, they want to maintain said

1    legislation, and I actually did not speak to Larry

2    Householder during the repeal effort.  I don't believe we

3    had any conversations.

4    **Q.**   Are you familiar with an entity known as Ohioans For

5    Energy Security?

6    **A.**   Yes.

7    **Q.**   What is Ohioans For Energy Security?

8    **A.**   It was an entity created to stop the repeal effort of

9    House Bill 6.

10   **Q.**   Who was associated with Ohioans For Energy Security?

11   **A.**   Carlo LoParo was the spokesman.  I believe that.

12   **Q.**   Do you recall anyone else involved with Ohioans For

13   Energy Security?

14   **A.**   A number of people were advising them, Ohioans For

15   Energy Security.  You know, Matt Borges, Neil Clark, Jeff

16   Longstreth, and a number of others.

17   **Q.**   I want to advance now to 2020.

18   **A.**   Okay.

19   **Q.**   During 2020, did you ever attend any meetings between

20   Jeff Longstreth and Larry Householder?

21   **A.**   Yes.

22   **Q.**   Was one such meeting in mid January of 2020?

23   **A.**   Yes.

24   **Q.**   And was there discussion of term limits at this meeting?

25   **A.**   Yes, among other things, because the State Central

```
 1    Committee was meeting to endorse.  Excuse me.  It was
 2    meeting to endorse candidates of the 2020 election, so that
 3    was a topic of discussion among mail, right in the thick of
 4    campaign season again.  And then also term limits came up.
 5    Q.    Do you recall who was present for that meeting?
 6    A.    Larry Householder, Jeff Longstreth, Neil Clark, and me.
 7    Q.    And can you explain to us what were term limits at that
 8    time?
 9    A.    At that time, and currently, term limits, an individual
10    can hold an office for eight years.  In the House that means
11    you can serve four 2-year terms.  And then you can go seek
12    another office.
13    Q.    Another office within the House?
14    A.    Sorry.  Outside the House.
15    Q.    Who is Chuck Jones?
16    A.    The former CEO of FirstEnergy.
17    Q.    Do you recall hearing any conversations between
18    Mr. Longstreth and Mr. Householder in February of 2020 about
19    Chuck Jones and raising money?
20    A.    Jeff Longstreth requested that the Speaker seek $5
21    million in donations from Chuck Jones.  I don't know if that
22    call ever happened.  It was just the request that I heard.
23    Q.    During the time that you worked with JPL & Associates,
24    were you aware of conversations between Larry Householder and
25    Chuck Jones?
```

**MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)**      14-2287

1    **A.**   I never was a part of any conversations between the two

2    of them.

3            MS. GAFFNEY-PAINTER:  May I have a moment to confer,

4    Your Honor?

5            THE COURT:  Yes.

6            MS. GAFFNEY-PAINTER:  No further questions.

7            THE COURT:  Very well.  Attorneys for

8    Mr. Householder and then Mr. Borges have an opportunity to ask

9    questions.

10       On behalf of Mr. Householder.

11           MR. OLESKI:  Thank you, Judge.

12           THE COURT:  Yes.

13           MR. OLESKI:  May I proceed?

14           THE COURT:  Yes, please.

15                       **CROSS-EXAMINATION**

16   BY MR. OLESKI:

17   **Q.**   Good morning, Ms. Fitzmartin.

18   **A.**   Good morning.

19   **Q.**   My name is Nick Oleski.  I am one of Mr. Householder's

20   attorneys.

21   **A.**   Okay.

22   **Q.**   I just have a few questions for you.

23       You indicated in your direct examination that you first

24   met Mr. Longstreth in September of 2017; is that right?

25   **A.**   Correct.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)     14-2288

1   **Q.**   And during the course of that meeting, you learned that

2   Mr. Longstreth had an opportunity for you, right?

3   **A.**   Yes.

4   **Q.**   And that was an opportunity that you wanted, right?

5   **A.**   That's correct.

6   **Q.**   You had been in politics since 2011, I think you said?

7   **A.**   Yes.

8   **Q.**   And you viewed this opportunity working with

9   Mr. Longstreth as an opportunity to continue advancing your

10  political career; is that right?

11  **A.**   That's correct.

12  **Q.**   And during the course of that initial meeting with

13  Mr. Longstreth, you understood that the role that you would

14  have would be supporting this slate of candidates, right?

15  **A.**   Correct.

16  **Q.**   And then either the next day or a few days -- a few days

17  after, you first met Mr. Householder, right?

18  **A.**   Yes.

19  **Q.**   And you had similar conversations with Mr. Householder;

20  is that right?

21  **A.**   Yes.

22  **Q.**   And at the time, were you aware that there was an

23  upcoming race for Speaker of the Ohio House of

24  Representatives?

25  **A.**   Yes.

1    **Q.**    And that would have been in 2018, right?  Strike that.

2          After -- that would have been a race after the general

3    election in 2018, right?

4    **A.**    Yes.

5    **Q.**    And who were the candidates for Speaker of the Ohio House

6    of Representatives?

7    **A.**    Larry Householder and Ryan Smith.

8    **Q.**    And during the course of those initial meetings with

9    Mr. Longstreth and Mr. Householder, did you come to learn that

10   they were running a slate of candidates against candidates

11   that were being run by Ryan Smith?

12   **A.**    They were running candidates opposing Ryan Smith, yes.

13   **Q.**    And during the course of those initial meetings with

14   Mr. Longstreth and Mr. Householder, did you learn that

15   Mr. Householder was upset with the current leadership in the

16   Ohio House of Representatives?

17   **A.**    Yes.  A number of people were.

18   **Q.**    And ultimately after having those initial meetings with

19   Mr. Longstreth and Mr. Householder, you were offered a job

20   working for them, right?

21   **A.**    Correct.

22   **Q.**    And who offered you that opportunity?

23   **A.**    Jeff Longstreth.

24   **Q.**    And ultimately I think you testified on your direct

25   examination that you worked as a contractor for

1    Mr. Longstreth's company, JPL & Associates; is that right?

2    **A.**    That's correct.

3    **Q.**    And you had your own company at the time, right?

4    **A.**    That's right.

5    **Q.**    What was that?

6    **A.**    MC Fitzmartin, LLC.

7    **Q.**    And so your company contracted with Mr. Longstreth's

8    company -- with Mr. Longstreth's company, right?

9    **A.**    That's correct.

10   **Q.**    And I think you testified to on your direct examination

11   that over the course of a couple years you served a variety of

12   different roles working for JPL & Associates, right?

13   **A.**    Yes.

14   **Q.**    So initially from that September 2017 time period until

15   early February of 2018, you were focused on candidate

16   recruitment; is that right?

17   **A.**    Yes.

18   **Q.**    And that was something that you and Mr. Longstreth were

19   working on, right?

20   **A.**    That's correct.

21   **Q.**    And I think you testified in your direct examination that

22   you were looking to recruit good people to run for the Ohio

23   House of Representatives?

24   **A.**    That's right.

25   **Q.**    What does that mean?

1    **A.**    Good people are individuals who put others before

2    themselves, and they put public service ahead of their own

3    egos.

4    **Q.**    So those were the types of individuals that you were

5    looking for to recruit to run for the Ohio House of

6    Representatives; is that right?

7    **A.**    That's correct.

8    **Q.**    And you also mentioned during your direct examination

9    that you were looking for a cross -- cross-section of

10    individuals from the community?

11    **A.**    Correct.

12    **Q.**    What does that mean?

13    **A.**    Again, the Ohio House of Representatives is made up of

14    99 individuals, and I think it's in the best interest, and I

15    believe a number of people would agree that it's in the best

16    interest to have a representation of all the different

17    facets of life, meaning jobs, moms, single, you know,

18    whomever, so that their interests are represented when

19    voting on legislation that impacts the seventh largest state

20    in the country.

21    **Q.**    And when recruiting these candidates, you and

22    Mr. Longstreth focused on open seats, right?

23    **A.**    That's right.

24    **Q.**    And that means that's a seat where there is not an

25    incumbent running for office, right?

1   **A.**   That's correct.

2   **Q.**   And because we have term limits in Ohio, there are

3   oftentimes a number of open seats that, you know, people would

4   run -- would run for in the Ohio House of Representatives,

5   right?

6   **A.**   Correct.

7   **Q.**   And because you're not -- you're not working with an

8   incumbent, you are working with people who by definition

9   haven't held elected office at this level before, they need a

10  lot of help and support; is that right?

11  **A.**   Yes.

12  **Q.**   And those were -- and that support was something that JPL

13  could provide, right?

14  **A.**   Correct.

15  **Q.**   The candidates retained JPL to provide kind of a soup to

16  nuts experience, right?

17  **A.**   Yes.  I have heard that term or phrase multiple times.

18  **Q.**   And what does that phrase mean, to your knowledge?

19  **A.**   It means -- it can be a very convoluted process to run

20  a campaign, and so the idea would be to have a one-stop shop

21  to have a menu of options for -- for your campaign, as

22  opposed to having to navigate through the murky waters.

23  **Q.**   And those were services that Mr. Longstreth and his

24  related companies could provide?

25  **A.**   Correct.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2293

1   **Q.**   And Mr. Longstreth at the time had a company, JPL &

2   Associates, right?

3   **A.**   That's right.

4   **Q.**   And then he also had another company called Constant

5   Content, right?

6   **A.**   That's right.

7   **Q.**   And the slate of candidates who were ultimately recruited

8   to run for the Ohio House of Representatives during the 2018

9   elections ultimately retained both Constant Content and JPL to

10  provide various services to them, right?

11  **A.**   That's my understanding, yes.

12  **Q.**   And is it your understanding that the candidates paid

13  monthly retainers both to JPL and to Constant Content for

14  those services?

15  **A.**   Yes.

16  **Q.**   Now, you testified to in your direct examination

17  regarding endorsements by the central committee.  Do you

18  recall that?

19  **A.**   Yes.

20  **Q.**   And I think you had indicated that there was a

21  traditional approach to endorsements and a nontraditional

22  approach to endorsements, right?

23  **A.**   Correct.

24  **Q.**   And if I understand -- if I understood your testimony

25  correctly, the traditional approach would be that the

**MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)**          14-2294

```
1    Republican central committee would not endorse candidates in

2    contested primaries; is that right?

3    A.    That's my understanding, right.

4    Q.    And what is a contested primary?

5    A.    A contested primary would be when there is more than

6    one candidate.

7    Q.    And in this case in the context of the 2018 elections,

8    was it your understanding that oftentimes the primaries were

9    contested?

10   A.    Yes.

11   Q.    And in many instances, the contested candidates for --

12   strike that.

13         In many cases, the candidates that were contesting those

14   primaries, some were supported by Mr. Householder and the

15   others were supported by Mr. Smith; is that right?

16   A.    Yes.

17   Q.    And Mr. -- and if I understood your testimony correctly,

18   Mr. Smith was advocating that the central committee endorse

19   his slate of candidates?

20   A.    That's correct.

21   Q.    And that would have been the nontraditional approach for

22   candidate endorsements, right?

23   A.    Correct.

24   Q.    And ultimately Mr. Longstreth and you were advocating for

25   taking the traditional approach, right?
```

1   **A.**   That's right.

2   **Q.**   And that would mean that the central committee would not

3   endorse?

4   **A.**   Correct.  Just let the primaries play out.

5   **Q.**   And was it your understanding, as well, that Mr. -- that

6   Mr. Smith -- that Mr. Smith's slate of candidates were being

7   supported by the Republican Caucus during those election

8   primaries?

9   **A.**   Correct.  They were being supported by the Ohio House

10  Republican Caucus.

11  **Q.**   And would that also be a nontraditional use of the

12  Republican party's monies to support candidates in contested

13  primaries?

14  **A.**   That's my understanding.

15          THE JUROR:  Your Honor?

16          THE COURT:  Yes.

17          THE JUROR:  Can we take a ten-minute break if I

18  could use the restroom?

19          THE COURT:  Yes.  We're going to take a ten-minute

20  break.  During the break, do not discuss the case among

21  yourselves.

22          THE COURTROOM DEPUTY:  All rise for the jury.

23          THE COURT:  Get up and move around.

24     (Jury exited the courtroom at 11:34 a.m.)

25          THE COURT:  A short, ten-minute break.  Let's stay

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2296

1     in the courtroom until we're advised the jury has cleared the

2     floor.

3          (Pause.)

4          THE COURT:  This is a short break, and the jury is

5     hanging out on this floor.  So if we might all be seated and

6     remain quiet off the record.  We'll get the jury back as soon

7     as we can.  You can remain standing if you wish.

8          (Recess from 11:36 a.m. until 11:38 a.m.)

9          THE COURTROOM DEPUTY:  All rise for the jury.

10         (Jury entered the room at 11:38 a.m.)

11         THE COURT:  You may all be seated.  Thank you.

12         And they are back.  We will continue to take testimony.

13    Q.   Circling back to candidate recruitment and recruiting

14    these good people to run for the Ohio House of

15    Representatives, in your experience during your time working

16    for JPL, did you ever observe Mr. Householder pressuring or

17    cajoling any of these candidates for their support?

18    A.   No, I did not.

19    Q.   After February of 2018, which is the filing deadline for

20    the candidates to -- to submit their petitions to run for the

21    Ohio House of Representatives, your role shifted after that

22    point, right?

23    A.   Yes.

24    Q.   You went from candidate recruitment to helping support

25    these candidates in their primary elections, right?

1    **A.**    That's correct.

2    **Q.**    And you focused on -- what did you focus on during that

3    time period?

4    **A.**    I focused on their campaign, so grassroots and media

5    efforts.

6    **Q.**    And you would -- you spoke to these candidates on a daily

7    basis; is that right?

8    **A.**    Multiple times a day.

9    **Q.**    And fair to say that each one of these candidates was

10   unique in how they wanted their imaging managed?

11   **A.**    That's correct.

12   **Q.**    Some of them wanted complete control over -- over their

13   imaging and marketing, right?

14   **A.**    That's right.

15   **Q.**    And others were more laid back about that, right?

16   **A.**    That's correct.

17   **Q.**    But either way, the individual candidates had final

18   approval over any mailing or advertisements that went out,

19   right?

20   **A.**    Correct.

21   **Q.**    And during that time period, as well, after the filing

22   deadline in February of 2018, were there -- were there

23   meetings at the JPL offices on State Street with the

24   candidates and various lobbyists?

25   **A.**    Yes.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2298

1    **Q.**    And those were held on a regular basis, right?

2    **A.**    That's correct.

3    **Q.**    And do I understand this correctly, that lobbyists and

4    other interested individuals from companies like the utility

5    companies to -- to Medicaid and a variety of other industries

6    would meet with these candidates?

7    **A.**    Correct.

8    **Q.**    And why would they do -- and why would you set up those

9    kinds of meetings?

10   **A.**    Due to term limits, there's a knowledge gap.  And so in

11   order to make sure that folks not only have to know where

12   the restroom is but also how to vote on -- you know, have an

13   understanding or at least a foundation on policy.  The

14   concept was to make sure that they at least had a -- an

15   understanding or an overview of some -- some base, you know,

16   whether it's Medicaid, utilities, or whatever industry, a

17   basic concept.

18   **Q.**    The point is to build up the candidate -- these

19   candidates' knowledge bases for a variety of different

20   industries, right?

21   **A.**    Correct.

22   **Q.**    Because ultimately, if these individuals succeed and are

23   elected members of the Ohio House of Representatives, they

24   will have to vote on and consider issues relating to the

25   utilities, labor unions, and Medicaid, right?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **A.**   That's right.  They immediately have to look at the

2   budget.

3   **Q.**   And those are just, you know, a handful of examples,

4   right?

5   **A.**   Correct.

6   **Q.**   We would want our elected officials to be educated on

7   these variety of issues, right?

8   **A.**   That's the idea.

9   **Q.**   And so in May of 2018 are the primary elections; is that

10  right?

11  **A.**   Correct.

12  **Q.**   And I think you had testified to on your direct

13  examination that in the lead-up to the primary elections, you

14  worked 80 to 100 hours a week, right?

15  **A.**   Correct.

16  **Q.**   Helping support or helping these slate of candidates

17  get -- win their primary elections, right?

18  **A.**   That's correct.

19          MR. OLESKI:  PJ -- or Your Honor, if we could

20  publish Government's Exhibit 241D, which has been admitted.

21          THE COURT:  Yes.

22          MR. OLESKI:  PJ, if you could just enlarge that a

23  little bit.

24  **Q.**   Do you see that on your screen, Ms. Fitzmartin?

25  **A.**   I do not yet -- there we go.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)     14-2300

1   **Q.**   Do you recognize this as an email sent by Jeff Longstreth

2   to a number of individuals, including yourself?

3   **A.**   Correct.  I see my name and Jeff Longstreth's name.

4   **Q.**   And Mr. Longstreth sent this email on May 8, 2018, right?

5   **A.**   Correct.

6   **Q.**   And May 8, 2018, was the date of the primary elections in

7   2018, right?

8   **A.**   That's correct.

9   **Q.**   And there are a number of different -- a number of

10  individuals who he sent this email to, correct?

11  **A.**   Correct.

12  **Q.**   And the subject of the email is Update No. 3, right?

13  **A.**   Yes, yes.

14  **Q.**   Presumably there is an Update No. 1 and an Update No. 2,

15  right?

16  **A.**   I would presume that as well, yes.

17          MR. OLESKI:  PJ, if you could go to the attachment,

18  the next page.

19  **Q.**   And this would reflect the Householder v. Smith primary

20  elections, right?

21  **A.**   Correct.

22  **Q.**   Mr. Longstreth was giving an update to these various

23  individuals regarding the initial results from those primary

24  elections, right?

25  **A.**   Correct.

1    **Q.**   And how the Householder candidates were doing against the

2    Smith candidates, right?

3    **A.**   Correct.

4    **Q.**   And I think you testified on your direct examination that

5    Team Householder went 20 and 1?

6    **A.**   Correct.

7            MR. OLESKI:  You can take that down, PJ.

8    **Q.**   And then after the primary elections in 2018, your role

9    shifted to helping the candidates in the general election,

10   right?

11   **A.**   That's correct.

12   **Q.**   Is it fair to say that the slate of candidates that you

13   helped changed over time?

14   **A.**   Yes.

15   **Q.**   So the slate of candidates you were helping during the

16   primary elections in 2018 were different than the candidates

17   that you were helping support in the general elections, right?

18   **A.**   The slate evolved, yes.

19   **Q.**   And why did the slate evolve?

20   **A.**   There are a number of political calculations as to why

21   the slate would evolve.  There are -- you know, some

22   individuals have a tough primary but have a relatively easy

23   general election, and some people ran unopposed in the

24   primary but then have a tough general election just based on

25   the demographics of each individual district.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2302

1   **Q.**   And ultimately, I think you testified to on your direct

2   examination, that you again worked 80 to 100 weeks helping

3   these candidates win their elections during the general

4   elections, right?

5   **A.**   Yes.  Campaigns are hard.

6          MR. OLESKI:  Your Honor, permission to publish

7   Householder Exhibit 338, which has been admitted.

8          THE COURT:  Yes.

9          MR. OLESKI:  Can you blow that up, PJ?

10  **Q.**   Do you recognize this, Ms. Fitzmartin, as an email sent

11  from Mr. Longstreth to you and a number of other individuals

12  on November 5th of 2018?

13  **A.**   Yes.

14  **Q.**   Now, during the course of this trial, we've heard the

15  phrase Team Householder quite a bit.  What does Team

16  Householder mean?

17  **A.**   A team, I mean, candidate's name, is just a pretty

18  common nomenclature to use to make sure that you're

19  identified as being a part of the candidate's team.  So Team

20  Householder or team -- I've had a number of bosses

21  throughout the years, and it's team my boss's name.

22  **Q.**   And Team Householder would include the various

23  individuals working to support Mr. Householder's interests,

24  right?

25  **A.**   Correct.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)         14-2303

1    **Q.**   So not just the slate of candidates, right?

2    **A.**   Correct.

3    **Q.**   You're part of Team Householder, right?

4    **A.**   Yes, I am.  Or was.

5    **Q.**   And this email by Mr. Longstreth was sent on the night

6    before the general elections in 2018; is that right?

7    **A.**   Yes.

8    **Q.**   And do you recognize all of the individuals that he sent

9    this email to to also have been part of Team Householder?

10   **A.**   Correct.

11   **Q.**   And, Ms. Fitzmartin, if you don't mind reading this

12   email, please.

13   **A.**   Hi, Team Householder.

14        I just wanted to drop you all a note and tell you how

15   thankful I am for all the hard work, blood, sweat, and tears

16   you have given to the team over the last two years.

17        We started with nothing more than an appreciation to

18   shake up the system and an admiration for our guy Larry

19   Householder.  In that time, we've all learned what an

20   inspirational leader he is and we've built the best team in

21   Ohio politics.

22        I'm so honored to have been part of such a special

23   group of people.  Every single person on this team has given

24   up their time and energy to ensure victory, and each of you

25   deserves special credit for bringing home the victory.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2304

1      I've spent time thinking about each of you tonight and

2    how you've helped us to get to this point.  From that moment

3    we started to raise -- started raising money, to recruiting

4    candidates, to developing candidates, to the mail, research,

5    communications, photography, polling, phones, digital --

6           THE COURT:  If you'll slow down, she's got to write

7    it all down.  Go ahead.

8    **A.**   Not only did we do it for 21 newbie candidates in the

9    primary against an organized, well-funded operation that

10   tried to kill us --

11          THE COURT:  I'm really, really sorry.  Will you read

12   slower?  She has to write everything down.

13          THE WITNESS:  Yes.

14          THE COURT:  "Not only."

15          THE WITNESS:  This team has never backed down, never

16   complained, and never stopped fighting to win.

17      By this time tomorrow night, we will see the fruits of

18   our labor and we are going to be victorious thanks to your

19   efforts.

20      Thank you and your teams for giving everything you have

21   to this cause.

22      Let's go win.  Jeff.

23      Sent from my iPhone.

24   **Q.**   And between September of 2017 and November of 2018, you

25   worked 80 to 100 hour workweeks helping support this slate of

1    candidates, right?

2    **A.**    Correct.

3    **Q.**    Ultimately all to get to that -- to this goal, to the

4    general elections in 2018, right?

5    **A.**    Correct.  Campaigns are built to win.

6    **Q.**    And after the November 2018 elections, Mr. Householder

7    and Mr. Smith swear off in their race for Speaker, right?

8    **A.**    Correct.

9    **Q.**    And ultimately, Mr. Householder was successful and he was

10   elected Speaker of the Ohio House of Representatives in

11   January of 2019, correct?

12   **A.**    That's right.

13          MR. OLESKI:  You can take this down, PJ.

14   **Q.**    Now, between September of 2017 and January of 2019, you

15   were working from your home; is that right?

16   **A.**    I worked from my home and reported to an office.

17   **Q.**    And the office was the JPL office at State Street?

18   **A.**    Correct.

19   **Q.**    And to be fair, I think you testified to in your direct

20   examination that Mr. Householder's campaign also had an office

21   space at that location?

22   **A.**    That was my understanding, yes.

23   **Q.**    After Mr. Householder was elected Speaker, did he no

24   longer have office space at that location?

25   **A.**    That's correct.

MEGAN FITZMARTIN - CROSS (HOUSEHOLDER)          14-2306

1    **Q.**   Where was his office space after that point?

2    **A.**   He had an official office in the Riffe Center and a

3    ceremonial office in the State House.  And I very, very

4    rarely saw him because he was doing the people's work.

5    **Q.**   And JP&L also -- JPL & Associates also moved out of the

6    State Street office, right?

7    **A.**   That's correct.

8    **Q.**   And where did -- where did JPL move to?

9    **A.**   When an individual's elected Speaker, they assume

10   authority of the campaign caucus, and at that time the

11   campaign caucus was in -- so the political arm of the House

12   was in an office on Broad Street.  There was -- they were in

13   the midst of a lease.

14   **Q.**   And your role shifted to the political side of things,

15   right?

16   **A.**   I continued on the political side of things, yes.

17   **Q.**   Fair enough.  And you rarely saw Mr. Householder after

18   January of 2019, correct?

19   **A.**   Correct.

20   **Q.**   You testified in your direct examination that you

21   currently work for the state of Ohio, I think is what you

22   said, right?

23   **A.**   Correct.

24   **Q.**   Who do you work for currently?

25   **A.**   I work for Speaker Jason Stephens.

**MEGAN FITZMARTIN - CROSS (BORGES)**                 14-2307

1    **Q.**   The current Speaker of the Ohio House of Representatives;

2    is that right?

3    **A.**   That's correct.

4             MR. OLESKI:  Moment to confer, Judge?

5             THE COURT:  Yes.

6             MR. OLESKI:  I have no further questions, Judge.

7             THE COURT:  Very well.  Questions on behalf of

8    Mr. Borges, if any?

9             MR. SCHNEIDER:  Yes, thank you, Your Honor.

10                        **CROSS-EXAMINATION**

11   BY MR. SCHNEIDER:

12   **Q.**   Ms. Fitzmartin, good morning.  I had to look to see if I

13   could say this morning.

14   **A.**   You're safe.

15   **Q.**   Just a couple questions for you.  You had been asked on

16   direct examination about these kitchen cabinet calls.  Matt

17   Borges wasn't on those, was he?

18   **A.**   No.

19   **Q.**   All right.

20   **A.**   He and Speaker Householder didn't get along.

21   **Q.**   Right.  And, in fact, they didn't get along, did they?

22   **A.**   Correct.

23   **Q.**   And you indicated, you know, obviously there was a slate

24   of candidates, and you managed and oversaw a lot of those.

25   Stu Harris was one, and he was conflicted on the Speaker,

1    wasn't he?

2    **A.**    He was.

3    **Q.**    He was.  And the reference to -- in the text message you

4    were shown by the prosecutor dealing with checking out the

5    process with the endorsement by the state Republican party,

6    that was reference that Matt had been former chairman and he

7    might ask -- be able to take the temperature and see whether

8    or not the nontraditional policy of not endorsing during

9    contested primaries might be changing, correct?

10   **A.**    Correct.

11   **Q.**    Right.  Nobody asked him to change the policy or to

12   advocate.  Just what's the process because you were state

13   chairman, and have you heard anything different?

14   **A.**    Correct.

15   **Q.**    That was the extent of it, right?

16   **A.**    Correct.

17   **Q.**    Okay.  And one of the candidates that were on your slate

18   of candidates was Jon Cross, correct?

19   **A.**    Yes.

20   **Q.**    Right.  And Jon, his opponent was Cheryl Buckland,

21   correct?

22   **A.**    That's right.

23   **Q.**    And you and Matt discussed Cheryl Buckland and his

24   sentiments towards her, correct?

25   **A.**    Correct.

**MEGAN FITZMARTIN - CROSS (BORGES)**          14-2309

1   **Q.**   And you understood those sentiments to be that he was a

2   friend of hers and he was going to support her?

3   **A.**   That's right.

4   **Q.**   Okay.  And -- but he was upfront with you on that,

5   correct?

6   **A.**   Yes.

7   **Q.**   At the end of the day, your candidate prevailed, correct?

8   **A.**   That's right.

9   **Q.**   Right.  And you actually did a stint of time, did you

10  not, at the Ohio Republican party that Matt hired you for a

11  project?

12  **A.**   That's right, I worked for Matt.

13  **Q.**   And with respect -- just going back here to Stu Harris.

14  Were you aware that Amie Kershner was fundraising for Ryan

15  Smith, correct?

16  **A.**   That's correct.

17  **Q.**   And were you aware that Amie would regularly attend Stu

18  Harris candidates' meetings, or campaign meetings?

19  **A.**   I'm unaware.

20  **Q.**   Okay.

21          MR. SCHNEIDER:  Thank you.  No further questions,

22  Judge.

23          THE COURT:  Very well.  Does the government have

24  redirect?

25          MS. GAFFNEY-PAINTER:  Just briefly, Your Honor.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

MEGAN FITZMARTIN - REDIRECT                    14-2310

```
 1              THE COURT:  Very well.  You may approach the podium.
 2              MS. GAFFNEY-PAINTER:  Thank you.
 3                      REDIRECT EXAMINATION
 4    BY MS. GAFFNEY-PAINTER:
 5    Q.   Ms. Fitzmartin, on cross-examination you were asked some
 6    questions about JPL's offices on State Street.  Do you recall
 7    those questions?
 8    A.   Yes.
 9    Q.   Generation Now's office was also in that same space,
10    correct?
11    A.   I am not aware.
12              MS. GAFFNEY-PAINTER:  Ms. Terry, will you -- may I
13    ask first for permission.  May we publish what's already been
14    admitted as Government Exhibit 201A?
15              THE COURT:  You asked very nicely.  And, yes.
16              MS. GAFFNEY-PAINTER:  Thank you.
17         Ms. Terry, will you please pull up Government's Exhibit
18    201A.
19         Will you please advance a little bit further, Ms. Terry,
20    please.  If you could advance a little bit further, please.  I
21    apologize.  I don't know the exact page number.
22         This is great.  Thank you.
23    Q.   Ms. Fitzmartin, looking at this, do you recognize this
24    floor plan?
25    A.   Yes.
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**   And what is this floor plan for?

2    **A.**   It appears to be an office space for -- that I'd report

3    to.

4            MS. GAFFNEY-PAINTER:  And if we could, please,

5    Ms. Terry, may we please blow up the very bottom of this page.

6    That footnoted area.

7    **Q.**   Ms. Fitzmartin, directing your attention to this, the

8    middle of this row here, what is the address that's listed

9    here?  Beneath the ads --

10   **A.**   Capitol Square Office Building, 65 East State Street,

11   Columbus, Ohio, 43215.  Suite 2540.

12   **Q.**   Thank you.  Now, Ms. Fitzmartin, were you still working

13   with JPL & Associates in 2020?

14   **A.**   Yes.

15   **Q.**   And what is the HRCC?

16   **A.**   House Republican Campaign Committee.

17   **Q.**   Now in 2020, who was Speaker of the Ohio House?

18   **A.**   Larry Householder.

19           MR. OLESKI:  Objection, Judge.  Beyond the scope.

20           MS. GAFFNEY-PAINTER:  Your Honor, I can explain

21   where we're going.

22   **Q.**   You were asked a series of questions about traditional

23   versus nontraditional approach to endorsements.  Do you recall

24   those questions?

25   **A.**   Yes.

**MEGAN FITZMARTIN - REDIRECT**                    14-2312

1    **Q.**   In 2020, were you aware that it was the plan of the House

2    Republican Campaign Committee to support Larry Householder

3    candidates in 2020 by offering an endorsement?

4              MR. OLESKI:  Objection; leading.

5              THE COURT:  Overruled.  Please proceed.

6              THE WITNESS:  An endorsement by whom?

7    **Q.**   By the House Republican Campaign Committee.

8    **A.**   Incumbents weren't -- are automatically endorsed by the

9    House Republican Campaign Committee.

10   **Q.**   Ms. Fitzmartin, you mentioned on cross-examination that

11   Speaker Householder was doing the people's work, and that's

12   why you didn't have much contact with him.  What does

13   "people's work" mean to you?

14   **A.**   The official office of the Speaker of the House, so

15   legislation and all that entails of being the Speaker.

16             MS. GAFFNEY-PAINTER:  May I have a moment to confer,

17   Your Honor?

18             THE COURT:  Yes.

19             MS. GAFFNEY-PAINTER:  No further questions.  Thank

20   you.

21             THE COURT:  Very well.  Recross on redirect from

22   Mr. Householder's counsel, if any.

23             MR. OLESKI:  No questions, Judge.

24             THE COURT:  Mr. Borges?

25             MR. SCHNEIDER:  No questions, Judge.

1              THE COURT:  My goodness.  You appear to have

2    survived.  You are free to go.

3              THE WITNESS:  Thank you, sir.

4              THE COURT:  We were anticipating breaking at 12:20.

5    What's the government make of that?

6              MS. GLATFELTER:  We have our next witness here ready

7    to call if we can proceed with that.

8              THE COURT:  Yes, please.  Who do you call?

9              MS. GLATFELTER:  The government calls Beth Ellis.

10             THE COURT:  Someone's gone to retrieve that witness.

11   And we will need to break at 12:20.

12             MS. GLATFELTER:  May I approach, Your Honor?

13             THE COURT:  Yes.

14        (Pause.)

15             THE COURT:  Good afternoon.  If you'd follow her.

16   You're headed to the witness stand.  If you'd be willing to

17   pause where you are and raise your right hand for the oath to

18   tell the truth.

19             THE COURTROOM DEPUTY:  You do solemnly swear or

20   affirm that the testimony you are about to give in this case

21   will be the truth, the whole truth, and nothing but the truth.

22   This you do affirm under the pains and penalties of perjury?

23             THE WITNESS:  Yes.

24             THE COURT:  That was awfully fast, Ms. Santoro.

25        You are welcome to be seated.  I tell everybody the seat

BETH ELLIS - DIRECT                                    14-2314

```
1    tips back so be careful.  I need you close to the microphone.

2    And the lawyers have some questions.

3         On behalf of the government, Ms. Glatfelter.

4             MS. GLATFELTER:  Thank you.

5                            BETH ELLIS

6    of lawful age, Witness herein, was examined and testified as

7    follows:

8                        DIRECT EXAMINATION

9    BY MS. GLATFELTER:

10   Q.   I guess good morning/good afternoon, Ms. Ellis.  Can you

11   state and spell your name for the record.

12   A.   Beth Ellis, B-E-T-H  E-L-L-I-S.

13   Q.   Ms. Ellis, do you reside in Ohio?

14   A.   I do.

15   Q.   What city and county do you reside?

16   A.   Sabina, Clinton County.

17   Q.   Okay.  And can you describe for the jurors what Clinton

18   County is or what's it like in terms of geography and makeup?

19   A.   Sure.  Clinton County is a small, rural county.  It's

20   flat.  Not a lot of terrain except in the southern part and

21   it's agricultural county.  There is some industry.  A big

22   airport there that gets some flights that come in from

23   Amazon, but it's good, good people, hardworking people.

24   Q.   Did you grow up in Ohio?

25   A.   I did.
```

BETH ELLIS - DIRECT                                    14-2315

1    **Q.**    Where'd you grow up?

2    **A.**    In Clinton County.

3    **Q.**    Do you currently work?

4    **A.**    I do.

5    **Q.**    What do you do?

6    **A.**    I'm a farmer.  My husband and I are farmers, and I own

7    and operate a pheasant hunting preserve.

8    **Q.**    What's a pheasant hunting preserve?

9    **A.**    So part of our farm has a preserve license, and we

10   raise and release game birds, and then people can come out

11   and have membership and can bring their dogs out or come out

12   and do a traditional pheasant hunt and take the pheasant

13   home and prepare it for dinner.  It keeps them -- keeps

14   people connected to their food sources.

15   **Q.**    And you mentioned you have a farm.  Is it all pheasant

16   raising or do you have other things that you do on the farm?

17   **A.**    The pheasant farm is a small part of it.  Actually, we

18   farm about 7300 acres as a whole family.  My husband's

19   family's been on the same road since just before the Civil

20   War.  So it's going into what, our sixth generation of

21   farmers.  We've expanded it over time, and it's a legacy

22   that we take care of and are embedded in the community for

23   sure.

24   **Q.**    Do you have any license or licenses?

25   **A.**    Well, myself, I wasn't a farmer.  I didn't grow up to

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1  be a farmer.  I actually left Clinton County to go to Ohio

2  State and got my degree in radiologic technology and then

3  specialized in ultrasound.  And I worked at the hospital for

4  almost 18 years doing that and interventional radiology.

5      And then as our farm grew and had babies and it just

6  got a little overwhelming with the pheasant farm because it

7  is a retail business.  So I left my job at the hospital and

8  started working on the farm full time, helping with the

9  books, helping with the office management of the farm side,

10  and then also the day-to-day operations of the pheasant

11  hunting preserve.

12      And then while I was there, I -- the little farm there

13  has a grass runway.  It's a public runway, but it's a grass

14  strip, and I got my pilot's license, as well.  And I learned

15  to fly airplanes.  So that afforded me the ability to have

16  the time to do that, which was unexpected as well, but I

17  enjoyed it.

18  **Q.**   Have you recently founded any organizations?

19  **A.**   Yeah.  I -- in 2019, we created a nonprofit called

20  Operation Cherrybend.  We found that our environment is

21  conducive to and very welcoming for combat veterans, and

22  talk about hunting, fishing, skydiving, take airplane rides.

23  And talk about veterans suffering with PTSD, suicidal

24  tendencies, forming a network.  It's just such a great

25  atmosphere.  People can come.  And it's got such a great

BETH ELLIS - DIRECT                                    14-2317

```
 1   vibe.

 2        And now we have a big event every year in September.

 3   And we have 43 veterans from all over the United States,

 4   from Florida to Alaska.  We raised funds to fly them all in.

 5   They didn't have to pay for a thing.  And then we had

 6   sporting tournaments, shooting tournaments, coyote hunting,

 7   skydiving, anything we could do to give them network and

 8   bonding moments.

 9        And then they -- we meet every Sunday night on Zoom so

10   they can connect -- reconnect and stay.  Do a check-in,

11   making sure if you have a rough week, it's just another

12   voice on the line.

13   Q.   And that's an organization that you founded and run?

14   A.   Correct.  It's a 501(c)(3).

15   Q.   Now, have you ever run for office?

16   A.   I did.  I ran for office in 2018.

17   Q.   Okay.  And what office did you run for?

18   A.   I ran for state representative of the 91st District.

19        MS. GLATFELTER:  Your Honor, permission to publish

20   what has been admitted as Exhibit 8.

21        THE COURT:  Yes.

22   Q.   Ms. Ellis, do you see the map on your screen?

23   A.   Not yet.  Oh, there it is, yes.

24   Q.   Could you -- do you see the district that you were

25   running to represent --
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

BETH ELLIS - DIRECT                                    14-2318

1    **A.**    I do.

2    **Q.**    -- depicted on this map?  Could you circle it for us?

3            MS. GLATFELTER:  Ms. Santoro, could she have the

4    ability --

5            THE WITNESS:  Is that this thing?

6    **Q.**    Yes.  Or you could use your finger.

7    **A.**    (Drawing.)  That's the 91st district, which is Clinton,

8    Highland, and Pike Counties.

9    **Q.**    Now, when you were running, did you participate in the

10   primary election in 2018?

11   **A.**    That's correct, I did.

12   **Q.**    Okay.  And were you running -- and how were you running?

13   As a Republican or --

14   **A.**    Yes, that's correct, as a Republican.

15   **Q.**    Okay.  And why did you seek to run for office?

16   **A.**    That's kind of a convoluted story.  But honestly, one

17   of the things I belonged to was the Farm Bureau, and I was

18   active in the community with Farm Bureau, and then I was

19   also appointed to the board of directors for the airport,

20   the port authority.  And so you have a lot of communication

21   for the state for funding for ODOT, you know, to keep the

22   runway safe and keep it, you know, kept up.

23        And then with the Farm Bureau, on the ag side, I would

24   go and once a year we would go to Washington, D.C., to talk

25   to our representation there about how important the issues

1    are and whether it was relevant to waters of the United

2    States or the Farm Bill, the things that affect us.  So when

3    your representatives get to see you, you're regular everyday

4    people and how stuff's affecting them, you just got to get

5    in front of them and get their ear so we would do that.

6         And in the State House in Ohio, I went up a couple

7    times and gave testimony on CAUV, which is the taxes, the

8    property taxes that we pay on farms.  It got really out of

9    balance there in the mid teens, about 2012 or so and on, and

10   it was really having an impact to farm communities with the

11   price of grain.  And the way the formula was, it was skewed

12   and it needed to be updated.

13        And I went and I spoke at the State House and gave

14   testimony how it's affecting our farm and young farmers

15   trying to get in the business and old farmers trying to

16   retire so -- and then I think I testified also a different

17   time on sales tax and small business.

18        So that got me into that, that world of really how

19   important it was to talk to representatives and to,

20   especially small districts like ours, it's a big district

21   geographically but the population is not great so you have

22   to have somebody active to get out there and talk about your

23   area.  And somebody said to me, have you ever thought about

24   running for office and, you know, the seat's coming open in

25   your district.  And, well, I'm not sure I'm qualified.  Am I

1    qualified, and of course you're qualified, everybody's

2    qualified.  And so it really sprung from that.

3         And then very soon after that I started getting in

4    contact with people and made it happen.

5    **Q.**   So if I understand you, after your testimony at the State

6    House, someone asked you if you had ever considered running

7    and that's when you started thinking about it?

8    **A.**   Yeah.  I didn't think I was -- I mean, who am I?  I'm

9    just a farmer's wife, right.  I don't know.  I just didn't

10   know if -- you don't see very many women, quite frankly, in

11   the State House.  And I didn't know it was an option I guess

12   until somebody asked have you ever thought about it and I

13   hadn't and then I started thinking about it.

14        And I thought, this might be a good thing.  And then

15   when I started talking about it, then at the time, the

16   Speaker was Speaker Rosenberger, and he was from our

17   district.  So that was kind of a special thing because the

18   Speaker of the House of Ohio was the representative for the

19   91st District and he was terming out, which is a big deal,

20   because then they'd have to get a new Speaker.

21        So his seat was going to be open and so was the

22   Speakership.  And so I talked to him and he said, you're

23   absolutely qualified.  You would be a wonderful asset to the

24   State House, being a woman, with all your experiences in

25   healthcare and, you know, aviation, farming, small business

```
 1    ownership, and nonprofits, it would be amazing.
 2              MR. OLESKI:  Objection, non-responsive.  Can she
 3    answer questions, please.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  So, yes, that's how I --
 6              THE COURT:  Excuse me.  Will you slow down a little
 7    bit?  She has to write it all down.  You're doing fine.
 8              THE WITNESS:  Okay.
 9    Q.   Is this your first time testifying in court?
10    A.   Of course.
11    Q.   All right.  So we'll go a little bit slower here.
12         So you mentioned that the former Speaker, Speaker
13    Rosenberger had -- you had talked to him about running for
14    office?
15    A.   I did.
16    Q.   Okay.  And at the time you decided to get involved in the
17    election, did you know anything about a Team Householder or a
18    Team Smith?
19    A.   I did not.
20    Q.   Had you even heard of Larry Householder?
21    A.   No, not until -- huh-uh, not until I started running.
22    Q.   Did you have to raise money to run for office?
23    A.   I did.
24    Q.   And how did you raise money?
25    A.   Making the ask.  That was the hardest thing in the
```

1    world for me to do.  I've always worked for every dollar I

2    had, and it was hard to ask people for money to help me in

3    my campaign, but I did.  You make calls.  You knock on

4    doors.  You have events.  Small events in your community.

5    People who are, you know, are supportive of you, you call

6    and ask.

7    **Q.**   And did you receive some financial support too from an

8    entity called OROC?

9    **A.**   I did.

10   **Q.**   What is OROC?

11   **A.**   It's the Ohio House Republican Organizational

12   Committee, which, if I understand right, is generally under

13   the control of the Speaker of the House.  And at the time,

14   of course, the Speaker was from my district.

15   **Q.**   Okay.  And so they financially supported your campaign

16   committee?

17   **A.**   Some.  I mean, I raised money about what, 65,000, maybe

18   $62,000, and then I sent some to them.  And then they would

19   help with me making fliers and mailers, things like that.

20   They'd, you know, advise, advise me on that.

21   **Q.**   And so at that point what my next question was, what did

22   you spend the money you raised, what did you spend it on?

23   **A.**   Newspaper ads, mailers about my skills, my skill sets,

24   positive mailers about my skill sets.  That's pretty much

25   it.

BETH ELLIS - DIRECT                                14-2323

1   **Q.**   Now, the primary season, you said you were running in

2   2018.  So when was the primary season?

3   **A.**   The primary was on May 8th, I believe.  So I'd actually

4   announced I was running in 2017.  I had a lot to get ahead

5   of because I needed to learn the district.  I really felt

6   like studying the district, and so that's what I did for

7   that pretty much a year.  I drove a lot.

8   **Q.**   And the filing deadline for that primary was in or around

9   February; is that right?

10   **A.**   I think it was February 8th maybe.

11   **Q.**   Okay.  And were you running unopposed for a period of

12   time up until the reporting deadline?

13   **A.**   Correct.  I was unopposed up until pretty much the

14   eleventh hour, and then a commissioner from Highland County,

15   Shane Wilkin, entered the race.

16   **Q.**   Now, after Shane Wilkin entered the race, did you -- did

17   your district start receiving negative ads about you?

18   **A.**   Yes.  A lot happened very quickly from February, March,

19   and April, one of which was the Speaker resigned from his

20   position.  And it just -- everything, the rails just came

21   off.  These mailers started coming in the mail.

22   **Q.**   Okay.  So let me ask you about these, and I know -- I'm

23   sorry to bring it up, but I want to ask you a few questions

24   about these mailers.

25       Did you receive these ads or these mailers to your own

1    house?

2    **A.**    Yes.

3    **Q.**    And how did you receive them?

4    **A.**    In the mailbox.  You mean, how did I perceive them?

5    **Q.**    No.  Did you receive them -- before when we spoke, you

6    referenced a family member that brought them into you.

7    **A.**    Oh, right.  So I had people calling me, did you check

8    your mailbox.  No, I didn't check my mailbox today.

9         One day my son got off the bus and checked the mailbox

10   and he was upset.  He's like, Mom, look at this.  What is

11   it?

12             MR. OLESKI:  Objection.

13             THE WITNESS:  It was a --

14             THE COURT:  Excuse me for a moment.  There is an

15   objection.

16             MR. OLESKI:  May we have a sidebar, please?

17             THE COURT:  Yes.

18             MR. OLESKI:  Thank you.

19                    **BEGIN SIDEBAR CONFERENCE**

20             MR. OLESKI:  Judge, the basis of my objection is

21   relevance.  The fact that this witness received or was the

22   subject of negative campaign mailers I don't think matters.  I

23   don't think her perception of the mailers were mean to her or

24   derogatory matters in this case.

25        I think she testified that she was a candidate for this

```
 1    House district.  She was supported by OROC.  And that she ran

 2    against Shane Wilkin, who's a member of Team Householder.  I

 3    think that's the extent to what this witness can testify to.

 4         Based on the -- I'm sorry, Judge.  Based on the Jencks

 5    material we received, this witness hasn't spoken to

 6    Mr. Householder, Mr. Longstreth, or Mr. Borges.  So we don't

 7    think that she has anything else relevant to say.

 8              THE COURT:  Very well.  On behalf of the government.

 9              MS. GLATFELTER:  Thank you, Your Honor.  It is

10    highly relevant.  She is going to testify, the necessary

11    questions are the mailers that she received which came through

12    the Growth and Opportunity PAC which was fully funded at that

13    time by Generation Now.  She received these mailers.  She will

14    testify that these mailers absolutely affected the race, and

15    by the time the primary came around, she didn't want to run

16    for office because of the effect they had on her and the

17    community.

18         This jury is entitled to hear what -- what happened with

19    these mailers and the effect that they had on the race because

20    this is part of the enterprise.  This is what the goal was, if

21    the goal was for Team Householder to elect a slate of

22    candidates and this is how they went about doing it.

23              THE COURT:  Last response.

24              MR. OLESKI:  Number one, I don't think that this

25    witness is qualified to testify about whether the mailers
```

```
 1    affected the outcome of the election.  And to the extent that

 2    the government intends to use the mailers to say that they --

 3    that the mailers had such a negative effect on this witness

 4    that she no longer runs or wants to run for elective office, I

 5    don't think that's relevant; and if it is relevant, it is

 6    unfairly prejudicial under 403.  I don't think it's relevant

 7    at all to the enterprise allegations or anything else in this

 8    case, Judge.

 9            THE COURT:  I disagree and overrule the objection as

10    to relevance, and I overrule the objection as to 403.

11        Let's get on with it.

12            MR. OLESKI:  Thank you.

13                   END OF SIDEBAR CONFERENCE

14            THE COURT:  If you want to resume questions now,

15    fine; if we should break now, fine.  We are on a tight

16    schedule.

17            MS. GLATFELTER:  Your Honor, we can break now.  I

18    think, as I understand it, we are going to take a 15-minute

19    break; is that right?

20            THE COURT:  We are taking a 30-minute break.

21            MS. GLATFELTER:  Oh, we are?  Okay.  That's fine.  I

22    can continue when we return.

23            THE COURT:  We're going to take a break.  This used

24    to be the lunch break.  But we need to get you out of here by

25    2 at the request that came from you all, and so we're going to
```

BETH ELLIS - DIRECT                                    14-2327

1    take the lunch break for 30 minutes.  I want you to have a

2    good break, a good lunch.  Come back in 30 minutes, and we'll

3    proceed until 2, and then you get to go home.

4         Out of respect for you, we'll rise as you leave for

5    lunch.

6              THE COURTROOM DEPUTY:  All rise for the jury.

7         (Jury exited the courtroom at 12:18 p.m.)

8              THE COURT:  The jury's left the room.  The door is

9    closing.  As always, we'll wait until we're advised that the

10   jurors have cleared the floor, and then we'll break for 30

11   minutes for lunch.

12        During the break as with all witnesses, you are not to

13   discuss your testimony.  We'll get you back at 10 of

14   something.  That's 30 minutes from now.

15             THE COURTROOM DEPUTY:  All clear, Judge.

16             THE COURT:  All right.  We're on break.  Thank you.

17             THE COURTROOM DEPUTY:  This court is in recess.

18        (Recess from 12:20 p.m. until 12:12:51 p.m.)

19             THE COURT:  I understand there is something somebody

20   wants to address to me outside the presence of the jury?

21             MR. OLESKI:  Yes, Judge.

22             THE COURT:  Do we need to ask the witness to leave?

23             MR. OLESKI:  No.

24             THE COURT:  Okay.

25             MR. OLESKI:  Judge, we just wanted to inform the

1    Court that on behalf of Mr. Householder, Mr. Marein will

2    handle the cross-examination of this witness even though I

3    have made a few objections earlier this morning.

4                THE COURT:  Very well.

5                MR. OLESKI:  Thank you.

6                THE COURT:  Let's call for the jury, please.

7          (Pause.)

8                THE COURTROOM DEPUTY:  All rise for the jury.

9          (Jury entered the courtroom at 12:55 p.m.)

10               THE COURT:  Jurors can be seated as they join us.

11         You may all be seated.  Thank you.

12         The 14 Members of the Jury who have rejoined us, welcome

13   back.  Thank you for your timeliness.

14         We will continue with the taking of the testimony.

15               MS. GLATFELTER:  Thank you, Your Honor.  May I

16   approach?

17               THE COURT:  Yes.

18   **Q.**   Good afternoon, Ms. Ellis.  I think before the break you

19   were describing the receipt of some ads at your house.  Can

20   you continue that, please?

21   **A.**   Yes.  I received these mailers, big ones, almost half

22   as big as this screen, big ones, and my son brought them in.

23   He had gotten off the school bus, and he was upset because

24   it depicted me, a caricature of me, with a lot of nasty

25   comments about being a Columbus insider and being a bad

BETH ELLIS - DIRECT                                    14-2329

1    person basically.

2         It's not me at all.  It didn't reflect me at all.

3         He was upset because he's like, Mom, what is this?

4         I'm like, Honey, I don't know.  We've never seen

5    anything like that in a district primary like that.  It's

6    just -- we just don't do that.  It's not that kind of place.

7    It's an agriculture community.  You don't have to -- and

8    within your own party -- attack each other like that.  It's

9    just not necessary.

10        And it was from -- I don't know who it was from.  It's

11   from an organization I didn't even recognize.  It wasn't

12   even a person.

13   **Q.**   Did the ads address your stance on particular issues?

14   **A.**   No.

15        MS. GLATFELTER:  Your Honor, permission to show or

16   permission to publish what's been admitted as 305D?

17        THE COURT:  Yes.

18        MS. GLATFELTER:  And if we can go to page 4,

19   Ms. Terry.

20   **Q.**   Ms. Ellis, do you recognize Government Exhibit 305D?

21   **A.**   I do.

22   **Q.**   Is this one of the ads that you had received?

23   **A.**   It is.

24   **Q.**   Okay.  Do you see the name at the top of the screen?

25   **A.**   Growth and Opportunity PAC, Inc.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**   When you were describing the organization that sent the

2    mailers, does this name look familiar?

3    **A.**   Yes.

4    **Q.**   Did you know what Growth and Opportunity PAC was?

5    **A.**   No.  I tried to Google it.  People were calling me and

6    asking me who it was.  I couldn't find anything about it.

7    **Q.**   You couldn't find anything?

8    **A.**   Huh-uh.

9    **Q.**   When you tried to research it?

10   **A.**   Huh-uh.

11   **Q.**   In addition to mailers, like Government Exhibit 305D,

12   were there any other tactics used against you?

13   **A.**   Mainly just the mailers.

14   **Q.**   What about phones calls?

15   **A.**   Oh, there was.  There was phone calls.  It's just --

16   honestly, I just want to forget about the whole thing.  It

17   was just a lousy time.  And there were robot calls, I guess

18   you call them, just Beth Ellis -- there is a radio ad, too,

19   my husband heard a radio ad, she is a Columbus insider,

20   she's -- I don't know.  Just, just -- it's not me.  It's

21   terrible.  It's not even necessary.  We didn't need that.

22   It wasn't necessary.

23   **Q.**   What, if any, actions did you take after receiving these

24   kinds of mailers?

25   **A.**   I engaged in a debate with my opponent.  I didn't put

1    any negative ads out.  That's not my style.  I'm not going

2    to do that.  I don't approve of it.  And I was even told,

3    somebody told me, they said, you know, negative campaigns or

4    negative ads --

5              MR. MAREIN:  Objection.

6              THE WITNESS:  -- win campaigns.

7              THE COURT:  Who objected?  Who objected?

8              MR. MARIEN:  I did, Judge.

9              THE COURT:  And the basis?

10             MR. MARIEN:  Relevance, as well as hearsay.

11             THE COURT:  It sounds like hearsay.  What do you

12   make of that?  The Court's ruled it's relevant.

13             MS. GLATFELTER:  I was asking her what she took and

14   I believe she is going to talk about advice she didn't take

15   and why but we can go on to that part.

16             THE COURT:  Very well.  Let's go.

17             MS. GLATFELTER:  Thank you.

18   **Q.**   Ms. Ellis, what actions -- if you could describe the

19   actions that you took aside from the directions that or

20   suggestions that people made?

21   **A.**   I just continued to campaign.  I went door to door.  I

22   went to events.  I went to every chicken dinner and fish fry

23   you could possibly imagine.  I went to coffee shops.  I was

24   boots on ground.  I knocked on doors.  I got crews together

25   to knock on doors.  Good old-fashioned campaigning.  I mean,

1    that's what I thought it was about.  It was about talking to

2    people, and I thought that's what it was about.

3    **Q.**   Did your enthusiasm for the election change as you got

4    closer to the primary?

5    **A.**   It absolutely changed as I got closer to the primary.

6    These negative ads were coming pretty consistently up until

7    the week of the election.  And it just -- I didn't want to

8    check the mail and I didn't -- you are trying to be

9    positive.  You're trying to project this issue of leadership

10   and don't worry about it and people were upset and not

11   understanding it.  Like I said, this is a primary campaign.

12   This isn't -- it's bad enough when cross parties do it to

13   each other but within your own party, I thought it was more

14   painful.  I was trying to explain to people, oh, don't worry

15   about it, but, you know, then they start reading newspaper

16   articles and reading about, you know, the fight for the

17   Speakership.  And I just wanted it over with.

18   **Q.**   And did your efforts to win the primary decrease as you

19   got closer to the election date based on the campaign against

20   you?

21   **A.**   Did my efforts?

22   **Q.**   Um-hmm.

23   **A.**   No.  I stuck at it every single day.  It was like my

24   job, and I felt I owed it to the people who had supported me

25   and put their faith behind me, their donations behind me,

1    and I was going to stick it out, stick it out to the bitter

2    end.

3    **Q.**   Now, you mentioned a Speaker's race.  Did you know

4    anything about that when you got into the election?

5    **A.**   No, not -- no -- 'cause I got into it in '17.  And

6    then -- I knew Speaker Rosenberger was terming out, that the

7    position would be open.  So that's what I focused on was

8    filling that position of the state rep for the district,

9    91st District.

10   **Q.**   Did you ever promise anyone that you would vote for them

11   for Speaker of the House if you were elected?

12   **A.**   No, no.  I had met Ryan Smith 'cause he is in a

13   neighboring district, and that interaction was, honestly,

14   more of -- I was asking when I was considering the run, you

15   know, I wanted to talk to people who were doing it to see if

16   this is really something my family wanted to deal with, the

17   effect it would have on my kids, my time, my business.  And

18   he had, I don't know, like four or five kids or something

19   and he was quite frank and said his wife carries the load.

20   And it was more of that.  But he never asked me if I was

21   going to vote for him for the Speakership.  I mean that's

22   putting the cart before the house.  I wasn't elected.  And

23   it wouldn't be until I was elected that whoever was the

24   candidates I would talk to about that.  It wouldn't be

25   preloaded.

1   **Q.**   You hadn't made a decision yourself?

2   **A.**   I hadn't?

3   **Q.**   Correct.

4   **A.**   Huh-uh, no.

5   **Q.**   Did anyone from Mr. Householder's campaign ever contact

6   you to find out your stance on important issues or your

7   values?

8   **A.**   No.

9           MS. GLATFELTER:  One moment, Your Honor.

10          THE COURT:  Very well.

11          MS. GLATFELTER:  No further questions.

12          THE COURT:  Very well.  Cross-examination, first on

13  behalf of Mr. Householder.

14          MR. MAREIN:  May I proceed?

15          THE COURT:  Yes.

16                    **CROSS-EXAMINATION**

17  BY MR. MAREIN:

18  **Q.**   Good afternoon.

19  **A.**   Hello.

20  **Q.**   I just have a couple of questions for you.

21       Do you know Larry Householder?

22  **A.**   I do not.

23  **Q.**   Never met him?

24  **A.**   I don't remember ever meeting Larry Householder.

25  **Q.**   Ever talk to him on the telephone?

1    **A.**   No.

2    **Q.**   How about Mr. Longstreth, is that a name that you're

3    familiar with?

4    **A.**   No.

5    **Q.**   What about Matt Borges, do you know him?

6    **A.**   No.

7    **Q.**   Have you ever met a Mr. Clark?

8    **A.**   No.

9    **Q.**   Were you at all involved or do you have any personal

10   knowledge in the legislation that is known as House Bill 6?

11   **A.**   No.

12   **Q.**   You really don't know anything about it, do you, other

13   than what you've read in the paper?

14   **A.**   I understand its genesis.

15   **Q.**   Okay.  But you have no personal knowledge of how it

16   worked itself through the legislature, what sort of actions

17   were taken, none of that, right?

18   **A.**   Just through what I've read.

19   **Q.**   Right.  So, in other words, no personal knowledge?

20   **A.**   I'm not a representative.  I have nothing to do behind

21   the scenes with anything.

22   **Q.**   Right.  Now, you lost the election, correct?

23   **A.**   I did.

24   **Q.**   And you lost the election to a Mr. Wilkin, is that right?

25   **A.**   Correct, I lost the election to Shane Wilkin.

1    **Q.**   And Mr. Wilkin, he is a former long-term county

2    commissioner in a different county than yours.  Are you aware

3    of that?

4    **A.**   He was commissioner for ten years in Highland County.

5    **Q.**   Right.

6    **A.**   I am aware of who he is.

7    **Q.**   A lot of political experience, a lot of legislature

8    experience, right?

9    **A.**   He has some experience.

10   **Q.**   Right.  Well, certainly more than you did, right?

11   **A.**   Certainly more than me, yes.  Locally.

12   **Q.**   Well, did you have local legislative experience as you

13   just qualified your answer?

14   **A.**   Just on the port authority.  It's a quasi government

15   entity.

16   **Q.**   Right.

17   **A.**   And I am on that.

18   **Q.**   All right.  So you came in here today to tell us that you

19   have a degree from Ohio State University in radiology; is that

20   right?

21   **A.**   That's correct.

22   **Q.**   And that you worked 18 years at Clinton Memorial

23   Hospital; is that right?

24   **A.**   That's right.

25   **Q.**   And that you have a family farm that you and your husband

1    work; is that right?

2    **A.**    That's correct.

3    **Q.**    And that farm is, am I accurate, it's 7300 acres?

4    **A.**    It's a family farm.  There's five families that work

5    it.

6    **Q.**    Okay.  But it's not a small farm, right?

7    **A.**    No, just a family farm.

8    **Q.**    And you came in here to tell us that your son was upset

9    because there were negative ads placed against his mom; is

10   that right?

11   **A.**    Of course.

12            THE COURT:  Excuse me.  Excuse me.  Excuse me.

13   There's an objection?

14            MS. GLATFELTER:  Yes, Your Honor.  I object to the

15   form of these questions.  I think they're unduly argumentative

16   and disrespectful of the witness.

17            THE COURT:  Going forward, continue to treat the

18   witness with dignity and respect.

19        The objection's overruled.

20            MR. MAREIN:  Thank you, Judge.

21   **Q.**    You have come in here to tell us that negative

22   campaigning, it's not consistent with who you are and what you

23   would expect in a election; is that right?

24   **A.**    I came here because I was subpoenaed by the FBI.

25   **Q.**    Okay.

BETH ELLIS - CROSS (HOUSEHOLDER)                    14-2338

1    **A.**    I would prefer to be somewhere else.

2    **Q.**    Okay.  Talking about you would like to be someplace else,

3    do you recall sending an email to the FBI, I think the date is

4    February 6th of 2023, some almost two weeks ago?

5    **A.**    Possibly.

6    **Q.**    Well, I have it right here if you'd like to see it.

7    **A.**    Yeah.  There was an email conversation.  I don't

8    remember what it was, but, yes.

9    **Q.**    And did you tell the FBI, of course, testifying in a

10   place you don't want to be as you had just indicated that you

11   will try to convey to the jury that Wilkin, your opponent,

12   subsequently voted for Householder after he was elected.  Did

13   you tell them that?  Just yes or no.

14   **A.**    Yes, I did.

15   **Q.**    Okay.  You've answered my question.  Thank you.

16         THE COURT:  If she needs to explain it, she has the

17   opportunity.  But the question has been asked.

18         MR. MAREIN:  Right, thank you.

19         THE COURT:  And it's been answered so you may

20   proceed with another question, counsel.

21   **Q.**    So you came here today.  You know nothing about House

22   Bill 6.  You don't know Larry Householder.  You don't know

23   really anything about this case other than you were involved

24   in an election where there was negative campaigning against

25   you.  Do I have that right?

1    **A.**    Yes.

2    **Q.**    And they subpoenaed you in to tell us that?

3    **A.**    I was subpoenaed by the FBI, that's correct.

4    **Q.**    Thank you.  Thank you, ma'am.

5              THE COURT:  On behalf of Mr. Borges.

6              MR. SCHNEIDER:  No questions of this witness.

7              THE COURT:  Redirect?

8              MS. GLATFELTER:  No, Your Honor.  I appreciate it.

9    Thank you.

10             THE COURT:  Very well.  You are free to go.

11             THE WITNESS:  Thank you.

12             THE COURT:  You have survived.

13             THE WITNESS:  Thank you.

14        (Witness was excused.)

15             THE COURT:  We're ready for another witness until 2

16   o'clock.

17             MS. GLATFELTER:  Yes, Your Honor.  The government

18   calls Chris Hartsel.

19             THE COURT:  Very well.

20             MS. GLATFELTER:  May I approach to get organized?

21             THE COURT:  Yes, yes.

22        If the witness would be willing to approach, sir, and

23   follow her.  We're going to bring you to the witness stand.

24   And if you would pause where you are and raise your right hand

25   for the oath to tell the truth.

```
 1              THE COURTROOM DEPUTY:  You do solemnly swear or

 2    affirm that the testimony you are about to give in this case

 3    will be the truth, the whole truth, and nothing but the truth.

 4    This you do affirm under the pains and penalties of perjury?

 5              THE WITNESS:  Yes, I do.

 6              THE COURT:  You can come on up to the witness stand.

 7    I tell everybody the seat tips back.

 8         (Witness took the stand.)

 9              THE WITNESS:  Thank you.

10              THE COURT:  Full disclosure.  We are going to need

11    you close to that microphone.

12              THE WITNESS:  Thank you.

13              THE COURT:  You are welcome.

14         The government may proceed to examine.

15              MR. GLATFELTER:  Thank you, Your Honor.

16              THE COURT:  Yes.

17                        CHRISTOPHER HARTSEL,

18    of lawful age, Witness herein, was examined and testified as

19    follows:

20                        DIRECT EXAMINATION

21    BY MS. GLATFELTER:

22    Q.   Good afternoon.

23    A.   Hi.

24    Q.   Could you go ahead and state your name and spell it for

25    the record.
```

```
 1   A.   My name is Christopher Hartsel.  That's spelled

 2   C-H-R-I-S-T-O-P-H-E-R.  Last name is H-A-R-T-S-E-L.

 3   Q.   Thank you, Mr. Hartsel.  Can you tell the jury where you

 4   work?

 5   A.   I work for the FBI.

 6   Q.   And what type of work do you do for the FBI?

 7   A.   I'm a forensic accountant.

 8   Q.   And how long have you worked there?

 9   A.   Since August of 2016.

10   Q.   Now, to be a forensic accountant at the FBI, what kind of

11   educational background do you have?

12   A.   So I have a bachelor's degree in accounting.

13   Q.   Okay.  Where is that from?

14   A.   Ohio University.

15   Q.   Okay.  And did you graduate with any other type of

16   degrees or minors from there?

17   A.   A minor in Japanese.

18   Q.   Are you fluent in Japanese?

19   A.   Yes, I am.

20   Q.   Can you tell the jury what jobs that you had after

21   college before you joined the FBI?

22   A.   So when I graduated in 2008, for a year and a half I

23   worked for a public accounting firm.  And following that,

24   for about a year and a half, I worked in corporate

25   accounting for a supplier of Honda.  And for about five
```

CHRISTOPHER HARTSEL - DIRECT                    14-2342

1    years after that, I worked for Honda research and

2    development.

3    **Q.**   Okay.  Now, in your first job, you said you worked for,

4    was it a public accounting firm or you served as a public

5    accountant or do I have those confused?

6    **A.**   Both.

7    **Q.**   Okay.  So what kind of work did you do in that job?

8    **A.**   So I was a financial auditor.

9    **Q.**   Okay.  And what did you do as a financial auditor?

10   **A.**   My job was to evaluate the financial statements of

11   companies, our clients, and to assess whether or not they

12   were in compliance with accounting standards.

13   **Q.**   Okay.  And, Mr. Hartsel, I think this is the first time

14   the jury has heard from an accountant so I might ask you some

15   follow-up questions there, okay?

16        You said you also worked for a Honda supplier as an

17   accountant; is that right?

18   **A.**   That's correct.

19   **Q.**   And can you tell us the type of work that you did for

20   Honda?

21   **A.**   So I worked on the other end of the audit.  I worked on

22   closing the books, which means that I wanted to ensure that

23   all of our transactions were included so we could prepare

24   for the following financial period.  And I also worked as a

25   budget analyst at the same time.

1    **Q.**   Okay.  And so when you say closing the books, what do you

2    mean?

3    **A.**   So our job is to make sure that our financial

4    statements are presented in accordance with accounting

5    standards, so I wanted to make sure that every transaction

6    that was included that should have been included and that

7    there weren't any inaccuracies or transactions that were

8    included that shouldn't have been included, which ultimately

9    impacts the financial statement.

10   **Q.**   And you said you were also a budget analyst.  What does

11   that mean?

12   **A.**   So in addition to closing the books, my job was to

13   compare the results for the company versus what we had

14   planned and to identify discrepancies and reasons for the

15   discrepancies.

16   **Q.**   Now, when you were working for Honda, were you actually

17   working in a bilingual capacity?

18   **A.**   Yes.

19   **Q.**   And describe your work there.

20   **A.**   So a number of our managers here in the U.S. were

21   Japanese management, and they were not very proficient in

22   English.  Additionally, since Honda's a global company and

23   our parent is in Japan, we would have to communicate

24   regularly with our reporting partners in the accounting

25   department in Japan.

1    **Q.**   Now, turning back and sort of pivoting back to the FBI

2    forensic role that you play, what are some of your job duties

3    that you've had since 2016?

4    **A.**   So primarily, I work in a support role for our

5    investigations.  My job is to ensure that there is someone

6    attached to an investigation who -- who can provide an

7    understanding of the financial aspect of the investigation.

8    **Q.**   Do you -- are there particular groups or squads that you

9    support?

10   **A.**   Yes.  I support a number of different violations.  The

11   majority of my work is focused on complex financial crimes

12   or public corruption, but I also support counterterrorism,

13   counterintelligence and violent crime investigations.

14   **Q.**   Okay.  Now, what kinds of certifications or licenses do

15   you have related to your work at the FBI?

16   **A.**   So I'm a Certified Public Accountant and a Certified

17   Fraud Examiner.

18   **Q.**   And do you have certain requirements to be -- well, let

19   me ask you this.  Is there an acronym for a certified public

20   accountant?

21   **A.**   A CPA.

22   **Q.**   And are there any requirements to be a CPA?

23   **A.**   So there is educational requirements.  There is a

24   number of hours you have to have in university level, and

25   you have to pass a CPA exam.

CHRISTOPHER HARTSEL - DIRECT                    14-2345

1    **Q.**   What about for a Certified Fraud Examiner license?

2    **A.**   For a Certified Fraud Examiner, there is a number of

3    ways you can qualify, but ultimately you have to pass the

4    Certified Fraud Examiner exam.

5    **Q.**   And you've done both of those?

6    **A.**   Yes.

7    **Q.**   Now, do you have any certifications related to cyber

8    security?

9    **A.**   I have two cyber security certifications with two

10   different organizations.

11   **Q.**   Can you describe those?

12   **A.**   One is with an organization called CompTIA, and the

13   other one's with GIAC.  They basically assess my fundamental

14   understanding of how cyber security attacks can occur and

15   how you can mitigate the risk of a cyber security attack.

16   **Q.**   Do those require tests to become certification, like the

17   CPA and Certified Fraud Examiner license?

18   **A.**   Yes.  Both of them require that you study and pass an

19   exam, yes.

20   **Q.**   Now, I want to talk about your role in this particular

21   investigation.  Were you involved in a supporting role?

22   **A.**   Yes.

23   **Q.**   Okay.  And can you describe what that role was?

24   **A.**   So for this particular investigation, my job was to

25   evaluate any financial documents that we thought we needed

1      or that we found throughout the course of the investigation

2      and help interpret those documents and help provide leads to

3      the investigative team.

4      **Q.**    Okay.  And so if you can tell the jury, what kinds of

5      documents were you evaluating or reviewing in this case?

6      **A.**    Most commonly it was bank statements for different

7      entities and individuals, but we would also encounter

8      sometimes, there would be loan documents, credit card

9      statements, and there may be some mortgages.

10     **Q.**    And when we talk about bank account documents, can you

11     specify the type that you're talking about?

12     **A.**    So for bank documents, we would acquire -- usually we'd

13     acquire signature cards, which shows who opened the account

14     or who has access to the account and control of the account.

15     There would be bank statements that show all the

16     transactions that flow through the account.

17         And in addition to the bank statements, there would be

18     check -- check images for checks that were written for the

19     account, deposit images for items that were deposited into

20     the account, and maybe any electronic funds transfer --

21     transactions such as like a wire transaction, we would get

22     advises for that.

23     **Q.**    Now, did you ever have to go back to banks or financial

24     institutions to obtain additional details about records?

25     **A.**    Yes.  So more often than not, once we received

1    subpoenaed documents from banks, they failed to include

2    everything that was requested in the original production.

3    So the initial production would have like bank statements,

4    but then it wouldn't have the details that support the bank

5    statement.  So we would have to go back to the bank and

6    request that they complete the production.

7    **Q.**   And can you think of a particular transaction from this

8    case where you had to go back and request additional

9    documentation to understand it?

10   **A.**   Yes.  There -- well, there are many, but one that comes

11   to mind is there was a wire transaction that -- that

12   included information about a payment for a particular

13   lawsuit settlement.

14   **Q.**   Okay.  And it was a -- was that a complex transaction?

15   **A.**   The transaction itself wasn't really complex, but it

16   did require that we made several follow-ups so that we could

17   get the supporting documentation, I believe it was from

18   Huntington, that particular transaction.

19   **Q.**   Okay.  And to do your work and when you're working in the

20   supporting role with a case agent, do you use any computer

21   programs?

22   **A.**   Yes.

23   **Q.**   What do you use?

24   **A.**   So an organization, we use commonly found software.  We

25   use a piece of software called BankScan which will scan an

CHRISTOPHER HARTSEL - DIRECT                    14-2348

1    electronic copy of the bank statement, and it will recognize

2    text.  And then we can take that, put it into a processing

3    program called BankScan, and with a little bit more

4    additional input, we can produce an Excel document that

5    represents what's in that bank statement.

6    Q.   Okay.  And what's -- are there any advantages to working

7    in Excel in your line of work?

8    A.   Yes, absolutely.

9    Q.   Can you explain what those are?

10   A.   Sure.  So Excel, for those who aren't familiar, Excel

11   is a spreadsheet software where it produces a grid that you

12   can manipulate.  And when you import or you arrange data in

13   Excel, it allows you to take a large number of lines or

14   transactions and allows you to summarize it pretty easily.

15   Q.   Did you face any particular challenges in this case in

16   terms of what's called scheduling the accounts?

17        Let me back up and say, what is -- when someone says

18   scheduling the accounts, have you heard that term before?

19   A.   Yes, that's the term that we often use to describe what

20   we do.

21   Q.   And so what does that mean?

22   A.   So to schedule an account basically means as I

23   described, that you take a bank statement, and it's paper or

24   electronic format, which is often like a pdf, similar to any

25   document that you get through an email attachment, and then

CHRISTOPHER HARTSEL - DIRECT                    14-2349

1    we would scan that into -- scan that into Excel, and then we

2    would provide basically a summary of the source and the

3    destination of all the funds that flow through a particular

4    account.

5    Q.    And are you able to manipulate the Excel spreadsheet so

6    you can look at -- you can categorize things in different ways

7    or you can organize in different ways?

8    A.    Yes.

9    Q.    So you could organize it by date if you wanted to?

10   A.    Correct.

11   Q.    Or by -- or by the amount of transaction?

12   A.    True.  And we can -- we can assign -- ultimately, when

13   we look at the checks or the deposits that we see in the

14   counter, maybe the wire information, we can assign that

15   information to every transaction so we can manipulate it

16   further.  Not just by the information that's initially

17   available on the bank statement, but also the additional

18   information that we acquire from the bank.

19   Q.    So during the course of working with Agent Wetzel in this

20   investigation, how many bank accounts -- do you have an

21   estimate of how many bank accounts that you -- whose records

22   you reviewed?

23   A.    So for this case, I touched at least 90 bank accounts.

24   Q.    And did working with that number of bank accounts,

25   approximately 90, did that pose any particular challenges?

1    **A.**   It did, yes.  So as I mentioned, often when we go to

2    the banks they supply us with an incomplete production, and

3    every time we make a request, it takes about 30 days.  So if

4    you identify one bank, for example, we'll just call it Bank

5    A, and you ask the bank to send you the records for Bank A,

6    and you realize they are incomplete.  Well, 30 days has

7    passed, so you request the additional information, another

8    30 days.  So you have two months that have passed before you

9    have the information.

10        And let's say you process it.  By the time you actually

11   made the first request, it took about 90 days until you

12   understand what was in the first round of Bank A's

13   statements, and then you identify additional banks or

14   additional accounts.  And so, therefore, you once again go

15   after those accounts.  And so it kind of unravels after that

16   point.

17   **Q.**   And did you -- what, if anything, did you create to help

18   you in your investigation in this case?

19   **A.**   So, for this case, because there were so many bank

20   accounts and because we were trying to get the information

21   as quickly as possible, I frequently had to append and add

22   on new information as it came in.  And because I'm trying to

23   process this quickly, I had to develop an attachment or a

24   program of sorts within Excel that allowed me to process

25   these new records quickly.

CHRISTOPHER HARTSEL - DIRECT                    14-2351

1   **Q.** Now, in the course of your work in this case, were you

2   involved in reviewing bank records for an entity called

3   Generation Now, LLC?

4   **A.** Yes.

5   **Q.** And were the bank records obtained for Generation Now?

6   **A.** Yes.

7   **Q.** What bank did Generation Now use?

8   **A.** It was Fifth Third.

9   **Q.** And how many accounts did Generation Now have at Fifth

10  Third?

11  **A.** Two.

12  **Q.** Was there a differential between the two accounts?

13  **A.** Yes.

14  **Q.** In terms of use?

15  **A.** Yes.

16  **Q.** Could you describe what you mean there?

17  **A.** So, in one of the bank accounts, it was frequently used

18  for the activity of the account, whereas, in the other bank

19  account there was very little activity used.

20  **Q.** But you looked at both when you reviewed records?

21  **A.** Yes.

22  **Q.** And did you have an opportunity to schedule those

23  accounts in the manner that you just described?

24  **A.** Yes.

25  **Q.** Okay. And in doing so, did you summarize the deposits or

CHRISTOPHER HARTSEL - DIRECT                14-2352

1   amounts of money that flowed into the Generation Now accounts?

2   **A.**   Yes.

3   **Q.**   Did you also summarize the outflows or the expenses out

4   of the Generation Now accounts?

5   **A.**   Yes.

6           MS. GLATFELTER:  Your Honor, permission to publish

7   what has been admitted as Exhibit 16?

8           THE COURT:  Yes.

9   **Q.**   Agent Hartsel, that should show up on your screen in a

10  moment.

11  **A.**   Yes.

12  **Q.**   Okay.  Can you tell us what the title of this document

13  is?

14  **A.**   So this is the deposits or inflows into Generation Now,

15  or the account in the name of Generation Now for Fifth Third

16  Bank.  Both account numbers are included ending in 3310 and

17  6847.

18  **Q.**   And are those account numbers described at the top of

19  this chart or table?

20  **A.**   Yes.

21  **Q.**   Did you create this?

22  **A.**   I did.

23  **Q.**   Okay.  Now, what is the date and the amount of the first

24  deposit into the account?

25  **A.**   So the first deposit in the account is on February 23,

CHRISTOPHER HARTSEL - DIRECT                    14-2353

1  2017, in the amount of $25,000.

2  **Q.**   Okay.  And what is the date of the last deposit?

3  **A.**   The last deposit on this summary is June 15th of 2020,

4  and the amount is $25,000.

5  **Q.**   Okay.  And in the time frame between 2017 when the

6  account opened and 6-15-2020, what is the total amount of

7  money that flowed into the Generation Now accounts?

8  **A.**   It's $6 -- approximately 64.4 million.

9  **Q.**   And is that depicted on the chart in front of us?

10 **A.**   Yes, it is.  There is a total at the bottom right hand.

11         MS. GLATFELTER:  Ms. Santoro, would he have the

12 ability to mark his screen?  Thank you.

13 **Q.**   Agent Hartsel -- or Chris Hartsel, could you circle where

14 you are talking about in terms of the total?

15 **A.**   It's right down here (complies).

16 **Q.**   Right above that, do you see transactions under $5,000?

17 **A.**   Yes, that's correct.

18 **Q.**   Can you tell us what you -- what that is?

19 **A.**   Those are a number of smaller transactions.

20 **Q.**   And what's the total of the amount of transactions that

21 are less than $5,000?

22 **A.**   $34,000.

23 **Q.**   Now, along with this exhibit showing the deposits into

24 the Generation Now accounts, did you create any charts or

25 graphics to depict the inflows data that's shown here in

1    Exhibit 16?

2    **A.**   Yes.

3              MS. GLATFELTER:  Your Honor, permission to show the

4    witness document or, I'm sorry, the document marked as Exhibit

5    17.

6              THE COURT:  Yes.  You can show the witness and the

7    lawyers.

8              MS. GLATFELTER:  Ms. Terry, if we can scroll through

9    the three pages so the witness can see all three.

10             THE WITNESS:  Thank you.

11             MS. GLATFELTER:  And return to the first, please.

12   **Q.**   Okay.  Do you recognize Exhibit 17?

13   **A.**   Yes, I do.

14   **Q.**   What is it?

15   **A.**   Exhibit 17 is a summary of the Generation Now deposits

16   broken into two categories.  The first category is labeled

17   "FirstEnergy and Partners For Progress," and the second

18   category is labeled "Other."

19   **Q.**   Okay.  And did you create this?

20   **A.**   I did.

21   **Q.**   And is it based on the specific information we just saw

22   in Exhibit 16, the table of all of the departments?

23   **A.**   Yes.

24             MS. GLATFELTER:  Move to admit and publish Exhibit

25   17.

1           THE COURT:  Any objection?

2           MR. OLESKI:  No.

3           MR. SCHNEIDER:  No objection.

4           THE COURT:  It's admitted.

5       Do you wish to publish it?

6           MS. GLATFELTER:  Yes.

7           THE COURT:  You may publish it.

8   **Q.**   Agent Hartsel, can you see that on your screen?

9   **A.**   Yes.

10  **Q.**   Okay.  Can you describe what page 1 is?

11  **A.**   So page 1 shows the total deposits into the Generation

12  Now accounts, broken down from year from 2017 through 2020

13  and then totaled by year and by total.  And, again, it's

14  broken down by two categories, FirstEnergy and Partners For

15  Progress in the first category, and Others in the second

16  category.

17  **Q.**   So if we go through, for example, 2017, what was the

18  total deposited into the account from FirstEnergy and Partners

19  For Progress?

20  **A.**   $1 million.

21  **Q.**   Okay.  And were there other sources of income in the

22  account?

23  **A.**   Yes.

24  **Q.**   In 2017?

25  **A.**   Yes.

CHRISTOPHER HARTSEL - DIRECT                14-2356

1    **Q.**   And what was that total?

2    **A.**   $332,000.

3    **Q.**   And when you add those together, that's how you get the

4    total at the bottom?

5    **A.**   That's correct.

6    **Q.**   All right.  Now, let's go through each of these years.

7    For 2018, did you analyze how much money from FirstEnergy

8    and/or Partners For Progress accounts was deposited into the

9    Generation Now accounts?

10   **A.**   Yes.

11   **Q.**   And what was that amount?

12   **A.**   $1.4 million.

13   **Q.**   Okay.  And did it also have money from other sources in

14   the account?

15   **A.**   Yes.

16   **Q.**   And what was that amount?

17   **A.**   Approximately $1.9 million.

18   **Q.**   I want to ask you, this particular table, it relates to

19   what accounts?

20   **A.**   The account ending in 3310 and I believe 6847.

21   **Q.**   Okay.  And for the year 2018, did you look at other bank

22   accounts that received money from FirstEnergy?

23   **A.**   Yes.

24   **Q.**   For example, like Hardworking Ohioans?

25   **A.**   Yes.

CHRISTOPHER HARTSEL - DIRECT                    14-2357

1   **Q.**   Is that money included in this total here on this screen?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   Because this is the money that was directly received to

5   Generation Now.

6   **Q.**   Okay.  And so if we move to 2019, can you tell us the

7   amount of money that was in the first -- from FirstEnergy

8   accounts or Partners For Progress accounts?

9   **A.**   Yes.  In 2019, Generation Now received a total of $57.3

10  million.  And that's broken out between FirstEnergy Partners

11  For Progress and Other, at $55.6 million approximately, and

12  1.7 million for other.

13  **Q.**   Okay.  And did you do the same thing for 2020?

14  **A.**   Yes.

15  **Q.**   Okay.  And what did you find?

16  **A.**   For 2020, FirstEnergy and Partners For Progress

17  deposited $2 million, while other sources deposited

18  $468,000.

19  **Q.**   Okay.  And did you come up with a percentage of the total

20  amounts that were deposited into the accounts by the entities?

21  **A.**   Yes.

22  **Q.**   Okay.  And what are those?

23  **A.**   So in total, for the years covered, the percentage of

24  money that was deposited from FirstEnergy and Partners For

25  Progress was 93 percent, and from other sources it was 7

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    percent.

2    **Q.**   Okay.  And did you create graphs to depict this as well?

3    **A.**   Yes.

4         MS. GLATFELTER:  If we may go to page 2, Ms. Terry.

5    **Q.**   Mr. Hartsel, can you tell us what's on page 2, please?

6    **A.**   So this is a pie graph that represents the percentage

7    or proportion of money sourced from Other and FirstEnergy

8    and Partners For Progress into the Generation Now account.

9    **Q.**   And what is the percentage?

10   **A.**   The percentage is 97 percent in 2019 was funded by

11   FirstEnergy and Partners For Progress, and 3 percent was

12   provided by Other.

13        MS. GLATFELTER:  Okay.  And if we'd go back up to

14   the first page, Ms. Terry.

15   **Q.**   What year had the most amount of money deposited into the

16   account?

17   **A.**   2019.

18   **Q.**   Is that why you chose 2019 to depict on page 2?

19   **A.**   Yes.

20        MS. GLATFELTER:  Okay.  And if we'd go to page 3,

21   please.

22   **Q.**   And can you tell us what is on page 3?

23   **A.**   On page 3, it is a breakdown once again showing a pie

24   graph that breaks down the percentage of funding into the

25   Generation Now account.  93 percent provided by FirstEnergy

CHRISTOPHER HARTSEL - DIRECT                    14-2359

1    and Partners For Progress and 7 percent provided by Other.

2    **Q.**   And does this graph depict the amount in the account over

3    that total time period, 2017 to June 2020?

4    **A.**   Yes.

5    **Q.**   Now, we talked about the generation accounts in general a

6    few moments ago.  Did you identify and schedule the money that

7    flowed out of the Generation Now accounts that we have been

8    talking about?

9    **A.**   Yes.

10           MS. GLATFELTER:  Your Honor, permission to show the

11   witness what has been marked as Exhibit 18.

12           THE COURT:  Yes.

13           MS. GLATFELTER:  Ms. Terry, if we can scroll through

14   the five pages so the witness can see all five.

15       And return to page 1.  Thank you.

16   **Q.**   Mr. Hartsel, do you recognize what is Government's

17   Exhibit 18?

18   **A.**   Yes.

19   **Q.**   What is it?

20   **A.**   This is a breakdown of the outflows or the expenses

21   from the Generation Now accounts arranged in a chart and a

22   pie graph and broken down by year from 2017 to 2020.

23   **Q.**   Okay.  And did you create this?

24   **A.**   Yes.

25   **Q.**   And have you reviewed it for accuracy?

CHRISTOPHER HARTSEL - DIRECT                    14-2360

1    **A.**   Yes.

2          MS. GLATFELTER:  Your Honor, I move to admit Exhibit

3    18 and to publish to the jury.

4          THE COURT:  Any objection?

5          MR. OLESKI:  No objection, Judge.

6          MR. SCHNEIDER:  Nor here.

7          THE COURT:  It's admitted.  You may publish.

8    **Q.**   Mr. Hartsel, can you describe page 1 of Government's

9    Exhibit 18 to the jury?

10   **A.**   So this is the outflows or the expenses from the

11   Generation Now accounts for the year of 2017.

12   **Q.**   Okay.  And how are they -- how are they ranked, or the

13   different parts of the chart?

14   **A.**   So on the left side you all find a chart that displays

15   the outflows by date and by entity and the amount, and on

16   the right you'll see a summary of the larger entities, the

17   larger beneficiaries of the account with the pie graph that

18   corresponds.

19   **Q.**   Okay.  So if we look at this chart from 2017, how much

20   money in total flowed out of the Generation Now accounts?

21   **A.**   $693,000.

22   **Q.**   Can you circle that where it is on the document so we can

23   see it?

24   **A.**   Yes.  (Complies.)

25   **Q.**   Okay.  And then I see you have an additional chart at the

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1  top or additional table.  Can you tell us what that is?

2  **A.**   So this is a summary of the larger beneficiaries of the

3  recipients of the most money from the account from 2017.

4  **Q.**   And who were the recipients of the most amount of money

5  on the Generation Now accounts?

6  **A.**   From largest to smallest, we have JPL & Associates LLC;

7  the Strategy Group, LLC; Dinsmore and Shohl, LLP; Brooke

8  Bodney; LAZ Parking; and then Other.

9  **Q.**   And what was the percentage that JPL & Associates

10  received of the 693 -- or $693,000?

11  **A.**   Approximately 84 percent.

12  **Q.**   And what was the monetary value of that?

13  **A.**   $580,000.

14  **Q.**   Is that the first line of that graph up in the top right?

15  **A.**   Yes.

16  **Q.**   Okay.  Now, if we go to page 2, can you explain to the

17  jury what this depicts?

18  **A.**   So this is a similar format.  It's showing the outflows

19  from the Generation Now accounts for 2018.

20  **Q.**   Okay.  And so it's broken up into what parts?  Can you

21  describe those for the jury?

22  **A.**   Yes.  So we have two tables, one is arranged by

23  transaction that shows the date, the beneficiary recipient,

24  and the amount, and then the Other shows a summary table

25  with a pie graph --

CHRISTOPHER HARTSEL - DIRECT                    14-2362

1    **Q.**    Okay.

2    **A.**    -- that corresponds.

3    **Q.**    And let's go ahead and look at the table in the top right

4    corner where it's titled, "Payee," "Percentage," and

5    "Outflows."  Do you see that?

6    **A.**    Yes.

7    **Q.**    Who received the largest amounts of money out of the

8    Generation Now account in 2018?

9    **A.**    JPL & Associates, LLC.

10   **Q.**    And what was the percentage of money that JPL &

11   Associates received?

12   **A.**    It's approximately 49 percent or approximately $1.9

13   million.

14   **Q.**    And can we see that depicted anywhere else on the chart,

15   or on this exhibit?

16   **A.**    Yes.  The pie graph below.

17   **Q.**    And circle where the JPL & Associates is on the pie graph

18   for us.

19   **A.**    (Complies.)

20   **Q.**    All right.  What was the second largest recipient of

21   money from the Generation Now account?

22   **A.**    It's Growth and Opportunity PAC.

23   **Q.**    And what percentage of money did the Growth and

24   Opportunity PAC receive in 2019?

25   **A.**    27 percent.

1   **Q.**   And approximately what does that translate into dollars?

2   **A.**   About $1 million.

3   **Q.**   What about Hardworking Ohioans?

4   **A.**   Hardworking Ohioans is 17 percent, and about $670,000.

5   **Q.**   And are other recipients or other large recipients listed

6   on that chart as well?

7   **A.**   Yes.  Below that we have Brooke Bodney, 3 percent, for

8   $120,000; the Strategy Group, LLC, 2 percent for $75,000;

9   Dinsmore & Shohl, LLP, approximately 1 percent or $30,000;

10  and then LAZ Parking, about $20,000.

11          MS. GLATFELTER:  Ms. Terry, if we may advance to

12  page 3.

13  **Q.**   Mr. Hartsel, can you describe what we're looking on --

14  looking at on page 3?

15  **A.**   So this is a little bit different from the prior two

16  charts due to the number of transactions.  It's easier to

17  summarize the information by the largest recipients, and

18  this is representing 2019 outflows from the Generation Now

19  accounts.  On the top left-hand corner you'll see that there

20  is a header called Count.  That just shows the number of

21  transactions for each one of the entities.  And it's

22  arranged again by the payee or the recipient and then the

23  amount.

24  **Q.**   Okay.  So let's walk through the first three so we

25  understand this chart.

1          So by count, if we go to the first row, we see Count 18.

2     What does that mean?

3     **A.**    That means there were 18 transactions to Ohioans For

4     Energy Security.

5     **Q.**    And the total of that 18 trans -- or those total of those

6     18 transactions?

7     **A.**    Is approximately $21.3 million.

8     **Q.**    And if we go down to the row of 17 Consulting Group,

9     what's the number of transactions or number of transfers from

10    the Generation Now accounts?

11    **A.**    9.

12    **Q.**    And they totaled what amount?

13    **A.**    $1.6 million.

14    **Q.**    Okay.

15            MS. GLATFELTER:  And if we go to the next page,

16    Ms. Terry.

17    **Q.**    And what do we see on page 4?

18    **A.**    So this is still for the same year, 2019, and this

19    summarizes the outflows in 2019 from the Generation Now

20    account.

21    **Q.**    And does this correspond to the page that we were just

22    reviewing?

23    **A.**    Yes.

24    **Q.**    Okay.  And can you explain this to us?

25    **A.**    So there's a chart above, and this summarizes by the

CHRISTOPHER HARTSEL - DIRECT                14-2365

1    largest beneficiary, the largest payee.  And below that is a

2    pie graph that corresponds with the chart above.

3    Q.   Okay.  So, for example, at the top, the first row is

4    what?

5    A.   The first row is Ohioans For Energy Security.  This is

6    showing that they received approximately 40 percent of the

7    outflows for 2019, which is approximately $21.3 million.

8    Q.   And how much did JPL & Associates receive?

9    A.   JPL & Associates received approximately $8 million,

10   which is 15 percent of the outflows.

11   Q.   And what about 17 Consulting Group?

12   A.   17 Consulting Group received approximately $1.6 million

13   or 3 percent of the outflows.

14        MS. GLATFELTER:  Ms. Terry, if we could go to the

15   last page, please.

16   Q.   Mr. Hartsel, can you tell us what's on the last page?

17   A.   So this is -- returning to the previous format where it

18   shows the transactions broken down by date in chronological

19   order on the left chart.  It shows the date, the payee, or

20   the recipient and the amount, and on the right there is a

21   table that summarizes by payee, the largest recipient to the

22   smallest, with a corresponding pie graph below it.

23   Q.   Okay.  And if we look at that right -- the table on the

24   right where it says payee, percentage, and outflows, can you

25   tell us who the largest recipient from funds from the

1    Generation Now accounts was in 2020?

2    **A.**    Coalition For Growth and Opportunity, Inc.

3    **Q.**    Okay.  And how much did they receive?

4    **A.**    49 percent.

5    **Q.**    Which translated into how much money?

6    **A.**    $1.2 million.

7    **Q.**    And what about JPL & Associates?

8    **A.**    JPL & Associates is 19 percent.

9    **Q.**    And what was the total amount that was -- that flowed out

10   of the account in 2020, at least up until June?

11   **A.**    $500,000.

12   **Q.**    For JPL?

13   **A.**    For JPL, correct.

14   **Q.**    And what was the total for 2020?

15   **A.**    The total for 2020 was approximately $2.5 million.

16   **Q.**    Okay.  And do you see Ohioans For Energy Security on this

17   table?

18   **A.**    I do.

19   **Q.**    Okay.  And what was the percentage in 2020?

20   **A.**    1.6 percent.

21   **Q.**    Now, did you investigate further or did you review

22   records related to the Ohioans For Energy Security account,

23   bank account?

24   **A.**    Yes, I did.

25   **Q.**    And what bank did Ohioans For Energy Security bank at?

1    **A.**    Ohioans was also Fifth Third.

2    **Q.**    That's the same as Generation Now?

3    **A.**    That's correct.

4    **Q.**    Okay.  And did you review and schedule those bank account

5    records in the same manner that you've described here?

6    **A.**    Yes.

7            MS. GLATFELTER:  Your Honor, permission to show the

8    witness what has been marked as Exhibit 153?

9            THE COURT:  Yes.

10   **Q.**    Mr. Hartsel, do you recognize Exhibit 153?

11   **A.**    Yes.

12   **Q.**    What is it?

13   **A.**    This is the inflows into Ohioans for -- an account in

14   the name of Ohioans For Energy Security.  It's a Fifth Third

15   Bank account and the account number is ending in 8255.

16   **Q.**    And did you prepare this exhibit as you've described for

17   the previous exhibits?

18   **A.**    Yes.

19   **Q.**    And you reviewed it prior to your testimony today?

20   **A.**    Yes.

21           MS. GLATFELTER:  Your Honor, I move to admit Exhibit

22   153 and publish.

23           THE COURT:  Any objections?

24           MR. OLESKI:  No.

25           MR. SCHNEIDER:  No objection.

CHRISTOPHER HARTSEL - DIRECT                    14-2368

1           THE COURT:  It's admitted.  You may publish.

2           MS. GLATFELTER:  Thank you, Your Honor.

3           THE COURT:  Yes.

4     **Q.**   Mr. Hartsel, can you tell the jurors what's depicted on

5     page 1 of Exhibit 153?

6     **A.**   So this is a breakdown by date, similar chart to what

7     you saw before, of the inflows into the Ohioans For Energy

8     Security Fifth Third Bank account.  It's arranged again by

9     date, the payor, or the benefactor, and the amount that was

10    deposited.

11    **Q.**   What was the total -- based on your review of the

12    records, what was the total deposited into the Ohio For Energy

13    Security account?

14    **A.**   Approximately $23.4 million.

15    **Q.**   And can you describe how much of that $23 million came

16    from the Generation Now account?

17    **A.**   Virtually all of it came from the Generation Now

18    account.  I believe 99 percent.

19          MS. GLATFELTER:  And if we'd go to page 2,

20    Ms. Terry.

21    **Q.**   Have you depicted that on page 2?

22    **A.**   Yes.

23    **Q.**   Okay.  Can you walk us through page 2 of this exhibit?

24    **A.**   So this is once again a table with a corresponding pie

25    chart of the inflows summarized by the benefactor or the

CHRISTOPHER HARTSEL - DIRECT                    14-2369

1   source.

2   **Q.**   Okay.  And did you make a graph at the bottom depicting

3   that?

4   **A.**   Yes, I did.

5   **Q.**   And those were the only three sources of funds into the

6   account?

7   **A.**   Yes.

8   **Q.**   Did you also analyze and review records relating to the

9   outflows from Ohioans For Energy Security, or the money

10  flowing out of the Ohioans For Energy account?

11  **A.**   Yes.

12         MS. GLATFELTER:  Your Honor, permission to show the

13  witness what's been marked as Exhibit 154.

14         THE COURT:  Yes.

15  **Q.**   Mr. Hartsel, do you recognize Exhibit 154?

16  **A.**   I do.

17  **Q.**   What is it?

18  **A.**   This is a breakdown or this is a summary by date of the

19  outflows or the expenses from the Ohioans For Energy

20  Security account.

21  **Q.**   Okay.  And did you create this exhibit?

22  **A.**   I did.

23  **Q.**   And was it based on the bank records that you obtained

24  and reviewed?

25  **A.**   Yes.

CHRISTOPHER HARTSEL - DIRECT                    14-2370

1  **Q.**  And you prepared it in the same way as the other charts?

2  **A.**  Yes.

3          MS. GLATFELTER:  Your Honor, I move to admit Exhibit

4  154 and publish for the jury.

5          THE COURT:  Any objections?

6          MR. OLESKI:  No, Judge.

7          MR. SCHNEIDER:  No.

8          THE COURT:  It's admitted.  You may publish.

9  **Q.**  Mr. Hartsel, can you describe page 1 of this exhibit?

10 **A.**  So there are three columns to the chart, and each of

11 these columns contains information relevant to the

12 transactions.  The outgoing transactions for Ohioans For

13 Energy Security, on the left you will find the date of the

14 transaction.  Then you will have the destination or the

15 beneficiary of the transaction, and then the amount.

16         MS. GLATFELTER:  And if we go to the second page,

17 Ms. Terry.

18 **Q.**  Does your chart continue on page 2?

19 **A.**  Yes.

20 **Q.**  Okay.  And what was the amount of money that flowed out

21 of the Ohioans For Energy Security account?

22 **A.**  Approximately $23.4 million.

23 **Q.**  Was that nearly all of the money that flowed into the

24 account?

25 **A.**  Yes.

CHRISTOPHER HARTSEL - DIRECT                    14-2371

1   **Q.**   During your investigation, did you -- or during the

2   investigation in this case, did you analyze the amount of time

3   that money stayed into the account in this case?

4   **A.**   Yes.

5   **Q.**   What did you find?

6   **A.**   So for Ohioans For Energy Security, in 2019, it took

7   about five days for the funds, every single deposit, to

8   leave the account.

9   **Q.**   Five days?

10  **A.**   Five days.

11  **Q.**   Now, Mr. Hartsel, did you also prepare a graphic image of

12  the outflows in this -- of this account?

13  **A.**   Yes.

14          MS. GLATFELTER:  Ms. Terry, if we could go to the

15  next page, please.

16  **Q.**   Mr. Hartsel, can you describe what the jury is viewing on

17  page 3?

18  **A.**   So this is a table of the outflows above for the

19  Ohioans For Energy Security account, along with the

20  corresponding pie graph below it.

21  **Q.**   And if we can go through who -- the payees from this

22  account?

23  **A.**   So we have Voter to Voter, Strategic Media Placement,

24  Constant Content, Lincoln Strategy Group, and Ohio Outdoor

25  Advertising.

1   **Q.**   And who is the largest recipient of funds from the

2   Ohioans For Energy Security account?

3   **A.**   Voter to Voter.

4   **Q.**   How much did they receive?

5   **A.**   Approximately $10.1 million.

6   **Q.**   And what percentage did that represent?

7   **A.**   47 percent.

8   **Q.**   All right.  And who is the next largest recipient of

9   funds from the Ohioans For Energy Security account?

10  **A.**   Strategic Media Placement.

11  **Q.**   How much money did Strategic Media Placement receive?

12  **A.**   Approximately 30 percent.

13  **Q.**   Okay.

14  **A.**   And $6.9 million.

15  **Q.**   All right.  Mr. Hartsel, in the course of your work in

16  this case, did you also analyze and review bank records for an

17  entity called 17 Consulting Group?

18  **A.**   Yes.

19  **Q.**   Were bank records obtained for 17 Consulting?

20  **A.**   Yes.

21  **Q.**   And did you schedule those bank records in the manner

22  that you've described previously?

23  **A.**   Yes.

24          MS. GLATFELTER:  Your Honor, permission to show the

25  witness Exhibit 133.

1              THE COURT:  Yes.

2    **Q.**   Mr. Hartsel, do you recognize Exhibit 133?

3    **A.**   Yes, I do.

4    **Q.**   What is it?

5    **A.**   This is again following a similar format as before.

6    These are the inflows into 17 Consulting Group.  There are

7    two dates that represent this data.  On the left you have

8    the transaction by transaction with the date, the source,

9    and the amount.  On the second table you have a summary of

10   the sources with the corresponding pie graph.

11   **Q.**   Did you create this exhibit?

12   **A.**   Yes.

13   **Q.**   And did you do so in the manner of the other exhibits

14   we've looked at today?

15   **A.**   Yes.

16             MS. GLATFELTER:  Your Honor, I'd move to admit

17   Exhibit 133 and publish.

18             THE COURT:  Any objections?

19             MR. OLESKI:  No objection, Judge.

20             MR. SCHNEIDER:  No objection.

21             THE COURT:  It's admitted, and you may publish.

22   **Q.**   Mr. Hartsel, when you analyzed the 17 Consulting Group

23   account records, what did you find with respect to the funding

24   of the account?

25   **A.**   It was entirely funded by Generation Now.

1    **Q.**   And between what dates?

2    **A.**   Between the dates of August 7, 2019, and December 16,

3    2019.

4    **Q.**   Okay.  And have you depicted that in the chart at the top

5    right and in the graph at the bottom of the page?

6    **A.**   Yes.

7    **Q.**   How much money total was deposited into the account?

8    **A.**   $1.6 million.

9    **Q.**   Now, Mr. Hartsel, during your analysis, did you also look

10   at how the money flowed out of the 17 Consulting Group

11   account?

12   **A.**   Yes.

13          MS. GLATFELTER:  Your Honor, permission to --

14   permission for the witness to review Exhibit 134?

15          THE COURT:  Yes.

16   **Q.**   Mr. Hartsel, do you recognize this exhibit?

17   **A.**   Yes.

18   **Q.**   What is it?

19   **A.**   This is a chart of the outflows of the 17 Consulting

20   Group account by date and chronological order with a date,

21   the destination of the funds of the payee, and the amount.

22   **Q.**   All right.  Did you create this?

23   **A.**   Yes.

24   **Q.**   All right.  And was this based on the bank records that

25   you obtained?

1    **A.**    Yes.

2    **Q.**    Did you create it in the manner that you described with

3    respect to the other exhibits we've seen here today?

4    **A.**    Yes.

5           MS. GLATFELTER:  Your Honor, I move to admit Exhibit

6    134 and publish.

7           THE COURT:  Any objection?

8           MR. OLESKI:  No objection, Judge.

9           MR. SCHNEIDER:  No objection.

10          THE COURT:  It's admitted.  You may publish.

11   **Q.**    Mr. Hartsel, can you describe what the jury's seeing on

12   Exhibit -- Government Exhibit 134?

13   **A.**    So this shows all the transactions, the outflow or

14   expense transactions from the 27 -- or 17 Consulting Group

15   account dated from August 8th of 2019 through December 26 of

16   2019.

17   **Q.**    Okay.  And what were the first four transactions out of

18   the account?

19   **A.**    The first four transactions were to Matthew Borges; CGI

20   Investigations, LLC; 614 Solutions; and Tyler Fehrman.

21   **Q.**    Okay.  And what were the amounts of those transactions?

22   **A.**    Matt Borges received $100,000, CGI Investigations

23   received $67,000, 614 Solutions received $100,000, and Tyler

24   Fehrman received $15,000.

25   **Q.**    Now, did you prepare some other exhibit with respect to

1     the 17 Consulting Group account?

2     **A.**   Yes.

3               MS. GLATFELTER:  Your Honor, permission to show the

4     witness Exhibit 135?

5               THE COURT:  Yes.

6     **Q.**   Mr. Hartsel, do you recognize Exhibit 135?

7     **A.**   Yes.

8     **Q.**   What is it?

9     **A.**   This is a table and a corresponding pie graph.  The

10    table shows the recipients from largest to smallest, or the

11    largest beneficiaries of the 17 Consulting account.

12    **Q.**   Okay.  And what time period does this chart cover?

13    **A.**   I believe 2019.

14    **Q.**   Did you prepare this in the method -- in the manner you

15    have described with respect to the other exhibits here today?

16    **A.**   Yes.

17    **Q.**   And was this based on the information in the previous

18    exhibit that we reviewed?

19    **A.**   Yes.

20              MS. GLATFELTER:  Your Honor, move to admit and

21    publish Exhibit 135.

22              THE COURT:  Any objections?

23              MR. SCHNEIDER:  None here.

24              MR. OLESKI:  No.  No, Judge.

25              THE COURT:  They're admitted.  You may publish.

CHRISTOPHER HARTSEL - DIRECT                    14-2377

```
 1    Spirit of full disclosure, we're getting close to a break.
 2             MS. GLATFELTER:  Okay.  I have like maybe two
 3    minutes.
 4             THE COURT:  Very well.
 5             MS. GLATFELTER:  Thank you, Your Honor.
 6    Q.   Agent -- excuse me -- Mr. Hartsel, can you describe what
 7    we're looking at in Government's Exhibit 135?
 8    A.   So similar to previous exhibits, this shows a summary
 9    of the payee, the largest to smallest beneficiary of the 17
10    Consulting account.  The chart on the left, you have the
11    payee's name with the percentage paid and the amount paid,
12    and the corresponding pie graph on the right.
13    Q.   All right.  And who was the largest recipient of funds in
14    2019 from the 17 Consulting Group?
15    A.   Juan Cespedes.
16    Q.   How much did he receive?
17    A.   He received $600,000.
18    Q.   Who's the second largest recipient of funds from the 17 C
19    account?
20    A.   Matt Borges.
21    Q.   And how much did he receive?
22    A.   $345,000.
23    Q.   And have you depicted those in the graph on the right?
24    A.   Yes.
25    Q.   Can you draw a line from the Juan Cespedes and Matt
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    Borges to the totals on the pie chart?

2    **A.**   Sure (complies).

3    **Q.**   Okay.

4          MS. GLATFELTER:  And Ms. Terry, if we look at page 2

5    of this.  We will be finished in one minute.

6    **Q.**   Can you describe what we're looking at here?

7    **A.**   So this is a flow chart that shows each of the entities

8    as a bubble.  And it shows the flow of money from

9    FirstEnergy through Generation Now to 17 Consulting and then

10    the largest beneficiaries.

11    **Q.**   And these are with respect to 2019, right?

12    **A.**   That's correct.

13    **Q.**   And were there other payments made from the account?

14    **A.**   Yes.

15    **Q.**   These represent ones related to the investigation?

16    **A.**   Correct.

17    **Q.**   Okay.

18          MS. GLATFELTER:  Your Honor, if we need to.

19          THE COURT:  Very well.  We're going to break for the

20    day in order to accommodate a juror who got stuck in the

21    elevator and I don't want to beat him up any further.

22    During the break, you get to go home, get early home.  I

23    want you to take a break, put this out of your mind.  Do not

24    discuss it among yourselves or with anyone else.  No

25    independent research.  Don't be checking out the media.  And

1    continue to keep an open mind.  We're grateful to you for the

2    work you are doing.  I hope you have a good, long break today.

3         Tomorrow we would anticipate you be at your spot by 9:15

4    so we can start again at 9:30.

5         Out of respect for you, we will rise as you leave.

6              THE COURTROOM DEPUTY:  All rise for the jury.

7         (Jury exited the courtroom at 2:00 p.m.)

8              THE COURT:  The jury's left the room, the door is

9    closing.  As always, we'll wait till we're advised that the

10   jury has cleared the floor, and then we will break for the

11   day.

12             THE COURTROOM DEPUTY:  All clear.

13             THE COURT:  Okay.  We're going to break till

14   tomorrow at 9:15.  Thank you.

15             THE COURTROOM DEPUTY:  All rise.  This court is in

16   recess.

17        (Proceedings continued in progress at 2:01 p.m.)

18                   CERTIFICATE OF REPORTER

19             I, Mary A. Schweinhagen, Federal Official Realtime
     Court Reporter, in and for the United States District Court
20   for the Southern District of Ohio, do hereby certify that
     pursuant to Section 753, Title 28, United States Code that the
21   foregoing is a true and correct transcript of the
     stenographically reported proceedings held in the
22   above-entitled matter and that the transcript page format is
     in conformance with the regulations of the Judicial Conference
23   of the United States.

24   s/Mary A. Schweinhagen
     _____ 19th of February, 2023
25   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1

## I N D E X

**EXAMINATIONS**

| GOVERNMENT WITNESSES | PAGE |
|---|---|
| **NATHAN HOLBROOK** | |
| Cross-Exam by Mr. Glickman | 2232 |
| Cross-Exam by Mr. Schneider | 2257 |
| Redirect Exam by Ms. Gaffney-Painter | 2257 |
| **MEGAN FITZMARTIN** | |
| Direct Exam by Ms. Gaffney-Painter | 2263 |
| Cross-Exam by Mr. Oleski | 2287 |
| Cross-Exam by Mr. Schneider | 2307 |
| Redirect Exam by Ms. Gaffney-Painter | 2310 |
| **BETH ELLIS** | |
| Direct Exam by Ms. Glatfelter | 2314 |
| Cross-Exam by Mr. Marein | 2334 |
| **CHRISTOPHER HARTSEL** | |
| Direct Exam by Ms. Glatfelter | 2340 |


**EXHIBITS**

| GOVERNMENT'S EXHIBITS | PAGE |
|---|---|
| ADMITTED | |
| No. 17 | 2355 |
| No. 18 | 2360 |
| No. 153 | 2268 |
| No. 154 | 2370 |
| No. 133 | 2373 |
| No. 134 | 2375 |