15-2381

1                      UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
2                       WESTERN DIVISION
                        - - -
3

UNITED STATES OF AMERICA,     : **CASE NO. 1:20-CR-0077**
4                                 :
                Plaintiff,    : **JURY TRIAL, DAY 15**
5           vs.               :
                                  : **21st of February, 2023**
6 LARRY HOUSEHOLDER, et al.      :
                                  :
7                Defendant.    :

8                            - - -
                    **TRANSCRIPT OF PROCEEDINGS**
9        **BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE**
                          - - -
10

APPEARANCES:
11

For the Plaintiff:
12                      Emily N. Glatfelter, Esq.
                     Matthew Charles Singer, Esq.
13                      Megan Gaffney Painter, Esq.
                     Assistant United States Attorneys
14                      221 East Fourth Street, Suite 400
                     Cincinnati, Ohio 45202
15

For the Defendant, Larry Householder:
16
                     Nicholas R. Oleski, Esq.
17                      Robert T. Glickman, Esq.
                     McCarthy, Lebit, Crystal & Liffman Co.
18                      1111 Superior Avenue East, Suite 2700
                     Cleveland, Ohio 44114
19                           and
                     Steven L. Bradley, Esq.
20                      Marein and Bradley
                     526 Superior Avenue, Suite 222
21                      Cleveland, Ohio 44114

22

23

24

25

```
 1    For the Defendant, Matthew Borges:

 2                         Karl Herbert Schneider, Esq.
                          Todd Aaron Long, Esq.
 3                         McNees Wallace & Nurick, LLC
                          21 East State Street, Suite 1700
 4                         Columbus, Ohio 43215

 5    Also present:       Larry Householder
                          Matthew Borges
 6                         Blane Wetzel, FBI Special Agent
                          Kelly Terry, paralegal
 7                         PJ Jensen, trial tech

 8    Law Clerk:          Cristina V. Frankian, Esq.

 9    Courtroom Deputy:   Rebecca Santoro

10    Stenographer:       Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                          United States District Court
11                         100 East Fifth Street
                          Cincinnati, Ohio 45202
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**PROCEEDINGS**

2      (Proceedings held in open court at 9:29 a.m.)

3          THE DEPUTY:  All rise.  This United States District

4   Court for the Southern District of Ohio is now in session,

5   The Honorable Timothy S. Black, District Judge, presiding.

6          THE COURT:  Thank you.  Please be seated.  Good

7   morning and welcome back.  It's 9:30, appears that all

8   principals and counsel are here.

9      Are we ready for the jury from the government's

10  perspective?

11          MS. GLATFELTER:  Yes, Your Honor.  Thank you.

12          THE COURT:  And from Mr. Householder's perspective?

13          MR. OLESKI:  Yes, Judge.

14          THE COURT:  And from Mr. Borges' perspective?

15          MR. SCHNEIDER:  Yes.

16          THE COURT:  Who's on the stand and in what phase?

17          MS. GLATFELTER:  Chris Hartsel is on the stand

18  currently on direct examination.

19          THE COURT:  Very well.  Let's call for the jury.

20          THE DEPUTY:  All rise for the jury.

21      (Jury entered the courtroom at 9:30 a.m.)

22          THE COURT:  Jurors can be seated as they join us.

23  You may all be seated.  Thank you.  To the 14 Members of the

24  Jury who have arrived timely, good morning and welcome back.

25  I've missed you.  We have a full week and we are ready to

1    go.  We will continue hearing testimony, if the government

2    will recall its witness.

3         If the gentleman would be willing to approach and come

4    to the stand.

5         (Witness re-took the stand.)

6              THE COURT:  You can approach the podium, Ms.

7    Glatfelter.

8              MS. GLATFELTER:  Thank you, Your Honor.

9              THE COURT:  Good morning.

10             THE WITNESS:  Good morning.

11             THE COURT:  You remain under oath and you

12   understand?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Very well.  Government will continue

15   examination.  You may commence when you're ready, Ms.

16   Glatfelter.

17             MS. GLATFELTER:  Thank you, Your Honor.

18         Good morning, Mr. Hartsel.

19             THE WITNESS:  Good morning.

20                  DIRECT EXAMINATION (Continued.)

21   BY MS. GLATFELTER:

22   Q     When we left off on Thursday, we were discussing the

23   17 Consulting Group account; do you recall that?

24   A     Yes.

25             MS. GLATFELTER:  And, Your Honor, if we may

1    continue publishing what has been admitted as Exhibit 135?

2         THE COURT:  Yes.

3    **Q**    Okay.  Mr. Hartsel, you were describing to us how you

4    had created this chart, and can you go ahead and describe

5    that again for the jury so we can pick up where we left off?

6    **A**    Sure.  So on the left, you'll find a table that shows

7    a summary of the spending from 17 Consulting.  At the top,

8    you'll see the greatest beneficiary of the account or payee

9    all the way down to the lowest.  And on the right, you'll

10   see a corresponding pie graph that shows the percentages

11   that corresponds to each one of the payees in the table to

12   the left.

13   **Q**    Okay.  And who were the top payees from the 17

14   Consulting Group account?

15   **A**    The top payees would have been Juan Cespedes, Matthew

16   Borges, CGI Investigations, Hancock and Prouty, Protect Ohio

17   Clean Energy Jobs, Denzenhall Resources.

18   **Q**    Okay.  And if we can move to page 2 of this exhibit,

19   and can you describe to us what this graph is depicting?

20   **A**    So this is what we described as a flow chart.  It

21   shows the flow of funds.  Moving from on the left, you'll

22   see FirstEnergy Service Company to Generation Now and then

23   flowing to 17 Consulting Group, LLC, and then to payees that

24   we regarded in the investigative team as significant.

25   **Q**    Okay.  And so all of the payees from the 17 Consulting

1   Group account are not listed on this chart, right, just

2   select ones?

3   **A**     That's correct.

4   **Q**     Okay.  And why did you choose to name things, for

5   example, on the top of the chart like FirstEnergy Service

6   Company?

7   **A**     Because this shows the source of the funds that

8   eventually made it to each one of the payees listed from 17

9   Consulting.

10  **Q**     And the FirstEnergy Service account or Service Company

11  account, is that where the money that flowed into Generation

12  Now at that time came from?

13  **A**     That's correct.

14  **Q**     Now, in the course of your work on this case, Mr.

15  Hartsel, were you involved in analyzing bank records for an

16  entity called JPL Associates, LLC?

17  **A**     Yes.

18  **Q**     And who is the signatory on the JPL Associates

19  account?

20  **A**     It's Jeff Longstreth.

21  **Q**     Okay.  And did you also analyze bank records for a

22  company called Constant Content company?

23  **A**     Yes.

24  **Q**     And who was the signatory on accounts associated with

25  Constant Content?

1    **A**    It's also Jeff Longstreth.

2    **Q**    And were bank records obtained for those two

3    companies?

4    **A**    Yes.

5    **Q**    And did you schedule those accounts in the manner

6    you've previously described for the jury?

7    **A**    Yes.

8    **Q**    And in doing so, did you summarize the deposits or in

9    flows into the JPL and Constant Content accounts?

10   **A**    Yes.

11        MS. GLATFELTER:  Your Honor, permission to show the

12   witness what has been marked as Exhibit 34?

13        THE COURT:  Yes.

14   **Q**    Mr. Hartsel, can you briefly describe what's depicted

15   in Exhibit 34?

16   **A**    So this is a chart similar to what we saw before;

17   however, it includes three different accounts, two for

18   Constant Content and one for JPL & Associates.  The chart

19   shows the inflows or the deposits listed from the largest

20   payor, benefactor, all the way down to the lowest.

21   **Q**    Okay.  And did you create this chart?

22   **A**    Yes.

23   **Q**    And did you create it in the same manner as the others

24   that you've described for the jury during your testimony?

25   **A**    Yes.

1          MS. GLATFELTER:  Your Honor, permission to admit

2      Exhibit 34 and publish it for the jury?

3          THE COURT:  Any objections?

4          MR. GLICKMAN:  No objection.

5          MR. SCHNEIDER:  No.

6          THE COURT:  Very well.  It's admitted.  You may

7      publish.

8      **Q**    Okay.  Mr. Hartsel, in a moment the jury will be able

9      to see the exhibit too.  Okay.  And if we can go through

10     each column of the -- each column of the chart and describe

11     what's depicted in that column.

12     **A**    Sure.  So as I mentioned, the chart is organized

13     similar to what you saw in previous charts with the greatest

14     payor or benefactor to the least.  On the left, those are

15     the entities, and then there are three columns listed,

16     starting from left to right, Constant Content account ending

17     in 4045, Constant Content account ending in 1219, and then

18     JPL & Associates ending in 9192, and the last column is a

19     total column that sums all three accounts for each one of

20     the entities listed on the left.

21     **Q**    Okay.  And so in the farthest right to the right of

22     the table, we see some percentages, can you describe what

23     those are for us, please?

24     **A**    So those percentages represent the total percentage of

25     all of the deposits coming into the account.

1   **Q**    Okay.  And so if we take the first line, for example,

2   can we go through that to show the jury how this works?

3   **A**    Sure.  So in the first line, the largest payee into

4   the JPL and Constant Content accounts is Generation Now,

5   Incorporated.  There is approximately $10.8 million that

6   comes in for the period reviewed in the account of 9192.

7   **Q**    Okay.  And what percentage of the total deposits into

8   these three accounts does the Generation Now, Inc. deposits

9   comprise?

10  **A**    61 percent.

11  **Q**    Okay.  And what's the second line?

12  **A**    The second line is the second-largest payor into the

13  account, that's Ohioans For Energy Security; $2.2 million

14  comes into the account ending in 4025, and $2.2 million

15  comes into the account ending in 2129.

16  **Q**    And we looked at the Ohioans For Energy Security

17  account on Thursday; do we remember that?

18  **A**    Yes.

19  **Q**    How is the Ohioans For Energy Security account funded?

20  **A**    That's funded by Generation Now.

21  **Q**    So 86 percent of the JPL and Constant Content accounts

22  were funded by deposits from Generation Now in one form or

23  the other?

24  **A**    That's correct.

25  **Q**    Okay.  Below that, you see a bunch of other

1    depositors -- I guess there's probably a better word for

2    that -- but people who are depositing money into the

3    account; do you see those listed?

4    **A**    Yes.

5    **Q**    What are the percentages of those people over time?

6    **A**    All except for Ohio AFL-CIO, it's either 1 percent or

7    less than 1 percent.

8    **Q**    And so money from other sources is coming into the

9    account at that time?

10   **A**    Yes.

11   **Q**    But it accounts for what percentage of the account

12   totals?

13   **A**    For the 1 percent and the 0 percent, approximately,

14   12 percent of the total inflows.

15   **Q**    Okay.  And then at the bottom of the chart, you have a

16   column -- or you have a row that says "Totals."  Can you

17   tell us what that is?

18   **A**    So at the bottom, there are totals for each one of the

19   accounts for the period reviewed followed by percentages,

20   once again, of the total in flows for all three entities.

21   **Q**    Okay.  And so that's the percentage of money into --

22   **A**    Each one of the accounts.

23   **Q**    I see.  Okay.  And what time frame does this chart

24   cover?

25   **A**    2019 and 2020, I believe.

1   **Q**    Okay.  Could it be 2017 to 2020?

2   **A**    Oh, yes.  I'm sorry.  Yes.

3   **Q**    We'll look at another one that's from a different time

4   frame later.

5   **A**    Thank you.

6   **Q**    Was there another JPL account that you examined

7   records for that is not listed on this chart?

8   **A**    Yes.

9   **Q**    Okay.  And can you explain that to us?

10  **A**    So the other JPL account, it didn't have much activity

11  in it at all except for maybe some transfers between the

12  9192 and the other JPL account, so, therefore, it's not

13  included on this graph.

14  **Q**    Because it didn't have any independent deposits?

15  **A**    Correct.

16       MS. GLATFELTER:  Okay.  One moment.

17       Okay.  If we can look at page 2, Ms. Terry, of this

18  exhibit.

19  **Q**    All right.  Mr. Hartsel, can you describe the chart

20  that you've created on page 2?

21  **A**    So this is a bar chart that shows at a large picture

22  what the percentage of funding is for each one of the

23  accounts.  So once again, from left to right, we have the

24  two Constant Content accounts, the JPL account, and then all

25  three accounts combined.

1    **Q**    Okay.  So let's go through those.  For the Constant

2    Content account -- and, again, this is for the period of

3    2017 through 2020?

4    **A**    Yes.

5    **Q**    Okay.  And for the Constant Content account ending in

6    4045, what percentage -- what was the largest contributor to

7    that account?

8    **A**    It was Ohioans For Energy Security.

9    **Q**    And is that what is depicted by the blue 83 percent?

10   **A**    Correct.

11   **Q**    Okay.  And the gray 17 percent represents what?

12   **A**    That's just other entities that are not Ohioans For

13   Energy Security.

14   **Q**    Okay.  And did you find similar percentages for the

15   other Constant Content account?

16   **A**    Yes.

17   **Q**    And what were those percentages?

18   **A**    84 percent and 16 percent, 84 percent funded by

19   Ohioans For Energy Security.

20   **Q**    Okay.  And for the 9192 account, what did you find?

21   **A**    That 87 percent was funded by Generation Now.

22   **Q**    Okay.  And 13 percent from other sources?

23   **A**    Others, yes.

24   **Q**    All right.  And so if we look, you also have a total

25   depiction there, what is that?

1   **A**     So that just shows -- I guess from the first layer of

2   source that that shows where the funds directly came from

3   for all three entities.

4            MS. GLATFELTER:  Okay.  And, Ms. Terry, if we can

5   advance to the next page, please.

6   **Q**     All right.  Mr. Hartsel, can you describe what this

7   shows?

8   **A**     So this is just the same showing percentages with the

9   familiar format we followed before of a pie chart.  It's

10  broken down into three categories, 14 percent are other

11  entities, 25 percent is Ohioans For Energy Security, and

12  61 percent is Generation Now.

13           MS. GLATFELTER:  Okay.  Your Honor, permission to

14  publish at the same time Exhibit 153, which has already been

15  admitted?

16           THE COURT:  Yes.

17           MS. GLATFELTER:  Okay.

18  **Q**     Agent Hartsel, I wanted to publish Ohioans For Energy

19  Security deposits on the right side of the screen while

20  we're looking at the JPL and Constant Content, deposits into

21  that account, and I wanted to understand the source of those

22  accounts like we discussed a few moments ago.

23  **A**     Yes.

24  **Q**     Okay.  Can you describe that for us?

25  **A**     Yes.  So basically, the reason why we grouped in

1    similar color and similar fashion the funding that came from

2    Ohioans For Energy Security and Generation Now is because if

3    you look at the -- peeling back one layer of the onion or

4    going back one pivot, if you look at the source of Ohioans

5    For Energy Security, 99.7 percent of the funds into the

6    Ohioans For Energy Security account come from Generation

7    Now.

8    **Q**     Okay.  And so --

9    **A**     Yeah.  Sorry.

10   **Q**     So when we look at the 99.7 percent chart on the

11   right, which is Exhibit 153, what piece of the pie chart

12   does that correlate with on the left side of the screen?

13   **A**     The 25 percent.

14   **Q**     Okay.  And so you could have also labeled this as

15   86 percent from Generation Now?

16   **A**     Correct.

17          MS. GLATFELTER:  All right.  Ms. Terry, if we can

18   take down 153 and we could advance to page 4.

19   **Q**     All right.  Mr. Hartsel, this final page of the

20   exhibit, can you describe what we're looking at here?

21   **A**     So instead of percentages, this is just showing the

22   scale of the amount of money that came into the Constant

23   Content accounts and the JPL accounts along with, once

24   again, a total on the right, and this is broken down by

25   millions of dollars.

1    **Q**    Okay.  So you've replaced the percentages with a

2    dollar value?

3    **A**    Correct.

4    **Q**    And can you go through those for us, please?

5    **A**    Yes.  So on the left, you'll see Constant Content

6    account ending in 4045 shows a total of $2.7 million coming

7    in.

8    **Q**    And who did that come in from?

9    **A**    That came in mostly from Ohioans For Energy Security.

10   **Q**    And as we just saw, Ohioans For Energy Security was

11   funded by what entity?

12   **A**    Generation Now.

13   **Q**    Okay.

14   **A**    And then Constant Content account ending in 1219,

15   there's $2.2 million that comes in from Ohioans For Energy

16   Security.  And in the JPL Associates account ending in 9192,

17   $10.9 million comes in from Generation Now.  So the total

18   for all three of the accounts is $10.9 million for

19   Generation Now and $4.4 million for Ohioans For Energy

20   Security, which means indirectly $15.3 million came in from

21   Generation Now.

22   **Q**    And 2.6 million over time from other sources?

23   **A**    That's correct.

24   **Q**    Okay.  Now, Mr. Hartsel, did you have the opportunity

25   to schedule the outflows or the payments out of the account

CHRISTOPHER HARTSEL - DIRECT EXAM (Cont.)                15-2396

1    from the JPL 9192 account in 2018?

2    **A**    Yes.

3    **Q**    And did you do the same for the Constant Content

4    account ending in 4045 in 2018?

5    **A**    Yes.

6         MS. GLATFELTER:  Your Honor, permission to show the

7    witness what's been marked as Exhibit 35?

8         THE COURT:  Yes.

9         MS. GLATFELTER:  Thank you.

10   **Q**    Mr. Hartsel, do you recognize Government's Exhibit 35?

11   **A**    Yes.

12   **Q**    Okay.  Can you please explain to us what it is?

13   **A**    So this is showing the outflows for two accounts, for

14   JPL ending in 9192 and for Constant Content ending in 4045,

15   listed by entity, by beneficiary or payee, from the greatest

16   beneficiary down to the lowest.

17   **Q**    And did you prepare this table?

18   **A**    Yes.

19   **Q**    And did you prepare it in the same way that you have

20   described preparing the others during your testimony?

21   **A**    Yes.

22        MS. GLATFELTER:  Your Honor, permission -- I'm

23   sorry, move to admit Exhibit 35 and publish for the jury?

24        THE COURT:  Any objections?

25        MR. OLESKI:  No, Judge.

1          MR. SCHNEIDER:  No objection.

2          THE COURT:  It's admitted.  You may publish.

3          MS. GLATFELTER:  Thank you.

4     **Q**    Mr. Hartsel, this should come up for the jury in a few

5     seconds.  There we go.

6          If we can start at the top of the chart, can you tell

7     us what the title of this is?

8     **A**    2018 Outflows From JPL Controlled Accounts, Constant

9     Content Account Number Ending in 4045 and JPL Account Ending

10    in 9192.

11    **Q**    Okay.  And so this particular outflow chart looks at a

12    particular year?

13    **A**    Correct.

14    **Q**    Okay.  And what year is that?

15    **A**    2018, 2018.

16    **Q**    Okay.  For JPL, what are the top four entities that

17    received money out of the JPL account?

18    **A**    Red Maverick Media received approximately $940,000.

19    Paychex received approximately $270,000.  Arena Online, LLC

20    received approximately $240,000.  And Storytellers Group,

21    LLC received approximately $218,000.

22    **Q**    Okay.  And if we go down further on that chart, do you

23    see an entry for Allen, Kuehale, Stovall & Newman?

24    **A**    Yes.

25    **Q**    And how much did that entity receive?

1    **A**     From both accounts in total, $140,000 approximately,

2    75,000 exactly from Constant Content ending in 4045 and

3    approximately 65.3 thousand dollars from 9192.

4    **Q**     So you mentioned $75,000 from the Constant Content

5    account?

6    **A**     Yes.

7    **Q**     Were there any other payments that you found during

8    2018 from that account?

9    **A**     No.

10   **Q**     Okay.  And if we go further down the chart, are there

11   entries for Anna Lippincott & Associates and MC Fitzmartin,

12   LLC?

13   **A**     Yes.

14   **Q**     And how much did they receive during 2018 from the JPL

15   account?

16   **A**     The Anna Lippincott & Associates received

17   approximately $47,000, and the MC Fitzmartin, LLC received

18   approximately $58,000.

19   **Q**     Okay.  And if you go down a little bit further, do you

20   see the Pullins law firm?

21   **A**     Yes.

22   **Q**     All right.  Did they receive any money or did it

23   receive any money during 2018?

24   **A**     Yes.

25   **Q**     How much money?

1    **A**    $27,500.

2    **Q**    Okay.  So how much money flowed out of these two

3    accounts total in 2018?

4    **A**    $3.4 million.

5    **Q**    Okay.  Now, there's one account that we saw in the

6    previous chart that received deposits but it's not depicted

7    on this chart in terms of payments; can you tell us why?

8    **A**    Because I believe, if I recall, there are no outflows

9    for 2018.

10   **Q**    Now, Mr. Hartsel, how many different bank accounts,

11   approximately, did you review and schedule in this

12   investigation?

13   **A**    I believe it was 95.

14   **Q**    And did you calculate the length of time deposits

15   stayed in these accounts during the time frame of your

16   investigation?

17   **A**    I did, yes.

18   **Q**    What was that number?

19   **A**    For the Ohioans For Energy Security account -- I

20   should say this, for every year, it was actually different

21   for each account, and, unfortunately, I can't recall

22   specifically for 2018 the amount of time that the deposits

23   stayed in the JPL accounts.

24   **Q**    Can you give us a few examples of calculations or the

25   numbers that you found for different accounts, if you can

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2400

1    recall any of those?

2    **A**    Sure.  So for 2019, I calculated the average number of

3    days that a deposit stayed in the Ohioans For Energy

4    Security account as about five days.  And I believe --

5    that's all I can recall with confidence, I'm sorry.

6    **Q**    Okay.  That's fine.

7            MS. GLATFELTER:  One moment, Your Honor.

8            THE COURT:  Yes.

9            MS. GLATFELTER:  No further questions.  Thank you,

10   Your Honor.

11           THE COURT:  Very well.  The attorneys for the

12   defendants have an opportunity to examine.  On behalf of

13   Mr. Householder?

14           MR. OLESKI:  Thank you, Judge.

15           THE COURT:  Yes.

16           MR. OLESKI:  May I proceed?

17           THE COURT:  Yes.  Thank you.

18           MR. OLESKI:  Good morning, sir.

19           THE WITNESS:  Good morning.

20           MR. OLESKI:  Just have a few questions for you.

21                       **CROSS-EXAMINATION**

22   **BY MR. OLESKI:**

23   **Q**    So when you testified last week on direct examination,

24   I think you indicated that after you graduated from college,

25   you started as a financial auditor at Honda; is that right?

1    A      At Schneider Downs.

2    Q      And then you transitioned to Honda, right?

3    A      Correct.

4    Q      And part of your duties and responsibilities both when

5    you initially graduated from college and then when you

6    worked at Honda revolved around, you know, what you referred

7    to as closing the books?

8    A      Correct.

9    Q      And what that means is ensuring the transactions added

10   up on, you know, financial statements, correct?

11   A      Correct.

12   Q      You worked at that, you worked at Honda, until about

13   2016; is that right?

14   A      That's correct.

15   Q      And in 2016, you joined the FBI, correct?

16   A      That's correct.

17   Q      And your role at the FBI is you support the FBI's

18   investigations of financial crimes, right?

19   A      That's correct.

20   Q      Because that's what your education and your employment

21   responsibilities focused on prior to joining the FBI --

22   A      That's correct.

23   Q      -- correct?

24          And in connection with this investigation, you

25   reviewed I think about 90 or 95 bank records, right?

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2402

1    **A**    Correct.

2    **Q**    And to assist in your review of those bank records,

3    you utilized a software program called BankScan, right?

4    **A**    That is correct.

5    **Q**    And, essentially, if I understood your testimony on

6    direct examination correctly, what BankScan is is it's a

7    program that scans in all of these paper bank accounts; is

8    that right?

9    **A**    Generally speaking, yes, yes.

10   **Q**    Scans in the bank statements, I should say; is that

11   right?

12   **A**    Yes.  We use OmniPage along with it; that converts it

13   to like a text file and the text file is adjusted by

14   BankScan.

15   **Q**    And then, ultimately, BankScan creates an Excel

16   spreadsheet of those bank statements, correct?

17   **A**    That's correct.

18   **Q**    And you utilize those Excel spreadsheets to manipulate

19   the data that's generated by BankScan, correct?

20   **A**    Yes, that's correct.

21   **Q**    And ultimately, all of the exhibits that you looked at

22   on your direct examination last week and today, those

23   weren't records that were produced by various financial

24   institutions, correct?

25   **A**    That's correct.

1   **Q**    Those were documents that were created by you?

2   **A**    That's correct.

3   **Q**    And you created those documents utilizing BankScan and

4   Excel; is that correct?

5   **A**    That's correct.

6   **Q**    Now, during the course of your direct examination, you

7   looked at summaries for a number of different entities,

8   right?

9   **A**    Yes.

10  **Q**    Including summaries that you created for Generation

11  Now and Ohioans For Energy Security, correct?

12  **A**    Yes.

13  **Q**    And during the course of your investigation, I think

14  you testified that Ohioans For Energy Security received

15  almost all of its moneys from Generation Now, correct?

16  **A**    Yes.

17  **Q**    All but about 70 or $80,000; is that right?

18  **A**    I can't recall exact amounts.

19  **Q**    Fair enough.

20       And ultimately, you prepared summaries for both

21  Generation Now and Ohioans For Energy Security, right?

22  **A**    Correct.

23  **Q**    And for both of those, you created a summary showing

24  moneys going into those accounts; is that right?

25  **A**    Yes.

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2404

1    **Q**    And then moneys leaving those accounts, right?

2    **A**    That's correct.

3    **Q**    And ultimately, for the Ohioans For Energy Security

4    account, the moneys going into that account are all

5    Generation Now moneys, right?

6    **A**    Yes.

7    **Q**    And so the summary for Generation Now and the summary

8    for Ohioans For Energy Security, they should be the same,

9    right?

10   **A**    So you might have some irreconcilable differences

11   because some of the records that you don't receive on one

12   end when you subpoena the records won't equal the records on

13   the other end.

14   **Q**    But those differences should be, you know, relatively

15   minuscule; is that right?

16   **A**    Yes.

17          MR. OLESKI:  Your Honor, may I publish Government

18   Exhibit 153, which has been admitted?

19          THE COURT:  Yes.

20   **Q**    Sir, do you recognize this document?

21   **A**    Yes.

22   **Q**    This is the summary you created for the Ohioans For

23   Energy Security account, right?

24   **A**    Yes.

25   **Q**    And this shows all of the deposits that were made into

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2405

1    the Ohioans For Energy Security account, right?

2    **A**    Yes.

3    **Q**    So from August of 2019 until February of 2020,

4    correct?

5    **A**    Yes.

6    **Q**    And with the exception of the Lincoln Strategy Group

7    deposit on October 18th and the Strategy Media Placement

8    deposit on December 18th, all of the moneys going into the

9    Ohioans For Energy Security account are from Generation Now,

10   correct?

11   **A**    Yes.

12   **Q**    And the deposits by Lincoln Strategy Group and

13   Strategic Media Placement are relatively nominal, correct?

14   **A**    They are smaller, yes.

15   **Q**    About 70 or $80,000?

16   **A**    That's correct.

17   **Q**    And what's the total amount of deposits according to

18   your summary into the Ohioans For Energy Security bank

19   account?

20   **A**    Approximately, $23.4 million.

21   **Q**    And you also created a summary for the Generation Now

22   bank account, right?

23   **A**    That's correct.

24   **Q**    And showing moneys that left the Generation Now bank

25   account, right?

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2406

1    **A**    Yes.

2           MR. OLESKI:  Judge, could we publish Government

3    Exhibit 18, which has been admitted?

4           THE COURT:  Yes.

5    **Q**    Recognize this document, sir?

6    **A**    Yes.

7    **Q**    This is the summary for the Generation Now bank

8    account, correct?

9    **A**    Yes.

10   **Q**    That you created?

11   **A**    Yes.

12          MR. OLESKI:  Could we advance to page 4, PJ?

13        And, Judge, if we could publish side by side page 4 of

14   Government Exhibit 18 and Government Exhibit 153 --

15          THE COURT:  Yes.

16          MR. OLESKI:  -- both of which have been admitted?

17          THE COURT:  Yes.

18   **Q**    Fair to say that these two numbers don't add up?

19   **A**    Yes.

20   **Q**    There's about a $2 million difference between the

21   summary you created in Government Exhibit 18 and the summary

22   you created in Government Exhibit 153, correct?

23   **A**    Yes.

24   **Q**    That's not a minuscule difference, you'd agree with

25   me, correct?

CHRISTOPHER HARTSEL - CROSS-EXAM                    15-2407

1    **A**    I agree.

2    **Q**    And you would agree that either you failed to include

3    a deposit on Government Exhibit 153 or you double counted a

4    deposit, correct?

5    **A**    I'd say it's just a missing deposit, yes, that's

6    correct.

7    **Q**    But either way, either way, these exhibits are

8    inaccurate, correct?

9    **A**    No, I would not describe them as inaccurate.

10   **Q**    Well, fair to say that the numbers don't add up,

11   right?

12   **A**    That's correct.

13   **Q**    And you created Government Exhibit 18 and Government

14   Exhibit 153 in the same manner that you created the other

15   summaries that we looked at?

16   **A**    That's correct.

17           MR. OLESKI:  Moment to confer, Judge?

18           THE COURT:  Yes.

19           MR. OLESKI:  No further questions, Judge.  Thank

20   you.

21           THE COURT:  Very well.

22           MR. SCHNEIDER:  Judge, we have no questions of this

23   witness.

24           THE COURT:  Very well.  Any redirect?

25           MS. GLATFELTER:  Yes.  Judge, permission to publish

1       those same exhibits again, 153 and 18, side by side?

2               THE COURT:  Yes.

3                       **REDIRECT EXAMINATION**

4       **BY MS. GLATFELTER:**

5       **Q**    Mr. Hartsel, what's the difference between these two

6       charts?

7       **A**    I --

8       **Q**    In terms of dates.

9       **A**    Well, one is for 2019 and one includes 2020 deposits.

10      **Q**    Right.  And so there's a difference in date ranges

11      that you're looking at for these two accounts?

12      **A**    That's correct.

13              MS. GLATFELTER:  All right.  Thank you.  No further

14      questions.

15              THE COURT:  Recross, if any?

16              MR. OLESKI:  Yes.  Judge if I may publish the same

17      two exhibits?

18              THE COURT:  Yes.

19                      **RECROSS-EXAMINATION**

20      **BY MR. OLESKI:**

21      **Q**    So there's -- the difference between these two

22      exhibits are that the exhibit on the right includes 2020

23      deposits, correct?

24      **A**    Correct.

25      **Q**    What is the amount of the 2020 deposits on

1    Exhibit 153?

2    **A**    $23.4 million.

3    **Q**    What is the very last line, the February 4th, 2020,

4    deposit that Generation Now made?

5    **A**    $40,000.

6    **Q**    And that's the only deposit that was made in 2020,

7    correct?

8    **A**    I can't recall, I'm sorry.

9    **Q**    Well, you created these documents, correct?

10   **A**    That's correct.

11   **Q**    And you tried to create them accurately, correct?

12   **A**    That's correct.

13   **Q**    And you would agree with me that these exhibits are

14   not accurate?

15   **A**    I --

16          MS. GLATFELTER:  Your Honor, move to strike.

17          MR. OLESKI:  No further questions.  I withdraw the

18   question.

19          THE COURT:  Objection is sustained.

20       And there are no further questions of this witness; is

21   that right?

22          MS. GLATFELTER:  Correct, Your Honor.  Thank you.

23          THE COURT:  Very well.  You are free to go, sir.

24          THE WITNESS:  Thank you.

25       (Witness left the stand.)

```
1              THE COURT:  Where do we stand from the government's
2     perspective?
3              MS. GAFFNEY-PAINTER:  The government is prepared to
4     call its next witness, Your Honor.
5              THE COURT:  Very well.  If you would do so.
6              MS. GAFFNEY-PAINTER:  The government calls Laura
7     Lanese.
8              THE COURT:  Very well.  We've gone to retrieve the
9     witness.  Give us just a moment.
10         (Pause.)
11             THE COURT:  If the witness would approach and
12    follow Ms. Santoro.  And as you arrive, ma'am, would you
13    pause and raise your right hand for the oath to tell the
14    truth?
15         (Witness took the stand and was sworn.)
16             THE COURT:  Very well.  I tell everyone this, the
17    chair tips back.
18             THE WITNESS:  Okay.  Thank you.
19             THE COURT:  Be careful.  And we're going to need
20    you very close to the fancy government microphone.  Did you
21    break something?
22             THE WITNESS:  No, not yet anyway.
23             THE COURT:  Very well.  The government will begin
24    with its questions.  Ms. Painter, you may approach.
25             MS. GAFFNEY-PAINTER:  Thank you, Your Honor.
```

```
 1                THE COURT:  Very well.  You can take your mask off.
 2    You don't have to.
 3                THE WITNESS:  Thank you.
 4                THE COURT:  We allow the witness and the examining
 5    attorney.
 6                THE WITNESS:  Thank you.
 7                MS. GAFFNEY-PAINTER:  May I proceed?
 8                THE COURT:  Yes.  Thank you.
 9                MS. GAFFNEY-PAINTER:  Good morning, Ms. Lanese.
10                THE WITNESS:  Good morning.
11                              LAURA LANESE
12                          DIRECT EXAMINATION
13    BY MS. GAFFNEY-PAINTER:
14    Q    Ms. Lanese, would you please state and spell your name
15    for the record?
16    A    Laura Lanese, L-A-U-R-A, L-A-N-E-S-E.
17    Q    What is your educational background?
18    A    I have a bachelor's degree from Miami University, a
19    juris doctoral law degree from The Ohio State University,
20    and then a master of law -- laws from Georgetown University.
21    Q    Where do you currently work?
22    A    I work at the Inner-University Council.
23    Q    Have you ever in your professional life served as an
24    Ohio State Representative?
25    A    Yes, I have.
```

1    **Q**    For what district?

2    **A**    For the 23rd.

3    **Q**    And when did you serve?

4    **A**    I served from 2017 until November of this past year.

5    **Q**    When did you first meet Larry Householder?

6    **A**    I think the very first time I met him, we had been

7    assigned to do legislation together.  It had come up

8    individually.  I -- it was legislation to help police

9    officers carry off duty, concealed carry off duty.  I had

10   had two police officers in my office, and I was a relatively

11   new representative and decided to write this legislation,

12   and then it turned out that Larry Householder was doing the

13   same thing, and so they joined us on that legislation.

14   **Q**    When Larry Householder sought the Speakership of the

15   House, did you support him or Ryan Smith?

16   **A**    Ryan Smith.

17   **Q**    Now, after Larry Householder was elected Speaker of

18   the House, did your position within the House change?

19   **A**    Yes.  I -- he had asked me to be a part of his

20   leadership team.

21   **Q**    Did Mr. Householder tell you why he had asked you to

22   serve in the leadership team?

23   **A**    Not really, and it was quite a surprise.  After the

24   election of the new Speaker, those of us who had been on

25   Ryan Smith's team had assumed that, you know, we wouldn't be

1    getting anything, and so I didn't realize it at the time

2    because it was only my second term, but, typically, at some

3    point you ask for what you want.  My first term we were

4    pretty much told what committees and they did it in writing.

5    So when he called me into his office, I didn't know what to

6    expect, and he asked me if I wanted to be on his leadership

7    team, and it was really quite a surprise.

8    **Q**    Did you accept his offer to join his leadership team?

9    **A**    Not immediately.  I told him I needed to speak to my

10   husband, and then I called Ryan Smith to see what he thought

11   about my doing it.  I didn't want it to appear that I was,

12   you know, being disloyal or anything like that.  And then I

13   called a few other people, and they encouraged me to do it,

14   to be kind of a bridge between those who were on Ryan

15   Smith's team, so that there would at least be, you know, a

16   conduit or a presence on the leadership team.

17   **Q**    During your time as a Representative, did you learn of

18   a piece of legislation known as House Bill 6?

19   **A**    Yes, I did.

20   **Q**    Now, what was your initial position on House Bill 6?

21   **A**    I was against it.

22   **Q**    Why is that?

23   **A**    It had started to bubble around that it might come up

24   for a vote, and I didn't understand exactly what was

25   involved with it, and I also didn't understand that there

1    were a lot of people that were talking about it and that

2    there were two different positions to take.  And it wasn't

3    until one of the other leadership members, I saw him taking

4    a vote tally and I asked him what he was doing, and he said

5    I'm seeing if people are for -- and I was never fully

6    informed of this, so I might be a little bit vague.  But

7    there was Position A or Position B, and Position A was more

8    for some of the -- to get more Republicans on board because

9    they were having a hard time getting votes, or Position B,

10   for getting more Democrats on board.  And so this person

11   said I'm going to put you down for A, and I said don't put

12   me down for anything, I'm not going to be voting for that,

13   and that was it for a while.

14        And the more I looked at it and researched it, the more

15   dug in I got, to me it was a very anti free market piece of

16   legislation.  It was the government weighing in and helping

17   one industry to the detriment of others.  So by giving lots

18   of money to these two nuclear power plants, other industries

19   like renewable energy or natural gas would be at a

20   detriment.

21        But it also seemed very unfair to my constituents and

22   the entire state to make them pay for this very expensive

23   bailout for these nuclear power plants when we didn't even

24   know if they needed the money, and that seemed to be a very

25   big issue for some of my colleagues.  We didn't know if they

1    even had a need for this kind of money.

2    **Q**    Now, did your position as to House Bill 6 ever change?

3    **A**    No.

4    **Q**    How would you describe the intensity of the effort to

5    pass House Bill 6?

6    **A**    It was pretty strong.  It was all anyone was talking

7    about at the time, and I didn't personally experience the

8    intensity until right before the vote when they found out

9    that they were short one vote.  And at one point in time, we

10   gathered in the Speaker's office and it was mostly the

11   leadership team and the policy staff and the leadership

12   staff, and they were trying to figure out where they were

13   going to get the one vote.  And I was sitting in the room,

14   and they knew that I could make their lives a lot easier if

15   I just conceded.  And we're sitting around this big table,

16   and the Speaker turns to me and he said, Laura, I really

17   need your vote.  And I said, I'm sorry, Mr. Speaker, I can't

18   do that.  And then it got really quiet and everybody was

19   staring at me and it was very uncomfortable.

20        And they started trying to figure out other ways to get

21   the vote.  There was somebody who was out of town, out of

22   country or something.  And so after several more minutes of

23   trying to figure out where else to get the vote, Householder

24   turned to me and he said, Laura, I really need your vote.

25   And I replied almost exactly the same, and I said, I'm

1    sorry, I can't give that to you, Mr. Speaker.

2        And at that point, there was a lot of tension in the

3    room.  Somebody slammed something on the desk, somebody

4    pushed back from their chair, a lot of, you know, sighing

5    and just very built-up frustration.  And then Speaker said

6    something and we all left the room, and that was probably

7    the -- you know, the hardest part and that's where I felt it

8    the most.

9    **Q**    Now, outside of the House in your district, was there

10   any media circulated about your vote on House Bill 6?

11   **A**    Sure.  I live in the Columbus area, so there was a lot

12   of media on the vote, and mailers were sent.  And I started

13   getting it from my friends and other people saying -- one

14   person sent it to me and said, hey, you're very popular and

15   sent me a copy of what he had received.  And so when I would

16   go out in town, people would talk about it.  And even when I

17   went to church, I had one of the little old ladies that I

18   know come up to me and whisper in my ear and said, I hope

19   you don't vote for this, and I said I've already said that

20   I'm not, and it made her very happy.  But, yes, in my

21   district it was a very well-known bill.

22   **Q**    Did House Bill 6 ultimately pass?

23   **A**    Yes, it did.

24   **Q**    Now, in the ballot referendum period after House Bill

25   6 passed, do you recall any leadership meetings where

1    signature collection efforts or signature collectors were

2    discussed?

3    **A**     There was one discussion, and, again, this happened in

4    the Columbus area.  There was an individual that had been

5    assaulted collecting signatures outside of a library, and he

6    was Asian, and I was part of a discussion with the

7    leadership team, and at the time, the press was saying this

8    is what happens when you have, you know, ads saying that the

9    Chinese are behind this, they're here to attack the American

10   grid and --

11          THE COURT:  Excuse me, there's an objection.  And

12   the basis?

13          MR. GLICKMAN:  Hearsay and speculation.

14          THE COURT:  Sounds like hearsay.  Sustained.

15   Re-ask or move on.

16   **Q**     Ms. Lanese, if you could describe that leadership

17   meeting without referencing, please, what the media was

18   reporting or what the media said?

19   **A**     Sure, sure.  So it was taken in the opposite way that

20   I thought that -- the way that I had viewed it, that this

21   was proof that, you know, it was causing some, you know,

22   some heart -- hard effects on people of Asian descent, and

23   it was a little bit of a joke that their efforts were

24   working that --

25          MR. GLICKMAN:  Objection, Evidence Rule 403.

```
 1              THE COURT:  Sustained.  Let's move along.

 2    Q     Ms. Lanese, when you ran for reelection in 2020, did

 3    you receive assistance from the Republican Caucus?

 4    A     It was -- it was just starting at about the time,

 5    maybe a month before the arrest.  Typically, in years past,

 6    we would get a lot of support at the end of the year before

 7    the election, help with gathering signatures, and then we

 8    would start to have meetings and have a more coordinated

 9    effort, that wasn't happening this time.

10    Q     Now, were you involved in efforts to repeal House Bill

11    6?

12    A     Yes.  Immediately after the --

13              MR. GLICKMAN:  Objection, Judge.  Relevance.

14              THE COURT:  This is really not about House Bill 6.

15    I'll overrule it and give you some latitude.

16         Were you involved in efforts to repeal House Bill 6?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  All right.

19              MR. SINGER:  May I have a moment to confer, Your

20    Honor?

21              THE COURT:  Yes.

22         (Pause.)

23    Q     Ms. Lanese, what is the current state of the

24    legislation House Bill 6?

25              MR. GLICKMAN:  Objection, Judge.  Relevance.
```

```
1              THE COURT:  I thought we had ruled on this.  I'll
2    give you a little more latitude.  You can answer the
3    question.
4              THE WITNESS:  My bill didn't go anywhere.  There
5    was a partial repeal bill because the FirstEnergy had found
6    out that there was --
7              MR. GLICKMAN:  Objection, Judge.
8              THE COURT:  Sustained.
9              MS. GAFFNEY-PAINTER:  No further questions, Your
10   Honor.
11             THE COURT:  Very well.  The lawyers for the
12   defendants have an opportunity to inquire.
13   Cross-examination on behalf of Mr. Householder, if any.
14             MR. GLICKMAN:  Thank you, Judge.
15             THE COURT:  Very well.
16             MR. GLICKMAN:  Good morning, Ms. Lanese.
17             THE WITNESS:  Good morning.
18             MR. GLICKMAN:  I'm Rob Glickman.  I'm one of the
19   lawyers for Larry Householder.  I just have a few questions
20   for you.  If you just give me one moment, please.
21                        CROSS-EXAMINATION
22   BY MR. GLICKMAN:
23   Q    So you indicated that you were asked to be part of the
24   leadership team of the Ohio House of Representatives after
25   Mr. Householder became Speaker?
```

```
 1    A    Yes.

 2    Q    And other than Mr. Householder, there are five members

 3    of that leadership team, yes?

 4    A    Correct.

 5    Q    Okay.  And three of them were people who supported

 6    Larry Householder for Speaker, right?

 7    A    At least, yes.

 8    Q    Well, you didn't?

 9    A    Correct.

10    Q    So that would be one?

11    A    Um-hmm.

12    Q    And Bill Seitz didn't, right; he voted for Ryan Smith?

13    A    Correct.

14    Q    So that would be two, right?

15    A    Correct.

16    Q    So at least two people asked by Larry Householder to

17    be on leadership supported Ryan Smith for Speaker?

18    A    Correct.

19    Q    Okay.  You were a no vote on House Bill 6?

20    A    Correct.

21    Q    Never changed?

22    A    Correct.

23    Q    You had a number of issues with it, yes?

24    A    Correct.

25    Q    One of the issues was you felt there wasn't enough
```

1    transparency in the financial information you were receiving

2    to show that FirstEnergy Solutions needed the money, fair?

3    **A**    That was one of them, yes.

4    **Q**    Well, FirstEnergy Solutions was in bankruptcy, wasn't

5    it?

6    **A**    That was one of the questions that I had and was

7    trying to get more information on.

8    **Q**    You weren't sure whether they were in bankruptcy or

9    not?

10   **A**    I was trying to uncover why they were in bankruptcy

11   and what they were trying to spin off from bankruptcy.

12   **Q**    You're a -- well, wait.  Sorry.  You're an Ohio State

13   educated lawyer with a master's in law from Georgetown?

14   **A**    Correct.

15   **Q**    You're aware, when anyone files bankruptcy, its

16   financial records are submitted to the United States

17   bankruptcy court?

18   **A**    Correct.

19   **Q**    And those financial records are a part of a public

20   docket?

21   **A**    Correct.  I was trying to find them.  Yes.

22   **Q**    So you went on the public docket of the United States

23   Bankruptcy Court and found the financial records of

24   FirstEnergy Solutions?

25   **A**    No.  I couldn't find them because I think it was in

```
 1    process at the time.

 2    Q    Okay.  Well, the House Bill 6 process lasted for many

 3    months, yes?

 4    A    Yes.

 5    Q    And during those many months, FirstEnergy Solutions

 6    remained in bankruptcy, right?

 7    A    Correct.

 8    Q    And during that period of months or longer, did you

 9    continue to go on the bankruptcy docket and search for the

10    financial records of FirstEnergy Solutions?

11    A    I only started looking at the end right before the

12    vote.

13    Q    Okay.  All right.  And did you -- I mean, you have a

14    master's in law.  Was that under one particular speciality?

15    A    International law.

16    Q    Oh.  And during your -- did you take bankruptcy in law

17    school?

18    A    No, sir.

19    Q    Okay.  You're familiar with the term, though, yes?

20    A    Correct.

21    Q    Okay.  And when one files a bankruptcy in bankruptcy

22    court, one has to show that it owes more money than it has,

23    or the bankruptcy court will throw it out, correct?

24    A    Correct.

25    Q    Okay.  So at the very least, FirstEnergy Solutions
```

1    owed more than it had, yes?

2    **A**    Correct, but we didn't know if they were going to be

3    able to spin off their bankrupt subdivision and then,

4    therefore, they wouldn't need the money.

5            THE COURT:  I thought I sustained an objection on

6    this topic during direct and now you're using it to

7    cross-examine.

8            MR. GLICKMAN:  I don't believe -- Judge, I'm

9    talking about --

10           THE COURT:  You can do the best you wish.  You may

11   proceed.

12           MR. GLICKMAN:  Okay.

13   **Q**    When you said "spin off" that, that aspect, you mean

14   the aspect that was losing money?

15   **A**    Correct.  If they were putting in the money-losing

16   portion, why did they need to be bailed out, if they were

17   going to get rid of their, you know, declining asset.

18   **Q**    Wasn't the declining assets the two nuclear power

19   plants?

20   **A**    Yes.  And if they were able to spin them off, then,

21   why did we need to get the taxpayer to fund them, that was

22   one of my questions.

23   **Q**    Okay.  And did you review the Ohio Legislative Service

24   Commission reports related to the financial condition of --

25   I'm sorry, related to the -- related to House Bill 6 and

LAURA LANESE - CROSS-EXAM                                    15-2424

1    what it would have meant to the State of Ohio?

2    **A**    I'm not sure which document you're talking about.

3    **Q**    Talking about the May 22nd, 2020 report authored by

4    the Ohio Legislative Service Commission.

5    **A**    Is this the one that said that the Ohio taxpayer would

6    save more money because of the renewable energy?

7    **Q**    Among other things.

8    **A**    If that's the one you're talking about, then, yes, I

9    am familiar with that.

10   **Q**    Okay.  And you indicated you felt some pressure from

11   people on House Bill 6, yes?

12   **A**    Correct.

13   **Q**    Okay.  And the example that you gave was during that

14   leadership meeting with Mr. Householder and, I take it, the

15   other four members of the leadership team?

16   **A**    Correct.

17   **Q**    Okay.  And the pressure you felt was Mr. Householder

18   urging you to vote yes?

19   **A**    Correct.

20   **Q**    Okay.  And somebody acting, for lack of a better word,

21   exasperated that you kept with your no vote, yes?

22   **A**    Yes.

23   **Q**    That was the -- that's the pressure that you felt,

24   other than I guess the mailing campaign that you testified

25   about earlier?

LAURA LANESE - CROSS-EXAM

1    **A**    No.  There were other people asking me to vote for it,

2    but in that room at that point in time, it was -- the

3    pressure felt palpable, to me, at least.

4    **Q**    Well, during your time as a State Representative,

5    other State Representatives often lobbied for your vote on

6    various pieces of legislation, yes?

7    **A**    Yes.

8    **Q**    Okay.  And you probably lobbied for other votes --

9    **A**    Correct.

10   **Q**    -- from your fellow members; is that fair?

11   **A**    Correct.

12   **Q**    And when you were a no vote, you felt comfortable

13   saying no, didn't you?

14   **A**    Yes, but this time was different.

15   **Q**    Well, you still felt comfortable enough to say no that

16   you said no, right?

17   **A**    I can tell you I lost sleep for months over it.

18   **Q**    Okay.  But you kept with your no vote?

19   **A**    I did, but I also knew that I probably would have a

20   very difficult time getting reelected because of it,

21   whereas, I never felt that with any other votes.

22   **Q**    Well, when you -- well, maybe I misunderstood.  When

23   you voted no on House Bill 6, I take it Mr. Householder

24   removed you from your leadership position?

25   **A**    No, but later was removed from the Civil Justice

1    Committee.

2    **Q**    Okay.  But you kept your leadership position?

3    **A**    Correct.

4    **Q**    Okay.  He certainly was within his rights to remove

5    you, wasn't he?

6    **A**    Yes, he was.

7    **Q**    But he didn't?

8    **A**    Correct.

9          MR. GLICKMAN:  Judge, can I just have a moment?

10         THE COURT:  Yes.

11         MR. GLICKMAN:  I don't have anything further.

12         THE COURT:  Very well.  Yes, sir, on behalf of

13    Mr. Borges?

14         MR. SCHNEIDER:  I just snapped my mask.

15                    **CROSS-EXAMINATION**

16    **BY MR. SCHNEIDER:**

17    **Q**    Ms. Lanese, you know Matt Borges, correct?

18    **A**    I do.

19    **Q**    He didn't talk to you about House Bill 6, correct?

20    **A**    He did not.

21         MR. SCHNEIDER:  Thanks.  No further questions.

22         THE COURT:  Very well.  Redirect, if any.

23         MS. GAFFNEY-PAINTER:  May I have just a moment to

24    confer, Your Honor?

25         THE COURT:  Yes.

LAURA LANESE - REDIRECT EXAM

15-2427

```
1          MS. GAFFNEY-PAINTER:  Thank you.

2      (Pause.)

3          MS. GAFFNEY-PAINTER:  May I have just a brief

4   redirect, Your Honor?

5          THE COURT:  Yes.
```

**REDIRECT EXAMINATION**

**BY MS. GAFFNEY-PAINTER:**

**Q**    Ms. Lanese, on cross-examination, you were asked a
series of questions about being lobbied by your colleagues
and lobbying yourself in support or against various pieces
of legislation; do you recall those questions?

**A**    I do.

**Q**    And I believe on cross-examination you said this time
was different.  Can you explain that a little bit more to
us?

**A**    This was sort of the only thing that appeared to be
going on at the time.  It was also during our budget, but
this was the issue that everybody was talking about.  And we
knew that this was the Speaker's signature piece of
legislation, and so there was a lot more pressure on this
one particular bill.  And the Speaker is the one who sort of
helps fund your campaign.  He supports the caucus, our
campaign caucus.  And so because of that, it's different
when you go up against, you know, one of your colleagues
versus the person who controls your campaign.

```
 1              MS. GAFFNEY-PAINTER:  May I have a moment to
 2      confer, Your Honor?
 3              THE COURT:  Yes.
 4              MS. GAFFNEY-PAINTER:  No further questions.  Thank
 5      you.
 6              THE COURT:  Very well.  Recross, if any?
 7              MR. GLICKMAN:  No, thank you, Judge.
 8              THE COURT:  Very well.
 9              MR. SCHNEIDER:  None here either.
10              THE COURT:  Very well.  You are free to go.
11              THE WITNESS:  Thank you.
12              THE COURT:  Thank you.
13          (Witness left the stand.)
14              THE COURT:  Where do we stand from the government's
15      perspective?
16              MS. GAFFNEY-PAINTER:  Your Honor, I believe we are
17      prepared to call our next witness.
18              THE COURT:  Very well.  Please do so.
19              MS. GAFFNEY-PAINTER:  Government calls Josh Altic.
20              THE COURT:  Someone going to retrieve that witness?
21              THE DEPUTY:  I believe he's getting checked in
22      right now in the lobby.
23              MS. GAFFNEY-PAINTER:  Your Honor, our witness is
24      being checked in in the lobby, so if this would be a good
25      time to take a morning break, the government would be in
```

1    support of that.

2          THE COURT:  Very well.  We'll take a 20-minute

3    break.  During the break, take a break.  Don't discuss it

4    among yourselves or with anyone else.  No independent

5    research.  No checking out media.  Continue to keep an open

6    mind.  We will rise out of respect for you as you leave for

7    the 20-minute break.

8          THE DEPUTY:  All rise for the jury.

9       (Jury exited the courtroom at 10:24 a.m.)

10         THE COURT:  The jury is leaving the room.  As

11   always, we'll wait until we're advised that they have

12   cleared the floor, and then we'll break until 10:45.

13         THE DEPUTY:  All clear.

14         THE COURT:  We're going to break until 10:50,

15   recess until that time.

16         THE DEPUTY:  All rise.  This court is in recess

17   until 10:50.

18      (Recess taken from 10:26 a.m. to 10:51 a.m.)

19         THE DEPUTY:  All rise.  This court is back in

20   session pursuant to the recess.

21         THE COURT:  Thank you.  Please be seated.  I

22   understand the lawyers want to talk to me outside the

23   presence of the jury.  Who wishes to be heard on what?

24         MS. GLATFELTER:  Your Honor, I think both parties.

25   We anticipate we would be ending early today just based on

1    the pace that we're going.  So we tried to call another

2    witness to have him here.  We would like to let defense

3    counsel know this was a witness we were going to call on

4    Friday.  We let defense counsel know on Friday and

5    apparently Counsel Mark Marein was going to cross, so I

6    don't know if this will disrupt plans or not.

7            THE COURT:  For the record, Mr. Marein is not here.

8    Court excused him for health reasons, not related to COVID

9    at the defendants' request, correct, on behalf of

10   Mr. Householder?

11           MR. OLESKI:  That's correct, Judge.

12           THE COURT:  What does this do to your planning,

13   what the prosecutor just suggested?  Do you wish to be

14   heard?

15           MR. BRADLEY:  We have two issues.  Number one, it

16   is Mr. Marein that is prepared to examine this witness,

17   No. 1, and, No. 2, we did receive some additional

18   information regarding this witness.  So under those

19   circumstances, it would be our preference that we not go

20   forward with this witness today.

21           THE COURT:  I think that's a reasonable request.

22   Was there something else, Mr. Bradley?

23           MR. BRADLEY:  No.

24           THE COURT:  All right.  Just clue me in, the next

25   witness the government intends to call, we're all ready to

```
 1    go on that witness.  After that witness, where do we stand
 2    from the government's sense?
 3              MS. GLATFELTER:  We have two more witnesses lined
 4    up for today.
 5              THE COURT:  One and two.
 6              MS. GAFFNEY-PAINTER:  One that will be testifying
 7    now, Mr. Altic, and two more after that who are prepared to
 8    go, and defense counsel was provided notice of those
 9    witnesses last night.  This was just we had an additional
10    witness coming to fill in the space.
11              THE COURT:  Very well.
12              MS. GAFFNEY-PAINTER:  That was the new witness.
13              THE COURT:  Very well.  We'll get through those
14    three witnesses and adjourn for the day, is the request of
15    the defense, which the Court understands and is amenable; is
16    that right, Mr. Bradley?
17              MR. BRADLEY:  That's correct, Judge.
18              THE COURT:  So we're prepared to call another
19    witness.
20         Are we ready for the jury from the government's
21    perspective?
22              MS. GAFFNEY-PAINTER:  Yes, Your Honor.
23              THE COURT:  And Mr. Householder's?
24              MR. OLESKI:  Yes, Judge.
25              THE COURT:  And Mr. Borges'?
```

```
1              MR. SCHNEIDER:  Yes, Judge.

2              THE COURT:  Let's call for the jury.  And we'll get

3       the witness as soon as the jury enters the room.

4         (Pause.)

5              THE DEPUTY:  All rise for the jury.

6         (Jury entered the courtroom at 10:57 a.m.)

7              THE COURT:  You may all be seated.  Thank you.  14

8       Members of the Jury have rejoined us after the break.  We're

9       going to continue to hear testimony.

10        Who does the government call at this time?

11             MS. GAFFNEY-PAINTER:  Your Honor, the government

12      calls Josh Altic.

13             THE COURT:  Very well.  If the gentleman would be

14      willing to approach and follow Ms. Santoro.  You're coming

15      to the witness stand, and if you would pause where you are,

16      sir, raise your right hand for the oath to tell the truth.

17        (Witness sworn and took the stand.)

18             THE COURT:  Very well.  I tell everybody this, the

19      chair tips back, so be careful.

20             THE WITNESS:  Thank you.

21             THE COURT:  Once you've settled, move that

22      expensive microphone.

23        Ms. Painter, you can approach and may proceed.

24             MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

25        Good morning, Mr. Altic.
```

| | |
|---|---|
| 1 | THE WITNESS: Good morning. |
| 2 | **JOSH ALTIC** |
| 3 | of lawful age, Witness herein, was examined and testified as |
| 4 | follows: |
| 5 | **DIRECT EXAMINATION** |
| 6 | **BY MS. GAFFNEY-PAINTER:** |
| 7 | **Q** What is your educational background? |
| 8 | **A** I have a bachelor's degree in liberal arts. |
| 9 | **Q** In what, in what area of study? |
| 10 | **A** Philosophy and some political history, and |
| 11 | mathematics, mostly. |
| 12 | **Q** Mr. Altic, if I may, would you just approach the |
| 13 | microphone a bit closer? |
| 14 | THE COURT: Towards you. |
| 15 | THE WITNESS: Yeah. How's that? |
| 16 | THE COURT: Could we get the name of the witness |
| 17 | for the Judge's edification? |
| 18 | MS. GAFFNEY-PAINTER: I apologize. |
| 19 | **Q** Would you please state your name and spell it for the |
| 20 | record? |
| 21 | **A** Josh Altic, A-L-T-I-C. |
| 22 | **Q** Mr. Altic, where do you work? |
| 23 | **A** I work for Ballotpedia dot org, which is a nonprofit |
| 24 | organization that does political information, neutral, |
| 25 | unbiased political information. |

JOSH ALTIC - DIRECT EXAM

15-2434

1    **Q**     And what is your title at Ballotpedia?

2    **A**     I am director of research for Ballotpedia.

3    **Q**     What are your responsibilities as director of research

4    for Ballotpedia?

5    **A**     I field all research requests and provide research

6    support for the editorial and communications departments.  I

7    work with external relations to draft proposals for various

8    research.  I do research on everything from candidates to

9    ballot measures to miscellaneous political data that anyone

10   might want.

11   **Q**     How long have you worked with Ballotpedia?

12   **A**     Over ten years now.

13   **Q**     And what professional roles have you had at

14   Ballotpedia?

15   **A**     Since -- well, until about seven months ago, I worked

16   primarily in the ballot measures department for Ballotpedia,

17   so I started there as a staff writer and worked through -- I

18   was project director for many years and then ended with that

19   project as managing editor for a couple of years.

20   **Q**     How long were you a managing editor of Ballotpedia?

21   **A**     Since 2016, June of 2016.

22   **Q**     And what was your specific area of focus?

23   **A**     I managed all of our ballot measure related content on

24   the Ballotpedia website.  So I was responsible for editorial

25   content and news content about ballot measures, both in

1    terms of tracking the current cycle of ballot measures,

2    creating our historical database of ballot measures, as well

3    as compiling a database of the laws governing the process

4    for ballot measures, and the rules that govern the

5    initiatives in each state.

6        I also covered local ballot measures and the rules

7    governing local ballot measures in each state.  I was

8    responsible for also doing external relations about ballot

9    measures.  So any time there was a media journalist request

10   or an interview or someone wanted an article written, I was

11   the one who was directed to field that request, if it was

12   related to direct democracy.

13   **Q**   In that role, just to be clear, did you research

14   ballot measures?

15   **A**   Yes, yes.  I spent a lot of my time researching,

16   researching the laws governing ballot measures and ballot

17   measures in the current cycle so I could guarantee the

18   accuracy of our content on the site.

19   **Q**   Now, did your research include the laws in all 50

20   states about ballot initiatives?

21   **A**   Yes, yes.  I was responsible for researching and

22   compiling a series of encyclopedic articles about the laws

23   governing ballot measures in each state broken down by type,

24   by origin, by what type of law they were amending.  So yes,

25   yes, every, every state was within my purview.

1    **Q**    Now, have you published on the subject of ballot

2    measures?

3    **A**    Yeah.  I coauthored -- excuse me.  I coauthored an op

4    ed in the *New York Times* about ballot measures.  I've also

5    published hundreds of news articles on Ballotpedia dot org.

6    I'm responsible for a large amount of the content, the

7    encyclopedic content, on Ballotpedia dot org.  I've been

8    cited in many media articles and been on various TV programs

9    and radio programs.

10   **Q**    Now, what are ballot measures?

11   **A**    A ballot measure I would describe it as any, any

12   policy change, so any, any law change that's decided

13   directly by voters as opposed to by their elected

14   representatives.

15   **Q**    What are the different types of ballot measures?

16   **A**    So I think the best way to break that down is -- at

17   least initially, is by origin.  So I would first say that

18   there are -- there are ballot measures that are put on the

19   ballot by elected representatives, so I would refer to those

20   as referrals.  They can be put on the ballot by the

21   legislature or by a constitutional convection, or in one

22   state, by a commission.

23        And then on the other side, there are ballot measures

24   that appear on the ballot because of a successful signature

25   petition campaign.  So those are citizen initiated in the

1    sense that they appear on the ballot because the sufficient

2    number of citizens signed a petition to put them on the

3    ballot.  So I would first divide ballot measures in that

4    way.

5         And then on -- for citizen initiated measures, I would

6    further divide those up into ballot initiatives and veto

7    referendums.  I would say that that's kind of a key

8    differentiating difference on that side of things.

9    **Q**    Now, will you please describe for us the difference

10   between a ballot initiative and a ballot referendum?

11   **A**    Yes.  So I would say a ballot initiative is a proposal

12   for a new change to either statute or the Constitution, so

13   it's the content within the ballot initiative is -- is from

14   the sponsors.  It's determined by the sponsors.  While a

15   veto referendum, which is also called a people's veto or a

16   popular referendum, it is a proposal that concerns a law

17   recently passed by the legislature.  So it's -- it doesn't

18   propose anything new or take away anything determined by the

19   sponsors.  Rather, it's designed specifically to repeal a

20   law that was recently passed by the legislature.

21   **Q**    How does a measure get on the ballot?

22   **A**    Are you referring to a citizen initiated measure?

23   **Q**    Yes.

24   **A**    So the process varies across the states, but in

25   general, there is -- there are a couple of phases.  You have

1        to submit the measure for some kind of approval either by

2        the Secretary of State or Attorney General in many cases.

3        And then the measure enters a signature-gathering phase

4        where the measure can be circulated and citizens can sign

5        their names onto the ballot initiative or veto referendum

6        petition.  There's usually a deadline involved with this.

7        There's a timeline over which sponsors of that petition can

8        circulate the measure.  And then once that process is over,

9        submitted for some kind of verification process generally,

10       and if a sufficient number of signatures are verified, then,

11       that measure is qualified for the ballot, barring any sort

12       of legal challenges or -- or a court case, court ruling that

13       blocks it from the ballot.

14       **Q**    Now, generally speaking, how are those signatures

15       gathered?

16       **A**    For the most part, signatures are gathered by

17       professional circulators.  The people are paid to bring the

18       petition around and try to collect signatures from citizens,

19       from registered voters.  There are maybe a handful every

20       cycle that get on the ballot through volunteer-driven

21       efforts, but those are usually in states with smaller

22       signature requirements, South Dakota, North Dakota, Montana.

23       A huge majority of measures that qualify for the ballot

24       are -- they're driven by some kind of paid

25       signature-gathering campaign and there are companies that do

1    that.

2    **Q**    And when you mentioned the paid signature-gathering

3    companies, just generally speaking, where does the funding

4    come from to pay those companies?

5    **A**    So funding would come from a sponsor of the petition

6    drive or multiple sponsors.  So those are the political

7    donations, usually through some kind of ballot measure

8    committee, a political action committee that spends money on

9    those, on those signature drives.  I would say most

10   frequently, the source of that money is located in a small

11   number of sponsors, of donors.  You don't usually see a

12   crowd funded petition drive.  Crowd funding usually comes in

13   after the measure is actually certified for the ballot.  So

14   yeah, from a sponsor, from either a sponsoring individual or

15   a sponsoring organization --

16   **Q**    And is the --

17   **A**    -- through political contributions.

18   **Q**    Excuse me, I apologize for interrupting you.

19        Is the identity of those sponsors usually known to the

20   people signing the petition?

21   **A**    There are certain laws around the country requiring

22   things like the largest donors to be listed on petitions,

23   but those are pretty rare and some have been overturned.

24   For the most part, that information is not available to the

25   signers, at least not readily available, and it's generally

1    not emphasized by the circulators, it's not.  So I would say

2    for the most part, no, for the most part, that information

3    is not available to signers unless they dig very hard to

4    find it.

5    **Q**    How would a potential signer know who is behind a

6    petition-gathering effort?

7    **A**    I mean, they would -- you might, you might look at

8    the -- you might look at the political contribution -- the

9    reporting on the political contributions made by whatever,

10   whatever PAC is sponsoring that measure.  And you could --

11   and those are available in some states, depending on their

12   system, from the state's campaign finance reporting system.

13   But even those could be from an organization that -- for

14   which it would be very difficult to know where that

15   organization's funding came from.  So in many cases, it is

16   almost impossible to determine who is backing the drive.

17   **Q**    Now, how does a -- excuse me.  How does a ballot

18   referendum work in Ohio specifically?

19   **A**    Yeah.  So in Ohio, Ohio is one of the states where

20   either for a ballot initiative or a veto referendum you need

21   to submit a number of signatures with your application.  So

22   you would submit a thousand signatures with your application

23   to start the petition drive.  Then, that petition would --

24   needs to include a summary of either the initiative or the

25   referendum.  So in the case of a referendum, it would be a

1   summary of the law that is being targeted for repeal.  And

2   that summary needs to be approved by the Attorney General

3   and portions of that petition need to be approved by the

4   Secretary of State.

5       Once those are approved, there is a deadline by which

6   you have to collect a certain number of signatures.  So in

7   Ohio, that number is tied to the number of votes for

8   governor in the last election, and it varies by type.  For

9   an initiative changing statute and a veto referendum, it

10  amounts to 6 percent of the -- 6 percent of the number of

11  votes last cast for governor, which is something like

12  between 200 and 300,000, depending on the cycle.  So for a

13  veto referendum, you have 90 days from when the law is

14  enrolled -- so after the governor signs it -- to collect

15  those signatures.  You can't start collecting the large

16  number of the -- the bulk of those signatures until you get

17  approval from the Attorney General for your -- for the

18  accuracy of your petition summary.

19      And then, so then once you get that approval, you're

20  free to circulate the petition, collect the hundreds of

21  thousands of signatures.  You must comply with requirements,

22  such as a distribution requirement, which means you need to

23  collect a certain number of signatures from half of the 88

24  counties, so from 44 of 88 counties.  You need to meet a

25  certain threshold in those counties, and then you submit

JOSH ALTIC - DIRECT EXAM

15-2442

1    those signatures for verification.  And if a sufficient

2    number are deemed valid, then, that measure qualifies for

3    the ballot.

4    **Q**    You mentioned "verification."  Who is responsible in

5    Ohio for verifying the signatures?

6    **A**    The state election officials are responsible for --

7    the Secretary of State's office is responsible for deeming a

8    petition sufficient.  There are ways to challenge

9    signatures, but in some cases, the signatures are -- it's

10   not required that every single signature be reviewed in

11   Ohio.

12   **Q**    Now, for opponents of a ballot referendum, what are

13   common tactics used to prevent the ballot referendum?

14   **A**    So I would break that up into two phases.  So for

15   opponents of a ballot initiative or a veto referendum, there

16   are certain activities that are useful before the measure is

17   certified for the ballot and then after.  So were you

18   referring to a particular phase or just --

19   **Q**    Both phases, please.

20   **A**    So after the measure is on the ballot and it's going

21   to appear on the ballot, then, that really just really

22   becomes a political campaign.  The support and opposition

23   sides are just using messaging campaigns and political ads

24   and signs and sort of the ways in which you might advocate

25   for a political position that you're probably familiar with.

1      Before the measure is certified for the ballot, there

2  are I think different tactics that are maybe less

3  well-known.  So I would say for a majority of initiative and

4  referendum efforts, opponents don't really do anything

5  before the measure is certified because it's largely in

6  their interest for the effort to not have any sort of

7  notoriety, so not have any sort of attention.  But there

8  are, there are cases where, especially if opponents are

9  confident that the sponsors have enough money and enough

10 activity to qualify the measure for the ballot, if they're

11 confident of that, then, there are certain activities that

12 you can do to prevent that measure from appearing on the

13 ballot.

14      One of those is to launch a lawsuit and try and

15 either -- either overturn -- either block the measure from

16 the ballot because of its content or for procedural reasons,

17 so claim that the requirements were not met, that the

18 petition was invalid, that a circulator maybe didn't meet

19 the requirements for circulators, and knock signatures off

20 of the petition that way.  So lawsuits are quite common.

21      Another tactic would be to try and inhibit the progress

22 of signature-gatherers.  So just as a circulator would be

23 trying to get registered voters to sign the petition, it's

24 equally possible to try to dissuade voters from signing a

25 petition.  This can be through a messaging campaign, so it

1    would be through trying to put some messages out there that

2    this is a petition that should not be signed for various

3    reasons.

4         It can also be -- and this is common in the sense that

5    it happens every cycle, there can also be efforts to block

6    petition signers, so to actually find the places where

7    circulators are collecting signatures and try to dissuade

8    the people that those circulators are talking to from

9    signing the petition or in any way inhibit the activity of

10   the paid circulators or the volunteer circulators from

11   gathering those signatures.  And that's often referred to as

12   petition blocking, and there's sort of lots of different

13   tactics you can use for that, and that can, of course, be

14   either a volunteer or a paid effort as well.

15        There's also then kind of a number of efforts that fall

16   like under that definition of petition blocking which would

17   just be to sort of dry up resources.  So I remember a couple

18   of times in the last six years where a competing effort has

19   sort of either launched their own signature campaign so that

20   they can hire up all of the petition-gatherers in that state

21   and essentially make it much more expensive or much more

22   difficult to find the manpower you need to qualify the

23   measure for the ballot.

24        I've also -- I've also heard and seen instances of

25   opponents even just sort of directly paying for activities

1    other than signature-gathering.  So essentially, hiring,

2    hiring the people who would be signature-gatherers to do

3    other things.

4    **Q**    Now, for the opponents of a ballot referendum, what is

5    the type of information that would be valuable to gather on

6    the proponent's efforts to obtain signatures?

7    **A**    Well, it would be -- starting kind of from where I

8    started in the previous question, with regard to lawsuits,

9    almost any information could be valuable.  So if you know,

10   if you know something about circulators that might lead them

11   to be disqualified, so if you have information about their

12   residency or their criminal history, even if you can get a

13   couple of circulators disqualified, then, you can knock all

14   of their signatures off of that petition, so knowing

15   information about circulators.  Knowing where circulators

16   are active is also valuable if you wanted to gather

17   information for a lawsuit.

18        There are certain activities that petitioners cannot

19   do.  They cannot lie.  They must swear that they've actually

20   witnessed every single signature.  So if you can gather

21   evidence that a certain number of circulators aren't

22   following those rules by actually observing them, then, that

23   could be a way, you could use that information in the

24   lawsuit.

25        In terms of the petition blocking, it would be

1    especially useful in a state where there's a distribution

2    requirement, like Ohio where you need to -- you need to

3    gather a certain threshold, not just in the entire state,

4    but in certain counties throughout the state.  If you know

5    how many signatures the sponsoring group, for example, has

6    gathered in a certain county and you know that they need

7    that county to meet their requirement, then, you can target

8    your petition-blocking efforts in a much more efficient way.

9    So knowing information about how much progress the sponsors

10   have made in gathering signatures, how close they are to

11   meeting thresholds, and especially how close they are to

12   meeting thresholds within the smaller sub jurisdictions that

13   make up the distribution requirement, that is all

14   information that would be very, very helpful in making your

15   petition blocking effort more useful.

16        Then, in terms of messaging, I would say knowing the

17   identity -- the identity of what you could say is the

18   original sponsors of the measure, so not necessarily the

19   political committee that was formed to fund the drive, but

20   the people behind that political committee or the people

21   behind the organization behind that political committee, if

22   you have that information and that information sort of shows

23   that the effort is anything but a grassroots, state-based,

24   ground-up-type effort, it's easy to form messaging that

25   deters signers with that type of information.  So that would

1    be information about who, like I said, maybe the original

2    funders are.  Once again, it depends on who those funders

3    actually are.

4        But it's -- frequently, a common tactic is to

5    accurately or inaccurately paint an initiative drive as out

6    of state, right, as something that's not an effort coming

7    out of Ohio or out of Florida or out of California, but it's

8    coming from some other national interest or from out of the

9    state, that's a common messaging tactic before the measure

10   is certified.

11   **Q**    Now, you had mentioned signature-gathering firms.

12   Approximately, how many signature-gathering firms are there?

13   **A**    I don't know how many there are, unfortunately,

14   because we track the measures that actually qualified for

15   the ballot.  So what I do know is that -- so there are

16   hundreds, if not thousands, of initiatives that are filed

17   with stated officials every year, and something like

18   8 percent of those or less actually make the ballot.  And a

19   certain portion of those may hire companies but never

20   actually qualify for the ballot.

21       So anyway, I'm not qualified to speak to the exact

22   number, but in terms of the initiatives that voters actually

23   see, there's a pretty small number of companies, I would say

24   between 50 and 30 every cycle, and you keep seeing the same

25   names over and over again that are hired to run the

1  signature drives for those initiatives that actually qualify

2  for the ballot.  So the successful petition drives are

3  generally run by a small number of -- like I said, between

4  15 and 30 companies that you kind of see repeat over and

5  over again.

6  **Q**    Throughout your testimony, you've used the word

7  "cycle."  For those of us who aren't familiar, what does

8  that refer to?

9  **A**    So I was using that phrase to refer to a two-year

10 cycle, so an odd-numbered year and an even-numbered year.  A

11 huge majority of ballot measures, in general, but also

12 citizen initiated measures, appear on the ballot in an

13 even-numbered year because many states require that.  Ohio

14 is not one of those states.  Ohio allows both odd-year and

15 even-year measures.  But yeah, since there are so few in an

16 odd-numbered year, I often lump the measures for a two-year

17 cycle into one in my mind, so that's what I mean by a cycle.

18         MS. GAFFNEY-PAINTER:  Your Honor, may I have a

19 moment to confer?

20         THE COURT:  Yes.

21         MS. GAFFNEY-PAINTER:  No further questions.  Thank

22 you.

23         THE COURT:  Very well.  The attorneys for the

24 defendants have an opportunity to examine.

25 Cross-examination on behalf of Mr. Householder, if any?

JOSH ALTIC - CROSS-EXAM

1    MR. GLICKMAN:  Thank you, Judge.

2    THE COURT:  Very well.

3    MR. GLICKMAN:  Good morning, Mr. Altic.

4    THE WITNESS:  Good morning.

5    MR. GLICKMAN:  I'm Rob Glickman.  I'm one of the

6    lawyers for Larry Householder in this case.  I only have a

7    couple of questions for you.

8                    **CROSS-EXAMINATION**

9    **BY MR. GLICKMAN:**

10   **Q**    Okay.  So as far as you just said generally in these

11   types of ballot referendums, only about 8 percent of them

12   actually are successful to get on a ballot?

13   **A**    Yeah.  So I was -- that's a number speaking about the

14   entire country.  So I was remembering specifically the 2018,

15   2020 and 2022 election years, and, yeah, between 600 and a

16   thousand of these were filed with state officials.  Now,

17   that could be -- that could be, you know, ten families angry

18   at a policy submitting an initiative to the officials with

19   no chance of making the ballot, right.  It's -- or it could

20   be a well-funded group that runs into trouble and doesn't

21   quite have enough funding or hits a lawsuit or something and

22   doesn't make the ballot.  But yeah, so out of those 600 to a

23   thousand measures, every cycle, it's been in the, you know,

24   50 to 70 range that actually make the ballot, so it works

25   out to about 8 percent nationwide that actually qualify for

1    the ballot.

2    **Q**    And even if you do make the ballot, that's no

3    guarantee that you'll win in the upcoming election, right?

4    **A**    Of course.  That's up to the voters, yeah.

5    **Q**    And a number of these initiatives are funded by

6    special interests; is that fair?

7    **A**    Yeah, I think it's fair.  It's fair to say that a

8    large number of initiative campaigns are funded by -- well,

9    could you tell me what you mean by "special interests"?

10   **Q**    Sure.  It's not a group of volunteer students who are

11   interested in an issue, it's a well-funded campaign funded

12   by wealthy companies, individuals or interest groups; is

13   that fair?

14   **A**    Yeah, I would say lot of the ones that actually make

15   the ballot are that way.  A lot of the -- so yeah, most of

16   the measures that make the ballot have funding for their

17   signature drive.

18   **Q**    And, in fact, if there's a hotly contested law that is

19   proposed in the General Assembly -- or in a state

20   legislature, I'm sorry, I'll speak generally, and that

21   proposal is opposed by a powerful special interest and

22   supported by a powerful special interest, if the law passed,

23   it is not out of the norm for the special interest who lost

24   in the General Assembly to attempt to get that law changed

25   with a ballot initiative?

1    **A**    I'm not sure I have like the statistics to speak to

2    that, "out of the norm."  Certainly, a common scenario is

3    for these initiatives that do make the ballot and are

4    controversial, say, is that there is -- that they are

5    controversial in the legislature as well, and that there are

6    many -- I'm sorry.  Yeah, I'm not sure if that makes sense

7    or not.

8    **Q**    Okay.  Well, I'll take out the word "norm."  Special

9    interests that are opposed to legislation that passed can

10   attempt a ballot initiative to eradicate the legislation

11   that has gone into effect, true?

12   **A**    A ballot initiative, so they can do a veto referendum

13   petition to overturn immediately.  So a veto referendum

14   would be for immediately passed legislation to overturn it

15   and appeal it, and in many cases, to keep it from going into

16   effect.

17   **Q**    In fact, in Ohio if you get on the ballot with an

18   initiative, the law doesn't go into effect --

19   **A**    Yeah.

20   **Q**    -- until the election?

21   **A**    Yeah, so it's suspended until the election, so you can

22   stop it from going into effect.  You can use a ballot

23   initiative effort years later to change the law.  So you

24   could also -- you could also use a ballot initiative to that

25   effect by using it to try to repeal or change the law that

1    was passed many years ago, say.

2    **Q**    And successful ballot initiatives generally need to be

3    well-funded, especially in states like Ohio as opposed to

4    North Dakota like you said earlier; is that correct?

5    **A**    Yeah.  I think the average cost of getting an

6    initiative on to the ballot or a veto referendum across the

7    country was something like 2 million in 2020.  It was

8    actually 4 million in 2022, but inflation hit that

9    company -- that industry hard.  And then I think in 2018, it

10   was like 1.3 million.  But the real cost usually comes after

11   the measure is on the ballot.  Though, if it's a

12   controversial issue, the cost of a campaign to try and get

13   voters to side with you is generally many times more

14   expensive than the drive itself, but either way, yeah, you

15   need a lot of money.

16   **Q**    But if the drive itself is opposed, that can be

17   expensive as well, yes?

18   **A**    Yes, yeah, yeah.  So like for a petition blocking or

19   lawsuits, all of the tactics I described to oppose the

20   signature drive are generally accomplished through funding

21   as well.

22   **Q**    I think you testified that through petition blocking

23   it was not abnormal -- I'm taking out -- strike that, Judge.

24          Opponents of a ballot initiative can go about hiring

25   these signature firms to block the people who want the

JOSH ALTIC - CROSS-EXAM

15-2453

1    ballot initiative from hiring them themselves, true?

2    **A**    What do you mean by "can"?

3    **Q**    It is -- they -- one of their strategies will be to

4    hire those firms so no one else can?

5    **A**    I've seen that strategy used, yes.

6    **Q**    And you indicated that oftentimes one cannot see who

7    is funding either the ballot initiative or the opposition to

8    the ballot initiative easily?

9    **A**    Correct.  Yeah.  It's often difficult to ascertain

10   what I would describe as maybe the original funders.

11   **Q**    Another avenue of blocking a ballot initiative or

12   supporting a ballot initiative is a media campaign, true?

13   **A**    Yes, yeah.  I think I testified that most commonly we

14   see sort of the messaging or media side being used by the

15   support before they get on the ballot just because often

16   anonymity is a tactic for some of these efforts before the

17   measure is actually on the ballot, but it is used, yes.

18   **Q**    But if the measure is very well-funded and is mounting

19   its own media campaign, putting it out in the public light,

20   one way of blocking it is to have a counter media campaign;

21   is that fair?

22   **A**    Certainly.

23   **Q**    And these media campaigns add substantially to the

24   expense of any referendum?

25   **A**    Yes.

JOSH ALTIC - CROSS-EXAM

15-2454

1    **Q**    And the media campaign can include radio, yes?

2    **A**    Yes.

3    **Q**    TV?

4    **A**    Sure.

5    **Q**    Mailings, direct mailings to voters?

6    **A**    Yes.

7    **Q**    Okay.  And the people even showing up where

8    signature-gatherers are attempting to get signatures and

9    trying to convince the people against signing, right?

10   **A**    Yeah, that can happen as well, yeah.

11   **Q**    In Ohio, as far as signature-gatherers, can felons

12   collect signatures?

13   **A**    I believe -- so it's -- I'm trying to remember Ohio's

14   law specifically.

15   **Q**    If you know, sir.  I don't want you to guess.

16   **A**    Yeah.  It's very common that there are laws against

17   certain types of felonies, so any kind of fraud or any kind

18   of related, like signature forgery, anything like that is

19   very frequently prohibited for circulators.  Yeah, I don't

20   remember exactly if felonies are blanket prohibited for

21   Ohio.

22            MR. GLICKMAN:  Can I just have one moment, Judge?

23            THE COURT:  Yes.

24            MR. GLICKMAN:  I don't have anything further.

25   Thank you.

```
 1                THE COURT:  Very well.
 2                MR. SCHNEIDER:  Judge, no questions of this
 3      witness.
 4                THE COURT:  Thank you, sir.
 5           Is there any redirect?
 6                MS. GAFFNEY-PAINTER:  No, Your Honor.
 7                THE COURT:  You're free to go.
 8                THE WITNESS:  All right.
 9                THE COURT:  Thank you.
10           (Witness left the stand.)
11                THE COURT:  Where do we stand from the government's
12      perspective?
13                MR. SINGER:  Your Honor, the government calls
14      Michael Roberson.
15                THE COURT:  Very well.  We've gone to retrieve that
16      witness.  You may gather at the podium.
17           Good morning, sir.  If you would be willing to pause
18      where you are for the oath to tell the truth.
19           (Witness sworn.)
20                THE COURT:  Very well.
21           (Witness took the stand.)
22                THE COURT:  I tell everybody the seat tips back,
23      spirit of full disclosure.
24                THE WITNESS:  Thank you, Your Honor.
25                THE COURT:  Once you're seated and comfortable,
```

1  we're going to need you close to that fancy government

2  microphone.

3       On behalf of the government, sir, you may approach and

4  begin your examination.

5            MR. SINGER:  Good morning.

6            THE WITNESS:  Good morning.

                          **MICHAEL ROBERSON**

8  of lawful age, Witness herein, was examined and testified as

9  follows:

10                       **DIRECT EXAMINATION**

11 **BY MR. SINGER:**

12 **Q**    Could you please state your name and spell it for the

13 record?

14 **A**    Michael Roberson, R-O-B-E-R-S-O-N.

15 **Q**    Mr. Roberson, where do you work?

16 **A**    Advanced Micro Targeting.

17 **Q**    And what is Advanced Micro Targeting?

18 **A**    We are one of the largest voter contact firms in the

19 country.  We provide field outreach for political campaigns

20 and ballot -- qualifying ballot initiatives.

21 **Q**    And what is a qualifying ballot initiative, could you

22 explain that, please?

23 **A**    To qualify a ballot initiative -- and there are

24 roughly a little over 20 states that allow it, citizen

25 initiated, and so any citizen can hire a company like

MICHAEL ROBERSON - DIRECT EXAM                    15-2457

1    Advanced Micro Targeting and typically you qualify something

2    for the ballot by collecting signatures.

3    Q    Does Advanced Micro Targeting have a shorthand name

4    that it goes by?

5    A    AMT, yes.

6    Q    And what is your role at AMT?

7    A    I'm the CEO.

8    Q    And what are your responsibilities as the CEO at AMT?

9    A    Overall leadership and management of the company,

10   business development.  I'm also an attorney, so I'm

11   responsible for legal compliance, making sure that we follow

12   each state's laws as to how to qualify an initiative.  I

13   also draft contracts, all of the contracts for the company.

14   Q    And how long have you been the CEO of AMT?

15   A    Since December 2018.

16   Q    And what was your job prior to working for AMT?

17   A    Well, I was an attorney for a law firm.  I was also an

18   elected official.  I was state Senator from 2010 to 2018,

19   Senate Majority Leader, and then I was the Republican

20   nominee for Lieutenant Governor in 2018, all in Nevada,

21   which is where I live.

22   Q    Now, do you recall whether AMT was involved in a

23   signature collection effort in 2019 in Ohio?

24   A    I do.

25   Q    Can you describe what AMT's role was in that effort?

MICHAEL ROBERSON - DIRECT EXAM                    15-2458

1    **A**    We were hired by Ohioans Against Corporate Bailouts, a

2    committee, to qualify a referendum related to HB 6.  And a

3    referendum is basically an opportunity for voters to have a

4    say over something that's been passed by the legislature and

5    signed by the governor.  And so we were hired in July of

6    2019 to collect a minimum of approximately 265,000 valid

7    signatures from registered voters in the state of Ohio to

8    qualify the referendum.  If it had qualified, the HB 6

9    legislation would have gone to a vote of the people.

10   **Q**    And do you recall what HB 6 involved?

11   **A**    It was the billion-dollar bailout bill, which, you

12   know, among other things --

13            MR. BRADLEY:  Objection, Your Honor.

14            THE COURT:  Basis?

15            MR. BRADLEY:  Characterization.

16            THE COURT:  You can cross-examine.  You may

17   proceed, Counsel.  Overruled.

18            THE WITNESS:  My understanding is it provided a

19   billion-dollar bailout to two -- to a nuclear energy company

20   that owned two nuclear energy plants in the state, and it

21   also raised the utility rates of every resident of the state

22   of Ohio.

23   **Q**    Now, were you involved personally in the AMT's effort

24   in Ohio in 2019?

25   **A**    I was.

MICHAEL ROBERSON - DIRECT EXAM

15-2459

1    **Q**    Can you describe how you were involved?

2    **A**    Well, initially, I negotiated the contract with the

3    committee who wanted to hire us to begin this process.

4    Then, I came to Ohio in July to oversee the first -- to put

5    a referendum on the ballot in Ohio, you first have to submit

6    language for the proposed referendum, which has to be

7    approved by the Attorney General.  And along with -- in

8    order to submit that language, you have to go out and

9    collect a thousand initial signatures within about a

10   three-day period.  And so I came into town in July to

11   oversee that process and worked with our client, Ohioans

12   for -- Against Corporate Bailouts, I believe from memory

13   that's the accurate name.  And we turned in the petition

14   language and the signatures to the Attorney General's office

15   in late July.  So that's my initial entry into the state

16   related to this process.  I came back a few times, spent

17   extensive amounts of time here in August and September, but

18   that was my first entry into the state relating to this.

19   **Q**    And was AMT able to successfully gather that initial

20   1,000 signatures?

21   **A**    Yes.

22   **Q**    Can you describe what happened after the -- after that

23   thousand signatures was collected?

24   **A**    Yes.  The Attorney General -- I believe it's ten

25   calendar days that the Attorney General has to either

1    approve or reject the language.  The Attorney General

2    rejected that language, and so my client had to redraft the

3    language and resubmit, and we had to collect another

4    thousand signatures along with that resubmittal.  So that

5    happened in August of 2019.

6    **Q**    Ultimately, was the summary -- petition summary

7    approved by the Attorney General on the second try?

8    **A**    It was.  I believe it was approved on August 30th

9    because we started collecting signatures on August 31st.

10   **Q**    And can you describe just what a petition summary is?

11   **A**    It's a summary of the petition that people are

12   signing, a summary of the fuller language.

13   **Q**    And --

14   **A**    It's an encapsulation of the proposed initiative.

15   **Q**    And can you describe how much time -- the full period

16   of time that you had to collect the 265,000-some

17   signatures --

18   **A**    Right.

19   **Q**    -- if the Attorney General would have approved the

20   first time?

21   **A**    Well, the law provides 90 days from the day the

22   governor signs the legislation, but given the two -- the

23   process of going to the Attorney General's office -- and by

24   the way, then it goes to the ballot board, which has to be

25   approved, and then it gets sent back to the Attorney

MICHAEL ROBERSON - DIRECT EXAM

15-2461

1    General.  So doing that twice cost us about 46 -- we had

2    50 -- 54 days, so it cost us 36 days.  So instead of

3    90 days, we had 54 days from the time we were able to

4    actually begin collecting signatures.  We had from August

5    31st to I believe October 23rd to collect those signatures.

6    Q    And can you describe whether that impacted your

7    ability to collect the total amount of signatures within the

8    90-day period?

9    A    It was a significant impediment.  I mean, just common

10   sense math.  You hoped to have 90 days or close to 90 days

11   as the law provides, but you actually only have 54 days, so

12   it's a significant obstacle to overcome.

13   Q    Under the contract that AMT had with Ohioans

14   Against -- Ohioans Against Corporate Bailouts, what would

15   happen if AMT failed to collect the requisite number of

16   signatures by the end of the 90-day period?

17   A    We would have to reimburse our client, I believe it

18   was initially $10.54 for every deficient signature, every

19   signature that was short of what we were required to

20   collect.

21   Q    Now, can you explain whether AMT hired employees to

22   help gather signatures?

23   A    We did, lots of employees.  All of our employees are

24   W-2 employees.  They're not independent contractors.  Many

25   of them we recruit nationally, and so while we certainly

1    hired a lot of residents of Ohio, we also hired people from

2    around the country.  And when we hire people from around the

3    country, we fly them into the state, we house them in hotel

4    rooms here, provide them rental cars, so there's a great

5    expense involved in bringing people from around the country.

6    And so if you -- I will tell you by the end of the project,

7    there were -- and I don't want to get ahead of myself, but

8    certainly from our company alone, hundreds of employees were

9    hired and brought into the state or were already in the

10   state.

11   **Q**    And how did you feel about AMT's ability to collect

12   the requisite number of signatures at the time that AMT was

13   hired for this project?

14   **A**    Well, we have collected literally -- we have qualified

15   hundreds of initiatives over the years throughout the

16   country.  I don't remember a situation where we haven't

17   succeeded prior to this.  So even though we thought we were

18   going to have closer to 90 days, it turns out we had

19   54 days, we were still confident we could do it.

20   **Q**    And did -- did your feelings about AMT's ability to

21   perform change at all during the course of the campaign?

22   **A**    It did.  You know, again, 54 days is not a lot of

23   time, and we quickly found out that we had opposition in the

24   field, which made it much more difficult to succeed.

25   **Q**    How would you describe the opposition to your efforts?

1    **A**    Well, I've never seen anything like it, and I've

2    worked in politics most of my adult life and been involved

3    in many, many campaigns.  It was like a war zone out there.

4    Our employees were stalked.  They were intimidated.  They

5    were harassed.  Some of them were assaulted.  It was quite

6    something.

7    **Q**    Can you explain whether the opposition to your efforts

8    impacted your ability to collect the requisite number of

9    signatures?

10    **A**    It did.  Very soon after we began collecting, probably

11    in early September, we had a conversation with our client to

12    try to determine how to deal with this environment we were

13    in, and at that time, we mutually agreed that our role would

14    change in that we would continue to do what we were doing,

15    collecting signatures, but we would also bring in several

16    other companies, several other sub vendors, to assist.  We

17    would kind of coordinate and supervise all of those firms.

18    And so ultimately, we had probably -- approximately, ten

19    different firms working underneath us and working with us to

20    try to deal with what we were seeing out in the field.

21        So could you ask the question again?  Because I think I

22    went --

23    **Q**    Can you just describe why is it that you determined

24    that you needed to bring in sub vendors to help collect

25    signatures?

1    **A**    Well, on a daily basis -- so we had offices in

2    Columbus, Cincinnati, Dayton, Toledo, Cleveland, Akron, and

3    what we would find is the opposition was everywhere, and in

4    Columbus where we had our main hub, we had our field office

5    there, but we also had our verification and processing

6    office.  Because what happens is when we collect signatures,

7    they all get processed, they all get scanned, sent to our

8    verification office in Dallas so that they can verify the

9    signatures to validate them to make sure they're good

10   signatures.  So it's a pretty big process, and that major

11   hub is in Columbus.  And what we found is that the

12   opposition would find out where our offices were, they would

13   be waiting for our employees when they got there.  They

14   would be in cars, they would follow our employees to where

15   they -- to their turf location.  Turf is, you know, a way of

16   saying where -- we have assignments for our canvass.

17            MR. BRADLEY:  Objection, Your Honor.

18            THE COURT:  Basis?

19            MR. BRADLEY:  It's all predicated on hearsay.

20            THE COURT:  Objection is overruled.  Please

21   proceed.

22            THE WITNESS:  So talking about turf, you know, I

23   think it's important to know how we collect these

24   signatures.  We collect them in public places, high-traffic

25   areas, grocery store parking lots, libraries, retail

1    outlets, anywhere where there's a good traffic, we can

2    identify registered voters, that's where our canvassers go,

3    but it's organized.  It's not just send people out and they

4    hunt and peck for a good location.  We map out turf plans

5    ahead of time on a daily basis.  So when our employees come

6    to the office, they have their assignments, typically in

7    teams of four.  They will go to particular turf location.

8         Well, the opposition would follow our employees, and

9    after awhile, they knew where we would likely places we

10   would be and they would be there as well.  And they would

11   create disturbances, you know, yelling, screaming at our

12   canvassers, at voters, telling them not to sign the

13   petition.

14        MR. BRADLEY:  Objection, objection, Your Honor, to

15   that last line of questioning.

16        THE COURT:  Overruled.

17   **Q**   Can you explain whether the opposition to AMT's

18   efforts impacted AMT's cost to manage this?

19   **A**   It did measurably in a number of ways.  First of all,

20   productivity goes down when you're being harassed and voters

21   are being harassed.  Productivity goes down, you can get

22   fewer signatures, ultimately, you have to go find another

23   location because of the disturbance.  Employees quit because

24   they did not want to work in that environment.

25        Although we pay our employees well, at a certain point,

1    it's not worth it every day to show up to a work site to be

2    harassed, to be yelled at, to be screamed at, to be stalked.

3    All of those things happened, and so our turnover was sky

4    high.  And then many of our employees were reached out to by

5    the opposition, text messages, phone calls.

6              MR. BRADLEY:  Objection, Your Honor.  It's not

7    responsive to the question.

8              THE COURT:  Overruled.

9              THE WITNESS:  So my point there is we lost -- many

10   of our employees were poached.  They all have employment

11   contracts, but they were poached, offered money and a plane

12   ticket to leave the state or offered money and an

13   opportunity to go work for the opposition.

14   **Q**    And how --

15   **A**    All of those things increased our costs.

16   **Q**    Up to that point, had you ever experienced an

17   opposition like the one you experienced in the HB 6

18   campaign?

19             MR. BRADLEY:  Objection, relevance.

20             THE COURT:  Overruled.  You can answer the

21   question.

22             THE WITNESS:  Thank you, Your Honor.

23        No, never.  It was extraordinary.

24   **Q**    Do you recall whether AMT hired an employee named

25   Tyler Fehrman?

1    **A**    Yes, AMT did.  I personally did.

2    **Q**    How was it that you came to hire Mr. Fehrman?

3    **A**    So we were looking for managers for the project.  This

4    was in late August -- I'm sorry, late July, early August,

5    and I don't recall if I reached out to him or he reached out

6    to me.  But, you know, we had been talking to folks and

7    different groups who, you know, might have some people

8    available who were suited for this kind of position.  So in

9    any event, I met with Tyler Fehrman on August 1st.  I met

10   with him at a Panera in Worthington.  I talked with him and

11   offered him a position to run our Columbus hub, to be the

12   project manager for the main hub in Columbus.

13   **Q**    What are the duties of a project manager?

14   **A**    Supervise the operation in that region of the state,

15   manage petition circulators, manage the office, run the

16   office, coordinate with me and others in management on a

17   daily basis, basically running that portion of the project,

18   the Columbus region, which was a very important region.

19   **Q**    Can you describe whether the project manager in the

20   Columbus region was important to AMT's efforts?

21   **A**    Yes.  It was the most important region because we also

22   had our verification field office there.  The Form 15

23   process, which is a registration form that everyone who's

24   involved in the effort has to complete and then that has to

25   be delivered to the Secretary of State's office before

1    someone can even work on the project, a lot -- all of that

2    runs through Columbus.  So Tyler was also involved in that,

3    assisting me in that process.  He also worked with the

4    client, communicating with the client, who was also based in

5    Columbus.  And so, you know, it was a very important role.

6    **Q**    Can you describe whether AMT took any steps to protect

7    the signatures that it collected?

8    **A**    Yes.  As I said, we had an office in Columbus, in

9    Worthington, dedicated just for processing and storage of

10   the signatures.  At a certain point, we had to get security,

11   around-the-clock security, for that building and that

12   office.

13   **Q**    Now, did you publish AMT's collection of signatures in

14   realtime?

15   **A**    No.

16   **Q**    And why not?

17   **A**    We wouldn't want anyone outside of AMT management to

18   have that information.  Canvassers don't even have that

19   information.  When you're trying to qualify something which

20   involves collecting signatures and you've got this

21   opposition out there that's trying to stop you, we wouldn't

22   want that information to get out to the opposition.

23   **Q**    So did you -- did you ever publicly disclose the

24   realtime number of signatures collected by AMT as of

25   September 6th, 2019?

1    **A**     No.

2    **Q**     Did you ever publicly disclose the realtime number of

3    signatures collected by AMT as of September 10th, 2019?

4    **A**     No.

5    **Q**     Did you ever publicly disclose the realtime number of

6    signatures collected by AMT during any time in the month of

7    September?

8    **A**     No.

9    **Q**     And why, why wouldn't you just publish the

10   information, if it was -- were the signatures ultimately

11   going to be -- the total number of signatures collected

12   ultimately going to be published?

13   **A**     Yes, at the end of the petition campaign, certainly,

14   we have to turn in the total number of signatures, yes.

15   **Q**     Would you -- would there ever be a time where you

16   would publish the signatures you collect as you collect them

17   in realtime?

18   **A**     No.  Some states, you do turn in signatures

19   progressively along the way, but not in Ohio, and in fact,

20   most states, you don't until the very end.

21   **Q**     And why wouldn't you publish the information in

22   realtime as the signatures are collected?

23   **A**     Because ballot initiative campaigns, like any kind of

24   political campaigns, typically have supporters and

25   opponents, they can be contentious; in this case, more so

```
 1    than I've ever seen.  You don't want your adversary to know

 2    the progress you're making or aren't making.  You don't want

 3    them to know where you're going every day to collect those

 4    signatures.  You certainly don't want them to know how many

 5    signatures you have.  It could affect how they try to

 6    interfere with the campaign.  It's just not -- I mean, it's

 7    the last thing they would ever want, is for realtime numbers

 8    to become public.

 9    Q     Now, during the course of this campaign, were you

10    aware of AMT employees simply stopped working without

11    providing notice during the middle of the effort?

12    A     Yes.

13    Q     And can you describe that?

14    A     We did.  We lost employees at a rate we had never lost

15    employees on a project.  They would just disappear, and in

16    some cases, we would discover after the fact they were

17    actually working for the other side.

18    Q     And I think you mentioned that -- well, I'll ask you

19    again, can you explain whether AMT had to amend its contract

20    during the course of this campaign?

21    A     We amended it on three separate occasions.

22    Q     And as part of the amendment, I think you testified

23    that you hired vendors to come in to help collect

24    signatures; is that right?

25    A     Yes.  So the initial contract we signed was in late
```

1    July.  We amended it in mid August to reflect the fact that

2    we were going to have to go out again a second time to get a

3    second round of a thousand signatures.  And, but then we

4    amended it two additional times, once in September and once

5    in October.  And the main reason for those amendments were

6    to reflect the fact that we were bringing in -- first, it

7    was four sub vendors, and then the final contract it was

8    seven sub vendors, and we may have even brought in more

9    after that, but we brought in seven sub vendors and we paid

10   them directly.  So the price of our contract had to go up to

11   allow us to pay these sub vendors to assist in the effort.

12   **Q**    And are you aware of whether any of the individuals

13   hired through the sub vendors ended up -- stopped coming to

14   work and stopped collecting signatures for your effort?

15   **A**    There was one company in particular that literally

16   left in the middle of the night, took the petitions with

17   them to Michigan, and it was quite a challenge to recover

18   those.

19   **Q**    Now, can you explain what happened with AMT's efforts?

20   **A**    Well, ultimately, we failed to qualify the referendum.

21   **Q**    And what does that mean, you "failed to qualify"?

22   **A**    Well, like I said, I don't recall us ever failing

23   previously.  Your reputation in this business or any

24   business is everything.  You know, we believe -- we know

25   we're one of the largest companies in the country, we

MICHAEL ROBERSON - DIRECT EXAM                    15-2472

```
 1   believe we're the best, and we believe our track record
 2   proves that out, but this was not a success.  And so
 3   reputationally, you know, that's a problem.
 4   Q    So ultimately, were you able to collect the number of
 5   signatures in the requisite time period?
 6   A    We were not.
 7   Q    And can you explain whether it would have been better
 8   for business if you would have successfully collected the
 9   number of signatures within the 90-day period?
10            MR. BRADLEY:  Objection, Your Honor.  Relevance.
11            THE COURT:  Not really convinced that that's
12   relevant.  The objection is sustained.
13            MR. SINGER:  May we approach at sidebar?
14            THE COURT:  Yes.
15   SIDEBAR CONFERENCE.
16            MR. SINGER:  Your Honor, this goes directly to one
17   of the elements for private services fraud, whether it was
18   reasonably likely that this company would have suffered
19   economic harm as a result of certain actions taken, and I
20   think this question goes directly to that element.
21            THE COURT:  And the response, Mr. Bradley?
22            MR. BRADLEY:  Your Honor, ultimately, we don't feel
23   like it's relevant whether this company suffered any
24   reputational or financial harm to the question of whether
25   there's been a services fraud.
```

MICHAEL ROBERSON - DIRECT EXAM

15-2473

1      THE COURT:  Very well.  It goes directly to an

2  element, I wasn't aware of it.  The objection is overruled,

3  and you may proceed.

4      MR. LONG:  Your Honor, just for the record, we

5  would join the objection, understanding that it's been

6  overruled.

7  **SIDEBAR CONCLUDED.**

8      THE COURT:  You may proceed.

9      MR. SINGER:  Thank you, Your Honor.

10 **Q**    Mr. Roberson, can you explain whether it would have

11 been better for AMT's business if it would have successfully

12 collected the number of signatures it was hired to collect?

13 **A**    It would have been better.

14 **Q**    And can you explain why?

15 **A**    Well, success breeds more success, and, obviously, as

16 I mentioned previously, reputation is important.  Having a

17 track record of success certainly helps when you're trying

18 to develop new business and trying to get hired on new

19 projects.  I think that's common sense.

20 **Q**    And the converse of that failing to be able to perform

21 under the contract, can you explain whether or not that

22 would have been better or worse for business?

23 **A**    Well, worse.  You know, a lot of firms fail in this

24 business, but we don't, very rarely, and so, yeah, it stung.

25 It was -- this project was hell on everyone involved in it

1      because of the opposition and what they did.  And certainly

2      failing to qualify, it was costly in many ways to us.  It

3      was costly to our client.  It was a bad result.  None of us

4      were happy about it.

5              MR. SINGER:  No further questions, Your Honor.

6              THE COURT:  Very well.  The attorneys for the

7      defense have an opportunity to inquire.  On behalf of

8      Mr. Householder?

9              MR. BRADLEY:  Thank you.  Judge, may I proceed?

10             THE COURT:  Yes.  Thank you.

11             MR. BRADLEY:  I'll say good afternoon, Mr.

12     Roberson.

13             THE WITNESS:  Good afternoon.

14                          **CROSS-EXAMINATION**

15     **BY MR. BRADLEY:**

16     **Q**     So ultimately, there is a 90-day window in which you

17     can collect the requisite number of signatures, correct?

18     **A**     Correct.

19     **Q**     But in this instance, that 90-day window got shrunk

20     down to 54 days, if I recall your testimony correctly,

21     right?

22     **A**     I believe, yes.

23     **Q**     And that was shrunk down because there was delays in

24     getting the appropriate petition summary approved by the

25     Attorney General?

1    **A**    Correct.

2    **Q**    And ultimately, in that 54-day window of time, you

3    hire -- your company hires a number of individuals from

4    around the country and I assume Ohio as well to come to Ohio

5    and essentially fan out across the state and attempt to

6    collect valid signatures in support of the referendum

7    effort, right?

8    **A**    Correct.

9    **Q**    And if I'm hearing you correctly, the opposition to

10   the referendum effort took steps to interfere with that?

11   **A**    Correct.

12   **Q**    And as a result, there was some attrition in your

13   staff of signature collectors, right?

14   **A**    Correct.

15   **Q**    And then ultimately, you had to hire -- I think you

16   described them as sub vendors, in other words, other

17   companies to bring in other manpower, correct?

18   **A**    Yes.

19   **Q**    And those sub vendors were brought in pretty late in

20   the game, so to speak, in other words, you know, with only

21   30 days or so left in that either 90- or 54-day window,

22   however you see it?

23   **A**    30 to 45 days, yes.

24   **Q**    And ultimately, in large part because there was such a

25   short window of time, 54 days, to collect some 265,000 valid

1    signatures, you were unsuccessful?

2    **A**    That's correct.

3         MR. BRADLEY:  Could I have a moment, please?

4         THE COURT:  Yes.

5         (Pause.)

6    **Q**    Now, ultimately, your client was Ohioans Against

7    Corporate Bailouts?

8    **A**    Yes.

9    **Q**    And who specifically hired you, what individual?

10   **A**    Brandon Lynaugh.

11   **Q**    And do you know who funded Ohioans Against Corporate

12   Bailouts?

13   **A**    I do not know.

14   **Q**    You have no idea?

15   **A**    I have no personal knowledge of who funded it.  In

16   many cases, we run petitions, we don't have a relationship

17   with the funders.

18   **Q**    And how much money was AMT paid for this effort?

19   **A**    The initial contract was for 2.8 million.

20   **Q**    And I think you indicated that it was amended, was it,

21   three times?

22   **A**    Yeah, three times.  I think the total amount was over

23   8 million total, but, again, much of that had to go to other

24   companies.  We were -- we were the conduit for those

25   payments.  It would come to us and then we would pay the sub

MICHAEL ROBERSON - CROSS-EXAM

15-2477

1    vendors.

2    **Q**    Sure.  And you've got to pay all of the signature

3    collectors, there's expenses?

4    **A**    Oh, absolutely.

5    **Q**    Of course, right.  But $8 million?

6    **A**    Yeah.

7    **Q**    And in the end, I think you indicated that you had to

8    refund per the contract, I think it was, $10 or so a

9    signature that you fell short?

10   **A**    That was the original contract.  In the process of

11   negotiating amendments -- again, we did three amendments --

12   we negotiated that out because the client understood how

13   difficult this was.  You know, the client wanted us to keep

14   going, the client wanted us to hire these additional sub

15   vendors.  We were not going to -- we would have been in a

16   position where we would have lost a tremendous amount of

17   money if this did not qualify, and so we negotiated that out

18   of the contracts, so we did not --

19   **Q**    So in the end, you didn't have to return any of the

20   money?

21   **A**    We did not.

22          MR. BRADLEY:  Okay.  I have no further questions of

23   Mr. Roberson.

24          THE COURT:  Thank you.  On behalf of Mr. Borges?

25          MR. SCHNEIDER:  Yes.  Thank you, Your Honor.

MICHAEL ROBERSON - CROSS-EXAM

15-2478

```
 1                    THE COURT:  Yes.
 2                    MR. SCHNEIDER:  Good afternoon.
 3                    THE WITNESS:  Good afternoon.
 4                         CROSS-EXAMINATION
 5       BY MR. SCHNEIDER:
 6       Q     So when you refer to "the client," "the client" is
 7       who, AMT's client?
 8       A     Ohioans Against Corporate Bailouts.
 9       Q     Right.  And --
10       A     It's a political committee.
11       Q     Right.  And you've served in the state Senate and ran
12       for Lieutenant Governor in Nevada, correct?
13       A     Correct.
14       Q     And you've referred to "the client" as Ohioans Against
15       Corporate Bailouts, correct?
16       A     That was the client.
17       Q     And you have no idea who funded that effort?
18       A     I don't have direct knowledge.
19       Q     Do you have indirect knowledge?
20       A     There were many groups who were supportive of our
21       efforts.  I believe the natural gas industry, obviously, had
22       an issue with a competitor getting a bailout.  There were
23       environmental groups who cared about this issue because I
24       believe there were changes in the law that affected
25       environmental protections.  There were consumer rights
```

1    advocates who were concerned about the rate hikes.  So there

2    were many allies involved in this, but I never had any

3    direct contact with the funders.  Typically, in our role, we

4    do not.  We work with the committee.

5    **Q**    All right.  So you worked with the committee that was

6    trying to referendum House Bill 6 or the legislation that

7    was passed.  You don't get into the weeds on funding, but

8    you really do have an idea of what special groups funded the

9    referendum effort, you've just named them, right?

10            MR. SINGER:  Your Honor, asked and answered.

11            THE COURT:  I think he has answered your question.

12            MR. SCHNEIDER:  Okay.

13   **Q**    Are you aware, Mr. Roberson, under the Ohio

14   Constitution, can you referendum a tax?

15   **A**    I am not aware of that.

16   **Q**    Okay.  And you've indicated turf, locations, where

17   you're sending your signature gatherers, but it's pretty

18   common you're going to go to libraries and Walmarts and

19   assembly areas in many instances, correct?

20   **A**    Yes.

21   **Q**    Okay.  I mean, and we heard from a witness earlier

22   today that blockers is a relatively common effort employed

23   by oppositions of referendums, correct?

24            THE COURT:  Excuse me, is there an objection?

25            MR. SINGER:  I think this witness can't testify

MICHAEL ROBERSON - CROSS-EXAM

15-2480

1    about what another witness testified about.

2           THE COURT:  I agree with that and sustain, but you

3    can take another run at it.

4    Q    Okay.  Blockers are not uncommon in ballot initiatives

5    to be employed by the opposition, correct, in your

6    experience?

7    A    Not uncommon, no.

8    Q    All right.  And signature-gathering firms, sitting one

9    out may be rare, but that's not unheard of either in your

10   experience, correct?

11   A    "Sitting one out," what do you mean?

12   Q    Sitting an initiative out.

13   A    I guess I don't understand what you mean by that.

14   Could you rephrase that?

15   Q    Signature-gathering firms that decline to get involved

16   and are going to sit a particular ballot initiative or

17   ballot measure out, is that common -- or let me ask you

18   this, is it uncommon?

19   A    So most companies in the industry want to be hired to

20   do work.  If they don't do work, it's because they weren't

21   hired or they took a buyout, which is also common in the

22   industry.

23   Q    Common in the industry, okay.

24   A    But, again, you're talking about companies, not

25   individual canvassers, right?

MICHAEL ROBERSON - CROSS-EXAM                    15-2481

1    **Q**    Right.

2    **A**    I think there's a difference there.

3    **Q**    Well, I'm talking about companies right now.

4    **A**    Okay.

5    **Q**    Okay.  And do you have -- I think -- I don't know if

6    Mr. Bradley asked you or whether Mr. Singer asked you, but

7    how much money was spent roughly for the proponents of the

8    referendum?

9    **A**    How much did the committee spend?

10   **Q**    Yeah, if you know.

11   **A**    Well, I would guess they spent at least $8 million,

12   perhaps more.

13   **Q**    Okay.  And resubmitting language, summary language, to

14   certify a petition such as a referendum or other ballot

15   measure, having to resubmit it isn't uncommon either in your

16   experience, correct?

17   **A**    Agree.

18   **Q**    And this is the first time AMT failed to get

19   signatures?

20   **A**    To my recollection, yes.

21   **Q**    What about since?

22   **A**    There's been only one other time, and that was in

23   Florida and that was similar blocking effort by some of the

24   same folks who blocked this effort.

25   **Q**    Okay.

MICHAEL ROBERSON - REDIRECT EXAM

15-2482

1    **A**    But I will also say for the record, we qualified more

2    state-wide initiatives than any company in the country last

3    year.

4    **Q**    Okay.  Fair enough.  So twice now, though, AMT has

5    failed to gather enough signatures, if you count Florida,

6    correct?

7    **A**    Out of hundreds, twice, yeah.  It's a pretty good

8    record.

9    **Q**    I think you indicated, though -- Mr. Bradley, one of

10   his questions -- that your success rate is much higher than

11   some of our competitors; is that right?

12   **A**    I believe it's the highest.

13   **Q**    Okay.  And I think you indicated -- you correct me if

14   I'm wrong, but you indicated there are some firms out there

15   that have a pretty poor success rate?

16   **A**    Yes.

17            MR. SCHNEIDER:  Okay.  Thank you.  No further

18   questions, Your Honor.

19            THE COURT:  Very well.  Redirect, if any?

20            MR. SINGER:  Very, very brief, Your Honor.

21                    **REDIRECT EXAMINATION**

22   **BY MR. SINGER:**

23   **Q**    Just so we're clear, can you describe the difference

24   between buying out a company to not work on a project and

25   buying out employees who are hired to gather signatures?

MICHAEL ROBERSON - REDIRECT EXAM

15-2483

1      **A**      Yeah.  So what happens on occasion is when there is a

2   contentious issue with two sides who are well-funded, the

3   opposition will call, reach out to companies to pay them to

4   not engage on a project.  We were -- that attempt was made

5   to us by Neil Clark before we ever took on the project, we

6   were offered money to not come to Ohio.  We rejected that.

7   So yes, that does happen.

8      That is different than you have employees under

9   contract on a job site in the state of Ohio, and they are

10   called and texted by the opposition with offers for money

11   and plane tickets to leave immediately, to leave the state

12   of Ohio or to take thousands of dollars and come work for

13   the opposition.  So those are two different scenarios.

14          MR. SINGER:  Nothing further, Your Honor.

15          THE COURT:  Very well.  Recross, if any?

16          MR. BRADLEY:  No questions.

17          MR. SCHNEIDER:  Nothing, Your Honor.

18          THE COURT:  Very well.  Sir, you have survived.

19   You are free to go.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Very well.

22      (Witness left the stand.)

23          THE COURT:  It's time for our lunch break.  It's

24   12:15.  We'll take an hour-and-a-half for lunch.  Actually,

25   however many minutes it is.  We're going to try to get you

MICHAEL ROBERSON - REDIRECT EXAM                    15-2484

1    at 1:30.  You hope you have a decent lunch.  I want you to

2    take a break, put this out of your mind.  Don't discuss it

3    among yourselves or with anyone else.  No independent

4    research.  No checking out the media.  And continue to keep

5    an open mind.  We'll rise for you as you leave for lunch.

6              THE DEPUTY:  All rise for the jury.

7         (Jury exited the courtroom at 12:14 p.m.)

8              THE COURT:  Jury has left the room.  As always,

9    we'll wait until we have been advised that the floor is

10   cleared, and at that time, we'll take our lunch break until

11   1:30.

12        All clear, we're in recess until 1:30.

13             THE DEPUTY:  This court is in recess until 1:30.

14        (Recess taken from 12:15 p.m. to 1:30 p.m.)

15             THE DEPUTY:  All rise.  This court is in session

16   pursuant to the recess.

17             THE COURT:  Thank you.  Please be seated.  We're

18   back from the lunch break.  Are we ready for the jury from

19   the government's perspective?

20             MR. SINGER:  Yes, Your Honor.

21             THE COURT:  Mr. Householder's?

22             MR. OLESKI:  Yes, Judge.

23             THE COURT:  And Mr. Borges'?

24             MR. SCHNEIDER:  Yes, Your Honor.

25             THE COURT:  Let's call for the jury, please.

```
1              (Pause.)

2              THE DEPUTY:  All rise for the jury.

3         (Jury entered the courtroom at 1:33 p.m.)

4              THE COURT:  You may all be seated.  Thank you.  14

5    Members of the Jury are back.  We've had a good lunch and

6    we're going to proceed with the taking of testimony.  Who

7    does the government call at this time?

8              MS. GAFFNEY-PAINTER:  The government calls Douglas

9    Gray.

10             THE COURT:  Very well.  If you would be willing to

11   follow Ms. Santoro, sir, and as you approach, if you would

12   pause, raise your right hand for the oath to tell the truth.

13             (Witness sworn and took the stand.)

14             THE COURT:  As I tell everybody, that seat tips

15   back, in spirit of full disclosure.

16             THE WITNESS:  Okay.

17             THE COURT:  Once you're comfortable, we'll need you

18   close to the microphone, you need to pull it close to

19   yourself.

20        And the government may inquire.  Mr. Singer, you can

21   approach the podium and proceed when you're ready.

22             MR. SINGER:  Thank you, Your Honor.

23             THE COURT:  Very well.

24             MR. SINGER:  Good afternoon.

25             THE WITNESS:  Good afternoon.
```

1      **DOUG GRAY**

2      of lawful age, Witness herein, was examined and testified as

3      follows:

4                          **DIRECT EXAMINATION**

5      **BY MR. SINGER:**

6      **Q**     Can you please state your name and spell it for the

7      court reporter?

8      **A**     Doug Gray, D-O-U-G, G-R-A-Y.

9      **Q**     Mr. Gray, where do you work?

10     **A**     I work -- I have a consulting firm, Doug Gray &

11     Associates, and reside in Kansas City, but work for myself.

12     **Q**     And what type of work do you do with your company?

13     **A**     I manage or consult on various types of campaigns,

14     from candidate campaigns to issues that are going before

15     voters for and against, sometimes large canvas operations,

16     door-to-door canvas operations advocating for or against

17     something, and sometimes manage signature campaigns.

18     **Q**     How long have you been doing this type of work?

19     **A**     About 30 years.

20     **Q**     And how many signature-gathering campaigns have you

21     worked on?

22     **A**     Signatures, probably ten, eight to ten.

23     **Q**     Do you recall whether you ever worked for a company

24     called Advanced Micro Targeting?

25     **A**     Yes, I've worked with Advanced Micro Targeting, yes.

1    **Q**    And have you just describe the experiences that you've

2    had working for Advanced Micro Targeting.

3    **A**    Sure.  I was working for a campaign in Arizona and

4    actually hired them to be the signature collection firm to

5    put an issue on the ballot in Arizona and worked really well

6    together.  And then in 2019, was asked if I would be

7    interested in coming in and managing the day-to-day

8    signature operation and did that.  And then one other

9    project here in Ohio right before COVID hit.

10   **Q**    What is Advanced Micro Targeting?

11   **A**    They are a signature-collection firm.  They have a

12   staff and all of the infrastructure so that they go in and

13   collect signatures and process those signatures and present

14   them to the entity that they need to present those to.

15   There's a lot of prep work.

16   **Q**    And do you recognize Advanced Micro Targeting by going

17   by any sort of shorthand?

18   **A**    AMT.

19   **Q**    So if I reference "AMT," you'll understand I'm talking

20   about Advanced --

21   **A**    Absolutely.

22   **Q**    You mentioned a project that you worked on with AMT in

23   2019.  Can you describe what you recall about that?

24   **A**    Yes.  We were collecting signatures to put on the

25   ballot a statewide initiative to repeal $1.3 billion that

1    was given to nuclear and coal companies in Ohio.

2    **Q**    And what exactly were you hired to do?

3    **A**    I was hired to manage the day-to-day.  We set up

4    offices in about every metropolitan area in the state to

5    start collecting signatures in those respective areas.

6    **Q**    And what was AMT trying to accomplish?

7    **A**    We were trying to collect enough signatures so that we

8    could qualify for the ballot.

9    **Q**    And can you describe the scope of AMT's operation in

10   Ohio?

11   **A**    Yes.  I mentioned, we had offices here in Cincinnati,

12   Dayton, Youngstown, all over the place, Columbus.  We hired

13   managers that worked in each of those field offices, and

14   then they would hire teams to go out and collect signatures

15   and then report those daily to us, and then every --

16   frequently, turn those in to us here in Columbus at our

17   processing office.

18   **Q**    And did -- can you explain whether or not you were a

19   manager of other employees working for AMT?

20   **A**    There was several people that were employees of AMT in

21   the state, and they -- we had people that ran the

22   processing, but I mostly oversaw the field offices and the

23   campaign offices.

24   **Q**    And which field or campaign offices did you oversee?

25   **A**    Well, I work out of Columbus.  I think we had eight

DOUG GRAY - DIRECT EXAM

15-2489

1    offices.

2    **Q**    And were you an employee of AMT at the time?

3    **A**    I was not.

4    **Q**    Okay.  Do you recall whether the individuals that you

5    were managing were typically employees of AMT?

6    **A**    Yes, yes, AMT mostly had hired individuals directly.

7    **Q**    Do you recall an individual named Tyler Fehrman?

8    **A**    Oh, yeah.  I know Tyler.  Um-hmm.

9    **Q**    And can you describe what your relationship was with

10   Mr. Fehrman?

11   **A**    Tyler was running our Columbus office.  We worked

12   together on a couple -- one other project since then, and he

13   was one of our field managers, did a great job.

14   **Q**    Can you describe whether there was any opposition to

15   your effort?

16   **A**    Yes, there was all kinds of opposition to the effort.

17   It started with what we -- we call them trackers or they

18   will show up oftentimes with an alternative petition.  It's

19   not usually an official petition like we had to file with

20   the Secretary of State.  But their goal is to convince the

21   person walking to the library or whoever, wherever we're

22   working, to not sign our petition, sign theirs, but their

23   ultimate goal is to just have that person throw up their

24   hands and say I don't know, I'm not signing either one.

25   **Q**    And were there any other activities used by the

DOUG GRAY - DIRECT EXAM

1    opposition to attempt to prevent you from collecting enough

2    signatures?

3    **A**    Yes.  In addition to the trackers, which were many,

4    and they would show up at our offices in the mornings and

5    wait in vehicles and then follow people out to the field,

6    and then we would see them in the evenings as well.  We

7    started having on daily morning check-ins with the team

8    reporting that, you know, maybe they had 15 or 20 people or

9    10 depending on where they were scheduled for that day, and

10   they started to report that, hey, I only had three people

11   show up and we've tried to reach these people and we can't

12   find them.  And so people were starting to leave, and we

13   were -- it just started coming in from across the state

14   that, hey, I only had this many people today, I don't know

15   where everyone else is.  If people were living in hotel

16   rooms, sometimes they would go there and they would see that

17   the hotel room had been abandoned and they were no longer

18   there.

19   **Q**    And can you describe whether or not this impacted your

20   efforts at all on behalf of AMT?

21   **A**    Yeah, tremendously.  It impacted us to the point where

22   you would get up the next day and wonder if anyone was left

23   because so many people were getting offers to leave.

24   **Q**    Now, can you compare the effort that you were working

25   on on behalf of AMT in 2019 with other signature-gathering

DOUG GRAY - DIRECT EXAM                                    15-2491

1    campaigns that you worked on?

2    **A**    Yeah.  I mean, it is the one that when I visit with

3    people that I work with that I always reference as I've

4    never seen anything like it before and most of my colleagues

5    the same way.  The amount of opposition, there were a few

6    instances where we had to --

7              MR. BRADLEY:  Objection.

8              THE COURT:  Basis?

9              MR. BRADLEY:  Predicated on hearsay.

10             THE COURT:  He's describing the issues he

11   encountered and not offered for the truth.  Please proceed.

12             THE WITNESS:  I would hear from managers when they

13   would report in that there had been people harassed in front

14   of locations they were working.  In a few instances, best of

15   my recollection, police were called because one thing we

16   train on is safety first, and to always, you know, exit,

17   exit something that's not working for you.  We started to

18   just see more and more people not show.  Had never, had

19   never witnessed it before or since.

20   **Q**    Can you explain whether there was an attempt to buy

21   you out?

22   **A**    Yes, there was.

23             MR. SINGER:  May we please show the witness only

24   what's been marked as Government's Exhibit 632?

25             THE COURT:  Show it to the witness and the lawyers.

1           MR. SINGER:  And can you page through the document,

2    please?

3    **Q**     Do you recognize this document?

4    **A**     Yes.

5    **Q**     And what is it?

6    **A**     It is my texts with Marcus back and forth, and then

7    also a contract that he had sent to me offering money and a

8    plane ticket out of the state of Ohio.

9    **Q**     And how do you recognize it as such?

10   **A**     This was filed with the campaign attorneys in an

11   affidavit.

12   **Q**     You notice there's black lines?

13   **A**     Yes.

14   **Q**     On page 1 and 2; do you see those black lines?

15   **A**     Yes.

16   **Q**     Is that information that was redacted out of the court

17   filing in this separate proceeding that you described?

18   **A**     No.  It was -- I mean, it's redacted here, but it was

19   not, was not then, no.

20   **Q**     But that's what is blacked out?

21   **A**     Exactly.

22   **Q**     It's from court proceedings; is that right?

23   **A**     Yes.  It was describing phone conversations.

24           MR. SINGER:  Okay.  At this time, Your Honor, we

25   move to admit Government Exhibit 632 into evidence.

DOUG GRAY - DIRECT EXAM

1          THE COURT:  Any objection?

2          MR. OLESKI:  No.

3          MR. SCHNEIDER:  No objection.

4          THE COURT:  It's admitted.

5          MR. SINGER:  May we please publish to the jury?

6          THE COURT:  You may publish it.  Yes.  They're

7     working on it.

8          MR. SINGER:  May we publish?

9          THE COURT:  Yes.

10          MR. SINGER:  Thank you, Your Honor.

11     **Q**     Focussing on what's on the screen right now, what is

12     this an image of?

13     **A**     Text messages with Marcus.

14     **Q**     And what do the light gray messages represent?

15     **A**     My texts.

16     **Q**     I'm sorry, the light gray messages.

17     **A**     Oh, I'm sorry, I'm sorry.  Marcus' texts.

18     **Q**     And what do the blue messages represent?

19     **A**     Mine.  I apologize.

20     **Q**     And can you describe the circumstances through which

21     you received this?

22     **A**     I received a text out of the blue asking -- saying,

23     hey, Doug, I have an opportunity for you, if you're

24     interested, similar to what has been -- was reported to me

25     by other people around the state.

DOUG GRAY - DIRECT EXAM

15-2494

1    **Q**    Can you read these messages?

2    **A**    Sure.  Hey, Douglas, my name is Marcus and I'm with

3    Ohioans For Energy Security.  Are you currently in Ohio?  If

4    so, I might have an opportunity that would interest you.

5         And I responded:  Yes, I'm in Ohio.  What opportunity?

6         And then Marcus responded:  I'd be happy to share in

7    detail.  Can I give you a call in just a few minutes?

8         I responded:  I guess so.

9         And then Marcus responded:  Great, I'll buzz in a

10   little bit.

11   **Q**    Can you describe why you responded the way that you

12   did to these messages?

13   **A**    Yes.  We and our campaign attorneys were trying to

14   figure out what was going on.  We were -- as I had

15   mentioned, people were starting to leave.  We're hearing

16   reports of offers that they were receiving because some

17   people didn't take the offers and they would say, hey, I

18   just was offered this amount of money.  So we were trying to

19   figure out what was going on, and we knew that the reason

20   people were receiving texts and other communications was

21   because they had all of our information from a form you have

22   to file with the Secretary of State in Ohio, a Form 15.  And

23   so our attorneys were trying to --

24        MR. BRADLEY:  Objection.

25        THE COURT:  Sustained.

1    **Q**    Can you describe what a Form 15 is?

2    **A**    Yes.  If you're going to collect a signature in the

3    state of Ohio, you must have that on file as a public

4    document with the Secretary of State's office which includes

5    your name, phone number, e-mail address, and your home

6    address.

7    **Q**    Now, were you actually interested in this offer from

8    Marcus?

9    **A**    No.

10   **Q**    Did you ultimately have a phone call with Marcus?

11   **A**    Yes.

12   **Q**    And can you explain the phone call?

13   **A**    Yes.  We had two phone conversations.  He called --

14   following this text exchange, he called to explain the

15   office in more detail and summarized it as signed contract,

16   will give you half the money upfront, which in my case was

17   $2,500 was the offer, and a plane ticket to home or wherever

18   I wanted to go in the 48, and then once they saw that the

19   plane ticket had been used, they would wire the other offer.

20   And in his summation of it was basically hire you to leave

21   the state until the campaign -- signature collection is

22   over.

23   **Q**    Now, did you describe to Marcus whether or not you had

24   an employment contract or whether you were working as an

25   independent contractor?

1    **A**    Yes, he asked, yes.

2          MR. SINGER:  Can we turn to page 2 of this

3    document, please?

4    **Q**    And would you mind reading this for the jury, please?

5    **A**    Sure.  I texted Marcus:  Marcus, can you send to me

6    what I need to sign if I want to take you up on your

7    opportunity?

8          And then Marcus responded:  No worries.  Give me half

9    hour or so to wrap up some things and I'll give a call.  If

10   I run longer, feel free to call me, looking forward to it.

11   Looking forward to connecting soon.

12   **Q**    All right.  Why did you send that top message at the

13   top of this document?

14   **A**    We wanted to see the contract they were offering.

15   **Q**    Okay.  So what happened next?

16   **A**    He called me and talked through the offer again and

17   then at the conclusion of that call sent me the contract.

18   **Q**    So did you, in fact, receive the document referenced

19   in this message?

20   **A**    Excuse me?

21   **Q**    Did you receive the document?

22   **A**    Yes.

23   **Q**    And what was it, what did you receive?

24   **A**    A contract.

25         MR. SINGER:  Can we please turn to page 3?

1    **Q**    And do you recognize this?

2    **A**    Yes.

3    **Q**    And what is it?

4    **A**    It is a contract.

5    **Q**    Okay.  Would you mind reading the first three

6    paragraphs at the top?

7    **A**    It says:  Petition Agreement.  This agreement is

8    entered into by and between Ohioans For Energy Security, LLC

9    an Ohio limited liability company, parentheses, Ohioans For

10   Energy Security, and Douglas Gray, a Michigan -- I'm

11   assuming, I'm not sure why Michigan -- sole proprietor.

12   Whereas, Ohioans for Energy Security and Douglas Gray desire

13   to enter into an agreement for Douglas Gray to assist the

14   provision the service as stated in Section 2 to Ohioans For

15   Energy Security.  Now, therefore, in consideration of the

16   mutual covenants and promises set forth herein, and for

17   other good and valuable consideration, Ohioans For Energy

18   Security and Douglas Gray, individually, a party,

19   collectively, the parties, hereby agree as follows.

20   **Q**    Do you see in the second paragraph that you just read,

21   there's a reference to provision of the service?

22   **A**    Yes.

23   **Q**    Do you recall that?  Do you see that?

24   **A**    Yes.

25   **Q**    Focussing on paragraph 2 of this page titled

DOUG GRAY - DIRECT EXAM                                    15-2498

1    "Services"; do you see that?

2    **A**    Yes.

3    **Q**    Would you mind reading that paragraph as well, please?

4    **A**    Services:  Douglas Gray will provide statewide ballot

5    issue advice and expert consultation on Ohio statewide

6    ballot measures and the associated petition circulation and

7    signature collection matters related to the referendum of HB

8    6 related issues which occurs within a 90-day period upon

9    enactment, HB 6.

10   **Q**    Now, during your phone calls with Marcus, did he

11   mention performing any services?

12   **A**    No.

13   **Q**    Did you sign this agreement?

14   **A**    No.

15   **Q**    And why not?

16   **A**    I was not interested.  I was trying to figure out

17   why what I was doing day-to-day was turned upside down.

18   **Q**    And there's a reference to "HB 6."  Do you have an

19   understanding of what HB 6 is a reference to?

20   **A**    Yes.  HB 6 was the legislation that gave $1.3 billion

21   to coal and nuclear.

22   **Q**    And how did this relate to what you were attempting to

23   accomplish?

24   **A**    We were trying to put forward to the voters a chance

25   to repeal that.

1    **Q**    At that time were you familiar with what Ohioans For

2    Energy Security was at that time?

3    **A**    Vaguely.  I mean, that name, yes, um-hmm.  I mean, I

4    knew that they were opposition, but I didn't know much.

5    **Q**    Okay.  Focussing on the last sentence on that page, it

6    says:  A retainer -- client will pay Douglas Gray a retainer

7    in the amount of $2,500.  Was that the offer that was made

8    by Marcus during your phone call?

9    **A**    Yes.

10         MR. SINGER:  All right.  Next page, please.

11   **Q**    And then focussing on the small paragraph B, first

12   full paragraph at the top of the page, do you see that,

13   starting $50 per hour?

14   **A**    Yes.

15   **Q**    Can you just read that first sentence?

16   **A**    B, $50 per hour for all time spent by Douglas Gray

17   providing advice and consultation to Ohioans For Energy

18   Security provided that such advice and consultation has been

19   performed at client's written request.

20   **Q**    Now, was this $50 per hour for advice and

21   consultation, was that mentioned by Marcus in your phone

22   call?

23   **A**    No.

24   **Q**    All right.  Staying on the same page, the paragraph

25   just below titled "Confidentiality"; do you see that?

DOUG GRAY - DIRECT EXAM

15-2500

1    **A**    Yes.

2    **Q**    And then on the second line under there, there's a

3    little A that references the identity of Gen Now; do you see

4    that?

5    **A**    Yes.

6    **Q**    Douglas Gray will not disclose, directly or

7    indirectly, to any person not a party to this agreement any

8    of the following, and it says "the identity of Gen Now"; do

9    you see that?

10    **A**    I see that, yes.

11    **Q**    Do you have any understanding about who Gen Now was at

12    that time?

13    **A**    No, had no idea.

14    **Q**    All right.  Moving on to the next page, do you see a

15    reference at the top of this agreement in small little Roman

16    Numeral 2 at the very top?

17    **A**    Yes.

18    **Q**    It describes what happens in the event of a breach of

19    an agreement; is that right?

20    **A**    Correct.

21    **Q**    Did you discuss with Marcus at all what would happen

22    if you breached an agreement?

23    **A**    No.

24         MR. SINGER:  Can we move to the next page, please?

25    **Q**    All right.  Do you see the notice paragraph?

DOUG GRAY - DIRECT EXAM

15-2501

1    **A**    Yes.

2    **Q**    Little paragraph D, do you see that?

3    **A**    Yes.

4    **Q**    References all notices or demands must be given a

5    certain way; is that right?

6    **A**    Correct, yes.

7    **Q**    And then can you read what it says, if notice is given

8    to client, who the client is?

9    **A**    It says:  If to client, Generation Now care of Jeff

10   Longstreth, Columbus, Ohio, and then gives his e-mail

11   address.

12   **Q**    Did you have any idea at that time who Generation Now

13   was?

14   **A**    No.

15   **Q**    Do you have any idea if Generation Now had any sort of

16   relationship with Ohioans For Energy Security?

17   **A**    No.

18   **Q**    Did you have any idea who Jeff Longstreth was?

19   **A**    No.

20           MR. SINGER:  All right.  Can we pull up and do a

21   side-by-side of Government's Exhibit 632-1 and Government's

22   Exhibit 632-6?

23           THE COURT:  Yes.

24           MR. SINGER:  Thank you, Your Honor.

25      Actually, I'm sorry, it's Exhibit 632-3 and 632-6.

DOUG GRAY - DIRECT EXAM

15-2502

1    **Q**    Now, focussing back on that first paragraph, who is

2    the contract being entered into between?

3    **A**    Ohioans For Energy Security.

4    **Q**    And then who is the notice being given to?

5    **A**    Generation Now, Jeff Longstreth.

6         MR. SINGER:  Okay.  And can we do a side-by-side of

7    Government's Exhibit page 6 and Government's Exhibit page 8?

8    **Q**    Focussing on the exhibit on the right side of your

9    screen, what entity is referenced at the top of that, of

10   that document?

11   **A**    Ohioans For Energy Security.

12   **Q**    And who is the care of?

13   **A**    Care of Jeff Longstreth.

14   **Q**    And how does that compare to the client on page -- on

15   the document on the left-hand side of the screen?

16   **A**    On the left-hand side, it's Generation Now, Jeff

17   Longstreth.

18        MR. SINGER:  Your Honor, no further questions at

19   this time.

20        THE COURT:  Very well.  Lawyers for the defense

21   have an opportunity to ask questions, if any.  On behalf of

22   Mr. Householder?

23        MR. BRADLEY:  We have no questions of this witness,

24   Your Honor.

25        THE COURT:  Very well.  On behalf of Mr. Borges?

1          MR. LONG:  Yes, Your Honor, just briefly.

2          THE COURT:  You can approach the podium.

3          MR. LONG:  Thank you.

4          THE COURT:  Very well.

5          MR. LONG:  Good afternoon.

6          THE WITNESS:  Afternoon.

7                      **CROSS-EXAMINATION**

8    **BY MR. LONG:**

9    **Q**    I just want to clarify, you were not an employee of

10   AMT, right?

11   **A**    Correct.

12   **Q**    Okay.  And so you did not have an employment agreement

13   with AMT, right?

14   **A**    Correct.

15   **Q**    And so when you had your first phone call with Marcus,

16   one of the first things he asked you was, do you have a

17   contract with your employer, right?

18   **A**    Correct.

19   **Q**    And you said no?

20   **A**    Correct.

21   **Q**    Okay.  And you knew that if you said yes, the

22   conversation would end at that point, right?

23   **A**    I had no idea.

24   **Q**    Okay.  But you told him no because you, in fact, did

25   not have a contract with AMT?

DOUG GRAY - CROSS-EXAM

1    **A**    Correct.

2    **Q**    Okay.  And so you did not have any kind of a

3    nondisclosure agreement with AMT, right?

4    **A**    Correct.

5    **Q**    Okay.  And then you had -- so you had a text message

6    conversation followed by a phone call, right?

7    **A**    Two phone calls.

8    **Q**    Two phone calls.  And then a final text and then an

9    e-mail; did I get that timing right?

10   **A**    I'd have to go back and look, but I know the text

11   message that we saw and the two phone calls.  I don't -- I

12   don't know about an e-mail.  I don't know.  I mean, I guess,

13   yeah, he e-mailed the contract, yeah.

14   **Q**    So after you had got the contract, you had cut off --

15   at that point you cut off communication with Marcus; is that

16   fair?

17   **A**    Yes.

18   **Q**    So Mr. Singer asked you about various provisions of

19   that contract, you know, paragraph 5 and paragraph 2,

20   whether those were ever discussed on the telephone calls.

21   You had cut off communications after you got the contract,

22   so fair to say that was there was never a further

23   opportunity to talk about the specifics of the contract you

24   received, correct?

25   **A**    He reached out a couple of times, but I never followed

1    up with him.

2    **Q**    Yeah.  You just declined to respond further, right?

3    **A**    Correct.

4         MR. LONG:  All right.  No further questions.  Thank

5    you.

6         THE COURT:  Very well.  Is there any redirect from

7    the government?

8         MR. SINGER:  No, Your Honor.

9         THE COURT:  Very well.  Your testimony has been

10   concluded and you will be free to go momentarily.

11        THE WITNESS:  Okay.

12        THE COURT:  Are you from Kansas City?

13        THE WITNESS:  I am.

14        THE COURT:  Do you have a football team there, a

15   professional football team?

16        THE WITNESS:  Well, I honestly can say I'm not a

17   rabid fan, but, certainly, I'm a hometown fan.

18        THE COURT:  Well, in that regard, you're free to

19   go.

20        THE WITNESS:  Thank you.

21      (Witness left the stand.)

22        THE COURT:  Can I see the lawyers at sidebar

23   briefly?

24   **SIDEBAR CONFERENCE.**

25        THE COURT:  I just wanted to touch base with you

1   all about what we're doing now and how I explain it to the

2   jury.  Is it true that we are adjourning for the day from

3   the government's perspective?

4           MR. SINGER:  Yes, Your Honor, we are.  We have --

5           THE COURT:  That's all I needed to know.  From

6   Mr. Householder's perspective, you agree and this is in part

7   at your request?

8           MR. BRADLEY:  Yes, Judge.

9           THE COURT:  Same for Mr. Borges?

10          MR. SCHNEIDER:  Yes.

11          THE COURT:  All right.  What do you want me to tell

12  the jury, we're done for the day and leave it at that?

13          MR. BRADLEY:  Yes.

14          MR. SINGER:  That works for the government.

15          THE COURT:  Very well.  Have you guys talked about

16  what we're doing tomorrow or you will do so timely in terms

17  of who you're going to call?

18          MR. SINGER:  We're going to call Pat Tully and Jeff

19  Longstreth tomorrow and believe those two witnesses will be

20  the entirety of the day.

21          MR. LONG:  Also Kevin Koehler?

22          MR. SINGER:  Kevin will not be among them.

23          THE COURT:  We've got it cleared up.  Is there

24  anything else before we end our relationship for the day?

25  Thank you.

1    **SIDEBAR CONCLUDED.**

2         THE COURT:  Members of the Jury, you need to trust

3    me.  We're going to break for the day.  You're going to get

4    to go home early.  We are on schedule and making progress.

5    I want you to enjoy the unexpected afternoon hours, put this

6    out of your mind.  Take a break.  Do not discuss it among

7    yourselves or with anyone else.  No independent research.

8    No checking out the media.  You need to continue to keep an

9    open mind.  We're grateful to you for your continuing work,

10   and we will rise as you leave for the day.  See you at 9:15

11   at your spot and we will try to get you in the courtroom at

12   9:30.

13        THE DEPUTY:  All rise for the jury.

14      (Jury exited the courtroom at 2:04 p.m.)

15        THE COURT:  Jury has left the room.  As always, as

16   soon as we're advised they've cleared the floor, you're

17   welcome to leave the courtroom.  We'll recess for the day

18   and recommence tomorrow at 9:30.

19        THE DEPUTY:  All clear, Judge.

20        THE COURT:  Very well.  We're in recess until

21   tomorrow.

22        THE DEPUTY:  This court is in recess.

23      (Proceedings continued in progress at 2:05 p.m.)

24

25

15-2508

1              **C E R T I F I C A T E**

2        I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter
3      prepared from my stenotype notes.

4      /s/    *Lisa Conley Yungblut*                    02/24/2023
            LISA CONLEY YUNGBLUT, RMR, CRR, CRC     DATE

5

6                         **I N D E X**

7                       **EXAMINATIONS**
                 **GOVERNMENT WITNESSES**                **PAGE**
8                    **CHRIS HARTSEL**
       Direct Exam (Cont.) by Ms. Glatfelter        2384
9      Cross-Exam by Mr. Oleski                      2400
       Redirect Exam by Ms. Glatfelter              2408
10     Recross-Exam by Mr. Oleski                    2408

11                   **LAURA LANESE**
       Direct Exam by Ms. Gaffney-Painter            2411
12     Cross-Exam by Mr. Glickman                    2419
       Cross-Exam by Mr. Schneider                   2426
13     Redirect Exam by Ms. Gaffney-Painter          2427

14                    **JOSH ALTIC**
       Direct Exam by Ms. Gaffney-Painter            2433
15     Cross-Exam by Mr. Glickman                    2449

16                **MICHAEL ROBERSON**
       Direct Exam by Mr. Singer                     2456
17     Cross-Exam by Mr. Bradley                     2474
       Cross-Exam by Mr. Schneider                   2478
18     Redirect Exam by Mr. Singer                   2482

19                    **DOUG GRAY**
       Direct Exam by Mr. Singer                     2486
20     Cross-Exam by Mr. Long                        2503

21

22                      **EXHIBITS**
                 **GOVERNMENT'S EXHIBITS**          **PAGE ADMITTED**
       No. 34                                       2388
23     No. 35                                       2397
       No. 632                                      2493
24

25