<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                           -  -  -

 3
     UNITED STATES OF AMERICA,        : **CASE NO. 1:20-CR-0077**
 4                                    :
                      Plaintiff,      : **JURY TRIAL, DAY 17**
 5            vs.                     :
                                      : **23rd of February, 2023**
 6   LARRY HOUSEHOLDER, et al.        :
                                      :
 7                    Defendant.      :

 8                           -  -  -
                    **TRANSCRIPT OF PROCEEDINGS**
 9        **BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE**
                           -  -  -
10
     APPEARANCES:
11
     For the Plaintiff:
12                         Emily N. Glatfelter, Esq.
                           Matthew Charles Singer, Esq.
13                         Megan Gaffney Painter, Esq.
                           Timothy S. Mangan, Esq.
14                         Assistant United States Attorneys
                           221 East Fourth Street, Suite 400
15                         Cincinnati, Ohio 45202

16   For the Defendant, Larry Householder:

17                         Nicholas R. Oleski, Esq.
                           Robert T. Glickman, Esq.
18                         McCarthy, Lebit, Crystal & Liffman Co.
                           1111 Superior Avenue East, Suite 2700
19                         Cleveland, Ohio 44114
                                  and
20                         Mark B. Marein, Esq.
                           Steven L. Bradley, Esq.
21                         Marein and Bradley
                           526 Superior Avenue, Suite 222
22                         Cleveland, Ohio 44114

23

24

25
</pre>

17-2704

```
 1     For the Defendant, Matthew Borges:

 2                             Karl Herbert Schneider, Esq.
                               Todd Aaron Long, Esq.
 3                             McNees Wallace & Nurick, LLC
                               21 East State Street, Suite 1700
 4                             Columbus, Ohio 43215

 5     Also present:          Larry Householder
                              Matthew Borges
 6
       Law Clerk:             Cristina V. Frankian, Esq.
 7
       Courtroom Deputy:      Rebecca Santoro
 8
       Stenographer:          Lisa Conley Yungblut, RDR, RMR, CRR, CRC
 9                            United States District Court
                              100 East Fifth Street
10                            Cincinnati, Ohio 45202

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **PROCEEDINGS**

2          (Proceedings held in chambers at 9:30 a.m.)

3          THE COURT:  We'll go on the record.  We're in

4    chambers.  Jury is not yet in the courtroom.  I asked for

5    the attorneys to join me.

6        For purposes of the record, who do we have for the

7    government?

8          MS. GAFFNEY-PAINTER:  Good morning.  Megan Painter

9    and Emily Glatfelter on behalf of the government.

10          THE COURT:  On behalf of Mr. Householder?

11          MR. BRADLEY:  Steven Bradley and Mark Marein on

12   behalf of Mr. Householder.

13          THE COURT:  On behalf of Mr. Borges?

14          MR. LONG:  Todd Long on behalf of Mr. Borges.

15          THE COURT:  I simply want to know where we are on

16   schedule, and in terms of that, this notion of breaking from

17   12 to 2 to accommodate a doctor's appointment for me, I can

18   reschedule that.  I don't want to be the one to hold this

19   up.  And we need to get this in the bag so that the defense

20   can begin its presentation.

21        Where are we on schedule from the government's

22   perspective?

23          MS. GLATFELTER:  We are where we were yesterday.

24   We think that we will finish up with all of our witnesses,

25   excluding Mr. Fehrman, by Friday sometime.  So depending on

```
 1     if we have a little bit of a longer break today, it might be
 2     a little bit later on Friday, but we have four witnesses to
 3     get through after Mr. Longstreth.  Right?
 4              MS. GAFFNEY-PAINTER:  That's correct.
 5              MS. GLATFELTER:  Okay.  So we --
 6              MS. GAFFNEY-PAINTER:  Excluding Mr. Fehrman, who
 7     would be our fifth.
 8              MS. GLATFELTER:  Right.  So we think we would
 9     finish up, depending on cross, sometime around late morning
10     or midday on Friday.
11              THE COURT:  But for Mr. Fehrman?
12              MS. GLATFELTER:  Yes.
13              THE COURT:  And what is the plan in that regard?
14              MS. GLATFELTER:  On Friday morning, we're going to
15     contact him again and find out where he is in terms of
16     symptoms.  When we spoke to him yesterday or the night
17     before, about 24 hours ago, he had moderate symptoms and was
18     pretty sick.  So we would give him a day and propose talking
19     to him tomorrow morning to see how he is.
20              THE COURT:  And have you talked to the defense
21     about how we're going to try to get this done?
22              MS. GLATFELTER:  Yes.  I understand from
23     discussions last night that we would be able to either have
24     Mr. Fehrman hopefully testify Monday morning in person or
25     via remote.  I understand that defense counsel -- they
```

1    represented that their clients would waive his presence and

2    they would waive their confrontation rights.

3              THE COURT:  So you would be ready to put him on

4    Monday morning either live or by video?

5              MS. GLATFELTER:  Yes.  The only exception to that

6    would be if he has -- if he has become more severely ill and

7    he's unable to testify remotely too, if he were in the

8    hospital or something like that.

9              THE COURT:  Very well.  On behalf of

10   Mr. Householder as to schedule, anything to add to the

11   conversation we just had?

12             MR. BRADLEY:  No, Your Honor.

13             THE COURT:  And on behalf of Mr. Borges?

14             MR. LONG:  No, Your Honor.

15             THE COURT:  Longstreth is on the stand for cross?

16             MS. GLATFELTER:  Yes.

17             THE COURT:  I don't want to go to the doctor.

18   Would it help in scheduling if we did not take a huge break

19   for lunch to accommodate me, from the government's

20   perspective first?

21             MS. GLATFELTER:  We are fine either way, Your

22   Honor.  It's not a -- I think we're talking about a

23   half-hour difference.

24             THE COURT:  45 minutes maybe.  Mr. Householder wish

25   to be heard on the mid-morning break or lunch break issue?

1          MR. BRADLEY:  I don't think -- given the fact that

2     the government is looking to put Mr. Fehrman on on Monday,

3     my understanding of the remaining witnesses, even

4     accommodating your schedule, there's going to be enough time

5     to get through all of those before the end of the day on

6     Friday.

7          THE COURT:  And on behalf of Mr. Borges as to the

8     lunchtime break issue?

9          MR. LONG:  We have no issue, Your Honor.  We think

10    that things will be wrapped up tomorrow with the exception

11    of Mr. Fehrman.

12         THE COURT:  Very well.  Well, thank you for

13    updating me, and I'm going to confer and come out.  We'll

14    get the jury down by 9:30.

15         MS. GLATFELTER:  Your Honor, may I ask one thing

16    more in terms of scheduling?

17         THE COURT:  Yes.

18         MS. GLATFELTER:  As the Court knows, per the trial

19    schedule calendar or the trial calendar, we provided our

20    Rule 26.2/*Jencks* material several weeks before trial that we

21    had in our possession, and, of course, if there were

22    additional disclosures, we provided those.  We have not

23    received the same from defense.  So there are no further

24    delays, we would ask that that be produced by Saturday

25    morning, to the extent that it exists, so that we're

```
1    prepared to proceed on Monday with their case.

2              THE COURT:  On behalf of Mr. Householder?

3              MR. BRADLEY:  We have no problem what that

4    whatsoever.

5              THE COURT:  Mr. Borges?

6              MR. LONG:  No problem.

7              THE COURT:  Does that resolve that issue?

8              MS. GLATFELTER:  It does.

9              THE COURT:  We'll see you out there.

10   SIDEBAR CONCLUDED.

11        (Proceedings held in open court at 9:32 a.m.)

12             THE DEPUTY:  All rise.  This United States District

13   Court for the Southern District of Ohio is now in session,

14   The Honorable Timothy S. Black, District Judge, presiding.

15             THE COURT:  Thank you.  Please be seated.  Couple

16   of minutes after 9:30.  Government team is here.

17   Defendants' teams are here.  Are we ready for the jury from

18   the government's perspective?

19             MS. GLATFELTER:  Yes, Your Honor.  Thank you.

20             THE COURT:  And from Mr. Householder's perspective?

21             MR. OLESKI:  Yes, Judge.

22             THE COURT:  And from Mr. Borges'?

23             MR. LONG:  Yes, Judge.

24             THE COURT:  I am going to break for lunch from 12

25   to 2.  For planning purposes, you can rely on that.  Let's
```

1    get the jury, and we could get the witness, too, I suppose.

2    Somebody is working on that?

3            MS. GLATFELTER:  Yes, Your Honor.

4            THE COURT:  Good morning.  If the witness would be

5    willing to retake the stand.  We have called for the jury.

6        (Witness re-took the stand.)

7        (Pause.)

8            THE COURT:  On the record.  I may need to break at

9    10 of noon.

10           MS. GLATFELTER:  I'm sorry, Your Honor, what time?

11           THE COURT:  May need to break at 10 of noon.

12           MS. GLATFELTER:  Okay.  Thank you, Your Honor.

13       (Pause.)

14           THE DEPUTY:  All rise for the jury.

15       (Jury entered the courtroom at 9:37 a.m.)

16           THE COURT:  You may all be seated.  Thank you.  14

17   Members of the Jury have rejoined us this morning.  Good

18   morning.  Thank you for your timely appearance.

19       We are going to continue to hear testimony.  I believe

20   it's the opportunity for Mr. Householder's attorneys to ask

21   questions of this witness.  Mr. Bradley, you may proceed.

22           MR. BRADLEY:  Thank you, Judge.

23           THE COURT:  Yes.

24                      **CROSS-EXAMINATION**

25   **BY MR. BRADLEY:**

1    **Q**    Good morning, Mr. Longstreth.

2    **A**    Good morning.

3    **Q**    My name is Steve Bradley.  I'm one of the attorneys

4    representing Larry Householder.  I've got some questions for

5    you this morning.

6    **A**    Okay.

7    **Q**    You testified yesterday about meeting, I think it was,

8    at the Island House restaurant with Mike Carey and Larry

9    Householder sometime, I believe it was, in the fall of 2016?

10   **A**    That's correct.

11   **Q**    And was it just the three of you that attended that

12   meeting?

13   **A**    As I recall, it was.

14   **Q**    And how do you know Mike Carey?

15   **A**    We've been friends for over 25 years.

16   **Q**    Have you had a working relationship with him?

17   **A**    Yes.

18   **Q**    And at the time, he was working for Murray Energy?

19   **A**    That's correct.

20   **Q**    And Murray Energy is a large coal company, I think,

21   operating out of West Virginia?

22   **A**    I think they operate out of Ohio, but --

23   **Q**    Okay.  But a large coal company?

24   **A**    Yes.

25   **Q**    And you've done work for Murray Energy in the past?

1    **A**    Yes.

2    **Q**    And did Mike Carey reach out and ask if you'd attend

3    this meeting?

4    **A**    I don't remember how that came to be.  I believe he

5    was talking about it and said, hey, let's get together.  I

6    don't recall exactly how that came about.

7    **Q**    Did you know that you were going to be meeting with

8    Larry Householder on that --

9    **A**    Yes.

10   **Q**    And what was your understanding was the purpose of the

11   meeting?

12   **A**    To talk to him about his race and sort of -- I hadn't

13   seen him in a long time, I don't know if Mike had or not,

14   but he said "let's go talk to him."

15   **Q**    You had known or met Larry before this meeting?

16   **A**    Yes.

17   **Q**    And when was that?

18   **A**    Probably in 2000 or 2001 when I worked at the State

19   House.

20   **Q**    And what was the nature of your relationship going

21   back to 2000 or 2001?

22   **A**    He was a member of the House of Representatives and I

23   worked there.  I didn't know him well.

24   **Q**    Okay.  And in the 15 or so years before 2000, 2001,

25   until that meeting, did you have any contact with

1    Mr. Householder?

2    **A**    Maybe a little bit when he was Speaker the first time,

3    but not any meaningful contact.

4    **Q**    Okay.  And how long would you estimate that meeting at

5    the Island House restaurant was?

6    **A**    At least an hour, probably less than two.  I don't

7    recall exactly how long that was.

8    **Q**    And what sort of topics were discussed?

9    **A**    I know we discussed his race for State Representative.

10   We discussed the Presidential race, which was a hot topic

11   right at that time.  I don't recall, you know, details of

12   other conversations.

13   **Q**    Was there any discussions that you can recall

14   regarding his interest in regaining the Speaker's position?

15   **A**    I believe he did bring it up either in that meeting or

16   the next one.  I believe he did bring up that he wanted to

17   be Speaker after, after his race was won, yeah.

18   **Q**    And how was it left?

19   **A**    I don't recall.

20   **Q**    You have no recollection when you left the meeting --

21   **A**    I know we met again a short time later, but I don't

22   remember exactly what was said at the end of the meeting.

23   **Q**    And when do you recall seeing and/or talking to Larry

24   after that initial meeting at the Island House?

25   **A**    I would guess probably within the next two weeks.

1  **Q**    And do you recall, was that an in-person meeting or a

2  telephone?

3  **A**    I don't recall if it was a telephone call or

4  in-person.  I'm pretty sure that the second time we met was

5  again at the Island House, I'm pretty sure.

6  **Q**    And who would have attended that meeting, just you and

7  Larry or --

8  **A**    I believe Mike was there again.

9  **Q**    So there was more than one meeting, is your

10 representation, at the Island House with you,

11 Mr. Householder and Mike Carey?

12 **A**    I believe there were two.

13 **Q**    Okay.  And what was discussed at that second meeting?

14 **A**    I would say the same topics.

15 **Q**    And, again, how was that meeting left?

16 **A**    I don't recall.

17 **Q**    And when do you recall that initial meeting being, to

18 the best of your knowledge?

19 **A**    The first?

20 **Q**    The first.

21 **A**    I remember it being after the Republican National

22 Convention, shortly after that, so that would have been late

23 summer.

24 **Q**    And then the next meeting, a couple of weeks after?

25 **A**    A couple of weeks later, that's how I remember it.

1    **Q**    And then it's my understanding that after these

2    in-person meetings that you and Mr. Householder had

3    telephone conversations over the next ensuing number of

4    weeks; is that right?

5    **A**    That's correct.

6    **Q**    And what sort of things were you discussing?

7    **A**    We were discussing generally about politics, generally

8    getting to know each other and other political background,

9    how we thought about, you know, candidates and races and

10    everything that was sort of the foundation of, you know,

11    what became the run for Speaker.

12    **Q**    So there was discussion after those meetings between

13    the two of you about eventually coming to do work for him?

14    **A**    Yes.

15    **Q**    And work for him helping him with his ultimate goal of

16    reclaiming the Speaker's position?

17    **A**    That's correct.

18    **Q**    And that would have been ultimately sometime in

19    December, I think, of 2016, is when you had conversations

20    with Mr. Householder wherein you agreed to do work for him;

21    is that right?

22    **A**    That's correct.

23          MR. BRADLEY:  Your Honor, could we publish what's

24    already been admitted as Government's Exhibit 201 B, as in

25    "boy"?

1          THE COURT:  Yes.  Give us just a moment.

2          MR. BRADLEY:  Can you blow that up a little bit,

3    PJ?

4    Q    Are you able to see that, Mr. Longstreth?

5    A    Yes, sir.

6    Q    I think you testified about this document previously,

7    correct?

8    A    That's right.

9    Q    And this would be a document that you created?

10   A    I believe it is.

11   Q    Uh-huh.  And do you know, would that have -- do you

12   know when you would have created that?

13   A    I don't remember exactly when I created that, but it

14   would have been early on in our conversations.

15   Q    And so this would have been after you had at least

16   some preliminary discussions with Mr. Householder and, more

17   specifically, about his goal of trying to regain the

18   Speaker's position?

19   A    That's correct.

20   Q    And if this was in late 2016, it would have been

21   approximately two years before the 2018 general election and

22   subsequent vote for the Speaker?

23   A    Roughly, yes.

24   Q    Roughly.  And that's why when we look at the third

25   bullet point down, when you say "The only things that matter

1    right away are raising money and recruiting candidates,"

2    because it was still two years away, approximately, until

3    the 2018 general election, right?

4    **A**    That's correct.

5    **Q**    And when we look a little bit further down, there's

6    reference to "Ginni Ragan"; do you see that?

7    **A**    I do.

8    **Q**    And also a reference to "Cliff," and I think you

9    talked about Cliff is Cliff Rosenberger; is that right?

10   **A**    That's correct.

11   **Q**    And Cliff Rosenberger, at least as of the fall of

12   2016, was the then-sitting Speaker of the House; is that

13   right?

14   **A**    That's correct.

15   **Q**    And Ginni Ragan was a wealthy individual that was a

16   significant donor to Cliff Rosenberger; is that right?

17   **A**    That's correct.

18   **Q**    And so would I understand correctly that what you're

19   thinking when you write "Ginni Ragan won it for Cliff, who

20   is our Ginni Ragan," you're contemplating, hmm, we need to

21   identify a significant financial backer or donor; is that

22   what you were thinking about when you wrote that?

23   **A**    I'm not sure if that was what I was thinking or that

24   was a note that I was taking from our conversations.

25   **Q**    And then there's a question afterwards about Boich,

1    question mark; do you see that?

2    **A**    I do.

3    **Q**    And that's in reference to Wayne Boich?

4    **A**    The company, yes.

5    **Q**    And Boich is another wealthy political donor; is that

6    right?

7    **A**    That's correct.

8    **Q**    So at least what you're writing there is, hmm, maybe

9    Wayne Boich can be our Ginni Ragan; is that what the thought

10   process was there?

11   **A**    I don't know what the thought process was when it was

12   written, whether I'm taking a note as I'm on a call or

13   whether it's, you know, something that I'm thinking about.

14   This was an ongoing list of notes.

15   **Q**    Sure.  But whether it was your thought or Larry's, I

16   mean, that's pretty much the only two people that would have

17   had any input that would have resulted in this sort of

18   document, right?

19           THE COURT:  Excuse me, is there an objection?

20           MS. GLATFELTER:  Yes, Your Honor.  He can't testify

21   as to what Larry thought.

22           THE COURT:  Agreed.  Sustained as to form.  Take

23   another --

24           MR. BRADLEY:  I'll move on.

25   **Q**    So the only -- you're only talking to Larry in and

1    around this time about these issues; is that right?

2    **A**    As I recall, yes.

3    **Q**    And so if this wasn't your thought about Mr. Boich

4    being -- serving essentially as Ginni Ragan served Cliff

5    Rosenberger, then, the only person that would stand to

6    reason that that thought could have come from would have

7    been Larry Householder?

8    **A**    That would be correct.  I didn't know Mr. Boich and I

9    know Mr. Householder did.

10   **Q**    Sure.  And he's an energy guy, right, meaning,

11   Mr. Boich?

12   **A**    I'm not exactly sure what their company does now, but,

13   generally, yes.

14   **Q**    And you talked about I think yesterday that, at some

15   point, there was some discussions that FirstEnergy would

16   potentially serve as a Ginni Ragan?

17   **A**    There were discussions that they would be a large

18   donor.

19   **Q**    Uh-huh.  But there's no reference to FirstEnergy in

20   this document, right?

21   **A**    That's correct.

22   **Q**    So back up to the third bullet point, the only things

23   that matter right away are raising money and recruiting

24   candidates, the idea -- I think you talked about this

25   yesterday -- was that there's a lot of turnover in the House

1    by virtue of term limits, and, therefore, resulting in every

2    election cycle a fair number of open seats, right?

3    **A**    That's correct.

4    **Q**    And by "open seats," no incumbent running?

5    **A**    That's correct.

6    **Q**    And the strategy of recruiting candidates for those

7    open seats with the hope that they would go on to support

8    somebody's bid for, let's say, Speaker is not some new or

9    novel idea, right?

10   **A**    That's correct.

11   **Q**    That's an approach that's been utilized --

12   "time-tested" as they say, right?

13   **A**    I would say so.

14   **Q**    And the key, of course, is to identify quality

15   electable candidates, right; it doesn't do any good for

16   somebody to win in the primary if they can't win in the

17   general?

18   **A**    That's correct.

19   **Q**    And that I think was one of your strengths to, namely,

20   recruiting quality electable candidates; is that right?

21   **A**    That's correct.

22   **Q**    And, in fact, I think it's something -- one of the

23   most enjoyable parts of your job, yes?

24   **A**    Yes.

25   **Q**    And then raising the money is the other half of the

1    equation, if you will, to the extent that -- I think you

2    talked about there could be upwards of 25 or so open seats

3    for what would be the 2018 general election, correct?

4    **A**    That's correct.

5    **Q**    And a lot of those are new candidates, you know, and,

6    thus, it's not -- as a general rule, it's not easy for those

7    candidates to raise money; is that right?

8    **A**    That's correct.

9    **Q**    And that is the point about -- that you've identified

10   in this bullet point about, hey, for now, meaning in 2016

11   rolling into 2017, one of the most important things is to

12   raise sufficient money to help support the political

13   campaigns of the 25 or so candidates that you and

14   Mr. Householder would be looking to recruit; is that

15   correct?

16   **A**    That's correct.

17   **Q**    And you understood, whether it's in and around the

18   time of these Island House meetings or at least over the

19   next months moving forward, that Mr. Householder had enjoyed

20   a lot of relationships with, you know, corporate leaders,

21   union leaders, et cetera, by virtue of his first time as a

22   Speaker; you understood that, right?

23   **A**    Yes.

24   **Q**    And at some point, as -- go ahead.  I'm just letting

25   you finish your drink there -- as you're game planning out

1    this strategy at some point regarding the fundraising aspect

2    of it, you helped create a spreadsheet identifying a list of

3    potential donors?

4    **A**    Yes.

5         MR. BRADLEY:  And, Your Honor, can we publish

6    what's already been admitted as Government's Exhibit 201 C?

7         THE COURT:  Yes.

8         MR. BRADLEY:  And, PJ, I'd ask you to go to page 8.

9    **Q**    Are you able to see that, Mr. Longstreth?

10   **A**    Yes.

11   **Q**    And do you recognize that as a spreadsheet that you

12   would have created identifying, you know, potential donors?

13   **A**    Yes.

14        MR. BRADLEY:  And can you just scroll down the next

15   page, PJ?

16   **Q**    And just as we look at --

17        MR. BRADLEY:  There's a second page and then can

18   you go down one more page, PJ?  And then a third page.

19   **Q**    Do you see that?

20   **A**    I do.

21        MR. BRADLEY:  And then can you go back up?  Well,

22   that would be page 8.  Yes.

23   **Q**    And is this a document that you would have created

24   with input from Mr. Householder?

25   **A**    Yes.

1    **Q**    And just looking at across the top, there's ask type;

2    do you see that?

3    **A**    Yes.

4    **Q**    And at least everybody on this list is identified as

5    corporate, so corporate donor; is that what that's referring

6    to?

7    **A**    That's correct.

8    **Q**    And then what's the "ask:  Referring to?

9    **A**    The amount to ask.

10   **Q**    And then further along the top column, after you get

11   to "Work Phone, Other Phone, LH Relationship"; do you see

12   that?

13   **A**    Yes.

14   **Q**    And what's that referring to?

15   **A**    Does Larry Householder have a relationship with them

16   or not, does he know them?

17   **Q**    "Know" as in he knows this person or not?

18   **A**    That's correct.

19   **Q**    And do you know about when this document would have

20   been created?

21   **A**    I don't know exactly.

22   **Q**    Can you ballpark it?  Would this have been in 2016 or

23   2017?

24   **A**    I would say at least 2016.

25   **Q**    But probably fairly -- if it was in 27, it would have

1    been likely fairly early in the process because, hey, time

2    is a wasting, that's the priority?

3            THE COURT:  There's an objection.

4            MS. GLATFELTER:  There is.  I think this is a

5    little misleading because there are document properties at

6    the end of this document that indicate when this was

7    created, so he should be able to see those document

8    properties.

9            MR. BRADLEY:  Can we go to the last page?  Can you

10   blow that up?  And can you cut out the create and last

11   modified, please?

12   **Q**    And do you see, it's a little fuzzy, but it looks like

13   the document was initially created October 17th of 2016,

14   right?

15   **A**    Yes.

16   **Q**    And then last modified on September of 2017, right?

17   **A**    That's correct.

18   **Q**    And that would reflect that this document was

19   effectively a work in progress?

20   **A**    I don't remember using that document at all in 2017.

21           MR. BRADLEY:  Okay.  So can we go back to page 8,

22   PJ?

23   **Q**    So the first three corporate donors identified would

24   be Boich Companies, and that's an energy company, right?

25   **A**    That's correct.

1    **Q**    And then Murray Energy, and that's an energy company,

2    right?

3    **A**    That's correct.

4    **Q**    And FirstEnergy, that's an energy company, right?

5    **A**    That's correct.

6    **Q**    And then there's a number of other individuals, but if

7    you go down about fifth from the bottom, there's AEP; do you

8    see that?

9    **A**    I do.

10   **Q**    And that's an energy company, right?

11   **A**    That's correct.

12   **Q**    And then when we look at those energy companies and

13   the LH relationships, these are people he knows, right?

14   **A**    Yes, for the most part.

15   **Q**    Yeah.  And generally, the CEOs, the top dog at these

16   major energy companies?

17   **A**    That's correct.

18   **Q**    And it would stand to reason that in October of 2016,

19   when this document is being created and we've got to

20   identify a list of potential donors, it would stand to

21   reason that the first people listed are energy companies

22   because, I think you talked about that, Larry had

23   relationships with these energy companies, right?

24   **A**    That's correct.

25   **Q**    And was recognized as a long time supporter of these

1   utility and energy companies, right?

2   **A**    That's correct.

3   **Q**    And I think you talked about, in fact, that that was

4   part of the reason why Generation Now was named Generation

5   Now, was because that was a big part of Larry's political

6   platform, namely, supporting the utilities and energy

7   producers in Ohio; isn't that right?

8   **A**    That's correct.

9   **Q**    And, clearly, there's many other names of companies

10   identified here that are not energy companies, right?

11   Fourth one down is Castellini Management which is Bob

12   Castellini, and I think he's CEO or owner of the Cincinnati

13   Reds baseball team; is that right?

14   **A**    That's correct.

15        MR. BRADLEY:  And then can you go to the next page,

16   PJ?

17   **Q**    And then just again looking at more of these potential

18   donors, you know, Penn National, is that the gaming company?

19   **A**    That's correct.

20   **Q**    And then third from the bottom, the limited brands,

21   that's the Columbus-based company The Limited?

22   **A**    That's correct.

23        MR. BRADLEY:  Okay.  And can you go to the next

24   page?

25   **Q**    And then Sherwin Williams, the paint company, is

1    identified as a potential corporate donor, right?

2    A    That's correct.

3    Q    And Chesapeake Energy, another energy company

4    identified, right?

5    A    That's correct.

6    Q    But to be clear, this is just the document that was

7    created about -- this is a starting point, we now need to

8    take that next step and solicit donations from these people?

9    A    That's correct.

10   Q    And are you -- I think you said that you're really not

11   involved in that part of it, right, that's more Larry?

12   A    Yes.  I mean, I'm involved, but not --

13   Q    Sure.

14   A    They're not there to see me.

15   Q    Pardon me?

16   A    They wouldn't be at a meeting to see me.

17   Q    Right.

18        And the goal, again, to be clear, is to raise what

19   would amount to -- you'd need millions of dollars in that

20   2017/2018 window leading up to the general election in

21   November of 2018, right?

22   A    That's correct.

23   Q    And you need millions of dollars because that's what

24   you and/or Larry would project would be needed to support

25   this slate of candidates, fair?

1    **A**    That's correct.

2    **Q**    And not everybody on this list donated money, right?

3    **A**    I couldn't tell you.

4    **Q**    But plenty of them did, right?

5    **A**    Several names on this list did donate, yes.

6    **Q**    Uh-huh.

7          MR. BRADLEY:  Your Honor, can we publish what's

8    already been admitted as Government Exhibit 16, please?

9          THE COURT:  Yes.

10         MR. BRADLEY:  And, PJ, can you blow up just that

11   portion that's I think on the left-hand side that would

12   include the period of 2017 through 2018?  So I think the

13   last entry is October 30th, 2018.

14   **Q**    So this is one of the government's exhibits that

15   identifies the companies and/or individuals that did in fact

16   contribute money during the 2017/2018 period.  Do you

17   recognize that?

18   **A**    Yes.

19   **Q**    And, clearly, if you look at the first donation --

20   well, let me take a step back.

21         And all of this money that was raised in that

22   2017/2018 period would have been raised into Generation Now;

23   is that right?

24   **A**    Either there or Mr. Householder's political account.

25   **Q**    That's Friends of Larry Householder?

1    **A**    That's correct.

2    **Q**    And that's his personal campaign account, right?

3    **A**    That's correct.

4    **Q**    And all of the candidates, the slate of candidates,

5    would have also had their own individual campaign accounts,

6    right?

7    **A**    That's correct.

8    **Q**    And I'm getting ahead of myself a little bit, but one

9    of the functions that you served to support these candidates

10   was to help them raise money into their individual campaign

11   accounts, right?

12   **A**    That's correct.

13   **Q**    But kind of separate and apart from that is this list

14   of donors that donated to Generation Now, right?

15   **A**    That's correct.

16   **Q**    And, generally, the donors were solicited by

17   Mr. Householder, right?

18   **A**    Generally, yes.

19   **Q**    And they would have done so with the understanding

20   that the money was going into Generation Now, right?

21   **A**    Yes.

22   **Q**    Because I think as part of the contributions, when

23   they submit their contributions, there's a contribution form

24   that says Gen Now, right?

25   **A**    That's correct.

1    **Q**     And so it would stand to reason that they would -- if

2    Larry is making the ask and the money is going into

3    Generation Now, that generally they have an understanding

4    what the money is going to be used for, right?

5    **A**     That's correct.

6    **Q**     So support the slate of candidates?

7    **A**     That's correct.

8    **Q**     With the goal that hopefully most or all of them would

9    win in the general election and then go on to support

10   Mr. Householder in his bid for Speaker?

11   **A**     That's correct.

12   **Q**     And so the first donation is actually from Wayne

13   Boich; do you see that, February 23rd of 2017?

14   **A**     I do.

15   **Q**     And that would be the same Boich, remember when we

16   were looking at the Word document and, you know, "Ginni

17   Ragan won it for Cliff and who's our Ginni Ragan," and it

18   says "Boich," that's that guy?

19   **A**     That's correct.

20   **Q**     And then we see the next three entries, yeah, entries

21   are from FirstEnergy Service Company, right?

22   **A**     That's correct.

23   **Q**     And it's your understanding that that's FirstEnergy

24   money?

25   **A**     Correct.

1    **Q**    And then just looking down the list, you know --

2         MR. BRADLEY:  PJ, can you cull out what would be

3    the April 4th, 2018, through 4/23?

4    **Q**    And then here in basically April of 2018, there's the

5    Ohio AFL-CIO, that's a union, right?

6    **A**    That's right.

7    **Q**    And then Resource Fuels, are you familiar with that

8    company?

9    **A**    I forget what that is.

10   **Q**    Okay.  And how about -- but, nevertheless, the Ohio

11   AFL-CIO contributed 175,000, right?

12   **A**    That's correct.

13   **Q**    And then Resource Fuels, whoever they are, contributed

14   a quarter of a million dollars?

15   **A**    That's right.

16   **Q**    And what about ACT Ohio Foundation, are you familiar

17   with them?

18   **A**    I believe that's another union.

19   **Q**    Uh-huh.  And you understood that Larry had

20   long-standing good relations with the union representatives

21   in Ohio, right?

22   **A**    With a lot of them, yes, um-hmm.

23   **Q**    And then Political Education Patterns, are you

24   familiar with them?

25   **A**    I am, but I forget who that ties back to, but I've

1    seen that before.  I think it's a union.

2    **Q**    $200,000 contribution, right?

3    **A**    Yes.

4    **Q**    And then JACK Entertainment, that's the casino, I

5    think, right?

6    **A**    Yes.

7    **Q**    And they contributed 25 grand and then Jim Walton, I

8    think that's from the Walmart Jim Walton, right?

9    **A**    I think that's correct.

10   **Q**    And then he contributed 20,000.  So when we look at

11   that whole list, to be fair, FirstEnergy does contribute a

12   significant amount of money, right?

13   **A**    That's correct.

14   **Q**    But it's also true that millions of dollars were

15   raised into Generation Now in that 2017/2018 period by a

16   variety of entities other than FirstEnergy, right?

17   **A**    That's correct.

18        MS. GLATFELTER:  Objection, Your Honor.  That's not

19   what the document states.

20        THE COURT:  Sustained as to form.

21   **Q**    Well, without going through each and counting every

22   dollar, we just went through a number of significant

23   donations from unions, et cetera, that would represent a lot

24   of money?

25   **A**    They made contributions for sure.

1    **Q**    And that's consistent with your understanding that

2    Larry was a prolific fundraiser, right?

3    **A**    Agreed.

4    **Q**    Good at it?

5    **A**    Agreed.

6    **Q**    In part, I think you said, because he's a dynamic, I

7    don't know if that was quite the word you used, but

8    larger-than-life persona, something like that, right?

9    **A**    Yes.

10   **Q**    And he's got the ability to quickly connect with

11   somebody, find that common ground I think you said, right?

12   **A**    That's correct.

13   **Q**    And good storyteller?

14   **A**    Yes.

15   **Q**    And then also because of his first tenure as Speaker

16   of the House, you know, he's developed a lot of

17   relationships with, you know, for lack of a better word, the

18   power brokers, the deep pockets, right?

19   **A**    That's correct.

20   **Q**    So when you put all of that into the mix, Larry is a

21   good fundraiser, right?

22   **A**    That's correct.

23   **Q**    And that's reflected in this government exhibit,

24   right?

25   **A**    That's correct.

1    **Q**    So when we go back to looking at that, what was game

2    plan 2018 when you made -- when you write out that the only

3    thing that matters now is recruiting the good candidates and

4    you were largely the boots on the ground to do that, right?

5    **A**    That's correct.

6    **Q**    And then Larry's job was to raise money, right?

7    **A**    That's correct.

8    **Q**    Let's move on, if we can, and talk a little bit I

9    think about the presidential inauguration in DC.

10    **A**    Okay.

11    **Q**    And that would have been in January, roughly the

12    middle of January of 2017, right?

13    **A**    That's correct.

14    **Q**    And I believe that we looked at an exhibit yesterday

15    that showed that you arrived in DC on January 18th, right?

16    **A**    That's what the document said and that's generally

17    when I believe I arrived there.

18    **Q**    And then would have stayed, what, maybe four days or

19    so?

20    **A**    Through the inauguration, um-hmm.

21    **Q**    And when we were looking at that previous exhibit and

22    that list of donations, we talked about all of that money

23    was getting deposited into the Gen Now bank accounts, right?

24    **A**    That's correct.

25    **Q**    And the decision to create an entity or organization

1    that was to be named Generation Now and be a 501(c)(4), that

2    decision had been made before you went to the inauguration,

3    right?

4    **A**    I don't remember exactly when that decision was made.

5           MR. BRADLEY:  Your Honor, can we show the witness

6    what's not been admitted that is Householder Exhibit

7    No. 254?

8           THE COURT:  Yes, show it to the witness and the

9    lawyers.

10   **Q**    Are you able to see that on the screen?

11   **A**    I am.

12   **Q**    And do you -- what is this?

13   **A**    This is an engagement agreement between Dinsmore &

14   Shohl.

15          MS. GLATFELTER:  Your Honor, I object and move to

16   strike this line of questions.

17          THE COURT:  We've been down this road.

18          MS. GLATFELTER:  I'm sorry?

19          THE COURT:  We have been down this road,

20   Mr. Bradley, and the Court has ruled.

21          MR. BRADLEY:  I'm not looking to go anywhere near

22   those issues.  I'm just trying to establish the date.

23          THE COURT:  I'm not convinced, but go ahead.

24   Objection is overruled.  Give you a little latitude.  Hit it

25   and move on.

1    **Q**    So you recognize this as a letter that you had

2    received, an engagement agreement regarding the creation of

3    what would be Generation Now?

4    **A**    That's correct.

5    **Q**    And what's the date of that letter?

6    **A**    January 10th, 2017.

7    **Q**    And that would be before the inauguration?

8    **A**    That's correct.

9    **Q**    All right.  So there was a decision -- and the

10   engagement letter actually goes on to identify the entity as

11   being named Generation Now, right?

12   **A**    It was addressed to Generation Now, I think.

13          THE COURT:  All right.  You've established the

14   date.

15          MR. BRADLEY:  Yeah.  And you can take that down,

16   PJ.

17   **Q**    So does that now refresh your recollection that the

18   decision to create Generation Now was made before you went

19   to the inauguration?

20   **A**    It does.

21          MR. BRADLEY:  Okay.  And then, Your Honor, can we

22   publish what's already been admitted as Government's

23   Exhibit 216 B, as in "boy"?

24          THE COURT:  Yes.

25          MR. BRADLEY:  And, PJ, can you blow that up?

1    **Q**    Do you recognize this exhibit, Mr. Longstreth?

2    **A**    I do.

3    **Q**    I think we looked at this yesterday, right?

4    **A**    That's correct.

5    **Q**    And just so we're all clear and on the same page, this

6    is an e-mail that you sent to Mr. Householder, right?

7    **A**    That's correct.

8    **Q**    And covered Bryan Gray?

9    **A**    That's right.

10    **Q**    Who's Bryan Gray?

11    **A**    Bryan Gray was his legislative assistant.

12    **Q**    And the date of the e-mail is Monday, January 16th, so

13    again, before the inauguration events, right?

14    **A**    That's right.

15    **Q**    And this is you just laying out the itinerary for the

16    events leading up to the inauguration, right?

17    **A**    That's right.

18    **Q**    And the first entry there is Wednesday, January 18th;

19    do you see that?

20    **A**    I do.

21    **Q**    And it reads:  Jeff's reception, (W Hotel.)  What

22    hotel was that; do you recall?

23    **A**    I think it was the W Hotel.

24    **Q**    Oh, the W Hotel?

25    **A**    Yeah.

1    **Q**    Okay.  And is that where you were staying?

2    **A**    No.

3    **Q**    You were staying at a different location?

4    **A**    That's correct.

5    **Q**    And this was looks like a couple of hour event,

6    cocktail hour basically?

7    **A**    That's right.

8    **Q**    And then later that same evening, there were dinner

9    reservations at the Charlie Palmer steakhouse at 7:30; is

10   that right?

11   **A**    That's right.

12   **Q**    And you were the host of the cocktail hour reception,

13   right?

14   **A**    Yes.

15   **Q**    And did Mr. Householder attend that cocktail hour, to

16   the --

17   **A**    He did.

18   **Q**    -- best of your recollection?

19   **A**    Yes.

20   **Q**    And you're aware, I think you testified about it

21   yesterday, that Mr. Householder would have arrived on the

22   18th and he flew on a FirstEnergy plane?

23   **A**    I don't remember what day he arrived, but he was there

24   for that.

25   **Q**    Right.  And -- but you're aware that he flew on a

1    FirstEnergy plane?

2    **A**    Yes.

3    **Q**    And you're aware as well that his youngest son, Luke,

4    flew with him on that plane as well, right?

5    **A**    That's correct.

6    **Q**    And I think you talked about yesterday that Larry's

7    wife as well as at least some, if not all, of his other boys

8    met him in DC to participate in the events?

9    **A**    That's my understanding, yes.

10   **Q**    So do you remember, was Luke at that cocktail hour

11   reception?

12   **A**    He was.

13   **Q**    And then it looks like that was scheduled to conclude

14   at 6:30 and an hour later was the Charlie Palmer steakhouse,

15   right?

16   **A**    It looks.

17   **Q**    And where is that in relation to the W Hotel, it's not

18   in the hotel, is it?

19   **A**    It's not.  I don't know how far away it is from the

20   hotel, but it's another building.

21   **Q**    A cab ride away?

22   **A**    Yes.

23   **Q**    And you attended that, I'm talking the dinner at

24   Charlie Palmer's steakhouse?

25   **A**    Yes.

1    **Q**    Is that the one I think you talked about there being

2    a -- I don't know if you said huge, but a very big table,

3    dinner table, right?

4    **A**    That's how I remember it, yes.

5    **Q**    And do you remember, was it round or rectangular

6    shaped?

7    **A**    I don't remember.

8    **Q**    And I think I recall you talking about that you --

9    that there were a number of people there, right?

10   **A**    That's correct.

11   **Q**    And by that, did you say that the table could seat

12   upwards of 20 people?

13   **A**    As I remember it, it was just a big table.  I don't

14   remember if it was 20 or 16 or 18 or 30.

15   **Q**    But more than just the six or eight round, for

16   example?

17   **A**    That's correct.

18   **Q**    And did that many people, to the best of your

19   recollection, attend?

20   **A**    It was people coming in and out throughout the large

21   portion of the evening, as I recall.

22   **Q**    And do you recall -- I think you said that you sat

23   next to Mike Dowling?

24   **A**    That's right.

25   **Q**    And Mike Dowling I think you talked about as somebody

1    associated with FirstEnergy, right?

2    **A**    That's correct.

3    **Q**    And do you recall, was Larry Householder at that

4    dinner?

5    **A**    Yes.

6    **Q**    And do you recall whether his son, Luke, was at that

7    dinner?

8    **A**    I don't remember.

9    **Q**    And I think you said that Larry was sitting next to

10   Chuck Jones?

11   **A**    At least for some portion of it, yes.

12   **Q**    But you have that vivid recollection in your mind?

13   **A**    As I recall, that's how it was set up.

14   **Q**    Sure.  And from where you were sitting, I assume this

15   is a crowded restaurant, I think you said for the

16   inauguration, all of the restaurants were full?

17   **A**    That's correct.

18   **Q**    Right.  And so from where you were sitting in relation

19   to where Mr. Jones and Mr. Householder were sitting, were

20   you able to hear what they were talking about?

21   **A**    No.

22   **Q**    And then at the end of the evening at the Charlie

23   Palmer steakhouse, who paid the bill?

24   **A**    I don't recall.

25   **Q**    Would you have?

1    **A**    Could have.

2    **Q**    Even though you couldn't hear what Chuck and Mike were

3    talking about, could you see them talking?

4    **A**    Do you mean Chuck and Larry?

5    **Q**    Yeah, I misspoke.

6    **A**    Yeah, I remember they chatted during that evening.

7    **Q**    And then when we move ahead to the 19th, there looks

8    like a whole host of I guess events starting at 9:00 a.m. in

9    the morning and going all the way until 9:00 p.m. at night?

10    **A**    That's correct.

11    **Q**    And I note that, again, looking on the 19th, there's

12    two dinner reservations; do you see that?  Dinner

13    reservation No. 1 at the Palm, 5:30; do you see that?

14    **A**    I do.

15    **Q**    And then dinner reservation No. 2 at the Palm, 9:15;

16    do you see that?

17    **A**    I do.

18    **Q**    Why two dinner reservations at the same restaurant?

19    **A**    Just in case people wanted to go to one of the other

20    events, that there would be a back-up dinner reservation.

21    **Q**    And did you attend dinner at the Palm on the 19th?

22    **A**    I believe I did.

23    **Q**    And would that have been the early seating or the

24    later seating?

25    **A**    I don't remember.

1    **Q**    There's an -- in between those two dinner seatings,

2    there's reference to black tie and boots; do you see that?

3    **A**    I do.

4    **Q**    What's that?

5    **A**    That's one of the -- they had various inaugural balls

6    and receptions and there was just a lot going on.  So this

7    is just an attempt to try to corral all of the different

8    opportunities that anybody wanted to attend.

9    **Q**    And did you attend that?

10   **A**    I believe I did, but I don't know if I was there early

11   or late.  You know, it was six years ago, I can't remember,

12   you know, the order of things.

13   **Q**    Um-hmm.  And who would have attended the dinner at the

14   Palm on the 19th?

15   **A**    So I know that there were -- that we had dinner I

16   think at the Palm with Mr. Jones, Mr. George, Mr. Dowling,

17   myself, Mr. Householder.  I can't remember if there were any

18   others.  I remember it being a much smaller group than the

19   one at the Charlie Palmer.

20   **Q**    Um-hmm.

21   **A**    But I also see that there's a dinner reservation on

22   Friday, too, and that could have been that night.

23   **Q**    What could have been that night?

24   **A**    The dinner with Mr. Dowling and Mr. Jones and

25   Mr. Householder and myself.  I know we had dinner at the

1    Palm.  I'm not sure if it was Thursday or Friday.

2    **Q**    And your recollection is that the dinner would have

3    been I think you described it as more intimate?

4    **A**    Yeah, smaller crowd.

5              MR. BRADLEY:  Your Honor, can we publish to the

6    jury what's already been admitted as Householder 468?

7              THE COURT:  Yeah.  I'm going to break in a couple

8    of minutes.

9              MR. BRADLEY:  Oh, I lost track of time.  If you

10   want to break now, that's perfectly fine.

11             THE COURT:  Very well.  We're going to break early

12   for the mid-morning break.  During the break, take a break.

13   No discussion of the case among yourselves or with anyone

14   else.  No independent research.  No checking out the media.

15   Continue to keep an open mind.  Going to break for

16   20 minutes, bring you back for another hour, and then we'll

17   break for a little longer than normal for lunch.  Out of

18   respect for you, we'll rise as you leave.

19             THE DEPUTY:  All rise for the jury.

20       (Jury exited the courtroom at 10:27 a.m.)

21             THE COURT:  Jury has left the room.  As always,

22   we'll wait in the courtroom until we disperse, until we get

23   word that the jury has cleared the floor.  We'll then break

24   until 10:50.

25       (Pause.)

```
 1                 THE COURT:  We're on break.

 2                 THE DEPUTY:  Court is in recess until 10:50.

 3             (Recess taken from 10:28 a.m. to 10:49 a.m.)

 4                 THE DEPUTY:  All rise.  This court is in session

 5     pursuant to the recess.

 6                 THE COURT:  Thank you.  Please be seated.  Are we

 7     ready for the jury from the government's perspective?

 8                 MS. GLATFELTER:  Yes, Your Honor.

 9                 THE COURT:  Mr. Householder's?

10                 MR. BRADLEY:  Yes, Judge.

11                 THE COURT:  Mr. Borges?

12                 MR. SCHNEIDER:  Yes.

13                 THE COURT:  Let's call for the jury.  Mr. Bradley,

14     Counsel, I'm going to break at 11:50.

15                 MR. BRADLEY:  Very good.

16                 THE COURT:  Very well.

17             (Pause.)

18                 THE DEPUTY:  All rise for the jury.

19             (Jury entered the courtroom at 10:53 a.m.)

20                 THE COURT:  You may all be seated.  Thank you.  All

21     14 jurors are here.  They've had their break and they're

22     ready to go.  We will continue with the taking of testimony.

23     Mr. Bradley.

24                 MR. BRADLEY:  Thank you, Judge.  All present and

25     accounted for.
```

1                THE COURT:  Indeed.

2       **Q**    So before we took our break, I was asking you about

3       the dinner at the Palm, which would have been after the

4       dinner at Charlie Palmer, right?

5       **A**    That's correct.

6       **Q**    And I think you indicated that you're not sure if the

7       dinner was on the 19th or the 20th, and to be clear, I'm

8       talking what would be the second dinner at the Palm?

9       **A**    That's correct.

10      **Q**    Now, you've met with the government on a number of

11      occasions to discuss these very same issues we're talking

12      about here today, correct?

13      **A**    That's correct.

14      **Q**    And at least some of those conversations were at least

15      a couple of years ago and presumably when these events are

16      fresher in your mind than as you sit here today.  Would it

17      refresh your recollection to review some of the notes from

18      the interviews with the government regarding whether the

19      dinner at the Palm was on the 19th?

20      **A**    Yeah, I'm not sure if it would or not.

21      **Q**    But you'd be willing to take a look?

22      **A**    Sure.

23                MR. BRADLEY:  Your Honor, could we show the witness

24      only Mr. Longstreth's proffer from October 6th of 2020?

25                THE COURT:  Just as to refresh his recollection,

1    yes.

2            MR. BRADLEY:  Yes.  And, PJ, can we go to page 3?

3    **Q**    And, Mr. Longstreth, if you could just take a moment

4    and read -- there we are -- and read to yourself the

5    interview notes from your proffer conducted October 6th of

6    2020.  Well, if you would do that.

7            Okay.  Have you had an opportunity to review that?

8    **A**    I have.

9    **Q**    And having reviewed that, does that now refresh your

10   recollection as to when the dinner took place at the Palm

11   restaurant?

12   **A**    There it says that the dinner at the Palm was the day

13   before the dinner at Charlie Palmer.

14   **Q**    The day after?

15   **A**    Or the day after, yeah.

16   **Q**    And when we were looking at your travel itinerary,

17   that would show that the Charlie Palmer's dinner was on the

18   18th, January 18th, right?

19   **A**    That's correct.

20   **Q**    And then the dinner at the Palm would have been the

21   next day, on the 19th?

22   **A**    That's correct.

23           MR. BRADLEY:  So, Your Honor, can we publish to the

24   jury what's already been admitted as Householder

25   Exhibit 468?

1          THE COURT:  Yes.

2          MR. BRADLEY:  And, PJ, can you blow up the top half

3     of that?

4     Q    So are you aware, Mr. Longstreth, that Chuck Jones and

5     his wife traveled by FirstEnergy private jet to attend the

6     inauguration?

7     A    I'm not aware.

8     Q    You're not aware of that.

9          And I would represent to you that this exhibit

10    represents the flight itinerary of FirstEnergy's private jet

11    that took his -- Mr. Jones and his wife from Naples,

12    Florida, to Washington, DC; do you see that?

13    A    I do.

14         MR. BRADLEY:  And, PJ, can you cull out just above

15    that the departure and arrival time or highlight?

16    Q    And regarding to the FirstEnergy's flight itinerary,

17    that would show that Mr. Jones and his wife arrived in

18    Washington, DC on January 19th of 2017; do you see that?

19    A    I do.

20    Q    And so it would stand to reason that he was not in DC

21    the day before, which would be January 18th?

22    A    Okay.

23    Q    Would you agree with that?

24    A    Yeah, that's what this seems to indicate, yes.

25    Q    Right.  And so when you were describing earlier the

1    dinner at the Charlie Palmer steakhouse where you were

2    sitting next to Mr. Dowling and you saw Mr. Jones and

3    Mr. Householder at the other end of that large table, do you

4    recall that testimony?

5    **A**    I do.

6    **Q**    And I think you testified that you recall -- you

7    couldn't hear what they were saying, but you could see that

8    they were chatting amongst themselves; do you recall that?

9    **A**    I do.

10   **Q**    That didn't happen, did it?

11   **A**    This would indicate that that was incorrect --

12   **Q**    That's right.

13   **A**    -- if he wasn't there.

14   **Q**    That's right.

15         MR. BRADLEY:  So can we now show the witness, Your

16   Honor, what has not been admitted that is Householder 479?

17         THE COURT:  Yes.

18         MR. BRADLEY:  And, PJ, can we just cull out that

19   top third?

20   **Q**    And, Mr. Longstreth, you've not seen this exhibit

21   before, correct?

22   **A**    I have not.

23   **Q**    Right.  And I would represent to you that this is

24   Mr. Jones' expense report for the period of January 15th,

25   his FirstEnergy expense report, for the period of

JEFF LONGSTRETH - CROSS-EXAM

17-2750

1    January 5th -- 15th, excuse me, January 15th of 2017 through

2    January 21st of 2017.  Do you see that?

3    **A**    I do.

4    **Q**    And that would, of course, encompass the time period

5    that was the inauguration in DC that we're talking about,

6    right?

7    **A**    That's correct.

8            MR. BRADLEY:  And then, PJ, can we go to the second

9    page?  And can you cull out the fourth entry from the bottom

10   that has -- yes.

11   **Q**    And it would appear that Mr. Jones expensed out a

12   business dinner to the tune of $1,331; do you see that?

13   **A**    I do.

14   **Q**    And there's an entry in there that MM, Mr. and Mrs.

15   Tony George, discussed legislative options for coal at the

16   Four Seasons Hotel at the Bourbon Steakhouse in Washington,

17   DC; do you see that?

18   **A**    I do.

19   **Q**    And you know Tony George, right?

20   **A**    I do.

21   **Q**    And do you know his wife?

22   **A**    I don't believe so.

23   **Q**    Do you know whether she attended the DC festivities

24   with her husband, Tony?

25   **A**    I don't recall.

```
 1              MR. BRADLEY:  Okay.  And then, PJ, can we go to the

 2     next page, please?

 3     Q    And then you can see there's two receipts on this

 4     page, right?

 5     A    Yes.

 6     Q    And I direct your attention to the one on the left,

 7     and this appears to be the receipt from the Four Seasons

 8     Hotel that is the Bourbon Steakhouse, 2800 Pennsylvania

 9     Avenue; do you see that?

10     A    I do.

11     Q    And at the bottom of the receipt, there appears to be

12     reference of Tony George and Christine George, which would

13     be Tony's wife, right?

14     A    I don't know.

15     Q    Okay.  But you see it says Tony George and Christine

16     George?

17     A    I do see that.

18     Q    Right.

19              MR. BRADLEY:  And then can you cull out the date,

20     PJ, of that receipt?

21     Q    And what's the date of the dinner receipt that

22     Mr. Jones expensed out for his dinner with Tony and

23     Christine George?

24     A    January 19th.

25     Q    Of 2017?
```

JEFF LONGSTRETH - CROSS-EXAM                           17-2752

1    **A**    That's right.

2    **Q**    So this receipt would appear to show that Mr. Jones

3    and Tony George and his wife had dinner at the Bourbon

4    Steakhouse on January 19th, right?

5    **A**    It appears so.

6    **Q**    So it would stand to reason that he wasn't at --

7          MS. GLATFELTER:  Objection, Your Honor,

8    argumentive.  That's not the only conclusion to draw from

9    this.

10         THE COURT:  Sustained as to form.

11   **Q**    If he was at dinner at the Bourbon Steakhouse with

12   Tony George on January 19th, then, he wasn't at dinner at

13   the Palm restaurant with you on January 19th, agree?

14   **A**    Not necessarily.

15         MR. BRADLEY:  Okay.  Your Honor, I believe there's

16   been a stipulation that this qualifies as a business record.

17   If we could, I would move to admit Householder Exhibit 479.

18         THE COURT:  Any objection?

19         MS. GLATFELTER:  No, Your Honor.

20         THE COURT:  Very well.

21         MR. SCHNEIDER:  No objection.

22         THE COURT:  Very well.

23         MR. BRADLEY:  May it be published?

24         THE COURT:  It's admitted and you may publish.

25         MR. BRADLEY:  There we are.  And, PJ, can you again

1    you cull out the date?

2    **Q**    And the date would be again, Mr. Longstreth, for the

3    benefit of the jury here, January 19th of 2017, his credit

4    card gets swiped at 8:46 p.m., right?

5    **A**    Yes.

6          MR. BRADLEY:  And, PJ, if you can cull out the name

7    of the hotel, the Four Seasons Hotel, Bourbon Steak.

8    **Q**    And that would appear that he had dinner that night

9    with Tony George and Christine George at the Bourbon

10   Steakhouse, right?

11   **A**    It would appear his credit card was used at the

12   Bourbon Steakhouse.

13   **Q**    And that he expensed it out to FirstEnergy, the

14   dinner, right?

15   **A**    I don't know.

16          MR. BRADLEY:  Can we go to page 1, please?

17   **Q**    And it -- certainly, when we look at the first page of

18   this exhibit, we can agree that this is his expense report

19   for the time period that we're talking about, right?

20   **A**    I can agree with that.

21          MR. BRADLEY:  And then can you go to page 2?  And

22   then the fourth entry from the bottom?

23   **Q**    And there he expensed out $1,331.10 for a business

24   dinner with Mr. and Mrs. Tony George, right?

25   **A**    I agree with that.

1    **Q**    And that to be crystal clear, the Bourbon Steakhouse

2    located in the Four Seasons Hotel is a different restaurant

3    than the Palm that you described you had dinner with

4    Mr. Jones on that same night?

5    **A**    That's correct.

6           MR. BRADLEY:  Okay.  Can we -- let's move on,

7    please, and show the witness Householder Exhibit 468?

8           THE COURT:  Yes.

9    **Q**    And this would appear to be Mr. Dowling's expense

10   report for that same period of time, January 15th, 2017,

11   through January 21st; do you see that?

12   **A**    I do.

13          MR. BRADLEY:  And, Your Honor, there's been a

14   similar stipulation.  I would move to admit Householder

15   Exhibit 478?

16          THE COURT:  Any objection?

17          MS. GLATFELTER:  No, Your Honor, we agree.

18          MR. SCHNEIDER:  No objection.

19          THE COURT:  Very well.  It's admitted.  Wish to

20   publish?

21          MR. BRADLEY:  Yes, please.

22          THE COURT:  You may publish.

23   **Q**    So again for the benefit of the jury, now that they

24   can see this, this appears to be Mr. Dowling's expense

25   report for the week that was the DC inauguration events,

1    right?

2    **A**    That's what it appears to be, um-hmm.

3           MR. BRADLEY:  And can we go down to page 3 of this

4    exhibit?  And can you cull out the top entry, PJ?

5    **Q**    And here appears to be expensed out a charge for

6    $261.15 for dinner at the Charlie Palmer steakhouse; do you

7    see that?

8    **A**    I do.

9           MR. BRADLEY:  PJ, can we go to page 7?  And can you

10   cull out that --

11   **Q**    Well, and this appears to be Mr. Dowling's handwritten

12   notes as part of his expense report for the date of

13   January 18th of 2017; do you see that?

14   **A**    I do.

15   **Q**    And in the middle of the page, there is that same

16   $261.15 charge we were looking at a moment ago on the first

17   page -- or second page of the document, right?

18   **A**    Yes.

19   **Q**    And this would describe Charlie Palmer's steakhouse,

20   correct?

21   **A**    That's correct.

22   **Q**    And that's consistent at least to the point where you

23   talked about earlier that you did have dinner at Charlie

24   Palmer's on the 18th, right?

25   **A**    That's correct.

JEFF LONGSTRETH - CROSS-EXAM

17-2756

1    **Q**    And that's the dinner that would have been in the

2    middle of the busy restaurant with the large table of

3    people, right?

4    **A**    That's correct.

5    **Q**    And you said that you had dinner with Mike Dowling and

6    in fact, sat next to him, right?

7    **A**    That's correct.

8    **Q**    And we've already seen from Mr. Jones' flight records

9    that he wasn't even in DC on the 18th, right?

10   **A**    That's correct.

11   **Q**    And here according to Mr. Dowling's expense report,

12   the people that attended that dinner were Mike Carey, Jeff

13   Longstreth, Roger Stoner -- Steiner, not really sure -- and

14   spouse of Timkin, and discussed Ohio political issues; do

15   you see that?

16   **A**    I do.

17   **Q**    Do you know, is it -- am I saying that right, Ryan --

18   **A**    I believe that's Ryan Stenger.

19   **Q**    So you know Ryan?

20   **A**    Yes.

21   **Q**    Was he at the dinner?

22   **A**    I don't recall.

23   **Q**    But to be clear, there's no reference to Chuck Jones

24   in this entry, correct?

25   **A**    That's correct.

1    **Q**    And no reference to Larry Householder?

2    **A**    That's correct.

3    **Q**    So I think you indicated that based on at least those

4    flight records that your memory could be faulty as to

5    whether Mr. Jones attended that dinner, right?

6    **A**    Could be.

7    **Q**    And given what we're now looking at in terms of

8    Mr. Dowling's expense report where there's no reference to

9    Larry Householder attending that dinner, could your memory

10    be equally faulty?

11    **A**    Well, there's no reference to a lot of people that

12    were there.

13    **Q**    Sure.  But I'm asking that when we look at this entry

14    and we see no reference to Larry Householder or Chuck Jones

15    attending this dinner, could your memory be wrong again?

16    **A**    It could be.  I don't know.

17    **Q**    Could be, that's right.

18         So I think you talked --

19         MR. BRADLEY:  You can take that down.

20    **Q**    I think you talked a little bit about, yesterday in

21    your testimony, that FirstEnergy officials were -- when they

22    were in DC were interested in exploring a federal solution

23    to the problem that was the nuclear power plants?

24    **A**    That's how I recall it, yes.

25    **Q**    And I think that they were looking to pursue some

1    remedy under like a 202 C of the Federal Code or something

2    along those lines?

3    **A**    I don't remember if that exact phrase was used, but --

4    **Q**    But nevertheless --

5    **A**    I've heard that phrase from them previously.  I don't

6    remember if it was at that meeting.

7    **Q**    Referencing -- I'm sorry.  Referencing a 202 C

8    solution?

9    **A**    I've heard of that before.

10   **Q**    And as of the inauguration, there was a certain sense

11   of urgency from FirstEnergy to pursue a federal solution,

12   right?

13   **A**    It appeared so.

14   **Q**    Well, based on your conversations certainly with

15   Mr. Dowling?

16   **A**    Yeah.

17   **Q**    He had made it perfectly clear to you that, hey, man,

18   we need to do something now, right?

19   **A**    That's correct.

20   **Q**    And you know an individual by the name of Joe

21   Wheatley?

22   **A**    Yes.

23   **Q**    And who's Joe Wheatley?

24   **A**    It's a friend of mine from -- a golf buddy of mine

25   that I've known for several years.

1    **Q**    And you knew him several -- well, prior to the

2    inauguration, right?

3    **A**    That's correct.

4    **Q**    And Mr. Wheatley has a relationship with Rick Perry?

5    **A**    That's correct.

6    **Q**    Are they friends or relatives?

7    **A**    Relatives.

8    **Q**    Relatives.  And who's Rick Perry?

9    **A**    Former Governor of Texas.

10   **Q**    And was at some -- and the soon to be Energy

11   Secretary, at least as of the 2016 election?

12   **A**    That's correct.

13          MR. BRADLEY:  And, Your Honor, can we show the

14   witness what's not been admitted, Householder Exhibit 466?

15          THE COURT:  Yes.

16   **Q**    Do you recognize this picture?

17   **A**    I do.

18   **Q**    What is it?

19   **A**    It's a picture of myself, Former Governor Perry, and

20   Joe Wheatley.

21   **Q**    And was that picture taken at the inauguration events

22   in DC that we're talking about?

23   **A**    Yes.

24          MR. BRADLEY:  Your Honor, permission -- excuse me.

25   I would move to admit the exhibit.

1          THE COURT:  Any objection?

2          MS. GLATFELTER:  No, none.

3          MR. SCHNEIDER:  None.

4          MR. BRADLEY:  And may we publish?

5          THE COURT:  It's admitted and you may publish it,

6    if you wish.

7    **Q**    So again, to be clear, you're on the left?

8    **A**    That's correct.

9    **Q**    And Joe Wheatley, your friend, is on the far right?

10   **A**    That's correct.

11   **Q**    And in the middle is Rick Perry, right?

12   **A**    That's correct.

13   **Q**    And, again, former governor, but soon at least as of

14   the date this photo was taken, soon to be Energy Secretary?

15   **A**    That's correct.

16   **Q**    And one of the things that you were talking to Mike

17   Dowling about was they wanted you to introduce them to Rick

18   Perry at these inauguration events, right?

19   **A**    That's correct.

20   **Q**    And they wanted to -- you to introduce them so that

21   they could at some point essentially establish some

22   relationship with Mr. Perry to pursue this federal solution

23   to their nuclear power plants --

24   **A**    I have no idea.

25   **Q**    -- power plant problem?

1           Mr. Dowling didn't tell you why --

2    **A**    I don't recall.

3    **Q**    Let me finish the question.

4    **A**    Okay.

5    **Q**    You have no idea why Mike Dowling wanted you to

6    introduce him to Rick Perry?

7    **A**    I know that they had a federal issue, and it was

8    assumed that Rick Perry was going to be announced, but he

9    didn't say specifically.

10   **Q**    But it was pretty clear?

11   **A**    Absolutely.

12   **Q**    Right.

13           MR. BRADLEY:  You can take that down, PJ.  So if we

14   can move on.

15   **Q**    You know, the inauguration events conclude basically

16   towards the end of January of 2016, and you return back to

17   Ohio, right?

18   **A**    That's correct.

19   **Q**    And by this time, you have -- you had already met with

20   Mr. Householder and he's bringing you on board to help him

21   pursue his strategy of recruiting the slate of candidates

22   towards the ultimate goal of becoming Speaker again, right?

23   **A**    That's correct.

24   **Q**    And so as of early 2017, you're now focussing on

25   recruiting candidates, yes?

1    **A**    That's correct.

2    **Q**    And for the most part -- well, can you just -- how

3    does that -- how do you go about recruiting a slate of 25 or

4    so candidates all across the state of Ohio, how do you

5    identify potential candidates?

6    **A**    Well, you identify the seats that you're looking at,

7    so the open seats which are scattered all over the state of

8    Ohio.  You figure out, okay, in this district, who do we

9    know, who do we -- you know what relationships do we have,

10   who knows anybody that's running, has anybody announced

11   they're running.  So you try to whittle it down as best you

12   can.  Go meet with folks that -- you know, whether it's --

13   you know, if you had relationships with the business

14   community, talk to business leaders, who would be a good

15   candidate.  Or if you have, you know, people that are

16   actively involved in the community, talk to them, who would

17   be a good candidate.

18        And then you sort of develop a list of, you know,

19   hopefully five or six, seven different people, you go meet

20   with them, talk to them, see if they're interested in

21   running or see if they're already running.  And you just

22   whittle it down district by district.

23   **Q**    And generally, as part of that process, you're looking

24   to identify, we've already established, quality electable

25   candidates, right?

JEFF LONGSTRETH - CROSS-EXAM                    17-2763

1    **A**    That's correct.

2    **Q**    And, but also candidates that generally have political

3    values that would be aligned with the political values held

4    by Mr. Householder?

5    **A**    Generally, yes.

6    **Q**    And generally, when you're engaging in this process of

7    identifying candidates, you're looking for candidates that

8    would have pro life, pro Second Amendment, pro labor?

9    **A**    Yes.

10   **Q**    And those were all generally political values held by

11   Mr. Householder, right?

12           MS. GLATFELTER:  Objection, Your Honor, irrelevant.

13           THE COURT:  Sustained, sustained.

14   **Q**    So that process takes place over the course of months,

15   right?

16   **A**    That's correct.

17   **Q**    And along the way while you're largely focussing on

18   recruiting the candidates, Mr. Householder is focussing on

19   raising money, generally, right?

20   **A**    Yes.

21   **Q**    And at least in the early stages, early 2017, it was

22   just you, Mr. Householder, and I think the first member of

23   the political team that was added was Anna Lippincott,

24   right?

25   **A**    That's correct.

1    **Q**    And then after Anna Lippincott was Megan Fitzmartin?

2    **A**    That's correct.

3    **Q**    And as you kind of moved through 2017, roll into 2018,

4    now we're marching towards the general -- well, the

5    primaries in 2018, right?

6    **A**    Yes.

7    **Q**    And was that in March or May?

8    **A**    I believe that was a May primary.

9    **Q**    Okay.  And by the time you hit, let's say, early 2018,

10   you've filled out your slate of candidates, right?

11   **A**    Excuse me, by what time?

12   **Q**    Say early 2018.

13   **A**    Generally, by the filing deadline, we would have had

14   our full slate.

15   **Q**    When was that?

16   **A**    It's 90 days before the election, so whenever the

17   election was, back it out 90 days.

18   **Q**    Okay.  And so by this point in time -- and I'm now

19   talking like early 2018 -- you're supporting a slate of 20

20   to 25 candidates, right?

21   **A**    That's correct.

22   **Q**    And that means 20 to 25 individual campaigns that

23   you're assisting with, right?

24   **A**    That's right.

25   **Q**    And there's a lot that goes into, you know, a

1    political campaign for a seat in the Ohio House of

2    Representatives, right?

3    **A**    That's correct.

4    **Q**    Fundraising, right?

5    **A**    Yes.

6    **Q**    And advertising?

7    **A**    Yes.

8    **Q**    Polling, yes?

9    **A**    Yes.

10   **Q**    And, you know, strategy decisions that have to get

11   made on a daily basis about a campaign, right?

12   **A**    That's correct.

13   **Q**    And so you -- it would be necessary to build out a

14   pretty big political team to accomplish all of that on

15   behalf of a slate of 20 to 25 candidates, right?

16   **A**    That's correct.

17          MR. BRADLEY:  And, Your Honor, can we publish

18   what's already been admitted as Householder Exhibit 338?

19          THE COURT:  Yes.

20   **Q**    Are you able to see that?

21   **A**    Yes.

22          MR. BRADLEY:  There you go.  Thank you, PJ.

23   **Q**    And do you recognize this as an e-mail from you to, it

24   looks like, a whole host of individuals; do you recognize

25   that?

1    **A**    Yes, yes.

2    **Q**    And the date would have been November 5th of 2018,

3    right?

4    **A**    Yes.

5    **Q**    And that would be the day before the general election

6    of 2018?

7    **A**    That's correct.

8    **Q**    And what was your purpose in sending this e-mail?

9    **A**    Just a general thank you to the team members for all

10   of their hard work.

11   **Q**    Over the course of almost two years, right?

12   **A**    That's correct.

13   **Q**    And so all of those people identified as recipients

14   would be the part of the political team that you organized?

15   **A**    That's correct.

16   **Q**    And we see the first recipient is Megan Fitzmartin,

17   and the next one is Scott Schweitzer.  And who's Scott

18   Schweitzer?

19   **A**    He works for the Strategy Group for media.

20   **Q**    And what's the Strategy Group?

21   **A**    They produce TV ads and all sorts of advertising, TV,

22   radio, and placement.

23   **Q**    On behalf of the slate --

24   **A**    Political candidates.

25   **Q**    Well, but, here, on behalf of the slate of 20 to 25

1    candidates that you were supporting?

2    **A**    That's correct.

3    **Q**    And then Anna Lippincott, Bryan Gray.  Who's Bryan

4    Gray?

5    **A**    Bryan Gray was Mr. Householder's legislative aide, and

6    then during the campaign came over -- took a leave of

7    absence from the House of Representatives and came over and

8    helped out on the campaigns.

9    **Q**    Jonathan -- I'm going to butcher it, Bocanegra?

10   **A**    Yeah, worked with us.

11   **Q**    What did he do?

12   **A**    I think he did IT and data.

13   **Q**    How about Chris Schrimpf?

14   **A**    He's a pollster.

15   **Q**    Polling?

16   **A**    Yes.

17   **Q**    And polling is an important part of a political

18   campaign, right?

19   **A**    Yes.

20   **Q**    And why is that generally important?

21   **A**    Generally, it helps you decide, you know, if you're

22   way ahead in a race or way behind in a race, you probably

23   aren't going to spend as much money, especially on TV.  If

24   it's real close, then you know this is a TV race, which

25   leads to other decisions that have to be made quickly.

1   **Q**   Helps you decide how to allocate your resources?

2   **A**   That's a great way to put it.

3   **Q**   And then who's Adam Maust?

4   **A**   He helped us with direct -- or yeah, direct mail.

5   **Q**   So that's -- when we all go out to our mailbox and go

6   out and get the various political advertising, that's all

7   part of your support for the slate of candidates?

8   **A**   That's correct.

9   **Q**   And then there's other individuals, Brooke Bodney I

10  see there.  Brooke is a pretty well-renowned political

11  fundraiser, correct?

12  **A**   That's correct.

13  **Q**   And she was part of the team?

14  **A**   That's correct.

15       MR. BRADLEY:  And, PJ, can you cull out the second

16  sentence that we started with?

17  **Q**   And you write:  We started with nothing more than an

18  appreciation to shake up the system and an admiration for

19  our guy Larry Householder.  Do you see that?

20  **A**   Yes.

21  **Q**   And in that time, we've all learned what an

22  inspirational leader he is and we've built the best team in

23  Ohio politics.  What did you mean when you say "an

24  appreciation to shake up the system"?

25  **A**   So at the time that Mr. Householder won his election

1    for state representative in 2016, the system was run by

2    some -- you know, other Republicans, and, typically, it's

3    really hard for an outsider to come into a system like that

4    and win and be elected the leader.

5    **Q**    And even though -- well, at the time, the Republicans

6    held the majority in the House of Representatives, right?

7    **A**    That's correct.

8    **Q**    And even though Larry was a Republican House member,

9    he was considered a political outsider?

10   **A**    By those in power, yes.

11   **Q**    Sure.  And specifically the leaders of the Republican

12   Caucus, Cliff Rosenberger included, right?

13   **A**    That's correct.

14          MR. BRADLEY:  PJ, can you cull out the fourth full

15   paragraph, "I've spent time"?  Thank you.  And then can

16   you -- so towards the end of the paragraph, PJ, can you

17   highlight "not only did we," all of that sentence?

18   **Q**    Do you see where we've highlighted that?

19   **A**    Yes.

20   **Q**    And it says:  Not only did we do it for 21 newbie

21   candidates in the primary against an organized, well-funded

22   operation that tried to kill us, we're now doing it for 38

23   more in the general against another group who wants to kill

24   us.  Do you see that?

25   **A**    I do.

1    **Q**    So the first half of that sentence, "Not only did we

2    do it for 21 newbie candidates in the primary against an

3    organized, well-funded operation that tried to kill us,"

4    what are you referring to?

5    **A**    The folks that were part of the insiders that

6    didn't --

7    **Q**    The establishment?

8    **A**    The establishment, so to speak.

9    **Q**    Okay.  And they were a well-funded operation as well?

10   **A**    That's correct.

11   **Q**    And that's primarily coming from the Republican

12   Caucus?

13   **A**    From what we could see, yes.

14   **Q**    And in the 21 newbie candidates that you're referring

15   to there, that was generally referred to as Team

16   Householder, those candidates, right?

17   **A**    That's correct.

18   **Q**    And then the organized, well-funded operation that

19   tried to kill you in the primaries was the slate of

20   candidates that the Republican Caucus supported, right?

21   **A**    That's right.

22   **Q**    And that was generally known as Team Smith?

23   **A**    That's correct.

24   **Q**    And that was a reference to Ryan Smith?

25   **A**    That's right.

1    **Q**     And he -- "he" being Ryan Smith -- was the candidate

2    that was the preferred candidate to become Speaker?

3    **A**     That's correct.

4          MR. BRADLEY:  And then, PJ, can you take that down.

5       And, Your Honor, can we publish what's already been

6    admitted that is Government's Exhibit 241 D, as in dog?

7          THE COURT:  Yes.

8          MR. BRADLEY:  And then -- there you go.  Thank you.

9    **Q**     And do you recognize this as an e-mail that you would

10   have sent on May 8th of 2018 to basically a whole host of

11   recipients?

12   **A**     It's an e-mail from me to a bunch of recipients.

13   **Q**     Yeah.

14   **A**     Yes.

15   **Q**     And May 8th of 2018?

16   **A**     That's right.

17   **Q**     Which would have been I think just after the primary,

18   right?

19   **A**     I'm guessing that's Election Day.

20          MR. BRADLEY:  Okay.  And then can we go to the next

21   page?

22   **Q**     And that's the attachment to that e-mail, right?

23   **A**     Yes.

24   **Q**     And it presumably either was Election Day or the day

25   after because it appears that -- well, it's probably

1    Election Day because --

2    **A**    It's a Tuesday.

3    **Q**    Yeah.  And there would be three columns there, and the

4    first column is essentially Team Householder candidates,

5    right?

6    **A**    That's correct.

7    **Q**    And then the second column is the Team Smith

8    candidates, right?

9    **A**    That's correct.

10   **Q**    And then the third column would be projections as to

11   who's ahead or who's already won, right?

12   **A**    That's correct.

13        MR. BRADLEY:  And so can you go back to the first

14   page, PJ?

15   **Q**    So, you know, when we look at this host of people,

16   it's no secret that there's, you know, two teams battling it

17   out here, right?

18   **A**    That's correct.

19   **Q**    And I think you said earlier that's a time-tested

20   political strategy to try and recruit a slate of candidates

21   into the open seats and hope they vote for you for Speaker

22   if they win, right?

23   **A**    That's correct.

24   **Q**    And that's what Householder was doing, right?

25   **A**    That's right.

JEFF LONGSTRETH - CROSS-EXAM                    17-2773

1    **Q**    And that's what Smith was doing?

2    **A**    That's correct.

3           MR. BRADLEY:  So you can take that down, PJ.

4    **Q**    In your efforts to support the candidates, we've

5    already talked about how money was raised into Gen Now that

6    would serve as, for lack of a better word, a bucket of money

7    that would be used to support the needs of the various

8    political campaigns, right?

9    **A**    That's right.

10   **Q**    And then, then you had two companies that had already

11   been established, you know, well before or at least

12   certainly before you met up with Larry at the Island House,

13   right?

14   **A**    That's correct.

15   **Q**    That was JPL & Associates, right?

16   **A**    Yes.

17   **Q**    And Constant Content, right?

18   **A**    That's correct.

19   **Q**    And Constant Content, kind of like the name evokes,

20   they would provide creative and design work for some of

21   those mailers that you were talking about, for example,

22   right?

23   **A**    That's correct.

24   **Q**    And other literature, campaign literature, right?

25   **A**    That's correct.

JEFF LONGSTRETH - CROSS-EXAM                    17-2774

1    **Q**    And then digital advertising?

2    **A**    That's correct.

3    **Q**    Right.  So like what's that mean, like mass texts?

4    What's digital advertising?

5    **A**    Digital would be like a Facebook ad.

6    **Q**    And so Constant Content would be responsible for all

7    of the creative efforts to design all of that?

8    **A**    Yes.

9    **Q**    And then contrast that with JPL, they would provide a

10   different service -- support services, you know, help in

11   fundraising, right?

12   **A**    Yes.

13   **Q**    We talked about that, that each of the candidates

14   would certainly benefit from some of the money that was

15   raised into Gen Now, but they would also fundraise into

16   their own campaign accounts?

17   **A**    That's correct.

18   **Q**    And because a lot of these people -- I think you used

19   the phrase "newbies" in one of those e-mails -- because

20   they're newbies, political newbies, you know, they can rely

21   on expertise provided by JPL to assist them in fundraising?

22   **A**    That's correct.

23   **Q**    And then JPL would provide field staff, right?

24   **A**    That's correct.

25   **Q**    And so, essentially, you know, people that have

1    experience operating a political campaign that would serve

2    the role of campaign mangers?

3    **A**    That's correct.

4    **Q**    And then JPL would also help with the polling, we

5    talked about that a little bit, right?

6    **A**    That's right.

7    **Q**    And then generally help with strategy decisions that

8    would be made as part of every political campaign, right?

9    **A**    That's correct.

10   **Q**    And Constant Content, looping back to Constant

11   Content -- when I say "you," I am referencing Constant

12   Content.  As being the owner of Constant Content, you would

13   charge the candidates a fee for their -- for the services

14   that Constant Content would provide, right?

15   **A**    That's correct.

16   **Q**    And that would be a flat fee of $1,500 a month?

17   **A**    I don't remember exactly.

18          MR. BRADLEY:  Okay.  Can we see -- Your Honor, can

19   we publish what's already been admitted as Government's

20   Exhibit 41 D, as in "dog"?

21          THE COURT:  Yes.

22          MR. BRADLEY:  And there's a series of pages to this

23   exhibit.  If we can just stay here for now, PJ.

24   **Q**    Do you recognize this as a series of checks from the

25   different candidates that were part of Team Householder

1    paying Constant Content?

2    **A**    I do.

3          MR. BRADLEY:  And can you scroll down, PJ, to the

4    next page?

5    **Q**    And, again, looking at the second check, that's from

6    Baldridge, $1,500; do you see that?

7    **A**    I do.

8    **Q**    And then from Tracy Richardson --

9    **A**    Um-hmm.

10   **Q**    -- $1,500; do you see that?

11   **A**    I do.

12   **Q**    Mike Rasor to Constant Content for $1,500, right?

13   **A**    Yes.

14   **Q**    And then Friends of Larry Householder for $1,500,

15   right?

16   **A**    Yes.

17   **Q**    So does that refresh your recollection --

18   **A**    Yeah.

19   **Q**    -- that you're charging these candidates a fee of 1500

20   bucks for the service?

21   **A**    Yes.

22   **Q**    To be fair, for the services that you're providing,

23   right?

24   **A**    Yes.

25   **Q**    And that includes Larry Householder's campaign, right?

1    **A**    That's right.

2    **Q**    So you provided services to all of these slate of

3    candidates, but also Mr. Householder's campaign, and he paid

4    for those?

5    **A**    That's correct.

6    **Q**    And that $1,500 is per month, right?

7    **A**    That's right.

8    **Q**    So if we're saying -- use on average 20 candidates

9    times 1500 bucks a month, that's $30,000 a month, right?

10   **A**    I don't know.  I didn't do the math that quickly, but

11   I'll take your word for it.

12   **Q**    Well, sure.  You know, 20 candidates, 1500, that

13   sounds like 30 grand to me.

14   **A**    Okay.

15   **Q**    And so -- and that's every month for Constant Content,

16   right?

17   **A**    That's right.

18   **Q**    And so I think it was yesterday when you were saying

19   that -- when Mr. Householder brought you on board, one of

20   the things he insisted was, well, you can only have him as a

21   client, right; do you recall that testimony?

22   **A**    That's right.

23   **Q**    But, in fact, there's at least 20 clients that are

24   these candidates, right?

25   **A**    When I say "only him as a client," that means Team

1  Householder.

2  **Q**    Okay.  So, so it wouldn't be correct to say you only

3  have one client that is Larry Householder, right?

4      MS. GLATFELTER:  Objection, Your Honor, asked and

5  answered.

6      THE COURT:  Agreed.  Sustained.

7  **Q**    So when you first met Larry at the Island House, the

8  times with Mike Carey -- and that was I think we said was

9  late 2016?

10  **A**    Late summer of 2016, yeah.

11  **Q**    And then we've already talked about how when you were

12  in DC, you were talking with Mike Dowling, right?

13  **A**    That's right.

14  **Q**    And you had a relationship with Mike Dowling that

15  predated these Island House lunches with Larry and Mike

16  Carey, right?

17  **A**    I knew Mike Dowling previous to that, yes.

18  **Q**    Yeah.  And you had done work in West Virginia for

19  other energy companies prior to 2016?

20  **A**    Yes.

21      MR. BRADLEY:  And, Your Honor, may we show the

22  witness what has not been admitted that is Householder

23  Exhibit 159?

24      THE COURT:  Yes.

25  **Q**    Are you able to see that on the screen,

1    Mr. Longstreth?

2    **A**    Yes.

3    **Q**    And starting at the bottom half, this appears to be an

4    e-mail that you would have sent on February 14th of 2017 to,

5    it looks like, a couple of people that are employed by

6    FirstEnergy; do you see that?

7    **A**    That's right.

8    **Q**    And then -- well, yes.

9         And that your e-mail ultimately gets forwarded to Mike

10   Dowling; do you see that?

11   **A**    That's right.

12   **Q**    And then, eventually, that gets forwarded to somebody

13   else, see at the very top, right?

14   **A**    That's right.

15        MR. BRADLEY:  So, Your Honor, at this time, I would

16   move to admit -- I lost track of the page -- Householder

17   Exhibit 159?

18        THE COURT:  Any objection?

19        MS. GLATFELTER:  No objection.

20        MR. SCHNEIDER:  None.

21        MR. BRADLEY:  May we publish?

22        THE COURT:  It's admitted.  You may publish.

23        MR. BRADLEY:  Yes?

24        THE COURT:  Yes.

25   **Q**    So this e-mail --

1          MR. BRADLEY:  And, PJ, can you cull out the bottom

2     half, please?

3     **Q**     This e-mail was dated February 14th, 2017, right?

4     **A**     That's right.

5     **Q**     Roughly, three weeks after the inauguration?

6     **A**     That's right.

7     **Q**     And what are you talking about here?

8     **A**     This is a -- this was a project to help them with --

9     they were having some issues with a pour plant, I don't

10    remember exactly what the issue was.  And they -- this is

11    a -- sort of a rough plan to put together a grassroots

12    campaign to support the issue.

13    **Q**     And they wanted you to be the guy conducting that

14    grassroots campaign?

15    **A**     That's correct.

16    **Q**     And, ultimately, you were hired by FE to conduct such

17    a grassroots campaign?

18    **A**     Yeah, after I went to Mr. Householder and seeked his

19    permission.  He said they're our biggest donor, they need

20    your help, go do it.

21    **Q**     So you wouldn't do that without getting his approval?

22    **A**     No, I would not.

23    **Q**     But, ultimately, they paid you for your work, right?

24    **A**     They did.

25    **Q**     90 grand?

1    **A**    I don't remember exactly how much, but --

2            MR. BRADLEY:  Can we see what has already been

3    admitted as Government's Exhibit 82?  And, PJ, can we go to

4    page 108?

5            THE COURT:  Yes.

6            MR. BRADLEY:  And can you cull out the check or --

7    the check first?

8    **Q**    And this appears to be a FirstEnergy check dated

9    March 16, 2017; do you see that?

10   **A**    Yes.

11   **Q**    And in the amount of $90,000, right?

12   **A**    Yes.

13   **Q**    And it's payable to the Coalition for Growth and

14   Opportunity; do you see that?

15   **A**    I do.

16   **Q**    And that's another company that you operate?

17   **A**    Yes.

18   **Q**    And that was established, again, prior to the Island

19   House meetings we've been talking about?

20   **A**    I don't remember exactly when, but I would guess that

21   it was.  Um-hmm.

22   **Q**    So in addition -- we've already talked about Constant

23   Content and JPL & Associates -- you also operated the

24   Coalition for Growth and Opportunity, right?

25   **A**    That's right.

```
 1                    MR. BRADLEY:  You can take that down, PJ.
 2            Your Honor, can we publish what has already been
 3       admitted as Householder Exhibit 472, please?
 4                    THE COURT:  Yes.
 5                    MR. BRADLEY:  And can you blow up the top?  Thank
 6       you.
 7       Q     And do you recognize this as an e-mail that Anna
 8       Lippincott -- that's one of the first Householder team
 9       members that we were talking about -- sends you on
10       May 8th -- May 15th of 2018; do you see that?
11       A     I do.
12       Q     There appears to be a number of attachments that are
13       invoices that is sent to the campaigns, right?
14       A     Right.
15       Q     So in addition to Constant Content invoicing the
16       candidates for the $1,500 a month retainer, JPL invoiced the
17       candidates for work performed on behalf of the candidates;
18       is that right?
19       A     Yes.
20                    MR. BRADLEY:  Can we go to page 2, please?
21       Q     And here is an example of one of those invoices,
22       right?
23       A     (Nodding head.)
24       Q     You have to answer --
25       A     Yes.
```

1   **Q**    Yeah.  And this particular example looks to be

2   Candidate Baldridge, right?

3   **A**    That's right.

4   **Q**    And this is dated May 14th, and the invoice amount is

5   $10,870, right?

6   **A**    That's right.

7   **Q**    And so you'd send out a whole host of these invoices

8   on a monthly basis?

9   **A**    That's right.

10  **Q**    And then, in turn, the candidates are paying you for

11  the invoiced amount, right?

12  **A**    That's right.

13  **Q**    So you're making money from Constant Content on behalf

14  of all of these candidates and you're making money from JPL

15  on behalf of all of these candidates, right?

16  **A**    I'm not sure if either were profitable at the time.

17  **Q**    But you're generating a lot of revenue, right?

18  **A**    That's correct.

19  **Q**    And to be fair, correct me if I'm wrong, what you're

20  referring to is, is that there's a lot of expenses

21  associated with these campaigns, right?

22  **A**    That's correct.

23  **Q**    And some of that money was being reimbursed by the

24  candidates, but sometimes it was being covered by advance by

25  JPL, right?

1    **A**    That's right.

2    **Q**    And reimbursed by -- from some of the money from Gen

3    Now?

4    **A**    Yes.

5         MR. BRADLEY:  I'm keeping an eye on the time, Your

6    Honor.  Now would be a good time.

7         THE COURT:  That's a credit to you.  We need to

8    break for lunch.  We're going to break until 2:00.  I have

9    something I need to address.  So you're going to get a

10   little longer break today, possibly a smaller lunch, but so

11   be it.  During the break, take a break, put it out of your

12   mind.  Don't discuss it with yourselves or anyone else.  No

13   independent research.  No checking out the media.  Continue

14   to keep an open mind.  I want you to enjoy your break.

15   We'll try to get you at 2.  We'll rise as you leave.

16        THE DEPUTY:  All rise for the jury.

17     (Jury exited the courtroom at 11:49 a.m.)

18        THE COURT:  Jury has left the room.  We'll remain

19   in here until we've been advised they've cleared the floor,

20   and we'll break until 2:00.

21     Witness is not to discuss his testimony during the

22   break and he understands?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Thank you.

25     (Pause.)

```
1              THE DEPUTY:  All clear.
2              THE COURT:  All right.  We're in recess until 2.
3              THE DEPUTY:  This court is in recess until 2:00.
4         (Recess taken from 11:50 a.m.  to 1:57 p.m.)
5              THE DEPUTY:  All rise.  This court is in session
6    pursuant to the recess.
7              THE COURT:  Thank you.  Please be seated.  The
8    government is here.  Mr. Householder's team is here.
9    Mr. Borges' team is here.  Are we ready for the jury, first,
10   from the government?
11             MS. GLATFELTER:  Yes, Your Honor.  Thank you.
12             THE COURT:  And Mr. Householder's perspective?
13             MR. BRADLEY:  Yes, Judge.
14             THE COURT:  And Mr. Borges'?
15             MR. SCHNEIDER:  Yes.
16             THE COURT:  Very well.  Let's call for the jury.
17        (Pause.)
18             THE DEPUTY:  All rise for the jury.
19        (Jury entered the courtroom at 2:01 p.m.)
20             THE COURT:  Thank you.  You may all be seated.  And
21   the jurors are back, welcome.  We are going to continue with
22   the hearing of testimony.  Mr. Bradley, you may continue.
23             MR. BRADLEY:  Thank you, Judge.
24             THE COURT:  Very well.
25   BY MR. BRADLEY:
```

1    **Q**    Good afternoon, Mr. Longstreth.

2    **A**    Good afternoon.

3    **Q**    Before we broke for lunch, we were talking a little

4    bit about some of the payments that were made by the

5    candidates into Constant Content and JPL; do you recall

6    those questions?

7    **A**    I do.

8    **Q**    In addition to those payments, you paid yourself a

9    management fee for your role in operating Generation Now,

10   correct?

11   **A**    The company was paid a management fee.

12          MR. BRADLEY:  Your Honor, may we publish what has

13   already been admitted as Government's Exhibit 202 A?

14          THE COURT:  Yes.

15   **Q**    And do you recognize what is Government's Exhibit 202

16   A, Mr. Longstreth?

17   **A**    It's an e-mail from me to Eric Lycan.

18   **Q**    And Eric Lycan was a treasurer for Generation Now?

19   **A**    That's correct.

20   **Q**    And besides yourself was the only other person that

21   had signature authority to write checks, correct?

22   **A**    That's correct.

23   **Q**    And, essentially -- and the date of this being

24   March 22nd, 2017, correct?

25   **A**    That's right.

1    **Q**    And you're essentially instructing Mr. Lycan that

2    moving forward, meaning as of March of 2017 moving forward,

3    that you would pay -- you would be paid a management fee of

4    $13,000 a month, right?

5    **A**    Yes.

6    **Q**    And then plus a 5 percent fundraising bonus, correct?

7    **A**    That's right.

8    **Q**    So do I understand correctly that for every, every

9    dollar that was fundraised into Gen Now, you get 5 percent

10    of that as a bonus?

11    **A**    That's correct.

12    **Q**    Okay.

13         MR. BRADLEY:  You can take that down, PJ.

14    **Q**    And Mr. Householder was unaware of how much you were

15    being paid from any of these entities, correct?

16    **A**    I don't recall the answer to that.

17    **Q**    We talked earlier about how you met with the

18    government and discussed some of these very issues that

19    we're talking about here in the courtroom today.  Would it

20    refresh your recollection to review some of those notes from

21    your -- actually your first time sitting down with the

22    government?

23    **A**    Yes.

24         MR. BRADLEY:  Your Honor, may we show the witness

25    Mr. Longstreth's proffer from July 30th of 2020?

1          THE COURT:  For the purpose of refreshing

2     recollection, if possible, go ahead.

3          MR. BRADLEY:  Thank you.  PJ, and could you go to

4     page 14?

5     Q    Are you able to see that?

6     A    Yes.

7     Q    Primarily directing your attention to the last full

8     paragraph.

9     A    Okay.

10    Q    Well, second-to-last full paragraph.

11    A    Okay.

12    Q    And having had the opportunity to review those

13    interview notes, does now refresh your recollection?

14    A    My recollection is we never -- we didn't really talk

15    about it, so I didn't know if maybe we had at one point, but

16    I don't believe that we had talked about it.

17    Q    And, but again, having now refreshed your

18    recollection, is it fair to say that as far as you know,

19    Mr. Householder had no idea how much you were paying

20    yourself?

21    A    That's correct.

22    Q    Moving on, one of the things that you were asked

23    yesterday was about the -- some of the moneys that you paid

24    towards Mr. Householder's legal fees and settlement

25    associated with a coal mine lawsuit.  Do you recall that?

1    **A**    I do.

2    **Q**    And at least some of that money was sourced from your

3    retirement account; is that right?

4    **A**    I don't recall where it all came from.

5         MR. BRADLEY:  Your Honor, can we show the witness

6    what has not been admitted, which would be Householder

7    Exhibit 477?

8         THE COURT:  Yes.

9    **Q**    Are you able to see that, Mr. Longstreth?

10   **A**    Yes.

11   **Q**    And do you recognize this exhibit to be a Huntington

12   Bank statement for the period of July 2018?

13   **A**    I do.

14   **Q**    And it would be for your personal checking account,

15   correct?

16   **A**    That's right.

17        MR. BRADLEY:  And can we go to page 2, please?

18   Well, actually, before we go any further, Your Honor, at

19   this time, I would move to admit Householder Exhibit 477.

20        THE COURT:  Any objections?

21        MS. GLATFELTER:  No, Your Honor.

22        MR. SCHNEIDER:  None here.

23        THE COURT:  They're admitted.  You may publish, if

24   you wish.

25        MR. BRADLEY:  Thank you.  Actually, can we go back

1    to page 1, please, PJ?  I'm sorry, page 2.

2        Could I have just one moment, Your Honor?

3            THE COURT:  Yes.  Back to page 1, PJ, and can you

4    cull out the deposit, please, from 7/18.

5    **Q**    And you in addition to having your personal checking

6    account with Huntington National Bank, you also had a Schwab

7    brokerage account, correct?

8    **A**    That's correct.

9    **Q**    And does it appear that there was money that was

10   deposited from your Schwab brokerage account on 7/18 into

11   your Huntington Bank account in the amount of a $100,000?

12   **A**    It does.

13   **Q**    All right.  And is the Schwab brokerage, is that your

14   retirement account?

15   **A**    I don't think so.

16   **Q**    Just a brokerage account?

17   **A**    Yeah, it's a brokerage account.

18   **Q**    Okay.

19           MR. BRADLEY:  And then could we go to the next

20   page, PJ?  And the 7/24 withdrawal, can you cull that out,

21   please?

22   **Q**    And then, you know, roughly a week or so after the

23   deposit from Schwab into your Huntington is the withdrawal

24   from 7/24 in the amount of $100,000; is that right?

25   **A**    That's right.

1    **Q**    And that was used to at least partially fund the

2    payments to the settlement?

3    **A**    I don't know where that -- where that went.  I don't

4    recall that date specific.

5    **Q**    You don't recall the $100,000 --

6    **A**    I don't.

7    **Q**    I'm sorry?

8    **A**    I don't recall where it went.

9          MR. BRADLEY:  You can take that down, PJ.

10   **Q**    In addition to the moneys paid towards the settlement

11   related to the litigation surrounding the coal mine, you had

12   also contracted with a contractor in Florida to do some

13   repairs at a home in Florida that Mr. Householder owned,

14   correct?

15   **A**    That's right.

16   **Q**    And there was a considerable amount of damage done to

17   the property as a result of a hurricane?

18   **A**    That's right.

19   **Q**    And for any number of reasons, that construction

20   process dragged on for quite some period of time, correct?

21   **A**    That's right.

22          MR. BRADLEY:  And can we, Your Honor, can we show

23   the witness what has not yet been admitted, which is

24   Householder Exhibit 480?

25          THE COURT:  Yes.

1    **Q**    Are you able to see that, Mr. Longstreth?

2    **A**    I can.

3    **Q**    And this -- do you recognize this as an e-mail that

4    was sent from a Steve Myli to you on May 27th of 2020; do

5    you see that?

6    **A**    I do.

7    **Q**    And Mr. Myli is in fact the Florida contractor that

8    was hired to do the repairs at the Florida home?

9    **A**    That's right.

10   **Q**    And if you just can take a look at the body of the

11   e-mail, this would suggest that, in summary, Mr. Myli

12   notifying you that the repairs are now complete and the

13   final amount owed is roughly $37,000; do you see that?

14   **A**    I do.

15   **Q**    And just putting that in its context, that would be,

16   you know, roughly 45 days before, before arrests were made

17   in connection with this case, right?

18   **A**    That's right.

19            MR. BRADLEY:  Your Honor, can we publish what has

20   already been admitted which is Government's Exhibit 823?

21            THE COURT:  Yes.

22            MR. BRADLEY:  Can you blow that up for us, PJ?

23   **Q**    Have you ever seen this exhibit, Mr. Longstreth?

24   **A**    I don't recall what that is.

25   **Q**    I would represent to you for purposes of these

1  questions that this is a Government Exhibit that reflects

2  how much you were paid from various entities over the course

3  of this case, roughly from late 2016 until the arrests in

4  July of 2020.

5  **A**    Okay.

6  **Q**    And you'll note that -- I'm sorry?

7  **A**    I just said okay.

8  **Q**    Oh, and you'll note that the payments roughly total

9  about $2.5 million, correct?

10  **A**    That's what it says.

11  **Q**    And then there's a little asterisk at the bottom, if

12  you can see that, this reflects the amount that flowed

13  through the account before the FBI seized the remaining

14  balance of just a tick under $2.9 million, correct?

15  **A**    That's right.

16  **Q**    So there was roughly $2.9 million that was frozen and

17  seized by the government upon your arrest, right?

18  **A**    That's right.

19  **Q**    And then, so if we were to add that roughly

20  $2.9 million with the roughly $2.5 million that you received

21  during the course of this case, that would total up to be

22  approximately $5.4 million?

23  **A**    Okay.

24  **Q**    Is that right, does that sound about right?

25  **A**    That sounds about right, yeah.

1   **Q**    So during the course of that roughly three-year period

2   of time, you made $5.4 million?

3   **A**    I don't know if that was profit, but --

4   **Q**    But you were paid $5.4 million, right?

5   **A**    That appears to be right.

6   **Q**    And had roughly 2.9 million in your accounts at the

7   time you were arrested and seized, right?

8   **A**    That's about right.

9   **Q**    And I think you indicated at the beginning of your

10  testimony yesterday that you -- when asked about essentially

11  your employment, that you're an investor?

12  **A**    That's right.

13  **Q**    And what sort of things are you investing in?

14  **A**    I invest in stocks, bonds, commodities, normal,

15  crypto, I mean, anything that trades, in addition to real

16  estate.

17  **Q**    So you're doing some of that as well?

18  **A**    That's right.

19  **Q**    So stocks, bonds, financial instruments, and

20  essentially flipping houses?

21  **A**    Yes.

22  **Q**    And you're married, yes?

23  **A**    That's right.

24  **Q**    Children?

25  **A**    Yes.

1    **Q**    How old are they?

2         MS. GLATFELTER:  Your Honor, I object to this.

3    This is personal.

4         THE COURT:  I sustain it.  I don't know that that's

5    relevant.  Let's move along.

6    **Q**    So shortly after your arrest, the government -- well,

7    upon your arrest, the government froze and seized

8    $2.9 million from you, correct?

9    **A**    That's correct.

10   **Q**    And shortly thereafter, you agreed to sit down with

11   the government and in a proffer session and tell them

12   everything you knew about this case, right?

13   **A**    That's right.

14   **Q**    And that would have been I believe that July 30th

15   proffer that we've looked at a little bit today, right?

16   **A**    That's right.

17   **Q**    So roughly a week after you were arrested?

18   **A**    Give or take, yeah.

19   **Q**    Yeah.  And then how many times have you met with the

20   government since to discuss your testimony in this case?

21   **A**    I don't know exactly.  I'd say eight or ten, but I'm

22   estimating.

23   **Q**    And when was the last time prior to your testimony

24   that you would have sat with the government?

25   **A**    Early -- either Sunday or Monday this week.

1    **Q**    And out of these eight or ten times or -- yeah, eight

2    or ten times, you know, just your best estimate here, you

3    know, how long are those meetings with the government?

4    **A**    Usually about a couple of hours.

5    **Q**    And has there been occasions where it's been longer

6    than that?

7    **A**    I'm sure there has, um-hmm, yeah.

8    **Q**    And you ultimately entered into a plea agreement with

9    the government, right?

10   **A**    That's right.

11   **Q**    And as part of that plea agreement, you're required to

12   do what you're doing right there, testify as a government

13   witness, right?

14   **A**    That's correct.

15   **Q**    And one of the conditions of your plea deal is that

16   you testify truthfully, right?

17   **A**    That's right.

18   **Q**    And it's the government that will determine whether

19   you've been truthful; is that correct?

20   **A**    I think they determine if I've provided substantial

21   assistance.

22   **Q**    But as part of that, you're required to testify

23   truthfully, right?

24   **A**    That's correct.

25   **Q**    And it's the government that will make that

1    determination?

2    **A**    That's my understanding, um-hmm.

3    **Q**    And if the government is satisfied that you've

4    testified truthfully as they see it, then, they would make a

5    recommendation to the Judge that you could avoid a prison

6    sentence all together, correct?

7    **A**    That's possible.

8    **Q**    That would be the best-case scenario?

9    **A**    Well, depends on what the Judge says.

10   **Q**    Well, sure.  But best-case scenario would be that when

11   it comes time for you to be sentenced by the Judge, that the

12   government would make a recommendation that you receive no

13   prison sentence?

14   **A**    That would be preferred.

15   **Q**    And worst-case scenario would be the government would

16   recommend that you receive a prison sentence of no more than

17   six months; is that right?

18   **A**    I don't know the answer to that.

19   **Q**    You're not sure?

20   **A**    I'm not sure that that's the worst-case scenario.

21   **Q**    Well, you know that, of course --

22   **A**    The worst-case scenario is that they don't make a

23   recommendation like that.

24   **Q**    Fair enough.

25   **A**    Because I didn't tell the truth.

1    **Q**    But if they do make a recommendation, the most that

2    they can recommend that you receive is six months in prison;

3    is that right?

4    **A**    That's correct.

5    **Q**    And the reason why I was asking some of those

6    questions about your family is not to pry, but it would be

7    devastating for you and your family to serve a prison

8    sentence, right?

9    **A**    Yes.

10   **Q**    So in the end, you're here to testify as a government

11   witness and you're going to put it in their hands whether

12   you've been truthful or not?

13   **A**    That's correct.

14        MR. BRADLEY:  Could I have a moment, Your Honor?

15        THE COURT:  Yes.

16     (Pause.)

17        MR. BRADLEY:  Your Honor, I have no further

18   questions of this witness at this time.

19        THE COURT:  Very well.  Thank you.

20     On behalf of Mr. Borges, does an attorney wish to

21   inquire?

22        MR. SCHNEIDER:  Your Honor, no questions of this

23   witness.

24        THE COURT:  Very well.  Redirect from the

25   government?

```
1              MS. GLATFELTER:  Yes, Your Honor.

2              THE COURT:  Very well.

3                      REDIRECT EXAMINATION

4    BY MS. GLATFELTER:

5    Q     Good afternoon, Mr. Longstreth.

6    A     Good afternoon.

7    Q     Now, several times today you were asked to look at

8    notes to see if they refreshed your recollection; is that

9    right?

10   A     Yes.

11   Q     And those weren't your notes, right?

12   A     That's right.

13   Q     You've never seen them before?

14   A     That's right.

15   Q     You were asked a series of questions this morning

16   about different donors into the Generation Now accounts; do

17   you recall that?

18   A     I do.

19             MS. GLATFELTER:  Your Honor, permission to publish

20   what has been admitted as Exhibit 17?

21             THE COURT:  Yes.

22   Q     Mr. Longstreth, these are deposits into the Generation

23   Now account by year.  Who was the largest contributor to

24   Generation Now in 2017?

25   A     FirstEnergy.
```

1    **Q**    And who was the largest contributor to Generation Now

2    in 2019?

3    **A**    FirstEnergy and Partners For Progress.

4    **Q**    What about 2020?

5    **A**    FirstEnergy and Partners For Progress.

6    **Q**    All right.  And let's go back to the year 2018.  What

7    are the totals for FirstEnergy and Partners For Progress for

8    2018?

9    **A**    1,400,000.

10   **Q**    Okay.  And there was other money that went into the

11   account?

12   **A**    That's correct, 1.875.

13   **Q**    And while we're looking at the Generation Now

14   deposits, the 1.4 million from FirstEnergy and Partners For

15   Progress, does that include the amount that went into other

16   accounts like Hardworking Ohioans, things like that?

17   **A**    I would assume that it did.

18   **Q**    You would assume that money into the Generation Now

19   account would also include other bank accounts?

20   **A**    That it would go from Generation Now to other bank

21   accounts, I would assume that.

22   **Q**    Right.  But what about amounts like that $500,000

23   amount that we were talking about yesterday, that went

24   directly from FirstEnergy to Hardworking Ohioans?

25   **A**    Yes.

1    **Q**    That's not included in this total, is it?

2    **A**    That's correct.

3    **Q**    All right.  And if we added to the total, it would be

4    around 1.9 million, right?

5    **A**    At least.

6    **Q**    Okay.  Now, you were asked a series of questions about

7    the Generation Now donor form; do you remember that?

8    **A**    I do.

9    **Q**    Did you have any interaction with Mr. Dowling from

10   FirstEnergy about the Generation Now donor form?

11   **A**    I did.

12   **Q**    Can you describe that for the jury?

13   **A**    So after -- are you talking about the first time?  I'm

14   sorry, clarification of which conversation about that?

15   **Q**    I'm asking about the conversations that you had with

16   Mr. Dowling about the contribution forms.

17   **A**    Okay.

18   **Q**    Yeah.

19   **A**    So in early February of 2017, Mr. Householder and

20   Mr. Jones had a conversation.  Mr. Householder told me, hey,

21   I talked to Chuck, they're going to pledge a million

22   dollars, get with Mike and work it out.  So then I called

23   Mr. Dowling and said, you know, I understand you and -- or

24   I'm sorry, I understand that Mr. Householder and Mr. Jones

25   had a conversation, you guys are going to do a million

1    dollars, how would you like to get the -- are you guys going

2    to write a check or a wire?  And then he said, Well, send me

3    the wiring instructions.

4    **Q**    Okay.

5    **A**    So I e-mailed him the wiring instructions.

6    **Q**    All right.  And did you have conversations with him

7    about the language on the Generation Now donor form?

8    **A**    I did.  They wanted a certain language on the donor

9    form that I'd sent him the first time.  They had wanted a

10   change, I forget what the change was, but so we changed it

11   and sent it back to them.

12   **Q**    They wanted you to edit the Generation Now

13   contribution form to include whatever language they wanted

14   on it?

15   **A**    That's correct.

16   **Q**    Did you make those edits?

17   **A**    I did.

18   **Q**    Now, Mr. Longstreth, you were asked a series of

19   questions today about payments that were made to the JPL

20   accounts and to the Constant Content accounts in 2018.  Do

21   you remember those questions?

22   **A**    Yes.

23   **Q**    All right.  And as we -- I think as you testified,

24   there were other sources of money that went into those

25   accounts, right?

1   **A**    That's right.

2          MS. GLATFELTER:  All right.  Your Honor, permission

3   to publish what has been admitted as Exhibit 34?

4          THE COURT:  Yes.

5   **Q**    And while this is coming up on the screen, was

6   Mr. Householder your only client at this time in 2018?

7   **A**    Yes.

8   **Q**    Can you describe what you mean by that for the jury?

9   **A**    I mean that Team Householder, so the candidates that

10  we recruited for the plan and anything else that he approved

11  of, all fall under the "that's my client."  Everything had

12  to be approved by him.  So any -- I was working on a lot of

13  things, but he was my one client, is what I mean by that.

14  **Q**    All right.  And he had approval authority over whether

15  or not you took on other work?

16  **A**    That's correct.

17  **Q**    And the money that was coming into these accounts at

18  the time, was it because of your relationship with

19  Mr. Householder?

20  **A**    Yes.

21  **Q**    Okay.  Now, do you see Exhibit 34 on your screen?

22  **A**    Yes.

23  **Q**    You'll see in the middle there three columns; do you

24  see those?

25  **A**    I do.

1    **Q**    Okay.  And what are the title of those columns?

2    **A**    Constant Content Co. and some numbers underneath of

3    that.

4    **Q**    Okay.

5    **A**    Constant Content Co. and some different numbers under

6    that.  JPL & Associates, LLC, and then total.

7    **Q**    All right.  And were those your business accounts that

8    you were talking about earlier?

9    **A**    They appear to be.

10   **Q**    Okay.  And what are the largest -- what's the largest

11   donor on the list, what's that first row?

12   **A**    Generation Now.

13   **Q**    Okay.  And what is the percentage of money in all

14   three of your accounts from Generation Now?

15   **A**    61 percent.

16   **Q**    What is the percentage in all of your accounts from

17   Ohioans For Energy Security?

18   **A**    25 percent.

19   **Q**    Okay.  Does everything else on the list comprise a

20   smaller amount than that?

21   **A**    Yes.

22   **Q**    Okay.  And if we picked out, for example, you see

23   further on down Tracy Richardson?

24        MS. GLATFELTER:  If I may have that ability to mark

25   on my screen.

17-2805

```
 1                    THE WITNESS:  I see it now.

 2                    MS. GLATFELTER:  Right here.

 3      Q    Okay.  And how much money did Tracy Richardson

 4      contribute to either the -- to any of your accounts, what's

 5      the total?

 6      A    Looks like $10,187.

 7      Q    And what percentage of the total money in your

 8      accounts does the money from Tracy Richardson account for?

 9      A    Zero percent.

10      Q    Okay.  And was Tracy Richardson a Team Householder

11      candidate at the time?

12      A    Yes.

13      Q    Mr. Longstreth, you were asked a series of questions

14      about the Coalition for Growth and Opportunity this morning

15      on cross-examination and the $90,000 that went into that

16      account.  Do you remember that?

17      A    Yes.

18                    MS. GLATFELTER:  Your Honor, permission to publish

19      what has been admitted as Exhibit 352?

20                    THE COURT:  Yes.

21      Q    Now, Mr. Longstreth, is Coalition for Growth and

22      Opportunity the same account or the same organization that

23      received $1.2 million from Generation Now in 2020?

24      A    Yes.

25      Q    And the money was passed through coalition to
```

1    growth -- on the way to Growth and Opportunity PAC for what

2    reason?

3    **A**    Because Generation Now had already become known as the

4    brand supporting the Householder policy of House Bill 6, so

5    it's passed through there to shield that from disclosure.

6    **Q**    Okay.

7         MS. GLATFELTER:  You can go ahead and take that

8    down, Ms. Terry.

9    **Q**    Now, I want to ask you a series of questions about the

10   inauguration.  You were asked a lot of questions about this

11   and spent a lot of time on this this morning.  Do you

12   remember those questions?

13   **A**    I do.

14   **Q**    And as part of those questions, you were shown a few

15   pages of documents, not all of them, and there were

16   questions about your recollection and your ability to

17   remember facts based on those few pages they showed you.  Do

18   you remember that?

19   **A**    Yes.

20   **Q**    All right.  And after showing you these -- showing you

21   those particular pages, defense counsel questioned whether

22   your memory was faulty.  Do you recall that?

23   **A**    I do.

24   **Q**    All right.  I want to go through the rest of the pages

25   of those exhibits with you and ask you a series of questions

1    about that.

2         MS. GLATFELTER:  So let's go ahead and start with

3    Householder 468.

4    **Q**    Do you recall seeing this document this morning?

5    **A**    I do.

6    **Q**    All right.  And what does it appear to be to you?

7    **A**    It appears to be a flight itinerary from FirstEnergy.

8    **Q**    All right.  And are you familiar with flight

9    itineraries from FirstEnergy?

10   **A**    No.

11   **Q**    Okay.  And is this an official FAA flight log?

12   **A**    I have no idea.

13   **Q**    All right.  Do you have any independent information

14   about the accuracy of this flight itinerary?

15   **A**    I do not.

16   **Q**    Itineraries including yours for the inauguration

17   changed over time, didn't they?

18   **A**    That's right.

19   **Q**    Now, let's talk about dates.  Do you see what the date

20   of this purported flight on the flight itinerary is?

21   **A**    Looks like the 19th of January 2017.

22   **Q**    Can you circle that for us so we can see where you're

23   referring?

24   **A**    (Witness writing.)

25   **Q**    And, remember, this document was shown to you to

1    suggest that Mr. Jones was not in Washington, DC, at the

2    time that you said he was?

3    **A**    That's right.

4    **Q**    Okay.  So let's look at those other documents.

5            MS. GLATFELTER:  Your Honor, if we may please

6    publish what has been admitted as Householder 479?

7            THE COURT:  Yes.

8    **Q**    Okay.  Do you recall being shown this document this

9    morning on cross-examination?

10   **A**    I do.

11   **Q**    Okay.  And was this your first time ever seeing this

12   document?

13   **A**    As far as I know.

14   **Q**    Okay.  And do you know whether you were shown all of

15   the pages of this document?

16   **A**    I do not.

17           MS. GLATFELTER:  All right.  Ms. Terry, could you

18   go ahead and scroll through all of the pages of this

19   document?  Okay.  Ms. Terry, if we could return to the first

20   page, please.

21   **Q**    All right.  Mr. Longstreth, can you tell us what the

22   title of this document is?

23   **A**    Travel expense statement.

24   **Q**    Okay.  And is there a name at the top that -- a person

25   it refers to?

1    **A**     Charles Jones.

2    **Q**     Okay.

3          MS. GLATFELTER:  And, Ms. Terry, if you can enlarge

4    the portion of this first page that says Individual

5    Statements.

6    **Q**     All right.  Mr. Longstreth, do you see any expenses on

7    there for January 18th, 2017?

8    **A**     I see one that says Other.

9    **Q**     Okay.  Can you circle that for us?

10   **A**     (Witness writing.)

11   **Q**     All right.  And that corresponds to the 357 on the

12   right-hand side?

13   **A**     Yeah.  Let me circle that. (Witness writing.)

14         MS. GLATFELTER:  All right.  Ms. Terry, if we can

15   go ahead and go to the second page, let's explore this 357.

16   **Q**     All right.  And do you see a box with a title or with

17   the total 357 in the middle of the page?

18         MS. GLATFELTER:  Ms. Terry, if you can go ahead and

19   enlarge that for us.

20   **Q**     Mr. Longstreth, what is this box saying?  I know this

21   is the first time that you've seen this document or this

22   portion of the document.

23   **A**     It says:  $357 complementary refreshments MMT George,

24   CEO the George Group, Capitol Skyline Hotel, Washington, DC.

25   **Q**     Okay.  That last line, what is the location?

1    **A**    Capitol Skyline Hotel, Washington, DC.

2    **Q**    All right.  Is that where you stayed when you were in

3    DC?

4    **A**    It is not.

5    **Q**    Okay.

6         MS. GLATFELTER:  Ms. Terry, if we can go to page 35

7    or 6 -- let's start with page 5.  All right.

8    **Q**    Mr. Longstreth, do you see the middle portion of this

9    document right under where it says "begin forwarded

10   messages"?

11   **A**    Yes.

12   **Q**    Okay.  Go ahead and tell us who that e-mail is from?

13   **A**    Tony George on January 4th, 2017, to Cej7471gmail.com.

14   **Q**    And what is the subject line?

15   **A**    Capitol Skyline Hotel reservation confirmation,

16   Capitol Skyline Hotel.

17   **Q**    And is there a message underneath that?

18   **A**    There is.  Chuck, attached is the confirmation for the

19   hotel for your records.

20   **Q**    All right.

21        MS. GLATFELTER:  If we can go to the next page,

22   Ms. Terry.  Okay.  And if we can enlarge the top half of

23   this document, please?

24   **Q**    All right.  Mr. Longstreth, who does this reservation

25   pertain to?

1    **A**     Mr. Charles Jones.

2    **Q**     All right.  And is that who you know to be Chuck

3    Jones?

4    **A**     It is.

5    **Q**     Okay.  Do you see the check-in and checkout date on

6    this hotel reservation that is a part of his expense report?

7    **A**     I do.  It says check-in January 18th, 2017, checkout

8    January 21st, 2017.

9    **Q**     All right.  Can you go ahead and circle that for us,

10   please?

11   **A**     (Witness writing.)

12        MS. GLATFELTER:  All right.  Now, let's go to

13   page 14, Ms. Terry.

14   **Q**     All right.  And can you read the title of this

15   document?

16   **A**     Your limo link revised confirmation.

17   **Q**     Okay.  And what's the passenger name for the limo link

18   reservation?

19   **A**     Chuck Jones.

20   **Q**     And what is the pick-up date listed?

21   **A**     Thursday, January 19th, 2017, at 8:45 a.m.

22   **Q**     And do you see a Post-it note in the middle of this

23   page talking about a cancellation of the car?

24   **A**     Yes.

25   **Q**     What does it say?

1    **A**    Note:  Original sedan cancellation will incur a -- I

2    think that says $595 fee to the event.

3    **Q**    Okay.  Now, do you remember that $357 charge that we

4    looked at before?

5    **A**    Yes.

6    **Q**    I want to go -- I want to continue talking about that.

7         MS. GLATFELTER:  Ms. Terry, if we can go to page 4,

8    please.

9    **Q**    All right.  Mr. Longstreth, do you see the black box

10   around two charges from -- or two entries from January 18th,

11   2017?

12   **A**    Yes.

13   **Q**    Okay.  And what is the total charge that you see

14   there?

15   **A**    $357.

16   **Q**    And is there a credit card or the last four digits of

17   a credit card listed there?

18   **A**    Looks like 5380.

19   **Q**    Okay.

20        MS. GLATFELTER:  And, Ms. Terry, can we put this on

21   the left side of the screen, and on the right side of the

22   screen, can we pull up page 3 of the same exhibit?

23   **Q**    Okay.  Do you see that okay?

24   **A**    I do.

25   **Q**    Now, where did you see the 5380 credit card number on

1    the left side, can you circle that for us, please?

2    **A**    Yes. (Witness writing.)

3    **Q**    Or the credit card number, next to VISA, MasterCard.

4    **A**    (Witness writing.)

5    **Q**    Thank you.  Look at this receipt for $1,101, first of

6    all, what is the credit card, do you see the account number

7    there at the end?

8    **A**    I do.

9    **Q**    Okay.  And can you circle that for us?

10   **A**    (Witness writing.)

11   **Q**    All right.  Does that -- appear to be the same set of

12   numbers?

13   **A**    It does.

14   **Q**    Okay.  And the signatory for this credit card receipt

15   is who?

16   **A**    I'm going to -- I don't know exactly what that

17   signature says.

18   **Q**    At the bottom do you see letterhead?

19   **A**    I do, Chuck Jones.

20   **Q**    Okay.

21       MS. GLATFELTER:  One moment.  Now, if we can erase

22   these circles.  There we go.

23   **Q**    What is the time stamp on the receipt, the $1,100,

24   what is the time stamp?

25   **A**    8:46 p.m.

1    **Q**    8:46 p.m. and what date?

2    **A**    January 19th, 2017.

3         MS. GLATFELTER:  And, Your Honor, permission to

4    publish that page, which I think is page 3, Ms. Terry, on

5    the left side of the screen with 216 B, which has already

6    been admitted?

7         THE COURT:  Yes.

8    **Q**    All right.  So, Mr. Longstreth, if you can go ahead

9    and circle where you saw the time stamp on that receipt.

10   **A**    (Witness writing.)

11   **Q**    Okay.  And what time was the dinner reservation, the

12   second dinner reservation, you had at the Palm on the 19th?

13   **A**    9:15 p.m.

14   **Q**    Can you circle that?

15   **A**    (Witness writing.)

16   **Q**    Now, you've been to DC, are these two times

17   incompatible for restaurants in DC?

18   **A**    I don't think so.

19   **Q**    While you were there for the inauguration, did you go

20   to multiple receptions and dinners and on the same day?

21   **A**    Yes.

22   **Q**    And was it sort of a frenzied pace of a weekend?

23   **A**    Yes.

24   **Q**    Now, defense asked you questions about the second

25   dinner that you had with FirstEnergy executives.  Do you

1    remember that?

2    **A**    I do.

3    **Q**    And you said, and correct me if I'm wrong, you said it

4    could have been on the 19th or the 20th, you didn't

5    remember?

6    **A**    That's right.

7    **Q**    Okay.  And then Mr. Bradley showed you someone else's

8    notes and suggested it was the 19th, right?

9    **A**    That's right.

10        MR. BRADLEY:  Objection, Your Honor.

11        THE COURT:  Overruled.  Please proceed.

12    **Q**    And they showed you a portion of Mr. Dowling's expense

13    report for the same time period, right?

14    **A**    That's correct.

15    **Q**    Did you see the page in there talking about

16    January 20th?

17    **A**    I did not.

18        MS. GLATFELTER:  Your Honor, if we can have

19    permission to publish what's been admitted as Defendant's

20    Exhibit 478, let's start with page 1?

21        THE COURT:  Yes.

22    **Q**    All right.  Mr. Longstreth, do you -- can you read the

23    title of this document for us?

24    **A**    Travel Expense Statement.

25    **Q**    Okay.  And who is it for?

1    **A**     Michael Dowling.

2          MS. GLATFELTER:  And, Ms. Terry, if we can go to

3    page 13.

4    **Q**     Do you see an entry on page 13 for Friday,

5    January 20th?

6    **A**     I do.

7    **Q**     All right.  And do you see your name in that third

8    paragraph?

9    **A**     Yes.

10   **Q**     What does it say?

11   **A**     Refreshments with Jeff Longstreth of JPL & Associates,

12   discussed Ohio political issue at Palm restaurant.

13   **Q**     All right.  And is "issue," the word "issue," singular

14   or plural?

15   **A**     Singular.

16   **Q**     Now, do you know whether it was the practice of

17   Michael Dowling and Chuck Jones to list expenses they paid

18   for elected officials on expense reports?

19          MR. BRADLEY:  Objection, Your Honor.

20          MS. GLATFELTER:  I'm asking if he knows.

21          MR. BRADLEY:  No personal knowledge.

22          THE COURT:  Well, we'll find out.  What was the

23   question, madame prosecutor?

24          MS. GLATFELTER:  It was whether he knows --

25   **Q**     Or do you know whether it was the practice of Michael

1    Dowling and Chuck Jones to list expenses they paid for

2    elected officials on expense reports?

3    **A**    I do not.

4    **Q**    If FirstEnergy did pay for a meal or a plane ride or a

5    hotel for an elected official like Mr. Householder at the

6    time, would someone have to disclose that on a report or

7    would they have -- would the elected official have to pay

8    for it?

9    **A**    If it's over a certain limit, yes.

10    **Q**    Okay.  Let's say that it's over a thousand dollars?

11    **A**    Yes.

12    **Q**    And is that consistent with your advice regarding the

13    plane ride to DC on the FirstEnergy jet?

14    **A**    Yes.

15    **Q**    All right.  Now, do you recall from looking at

16    these -- oh, it's actually on this page.  Do you see that

17    reference to Capitol Skyline Hotel at the top there?

18    **A**    Yes.

19    **Q**    All right.  And is that the hotel that Mr. Jones

20    stayed at according to the reservation documents that we saw

21    a few minutes ago?

22    **A**    According to those documents.

23    **Q**    All right.  Remind us who Tony George is.

24    **A**    Tony George is a -- I would define him as a very good

25    friend of Chuck Jones.

1          MS. GLATFELTER:  Okay.  And, Ms. Terry, if we can

2     go to page 3 of this exhibit.  All right.  And if you can

3     enlarge the second box from the bottom there.

4     **Q**     Do you see a reference to Mr. George in this box?

5     **A**     I do.

6     **Q**     All right.  And what is the description listed on this

7     expense report in terms of Tony George?

8     **A**     FE Consultant.

9          MS. GLATFELTER:  All right.  Your Honor, at this

10    time I would ask to show the Court and the parties what's

11    been marked as Government's Exhibit 217?  This is a new

12    exhibit and I have copies for the parties and for the Court.

13         THE COURT:  Very well.

14         (Pause.)

15         MS. GLATFELTER:  Your Honor, I'm going to ask for

16    the admission of Government Exhibit 217 pursuant to the

17    stipulation regarding devices that were searched by the FBI

18    and the contents of those retrieved, and also the notice

19    that we gave showing that these records are authentic.

20         THE COURT:  Any objections?

21         MR. BRADLEY:  Yes, Judge.

22         THE COURT:  Basis?

23         MR. BRADLEY:  Relevance and hearsay.

24         THE COURT:  Overruled.

25         MR. LONG:  No objection, Your Honor.

JEFF LONGSTRETH - REDIRECT EXAM

```
1              THE COURT:  It's admitted.
2              MS. GLATFELTER:  Thank you, Your Honor.  May we
3    publish this to the jury?
4              THE COURT:  Yes.
5              MS. GLATFELTER:  Thank you.
6    Q    All right.  Mr. Longstreth, do you see at the top the
7    name "Tony George"?
8    A    I do.
9    Q    And how is he related to this document?
10   A    I'm sorry?
11   Q    How is he related to this document?
12   A    Oh, this appears to be an e-mail from him.
13   Q    Okay.  And who is it sent to, who is in the "To" box?
14   A    Larry Householder.
15   Q    Okay.  And what is the subject line?
16   A    Capitol Skyline Hotel reservation confirmation,
17   Capitol Skyline Hotel.
18   Q    All right.  And is there a message underneath it?
19   A    There is.
20   Q    What does it say?
21   A    Larry, attached is a confirmation for the hotel for
22   your records.  Thanks, Sabrina.
23             MS. GLATFELTER:  Okay.  And if we go to the second
24   page of this exhibit, Ms. Terry.
25   Q    Do you see the time frame of the hotel reservation in
```

1     the middle of the page?

2     **A**     Yes.

3     **Q**     Okay.  What are those dates?

4     **A**     From January 18th, 2017, to January 20th, 2017.

5          MS. GLATFELTER:  Thank you.  And if we can return

6     to page 1, please.

7     **Q**     And what is the name of this hotel?

8     **A**     Appears to be Capitol Skyline Hotel.

9     **Q**     The same name that we saw on the paperwork for

10    Mr. Dowling and Mr. Jones?

11    **A**     That's correct.

12    **Q**     Okay.  And do you see a total, a total amount, for the

13    cost of this reservation?

14    **A**     The charge says $1,557.

15    **Q**     Okay.  And can you circle that for us?

16    **A**     Yes. (Witness writing.)

17         MS. GLATFELTER:  All right.  Thank you, Ms. Terry.

18    **Q**     Now, Mr. Longstreth, did you meet with FirstEnergy

19    executives with Mr. Householder?

20    **A**     Yes.

21    **Q**     During the inauguration?

22    **A**     Yes.

23    **Q**     Did you meet Mr. Jones?

24    **A**     Yes.

25    **Q**     Was this actually the first time that you had met him

1    in person?

2    **A**    I believe so.

3          MS. GLATFELTER:  May I please show the witness what

4    has been admitted as Government Exhibit 706 B?

5          THE COURT:  Yes.

6          MS. GLATFELTER:  And if we can go to page 2,

7    please.

8    **Q**    Now, Mr. Longstreth, this is an extraction from your

9    phone.

10          MS. GLATFELTER:  And if we go to page 2 at the top

11    and if we can enlarge that, Ms. Terry.

12    **Q**    Do you see an entry for someone named Chuck Jones?

13    **A**    I do.

14    **Q**    And what was the creation date for that contact?

15    **A**    January 21st, 2017.

16    **Q**    And was that during your trip?

17    **A**    It was.

18          MS. GLATFELTER:  One moment, Your Honor.

19          THE COURT:  Very well.

20          MS. GLATFELTER:  No further questions.  Thank you.

21          THE COURT:  Very well.  Recross on redirect, if

22    any?

23          MR. BRADLEY:  Yes, Judge.

24          THE COURT:  Very well.

25                    **RECROSS-EXAMINATION**

1    **BY MR. BRADLEY:**

2    **Q**    Just a few follow-up questions, Mr. Longstreth.

3    **A**    Okay.

4    **Q**    So the prosecutor had asked you some follow-up

5    questions about, you know, was Larry your only client and I

6    think you went on to explain that, you know, what you meant

7    was Larry's and anybody that fell under the umbrella of Team

8    Householder, correct?

9    **A**    That's fair to say.

10   **Q**    And that ultimately, you know, he would have to be the

11   guy that would approve, you know, you working for some other

12   client, right?

13   **A**    That's correct.

14   **Q**    And, ultimately, you know, he made that clear to you

15   from day one, right?

16   **A**    That's right.

17   **Q**    And I think you had indicated that, you know, you

18   weighed that out, you know, kind of a, you know,

19   cost/benefit analysis, risk/reward, however you want to say

20   it, right?

21   **A**    That's right.

22   **Q**    And that, you know, there was some potential downsides

23   to agreeing to such an arrangement, right?

24   **A**    That's right.

25   **Q**    And then there was some potential upsides to such an

1    arrangement, right?

2    **A**    That's right.

3    **Q**    And, for example, one of the upsides was just, you

4    know, your, I guess, stature in your political world could

5    be elevated through your work with Speaker Householder,

6    right?

7    **A**    That's fair.

8    **Q**    And then ultimately, the other -- another big benefit

9    was $5.4 million, right?

10           MS. GLATFELTER:  Your Honor, I'm going to object.

11   Outside the scope.

12           THE COURT:  I think we are drifting outside it.

13   Sustained.  Sustained.

14           MR. BRADLEY:  I'll move on.

15      Can we see Government's Exhibit 17?

16   **Q**    Are you able to see that?

17   **A**    Yes.

18   **Q**    And the prosecutor had asked you some questions about,

19   you know, the moneys that were donated to Gen Now over the

20   course of, you know, four years, right?

21   **A**    That's right.

22   **Q**    And really the years of 2017/2018 would reflect

23   essentially $2.4 million paid by FirstEnergy and/or Partners

24   For Progress into Gen Now, right?

25   **A**    That's correct.

1    **Q**    And that would have been the moneys that was paid to

2    essentially support the slate of candidates that was known

3    as Team Householder, right?

4    **A**    That's correct.

5    **Q**    And then -- and then once House Bill 6 was introduced,

6    there was moneys that were contributed and spent on a public

7    education program, essentially, advocating for the benefits

8    of House Bill 6?

9    **A**    That's correct.

10   **Q**    And then once House Bill 6 was signed into law --

11            MS. GLATFELTER:  Objection, Your Honor.  This is

12   outside the scope.

13            THE COURT:  As to this exhibit, I agree.

14   Sustained.

15            MR. BRADLEY:  Okay.  Can we see Householder

16   Exhibit 479?

17   **Q**    The prosecutor had asked you a series of questions

18   about this exhibit that's 479, which we've already discussed

19   is the expense report for Chuck Jones, right?

20   **A**    That's right.

21   **Q**    And then also showed you what would be 478, which was

22   just essentially the same document for Mike Dowling; do you

23   recall that?

24   **A**    I recall seeing his statement too.  I don't remember

25   the number.

1    **Q**    And the -- I think you had indicated that you had met

2    with the government eight to ten times or so, right, before

3    your testimony here today?

4    **A**    That's right.

5    **Q**    And so in any of those meetings with the government,

6    did they ever show you these documents?

7    **A**    I don't recall.

8    **Q**    Well, you've indicated that you've not seen them

9    before?

10   **A**    Yeah.  I don't believe I've seen these.

11   **Q**    Right.  So it would -- again, if you've not seen them

12   before and I ask you the question did the government ever

13   show them to you in any of those meetings, the answer would

14   be no?

15          MS. GLATFELTER:  Your Honor, I'm going to object.

16   These were provided to us last night around midnight.  No

17   one has seen them before except for today.

18          MR. BRADLEY:  And that's the point, Judge, that the

19   government never secured these documents.

20          THE COURT:  What's your question for the witness?

21   **Q**    Did you ever see them before?

22   **A**    I don't recall seeing them.

23   **Q**    Okay.  And so the answer to have -- did the government

24   show you in any of those --

25   **A**    Apparently not.

1    **Q**    -- previous meetings, the answer would be no; is that

2    right?

3    **A**    Apparently, they didn't.  I don't recall ever seeing

4    them, but I wouldn't swear to it.

5         MR. BRADLEY:  Can you cull out the very bottom of

6    this page?  No, I'm sorry, starting from additional trip

7    information down.

8    **Q**    So, you know, according to the first page of this

9    document, it would reflect that January 19th passenger on

10    FirstEnergy aircraft to Dulles Airport to attend the 2017

11    presidential inauguration events, correct?

12    **A**    That's what it appears.

13         MR. BRADLEY:  Then, can we go to page 11, PJ?

14    **Q**    And, again, the arrival date into DC was January 19th,

15    2017, at 9:27, correct?

16    **A**    That's what it says.

17         MR. BRADLEY:  And then, PJ, can you cull out the

18    very bottom portion of this page?  Go all the way to the

19    bottom, the very bottom.

20    **Q**    And then do you see in the lower left-hand corner of

21    this document trip last updated January 18th of 2017,

22    correct?

23    **A**    Yes.

24    **Q**    At, if my math is right, that would be about

25    9:00 p.m., correct?

1    **A**    That's right.

2    **Q**    So at least according to this record, it would show

3    that the travel itinerary was for Mr. Jones to arrive in DC

4    at 9:30 approximately in the morning of the 19th and this

5    itinerary was last updated at 9:00 p.m. on the 18th,

6    correct?

7    **A**    That's what it says.

8          MR. BRADLEY:  One moment, please.

9          THE COURT:  Yes.

10         MR. BRADLEY:  Nothing further, Judge.  Thank you.

11         THE COURT:  Very well.

12         MR. BRADLEY:  I'm sorry.

13         THE COURT:  Very well.

14       (Pause.)

15         MR. BRADLEY:  Just one last question.

16   **Q**    The prosecutor had asked you some questions about some

17   of the notes that you were asked to review, right?

18   **A**    Yes.

19   **Q**    And I think you acknowledged and I wasn't trying to

20   suggest, those aren't your notes, right?

21   **A**    That's correct.

22   **Q**    But those would be -- appear to be notes that would

23   reflect the details of your conversation from your meeting

24   with the government, right?

25   **A**    I've never seen them before, so I don't really know

1   what they are.

2   **Q**    Sure.  But when you read the details of --

3        THE COURT:  Those notes are not available for

4   impeachment.

5        MR. BRADLEY:  Sure, Judge, I'm not trying to

6   suggest they are.

7        THE COURT:  It appears that's what you're doing.

8        MR. BRADLEY:  That's not my intention at all.

9        THE COURT:  All right.

10  **Q**    So they would appear, though, to reflect the essence,

11  the details, of what you discussed with the government?

12  **A**    I don't know if they're detailed or not.  It doesn't

13  appear to be a transcript, which I would consider detailed.

14  Appears to be a summary that someone's written.

15  **Q**    Fair enough.  Ultimately and specifically regarding

16  the question of whether the dinner was held on the 19th or

17  the 20th, and you had indicated that you didn't recall and I

18  said, hey, will you look at this document to refresh your

19  recollection, right?

20  **A**    Yes.

21  **Q**    And then, ultimately, when we asked did that refresh

22  your independent recollection, you said it was the 19th,

23  right?

24  **A**    I said it could have been, yeah, um-hmm.

25       MR. BRADLEY:  Judge, I have no further questions.

```
 1              THE COURT:  Very well.  Anything further?
 2              MS. GLATFELTER:  No, Your Honor.  Thank you.
 3              THE COURT:  You are free to go, sir.
 4              THE WITNESS:  Thank you, thank you.
 5     (Witness left the stand.)
 6              THE COURT:  3:00, where do we stand from the
 7     government's perspective?
 8              MR. SINGER:  The government is prepared to call
 9     Dave Greenspan.
10              THE COURT:  Very well.  Call for Mr. Greenspan,
11     please.
12              MR. MAREIN:  Judge, I'm sorry.
13              THE COURT:  If the witness would pause, back out
14     the door, we'll call you momentarily.
15              MR. MAREIN:  Before the government puts this
16     witness on, is it possible to have a sidebar with the court
17     reporter present?
18              THE COURT:  Sure.
19     SIDEBAR CONFERENCE.
20              MR. MAREIN:  Tell me when I can proceed.
21              THE COURT:  Mr. Marein, go ahead.
22              MR. MAREIN:  Before this witness begins testifying
23     and in an effort to avoid me jumping up and down lodging
24     objections, I'm, at this point, moving the Court in limine
25     to prohibit the government from doing three things.  First
```

1    and foremost, asking that the witness, if an individual by

2    the name of George Phillips, who is not a witness in this

3    case, told him to delete records, that is violative of

4    confrontation rights.  It's hearsay.

5         THE COURT:  Is that what you wanted to bring to my

6    attention?

7         MR. MAREIN:  Secondly, the -- I would expect the

8    government intends to attempt to elicit from this witness

9    Mr. Householder's reputation as being a vindictive guy.  I

10   would respectfully request that Evidence Rule 404(a)

11   indicates that a character trait of an individual cannot be

12   used to show that that individual acted in conformity

13   therewith, and that the only way to prove that character

14   trait is through specific instances or reputation under --

15   reputation for that trait under Evidence Rule 404(a), so I

16   would move in that regard.

17       And then, finally -- I had one other.  I expect that

18   the government is going to attempt to elicit that this

19   individual, as well as others, received $500 checks from

20   FirstEnergy at or around the time of the vote for House Bill

21   6.  And while he can testify what he received, anything that

22   he says about other members is predicated on, first of all,

23   lack of personal knowledge and hearsay.  So those would be

24   my three objections.

25         THE COURT:  All right.  While we're here, I would

```
 1    like to hear from the government in response.  And I'm

 2    wondering whether we should recess for our midafternoon

 3    break so everybody is able to get a deep breath.

 4            MR. SINGER:  Be a good time to recess, Your Honor.

 5            THE COURT:  What's your position on his issues?

 6            MR. SINGER:  As to the first issue, Your Honor, the

 7    witness is prepared to testify what he was instructed to do.

 8    I think the law is clear that an instruction is not a

 9    statement under 801 and it is not hearsay, so the question

10    is:  Were you instructed to do anything on the phone call.

11    He can answer what he was instructed to do, that is not

12    violative of hearsay.

13            THE COURT:  Okay.

14            MR. SINGER:  As the second issue, we're not going

15    to get into his character, but this witness is going to

16    testify what he did in response to conversations with

17    Mr. Householder based on his knowledge of Mr. Householder

18    and how he felt based on that, and in fact he called the

19    FBI.  It's relevant to the testimony that we've heard and

20    it's relevant to the issues before the Court.

21            THE COURT:  And there's a third thing.

22            MR. SINGER:  We're not going to get into the $500.

23            THE COURT:  Okay.  And a response?

24            MR. MAREIN:  Respectfully, I don't mean to be a

25    wise guy here, but I must have missed that day in law
```

```
1    school.
2              MR. SINGER:  I've got some case law.
3              MR. MAREIN:  If you do, I would like to see it and
4    I will withdraw it.
5              THE COURT:  All right.
6              MR. MAREIN:  As it relates to suggestions that he's
7    going to be getting into Mr. Householder's -- or the
8    consequences of his failure to vote for House Bill 6, that
9    is he is -- and I have his Grand Jury testimony, he is going
10   to be saying that based upon Mr. Householder's reputation as
11   being a vindictive guy.  No matter how you slice and dice
12   it, that's what you're going to be eliciting, and that is
13   violative of 404(a).
14             MR. OLESKI:  If I could just --
15             THE COURT:  I'm not going to hear from five lawyers
16   for one client.
17             MR. OLESKI:  Understood.
18             THE COURT:  I'm going to take a rest and tell the
19   jury that I have decided to do that.  You guys talk about
20   instruction versus statement and you guys talk about the
21   third issue
22   SIDEBAR CONCLUDED.
23             THE COURT:  We burned so much time at sidebar,
24   we're going to take a 20-minute break.  During the 20-minute
25   break, take a break, don't discuss it among yourselves,
```

```
1    anyone else.  No independent research, checking out the

2    media.  Continue to keep an open mind and understand that

3    it's Thursday and we're making progress.  We'll rise out of

4    respect for you as you leave for 20 minutes.

5              THE DEPUTY:  All rise for the jury.

6         (Jury exited the courtroom at 3:05 p.m.)

7              THE COURT:  Jury has left the room.  We're waiting

8    to be advised that they've cleared the floor before we

9    vacate the courtroom.

10        (Pause.)

11             THE DEPUTY:  All clear, Judge.

12             THE COURT:  Ms. Santoro, will you advise the

13   witness that the Judge has decided to take a break until

14   3 -- for 20 minutes and we will call him at that time?

15             THE DEPUTY:  Yes, Judge.

16             THE COURT:  And that and that alone.  We're in

17   recess.

18             THE DEPUTY:  This court is in recess.

19        (Recess taken from 3:06 p.m. to 3:33 p.m.)

20             THE DEPUTY:  All rise.  This court is in session

21   pursuant to the recess.

22             THE COURT:  Thank you.  Please be seated.  Have you

23   all been able to work through what we discussed from your

24   perspective, Mr. Marein?

25             MR. MAREIN:  Judge, Mr. Oleski and the prosecutor
```

```
 1     were able to work through the issues.  I believe the way
 2     that they're going to question the witness is -- it comports
 3     with what I was concerned about.  Relative to the issue of
 4     whether or not the instruction is a nonhearsay, I was wrong.
 5             THE COURT:  And on the other issues, have we banged
 6     through those as well?
 7             MR. MAREIN:  Yes.
 8             THE COURT:  All right.  Very well.  So can we -- is
 9     the government ready for the jury?
10             MR. SINGER:  Yes, Your Honor.
11             THE COURT:  Mr. Householder's team?
12             MR. OLESKI:  Yes, Judge.
13             THE COURT:  Mr. Borges'?
14             MR. SCHNEIDER:  Yes.
15             THE COURT:  All right.  We will go get the jury.
16         (Pause.)
17             THE DEPUTY:  All rise for the jury.
18         (Jury entered the courtroom at 3:37 p.m.)
19             THE COURT:  You may all be seated.  Thank you.  14
20     jurors have reappeared as summoned.  Thank you for your
21     patience.  We're going to continue to hear testimony.  Where
22     do we stand from the government's perspective?
23             MR. SINGER:  Your Honor, the government calls Dave
24     Greenspan.
25             THE COURT:  And somebody is working on that?  Yes,
```

1    Mr. Greenspan, if you would be willing to follow that woman,

2    and as you get where you are, if you would pause where you

3    are, raise your right hand for the oath to tell the truth.

4        (Witness sworn.)

5        THE COURT:  Very well, you can take the witness

6    stand.  I tell everybody in the spirit of full disclosure,

7    that seat tips back.

8        THE WITNESS:  Okay.

9    (Witness took the stand.)

10       THE COURT:  We're going to need your mouth very

11   close to that fancy government microphone.

12       THE WITNESS:  Thank you.

13       THE COURT:  Mr. Singer, on behalf of the

14   government, you may approach the government and question the

15   witness.

16       MR. SINGER:  Thank you, Your Honor.

17       THE COURT:  Very well.

18       MR. SINGER:  Good afternoon.

19       THE WITNESS:  Thank you.  Good afternoon.

20                       **DAVID GREENSPAN**

21   of lawful age, Witness herein, was examined and testified as

22   follows:

23                    **DIRECT EXAMINATION**

24   **BY MR. SINGER:**

25   **Q**    Please state your name and spell it for the court

1    reporter, please?

2    **A**    Sure.  David Greenspan, D-A-V-I-D, last name

3    G-R-E-E-N-S-P-A-N.

4    **Q**    Mr. Greenspan, have you struggling with your voice a

5    little bit today?

6    **A**    I have a little bit of laryngitis, yes, sir.

7    **Q**    Feel okay?

8    **A**    I feel perfectly okay.

9    **Q**    What do you do for a living, Mr. Greenspan?

10   **A**    I am a human relations principal of the MetroHealth

11   System in Cleveland in the state and local government

12   relations.  And I'm also city council president in the City

13   of Westlake.

14   **Q**    And is your position with the City of Westlake, is

15   that an elected position?

16   **A**    It is an elected position, yes.

17   **Q**    Can you explain to the jury whether you've held any

18   other elected offices?

19   **A**    I have.  I was fortunate in 2005 to be elected to an

20   inaugural city council in Sandy Springs, Georgia, first new

21   city in Georgia in nearly 50 years.  I served there for two

22   years, until '07, when I moved to Cuyahoga County, to

23   Westlake.  I then ran for office again in 2010.  I was

24   successful and won a county council seat in the newly

25   reformed government in Cuyahoga County.  I won that election

1   in 2010 and then won reelection in '14.  And then I ran for

2   the state legislature in 2016, to which I was successful in

3   that election and reelected in 2018.  Now I serve on the

4   Westlake City Council as Council President.  So I've been

5   very fortunate to hold the public trust at the city, county

6   and state levels of government.

7   **Q**    And can you explain again what period of time you

8   served as a rep for the 16th District?

9   **A**    Yes, that was from 2017 to 2018, 132nd General

10  Assembly, and then 2019 and 2020 in the 133rd General

11  Assembly.

12  **Q**    Can you explain where the 16th Ohio District is

13  located?

14  **A**    The 16th District is western Cuyahoga County.  So it's

15  the five cities of Bay Village, Fairview Park, Olmsted,

16  Rocky River, and Westlake.

17  **Q**    Is that just up by the lake in northern Ohio?

18  **A**    It is.  Is it's the northwest corner of Cuyahoga

19  County.

20  **Q**    What were your duties and responsibilities as an

21  elected official for the 16th House District?

22  **A**    Has about 120,000 people, so my responsibility was to

23  represent them in the legislature on policy matters.

24  **Q**    Now, how many elections were you involved in as an

25  Ohio State Rep?

1    **A**    Three.

2    **Q**    And are you familiar with the differences between the

3    general election and a primary election?

4    **A**    I am.

5    **Q**    Can you explain the difference?

6    **A**    Sure.  Primary election is when each party or parties,

7    there are multiple parties, hold an election to have one

8    person represent that party in the general election.

9    **Q**    And were you ever -- did you ever participate in a

10   primary election?

11   **A**    I did.

12   **Q**    And --

13   **A**    Yes.  In all three terms, the General Assembly, there

14   are primary elections.  Sometimes you're unopposed and

15   sometimes you're opposed.

16   **Q**    And in those elections, for any of those elections,

17   did you have a primary opponent?

18   **A**    I did, in 2018.

19   **Q**    And what party are you affiliated with?

20   **A**    I'm a Republican.

21   **Q**    So can you explain -- can you explain what it's like

22   to have a primary opponent?

23   **A**    Well, you generally don't expect to have a primary

24   opponent as an incumbent.  In an open seat, it's more

25   expected that you may have one.  So when you have one, you

1    basically are running within your own party, you're

2    targeting the voters of your party to convince them to

3    encourage them to return you back to the office.  In my

4    case, I was an incumbent who had a challenger.

5    **Q**    And do you have to fundraise for these elections?

6    **A**    Yes, yes.

7    **Q**    And is there a difference in fundraising between the

8    primary election and the general election?

9    **A**    Well, generally, no.  The primary difference, the

10    differences, that -- in a primary, you are targeting a

11    smaller audience.  You're targeting primarily Republican

12    voters in my case.  In a general election, it's Republicans,

13    independent and Democrats.

14    **Q**    Now, do you recall who was the Ohio Speaker of the

15    House in 2018?

16    **A**    In 2018, we had -- it was an interesting time, so we

17    had at the beginning of that General Assembly Cliff

18    Rosenberger was the Speaker, and then to conclude that

19    General Assembly, Ryan Smith was Speaker in 2018.

20    **Q**    And how was it that Representative Smith became

21    Speaker in 2018?

22    **A**    So in April, Speaker Rosenberger resigned from office,

23    and so there had to be an election for a Speaker.  We have

24    to have a Speaker in order to conduct business in the House.

25    And so there was a special election at that time, and that's

1    when Representative Smith was elected Speaker.

2    **Q**    And how long did Representative Smith remain Speaker?

3    **A**    He served as Speaker for the rest of that General

4    Assembly, the 132nd General Assembly.

5    **Q**    Then was there another Speaker election in 2019?

6    **A**    There was, there was.  As there is customary at the

7    beginning of every General Assembly, there is an election

8    for Speaker.

9    **Q**    Who were the candidates in 2019?

10   **A**    In that election, it was returning -- well, it was

11   Speaker Ryan Smith and at that time it was Representative

12   Householder.

13   **Q**    And which parties are those two individuals in?

14   **A**    Both Republican Party.

15   **Q**    And who did you support for Speaker in 2019?

16   **A**    Ryan Smith.

17   **Q**    How would you describe the race for the Speakership in

18   2019?

19   **A**    It was probably one of the most unusual experiences

20   that one can imagine because traditionally you have the

21   Speaker and at that point it was Ryan Smith was the -- was

22   the returning, expected to be returning Speaker, and there's

23   a caucus that's put together that recruits candidates for

24   your party, the Democrats have the same thing for their

25   party, and those candidates are typically the ones that have

1    the full caucus support.  What was happening in that cycle

2    is Speaker Householder had his slate of candidates and they

3    were running, it is referred to as a shadow caucus, they

4    were running a separate caucus, separate fundraising

5    activities, separate campaign-related activities, and the

6    traditional model that the Speaker -- that the incumbent

7    Speaker would run.

8    **Q**    And can you describe what happened in the Speaker

9    election in 2019?

10   **A**    It was -- the floor vote was not as contentious as

11   what was happening behind the scenes.  So both candidates

12   were trying to get 50 members, 50 votes.  Both Republicans

13   and Democrats vote for the Speaker of the House.  And so we

14   had the floor vote, and the Speaker Smith came up short in

15   that vote, and although he did receive a majority of the

16   Republican Caucus support.  Usually and traditionally what's

17   happened --

18            MR. MAREIN:  Objection.

19            THE COURT:  What's the question, Mr. Singer?

20            MR. SINGER:  I was asking what happened in the 2019

21   Speaker election.

22            THE COURT:  What's the objection?

23            MR. MAREIN:  The objection is he's providing a

24   dissertation and not answering the question.

25            THE COURT:  I'd like to take it question by

1    question.  He's getting to it.  So what happened?

2            THE WITNESS:  So traditionally what happens is is

3    that the caucus will meet and between -- within the members

4    and they will agree that the candidate who gets the most

5    votes the caucus will support so as not to rely on the other

6    party's votes to become Speaker.  So in that election,

7    Speaker Smith received more votes within the Republican

8    Caucus to become Speaker.  At that point, traditionally, you

9    would expect all members to rally around the majority

10   caucus' nominee and vote on the floor for their Speaker.

11   That's not what happened in that 2019 Speaker vote.

12           THE COURT:  What happened?

13           THE WITNESS:  Speaker Householder received 26

14   member votes of the Republican Caucus, which was about a

15   third, maybe a little higher than a third, and he received

16   26 votes from the Democrat caucus, which gave him enough

17   votes to become Speaker.

18   Q    Now, did you have an office during the time you were

19   an Ohio State Rep?

20   A    Yes.

21   Q    And where was that office located?

22   A    So the office was in the Riffe Center which is where

23   all of the Reps of the Ohio House have offices.

24   Q    And did you have any separate office other than the

25   official office in the Riffe Center?

1    **A**    I did not.

2    **Q**    Now, are you familiar with any nuclear power plants in

3    Ohio?

4    **A**    I am.  I am aware that there are two.

5    **Q**    And how are you familiar with those plants?

6    **A**    Well, they're a part of the clean energy portfolio in

7    Ohio.  We're just made aware that there are two nuclear

8    power plants, one Davis-Besse and the other Perry.

9    **Q**    And during the time that you were an Ohio State Rep,

10   who owned the nuclear power plants in Ohio?

11   **A**    FirstEnergy, FirstEnergy Solutions.

12   **Q**    And during that period, do you recall legislation that

13   was introduced relating to those plants?

14   **A**    So yes.  So in my term in the legislature, I served

15   two general assemblies.  In the first General Assembly, the

16   132nd from '17 to '18, there was a piece of legislation

17   introduced referred to as the ZEN legislation which would

18   have provided funding for the nuclear power plants and then

19   in the second term in the 133rd General Assembly, there was

20   another piece of legislation that was introduced because the

21   first one didn't move, was not voted on, so a second piece

22   of legislation was introduced which we referred to as FE 2.0

23   or FirstEnergy 2.0.

24   **Q**    So starting with the first piece of legislation that

25   you referenced, can you describe what that legislation did?

1    **A**    It was fundamentally a smaller version or a

2    watered-downed version of FE 2.0, House Bill 6 legislation,

3    which would have provided a bailout to the nuclear power

4    plants.

5    **Q**    And can you describe whether you used any shorthand

6    reference when you spoke of that legislation?

7    **A**    Oh, that was typically what we referred to it as FE

8    for FirstEnergy or ZEN.

9    **Q**    And why did you refer to it that way?

10   **A**    Well, FE was FirstEnergy, we knew the bill was being

11   supported by FirstEnergy.

12   **Q**    And did you vote on that legislation?

13   **A**    That legislation, no.  It never came to a vote in the

14   132nd General Assembly.

15   **Q**    And why not?

16   **A**    At the time, I mentioned we had two Speakers, Speaker

17   Rosenberger and Speaker Smith, neither of them advanced the

18   legislation.

19   **Q**    And why is that important for the legislation?

20   **A**    I'm sorry?

21   **Q**    Why is that important?

22   **A**    Well, the Speaker has -- Speakers in general have a

23   lot of power, everything from parking spaces to your aide,

24   your office, the committees you sit on, if you have

25   chairmanships, if your legislation moves or if legislation

1    moves in general.  So neither one of those Speakers were in

2    favor of -- obviously were in favor of the ZEN or FE

3    legislation, the 132nd General Assembly, so accordingly, the

4    legislation didn't move.

5    **Q**    And what ultimately happened to the ZEN legislation?

6    **A**    I'm not sure it ever was voted out of committee.

7    **Q**    So the second piece of legislation, can you describe

8    what that was?

9    **A**    So that was in the 133rd General Assembly.  In the

10   General Assembly, the Speaker I mentioned has a lot of

11   authority.  One of the -- one of the items the Speaker does

12   is set priority bills.  So you'll typically see a number and

13   to draw correlation, I believe I saw in this current General

14   Assembly, they reserved the first 11 bills as priority

15   legislation under Speaker Householder the first 15 bills

16   were referred to as priority legislation.  So if your bill

17   was in that list of priority legislation, you knew that it

18   was a priority of the Speaker.  So House Bill 6 was a

19   priority of the Speaker.  It was first introduced formally

20   in April.  It moved very quickly and it was voted out six

21   weeks later, meaning voted out of the House to the Senate.

22   It was a very fast tracked bill.

23   **Q**    I think you mentioned this, but I might have spoke

24   over you, so I'll ask you again.  Did you have any shorthand

25   reference when you were speaking of that legislation?

1    **A**    That legislation we referred to as FE 2.0.

2    **Q**    Why is that?

3    **A**    FirstEnergy, second iteration of the previous General

4    Assembly that didn't move.

5    **Q**    I think you mentioned that sort of sped through the

6    process a little bit.  Can you describe that a little bit?

7    **A**    It did.  So there are a lot of ways that legislation

8    moves.  Some legislation may take multiple General

9    Assemblies to move through one chairman, just depends on a

10   number of factors, but, obviously, the intent of the Speaker

11   to advance legislation.  So this piece of legislation, we as

12   members of the General Assembly at least in the House were

13   aware that this subject was a priority of Speaker

14   Householder.

15       There were some prior interested party meetings to the

16   bill being introduced in April, which is not uncommon, but

17   the speed with which it moved through the House was very

18   rapid.  I believe it was about six weeks, maybe a little

19   longer from when it was introduced and until when it was

20   voted on at the end of May.

21   **Q**    Can you talk about the small group meetings that you

22   were involved in relating to House Bill 6?

23   **A**    So there was obviously a number of members within the

24   Republican Caucus who had issues with House Bill 6, and once

25   again, when a bill goes to the floor for a vote, the Speaker

1    wants to be confident that that bill has the support because

2    nobody wants to put a bill up and have the embarrassment

3    that it fails.  So there was an attempt to get at least the

4    members of the Republican Caucus to support the legislation.

5    A number of us -- I wasn't sure until the actual vote how

6    many were going to be no votes, but obviously, as the bill

7    was being whipped, as members being contacted to see where

8    they stood on the bill, leadership was aware that they might

9    not have the votes within the Republican Caucus to pass it.

10   So what Speaker Householder would do is have groups, 10 to

11   15, somewhere in that range, however many would fit around

12   the Speaker's conference room table, to discuss the bill,

13   give update status to ultimately determine how many members

14   were in support, were opposed, were maybe on the fence.

15   **Q**    And was Mr. Householder directly in those small group

16   meetings?

17   **A**    Yes.

18   **Q**    And do you recall whether in those small group

19   meetings there was an effort to convince those

20   representatives that weren't supportive or may not have

21   known which way they were going to go to convince them to

22   support the bill?

23   **A**    Yes.  I would almost argue that that was the point of

24   having the meetings, to get those members that were on the

25   fence to come over and be supportive of the bill.

1    **Q**    And during the course of those meetings, did you ever

2    indicate where you thought you were as far as the bill goes?

3    **A**    I was never in support of the bill.

4    **Q**    Now, do you recall whether you had your own

5    legislation that was advancing at that time?

6    **A**    Yes.  I had a number of pieces of legislation that had

7    carried over from the previous General Assembly that I was

8    working on.  Obviously, I'm biased, but good pieces of

9    legislation, one was the sports gaming bill, one was dealing

10   with anti bullying and anti hazing and the other a good

11   government and inspector general kind of ethics type of

12   legislation, those were kind of the three that I was really

13   focused on.

14   **Q**    And could you explain what that sports betting

15   legislation involved?

16   **A**    So in the previous General Assembly, Speaker Smith had

17   asked me to take the lead in the House.

18          MR. MAREIN:  Objection, not responsive.

19          THE COURT:  What did the sports betting legislation

20   involve?

21          THE WITNESS:  The sports betting bill involved

22   legalized sports betting in Ohio.  The US Supreme Court had

23   given the states the right to determine if they wished to

24   engage in sports gaming.

25   **Q**    Do you recall whether you were working with

1    Mr. Householder relating to the sports gaming legislation?

2    **A**    So not, not directly.  When I met with Speaker

3    Householder a week or so after he was elected Speaker, he

4    asked me to come into his office, and we met in his

5    conference room and we had a talk.  And I mentioned to him

6    two pieces of legislation that were important to me, one of

7    which was sports gaming at which time I was moving forward

8    with reintroducing the bill from the previous General

9    Assembly.

10   **Q**    And was -- did anything result from that meeting you

11   had with Mr. Householder relating to the sports betting

12   legislation?

13   **A**    Yeah.  So traditionally when you work on a piece of

14   legislation, you work with each caucus, either the

15   Republicans and Democrats have their own policy.

16          MR. MAREIN:  Objection, not responsive.

17          THE COURT:  Did anything result from that meeting

18   you had with Mr. Householder?

19          THE WITNESS:  Yes.  Mr. Householder asked me to

20   work directly with Neil Clark on sports gaming.

21   **Q**    And who is Neil Clark?

22   **A**    Neil Clark is a lobbyist who has numerous clients, has

23   been on Capitol Square for a long time.

24   **Q**    And what did you understand Mr. Clark's relationship

25   with Mr. Householder to be?

1    **A**    My understanding is that they had a very strong

2    relationship that spanned many years.

3    **Q**    What was the basis of that understanding?

4    **A**    Well, first, Mr. Clark told me that, but it was just

5    widely known that Mr. Clark and Speaker Householder had a

6    long-standing relationship.

7    **Q**    So based on your understanding, why were you working

8    with Neil Clark relating to the sports betting legislation?

9    **A**    I asked Mr. Householder, Speaker Householder that, and

10    he just reiterated that he would like me to work with

11    Mr. Clark on that piece of legislation.

12    **Q**    All right.  Can you describe your discussions with

13    Mr. Clark relating to the sports betting legislation?

14    **A**    So Mr. Householder, Speaker Householder and I had that

15    conversation in early January, and Mr. Clark seemed

16    extremely knowledgeable on the subject matter and he and I

17    spoke very regularly on sports gaming.  As we were drafting

18    and I had -- I had a joint sponsor, representative Bridget

19    Kelly, she's no longer in the legislature, but she and I

20    worked on the bill and we worked with legislative service

21    commission that drafts our legislation to help us craft a

22    piece of legislation that we could move forward and advance.

23    **Q**    Do you recall whether you had any discussions with

24    Mr. Clark at this time relating to House Bill 6?

25    **A**    Not in the beginning, but as it came closer to and as

1    House Bill 6 was introduced, moving closer to its vote, yes,

2    Mr. Clark would have various conversations with me about

3    House Bill 6.

4    **Q**    And what did Mr. Clark say relating to House Bill 6?

5    **A**    Well, he was supportive of House Bill 6, and knowing

6    that I wasn't, he made it very clear that it would be in my

7    best interest to not be a no vote but to support House Bill

8    6.

9    **Q**    Do you recall whether you told Mr. Clark what your

10   position was with regards to House Bill 6?

11   **A**    I did.  I was a firm no on House Bill 6 for various

12   reasons.  Mr. Clark was aware of that.

13   **Q**    And do you recall any conversations in which Mr. Clark

14   responded to the fact that you told him you were not going

15   to support House Bill 6?

16   **A**    Yes.  Once again, he was very insistent that I

17   reconsider my position, that once again, in my best

18   interest, understanding the fact that Speaker has a lot of

19   power and --

20           THE COURT:  Excuse me, is there an objection?

21           MS. GLATFELTER:  Not an objection, but there's some

22   strange noise that's difficult to hear over coming from the

23   back of the courtroom.  I think it's distracting.

24           THE COURT:  I assure you it is not I.

25           MS. GLATFELTER:  I don't know if we can --

```
 1              THE COURT:  That's the air system.  It makes some
 2    noise sometimes.  It's safe.  We've got more air in here
 3    recently for a reason.
 4              MR. SINGER:  I would lean in and speak louder in
 5    the microphone.
 6              THE WITNESS:  I'll try my best.
 7    Q    Okay.  So do you recall an instance in which Mr. Clark
 8    responded to you directly relating to your position with
 9    regards to the House Bill 6?
10    A    Yes.  If I can, my statement to Mr. Clark was very
11    simple.  You know, I told him that there will be a
12    January 1st where I will not be in office, whether it's
13    election, whether it's term limits, or whether I was to no
14    longer be in office, and I said I have to be comfortable
15    with every decision, every vote I make on that January 1st
16    when I'm not there.  And so I stood firm in my position, and
17    Mr. Clark said to me, Dave, nobody gives a damn about your
18    opinion.
19    Q    And how did this make you feel?
20    A    Well, obviously, I was resolute in where I stood.  I
21    did raise questions, though, in my mind about possible
22    retaliation and what might happen to my legislation, my
23    committee chair, my committees, if I was to vote no.
24    Q    Okay.  And is that?
25    A    Well, based on information based on what Mr. Clark was
```

1    telling me, that these things are all at the discretion of

2    the Speaker and I interpreted his statement to me that it

3    would be in your best interest to support House Bill 6 to

4    imply that if I did not, let's just take sports gaming in

5    particular, the legislation he and I were working on, would

6    not move forward.

7    **Q**    Do you recall any conversations you had with

8    Mr. Householder about House Bill 6?

9    **A**    Well, the -- I did receive a text message, yes.  So I

10   did call Mr. Householder, Speaker Householder, the Sunday

11   before the vote, and I called him specifically because I'm

12   of the belief that if you're not going to support a piece of

13   legislation, that you should let the sponsor know so that

14   they aren't surprised by your no vote.  With Mr. Householder

15   knowing it wasn't his bill as the sponsor, I knew that it

16   was important to him.

17        So I called Mr. Householder Sunday evening and I just

18   let him know that I would not be supportive of his bill --

19   of this bill, and I wanted him to know out of a matter of

20   professional respect based on my own belief that a member

21   should notify another member if they weren't going to

22   support a piece of legislation.

23   **Q**    Did you tell Mr. Householder why you weren't

24   supporting the bill?

25   **A**    I did.  I had various reasons why I was not supportive

1    of the bill.

2    **Q**    And what were those reasons as you described them?

3    **A**    Well, I don't -- there were a number of reasons.  I

4    don't believe in corporate bailouts.  What made this bill

5    more challenging is that there was no information provided

6    that showed that the -- that the company needed the money,

7    meaning, there were no financial statements presented, there

8    was no requirement as would normally be presented when a

9    grant program is established where there are criteria for

10   receiving the grant that had to be met, none of that was

11   incorporated in the bill.  I would almost argue that this

12   was not even a grant bill but it was a gift.  There was

13   nothing in the bill that required FirstEnergy to do anything

14   other than be a corporation, and so I had a big problem with

15   that and I shared that with the Speaker at that time.

16   **Q**    Did you tell Mr. Householder during that call whether

17   there was a version of the bill that you would have

18   supported?

19   **A**    There was, and yes, I did.  And, you know, believing

20   that in an all above energy approach, whether it's wind,

21   solar, natural gas, whatever it is, I believe that if the

22   bill was modified and I shared this with him, if it was

23   modified to be a clean energy revolving loan bill where the

24   money could be loaned to a company who would advance green

25   energy or cleaner initiative, cleaner initiatives, so if it

1    was a wind, solar or nuclear in this case, there were no

2    emissions, but it had to go for capital only, not for

3    operating use.  But if there were -- if it was coal or gas,

4    if companies would make themselves available to making

5    strides to become cleaner in the production of those, that

6    was my concept as to how we could move forward with this.

7    And obviously that didn't happen.

8    **Q**    Now, did the conversation that you just described with

9    Mr. Householder and the prior conversations that you had

10   with Mr. Clark cause you to do anything?

11   **A**    Well, yeah.  I became very concerned about --

12          MR. MAREIN:  Objection, not responsive.

13          THE COURT:  Did the conversation that you just

14   described with Mr. Householder and the prior conversations

15   that you had with Mr. Clark cause you to do something?

16          THE WITNESS:  Yes, it did.

17   **Q**    Can you describe what you did?

18   **A**    Thank you.  So yes, based on the conversations with

19   the Speaker and based on my conversations with Mr. Clark,

20   the morning before the vote, I was really challenged with

21   knowing where my vote was going to be and what might happen

22   after, after the vote, and so I reached out to a friend of

23   mine, Pete Elliott, who was the US Marshal for the Northern

24   District of Ohio on my way to Columbus, and I said, Pete,

25   here's what I know, here's what I've been told.  He said,

1    Dave, that's not --

2            MR. MAREIN:  Objection.

3            THE COURT:  Sustained.  What did you do?  You're on

4    your way to Columbus, you spoke to him, and what did you do?

5            THE WITNESS:  Spoke to Pete Elliott.  Pete Elliott

6    then put me in contact with the FBI.  I met with the FBI

7    that evening, with Agent Wetzel, and I explained to him what

8    was going on and what my concerns were.

9    Q    Had you ever reached out to the FBI at any other point

10   during the time you were an Ohio State rep?

11   A    No, I did not.

12   Q    And can you describe the meeting that you had with

13   Special Agent Wetzel?

14   A    Well, I explained to him -- not to be repetitive, but

15   what Mr. Clark had said to me and my conversation with the

16   Speaker that Sunday.  My purpose of the meeting was simple,

17   I don't know how this is going to turn out, this is what

18   I've been told.  I knew that there were about a dozen of us

19   that were going to vote no tomorrow.  I said just look out

20   for the 12 of us and watch and see what happens, if

21   anything, that Mr. Clark reiterated to me was going to come

22   through.  That was the whole purpose of the meeting.  There

23   was no -- excuse me, no other motives.  It was purely to ask

24   an independent body not affiliated with state government to

25   provide basically an overlook to see what happens to the

1    dozen of us who were going to vote no the next day.

2    **Q**    You referenced "the dozen of us," who does that

3    represent?

4    **A**    Well, those -- I'm sorry.  The dozen were the

5    Republican members.  It turns out there were 17 Republicans

6    that voted no.

7    **Q**    Did you receive any text messages during the time you

8    were meeting with Special Agent Wetzel?

9    **A**    I did, I did at the end of the meeting.  I believe we

10   were done and I received a text message from Speaker

11   Householder.

12   **Q**    What did you do after you received the message?

13   **A**    Well, I showed Agent Wetzel that I received this text

14   message from Speaker Householder.

15   **Q**    And what did you do next?

16   **A**    Well, I responded to him, and I let him know, just as

17   I said on Sunday, that I'm not going to be supportive of

18   this legislation.

19   **Q**    How long did the -- did Mr. Householder respond or

20   reply to your response?

21   **A**    He did.  He responded almost immediately.

22   **Q**    How long did this entire exchange last?

23   **A**    From the first time I received the text and read it

24   until the last response I got from Speaker Householder, it

25   was basically a matter of minutes, as long as it would take

1    to type.

2           MR. SINGER:  Your Honor, may we please show the

3    witness only what's been identified as Government's

4    Exhibit 473 A?

5           THE COURT:  Yes.

6           MR. SINGER:  Your Honor, may we also show the

7    witness 473 B side by side?

8           THE COURT:  Yes.

9    **Q**    Do you recognize what is 473 A and 473 B?

10   **A**    I do.

11          MR. SINGER:  Ms. Terry, would you mind scrolling

12   through 473 A?  And can you scroll through 473 B, please?

13   **Q**    And do you recognize these documents?

14   **A**    I do.

15   **Q**    And what are they?

16   **A**    So 473 A is a copy of a piece of literature, an attack

17   ad against me, in the general election in 2018.

18   **Q**    Can you describe what the entirety of 473 A is, all

19   four pages --

20   **A**    Oh.

21   **Q**    -- generally.

22   **A**    It was me sharing with the Speaker the literature that

23   I received and then a dialogue between the two of us.

24   **Q**    Text message exchanges between you and

25   Mr. Householder?

DAVID GREENSPAN - DIRECT EXAM                          17-2859

```
1    A    That's correct.

2    Q    And then 473 B, what do you recognize that as?

3    A    So 473 B was the part of the Speaker's response to 473

4    A.

5    Q    Text message exchange between the two of you?

6    A    Text message exchanges.

7              MR. SINGER:  Your Honor, at this time, we move to

8    admit 473 A and 473 B?

9              THE COURT:  Any objections?

10             MR. OLESKI:  No.

11             MR. SCHNEIDER:  None here.

12             THE COURT:  They're admitted.  You may publish, if

13   you wish.

14             MR. SINGER:  Yes, Your Honor.

15             THE COURT:  All right.  Publish.

16   Q    All right.  So does the document on the right, 473 B,

17   contain the same information that is on the left, 473 A?

18   A    It's of the same context, yes.

19   Q    So let's focus on 473 A first.

20             MR. SINGER:  Ms. Terry, would you please scroll

21   down to page 4?  And can you enlarge the messages at the

22   top?

23   Q    All right.  Do you recognize this?

24   A    Yes.  This is the text exchange that happened when I

25   was meeting with Agent Wetzel.
```

DAVID GREENSPAN - DIRECT EXAM

1  **Q**     And what does -- the boxes starting on the left, what

2  do they represent?

3  **A**     Those are messages from Speaker Householder to me.

4  **Q**     And then the lighter box on the right side, what does

5  that represent?

6  **A**     That was my response to Speaker Householder.

7  **Q**     Okay.  Can you read Mr. Householder's first message to

8  you?

9  **A**     Yes.  David, I really need your vote yes on HB 6.  It

10  means a lot to me.  Can I count on you?

11  **Q**     And can you please read your response?

12  **A**     My response:  Mr. Speaker, I appreciate you reaching

13  out.  As we discussed Sunday, I have significant challenges

14  with the bill.  It's a 180-degree change in direction as to

15  my previous positions in energy generation over the past

16  nine years.  I'm willing to maintain my position from

17  Sunday.  I hope you can understand and respect my vote.

18  Dave.

19  **Q**     And why did you send that message?

20  **A**     I'm sorry?

21  **Q**     Why did you send that message?

22  **A**     I was responding to the Speaker asking if he can count

23  on my vote.  I was letting him know no and reiterating the

24  conversation that we had on Sunday.

25  **Q**     And can you read Mr. Householder's reply?

DAVID GREENSPAN - DIRECT EXAM

17-2861

1    **A**    The reply was:  I just want you to remember when I

2    needed you, you weren't there.  And another text came in

3    immediately after it:  "Twice."

4    **Q**    And what did you understand the reference to "twice"

5    to mean?

6    **A**    "Twice," meaning I was not supportive of Speaker

7    Householder for Speaker and now I was not supportive of him

8    on House Bill 6.

9    **Q**    How did this exchange make you feel?

10    **A**    Well, it kind of reinforced, it made me feel a little

11    uneasy, threatened, backed up statements that Mr. Clark had

12    made to me earlier.

13    **Q**    What did you do with these messages that you received

14    from Mr. Householder?

15    **A**    I shared them with the FBI sitting across the table

16    from me.

17    **Q**    Okay.  So let's focus on 473 B.

18         MR. SINGER:  If you can scroll down to the third

19    page, please.

20    **Q**    All right.  So the bottom half of page 3 of this

21    document, what does that represent?

22    **A**    I'm sorry, could you repeat that?

23    **Q**    What does the bottom half of this document represent?

24    **A**    My right-hand side?

25    **Q**    Yes, on your right-hand side.

1    **A**    This is the text exchange with Mr. Householder.

2    **Q**    And did you just take a screenshot of your phone?

3    **A**    I did.

4    **Q**    And then what does the information above that show?

5    **A**    That it was being -- I e-mailed this to Agent Wetzel.

6    **Q**    Okay.  All right.  Can you describe the vote on House

7    Bill 6?

8    **A**    So the vote on House Bill 6, it was, you know, taken

9    as if any other vote would be taken.  As I said, there were

10   17 Republicans that voted no.  There were enough members

11   between the both the Republican and Democrat caucus to

12   support the bill, and it passed.

13   **Q**    And what was your vote on House Bill 6?

14   **A**    I voted no.

15        MR. SINGER:  May we please keep 473 A up?

16        THE COURT:  Yes.

17        MR. SINGER:  And can you scroll to page 2, please?

18   And then page 3?  I'm sorry.

19   **Q**    Do you see the exchange at the top of this document?

20   **A**    Yes.

21   **Q**    Do you recognize that?

22   **A**    Yes, I do.

23   **Q**    And generally, what is Mr. Householder stating in the

24   text messages at the top?

25   **A**    Well, this was in response to the piece of literature,

1     the negative piece of literature, that was mailed against me

2     in the general election.

3     **Q**    And do you see where Mr. Householder says:  "Nobody

4     comes after the team without consequences"?

5     **A**    Yes.

6     **Q**    What did you understand that to mean?

7     **A**    Well, if you were on Team Householder, you were

8     protected; if you weren't, there were consequences.

9     **Q**    And did you believe you were on Team Householder?

10    **A**    No.

11    **Q**    And why is that?

12    **A**    Well, I was with -- you know, I was -- I voted for

13    Ryan Smith, and I never really got the sense that I was

14    truly part of Team Householder, of the Speaker.  Remember,

15    in the majority caucus, roughly a third of the members --

16    two-thirds of the members, I'll go that way, voted for Ryan

17    Smith, so there was this undercurrent between or within the

18    caucus for members that were supportive of Speaker

19    Householder and Ryan Smith.

20    **Q**    Now, shortly after the first House Bill 6 vote, can

21    you explain whether you received a phone call from an

22    individual named George Phillips?

23    **A**    Yes, I did.  So the vote was on Wednesday.  On

24    Saturday evening, I believe it was around 9.

25    **Q**    Okay.  If you can --

1    **A**    Sorry.

2    **Q**    No.  Can you explain when you received the phone call?

3    **A**    Around 9, I believe it was around 9:00 p.m. Saturday

4    evening.

5    **Q**    Okay.  Focussing specifically on what I'm asking, did

6    you receive any instructions during that phone call?

7    **A**    I did.

8    **Q**    And just limiting your testimony to what you were

9    instructed to do?

10   **A**    I was instructed to delete all of the text messages

11   between Speaker Householder and myself.

12   **Q**    And what did you do in response to your phone call

13   with Mr. Phillips?

14   **A**    I did not delete any of the text messages.  I advised

15   Mr. Phillips to let Mr. Longstreth know that the message has

16   been communicated.

17   **Q**    And did you retain your messages with Mr. Householder?

18   **A**    Yes, I did.

19   **Q**    Did you do anything else in response to the phone

20   call?

21   **A**    I did.  After the call with Mr. Phillips, I called

22   Agent Wetzel, let him know what had just transpired.

23   **Q**    Was there a second vote on House Bill 6?

24   **A**    There was.

25   **Q**    Do you recall where you were at the time that you were

1    notified about the second vote?

2    **A**    Yes.  I was in Chicago.

3    **Q**    And why were you in Chicago?

4    **A**    I was at that point on the executive committee of the

5    council of state governments Midwest region.

6    **Q**    And what was the status of the General Assembly at

7    that time?

8    **A**    We were in recess.

9    **Q**    What does that mean, you're in recess?

10   **A**    So it means it's a period of time during the General

11   Assembly calendar where there are no sessions currently

12   scheduled.  Typically, in the summer is the large summer

13   recess.

14   **Q**    And were there other members in Chicago at that time?

15   **A**    There were.

16   **Q**    And how long was the conference supposed to run?

17   **A**    I believe around seven days.

18   **Q**    Did anything happen while you were in Chicago?

19   **A**    Yes.  I was sitting next to Bob Cupp, who became

20   Speaker, who was also on the executive committee, and I

21   mentioned to him that it looks like that we're going to go

22   back to vote on House Bill 6 since the Senate voted it out.

23   At which time then Representative Cupp said:  Yes, we're

24   going back Tuesday to vote.  This was Sunday, and I had not

25   received notice through my aide that the vote was on

1    Tuesday.

2    **Q**    Now, prior to this, was there a session scheduled for

3    July 23rd?

4    **A**    There was not.

5    **Q**    And was that the Tuesday that you just described?

6    **A**    Yes.

7    **Q**    Were there any sessions scheduled for the month of

8    July?

9    **A**    I do not recall there being any.

10   **Q**    All right.  Did you ultimately return home for the

11   second vote on House Bill 6?

12   **A**    I did.

13   **Q**    And how would you describe the vote being scheduled

14   for a time when the House was in recess?

15   **A**    Well, I don't recall in my short time there that we

16   had ever had a session scheduled during summer recess like

17   that on such short notice.  The other thing that was unusual

18   was that Speaker Householder had made a comment that if a

19   session was to be called, it would be no earlier than

20   1:00 p.m. to allow members time to travel to Columbus.

21   **Q**    Were there any other matters voted on on that day?

22   **A**    I do not believe there was anything else on the

23   agenda.

24   **Q**    And how did you vote the second time on House Bill 6?

25   **A**    I voted no.

1   **Q**    Can you explain when the Governor signed House Bill 6

2   in relation to when the House voted on it the second time?

3   **A**    The Governor signed the bill within hours of the House

4   adopting the concurrence vote from the Senate.

5   **Q**    Can you describe -- you mentioned a number of pieces

6   of legislation that you had or you were involved in in the

7   spring of 2019; do you recall that?

8   **A**    Yes, sports gaming, the sports gaming bill.

9   **Q**    And can you describe what happened with this

10  legislation following your vote in May 2019?

11  **A**    So I voted no, and the day after the vote, I reached

12  out to continue to work on sports gaming with Mr. Clark, and

13  I never received another phone call, text or e-mail from

14  Mr. Clark, and I never heard from him again.

15  **Q**    And relating to the legislation, can you describe how

16  that moved?

17  **A**    So sports gaming ultimately was brought up for a vote

18  about 13 months later in the House Finance Committee.

19  **Q**    And so following your vote, was it -- did it continue

20  at the same pace that it had been moving prior to the vote?

21  **A**    No.  And I was noticed -- I believe Oelslager, the

22  Chair of the Finance Committee, noticed me the night before

23  or the day before that the bill was going to be placed on

24  the agenda for the next day in finance committee and it was

25  starred for a vote with three amendments.

1  **Q**    And how about the other legislation you were working

2  on, did that move?

3  **A**    I don't remember them moving, nothing of any --

4  nothing like prior to the vote.

5         MR. SINGER:  Okay.  Nothing further at this time,

6  Your Honor.

7         THE COURT:  Very well.  Attorneys for the defense

8  have an opportunity to ask questions on behalf of

9  Mr. Householder.

10         MR. MAREIN:  Judge, I mean, I'm ready to go

11  forward.  Do you want me --

12         THE COURT:  Do you have a sense for how long?

13         MR. MAREIN:  Longer than 10 minutes, I can assure

14  you.

15         THE COURT:  12 minutes?

16         MR. MAREIN:  13 maybe.

17         THE COURT:  13?

18         MR. MAREIN:  Uncertain.  I'll try to start and go

19  and see how we go.

20         THE COURT:  Let's do it.  Very well.

21         MR. MAREIN:  Thank you.

22         THE COURT:  Yes.

23  BY MR. MARIEN:

24  **Q**    Mr. Greenspan, do I get a sense that there is

25  something wrong or nefarious with Democrats and Republicans

1    coming together to sign off and ultimately enact

2    legislation, just --

3    **A**    No.

4    **Q**    Right.  But, yet, you just testified before this jury

5    as if to suggest there was --

6              THE COURT:  Questions for the witness?

7              MR. MAREIN:  Thank you.

8                        **CROSS-EXAMINATION**

9    BY MR. MAREIN:

10   **Q**    Now, this isn't the first time you've testified about

11   this case, right?

12   **A**    It is not.

13   **Q**    Right.  In fact, I think it was July the 8th of 2020,

14   you were down in this courthouse, weren't you?

15   **A**    I was.

16   **Q**    And you weren't in this courtroom, right?

17   **A**    That's correct.

18   **Q**    And there was no judge in that courtroom with you?

19   **A**    That's correct.

20   **Q**    And there was not all of these group of defense

21   lawyers, right?

22   **A**    That's correct.

23   **Q**    There was a court reporter; is that right?

24   **A**    Among others, yes.

25   **Q**    And there were a number of people that made up what is

1    the United States Grand Jury for the Southern District of

2    Ohio, right?

3    **A**    That's correct.

4    **Q**    And there was that prosecutor, Mr. Singer, and that

5    prosecutor, Ms. Glatfelter; is that right?

6    **A**    I believe so, yes.

7    **Q**    And they asked you a series of questions?

8    **A**    Yes.

9    **Q**    Mr. Householder wasn't there, was he?

10   **A**    He was not.

11   **Q**    All right.  And when you testified, you were asked a

12   series of questions concerning why it is that you felt it

13   necessary to call the FBI based upon what ultimately was the

14   telephone call that you and Mr. Householder had on May 26th.

15   Do you remember a series of those questions?

16   **A**    I remember the questions.

17   **Q**    Right.  And I think, correct me if I'm wrong, and if

18   you recall, did you tell the Grand Jury that Mr. Householder

19   was rather calm over the telephone and did not threaten you,

20   right?

21   **A**    That is correct.

22   **Q**    He didn't cuss at you, did he?

23   **A**    He did not.

24   **Q**    He did not tell you that something bad was going to

25   happen to you if you were a no vote; isn't that right?

1    **A**    He did not.

2    **Q**    And in fact, I think what you told the Grand Jury was

3    that what set you back is that Mr. Householder was smug and

4    what you said in defining what you meant by that --

5          THE COURT:  What question do you have for the

6    witness?  You can use Grand Jury testimony to impeach.  You

7    cannot use it to testify.  What is your question for the

8    witness?

9    **Q**    All right.  Did you define what you meant by

10   Mr. Householder was smug?

11   **A**    I'm sorry, did you ask?

12   **Q**    Did you talk to the Grand Jury under oath, tell them

13   what you meant by Mr. Householder was smug?

14   **A**    Yes.

15   **Q**    Right.  And do you recall telling them he just said

16   okay and moved on to other topics, right?

17   **A**    I don't recall that specific, specifically.

18   **Q**    Well, if you saw your testimony --

19         THE COURT:  Ask a question of the witness.

20   **Q**    If you do not recollect, do you believe if I showed

21   you the transcript of your testimony and you reviewed it

22   that it may refresh your recollection?

23   **A**    Yes, yes.

24         MR. MAREIN:  Okay.  Do you have that, can you bring

25   up that Grand Jury testimony only for the witness and the

1    Judge and the lawyers?  Judge, do I have your permission to

2    do that?

3            THE COURT:  Do what, call up the testimony to

4    refresh his recollection?

5            MR. MAREIN:  That's correct, that's correct.

6            THE COURT:  Yes, you may.

7            MR. MAREIN:  I'm going to have to look exactly

8    where that is, but I have it written down.  One moment,

9    Judge, I'll get right to it.  It's at page 37.  I'd ask you

10   to highlight the two paragraphs starting with, "when I got

11   off," and "I don't want to say."

12   Q    And I'd ask you to read that to yourself, sir.

13   A    I remember that, yes.

14   Q    Okay.  So in fact, you did tell them that it was

15   smugness and it was because Mr. Householder said:  Okay,

16   fine, you're going to vote against me, you know, right?

17   A    Yes, because I believed Mr. Householder did not need

18   my vote to pass House Bill 6.

19   Q    Okay.  So are you telling us that based upon him being

20   smug you needed to call the Federal Bureau of Investigation?

21   A    No, that's not what I'm saying.

22   Q    Okay.  Well, but that's what you did, right?

23           THE COURT:  Questions for the witness.

24           MR. MAREIN:  It is a question, Judge.

25           THE COURT:  I'd like to hear it.  Go ahead.

1   **Q**    Are you telling us, sir, that based upon that

2   smugness, you felt it necessary to call the Federal Bureau

3   of Investigation?  That's the question.

4   **A**    No.

5   **Q**    But you did?

6   **A**    I did, I did as it related to the statement made by

7   Mr. Clark.

8   **Q**    Okay.  And, I mean, were you -- did that smugness, did

9   that cause you to have a panic attack?

10  **A**    No.

11  **Q**    I mean, did you completely lose it as a result of him

12  being smug?

13  **A**    No.  It just inferred to me that he didn't need my

14  vote.

15  **Q**    Okay.  But, I mean, did you find it necessary that you

16  needed to call the Federal Bureau of Investigation to report

17  that, oh, my goodness, this guy just told me that?

18       THE COURT:  That's been asked and answered.

19  There's an objection?

20       MR. SINGER:  That was my objection, Your Honor.

21       MR. MAREIN:  Thank you.

22  **Q**    Now, after you had that telephone conversation with

23  the FBI, you've told us you had an occasion to meet with

24  them, I think it was at a Bob Evans like three days later,

25  right?

1    **A**    It was the day -- the night before the vote, yes.

2    **Q**    Oh, I'm sorry.  So it was, what, the 28th of May?  The

3    vote was the 29th.

4    **A**    Yes.

5    **Q**    All right.  And you've already had an occasion to

6    identify the text message and you've read it for the jury.

7    And, question, Mr. Householder was not threatening you in

8    that, was he?

9    **A**    Are you referring to the text message that I read

10   earlier?

11   **Q**    Yeah.

12   **A**    I would -- I inferred the statement, I remember, I'll

13   remember you weren't with me twice as a threat, yes.

14   **Q**    All right.  So you interpreted that "you weren't with

15   me twice," was he threatening that he was going to do

16   something to your career?

17   **A**    So let's put -- keep in mind that that text message

18   came at the end of my meeting with the FBI when I was

19   explaining to them these statements made by Mr. Clark.  And

20   then this message came across recognizing that Mr. Clark,

21   Mr. Householder speak often, and that Mr. Clark was saying

22   it's in your best interest to vote for the bill.

23   **Q**    That was Mr. Clark that told you those things, not

24   Mr. Householder, was it?

25   **A**    That's correct.

1   **Q**    Right.

2   **A**    But Mr. Clark --

3   **Q**    You've already answered the question, sir.  I

4   appreciate it.

5   **A**    Thank you.

6        THE COURT:  If he needs an opportunity to explain

7   his answer, he is entitled to do so.

8        THE WITNESS:  Thank you, Your Honor.

9        Mr. Clark made it clear to me during my conversations

10  that he spoke with Speaker Householder on a frequent basis

11  and that it could be strongly implied that the conversations

12  that I had with Mr. Clark were the same -- were being shared

13  with Mr. Householder.

14  **Q**    So you just testified on direct examination and you

15  did not tell the jury that, you just somehow recalled that

16  conversation with Mr. Clark, that if he's telling you this,

17  you can assume that it's coming from Mr. Householder as

18  well; is that what you're telling us?

19  **A**    If it was not included in my previous testimony, I'm

20  telling you right now what was said during those

21  conversations.

22  **Q**    Okay.  And so when Mr. Householder texts you, within

23  the confines of that text, all he told you is, remember,

24  when I asked you, you weren't there for me twice --

25  **A**    Correct.

1    **Q**    -- is that right?

2    **A**    Correct.

3    **Q**    Now, you had -- during the course of the prosecutor's

4    questioning of you, you had talked about, you know, you were

5    worried that Mr. Householder, he's the Speaker, he's very --

6    he's got a lot of power, he could do a lot of things to me;

7    is that right?

8    **A**    Correct.

9    **Q**    Let's talk about your assignment to the Transportation

10   Subcommittee.  I think you're the chairman; is that right?

11   **A**    I was chairman, yes.

12   **Q**    And that assignment was given to you by Speaker

13   Householder, was it not?

14   **A**    That is correct.

15   **Q**    And he gave you that assignment, which is one of the

16   most prestigious --

17          THE COURT:  Questions for the witness?

18          MR. MAREIN:  Judge, I've got to preface it for him

19   to answer the question.

20          THE COURT:  You are not in the position to testify.

21   It's now after 4:30 and perhaps we should recess, unless you

22   think you're going to finish up.

23          MR. MAREIN:  I'm not going to finish up.

24          THE COURT:  Okay.  Fair enough.  We're going to

25   recess for the day.  During your time at home, take a break.

```
 1     No discussion of the case with anyone, including among

 2     yourselves yet.  No independent research.  No checking out

 3     the media.  Continue to keep an open mind.  I'll see you at

 4     your spot at 9:15 and we'll try to get you in the courtroom

 5     at 9:30.  Out of respect for you, we'll rise as you leave.

 6              THE DEPUTY:  All rise for the jury.

 7          (Jury exited the courtroom at 4:33 p.m.)

 8              THE COURT:  Jury has left the room.  As soon as

 9     they've cleared the floor, we'll recess for the day.

10              MR. MAREIN:  Judge, can I put something on the

11     record when the witness walks out?

12              THE COURT:  Yes.  The witness is free to go.  We're

13     going to need you back here tomorrow.  During the break, do

14     not discuss your testimony with anyone.  Thank you, sir.

15              THE WITNESS:  Okay.  Thank you.

16              THE DEPUTY:  All clear, Judge.

17              THE COURT:  If you'd be willing to exit the

18     courtroom, sir.

19          (Witness left the room.)

20              THE COURT:  You may all be seated, if you wish.  We

21     remain on the record.

22              MR. MAREIN:  May I proceed?

23              THE COURT:  Yes.

24              MR. MAREIN:  I'll speak into the microphone so I'm

25     loud enough.  Judge, this is cross-examination.
```

```
1              THE COURT:  I'm familiar with --

2              MR. MAREIN:  I know you're --

3              THE COURT:  I'm familiar with cross-examination.

4              MR. MAREIN:  I know you're familiar with it, Judge.

5              THE COURT:  Excuse me.  I will treat you with

6     dignity and respect, as I have, and I expect you to afford

7     me the same consideration.  You may proceed.

8              MR. MAREIN:  Of course, I will.  Judge,

9     cross-examination requires leading questions.  Leading

10    questions imply facts.  I cannot ask questions that are

11    leading if I'm not able to include facts or statements

12    within the questions themselves, and this is exactly what's

13    been going on this whole trial with my colleagues.  You've

14    been tying our hands, overruling every objection, and, quite

15    frankly, I don't understand where this is coming from.

16         Are you not allowing us to try our case?  Does this go

17    back to what I brought at the beginning of this trial, is

18    there something personal about Mr. Householder?  I don't get

19    it, but I know one thing, I can't do my job if you tie my

20    hands like this.

21             THE COURT:  Is there anything further?

22             MR. MAREIN:  No.

23             THE COURT:  We're in recess.

24             THE DEPUTY:  All rise.  This court is now in

25    recess.
```

1    (Proceedings continued in progress at 4:36 p.m.)

2

3       **C E R T I F I C A T E**

4   I certify that the foregoing is a correct transcript of
the record of proceedings in the above-entitled matter
5 prepared from my stenotype notes.

6  */s/*  *Lisa Conley Yungblut*
                 *02/26/2023*
    LISA CONLEY YUNGBLUT, RMR, CRR, CRC  DATE

7

8        *I N D E X*

9       *EXAMINATIONS*

| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| **JEFF LONGSTRETH** | |
| Cross-Exam by Mr. Bradley | 2711 |
| Redirect Exam by Ms. Glatfelter | 2799 |
| Recross-Exam by Mr. Bradley | 2822 |
| | |
| **DAVID GREENSPAN** | |
| Direct Exam by Mr. Singer | 2835 |
| Cross-Exam by Mr. Marein | 2869 |

*EXHIBITS*

| HOUSEHOLDER EXHIBITS | PAGE ADMITTED |
|---|---|
| No. 479 | 2752 |
| No. 478 | 2754 |
| No. 466 | 2760 |
| No. 159 | 2779 |
| No. 477 | 2789 |
| **GOVERNMENT EXHIBITS** | PAGE ADMITTED |
| No. 217 | 2819 |
| Nos. 473 A and 473 B | 2859 |