```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION
                            -   -   -
 3
      UNITED STATES OF AMERICA,        : CASE NO. 1:20-CR-0077
 4                                     :
                       Plaintiff,      : JURY TRIAL, DAY 18
 5              vs.                     :
                                       : 24th of February, 2023
 6    LARRY HOUSEHOLDER, et al.         :
                                       :
 7                     Defendant.       :

 8                          -   -   -
                    TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                            -   -   -
10
      APPEARANCES:
11
      For the Plaintiff:
12                          Emily N. Glatfelter, Esq.
                            Matthew Charles Singer, Esq.
13                          Megan Gaffney Painter, Esq.
                            Assistant United States Attorneys
14                          221 East Fourth Street, Suite 400
                            Cincinnati, Ohio 45202
15
      For the Defendant, Larry Householder:
16
                            Nicholas R. Oleski, Esq.
17                          Robert T. Glickman, Esq.
                            McCarthy, Lebit, Crystal & Liffman Co.
18                          1111 Superior Avenue East, Suite 2700
                            Cleveland, Ohio 44114
19                                   and
                            Steven L. Bradley, Esq.
20                          Mark Marein, Esq.
                            Marein and Bradley
21                          526 Superior Avenue, Suite 222
                            Cleveland, Ohio 44114
22

23

24

25
```

```
 1    For the Defendant, Matthew Borges:

 2                            Karl Herbert Schneider, Esq.
                              Todd Aaron Long, Esq.
 3                            McNees Wallace & Nurick, LLC
                              21 East State Street, Suite 1700
 4                            Columbus, Ohio 43215

 5    Also present:          Larry Householder
                             Matthew Borges
 6                           Blane Wetzel, FBI Special Agent
                             Kelly Terry, paralegal
 7                           PJ Jensen, trial tech

 8    Law Clerk:            Cristina V. Frankian, Esq.

 9    Courtroom Deputy:     Rebecca Santoro

10    Stenographer:         Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                            United States District Court
11                          100 East Fifth Street
                            Cincinnati, Ohio 45202
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings held in open court at 9:19 a.m.)

2          THE DEPUTY:  All rise.  This United States District

3     Court for the Southern District of Ohio is now in session,

4     The Honorable Timothy S. Black, District Judge, presiding.

5          THE COURT:  Thank you.  Please be seated.  Back on

6     the record outside the presence of the jury.  It's 9:20.  I

7     understand the government wishes to be heard before we get

8     the jury.

9          MR. SINGER:  Yes, Your Honor.  Thank you.  Defense

10    Counsel Marein made a number of accusations at the end of

11    trial yesterday and they echoed accusations made earlier in

12    the trial, and the government would like to make the record

13    clear regarding this attorney's conduct.

14         This Court has a standing order related to the proper

15    decorum that attorneys are to use during trial, includes

16    standing during objections, examining witnesses with

17    respect, and treating opposing counsel with professionalism.

18    Standing order flows from the Rules of Professional

19    Responsibility and Federal Rules of Evidence 611 which gives

20    the Court wide latitude to control the mode and manner of

21    how evidence is presented, and it includes protecting

22    witnesses from harassment.

23         Mr. Marein has repeatedly broken these rules throughout

24    this trial.  He's made loud noises during opening

25    statements.  He's examined two witnesses in this case.  He's

```
1    dealt with them both, he was unnecessarily aggressive and
2    unprofessional, and many of his questions were improper.
3    Rule 611 expressly states that the Court should prevent this
4    type of questioning.  And that's what the Court did
5    yesterday.
6         In response, Mr. Marein has asserted that he's being
7    treated unfairly.  This is flat wrong.  The Court has been
8    accommodating and repeatedly given this defense the benefit
9    of the doubt.  Twice this week the Court ended the day early
10   because counsel for Householder represented they were unable
11   to proceed with cross-examination despite having multiple
12   attorneys capable of cross-examining the witness and as
13   previously raised by the government, the defense has
14   repeatedly attempted to inquire into substance and introduce
15   evidence that was contrary to Court's pretrial orders.
16   Contrary to the representations of defense counsel, Court
17   has given them wide latitude and the record should be clear
18   treats all parties with respect.
19        If this attorney's accusations are some kind of tactic
20   with the hopes of gaining an advantage during objections, he
21   insults the integrity of the Court.  In any case, the record
22   should be clear that this attorney's conduct through the
23   examination of the witness resulted in the accusations that
24   he raised yesterday at the end of trial.
25             THE COURT:  Very well.  Has the government been
```

```
 1   heard?
 2            MR. SINGER:  Yes, Your Honor.  Thank you.
 3            THE COURT:  All right.  I'm prepared to call for
 4   the jury shortly before 9:30.  Is the government ready to
 5   go?
 6            MR. SINGER:  Yes, Your Honor.
 7            THE COURT:  Mr. Householder's team?
 8            MR. MAREIN:  Yes, Judge.
 9            THE COURT:  Mr. Borges' team?
10            MR. SCHNEIDER:  We are.
11            THE COURT:  Very well.  Thank you.  I'm going to
12   step down momentarily -- well, yeah, I'm going to step down
13   momentarily, come back, and we'll call for the jury in the
14   interim.  We're in short recess.  I'll be back.  Thank you.
15            THE DEPUTY:  All rise.  This court is in recess.
16         (Recess taken from 9:23 a.m. to 9:25 a.m.)
17            THE COURT:  Remain seated, please.  We are prepared
18   to call for the jury.  Back on the record.  Ms. Santoro,
19   will you call for the jury, please?
20            THE DEPUTY:  Yes, Your Honor.
21         (Pause.)
22            THE DEPUTY:  All rise for the jury.
23         (Jury entered the courtroom at 9:30 a.m.)
24            THE COURT:  Thank you.  You may all be seated.  To
25   the 14 Members of the Jury who have timely joined us, it's
```

1    9:30, good morning.  Thank you for your attention.  We will

2    continue to hear testimony.  If we could recall the witness

3    who was on the stand.  Somebody is retrieving the witness.

4        Sir, if you would be willing to approach and retake the

5    witness stand.

6        (Witness took the stand.)

7            MR. MAREIN:  Your Honor, may I approach the podium?

8            THE COURT:  Yes.  Good morning.

9            THE WITNESS:  Good morning.

10           THE COURT:  You remain under oath, you understand?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Very well.  Cross-examination to be

13   continued, Mr. Marein.

14           MR. MAREIN:  Judge, I have no further questions.

15           THE COURT:  Very well.  Mr. Borges' counsel?

16           MR. SCHNEIDER:  Good morning, Mr. Greenspan.  I'm

17   Karl Schneider.  I represent Matt Borges.  Just a couple of

18   questions.

19                      **CROSS-EXAMINATION**

20   **BY MR. SCHNEIDER:**

21   **Q**    You've known Matt for a while?

22   **A**    Yes, sir.

23   **Q**    You knew him when he was state party chair?

24   **A**    Yes, sir.

25   **Q**    And you were at that time with the county executive

1    government in Cleveland?

2    **A**    Yes, sir.

3    **Q**    Okay.  And then while you were in the legislature, you

4    also would spend some time in the Roetzel & Andress law

5    offices with a common client, I think?

6    **A**    Well, at that time, I was in the legislature, and

7    Roetzel -- one of the partners at Roetzel was a friend of

8    mine.

9    **Q**    Okay.  And that's Melissa Hoeffel?

10   **A**    Yes, sir.

11   **Q**    Okay.  And Matt knew you were a no vote on House Bill

12   6, didn't he?

13   **A**    Yes, sir.

14   **Q**    And he didn't pressure you to change your vote, did

15   he?

16   **A**    That is correct, he did not.

17           MR. SCHNEIDER:  Thank you.  No further questions,

18   Your Honor.

19           THE COURT:  Very well.  Redirect, if any.

20           MR. SINGER:  No, thank you, Your Honor.

21           THE COURT:  You are free to go.

22           THE WITNESS:  Thank you.

23       (Witness left the stand.)

24           THE COURT:  Very well.  Where do we stand from the

25   government's perspective?

```
 1              MS. GAFFNEY-PAINTER:  Government is prepared to
 2    call its next witness, Your Honor.
 3              THE COURT:  Please proceed.
 4              MS. GAFFNEY-PAINTER:  Government calls Kyle
 5    Koehler.
 6              THE COURT:  Very well.  We've gone to retrieve the
 7    witness.
 8         (Pause.)
 9              THE COURT:  If the gentleman would be willing to
10    approach and follow the woman in front of you, follow the
11    woman in front of you, and while you are there, if you would
12    pause, sir, raise your right hand for the oath to tell the
13    truth.
14         (Witness took the stand and was sworn.)
15              THE COURT:  Very well.  You may take the witness
16    stand.  I tell everybody that that chair tips back in the
17    spirit of full disclosure.  We're going to need your mouth
18    close to that fancy government microphone.
19              THE WITNESS:  Okay.
20              THE COURT:  On behalf of the government, you may
21    approach and begin your examination.
22              MS. GAFFNEY-PAINTER:  Thank you, Your Honor.
23              THE COURT:  Very well.
24              MS. GAFFNEY-PAINTER:  Good morning, Mr. Koehler.
25              THE WITNESS:  Good morning.
```

1          **JEROME KYLE KOEHLER**

2    of lawful age, Witness herein, was examined and testified as

3    follows:

4          **DIRECT EXAMINATION**

5    **BY MS. GAFFNEY-PAINTER:**

6    **Q**    Would you please state and spell your name for the

7    record?

8    **A**    Name is Kyle Koehler.  My first name is Jerome,

9    J-E-R-O-M-E, K-Y-L-E, K-O-E-H-L-E-R.  I go by Kyle.

10   **Q**    Mr. Koehler, what is your profession?

11   **A**    I am a software engineer by training.  Mechanical

12   engineer for the last 33 years for a family business.  And I

13   just finished eight years in the Ohio House.  I was term

14   limited in December of this past year.

15   **Q**    When were you first elected as a State Representative?

16   **A**    In November of 2014.

17   **Q**    When you served as a State Representative, where was

18   your office located?

19   **A**    On the 11th floor of the Riffe initially for my first

20   four years, and then on the 13th floor the last four years.

21   **Q**    Where is the Riffe building?

22   **A**    Riffe building is directly across the street from the

23   State Capitol on High Street.

24   **Q**    During the time that you served as a State

25   Representative, where was the location of your office in

1    comparison to the office that Mr. Householder occupied?

2    **A**    It was right next door.  In the Riffe, there's about

3    30 offices per floor.  Mine was directly adjacent to his.

4    **Q**    Now, during your time as a State Representative, did

5    you ever meet a man named Jeff Longstreth?

6    **A**    Yes, I did.

7    **Q**    When did you first meet him?

8    **A**    Back in February of 2014, I was running for office for

9    the first time for the State House.  And another gentleman

10   who had come and interviewed me about who I was and what my

11   values were suggested I meet with Jeff Longstreth in

12   Columbus.

13   **Q**    And did you, in fact, meet with Mr. Longstreth in

14   Columbus?

15   **A**    Yeah, a couple of weeks later, yes.

16   **Q**    Can you describe for us what you recall about that

17   first meeting with Mr. Longstreth?

18   **A**    Mr. Brian Williams, who was association of builders

19   and contractors wanted me to meet him, introduce me to him.

20   We chatted about where I was, where I stood on issues, and

21   then he offered to help me on the campaign, do some flyers.

22   I created one flyer on my own and he offered to create some

23   more flyers.

24   **Q**    Did you take him up on his offer?

25   **A**    Yes, I did.

1   **Q**    Now, turning your attention to the summer of 2018, did

2   you have any interactions with Mr. Longstreth during that

3   time?

4   **A**    In 2018?

5   **Q**    Yes.

6   **A**    I had an interaction with him in 2017, in the summer

7   of 2017, not 2018.

8   **Q**    Excuse me.  If you will, tell us about the interaction

9   you had with him in the summer of 2017.

10  **A**    He contacted me.  I hadn't really talked to him since

11  I won the election in 2014.  He called me in 2017 and asked

12  to meet with him at the Sheraton, the lobby of the Sheraton

13  in Columbus.

14  **Q**    And did you meet with him in the lobby of the

15  Sheraton?

16  **A**    Yes, I did.  Yes, I did.

17  **Q**    Now, would you please describe for us that meeting?

18  **A**    Well, we met in the lobby across from the -- where the

19  people check in at the hotel and had coffee.  He told me

20  that -- we talked, we exchanged pleasantries about, you

21  know, how things had been going because I hadn't talked to

22  him in a while.  And then he informed me that he was asked

23  by Larry Householder to give up all of his clients and run

24  all of Larry Householder's candidates' campaigns in the

25  coming election of 2018.

1    **Q**    Speak with you at all about you meeting with

2    Mr. Householder?

3    **A**    Yes.  That was the -- we exchanged pleasantries.  He

4    asked me -- he told me about the fact that he was going to

5    be running all of the campaigns, and then he said would I be

6    willing to meet with Larry Householder.

7    **Q**    And did you actually at a later date meet with

8    Mr. Householder?

9    **A**    About two weeks later, I did, yes.

10   **Q**    Will you describe that meeting for us, please?

11   **A**    Well, he told me where his office -- he has an office

12   on the 25th floor of the Sheraton hotel or Sheraton business

13   complex, and I went up and sat and talked with Larry

14   Householder for about two hours where he explained to me his

15   philosophy on what it's like to be a Speaker and his time in

16   the office before and how he saw things, how he thought he

17   should run things if he was Speaker.

18   **Q**    Now, during that conversation, did Mr. Householder ask

19   you who you intended to vote for Speaker?

20   **A**    No, he didn't.  It was about a two-hour conversation

21   where I sat and smiled and nodded a lot.  And to be honest,

22   I had somewhere to go.  I think it was around 4:00 that it

23   started, and about 6:00, I had to go somewhere, and to be

24   honest, I had to go to the bathroom.  So I finally got up

25   and said I need to go, and I said I don't know who I'm going

1    to vote for for Speaker.  He said, oh, I'm not asking you

2    who you're going to vote for for Speaker.  So again, it was

3    just a long meeting.

4    **Q**    Now, whom did you ultimately support for Speaker?

5    **A**    Well, initially, I -- I voted for Ryan Smith back in

6    20 -- I'm sorry, that was 2017.  So 2018, I voted for Ryan

7    Smith for Speaker.

8    **Q**    As a State Representative, during your tenure as a

9    State Representative, are you familiar with a piece of

10   legislation known as House Bill 6?

11   **A**    Yes.

12   **Q**    Just generally speaking, what is House Bill 6?

13   **A**    House Bill 6 was a bailout for nuclear power plants

14   owned by FirstEnergy.

15   **Q**    Whose bill was House Bill 6?

16   **A**    I knew it as -- well, the cosponsors were two

17   representatives, but knew it as Larry Householder's bill.

18   **Q**    Now, at the time that House Bill 6 was introduced,

19   what was your position on the bill?

20   **A**    I was a no.

21   **Q**    Now, in the time before the first vote on House Bill

22   6, did you have any communications with Larry Householder

23   about it?

24   **A**    Yes.

25   **Q**    Can you describe those communications?

JEROME KYLE KOEHLER - DIRECT EXAM                    18-2893

1     **A**     One was a phone call where he wanted me to vote for

2     the bill, and I explained to him that I was against bailing

3     out private industry.  It was a reason I ran for office in

4     20 -- when I started looking at political things back in

5     2009 when we did that at the federal level, but, mostly,

6     there was a group called United For Clean Power that had

7     attacked me during the 2018 campaign, and at the time it was

8     called United For Clean Power.  I didn't know who they were

9     because they were a part of a group where you don't know who

10    they are.  And I told him until I knew who those people

11    were, I wasn't going to vote for the bill.

12    **Q**     How did you actually vote with respect to House Bill

13    6?

14    **A**     I voted no both times it came before the House.

15    **Q**     What happened in your district in response to your

16    vote?

17    **A**     We voted for it in late May, early June, and the

18    following day after I voted, mailers started showing up in

19    mailboxes and I started getting calls at my office because

20    there was a mailer that had my office phone number and it

21    said call Kyle Koehler and tell him to have the courage to

22    vote for House Bill 6, because I had voted no the day or few

23    days before.  I sat and listened to an aide outside my

24    office take call, after call, after call having to explain

25    why I voted no, and they wanted to know why I didn't have

1    the courage -- when they found out I voted no, they wanted

2    to know why I didn't have the courage to vote yes.

3    **Q**    Who was responsible for those mailers as far as you

4    knew?

5    **A**    It said Generation Now on it.

6    **Q**    Now, what did you understand generation to be at that

7    time -- excuse me, Generation Now to be at that time?

8    **A**    It was the group that was pushing the bill.  It was

9    some sort of a PAC or group that was pushing the bill.

10   **Q**    Did you ever have any contact with Mr. Longstreth in

11   regards to those mailers you were describing?

12   **A**    Yes, I did.  When I saw that it said Generation Now on

13   it, I went on the IRS website and looked up who Generation

14   Now was.  There's 990 forms out there, and it said JPL &

15   Associates was the director or the address that it was

16   associated with.

17   **Q**    And what did you know at that time about JPL &

18   Associates?

19   **A**    Well, I -- one, I had met Jeff Longstreth, so I knew

20   who JPL & Associates were.  In January of 2019, we had a

21   caucus retreat, and Jeff Longstreth and JPL & Associates and

22   a group called Majority Strategies was introduced to us by

23   the Speaker and his staff as the folks that were going to

24   help us get reelected, you know, as we move forward through

25   the next General Assembly, next two years.

```
 1            MS. GAFFNEY-PAINTER:  Your Honor, may we please

 2    have permission to publish what's already been admitted as

 3    Government Exhibit 474?

 4            THE COURT:  Yes.

 5    Q    Mr. Koehler, directing your attention to the very top

 6    of this document where it says --

 7            THE COURT:  It's just come up on his screen.

 8            MS. GAFFNEY-PAINTER:  Oh, I apologize.

 9            THE COURT:  That's all right.  You may proceed.

10            MS. GAFFNEY-PAINTER:  Thank you.

11    Q    Mr. Koehler, directing your attention to the top of

12    the page where it lists participants, who are the

13    participants here?

14    A    Myself and Jeff Longstreth.

15            MS. GAFFNEY-PAINTER:  Now, Ms. Terry, may we please

16    advance to the second page?  And may we please cull out the

17    blue -- the very first blue text message box that appears

18    here.

19    Q    Now, Mr. Koehler, will you please read this text

20    message to us?

21    A    It says my name and my phone number.  People received

22    them yesterday.  The flyers do not say quote "call Rep

23    Koehler and thank him," end quote.  I'm sitting in my office

24    listening to my consultant aide explain repeatedly to

25    callers today why I didn't have the courage to vote yes.
```

1    Thanks, great to know you have my back, and then a question

2    mark.

3    **Q**    When you write here "great to know you have my back,"

4    question mark, what do you mean?

5    **A**    I'm being sarcastic because it was hurting me.  It was

6    hurting me that basically somebody was accusing me of not

7    having courage to vote on something that I didn't agree with

8    and the flyer wasn't real clear on, you know, why I should

9    vote for it.  So basically, folks were being told after I

10   voted no on something and I was having to defend myself.

11   They were not good calls.

12           MS. GAFFNEY-PAINTER:  Now, Ms. Terry, may we please

13   advance to page 4?  And will you please blow up for us the

14   bottom blue text message on this page?

15   **Q**    Now, Mr. Koehler, will you please read this text

16   message for us?

17   **A**    It says:  Up until Sunday of Memorial Day leadership

18   was somehow under the impression that I was voting for House

19   Bill 6.  What -- WTF were you doing sending out crap two

20   days before that?  Have you picked my primary opponent yet?

21   **Q**    Now, what are you referencing here in this text

22   message?

23   **A**    One of the whips for our caucus had sent a message to

24   me saying you're still a yes on this, and I hadn't responded

25   to him yet, and he thought that I was a yes.  So I wanted to

```
1    know why they were sending out flyers saying call Kyle

2    Koehler to tell him to vote yes, because other

3    representatives were getting mailers saying call this

4    representative and thank him for voting or supporting House

5    Bill 6.  So I was -- again, I was confused why they were

6    sending this out if in fact someone at leadership thought I

7    was a yes vote already.

8    Q    Now, directing your attention to the last line of this

9    text message, have you picked my primary opponent yet, what

10   are you referring to there?

11   A    I was referring to the fact that, if I voted no, I was

12   going to have somebody picked to run in a Republican primary

13   against me in the following election.

14   Q    Now, it appears here that there is a screenshot

15   attached to this text message.

16        MS. GAFFNEY-PAINTER:  Ms. Terry, may we please

17   advance to page 7 of this document.

18   Q    You'll notice at the very top of this page, which is

19   page 8 --

20        MS. GAFFNEY-PAINTER:  Thank you very much,

21   Ms. Terry.

22   Q    Now, what are we looking at here, Mr. Koehler?

23   A    That is the text from Representative Jay Edwards

24   basically saying you're good on HB 6, correct?  And he

25   somehow thought I was a yes, even though I had told
```

1    everybody I was a no.  I had never said I was a yes, but Jay

2    has a way of asking questions like that as a whip.

3    **Q**    And just to be clear, who is Jay at this time?

4    **A**    Jay Edwards, Representative Jay Edwards, he is the

5    whip -- either the majority whip or the assistant majority

6    whip for the Ohio House at that time, I think.

7         MS. GAFFNEY-PAINTER:  Now, Ms. Terry, may we please

8    advance to page 6 -- or back up to page 6?

9    **Q**    Mr. Koehler, what are we looking at here?

10   **A**    That is one side of the flyer that was sent out that

11   was received after I voted no on House Bill 6.

12   **Q**    And directing your attention, Mr. Koehler, to the top

13   of this page upper left-hand corner, what do we see there?

14   **A**    It says:  "Paid for by Generation Now, Incorporated."

15        MS. GAFFNEY-PAINTER:  Your Honor, may I have a

16   moment to confer?

17        THE COURT:  Yes.

18        MS. GAFFNEY-PAINTER:  No further questions.  Thank

19   you.

20        THE COURT:  Very well.  Thank you.  The attorneys

21   for the defendants have an opportunity to examine.

22   Cross-examination on behalf of Mr. Householder?

23        MR. OLESKI:  Yes, briefly, Judge.

24        THE COURT:  Very well.

25        MR. OLESKI:  May I proceed?

1          THE COURT:  Yes.

2          MR. OLESKI:  Good morning, sir.

3          THE WITNESS:  Good morning.

4          MR. OLESKI:  My name is Nick Oleski, one of

5     Mr. Householder's attorneys.  Just have a couple of

6     questions for you.

7                    **CROSS-EXAMINATION**

8     **BY MR. OLESKI:**

9     **Q**     You were asked on direct examination about the

10    potential of having a primary opponent in the 2020 election

11    cycle?

12    **A**     Um-hmm.

13    **Q**     Do you recall those questions?

14    **A**     Yes.

15    **Q**     Did you have a primary opponent --

16    **A**     No.

17    **Q**     -- in the 2020 elections?

18    **A**     No.

19    **Q**     And when were the 2020 primaries held?

20    **A**     2020 primaries were held -- they were supposed to be

21    held in May.  They were postponed for a while because of

22    COVID epidemic.

23    **Q**     Fair enough.  You were asked some questions on direct

24    examination about a meeting you had with Mr. Householder

25    sometime in 2017; do you recall those questions?

1    **A**    Yes.

2    **Q**    And it was a two-hour meeting?

3    **A**    Um-hmm.

4    **Q**    That Mr. Householder talked on and on, correct?

5    **A**    Um-hmm.

6    **Q**    And at the end of the meeting, he didn't ask you to

7    vote for him to be Speaker, correct?

8    **A**    Not at that time, no.

9    **Q**    And during when you were in 2019 while House Bill 6

10   was pending before the General Assembly, I think you

11   recalled -- I think you testified that you were called once

12   by Mr. Householder and he asked you what your position was

13   on House Bill 6, correct?

14   **A**    Um-hmm, yes.

15   **Q**    And you explained that you were a no vote, correct?

16   **A**    Yes.

17   **Q**    And the conversation then ended shortly thereafter,

18   right?

19   **A**    The conversation when he called me or when he texted

20   me?

21   **Q**    When he called you.

22   **A**    When he called me, I told him I would not vote for

23   House Bill 6 until somebody could tell me who Generation Now

24   was.  He asked somebody off the phone, do we have anything

25   to do with Generation Now and he came back and said I didn't

```
 1    have anything to do with them.
 2              MR. OLESKI:  Moment to confer, Judge?
 3              THE COURT:  Yes, thank you.
 4              MR. OLESKI:  Thank you, sir.  I don't have any
 5    further questions for you.
 6              THE COURT:  Questions on behalf of Mr. Borges?
 7              MR. SCHNEIDER:  No questions, Your Honor.
 8              THE COURT:  No questions.  Redirect, if any?
 9              MS. GAFFNEY-PAINTER:  No, thank you, Your Honor.
10              THE COURT:  Thank you, sir.  You're free to go.
11              THE WITNESS:  Thank you.
12          (Witness left the stand.)
13              THE COURT:  Where do we stand from the government's
14    perspective?
15              MS. GAFFNEY-PAINTER:  We are prepared to call our
16    next witness, Your Honor.
17              THE COURT:  Please do.
18              MS. GAFFNEY-PAINTER:  Government calls Nick Owens.
19              THE COURT:  Very well.  If Mr. Owens would follow
20    the lady in front of you, sir.  And if you would pause where
21    you are, sir, raise your right hand for the oath to tell the
22    truth.
23          (Witness sworn and took the stand.)
24              THE COURT:  You can take the witness stand.  I tell
25    everybody that chair tips back in the spirit of full
```

1    disclosure.  You can climb up, sit on it at your own risk.

2    Go ahead.

3         THE WITNESS:  Thank you, Your Honor.

4         THE COURT:  We're going to need your mouth close to

5    the fancy federal microphone.

6         THE WITNESS:  Okay.  Thank you.

7         THE COURT:  On behalf of the government, you may

8    approach and examine.

9         MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

10        THE COURT:  Very well.

11        MS. GAFFNEY-PAINTER:  Good morning, Mr. Owens.

12        THE WITNESS:  Good morning.

13                    **NICHOLAS RYAN OWENS**

14   of lawful age, Witness herein, was examined and testified as

15   follows:

16                    **DIRECT EXAMINATION**

17   **BY MS. GAFFNEY-PAINTER:**

18   **Q**    Will you please state and spell your name for the

19   record?

20   **A**    My full name is Nicholas Ryan Owens.

21        I'm sorry, is that all you asked?

22   **Q**    No problem.  Would you please spell it for the record

23   as well?

24   **A**    N-I-C-H-O-L-A-S, R-Y-A-N, O-W-E-N-S.

25   **Q**    Mr. Owens, where do you work?

1    **A**    I'm -- I work for myself.  I'm a solo attorney in

2    private practice.

3    **Q**    Now, back in March of 2020, where did you work?

4    **A**    Well, I was on leave of absence from the Brown County

5    prosecuting attorney's office where I worked from -- since

6    passing the bar in 2012 until I took a leave of absence in

7    January -- well, end of December, beginning of January of

8    2020.

9    **Q**    Why did you take a leave of absence?

10   **A**    I took a leave of absence from my position as a

11   prosecuting attorney, assistant prosecuting attorney, to run

12   for State Representative in the 66th House District, which

13   encompasses portions of Clermont County, the rural portions

14   of Clermont County, and then all of Brown County.  I'm from

15   Georgetown in Brown County.

16   **Q**    Now, at the time that you took that leave of absence

17   to run for that position, had you ever run for office

18   before?

19   **A**    I had.  I had run for office in a Republican primary

20   election in 2012.  I had lost that spot.  I came in second

21   out of three people, and in 2016, I ran for the state board

22   of education and had won that seat.

23   **Q**    Now, in the 2020 race for representative, how many

24   candidates were running?

25   **A**    Well, for the Republican nomination, there was three,

1    and my area of what has now changed district lines, but in

2    the 66th House District, it's an overwhelmingly Republican

3    area, whoever wins the primary, in this case the Republican

4    primary, would essentially be the State Representative.

5    **Q**    And just to be clear, for the three representatives

6    running for that race in 2020, what was the political

7    affiliation for all of those three individuals?

8    **A**    Candidates, all three candidates were Republicans.

9    **Q**    When was the primary in 2020?

10   **A**    Well, that's a sore subject.  It was supposed to be

11   March 17th, but on March 16th, to my displeasure, Governor

12   DeWine -- and, frankly, I believe without lawful

13   authority -- continued the election.  At the time he said

14   until June.  He actually said that we were going to go to

15   Franklin County and get a court injunction to move it then.

16   Franklin County Common Pleas court denied that.  Later the

17   night of the 16th, I had actually started putting signs out

18   for that day and then halfway of putting signs out for that

19   election, we got word that the Department of Health

20   Director, Amy Acton, had cancelled -- well, postponed the

21   election, and at that point we bought it and thought it was

22   going to be in June, but then ultimately the legislature

23   came back in session and made the primary on April 28th.

24       Now, this is convoluted, but as a candidate, even more

25   frustration.  What was an in-person election became in our

1    state's history the only mail-in Election Day.  So I had a

2    lot of people that I knew would have voted for me, but they

3    could only vote for someone by requesting an absentee ballot

4    and by getting it in by April 28th or a couple of days

5    thereafter.  It was an all mail-in ballot and no in-person

6    voting unless you voted in person at the Board of Elections

7    in your respective county prior to the primary on

8    March 16th.  So it's convoluted.

9    **Q**    Mr. Owens, when did you announce your intention to run

10   for that seat?

11   **A**    So I actually announced my intention to publicly

12   announce by filing my petitions and sending out a press

13   release in November of 2019, but anybody who's been involved

14   in politics for a while knows that you do a lot of back

15   channeling, a lot of discussions with people that are

16   involved with the party, whatever party you're involved

17   with, instrumental people in the community, so I had been

18   telling people or people in the know in politics that I had

19   planned to run for State Representative for multiple years.

20   The State Representative that I had lost to in 2012 in the

21   Republican primary, Doug Green, who since passed away, but

22   Doug Green was term-limited out of office after eight years.

23   So everybody knew that he could only serve eight years in

24   office, so I was 26, 27 when I ran in 2012, so I knew that

25   being a young age, I'd have another opportunity in 2020.

1    **Q**    Now, did you ever meet with Larry Householder about

2    your candidacy and I'm focussing on the 2020?

3    **A**    Yes.  And actually very early in the process, in

4    November of 2018, actually I checked my phone calendar

5    recently, it was November 15th, 2018, I had received a call

6    from him.  We were put in mutual contact.  He was looking

7    for candidates to fill term limited state representatives to

8    be supportive of and so we set up a meeting over the phone

9    for November 15th, 2018.

10    **Q**    Now, you mentioned a mutual contact.  Who was the

11    mutual contact?

12    **A**    So it was now State Representative Jean Schmidt,

13    former Congressman Jean Schmidt, I actually worked for her

14    my first year out of college, although I have a finance

15    undergrad, but before I went to law school, she was running

16    a special election, I helped on her campaign and started

17    working for Congresswoman Jean Schmidt.  I worked in her

18    district staff, worked in DC for her, so we had had a

19    long-standing relationship, and she had a previous

20    relationship with Larry Householder during their mutual time

21    in state legislature.  So I was told by Jean that she was

22    looking for candidates in the 66th District, and she said I

23    know someone who would be perfect for that who's planning to

24    run, which was actually the neighboring district.  She is a

25    state rep or she ran in 2020 and got elected to the 65th

1    House District which is contiguous to the 66th.

2    Q    Now, where did the meeting with Mr. Householder take

3    place?

4    A    So it happened in an office tower right off of Capitol

5    Square on the top floors.  It's sort of an office complex

6    that shares the Sheraton hotel.  So if you guys know where

7    the capital is, there's a Sheraton, and then it was on the

8    top floor.  It was -- on the outside of the marquis, it said

9    Strategy Group For Media -- or Strategy Group.  It was a

10   very nice office on the top floor, had a balcony, but it was

11   just an office building office.

12   Q    Who attended that meeting?

13   A    November 15th, 2018 meeting, I was greeted first by

14   Bryan Gray and then second by Anna Lippincott, where we

15   started some small chatting, and then ultimately I was

16   brought back to a -- not an opulent, but a small office in

17   the -- in their office space where Larry Householder was

18   sitting, and so I had a meeting with Larry Householder, who

19   was not Speaker at that time, Megan Fitzmartin, and Bryan

20   Gray.

21   Q    Now, will you describe for us what happened during

22   that meeting?

23   A    So that was -- when I ran in 2012, there was no sort

24   of candidate -- I spoke with a political --

25         MR. GLICKMAN:  Objection, not responsive.

1        THE COURT:  Can you restate the question, please?

2    **Q**    Could you describe for us what happened during that

3    November 15th, 2018 meeting?

4    **A**    We talked about politics.  We talked about the lay of

5    the land in the area.  We talked about various candidates.

6    It was just really -- really wasn't a grilling.  I thought

7    it would be like an interview, but it was more of just a

8    chat.

9    **Q**    Now, during that meeting, did Mr. Householder show you

10   any piece of media?

11   **A**    His staff did at his direction.

12   **Q**    Will you describe that for us, please?

13   **A**    So we were just in the course of the conversation

14   talking about past races and races that he was involved in,

15   and we were talking about negative campaigning and how it is

16   effective, and he told his staff to go get a piece of

17   literature that he said was very effective in helping a

18   candidate win.  And so he showed me -- and, frankly, I can't

19   recall if it was a piece of mail or it was a video or

20   something, I was shown some sort of political advertisement

21   that had just been a part of the campaign in the

22   November 2018 election.

23   **Q**    Do you recall the contents of that media that you were

24   shown?

25   **A**    Yeah.  So it was -- it had to do with a candidate who

1    was under suspicion of drunk driving, and it was very

2    effective because I believe -- and this is -- again, I don't

3    know if it was a video or a still image on a mailer or maybe

4    both.  This is four years ago -- this was over four years

5    ago.  But essentially, implied that the candidate for office

6    was guilty of drunk driving, and it was just -- it was a

7    public record.  It was from a body cam, I believe.

8    Certainly was not helpful to that candidate who was running

9    for office.

10   **Q**    Do you recall any statements that Mr. Householder made

11   with regards to that media that he showed you?

12   **A**    So yes.  So Jay Todd Smith, who was the sitting

13   Republican lawmaker in that district, his candidate was the

14   one that had the mail that had the suspicion of drunk

15   driving.  He had said that Ryan --

16           MR. GLICKMAN:  Objection, Judge, hearsay.

17   **Q**    Mr. Owens, if you could clarify, when you say "he

18   said," are you talking about Mr. Smith or are you talking

19   about Mr. Householder?

20   **A**    Mr. Householder.

21           MR. GLICKMAN:  Withdrawn, Judge.

22           THE COURT:  Very well.

23           THE WITNESS:  I'm sorry.  Mr. Householder said that

24   Speaker Ryan Smith had kind of left Jay Todd Smith hanging

25   out to dry with no help from the caucus or the party, and

1    that essentially -- and Jay Todd had just won under the

2    common assumption that Jay Todd Smith had just won a very

3    close election because I had met with him nine days, ten

4    days after the election, and he said he was essentially

5    being left to hang out to dry, and he came in and helped him

6    get about $500,000 to help put him over the finish line and

7    win.

8    **Q**    Now, what were your impressions when you left that

9    meeting?

10   **A**    About the spending or about my candidacy?

11   **Q**    Let me ask it this way.

12   **A**    Yeah.

13   **Q**    What did you understand the purpose of that meeting to

14   be?

15   **A**    I understood it to be a candidate recruitment

16   interview.  Certainly, I've been involved in politics and to

17   know that just because I met with Larry Householder doesn't

18   mean I'm going to be his candidate or part of his slate of

19   candidates for office.  I thought that the conversation went

20   well.  You know, essentially, I left it thinking -- it was

21   still very early in the process.  It was November of 2018.

22   I thought, oh, well, hopefully we'll have follow-up

23   conversations and discuss my candidacy and, you know, lead

24   to me ultimately being elected state rep.  So it was very

25   general thoughts.  I was optimistic.

1  **Q**   Did you ever have any follow-up meeting?

2  **A**   I did.  So Megan Fitzmartin reached out to me prior to

3  a meeting on February 11th at the same office building, but

4  in a conference room we met.  And she said, hey, the team

5  wants to have you up to meet with us and discuss your

6  candidacy, again, no promises, but to discuss your

7  candidacy.  And I said okay.  We arranged -- it was a day I

8  was already in Columbus for State Board of Education, and

9  actually when I met with Larry Householder November 15th,

10 2018, I was there for State Board of Education meeting.  I

11 wanted to limit my trips to Columbus.  And so, yeah, so we

12 arranged a meeting February 11th, 2019, meeting.  The

13 Speaker -- Larry Householder had then become the Speaker, he

14 was not present.

15 **Q**   Who was present for that meeting?

16 **A**   It was Jeff Longstreth, Megan Fitzmartin, and Anna

17 Lippincott.

18 **Q**   Where was that meeting held?

19 **A**   Again, it was in the same suite of offices, Strategy

20 Group for media, top floor of a building near the Sheraton,

21 but instead of being in a smaller office, this was in a

22 conference room.

23 **Q**   And what did you discuss during that meeting?

24 **A**   So this was more of a nuts and bolts discussion of

25 the -- of my candidacy and things like that, which is very

1    common when you're being vetted for political office.  I was

2    asked where my position on Right to Life, my position on the

3    Second Amendment, and my position on right to work.  I was

4    also just -- it was -- it really wasn't that long of a

5    meeting, maybe 30, 45 minutes.  They sort of talked about --

6    Jeff Longstreth specifically told me that, you know, you

7    become our candidate, essentially they do everything from

8    fundraising, mail, TV, essentially that they control the

9    operation, and it was -- but it wasn't necessarily in a

10   negative way.  It seemed to be at the ease of the candidate

11   as well.  I mean, any candidate gets told that they're going

12   to have a lot of their work taken off their plate would be

13   happy by that.  So yeah.

14   **Q**    Was there any follow-up after that meeting about your

15   selection?

16   **A**    So not for a while.  I had heard, found out, that Jean

17   Schmidt had sort of started the on-boarding process in April

18   or May, but I had been kind of asking around what's going on

19   and heard kind of radio silence.  But I was okay with that

20   in the sense that if, if Team Householder, as they were

21   called, didn't get involved in my primary election because

22   it was an open seat, frankly, that's fair for all of the

23   voters and they're not -- no one is putting their thumb on

24   things, so I was fine with that.  Now, certainly, I would

25   have been fine being the candidate as well.

```
 1           And then I had a mutual state rep friend, State

 2      Representative John Becker, who knew -- served with the

 3      Speaker and asked and said, hey, what's going on with that

 4      66th House District, are you picking a candidate or things,

 5      and he said, well, we'll have Nick --

 6                MR. GLICKMAN:  Objection, Judge, hearsay.

 7                THE COURT:  Appears to be hearsay.

 8                MS. GAFFNEY-PAINTER:  I can rephrase this.

 9                THE COURT:  All right.  It's sustained.  Go ahead.

10      Q     So did Mr. Householder end up selecting a candidate

11      for your district?

12      A     Yes.

13      Q     Who was that candidate?

14      A     Allen Freeman.

15      Q     Now, what were the consequences in your race once

16      Allen Freeman was selected by Larry Householder?

17      A     Well, he had a whole team of people behind him.  He

18      had institutional support.  He had a whole team of people in

19      Columbus.  He had on-the-grounds staff.  He had support

20      staff in Columbus.  He had assigned door-knockers.

21      Ultimately, what later came in the campaign, had lots of

22      spending on his behalf.  He had a lot of support.

23      Q     And when you talk about "support," can you describe

24      for us specifically any media support that you saw in your

25      district after Mr. Freeman was selected by Mr. Householder?
```

1    **A**    Certainly.  So in any election -- this is a primary

2    election.  It was Presidential primary.  So it was supposed

3    to happen on March 17th.  So it's kind of crazy because

4    people get out of the November elections and then all of a

5    sudden, they're running this very contested election and

6    people think, well, we were just in election.  So a lot of

7    people think of election in general election terms in

8    November, but it was kind of a -- there was a lot of

9    candidates doing things, meeting with people, but things

10   didn't really heat up until about mid February.  So I'm

11   going to say in January all of the candidates are going to

12   local Republican Party things, meeting with integral people,

13   getting starting to maybe even get signs up, but things

14   don't really heat up until February.  In about mid February,

15   early to mid February, everybody -- and there was a lot of

16   primaries going on, not only mine.  A lot of mail started

17   showing up in the mailboxes for a lot of candidates, but

18   particularly Allen Freeman and both from his official

19   campaign, I think was Allen -- the Committee to Elect Allen

20   Freeman, I believe.  I saw it a lot in the mail and on TV,

21   and then the Growth and Opportunity PAC started spending a

22   lot of money on his behalf too.  And the PAC also spent

23   money attacking me, but also attacking Adam Bird, who

24   ultimately won the race for election.

25   **Q**    Just to be clear, who is Adam Bird at this time?

1    **A**      So Adam Bird is one of the candidates.  So there was

2    three candidates, myself, Allen Freeman, and Adam Bird.  I

3    was endorsed by the Brown County Republican Party, Adam was

4    endorsed by the Clermont County Republican Party, and Allen

5    was endorsed by the Speaker.  So it was a very contested

6    vote.  Adam had -- my math is not going to be right.  Maybe

7    Adam had 36, I had 33 and Allen had 32.  It was a very close

8    race.  I ultimately lost by like 420 votes.

9    **Q**    I believe you testified that there were a lot of

10   mailers.  Can you just explain that to us?

11   **A**      Yeah.  So when the mailers would come -- I only had

12   the ability to afford about four mailers for my whole

13   campaign.  And that's the best way to get your message out

14   in a rural area and the most cost effective, although it's

15   still costly, is to put mail in people's mailboxes.  So I

16   could only afford four mailers district-wide, which averaged

17   about $5,000 per mailer.  And so Adam Bird sent out probably

18   about three to four mailers.  Allen Freeman, on the other

19   hand, from his committee to elect Allen Freeman probably had

20   about ten mailers, and then -- that's his official campaign,

21   and then the Growth and Opportunity PAC, which was being

22   spent on his behalf advocating him, there was probably

23   another ten mailers.  So both the official and the

24   nonofficial mailers on behalf of Allen Freeman, there was

25   probably 20.

1          MS. GAFFNEY-PAINTER:  Your Honor, may we please

2     have permission to publish what's already been admitted into

3     evidence as Government's Exhibit 342 B?

4          THE COURT:  Yes.

5          MS. GAFFNEY-PAINTER:  And, Ms. Terry, will you

6     please advance to page 3 of this exhibit?

7     **Q**    Now, Mr. Owens, what are we looking at here?

8     **A**    So this is one of the mailers.  They were all about

9     the standard, this standard size.  Actually, on my screen,

10    it's about the actual size it was.  You'll see at the top

11    Adam Bird, who ultimately won the race and who is current

12    State Representative, who was just reelected this past year

13    for his second term, and then myself, and then you'll notice

14    that this was paid for by the Growth and Opportunity PAC.

15    But there are certain unique things that I was starting to

16    notice.  Once I got all of this mail, I noticed that the

17    disclaimers were generally in the same font, same locations,

18    the postal permits were, both sets, the Growth and

19    Opportunity PAC and Allen Freeman campaign.  The postal

20    permit area were the same, fonts were the same, like little

21    disclaimers or little -- I don't know, internal

22    measurements, it says HD 66 slash 006, which I think that

23    was like the sixth mailer.  So it was pretty -- you could

24    keep the stream of things because they internally always had

25    those things.  So --

1          MR. GLICKMAN:  Objection, Judge.

2          THE COURT:  Basis?

3          MR. GLICKMAN:  Speculation.  He's speculating as to

4     numbers that are on a document that he neither created nor

5     contacted the person who created.

6          THE COURT:  He's giving his opinion.  I think we

7     need to move on.  I sustain the objection as to that

8     particular question.

9          MS. GAFFNEY-PAINTER:  Ms. Terry, may we please just

10    highlight the very bottom fourth of this document that we

11    see?

12    **Q**    Now, Mr. Owens, you mentioned a disclaimer.  Is the

13    disclaimer you're talking about displayed in this callout?

14    **A**    It is.

15    **Q**    All right.  Can you just direct us to it?

16    **A**    It's at the very bottom there.  It's entered:  "Paid

17    for by the Growth and Opportunity PAC Inc.," and then it has

18    a website address.  Not authored by any candidate or

19    candidate's committee.  I take objection to those parts

20    throughout the campaign, but --

21    **Q**    Thank you.

22         MS. GAFFNEY-PAINTER:  All right.  Ms. Terry, may we

23    please advance to page 6 of this exhibit.

24    **Q**    Mr. Owens, what are we looking at here on page 6 of

25    Government Exhibit 342 B?

1    **A**    So this is another advertisement or political mailer

2    by the Growth and Opportunity PAC, a different one I

3    believe.  I don't know if this is the front or this could

4    have been the opposite side, but it seems like it's

5    different.  Postal permits, and it's just -- there was

6    literally similar versions of this from the Growth and

7    Opportunity PAC at least ten times.  I got to the point, I'm

8    not joking, that my mailman -- because I always wanted --

9            MR. GLICKMAN:  Objection, Judge, nonresponsive.

10           THE COURT:  You can ask him the question.  What is

11   the question pending, please?

12           MS. GAFFNEY-PAINTER:  I was having him describe

13   this mailer to us and what we were looking at.

14           THE COURT:  Okay.

15           MR. GLICKMAN:  Judge, I still have to object.  He

16   was describing what his mailman did.

17           THE COURT:  I agree.  Sustained.

18   **Q**    Mr. Owens, directing your attention to the upper

19   left-hand corner here, what do we see printed there?

20   **A**    "Growth and Opportunity PAC, Inc., PO Box 8218

21   Columbus Ohio 43201-0218."

22   **Q**    And now directing your attention on that same top line

23   to the right side of the document, what do we see in that

24   white rectangle there?

25   **A**    "Presorted Standard US Postage Paid, Columbus, OH,

1    Permit 6871."

2    **Q**    You had testified earlier about postage permits; is

3    this what you were referring to?

4    **A**    Yeah.  So generally, from my experience in politics,

5    when there's a --

6         MR. GLICKMAN:  Objection, Judge.

7         THE COURT:  You need to ask a question.  What is

8    the question of the witness?

9         MS. GAFFNEY-PAINTER:  I was asking him to

10   explain -- he had testified earlier about postage permits,

11   and I was asking him if this square that we see displayed

12   here is the postage permit that he was generally referencing

13   earlier.

14        THE COURT:  And what was the answer?

15        THE WITNESS:  Yes.

16        THE COURT:  Next question.

17   **Q**    Now, what is Growth and Opportunity PAC, as far as

18   you're aware?

19   **A**    It was a political action committee or a dark money

20   political action committee that was --

21        MR. GLICKMAN:  Objection, characterization, Judge.

22        THE COURT:  Overruled.

23        THE WITNESS:  That was spending money to elect

24   certain candidates.

25   **Q**    Now, during this run up to the primary in 2020, how

1    would you compare your experience running for office with

2    your previous experience running for State Representative?

3            MR. GLICKMAN:  Objection, relevance.

4            THE COURT:  Overruled.

5            THE WITNESS:  Night and day.  In 2012 when I ran

6    for an open seat, it was a three-way race as well, Doug

7    Green, myself, and Rick Heron, very contested.  There was --

8    I spent as much money personally in raising money as was

9    spent combined amongst the three candidates in that race.

10   So this race was -- it was night and day.  It was frankly

11   like a Congressional race or a statewide race.  It was -- it

12   morphed overnight.  From beginning around middle of

13   February, it became -- it was just -- it exploded.  The

14   race, from attention, mailers, ultimately TV, radio, it was

15   unlike anything I had ever been involved with and I was

16   personally involved with.

17   **Q**    Now, without getting into any sort of content, what

18   did you do in response to this effort made in support of

19   Allen Freeman?

20   **A**    Well, you know, I'm an attorney by trade.  I've been

21   involved in politics for a long time.  Dark money

22   campaigns --

23   **Q**    I'm going to stop you there.

24           MR. GLICKMAN:  Objection.

25           THE COURT:  She stopped him.  What is the question?

1    **Q**    I just want to be clear, Mr. Owens.  We know that you

2    are a lawyer and that you have experience.  We don't want

3    any sort of legal opinions or any information about the law.

4    I'm just interested in what you did, the actions you took in

5    response to the support made for Mr. Freeman.

6    **A**    Well, I was very vocal about them.  I rallied even my

7    opponent, Adam Bird, in the neighboring district, other

8    opponents, to be loud about this, that this seemed improper,

9    that it was illegal, that it was a violation of campaign

10    finance --

11           MR. GLICKMAN:  Objection.

12           THE COURT:  Sustained.  Strike that.

13      What did you do?

14           THE WITNESS:  I called a press conference to decry

15    what I believed was illegal spending and illegal

16    coordination.

17           MR. GLICKMAN:  Objection.

18           THE COURT:  It's his opinion.  I'll instruct the

19    jury in due course on the law.  Please proceed.  The

20    objection is sustained.

21    **Q**    Did you contact anyone in response to the efforts made

22    on behalf of Mr. Freeman?

23    **A**    I did.  In law enforcement?

24    **Q**    You answer the questions, sir.

25    **A**    Yes, I did.

1    **Q**    Who did you contact?

2    **A**    I contacted many people.  I was frustrated.  When

3    you're in a heated campaign -- I was very frustrated, but I

4    contacted and spoke to many people, including law

5    enforcement.

6            MS. GAFFNEY-PAINTER:  May I have a moment to

7    confer, Your Honor?

8            THE COURT:  Yes.

9            MS. GAFFNEY-PAINTER:  No further questions.  Thank

10   you.

11           THE COURT:  Very well.  The attorneys for the

12   defendants have an opportunity to inquire.

13   Cross-examination on behalf of Mr. Householder?

14           MR. GLICKMAN:  Yeah, Judge, just briefly.

15           THE COURT:  Very well.

16           MR. GLICKMAN:  Sir, I'm Rob Glickman.  I'm one of

17   Mr. Householder's attorneys.  I just have a couple of

18   questions for you.

19           THE WITNESS:  Good morning.

20                         **CROSS-EXAMINATION**

21   **BY MR. GLICKMAN:**

22   **Q**    You just testified that it felt like a statewide race

23   to you?

24   **A**    Or a Congressional race.

25   **Q**    Right.  Where millions and millions of dollars are

```
1    spent, and well over eight figures are spent in senate or

2    governor races, that's how it felt?

3            THE COURT:  Excuse me.  Let him ask the question

4    and let him answer it.  What was your question?  I did not

5    hear it.

6    Q    You testified earlier that this felt like a statewide

7    race, yes?

8    A    In the Cincinnati area, yes.

9    Q    Well, a statewide race covers the whole state, not

10   just the Cincinnati area, yes?

11   A    So no, I felt like a statewide race in the Cincinnati

12   media market.

13   Q    Okay.  And you felt that that was somehow

14   inappropriate, yes?

15   A    Yes.

16   Q    Okay.  And the bulk in your opinion of the spending

17   was being spent to support Mr. Freeman, true?

18   A    And the neighboring district Jean Schmidt.

19   Q    Okay.  But for your purposes, you cared more about Mr.

20   Freeman than Ms. Schmidt, yes?

21   A    Of course.

22   Q    And that was your race?

23   A    Yes.

24   Q    He lost?

25   A    Yes.
```

1    **Q**    Okay.  All right.  And you were from -- your district

2    encompassed three counties?

3    **A**    Two.

4    **Q**    Just two counties?

5    **A**    Trust me, I know.

6    **Q**    I'm sure you do.  You live there, I'm sure you do.

7    **A**    I do.

8    **Q**    All right.  So, and Mr. Bird was from an adjacent

9    county, yes?

10   **A**    Correct.  He's from Clermont County.

11   **Q**    And he's the one that actually ended up winning?

12   **A**    Yes.

13   **Q**    Okay.  And, sir, during this period of time, you were

14   involved in a somewhat public debate for lack of a better

15   word with your county recorder?

16   **A**    Yes, for not showing up to work.

17   **Q**    Right.  And your county recorder was who?

18   **A**    Amy Jo DeClaire.

19   **Q**    And she had her own base of support, right?

20        MS. GAFFNEY-PAINTER:  Objection, Your Honor,

21   relevance.

22        MR. GLICKMAN:  I'm getting there.

23        THE COURT:  Overruled.  I'll give you a little

24   latitude.

25        THE WITNESS:  Yes.

1    **Q**    Republican support?

2    **A**    Diminished Republican support.

3    **Q**    But support, nonetheless, yes?

4    **A**    Yes.

5    **Q**    And you only lost by 400-and-some votes?

6    **A**    Yes.

7    **Q**    So 400-and-some Republicans who supported that county

8    recorder voting for you -- actually, 200-and-some would have

9    made the difference, right?

10            MS. GAFFNEY-PAINTER:  Objection, Your Honor.

11            THE COURT:  Sustained.

12   **Q**    Okay.  Sir, isn't it possible that that dispute with

13   the county recorder cost you the election and not anything

14   else?

15   **A**    I disagree.

16            MS. GAFFNEY-PAINTER:  Objection, Your Honor.

17            THE COURT:  Overruled.  He's prepared to answer it.

18            THE WITNESS:  I disagree.

19   **Q**    Well, whether you disagree or not, you lost by

20   400-and-some votes, right?

21   **A**    Yes.  It was a close election.

22            MS. GLICKMAN:  Okay.  Thanks.  I don't have

23   anything further.

24            THE COURT:  Questions on behalf of Mr. Borges?

25            MR. SCHNEIDER:  Nothing here, Judge.

```
1              THE COURT:  Very well.  You survived.  You're free
2       to go.
3              THE WITNESS:  Thank you, Your Honor.
4              THE COURT:  Very well.  Goodbye.
5              THE WITNESS:  Thank you.
6          (Witness left the stand.)
7              THE COURT:  I'm going to take the mid-morning break
8       now.  Going to break for 30 minutes.  Enjoy the break.  Take
9       a break.  Don't discuss it among yourselves yet or with
10      anyone else.  Continue to keep an open mind.  No independent
11      research of any kind.  No checking out the media.  Take a
12      break.  We'll rise as you leave out of respect for you.
13             THE DEPUTY:  All rise for the jury.
14         (Jury exited the courtroom at 10:24 a.m.)
15             THE COURT:  Jury has left the room.  We're about to
16      recess for 30 minutes.  We'll wait in the courtroom until
17      we've been advised that the jurors have cleared the floor,
18      as always.
19         (Pause.)
20             THE DEPUTY:  All clear.
21             THE COURT:  All right.  We're in recess.
22             THE DEPUTY:  This court is in recess.
23         (Recess taken from 10:25 a.m. to 10:56 a.m.)
24             THE DEPUTY:  All rise.  This court is now in
25      session pursuant to the recess.
```

```
1              THE COURT:  Thank you.  Please be seated.
2     Everybody is here.  Are we ready for the jury from the
3     government's perspective?
4              MS. GAFFNEY-PAINTER:  Yes, Your Honor.
5              THE COURT:  Mr. Householder's?
6              MR. OLESKI:  Yes, Judge.
7              THE COURT:  From Mr. Borges'?
8              MR. SCHNEIDER:  Yes.
9              THE COURT:  Let's call for the jury.
10         (Pause.)
11             THE DEPUTY:  All rise for the jury.
12         (Jury entered the courtroom at 10:59 a.m.)
13             THE COURT:  You may all be seated.  Thank you.  14
14    jurors have reappeared, as requested, in the courtroom.  I
15    hope you had a decent break.  Continue to hear testimony.
16         Where do we stand from the government's perspective?
17             MS. GAFFNEY-PAINTER:  Your Honor, the government is
18    prepared to call its next witness.
19             THE COURT:  Very well.  Who is that, please?
20             MS. GAFFNEY-PAINTER:  Government calls Steve Myli.
21             THE COURT:  Let's call for that witness.
22         (Pause.)
23             THE COURT:  Sir, if you would be willing to follow
24    the woman in front of you, she'll bring you towards the
25    witness stand.  And if you would pause where you are, sir,
```

1   and raise your right hand for the oath to tell the truth.

2          (Witness was sworn and took the stand.)

3          THE COURT:  Very well.  You can take the witness

4   stand.  I tell everybody in the spirit of full disclosure

5   that seat tips back, and we're going to need you, once

6   you're settled and comfortable, going to need your mouth

7   close to that microphone.

8       On behalf of the government, Ms. Painter, you may

9   proceed.

10         MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

11         THE COURT:  Very well.

12         MS. GAFFNEY-PAINTER:  Good morning, Mr. Myli.

13         THE WITNESS:  Good morning.

14                      **STEVEN MYLI**

15  of lawful age, Witness herein, was examined and testified as

16  follows:

17                  **DIRECT EXAMINATION**

18  **BY MS. GAFFNEY-PAINTER:**

19  **Q**    Will you please state and spell your name for the

20  record?

21  **A**    Steven Myli, S-T-E-V-E-N, M-Y-L-I.

22  **Q**    Mr. Myli, what is your profession?

23  **A**    I'm a licensed general contractor in the state of

24  Florida.

25  **Q**    And, again, just generally, what is a general

1    contractor?

2    **A**    A general contractor, we are the -- essentially the

3    overseers of a project.  We're the prime contract.  We

4    coordinate with our subcontractors, with the architect and

5    with the owners.

6    **Q**    And what's your company's name?

7    **A**    Nordic Construction.

8    **Q**    And where is Nordic Construction located?

9    **A**    Naples, Florida.

10   **Q**    Now, back in 2019, did you work on a home at 226

11   Belville in Naples, Florida?

12   **A**    I did.

13   **Q**    Who owned the home at that time?

14   **A**    Mr. Larry Householder.

15   **Q**    How were you hired to perform work at that property?

16   **A**    Mr. Householder had a long-time friend that lived down

17   there, and he reached out to her, and her son happens to be

18   a friend of mine, and so that's how I was put in contact to

19   do the work.

20   **Q**    What estimate did you provide for the work?

21   **A**    The House had taken some substantial damage during

22   Hurricane Erma, so I provided an estimate to fix those

23   issues and then to remediate some damage that happened

24   inside the home.

25   **Q**    Now, you mentioned damage.  Can you just explain that

1    a bit more for us?

2    **A**    The House took roof damage during Hurricane Erma, lost

3    a lot of shingles -- I'm sorry, tile, subsequently, then, it

4    took some water damage inside and the lanai actually got

5    blown off and then there was some damage to one of the

6    sliding doors and to the front door as well.

7    **Q**    What is the significance of roof damage for homes in

8    Florida?

9    **A**    What was the question again?

10   **Q**    What is the significance of roof damage for homes in

11   Florida?

12   **A**    So like when this roof was blown off, of course,

13   that's the barrier for water, so of course after the roof

14   took the damage, the interior then was essentially flooded.

15   **Q**    Are you able to sell a home in Florida if you have

16   substantial roof damage?

17   **A**    No, you're not.  Well, let me rephrase that.  You are

18   to a cash buyer.  It is unmortgageable if a House has roof

19   damage in the state of Florida.

20   **Q**    Who was your point of contact with regards to work on

21   the House?

22   **A**    Mr. Longstreth.

23   **Q**    Now, at that time, what was your understanding of the

24   relationship between Mr. Householder and Mr. Longstreth with

25   respect to the House?

1    **A**    He was just actually helping facilitate the work

2    because Mr. Householder was extremely busy at his current

3    position.

4    **Q**    How long did the project take you?

5    **A**    From start to finish, about eight months.

6    　　　MS. GAFFNEY-PAINTER:  Your Honor, may we please

7    have permission to publish what's already been admitted as

8    Government Exhibit 809 A?

9    　　　THE COURT:  Yes.  It will come up on the screen

10   momentarily.

11   **Q**    Mr. Myli, can you please describe for us what we're

12   looking at here?

13   **A**    This is actually an A I A schedule of values.  It's

14   essentially it's a breakout that we use for billing

15   purposes.  What it shows is all of the items that were on

16   the original estimate, and then what you see in blue would

17   be what was being billed at that point in time.  So if you

18   look into the upper right hand corner, you'll see

19   application date and then period 2, so that was everything

20   that was billed up to October 31st, 2019, and then it would

21   show if you see on column G, the balance to finish, and so

22   it kind of shows this is what, you know, we've billed for

23   for this month, and then this is what needs to be, you know,

24   balance to finish.

25   **Q**    Now, directing your attention to the bottom of this

1    document, we see a line that says original contract.  Can

2    you explain what's depicted there?

3    **A**    So that was just the original number that I had given

4    to complete the work at that residence.

5    **Q**    Now, who paid you for your work on this home?

6    **A**    I submitted my billing to Mr. Longstreth, and then I

7    was paid by a corporate account.  Well, I shouldn't say

8    corporate.  I really don't know the account.  It was not a

9    personal check.  Let me rephrase that.

10   **Q**    Now, as a further record of the work that you

11   performed on this home, did you film a videotape?

12   **A**    I did for the final billing.  I do that a lot for out

13   of state clients that can't come down, so what I will do is

14   I'll videotape the work that I've done and then send the

15   videotape with the final bill showing that I had completed

16   the work that I was supposed to do.

17          MS. GAFFNEY-PAINTER:  Your Honor, may we please

18   have permission to publish what's already been admitted as

19   Government's Exhibit 809 B?

20          THE COURT:  Yes.

21      (Video playing.)

22   **Q**    And, Mr. Myli, while this video clip is playing, is

23   this the home that we have been referencing in our

24   conversation this morning?

25   **A**    Yes, it is.

1  **Q**    Mr. Myli, as part of your work, did you represent

2  Larry Householder at any proceedings related to this home?

3  **A**    Yes, I did.

4  **Q**    Now, can you please explain for us the circumstances

5  of that representation?

6  **A**    So what had happened was is that from what I was told,

7  his mother had passed right before or right after Erma, and

8  because the house took so much damage, there was -- HOA had

9  started to want to get this work done because all of the

10  other houses in the neighborhood had completed their

11  repairs.  And after a certain period of time, the HOA will

12  then turn it over to Code Enforcement, and so then Code

13  Enforcement got involved in this home as well, and then at

14  that point is when I referenced -- I won't say referenced --

15  I represented Mr. Householder in a Code Enforcement hearing.

16  **Q**    So just to take a step back, for those of us who are

17  unfamiliar, what is HOA?

18  **A**    So that's a Homeowners Association, in particular

19  where they have Berkshire Homeowners Association, so they're

20  the ones who are in charge of making sure your grass is cut,

21  if -- there are certain rules that you can't have a vehicle

22  parked in your parking lot -- I mean, your driveway if

23  you've got oil stains or whatever reason on your driveway,

24  you know, certain things like that.

25      So after the Hurricane Erma hit Collier County, a lot

1    of these HOAs, the rules were kind of put on hold for people

2    to repair the damage, but after a certain period of time,

3    then, the HOA said, okay, we're done looking at a blue tarp

4    roof on your home, we want you to put a new roof on your

5    house.  And they usually give you about a year just because

6    you have to deal with insurance issues with your insurance

7    company.  And then, of course, generally after a hurricane,

8    contractors are extremely busy, especially roofers, so you

9    may have a blue tarp on your home for a year or

10   year-and-a-half after the hurricane at that point.  So

11   that's what the HOA is in charge of.

12   **Q**    You mentioned a Code Enforcement hearing, what is

13   that?

14   **A**    HOA, if you've done something to your house that you

15   have not complied with HOA, then, what they'll do is turn

16   you over to Collier County Code Enforcement, and then Code

17   Enforcement will get involved as well to essentially reach

18   out to you and say you need to fix these things, you've gone

19   through the allotted kind of grace period, you need to get

20   these things done.  For instance, if your neighbor had a

21   trash pile in the back of their yard and you can see it from

22   yours and you've asked them to remove the trash pile and

23   they haven't, then, they'll call Code Enforcement.  Code

24   Enforcement will then come out and say you're going to

25   remove the trash pile and you have 30 days.  If you don't,

1    then what they'll do is then you'll have to either -- give

2    you a hearing in front of the magistrate and then the

3    magistrate will tell you, well, you've got 30 days or we'll

4    start fining you.

5         MS. GAFFNEY-PAINTER:  Your Honor, may we please

6    have permission to publish what's already been admitted as

7    Government's Exhibit 809 C?

8         THE COURT:  Yes.

9         MS. GAFFNEY-PAINTER:  Ms. Terry, if you could

10   please publish page 1 on the left and page 2 on the right.

11   Thank you.

12   Q    Mr. Myli, directing your attention to the left side

13   here, this is page 1, what are we looking at on this first

14   page?

15   A    So this was the power of attorney that was granted to

16   me by Mr. Householder to represent him in the Code

17   Enforcement hearing.

18   Q    And what are we looking at here on the second page?

19   A    Essentially, that was the agreement that I had made on

20   his behalf for Collier County.

21   Q    Now, did you in fact represent Mr. Householder at the

22   Code Enforcement hearing?

23   A    I did.

24   Q    And what happened at that Code Enforcement hearing?

25   A    So prior to the hearing, you sit down with Code

1     Enforcement officer who's in charge and you've already kind

2     of hashed out the agreement.  And then you're sworn in at

3     the magistrate, something essentially like this, and then

4     when your docket is called, the Code Enforcement officer

5     will then come up and say, you know, Your Honor, we've come

6     to an agreement, and she'll -- at this particular court, it

7     was a woman.  They would then tell the magistrate this is

8     the deal that we've made, and then the magistrate would look

9     at me or whoever, you know, is on the other side and say do

10    you agree to this, these terms, and I agreed to the terms.

11    **Q**    Do you recall the terms that you agreed to on behalf

12    of Mr. Householder?

13    **A**    I had six months to mediate the damage that was caused

14    by the hurricane, nothing interior, only the exterior work,

15    so the roof and the lanai, I had six months to complete that

16    work.

17    **Q**    Did you perform that work within the allotted time?

18    **A**    I did.

19    **Q**    What was the total cost of the bill?

20    **A**    We would have to go back to the schedule of values.  I

21    don't remember the total cost of the contract.

22         MS. GAFFNEY-PAINTER:  Your Honor, may we please

23    have permission to publish what's already been admitted as

24    809 A?

25         THE COURT:  Yes.

1  **Q**    Does that assist you, Mr. Myli?

2  **A**    Yes.  So this original one was 142,600, but if I

3  remember correctly, I actually brought the job in a little

4  under that.  So this was -- essentially, what this was was

5  kind of a cost plus, so I sent them all of the invoices and

6  all of the bills, and if I remember right, I came in under

7  that number.

8  **Q**    What does "cost plus" mean?

9  **A**    Cost plus is I show them every, every subcontractor's

10  bill that was given to me, I forwarded to them in a packet,

11  and then they pay me for that work.  Plus, I have what's

12  called up top with the general conditions, and, of course,

13  my profit.

14  **Q**    Do you know what ultimately happened to the House?

15  **A**    I do not.

16         MS. GAFFNEY-PAINTER:  May I have a moment to

17  confer, Your Honor?

18         THE COURT:  Yes.

19         THE WITNESS:  Well, actually I --

20         THE COURT:  If you need to clarify, go ahead.

21         THE WITNESS:  Thank you.  Ultimately, to my

22  understanding, the house has been sold.

23         MS. GAFFNEY-PAINTER:  No further questions.  Thank

24  you, Your Honor.

25         THE COURT:  Very well.  Attorneys for the defense

1    have an opportunity to ask questions.  On behalf of

2    Mr. Householder?

3              MR. OLESKI:  May I proceed?

4              THE COURT:  Yes.  Thank you.

5              MR. OLESKI:  Thank you, Judge.

6         Good morning, Mr. Myli.

7              THE WITNESS:  Good morning, sir.

8              MR. OLESKI:  My name is Nick Oleski.  I'm one of

9    Mr. Householder's attorneys.  Just a few questions for you.

10                      **CROSS-EXAMINATION**

11   **BY MR. OLESKI:**

12   **Q**    I want to start with that Code Enforcement hearing

13   that you were asked about on direct examination.  I think

14   you testified a little bit earlier that you've had other

15   out-of-state clients, correct?

16   **A**    I've done work for other out-of-state people, correct.

17   **Q**    And have you represented those out-of-state clients at

18   similar HOA enforcement meetings?

19   **A**    Only if it was that cause.

20   **Q**    So this was not -- so this was not the first time that

21   you represented an out of state client at an HOA meeting?

22   **A**    For HOA, correct.  No Code Enforcement, no, this would

23   have been my first.

24   **Q**    Now, I think you testified on direct examination that

25   you first visited the home sometime in the summer of 2019;

1    is that right?

2    **A**    Correct.

3    **Q**    And at the time you visited the home, the home was in

4    a state of disrepair, fair to say?

5    **A**    Correct.

6    **Q**    If sustained heavy damage during the hurricane a year

7    or so earlier, right?

8    **A**    Yes, sir.

9    **Q**    And because the home sustained roof damage, that means

10   that the home could not be mortgaged, right?

11   **A**    Correct.  If it were to go on the market in the state

12   of Florida, generally, yes, it would be unmortgageable.

13   **Q**    So essentially, there would be two options, either to

14   sell the home as in a cash sale or to try to fix up the

15   home, right?

16   **A**    Correct.

17   **Q**    And when you first toured the property, did you tour

18   the property with Mr. Longstreth?

19   **A**    Yes, sir, I believe in June.

20   **Q**    And you heard back from Mr. Longstreth sometime a

21   month or two later, right?

22   **A**    Correct, and I believe in August.

23   **Q**    And was it your understanding that Mr. Longstreth and

24   Mr. Householder were going to form a partnership together?

25   **A**    Correct.

STEVEN MYLI - CROSS-EXAM

18-2940

1    **Q**    And form a business, right?

2    **A**    Yes, sir.

3    **Q**    And then, ultimately, you know, they would fix up the

4    home, right?

5    **A**    Yes.

6    **Q**    And either sell the home, right?

7    **A**    Correct.

8    **Q**    Or rent the home out, right?

9    **A**    Air B and B, yes.

10   **Q**    And I think you testified that you would invoice

11   Mr. Longstreth on a somewhat regular basis, right?

12   **A**    Correct.

13   **Q**    And ultimately, you know, you completed work at the

14   property in May of 2020, fair?

15   **A**    Yes -- or I think I completed -- actually, I believe I

16   completed it a little earlier.  I just forgot to invoice.

17   **Q**    Fair enough.

18        MR. OLESKI:  Judge, may I show the witness

19   Householder Exhibit 480, which has not been admitted?

20        THE COURT:  Yes.  Show the witness and the lawyers.

21        MR. OLESKI:  Thank you.

22   **Q**    Do you see that document on your screen, sir?

23   **A**    Yes, yes.

24   **Q**    Does this appear to be an e-mail that you sent to

25   Mr. Longstreth on May 27th of 2020?

1    **A**    Yes.

2    **Q**    And the subject of the e-mail is Belville, right?

3    **A**    Yes.

4          MR. OLESKI:  Judge, I move to admit this exhibit.

5          THE COURT:  Any objections?

6          MS. GAFFNEY-PAINTER:  No objections.

7          MR. SCHNEIDER:  No.

8          THE COURT:  It's admitted.

9          MR. OLESKI:  May I publish, Judge?

10          THE COURT:  Yes.

11          MR. OLESKI:  Thank you.

12    **Q**    And, Mr. Myli, would this reflect -- strike that.

13          Mr. Myli, would this reflect the final invoice that

14    you sent to Mr. Longstreth sometime in and around May of --

15    the end of May of 2020?

16    **A**    Yes.

17          MR. OLESKI:  Moment to confer, Judge?

18          THE COURT:  Yes.

19          MR. OLESKI:  I have no further questions.  Thank

20    you, sir.

21          THE WITNESS:  Thank you.

22          THE COURT:  Very well.  Counsel for Mr. Borges?

23          MR. SCHNEIDER:  No questions, Your Honor.

24          THE COURT:  Very well.  Redirect from the

25    government, if any?

1          MS. GAFFNEY-PAINTER:  No, thank you, Your Honor.

2          THE COURT:  My goodness, you're free to go.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  Take care.

5      (Witness left the stand.)

6          THE COURT:  Ladies and Gentlemen of the Jury, the

7   government has one more witness to call and then they will

8   rest, they will have presented their case.  That witness

9   can't be here until Monday through no fault of anyone.  So

10   I'm going to recess for the day.  I want you to understand

11   that we're still doing okay on the schedule.  We'll see you

12   back here on Monday, but keep in mind, we're not done yet.

13          So during the break, enjoy the break.  There's an

14   expression in the law, "TGIF," that's what's happening here.

15   I want you to -- don't be leaving.  I'm still chatting.  I

16   want you to understand that I want you to take a break today

17   and over the weekend.  Put this out of your mind and

18   concentrate on your loved ones and your family and your

19   weekend.  On the weekend and in every day in your life, be

20   safe.  Don't talk about the case with anyone, including

21   among yourselves.  No independent research.  No checking out

22   the media.  Continue to keep an open mind until you have

23   heard all of the evidence.  I too anticipate taking a break.

24          Out of respect for you, we'll rise as you leave.  Come

25   back Monday at 9:15 at your spot so we can get you in at

```
 1    9:30.

 2              THE DEPUTY:  All rise for the jury.

 3         (Jury exited the courtroom at 11:22 a.m.)

 4              THE COURT:  Jury has left the room.  As always,

 5    we'll stay in the courtroom until we've been advised that

 6    they have cleared the floor, and then we'll break for the

 7    weekend with the expectation we're all back at 9:15 and

 8    ready to hear the testimony of a witness at 9:30.

 9         Is there anything that requires my attention before we

10    recess and if there is -- is there?

11              MS. GLATFELTER:  Yes, Your Honor.

12              THE COURT:  You may all be seated.

13              MS. GLATFELTER:  Just very briefly.

14              THE COURT:  Very well.

15              MS. GLATFELTER:  Wanted to inquire as to the

16    defense's witness order for Monday so that we can be

17    prepared to proceed.

18              THE COURT:  Very well.  Fair enough.

19              MR. OLESKI:  Judge, at this time we're not in a

20    position to inform the government as to who our witnesses

21    will be.  I expect we will do so by the end of business

22    today.

23              THE COURT:  Very well.  You make a commitment to me

24    in that regard?

25              MR. OLESKI:  Of course.  And, ultimately, we just
```

1    need to contact the witnesses and confirm that they will be

2    here by 1:30.

3              THE COURT:  I understand.

4              MS. GAFFNEY-PAINTER:  Your Honor, there's one other

5    matter.  You had requested an update with regards to the

6    witness, and if you would indulge us with a sidebar, we are

7    prepared to provide that information to the Court.

8              THE COURT:  Very well, come on down.

9    **SIDEBAR CONFERENCE.**

10             THE COURT:  Ms. Painter?

11             MS. GAFFNEY-PAINTER:  During the morning break, we

12   reached out to Mr. Fehrman through our agent, Special Agent

13   Blane Wetzel, and received an update as to his health.  He

14   is currently still experiencing symptoms; however, he is

15   much better.  He describes it as the tail end of a gross

16   cold, and he is now able to sit upright and be awake for

17   more than an hour.  He did represent that he felt well

18   enough to travel.  So our plan is to have him come to

19   Cincinnati on Sunday and be prepared to testify in person on

20   Monday.

21             THE COURT:  Very well.  Thank you for that update.

22        Any other comments or questions before we break for the

23   weekend?  From the government, anything further?

24             MS. GAFFNEY-PAINTER:  No, thank you, Your Honor.

25             THE COURT:  From Mr. Householder's counsel?

1          MR. BRADLEY:  Nothing, Your Honor.  Thank you.

2          THE COURT:  Anything further from the gentleman in

3    black shoes?

4          MR. SCHNEIDER:  No, no comment.

5          THE COURT:  Very well.  I will go back to the bench

6    and check that the jury is gone and release everyone from

7    the courtroom.  Have a good weekend, although, I know you

8    won't.

9          MR. SCHNEIDER:  Enjoy the weekend.

10         MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

11   **SIDEBAR CONCLUDED.**

12         THE COURT:  Has the jury cleared the floor,

13   Ms. Santoro?

14         THE DEPUTY:  Yes, Judge.

15         THE COURT:  We're in recess until Monday at 9:30.

16   Enjoy the break.

17         THE DEPUTY:  All rise.  This court is in recess

18   until Monday.

19      (Proceedings concluded at 11:26 a.m.)

20              **C E R T I F I C A T E**

21      I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter
22   prepared from my stenotype notes.

23   /s/        *Lisa Conley Yungblut*              02/26/2023
             LISA CONLEY YUNGBLUT, RMR, CRR, CRC      DATE
24

25

1                        *I N D E X*

2                      *EXAMINATIONS*
              **GOVERNMENT'S WITNESSES**                    **PAGE**
3                   **DAVID GREENSPAN**
        Cross-Exam by Mr. Schneider                      2885
4               **JEROME KYLE KOEHLER**
        Direct Exam by Ms. Gaffney-Painter               2888
5       Cross-Exam by Mr. Oleski                         2899
                **NICHOLAS RYAN OWENS**
6       Direct Exam by Ms. Gaffney-Painter               2902
        Cross-Exam by Mr. Glickman                       2922
7                     **STEVEN MYLI**
        Direct Exam by Ms. Gaffney-Painter               2928
8       Cross-Exam by Mr. Oleski                         2938

9                       **EXHIBITS**
              **HOUSEHOLDER EXHIBITS**          **PAGE ADMITTED**
10      No. 480                                          2941

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25