19-2947

1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION
                  - - -
3

UNITED STATES OF AMERICA,     : **CASE NO. 1:20-CR-0077**
4                          :
            Plaintiff,    : **JURY TRIAL, DAY 19**
5       vs.             :
                       : **27th of February, 2023**
6  LARRY HOUSEHOLDER, et al.    :
                       :
7           Defendant.    :

8                  - - -
            **TRANSCRIPT OF PROCEEDINGS**
9   **BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE**
                  - - -
10

APPEARANCES:
11

For the Plaintiff:
12                Emily N. Glatfelter, Esq.
                Matthew Charles Singer, Esq.
13                Megan Gaffney Painter, Esq.
                Assistant United States Attorneys
14                221 East Fourth Street, Suite 400
                Cincinnati, Ohio 45202
15

For the Defendant, Larry Householder:
16

                Nicholas R. Oleski, Esq.
17                Robert T. Glickman, Esq.
                McCarthy, Lebit, Crystal & Liffman Co.
18                1111 Superior Avenue East, Suite 2700
                Cleveland, Ohio 44114
19                    and
                Steven L. Bradley, Esq.
20                Marein and Bradley
                526 Superior Avenue, Suite 222
21                Cleveland, Ohio 44114

22

23

24

25

```
 1    For the Defendant, Matthew Borges:

 2                           Karl Herbert Schneider, Esq.
                             Todd Aaron Long, Esq.
 3                           McNees Wallace & Nurick, LLC
                             21 East State Street, Suite 1700
 4                           Columbus, Ohio 43215

 5    Also present:         Larry Householder
                            Matthew Borges
 6                          Blane Wetzel, FBI Special Agent
                            Kelly Terry, paralegal
 7                          PJ Jensen, trial tech

 8    Law Clerk:            Cristina V. Frankian, Esq.

 9    Courtroom Deputy:     Rebecca Santoro

10    Stenographer:         Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                            United States District Court
11                          100 East Fifth Street
                            Cincinnati, Ohio 45202
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**<u>PROCEEDINGS</u>**

1

2    (Proceedings held in open court at 9:28 a.m.)

3        THE DEPUTY:  All rise.  This United States District

4  Court for the Southern District of Ohio is now in session,

5  The Honorable Timothy S. Black, District Judge presiding.

6        THE COURT:  Please be seated, thank you.  Good

7  morning.  We're here on the open -- in the open courtroom

8  awaiting the jury.  Government team is here.

9  Mr. Householder's team is here.  Mr. Borges' team is here.

10     Mr. Marein is excused from participation today at his

11  request again.

12     Are we ready for the jury from the government's

13  perspective?

14        MS. GAFFNEY-PAINTER:  Yes, Your Honor.

15        THE COURT:  From Mr. Householder's perspective?

16        MR. OLESKI:  Yes.

17        THE COURT:  Mr. Borges' perspective?

18        MR. SCHNEIDER:  Yes.

19        THE COURT:  Let's call for the jury.  Someone is

20  prepared to get the witness?

21        MS. GAFFNEY-PAINTER:  Yes, Your Honor.

22        THE COURT:  Very well.

23    (Pause.)

24        THE DEPUTY:  All rise for the jury.

25    (Jury entered the courtroom at 9:32 a.m.)

```
1            THE COURT:  You may all be seated.  Thank you.
2    Good morning to the 14 jurors who have arrived in the
3    courtroom again timely and ready to go.  It's kind of a
4    rainy day out there, good day to spend inside, that's what
5    we anticipate.
6            During the course of the trial, we've taken a number of
7    recesses as we call them, breaks, we sent you upstairs and
8    you have to hang out and wait on us.  Understand and
9    appreciate, I promise, we're at work down here outside your
10   presence as required by law.  Nobody is sleeping or watching
11   movies or having chocolate.  We're on it.  But it leaves you
12   upstairs wondering, my goodness, are they wasting my time?
13   I assure you from the depths of my heart and training, we're
14   not wasting your time.  You have come a long way.  We have
15   an important week, and I'm grateful to you on behalf of the
16   Court and the community for your close attention.
17           We will continue taking testimony.  Government is
18   prepared to call its last witness in its case-in-chief.
19   When they're done, I'm going to have to take a break, talk
20   to the lawyers about stuff I need to talk to them and them
21   alone.  If it's a longer break, I apologize, but try and
22   find strength to enjoy the time off and come back ready to
23   go, as you have day after day after day.
24           So with that, is the government prepared to call its
25   next witness?
```

```
1              MS. GAFFNEY-PAINTER:  Yes, Your Honor.

2              THE COURT:  Please do so.

3              MS. GAFFNEY-PAINTER:  The government calls Tyler

4    Fehrman.

5              THE COURT:  Very well.  This is Mr. Fehrman.  If

6    you would follow the lady with red hair in front of you and

7    when you get here, would you pause, sir, where you are and

8    raise your right hand for the oath to tell the truth?

9         (Witness left the stand and was sworn.)

10             THE COURT:  Come up to the witness stand.  I tell

11   everybody the chair tips back in the spirit of full

12   disclosure.  Once you're comfortable and seated, I need your

13   mouth close to that fancy federal microphone.

14             THE WITNESS:  Thank you.

15             THE COURT:  Government attorney is prepared and you

16   may proceed.

17             MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

18             THE COURT:  Very well.

19             MS. GAFFNEY-PAINTER:  Good morning, Mr. Fehrman.

20             THE WITNESS:  Good morning.

21                          TYLER FEHRMAN

22   of lawful age, Witness herein, was examined and testified as

23   follows:

24                       DIRECT EXAMINATION

25   BY MS. GAFFNEY-PAINTER:
```

1    **Q**    Will you please state and spell your name for the

2    record?

3    **A**    Yes.  Tyler Fehrman, T-Y-L-E-R, F-E-H-R-M-A-N.

4    **Q**    Mr. Fehrman, where do you work?

5    **A**    I work for World Kinect Energy Services.

6    **Q**    And what is your title?

7    **A**    Director of renewable energy -- I'm sorry, director of

8    renewable energy developer relations.

9    **Q**    What is your educational background?

10   **A**    I have a bachelor's degree in business administration

11   from Mount Vernon Nazarene University and a master's in

12   public administration from Ohio University.

13   **Q**    Now, was there ever a time during your professional

14   career where you worked in politics?

15   **A**    Yes.

16   **Q**    And when did you first get involved in politics

17   professionally?

18   **A**    Professionally, in 2008.

19   **Q**    And what did you do in 2008?

20   **A**    2008, I was hired by the Ohio Republican Party to

21   serve as a field manager for the McCain for President

22   campaign.

23   **Q**    During the course of your professional life, did you

24   ever meet a man named Matthew Borges?

25   **A**    Yes, I did.

1    **Q**    When did you meet him?

2    **A**    Probably would have been during the McCain for

3    President campaign or sometime shortly after, around

4    somewhere between 2008 and 2010.

5    **Q**    Would you describe for us the relationship you had

6    with Mr. Borges from 2008 through 2019?

7    **A**    Yeah.  So Matt was a big deal in Ohio politics, and as

8    a young political operative, somebody you kind of wanted to

9    be close to, get to know.  I really got to know him as a

10   worked on the Kasich for Governor campaign in 2010.  Had

11   always seen him around kind of tangentially and just kind of

12   tried to pay attention to what he was doing.  Kasich was

13   elected president [sic] and Matt became the Chairman of the

14   Ohio Republican Party.  We had built sort of a friendly

15   rapport and then got to know each other better over the

16   years, saw each other at events regularly, and I found

17   myself, you know, again, as a young operative, you're kind

18   of like well, how do I get close to the big guys?  So I

19   tried to find ways to do that and build a relationship.  Saw

20   each other at campaign events, different political

21   functions, and then in -- in 20- -- goodness, 20- -- 2018, I

22   was hired to manage some campaigns, some State

23   Representative campaigns in Franklin County and Matt and I,

24   at that point, had become pretty good friends.  When he ran

25   for reelection as chairman of the Ohio Republican Party

1    in 20- -- it would have been January of 2017, he had
2    opposition.  There was a shift in the political winds in
3    Ohio, and I had shown up at the meeting to help support him
4    and made it very clear whose side I was on in that battle
5    for the chairmanship, considered him a good friend and a
6    mentor by that point.  And then progressing into that, 2018
7    was hired to run the campaigns.  We had communicated
8    regularly.  I had found myself in a little bit of a tough
9    spot professionally trying to figure out what was next and
10   had regularly sought his advice and counsel on what might be
11   available work-wise, and then again, 2018 was hired to run
12   these campaigns.  Matt was my primary point of contact.  We
13   spoke very regularly, communicated about the campaigns but
14   also just as friends, Sunday afternoons were usually texting
15   back-and-forth about Patriots football, born and raised in
16   Ohio, but die-hard Pats fan, so... and then after those
17   campaigns, in 2018, I went back to work for the State of
18   Ohio.  Matt was instrumental in kind of helping me make some
19   connections there again and get my foot back in the door.
20   And then in the summer of 2019, left the State of Ohio and
21   was looking for another opportunity, and as I looked for
22   that, would stop by Matt's office or hop on the phone, text
23   back-and-forth about opportunities that might be available,
24   looking for my next thing.  Matt, in the winter of 2018 and
25   very beginning of 2019, also paid me to do some work for

1    him, lobbying some federal issues, helping out with that.

2    So he was just -- he had become a friend and a mentor,

3    somebody I looked up to and had really helped provide me

4    some good opportunities professionally.

5    Q    Now, you mentioned that you were running or working on

6    campaigns in 2018.  Which campaigns were you working on?

7    A    So in the winter and spring of 2018, I was working on

8    the Tim Barhorst for State Representative campaign in the

9    19th -- then the 19th District, which was the northeastern

10   Franklin County, as well as Stu Harris for State

11   Representative, which would have been sort of the northwest

12   portion of Franklin County.

13   Q    Now, did you work on those campaigns for the primary

14   and the general, just the primary, just the general, what

15   was the nature of your work there?

16   A    So both of those campaigns I worked on in the primary

17   and then after the primary, went on to be the manager for

18   the Stu Harris campaign.  Still, like, communicated with

19   folks on the Barhorst campaign but was the primary contact

20   for Stu Harris.

21   Q    Now, during that time that you were managing those

22   campaigns, who paid for you, who paid for your work?

23   A    So it was different.  In the primary, I had been

24   asked -- I was approached by Matt as well as Doug Price, the

25   then-chairman of the Franklin County Republican Party, and

1    asked if I'd be willing to manage those two campaigns.  They

2    said we have an opportunity for you.  At that point, all of

3    us working in Republican politics in Ohio knew that Larry

4    Householder wanted to be Speaker of the House again, and --

5            MR. GLICKMAN:  Objection, Judge.

6            THE COURT:  Overruled.  Please proceed.

7            THE WITNESS:  And we -- and he had a full slate of

8    candidates in the primary that were all running, folks that,

9    you know, he knew would support him in the race for Speaker.

10           MR. GLICKMAN:  Objection, Judge.

11           THE COURT:  Sustained.  Ask the question again.  He

12   doesn't know what other people knew.

13   **Q**    Yes.  If you could just talk about who was paying for

14   your work while you were working on these campaigns.

15   **A**    Yeah.  So for the primary campaigns, I was paid

16   directly by Matt, by the Franklin County Republican Party

17   and Doug Price, the then-chairman of the party.  And then

18   for the general election, I was hired as a member of what

19   was referred to as "Team Householder" and paid -- my checks,

20   I believe, were signed by JPL & Associates.

21   **Q**    Now, in the summer of 2019, where were you working?

22   **A**    In the summer of 2019, at the beginning of the summer,

23   I was working at the Ohio Department of Public Safety.  I

24   left there at the end of June and so beginning in mid-August

25   was working for Advanced Micro Targeting, Incorporated, as

1    one of their managers for the House Bill 6 repeal campaign.

2    **Q**    Now, before you took that position with Advanced Micro

3    Targeting, did you speak with Mr. Borges about it?

4    **A**    Yes, I did.

5    **Q**    What did he tell you about that opportunity?

6    **A**    I was concerned when I was offered the position or was

7    being considered for the position because I knew that Matt

8    was going to be on the opposite side.  He was a proponent of

9    House Bill 6, and I was being offered a job to help repeal

10   it.  And I didn't want to damage the personal or

11   professional relationship, and so I went to Matt and let him

12   know, asked him what he thought.  He was very friendly about

13   it, told me that that's business, that's politics sometimes,

14   don't worry about it, you should take it if given the

15   opportunity and best of luck.

16   **Q**    Now, in connection with your employment by Advanced

17   Micro Targeting, did you sign a contract?

18   **A**    Yes, I did.

19           MS. GAFFNEY-PAINTER:  Your Honor, may we please

20   have permission to publish what's already been admitted as

21   Exhibit 624 B?

22           THE COURT:  Yes.  Give us just a minute, we'll wake

23   up the machine.

24   **Q**    Mr. Fehrman, do you see Government's Exhibit 624 B on

25   the screen in front of you?

1    **A**    Yes, I do.

2    **Q**    Now, is this your employment contract with Advanced

3    Micro Targeting?

4    **A**    Yes, ma'am.

5    **Q**    What was your title with Advanced Micro Targeting?

6    **A**    If I recall correctly, it was field manager.

7    **Q**    And what were --

8    **A**    Or project manager.  I'm sorry.

9    **Q**    No, excuse me.  I shouldn't interrupt you.

10          Project manager or field manager, what were your

11   responsibilities as a project manager or a field manager?

12   **A**    It varied on a daily basis.  It involved training,

13   professional canvassers on how to gather signatures for the

14   referendum effort as well as training them how to speak to

15   the referendum so that they were presenting accurate

16   information.  And it involved trying to find canvassers,

17   identifying good candidates for the job, interviewing them,

18   if they were a good fit, collecting and processing their

19   information to get them hired.  That was more the

20   administrative side.  There were days where I was in the

21   field collecting signatures.  There were days where every

22   day it was checking in on canvassers.  We would send them

23   out in teams all around various counties in central Ohio and

24   then elsewhere later on.  Doing sort of spot-checks to make

25   sure they were doing their job, make sure that they had what

1    they needed, and that they were taken care of.

2    **Q**    What was your salary?

3    **A**    It started at $5,000 a month and then it was raised to

4    $6,000 a month.

5    **Q**    And what were the circumstances around the raise that

6    you received?

7    **A**    The workload was a little bit more than we

8    anticipated.  It was a large referendum effort.  It was also

9    realized just very shortly into my start with Advanced Micro

10   Targeting that I -- they were a company from out of state,

11   and I had a lot of connections in Ohio and knew a lot of the

12   folks running the actual campaign committee, and so instead

13   of just handling the day-to-day for the canvassers in

14   central Ohio, I began handling other duties, like meeting

15   some of the folks who were funding the repeal effort,

16   showing them our facilities, taking them to meet canvassers

17   in the field, and just sort of helping do some of that --

18   some of the internal public relations work as well as

19   helping manage other regions, northern Ohio, the Cleveland

20   area, and then Dayton and Cincinnati as well.

21   **Q**    Now, describe for us just a typical work day back in

22   2019 when you were working for Advanced Micro Targeting.

23   **A**    I will do my best.  I don't know that there was a

24   "typical" work day.  It normally started at around 7 or 7:15

25   a.m. meeting the team in the Columbus region at their hotel,

1   providing them their daily turf, which is what we call just

2   sort of the area that they were assigned to canvas that

3   specific day, which could be a series of libraries, grocery

4   store parking lots, think of any of the places that you

5   might be annoyed by someone trying to collect your

6   signature.  We would try to research the best places, the

7   busiest places for our folks to go and gather signatures.

8   So it began with meeting them and sending them off.

9        Then, typically, I would head to my office in

10  Worthington, Ohio, and would have a slate of interviews to

11  conduct.  So 10 or 11 people sometimes that would come one

12  after the other and just kind of talk about why they were

13  interested in the job.  If we liked them, a lot of times we

14  would hire them on the spot and begin processing their

15  paperwork.  And then I'd begin, sometime after lunch,

16  conducting spot-checks and checking in on my team.  That

17  would take several hours, you know, afternoon, sometimes

18  into the early evening.

19       And then we would -- everyone knew they were supposed

20  to be back to the office by about 9:00 p.m., so they would

21  stop working around 8:30 and make their way back.  Then at

22  9:00 p.m., everyone would come back to the office in

23  Worthington.  I would collect all of their signature sheets,

24  have them fill out the information on the back.  You have to

25  make sure that it's very specifically accurate to ensure

1    that it's able to be validated.  Then they would leave and I

2    would stay with our processing team and tally the number of

3    signatures for the day, organize it per gatherer, and then

4    turn it over to a team that would take it to a separate

5    secured location to begin scanning and validating what we

6    had so we could look at accuracy rates and figure out what

7    our -- what our running total signature count was.

8    **Q**    How many hours a week were you working?

9    **A**    Oh, goodness, most days were 15, 16 hours long,

10   seven days a week.  Yeah.  I'm not great at math on the

11   spot, but very long days, seven days a week.

12   **Q**    Were you given any instructions about how to treat the

13   signatures that you were receiving?

14   **A**    Yes.  We were made -- it was made very clear to myself

15   and the others on the team that we needed to treat the

16   signatures with -- essentially protect them with whatever we

17   could, so ensure that they were locked up at the end of the

18   day, make sure that they were never out of our sight before

19   we were locked up, and just to keep extra close watch on any

20   and every piece of paper that had legal signatures on it.

21       MS. GAFFNEY-PAINTER:  Your Honor, may we please

22   have permission to publish what's already been admitted as

23   Government Exhibit 621 A?

24       THE COURT:  Yes.

25   **Q**    Now, Mr. Fehrman, looking here at Government

1    Exhibit 621 A, just generally, what are we seeing here?

2    **A**    This is a text message between myself and Matt Borges.

3    **Q**    And what is the date on the top exchange here?

4    **A**    Sunday, September 1st.

5    **Q**    And was this after you had started your job with

6    Advanced Micro Targeting?

7    **A**    Yes.

8    **Q**    And the top message reads:  Let's meet for coffee

9    tomorrow.  Did you in fact meet with Mr. Borges for coffee?

10    **A**    Yes, I did.

11    **Q**    What happened at that meeting?

12    **A**    At that coffee meeting, you know, I went to the job

13    knowing we were on opposite sides, but we still

14    communicated, agreed to meet for coffee, went and sat down.

15    It seemed friendly like it normally would have when we would

16    get together and talk.  But the conversation turned pretty

17    quickly.  Matt talked to me about how he wanted information

18    about the campaign.  He asked kind of well, how are you

19    doing, what do things look like, how's it going, and then

20    essentially made offers to me about how I could be taken

21    care of.  He asked if I had a car note.  He asked about debt

22    that I had that we had communicated about in the past

23    related to my professional circumstances.  He asked how much

24    there was outstanding and said essentially that all of that

25    could be taken care of, that he had been well taken care of,

1    and that all he needed was information on what was going on

2    related to the House Bill 6 repeal.

3    **Q**    Now, how did you leave that meeting with Mr. Borges?

4    **A**    Feeling very upset, shaken.  I had never been put in a

5    situation in my career where I had been asked to do

6    something like that, something that I immediately knew was

7    just absolutely wrong.  I think during the meeting I was

8    shocked and tried to hide it but left feeling very

9    conflicted having been asked by someone I looked up to,

10   someone who knew details about my personal life, my personal

11   situation, been asked to do something that was wrong but had

12   been -- those things had been used as leverage to try and

13   get me to do that.  If felt -- it was very upsetting.

14   **Q**    Now, during that first meeting with Mr. Borges, what

15   was your response to this offer he extended you?

16   **A**    Yeah.  My response, as best I remember, was, I need

17   some time to think about it.  I'd like to have the night to

18   sleep on it.  And I will get in touch with you tomorrow.

19   **Q**    What did you do immediately after that coffee meeting

20   with Mr. Borges?

21   **A**    Immediately after that meeting, I called a dear friend

22   who I trust very much and explained to him what had taken

23   place, explained that I felt very uncomfortable, that it

24   seemed incredibly wrong, and that I felt that I didn't -- it

25   didn't feel like just a request to do something wrong, but

1    that I felt threatened in a way, that I felt very uneasy

2    because of the way things had been presented.  So I spoke to

3    that friend who counseled me that I should probably speak to

4    someone about it, that I should probably report it.

5    **Q**    Now, you testified that when you left the meeting with

6    Mr. Borges, you said you needed the night to think about it

7    and would respond.  Did you ever respond back to Mr. Borges

8    after that coffee meeting?

9    **A**    Yes, I did.  I did not take the night.  I spent a few

10   hours just sort of in shock, spoke with my friend, and then

11   later that afternoon sent him a text message letting him

12   know that I was not interested in taking part in what he had

13   offered.

14          MS. GAFFNEY-PAINTER:  Your Honor, may we please

15   have permission to publish three exhibits?  They have all

16   been admitted and they represent sequential screenshots of

17   the same text.  It's Government's Exhibit 621 B, Government

18   Exhibit 621 C, and Government Exhibit 621 D.

19          THE COURT:  Yes.

20          MS. GAFFNEY-PAINTER:  And, Ms. Terry, if we could,

21   please, have 621 B on the left-hand side of the screen and

22   621 C on the right-hand side of the screen.  Thank you.

23   **Q**    Mr. Fehrman, will you please read this text message

24   that appears here?

25   **A**    Yes.  Hey, I've thought about it.  I don't need

1    overnight.  At the beginning of this, I thought I could walk

2    my information into Larry's office and sell it for enough to

3    retire on.  That's what I've used as motivation to keep

4    working long hours, be away from my family and meet the

5    expectations of the people on this project, but I didn't

6    think I would actually be given the option to choose.  I've

7    struggled since 2016 to get things back on track.  I've got

8    debt.  I've got a shit car.  Just sold my motorcycle and

9    need a permanent job after this thing is done in 50 days.

10   Part of the lesson I've been trying to learn is working hard

11   to earn what I have instead of relying on political favors

12   to get me by.  I would love to have those wiped out, to be

13   debt free and not have to worry, but I can't put a price tag

14   on my integrity or my word.  You've been a good friend and

15   loyal mentor and I appreciate everything you've done for me

16   more than you know.  But you obviously chose to invest in me

17   because you thought I was trustworthy on some level.  I

18   wouldn't be the guy you chose to invest in, the guy who

19   showed up for you at the central committee meeting in 2017

20   with your sticker if I sold this team down the river.  My

21   word is my word.  My integrity is literally all I've got

22   right now and I'm not willing to sell it.  So it may not

23   land me in the car, house, job or financial -- and then

24   that's the end.

25   **Q**    Thank you, Mr. Fehrman.

TYLER FEHRMAN - DIRECT EXAM

19-2966

1          MS. GAFFNEY-PAINTER:  Now, Ms. Terry, if we could

2    please display Government Exhibit 621 D.

3    **Q**     And, Mr. Fehrman, if you could complete your read of

4    the blue text that appears at the top of this screenshot.

5    **A**     Yeah.  So it may not land me in the car, house, job or

6    financial situation I want to be in, but I couldn't face

7    myself if I did anything but work for this and do it

8    honestly.

9    **Q**     And, Mr. Fehrman, to be clear, this is the text

10   message that you sent to Mr. Borges; is that right?

11   **A**     Yes, it is.

12   **Q**     Now, will you please read for us the two gray texts

13   that appear after the blue text that you just read?

14   **A**     Um-hmm.  Okay.  Just keep me posted as a friend on how

15   you guys are doing.  That's all I really -- that's really

16   all I need to know.  Thanks.  And no matter what, don't ever

17   tell anyone about our conversation from earlier.  Thanks.

18   **Q**     Now, what did you do after you got the text message

19   from Mr. Borges reading:  No matter what, don't ever tell

20   anyone about our conversation from earlier?

21   **A**     I called my friend again and said, I need to talk to

22   someone, but I'm not sure who or how to reach them.

23   **Q**     And what happened next?

24   **A**     My friend put me in contact with the FBI.

25   **Q**     And describe for us that contact you had with the FBI.

1    **A**     Initially, it was a phone call.  I had a conversation

2    on the phone with Special Agent Blane Wetzel and just kind

3    of gave some high-level detail as to the conversation that I

4    had had and my concerns related to it, and then he asked me

5    if I would be willing to have a meeting, to sit down and

6    discuss what had taken place, and I agreed to it.

7    **Q**     And did that meeting actually take place?

8    **A**     Yes, it did.

9    **Q**     Where was that meeting?

10   **A**     That meeting was at a Graeter's Ice Cream shop in

11   Columbus, Ohio, in Worthington, Ohio.

12   **Q**     Who was present for that meeting?

13   **A**     Myself and Special Agent Wetzel.

14   **Q**     What did Special Agent Wetzel ask you to do?

15   **A**     After I detailed the conversation to him, as well as

16   my concerns, he asked me if I would be willing to approach

17   Matt and agree to what he had originally requested of me

18   while working in cooperation with the government to kind of

19   document those conversations.

20   **Q**     Did you accept that offer at that time?

21   **A**     I did.

22   **Q**     Now, we're not going to go through all of the

23   recordings and videos that were made with your contact with

24   Mr. Borges but we are going to walk through some of them.

25   **A**     Okay.

```
1           MS. GAFFNEY-PAINTER:  Your Honor, may we please

2    have permission to publish what's been admitted as

3    Government's Exhibit 614 C?

4           THE COURT:  Yes.

5           MS. GAFFNEY-PAINTER:  May the jury please have

6    permission to follow along with the transcript that's been

7    marked for identification as Exhibit 614 D?

8           THE COURT:  Yes.  Give us a moment to pull that up.

9    So we're looking for Exhibit 614 D as in "duck"?

10          MS. GAFFNEY-PAINTER:  Yes.

11          THE COURT:  Give us a moment.

12          MS. GAFFNEY-PAINTER:  Sure.

13          THE COURT:  Very well.

14   (Video playing.)

15   Q    Mr. Fehrman, there was a reference to Brandon in

16   there.  Who is Brandon?

17   A    Brandon Lynaugh, he was the -- one of the three people

18   running the campaign committee to repeal.

19   Q    You also made reference to Matt Borges' New England

20   Patriots Super Bowl hat.  What are you referring to there?

21   A    In 2018 or January of 2019, the New England Patriots

22   went to the super bowl, and being a big fan, I was excited,

23   texted back-and-forth a lot with Matt about it, and Matt

24   went to the game.  I was extremely jealous, and he actually

25   went to the game and brought me back a victory hat from the
```

1    game that I had put in the back window of my car next to a

2    little Patriots decal.  It's an unpopular thing to do in

3    Ohio, but that hat rode in the back window of the car.

4    **Q**    On that recording, Mr. Borges made a comment:  That

5    would be bad for both of us if a story like that came out,

6    but it would be worse for you.  How did you interpret that

7    line?

8    **A**    I interpreted it to be extremely demeaning,

9    essentially him reminding me that I was a small fish and

10   that he had quite a bit of authority and influence inside

11   the space that we both worked.

12            MS. GAFFNEY-PAINTER:  Your Honor, may we please

13   have permission to publish the following exhibits, all of

14   which have been admitted and which constitute a continuing

15   text exchange?  First we would request permission to publish

16   Government Exhibit 621 E?

17            THE COURT:  Yes.

18            MS. GAFFNEY-PAINTER:  And then we would request

19   permission to publish Government Exhibit 621 I?

20            THE COURT:  Yes.

21            MS. GAFFNEY-PAINTER:  Permission to publish

22   Government Exhibit 621 J?

23            THE COURT:  Yes.

24            MS. GAFFNEY-PAINTER:  Government Exhibit 621 K?

25            THE COURT:  Yes.

1          MS. GAFFNEY-PAINTER:  Government Exhibit 621 M?

2          THE COURT:  Yes.

3          MS. GAFFNEY-PAINTER:  And Government Exhibit 621 O?

4          THE COURT:  Yes.

5          MS. GAFFNEY-PAINTER:  Now, Ms. Terry, will you

6    please pull out for us from Government Exhibit 621 E, the

7    top three texts that appear on that screenshot?

8    **Q**    All right.  Mr. Fehrman, will you please read this

9    text exchange that appears here?

10   **A**    Yes.  Yo, I'm free.  Heading that way now.  Get me a

11   copy of your employment contract.  I'll make you an offer to

12   buy you out.  It will be substantial.  Make sure you didn't

13   sign an NDA.

14   **Q**    In this text exchange, Mr. Fehrman, Mr. Borges asks

15   you to get a copy of your employment contract.  Did you in

16   fact send Mr. Borges a copy of your employment contract?

17   **A**    Yes, I did.

18          MS. GAFFNEY-PAINTER:  All right.  Ms. Terry, may we

19   please publish Government Exhibit 621 I.  And if you could,

20   pull out the bottom six text messages there, please.

21   **Q**    And, Mr. Fehrman, if you could read this text exchange

22   for us and just indicate when Mr. Borges is texting and when

23   you are texting.

24   **A**    Yes.  So we'll start with, the gray is from Matt:

25   Give me a day or two to figure this out.  What e-mail did

1    you send it to?

2         And then the next is me, said:  Your Roetzel one, I

3    think that's the only one I have, let me make sure it sent.

4    Just went through.  He said:  Thanks.  And then a little

5    while later said:  Have you guys started door to door?

6    **Q**    All right.

7         MS. GAFFNEY-PAINTER:  Ms. Terry, may we please

8    publish Government Exhibit 621 J.  And if you could, please,

9    highlight and pull out those bottom three text messages that

10   appear there?

11   **Q**   And, Mr. Fehrman, if you could read these for us,

12   please.

13   **A**   Have you guys started door to door?

14        No.  It's not a part of the plan as far as I know.  I

15   don't think it would be effective, too much time spent

16   walking and driving.

17        MS. GAFFNEY-PAINTER:  Now, Ms. Terry, if you will,

18   please, publish Government Exhibit 621 K.

19   **Q**   And, Mr. Fehrman, if you could please read the whole

20   exchange starting with the gray box people.

21   **A**   Yes.  People are starting to report getting folks at

22   their doors.  So just want to check.  Could be a head fake.

23   Don't know.

24        My response:  That's odd.  Definitely nothing on my

25   end door-wise.  We had a lady tell one of our people that

1    she had been hired to follow petitioners and report their

2    locations.

3        Matt:  Nice.  Any idea what the count looks like at

4    this point?  Just want to nail down the opportunity we

5    discussed.  Thanks.

6        Not immediately, but I should have access to some of

7    that tonight and tomorrow.  I also don't want to share too

8    much without some guarantee I'm not going to get fucked.

9    Not you, just me trying to be careful on all of this.

10       MS. GAFFNEY-PAINTER:  Now, Ms. Terry, may we please

11   publish Government Exhibit 621 M?  And if we could please

12   highlight the bottom five texts that appear here?  Or excuse

13   me, Ms. Terry, my mistake, may we please pull out the bottom

14   six text messages there?  Thank you.

15   **Q**    Mr. Fehrman, will you please read this exchange?

16   **A**    Yes.  Yep, I can get this done.  They just want to

17   know they have the right source.  So a data point here will

18   help me get it finalized.  Ballpark for my region without

19   having exact specifics or knowing our validity rate is

20   around 7500.  How many regions?  Thanks.  They've got it

21   broken up weird.  I think nine.  Got it, I'll get this done.

22       Just let me know.

23   **Q**    Now, Mr. Fehrman, you text here "validity rate."  For

24   those of us who aren't familiar, what were you referring to

25   with validity rate?

1    **A**    Yeah.  When you're collecting signatures for a

2    referendum effort or any kind of ballot issue campaign, it's

3    essentially guaranteed that not every signature is going to

4    be valid.  Someone might write their name incorrectly, they

5    might write their address incorrectly, they may not be a

6    registered voter or they might be registered at a different

7    address than they put on the paper.  Just, there's room for

8    error.  And so when you receive signatures of this nature,

9    you have to validate them by running them against a voter

10   database and that essentially provides a validity rate.  So

11   you can take a look at a hundred signatures and have a

12   validity rate of 70, 75 percent, and that helps you

13   understand, you know, if you've got to get 400,000

14   signatures, they have to be 400,000 valid, and so you

15   calculate how many more you need based on the validity rate,

16   not on the raw signature count.

17        MS. GAFFNEY-PAINTER:  Ms. Terry, will you please

18   publish Government Exhibit 621 O?

19   **Q**    And, Mr. Fehrman, will you please read this entire

20   text exchange that appears here?

21   **A**    Yes.  Let's meet for coffee tomorrow.  I'd do today

22   but have to be on the road this afternoon.  How about those

23   fucking Patriots?

24        Cool.  Time place?  Also, oh, my God, that football

25   game.

TYLER FEHRMAN - DIRECT EXAM                                    19-2974

1      **Q**    Now there's reference in this text exchange to a

2      meeting.  Did you in fact meet with Mr. Borges after this

3      text exchange?

4      **A**    I believe so, yes.

5      **Q**    And where did you meet with them?

6      **A**    It would have been at a Starbucks in Columbus, Ohio.

7      **Q**    Did you record that meeting on behalf of the FBI?

8      **A**    Yes.

9            MS. GAFFNEY-PAINTER:  Now, Your Honor, we

10     previously admitted Government Exhibit 615 A, which was the

11     audio from that meeting and Government Exhibit 615 B, which

12     was the video, and we combined them into a demonstrative

13     that we marked for identification as 615 D.  May we please

14     have permission to publish the demonstrative marked as

15     Government's Exhibit 615 D?

16           THE COURT:  Any objections?

17           MR. SCHNEIDER:  No.

18           MR. GLICKMAN:  No, Judge.

19           THE COURT:  You may.

20           MS. GAFFNEY-PAINTER:  Your Honor, we will only be

21     publishing select portions from this demonstrative.  And we

22     would request permission for the jury to follow along with

23     the transcript that has been marked for identification as

24     Government Exhibit 615 C?

25           THE COURT:  Very well.

1          MS. GAFFNEY-PAINTER:  And for the ease of the

2     jurors, the transcript will begin on page 5 for the segment

3     that we intend to publish.

4          THE COURT:  615 C as in "Charlie," page 5; is that

5     right, Counsel?

6          MS. GAFFNEY-PAINTER:  That's correct, Your Honor.

7          THE COURT:  All right.  Give us just a moment.

8          MS. GAFFNEY-PAINTER:  And while everyone is getting

9     situated, I would just like to note for the record that the

10    portion that we will be publishing of 615 D begins at

11    4 minutes and 17 seconds and will be ending at 13 minutes,

12    36 seconds.

13         THE COURT:  Very well.  You may proceed.

14         MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

15    (Video playing.)

16    **Q**    Now, Mr. Fehrman, there was a reference in that

17    segment to environmental council.  Will you please explain

18    that to us?

19    **A**    Yeah.  The Ohio Environmental Council was an

20    organization active in the repeal effort who also had

21    several -- or at the time, a full-time position they were

22    hiring for that I was interested in.  I had applied for the

23    job.  I think in the recording I mentioned that I had

24    applied for it in July and was still waiting to hear back on

25    whether or not I would have a shot at going to work there.

1    I wanted to go work with the organization full time.

2    **Q**    Is that also known and referred to in that segment as

3    "OEC"?

4    **A**    Yes, it is.

5    **Q**    Now, in that segment we just listened to, you say:

6    "Good job on finding us, by the way, and I've had a lady

7    sitting outside my office watching me and the trackers out

8    in the field."  Will you explain that to us?

9    **A**    Um-hmm.  Shortly after the canvassing efforts began,

10   my petition gatherers in the field started -- folks started

11   showing up to their -- where they were gathering.  They

12   would stand nearby and yell at them or try to yell over them

13   when people attempted to sign their names.  When they would

14   move locations, because it got very frustrating, those folks

15   would follow them either on foot or by vehicle to the next

16   location.  And then beyond that, my office in Worthington, I

17   had someone that would regularly come and sit in the parking

18   lot.

19        One night in particular stands out, it was the final

20   night that it happened, but a lady sat in a dark SUV in the

21   parking lot and just stared at me up through the windows.

22   You could see into my conference room from the lot, just sat

23   and had followed me to the office, sat and watched me inside

24   the building.

25   **Q**    Now, there was discussion in that segment about

1    "getting out from under this bad child support."  Now, at

2    the time that this was recorded, were you in fact dealing

3    with child support issues?

4    **A**    Yes, I was.  After a period of unemployment and a

5    fairly messy divorce several years prior, had been left with

6    owing a pretty high monthly amount in child support and then

7    being unemployed, got behind and was working to pay off the

8    arrears.

9    **Q**    Was Mr. Borges aware of that at that time?

10   **A**    Yes, he was.

11   **Q**    Now, you talked in that segment about the central

12   committee meeting and putting everything on the line.  What

13   were you referencing there?

14   **A**    Yeah.  I referenced this a little while ago, but in --

15   it would have been January or February of 2017, Matt was

16   running for reelection as the chairman of the Ohio

17   Republican Party.  It was a pretty contested race for that

18   seat between he and someone who was kind of hand-picked by

19   the incoming Trump administration.  I felt like my mentor

20   and friend's role was on the line and showed up at a time in

21   Ohio when it was kind of politically tumultuous even within

22   our own political party to pick a side and I picked a side.

23   And I had a button that said -- or a sticker that said "I am

24   with Matt."  I think I Tweeted that at one point and showed

25   up that day to support him and wound up being asked by the

1    then-chairman of the Franklin County Republican Party, if I

2    knew any of the central committee members on the floor when

3    there were breaks in voting, because it was deadlocked, and

4    if I could go onto the floor and try and lobby those members

5    to support Matt for chair, which I did.  And so for me at

6    that time, it felt like putting quite a bit on the line

7    because I was openly saying:  I'm with this faction of the

8    party, I am standing with this person, and it was during a

9    time when I was trying to figure out kind of what my next

10   career move was.

11        MS. GAFFNEY-PAINTER:  Your Honor, we would now like

12   to publish a second portion of that 615 D with the Court's

13   permission?

14        THE COURT:  Very well.

15        MS. GAFFNEY-PAINTER:  We will be publishing for the

16   record at minute 14 and 15 seconds to minute 19 and

17   37 seconds and before we begin that, for the jury's

18   guidance, the transcript will begin on page 14 for this

19   segment.

20        THE COURT:  Very well.

21   (Video playing.)

22   Q    Mr. Fehrman, in that segment we just listened to,

23   Mr. Borges said:  It would be bad for me, it would be worse

24   for you, and you replied:  Right, I get it, I understand

25   that.  Will you explain your understanding?

1     **A**     Yeah.  It was, once again, a reminder that I was a

2     small fish and he was a big one, that he had more influence

3     than I did, and that if these conversations came out

4     publicly, it would be bad for him, but it would be, you

5     know, negative media coverage, but that it would be worse

6     for me because I was a small fish, because I was somebody

7     who had been recently looking for employment opportunities

8     and trying to figure out what my next career move was and

9     that I'd no longer have some of the help I had been given,

10    that it would -- it felt like a threat, that he would make

11    sure, make sure that people knew that I had been a part of

12    that.

13    **Q**     Also in that segment, Mr. Borges referenced Larry.

14    Who did you understand Larry to be?

15    **A**     Larry Householder.

16          MS. GAFFNEY-PAINTER:  Your Honor, I would at this

17    time request permission to publish a third portion of this

18    meeting from 615 D?

19          THE COURT:  Yes.

20          MS. GAFFNEY-PAINTER:  Thank you.  For the record,

21    we will be publishing minute 20 and 9 seconds to minute 21

22    and 3 seconds, and for the jury's guidance, the transcript

23    will start on page 19.

24    (Recording playing.)

25    **Q**     Mr. Fehrman, in that segment we just listened to,

1    Mr. Borges says:  I'm helping you out with a personal

2    situation you need help with because I'm your friend.  Is

3    that what you understood this arrangement to be?

4    **A**    No.

5         MS. GAFFNEY-PAINTER:  Your Honor, permission to

6    publish a fourth portion of Government Exhibit 615 D?

7         THE COURT:  Yes.

8         MS. GAFFNEY-PAINTER:  Here we are publishing from

9    minute 22 and 52 seconds to minute 23 and 18 seconds.  And

10   for the jury's guidance, the transcript will start on

11   page 22.

12   (Recording playing.)

13   **Q**    Mr. Fehrman, immediately after this meeting ended,

14   what did you do?

15   **A**    After this meeting ended, I would have driven to meet

16   Special Agent Wetzel.

17        MS. GAFFNEY-PAINTER:  Your Honor, may we please

18   have permission to publish what's already been admitted as

19   Government Exhibit 621 T?

20        THE COURT:  Yes.

21        MS. GAFFNEY-PAINTER:  And may we, on the right side

22   of the screen, please, publish what's already been admitted

23   as Government Exhibit 621 Y?

24        THE COURT:  Yes.

25   **Q**    Mr. Fehrman, directing your attention to the left side

1    of the screen, please, will you read this exchange for us

2    starting with the blue text, "all right"?

3    **A**    Yes.  All right.  I have Columbus ready but the rest I

4    won't have -- I won't have when we do our weekly every

5    Friday.  Can we meet this afternoon?  I'll bring this.  You

6    bring what we discussed yesterday.  I can explain some of

7    the process.  I've got hiring interviews and training until

8    about 3:00.

9         I could meet around 6.

10        Works for me.  That way I can make sure my crew is all

11   taken care of and meetings, interviews, trainings are out of

12   the way.  Same place?

13        Sure.

14   **Q**    Now, Mr. Fehrman, please, directing your attention to

15   Government Exhibit 621 Y that appears on the right side of

16   the screen, will you please read this exchange starting with

17   the gray text, "let's move tomorrow"?

18   **A**    Yes.  Let's move tomorrow, sorry.

19        All right.  No worries.  Time?  My mornings are

20   wrecked until about noon.

21        I think 2ish.

22        Can you do 3:00?  I can shuffle my afternoon

23   appointment and be free and clear that way.

24        Yes.

25   **Q**    Now, just generally speaking, what's happening in

1    these text message exchanges we see here?

2    **A**    This was an attempt to set up my next meeting with

3    Matt.

4            MS. GAFFNEY-PAINTER:  Your Honor, may we please

5    have permission to publish what's already been admitted as

6    Government Exhibit 622 D?

7            THE COURT:  Yes.

8    **Q**    Mr. Fehrman, will you please read for us this exchange

9    starting with the gray text box stuck up here, and if you

10   could attribute the text to either you or Matt as you read

11   them?

12   **A**    Yes.  The first text is from Matt:  Stuck up here at

13   Rex's office.  Sorry this is becoming a shit show.  We will

14   figure it out.  I'll let you know.

15       And then from me:  Okay.  I rearranged my whole day to

16   slip out and just got here.  How long do you think?

17       Then Matt:  Stuck here.  We also need to take a

18   different approach.  Want to hire you to consult on an

19   unrelated project.  Will explain.

20           MS. GAFFNEY-PAINTER:  Now, Your Honor, may we

21   please have permission to publish what's already been

22   admitted as Government Exhibit 622 G?

23           THE COURT:  Yes.

24   **Q**    Now, Mr. Fehrman, will you please read for us the

25   exchange starting with the blue next box, "all right"?

TYLER FEHRMAN - DIRECT EXAM

19-2983

```
1    A    Yes.  All right.  Good for me to head back to work or

2    do you still want to try something today?

3         And then from Matt:  Sorry.  Go ahead and head back

4    and we will get this figured out tomorrow.

5         And then from me:  All right.  Just let me know so I

6    can plan my day tomorrow.  Things are getting sort of crazy.

7    Q    What's happening in this text exchange that you've

8    read to us?

9    A    Yeah.  We had had a meeting scheduled to sit down, and

10   if I remember correctly, he was going to pay me money we had

11   agreed upon.  I arrived at the location for the meeting and

12   he didn't show up, and then he told me he was stuck in Rex's

13   office, and it was me attempting to figure out, are we still

14   going to meet, what are we going to do, you know, when are

15   we -- when are we getting together?

16   Q    Did you in fact meet with Mr. Borges on another time

17   after this exchange?

18   A    Yes, I did.

19        MS. GAFFNEY-PAINTER:  Your Honor, before we enter

20   into the next recorded meeting, I notice the time, it might

21   be a good point for a break, but I'm also prepared to

22   proceed if you would like.

23        THE COURT:  No, I think it's our normal break time.

24   We'll take a break.  To the Members of the Jury, I want you

25   to take a break.  Don't talk about the case among yourselves
```

```
1    yet at all or anybody else.  No independent research.  No

2    checking out the social media or media.  Continue to keep an

3    open mind.  We'll break for 20 minutes and out of respect

4    for you, we'll rise as you leave.

5              THE DEPUTY:  All rise for the jury.

6         (Jury exited the courtroom at 10:43 a.m.)

7              THE COURT:  Okay.  The jury is leaving the room.

8    As always, we'll wait in the courtroom until we're advised

9    that they've cleared the floor and then we'll take our

10   20-minute break.  Door is closing.  During the break, sir,

11   you are ordered not to discuss your testimony, you

12   understand?

13             THE WITNESS:  Yes.

14             THE COURT:  Thank you.

15        (Pause.)

16             THE DEPUTY:  All clear.

17             THE COURT:  Break for 20 minutes.

18             THE DEPUTY:  This court is in recess for

19   20 minutes.

20        (Recess taken from 10:44 a.m. to 11:04 a.m.)

21             THE DEPUTY:  All rise.  This court is in session

22   pursuant to the recess.

23             THE COURT:  Thank you.  Please be seated.  Back in

24   the open courtroom ready to call the jury.  Is the

25   government ready to proceed?
```

1          MS. GAFFNEY-PAINTER:  Yes, thank you, Your Honor.

2          THE COURT:  Mr. Householder?

3          MR. GLICKMAN:  Yes, Judge.

4          MR. SCHNEIDER:  Yes.

5          THE COURT:  Very well.  Let's call for the jury.

6      (Pause.)

7          THE DEPUTY:  All rise for the jury.

8      (Jury entered the courtroom at 11:09 a.m.)

9          THE COURT:  You may all be seated.  Thank you.  14

10     Members of the Jury have rejoined us.  We will continue to

11     hear the taking of testimony.  The witness remains under

12     oath.  Ms. Painter, you may proceed.

13         MS. GAFFNEY-PAINTER:  Thank you, Your Honor.

14         THE COURT:  Very well.

15     **Q**    Mr. Fehrman, I want to take a step back to that very

16     first coffee meeting you had with Mr. Borges in August of

17     2019.  What information did Mr. Borges say he wanted from

18     you during that meeting?

19     **A**    He asked for just sort of a general sense of how many

20     signatures were being gathered, kind of what the lay of the

21     land on the ground was, where canvassers would be, and just

22     a general idea of what we were up to or what kind of

23     progress was being made.

24     **Q**    Now, I want to advance to that second recorded meeting

25     you had with Mr. Borges in September of 2019.

1          MS. GAFFNEY-PAINTER:  Your Honor, previously we

2     admitted Government Exhibit 616 A, which was the audio from

3     that meeting, and Government Exhibit 616 B, which was the

4     video, and we created a demonstrative which we marked for

5     identification as Government Exhibit 616 D, which combined

6     those two exhibits.  May we please have permission to

7     publish that demonstrative, 616 D?

8          THE COURT:  Any objections?

9          MR. SCHNEIDER:  No objection.

10          MR. GLICKMAN:  No, Judge.

11          THE COURT:  Very well.  Yes, you may publish the

12     demonstrative exhibit.

13          MS. GAFFNEY-PAINTER:  Thank you, Your Honor.  We

14     will only be publishing select portions of 616 D.  And, Your

15     Honor, may the jury have permission to follow along with the

16     transcript that has been marked for identification as

17     Government Exhibit 616 C?

18          THE COURT:  Yes.  616 C.  Give us just a moment.

19          MS. GAFFNEY-PAINTER:  Certainly.  And while

20     everyone is getting situated, just for the record, I will

21     note that this first portion we are publishing is from

22     1 minute and 22 seconds to 8 minutes and 9 seconds.  And for

23     the sake of the jury, the transcript will start on page 3.

24          THE COURT:  Very well.  You may proceed.

25     (Video playing.)

1    **Q**    Mr. Fehrman, there was a reference in that segment to

2    a Kasich reunion thing for Judy French and needing your help

3    with that.  Did that make sense to you at the time?

4    **A**    It made no sense whatsoever.

5    **Q**    Why is that?

6    **A**    Judy French was a Supreme Court justice, John Kasich

7    was the governor or former governor, a John Kasich reunion

8    for Judy French just did not make sense to me at all.

9    **Q**    Now, in that segment, you mentioned that, "you kind of

10   creeped me out in a car with the LaRose sticker."  Can you

11   explain that to us?

12   **A**    Um-hmm.  So the earlier conversation we had had where

13   we were supposed to meet the day prior and then Matt did not

14   show up, he told me he was stuck in Rex's office.  Shortly

15   afterwards, I received text messages from one of my

16   canvassers who said some big-wig looking guys are showing up

17   and asking us questions and we're a little bit worried about

18   who they are.  They were just confused.  They said these

19   aren't normal blockers.  And I asked them to try and get

20   pictures of the folks that were there.  The pictures they

21   sent me were of the Audi that I knew Matt drove that had a

22   Frank LaRose for Secretary of State sticker in the back

23   right window or in the back right rear, rear window.  And I

24   just, I thought it was very odd because he had told me he

25   was in Rex's office, which I knew was downtown, and this was

1    out pretty far from downtown at a public library.  I thought

2    it was odd that he would personally be out confronting or

3    watching my canvassers.

4    **Q**    Now, Mr. Borges made a comment in that segment, "I'm

5    going to blow your house up."  How did you take that?

6    **A**    That comment, when it was made, shook me.  I had felt

7    threatened in our earlier conversations, but that struck a

8    different tone with me.  Sometimes, in politics especially,

9    we utilize dark humor, but we hadn't been doing that.  He

10   had been asking me to do things that he knew were not

11   acceptable and that I had --

12           MR. GLICKMAN:  Objection.

13           THE COURT:  Sustained, strike it.  Testify as to

14   what you know.

15           THE WITNESS:  He had asked me to do things that I

16   had made it clear initially that I thought -- that I felt

17   were wrong, and he kept asking if I was going to report it

18   to someone or if he was going to get a phone call from Randy

19   Ludlow, who was a reporter.  It was all very intimidating,

20   and then to be told he would "blow my house up" was --

21   was -- it scared me.

22           MS. GAFFNEY-PAINTER:  Your Honor, may we publish a

23   second portion from this same demonstrative exhibit?

24           THE COURT:  Yes.

25           MS. GAFFNEY-PAINTER:  For the record, this will be

1    from 8 minutes and 9 seconds to 11 minutes and 1 second.

2    And for the help of the jury, the transcript will be

3    continuing on page 9 where we left off.

4           THE COURT:  Very well.

5    (Video playing.)

6    Q    Mr. Fehrman, in that segment we just listened to,

7    there was reference to Rex.  Who is Rex?

8    A    Rex Elsass was a political consultant in Columbus.

9    Q    There was also reference in that segment we just

10   listened to to that project for Judy French.  Did that

11   project ever happen?

12   A    No.

13   Q    Did you ever do any work --

14   A    No.

15   Q    -- associated with that?

16          MS. GAFFNEY-PAINTER:  Your Honor, may we please

17   have permission to publish what's already been admitted as

18   Government Exhibit 617 A?

19          THE COURT:  Yes.

20          MS. GAFFNEY-PAINTER:  And may the jury please have

21   permission to follow along with the transcript that's been

22   marked for identification as Government Exhibit 617 B?

23          THE COURT:  Yes.  Give us just a moment.  617 B as

24   in "boy"?

25          MS. GAFFNEY-PAINTER:  617 B.

1          THE COURT:  I'm a little dyslexic.  All right.  617

2     B?

3          MS. GAFFNEY-PAINTER:  Yes.

4          THE COURT:  Very well.  You may proceed.

5          MS. GAFFNEY-PAINTER:  Thank you.

6     (Recording playing.)

7     **Q**    Mr. Fehrman, in that call we just listened to, there

8     was reference to Carlo.  Who is Carlo?

9     **A**    My understanding was that it was a reference to Carlo

10    LoParo, who was a -- he's a communications professional in

11    Columbus.

12    **Q**    Now, that story that you told about the man in the

13    Brooks Brothers dress clothes, was that story true?

14    **A**    Yes, it was.

15    **Q**    Now, in that segment, you reference a $15,000 check.

16    What did you do with that check?

17    **A**    I took that check, after the meeting with Matt and as

18    was standard practice, met Special Agent Wetzel privately

19    after the meeting to kind of debrief, and then took that

20    check to my bank and deposited it and then immediately wrote

21    a check for the same amount to the United States Marshals.

22          MS. GAFFNEY-PAINTER:  Your Honor, may we have

23    permission to publish what's already been admitted as

24    Government Exhibit 624 A?

25          THE COURT:  Yes.

1    **Q**    Mr. Fehrman, looking at your screen, is this the check

2    that you were just referencing?

3    **A**    Yes, it is.

4         MS. GAFFNEY-PAINTER:  Your Honor, may we please

5    have permission to publish what's already been admitted as

6    Government Exhibit 618 A?

7         THE COURT:  Yes.

8         MS. GAFFNEY-PAINTER:  And may the jury have

9    permission to follow along with the transcript, which has

10   been marked for identification as Government Exhibit 618 B?

11        THE COURT:  Yes.

12        MS. GAFFNEY-PAINTER:  We will only be publishing a

13   segment of this call.  For the record, we will be publishing

14   from 1 minute and 28 seconds to the end of the call.  And

15   for the help of the jury, the transcript starts on page 3.

16        THE COURT:  Very well.

17   (Recording playing.)

18   **Q**    Mr. Fehrman, in that segment of the call that we just

19   listened to, Mr. Borges asks you:  Do you know a number?

20   What did you understand him to be asking you?

21   **A**    He was asking for the number of signatures that we had

22   up to that point.

23        MS. GAFFNEY-PAINTER:  Your Honor, may we please

24   have permission to publish what's already been admitted as

25   Government Exhibit 622 Q, Government Exhibit 622 S,

1    Government Exhibit 622 T, Government Exhibit 622 V, all of

2    which have been admitted and all of which constitute

3    screenshots of a continuing text exchange?

4             THE COURT:  Yes.

5             MS. GAFFNEY-PAINTER:  Ms. Terry, may we please

6    publish on the left side of the screen Government

7    Exhibit 622 Q and on the right side of the screen Government

8    Exhibit 622 S?

9    **Q**    Mr. Fehrman, will you please, starting on the left

10   side read this text exchange for us and indicate when you

11   are writing and when Mr. Borges is writing?

12   **A**    Yes.  So on the left side, first one is from me.

13   Says:  Call was canceled again due to a shitload of things

14   going on.  Let's reconnect later.

15            And then Matt:  We were told you guys had 120,000

16   signatures.  Any idea if that's right?

17            And then me:  Sorry, crazy day.  All I've known so far

18   was the regional total I gave you.

19   **Q**    And now if you could proceed to the right side of the

20   screen where Government Exhibit 622 S is displayed and read

21   from the gray text box down to the bottom, please.

22   **A**    Yes.  The gray text is from Matt:  Any idea how many

23   total signatures you guys have?  We were told 80,000 today.

24   Any intel you have would make me a hero.  Thanks.

25            And then from me:  No clue.  Everything is sort of --

1  everything is sort of influx/up in the air.  They brought in

2  a bunch of other firms and groups and haven't shared details

3  yet.  So numbers are basically impossible to track.  We're

4  meeting early next week to go over the new plan and I'll

5  know then.  Touch base Monday or Tuesday?

6  **Q**    Thank you.

7       MS. GAFFNEY-PAINTER:  Now, Ms. Terry, will you

8  please display on the left side of the screen Government

9  Exhibit 622 T and display on the right side of the screen

10 Government Exhibit 622 V?

11 **Q**    Now, Mr. Fehrman, looking at the left side of the

12 screen, please, Government Exhibit 622 T, will you please

13 just read for us underneath the blue text, the gray text

14 response there?

15 **A**    Yes.  Said:  That would be great, thanks.

16 **Q**    And now looking at the right side of the screen, will

17 you please read the exchange for us starting with the gray

18 text?

19 **A**    Um-hmm.  Text from Matt reads:  Do you think you guys

20 will make it?

21       And then from me:  I do, but being able to back it up

22 with evidence is a little impossible on my end.  Very

23 separate entities as I'm sure you've seen from filings.

24 **Q**    Mr. Fehrman, when Mr. Borges wrote, "do you think you

25 guys will make it," what did you understand him to be

1    referring to?

2    **A**    My understanding was that he was referring to whether

3    or not we would collect the number of signatures necessary

4    to place the referendum on the ballot.

5         MS. GAFFNEY-PAINTER:  Your Honor, may we please

6    have permission to publish what's already been admitted as

7    Government Exhibit 619 A?

8         THE COURT:  Yes.

9         MS. GAFFNEY-PAINTER:  And, Your Honor, may the jury

10   have permission to follow along with the transcript that's

11   been marked for identification as Government Exhibit 619 B?

12        THE COURT:  Yes.

13        MS. GAFFNEY-PAINTER:  Your Honor, we will only be

14   publishing a segment of this call.  We will play from the

15   start of the call until 5 minutes and 29 seconds, therefore,

16   to Members of the Jury, the transcript, where it starts,

17   will be the proper point at which to start reading along.

18   (Recording playing.)

19   **Q**    Mr. Fehrman, in that segment of the call that we

20   listened to, you told a story about a guy who left abruptly

21   in the middle of the day.  Was that story true?

22   **A**    Yes, it was.

23   **Q**    And when you said "Form 15," what were you referring

24   to?

25   **A**    When you are going to be canvassing to collect

1    signatures in the state of Ohio, at least at the time, I'm

2    not sure if it's changed, but there is a requirement that

3    you file a form that registers you as someone gathering

4    signatures.  You file it with the Secretary of State's

5    Office, and so our canvassers would file those.  We would

6    turn them into the Secretary of State.  They were not

7    allowed to go and canvas until we had confirmation that it

8    had been received.  But those forms became public record as

9    soon as they were filed by the secretary's office.

10   **Q**    During that segment, you said:  It's gotten like way

11   further out of control -- weird -- than anything I think

12   I've ever like worked on.  Was that true?

13   **A**    Yes, it was.

14          MS. GAFFNEY-PAINTER:  Your Honor, may I have

15   permission to publish what's already been admitted as

16   Government Exhibit 620 C?

17          THE COURT:  Yes.

18          MS. GAFFNEY-PAINTER:  And may the jury have

19   permission to follow along with the transcript that's been

20   marked for identification as Government Exhibit 620 D?

21          THE COURT:  Yes.

22   (Recording playing.)

23   **Q**    Mr. Fehrman, in that call, there was a reference to a

24   press conference.  What was that referring to?

25   **A**    There was intended to be a press conference or press

1    release related to the signature gathering effort that

2    afternoon.  That call was from the very last day of the

3    campaign.

4    **Q**    There was also a reference in that phone call to a

5    court hearing.  Just generally, what was that referring to?

6    **A**    There was a court hearing tentatively scheduled for

7    the following day in Columbus regarding some of the things

8    that had taken place on the campaign to block folks from

9    gathering signatures.

10   **Q**    Mr. Fehrman, when you worked with the FBI, did they

11   compensate you in any way?

12   **A**    Yes.

13   **Q**    How many times?

14   **A**    One time.

15   **Q**    How much money did the FBI provide to you?

16   **A**    $1,000.

17   **Q**    What did you understand that money to be for?

18   **A**    My understanding was that it was money essentially

19   to -- because of what I had had to deal with, being

20   followed, recording conversations, all of that, just it was

21   extremely stressful and was, kind of sucked a lot of energy

22   out of me.  So my understanding was that it was just to sort

23   of help me through the process.

24   **Q**    Did you know that the FBI was going to compensate you

25   before they did so?

1    **A**    Absolutely not.

2    **Q**    Mr. Fehrman, after this case was charged, did you have

3    any personal interaction with Mr. Borges?

4    **A**    No.

5    **Q**    Did Mr. Borges communicate about you publicly?

6    **A**    Quite a bit.

7    **Q**    Can you describe that for us?

8    **A**    Yeah.

9          MR. LONG:  Objection, Your Honor.

10          THE COURT:  Basis?

11          MR. LONG:  Relevance and 403.

12          MS. GAFFNEY-PAINTER:  Your Honor, may I be heard at

13    sidebar?

14          THE COURT:  Yes:

15    **SIDEBAR CONFERENCE.**

16          MR. LONG:  Your Honor, we believe the government is

17    attempting to elicit information from this witness about a

18    website linked to our client.  We would argue that not only

19    is that information irrelevant, but even if it were

20    relevant, it would be -- any relevance would be

21    substantially outweighed by the danger of unfair prejudice.

22          THE COURT:  Okay.

23          MS. GAFFNEY-PAINTER:  Your Honor, I have two Sixth

24    Circuit cases that establish that spoliation evidence,

25    including evidence that the defendant attempted to bribe or

1    threaten a witness, is admissible to show consciousness of

2    guilt.

3        It's not just the website; it's the posting of his

4    personnel file which contained his personal information has

5    been the subject of a prior court order.  It was dealt with

6    when the Court had to modify his conditions of bond.  And

7    this is proper even under Rule 404(b), there's a Sixth

8    Circuit case, *United States v. Buford*, that says such

9    evidence does not raise an improper character inference

10   because threats tend to show consciousness of guilt without

11   any inference as to the character of the spoliator and thus

12   the district court doesn't violate 404(b) by allowing

13   somebody to testify to what someone perceived as being

14   threats against somebody as being witnesses.

15       And as my colleague raises in opening, Mr. Borges'

16   counsel said these weren't serious threats, and so this is

17   relevant in part to the argument that they have raised.

18           THE COURT:  All right.  Last word and then I'm

19   going to confer with my law clerk.

20           MR. GLICKMAN:  On behalf of Mr. Householder, may I

21   be heard?

22           THE COURT:  Yes.

23           MR. GLICKMAN:  We join in the objection.  And,

24   further, if the Court is going to admit some of this

25   evidence, we ask for a limiting instruction that it has

1    nothing to do with Mr. Householder, he had nothing to do

2    with the website.  I remind the Court that we would ask to

3    separate the two cases with limiting instruction that this

4    should not be construed in any way regarding

5    Mr. Householder.

6              THE COURT:  On that issue?

7              MS. GAFFNEY-PAINTER:  The government would have no

8    objection to a limiting instruction and in no way intends to

9    argue that Mr. Householder had anything to do with the

10   website or the posting of this personal information.

11             THE COURT:  Last word.

12             MR. LONG:  Thank you, Your Honor.  Your Honor, I

13   didn't -- what I referenced in opening was specific to what

14   was on the recordings, so I didn't open the door in any

15   fashion to what the government is alleging here.  And

16   moreover, I don't believe there's anything overtly

17   threatening about what was posted, but again, preserving my

18   objection.

19             THE COURT:  Very well.  Let me confer with my law

20   clerk outside your presence, please.

21        (Pause.)

22             THE COURT:  May I see counsel, please?  I have no

23   idea what's on the websites.  I'd like to read the two Sixth

24   Circuit cases and I'd like to know by a proffer what the

25   government intends to establish from the website.  I'll read

1    the case law and see what they say about the specificity of

2    threats.  It's 12:15, I'd be inclined to take a lunch break.

3    What do you make of that?

4            MR. LONG:  Your Honor, I think that's a great plan.

5            THE COURT:  Is the government able to be

6    responsive?

7            MS. GAFFNEY-PAINTER:  No objection to the lunch

8    break, and, yes, able to be responsive.

9            THE COURT:  So I want you to e-mail the cases to my

10   law clerk and a copy to adverse counsel, and proffer what

11   you're going to pull off the website that you believe is a

12   threat.  I'll then evaluate the facts and the law and rule.

13   So it's time for lunch.  Let's break.

14   **SIDEBAR CONCLUDED.**

15           THE COURT:  Members of the Jury, guess what?  It's

16   lunch time.  Break until shortly after 1:30.  During the

17   break, take a break and have a decent lunch.  Don't discuss

18   the case among yourselves or with anyone else.  No

19   independent research.  No checking out the media.  Continue

20   to keep an open mind until you've heard all of the evidence.

21   We'll stand in recess for lunch, and out of respect for you,

22   we'll rise as you leave.

23           THE DEPUTY:  All rise for the jury.

24       (Jury exited the courtroom at 12:19 p.m.)

25           THE COURT:  Jury has left the courtroom for the

1    lunch break.  As always, we'll wait in the courtroom until
2    we're advised that they have cleared the floor.  Then we'll
3    break until 1:35.  The witness is advised again that you're
4    not to discuss your testimony during the break and you
5    understand?
6              THE WITNESS:  Yes.
7              THE COURT:  Thank you.  All right.  As soon as we
8    get the word, we will break for lunch.
9              MR. SCHNEIDER:  What time did you say, Judge?
10             THE COURT:  1:35.
11             MR. SCHNEIDER:  Okay.  Thank you.
12             THE DEPUTY:  All clear, Judge.
13             THE COURT:  All clear.  We're in recess.
14             THE DEPUTY:  All rise.  This court is in recess.
15        (Recess taken from 12:20 p.m. to 1:36 p.m.)
16             THE DEPUTY:  All rise.  This court is in session
17   pursuant to the recess.
18             THE COURT:  Thank you.  Please be seated.  I need
19   to talk to the lawyers.  I would ask that the witness step
20   down off of the witness stand, head back to the witness
21   room, and we'll call you momentarily.  Thank you for your
22   understanding.
23   (Witness left the room.)
24             THE COURT:  What's up?  Put the gentleman in my
25   chambers, Ms. Frankian.

TYLER FEHRMAN - DIRECT EXAM

19-3002

1      Close the door, please.

2      Okay.  Over the lunch break, I've reviewed the case law

3  that was presented and considered the circumstances of

4  Defendant Borges' post-indictment conduct with regard to

5  this witness.  Case law states in sum that evidence of a

6  threat speaks to consciousness of guilt and that the trial

7  court is in the best position to determine whether something

8  is a threat.  Moreover, the Court can allow the evidence to

9  come in even if it's uncertain as to whether the threat

10  actually occurred.

11      Here, Mr. Borges received an employment file from the

12  Franklin County Auditor, that file was not redacted in the

13  first instance.  That was Franklin County's error.

14  Mr. Borges claimed he didn't realize the documents contained

15  personal information when he posted them.  He took them down

16  immediately.  Subsequently, he even agreed to modification

17  of his bond.  That said, this Court issued an order

18  modifying defendant's bond and expressed skepticism that the

19  disclosure was inadvertent.  Frankly, I think Mr. Borges

20  knew what he was doing, but the issue is, I'm not convinced

21  that it was intended to be a threat so much so as it was

22  just Mr. Borges lashing out.  I would note that the website

23  on which Mr. Borges posted this information also contains

24  elaborate statements saying that Mr. Fehrman and the

25  prosecutors are liars, that seems to be more like an act of

1    anger than an actual threat.  It's a close call.  I could

2    let the evidence in.  Frankly, if I did that, I'd also have

3    to let in Mr. Borges' entire explanation, that it was

4    Franklin County's fault, and he claims he didn't see the

5    personal information, that he rectified the situation and

6    agreed never to post again.  In that regard, and the rest of

7    the website contains numerous references to Mr. Fehrman

8    being a liar, according to Mr. Borges.

9         So on balance, I do not believe that the probative

10   value outweighs the risk of unfair prejudice and confusing

11   the jury, and I sustain the objection lodged against the

12   government.  The Court has ruled.  The government

13   understands?

14              MS. GAFFNEY-PAINTER:  Yes, Your Honor.

15              THE COURT:  Defense as well?

16              MR. LONG:  Yes, Your Honor.

17              MR. GLICKMAN:  Of course, Judge.

18              THE COURT:  Very well.  Are we ready for the jury

19   from the government's sense?

20              MS. GAFFNEY-PAINTER:  Yes, Your Honor.

21              THE COURT:  From Mr. Borges' sense?

22              MR. SCHNEIDER:  Yes, Your Honor.

23              THE COURT:  Mr. Householder's?

24              MR. GLICKMAN:  Yes.

25              THE COURT:  You can bring in the witness too.

1      (Pause.)

2      (Witness took the stand.)

3          THE DEPUTY:  All rise for the jury.

4          (Jury entered the courtroom.)

5          THE COURT:  You may all be seated.  Thank you.

6      That's a drum roll.  The jury is back.  Thank you for your

7      close attention.  We will continue to hear testimony.

8      Witness is on the stand and still under oath.  Does the

9      government wish to inquire?

10         MS. GAFFNEY-PAINTER:  Yes, thank you, Your Honor.

11     May I approach the podium?

12         THE COURT:  Yes, thank you.

13         MS. GAFFNEY-PAINTER:  Good afternoon, Mr. Fehrman.

14         THE WITNESS:  Afternoon.

15     **Q**    Before lunch, we were talking about the

16     signature-gathering that you were overseeing on behalf of

17     Advanced Micro Targeting during that referendum period and

18     there was some discussion of blockers or being followed.

19     Can you describe for the jury how those efforts affected

20     your work day to day?

21     **A**    Yes.  It made everything exponentially more difficult

22     in gathering signatures from my end as the manager, it meant

23     trying to keep a close watch on a very large team of folks

24     that I had in the field, to make sure they were all right,

25     to make sure they were safe.  There were several instances

1    where there were physical altercations between --

2        MR. GLICKMAN:  Objection, Judge, to the extent this

3    is hearsay.

4        THE COURT:  Rephrase.

5    **Q**   Mr. Fehrman, if you can speak to us about what you

6    personally observed or personally witnessed and not

7    necessarily what others told you happened.

8    **A**     Yes.  I had to speak with the Columbus Police

9    Department on one occasion because one of my

10   signature-gatherers was physically assaulted by another

11   individual who was a blocker.  Having to try and maintain

12   morale with a team that is, you know, working 15-plus hours

13   a day, seven days a week and were being regularly followed,

14   harassed, yelled at, their work was being impeded, which

15   affected in turn their numbers that they were bringing back

16   at the end of the day.  When you're working on initiative

17   that is almost solely based on success found in numbers, it

18   made everything much, much more difficult.  I have worked on

19   quite a few campaigns, whether it's candidates or ballot

20   issues, and had never experienced anything like this.  It

21   was a different type of opposition.

22       At one point, we had folks circulating a fake petition

23   trying to confuse the folks that we were approaching for

24   signatures.  On one occasion, one of our employees actually

25   was my mother, I hired her to come and gather signatures for

1    us, and received a phone call from her that she was at a

2    public library in Columbus.

3            THE COURT:  Interrupt and make sure we don't hear

4    hearsay.

5            THE WITNESS:  Was on a -- called me to ask if I

6    would come to where she is located because she was being

7    yelled at.  I arrived.

8            MR. GLICKMAN:  Objection, Judge.

9            THE COURT:  Sustained.  Ask your question of the

10   witness that does not call for hearsay.

11   **Q**    Can you tell us, Mr. Fehrman, what happened after you

12   arrived, what you saw?

13   **A**    Yes.  When I arrived, she had three people surrounding

14   her outside of the public library trying to talk over her

15   and tell people not to sign her petition.  I instructed her

16   to go inside the library and use the restroom or go away for

17   a minute.  Those individuals began to leave.  They got into

18   their vehicle, but they sat and waited until she came

19   outside and got into her vehicle to leave.  My assumption

20   was that their intention was to follow her --

21           MR. GLICKMAN:  Objection, Judge.

22           THE COURT:  Strike the assumption.

23           THE WITNESS:  I positioned my vehicle in front of

24   their parking space so that they could not follow her.

25   There was another instance at the Dublin public library

```
 1    where I received a phone call from staff asking me to come

 2    because they were being yelled at.  I arrived to find one

 3    signature-gatherer surrounded by three blockers.  Those

 4    individuals were yelling, following my staff member around

 5    to the public pavilion outside of the library.  They didn't

 6    know who I was.  I approached and asked what they were

 7    doing, and they began trying to tell me that this other

 8    individual, my team member, was passing a fake petition and

 9    all kinds of different things.  They realized who I was and

10    began taking pictures of me and then left.

11         Those were just two instances that I encountered.

12    There were many more where I was called to please come to a

13    site because my team members were being openly harassed and

14    their work was being impeded.

15    Q    Mr. Fehrman, you testified earlier that you considered

16    Mr. Borges to be a mentor and a friend.  These interactions

17    that you had with Mr. Borges that we talked about, what

18    effect did those interactions have on you?

19    A    After our initial conversation, I knew that we weren't

20    friends.  I made that determination on my own because I felt

21    as though someone I had trusted with information -- personal

22    information about myself and my professional and personal

23    struggles was using that information against me to try and

24    get something from me.  The further we got into these

25    conversations and meetings, the more that was cemented in my
```

1    mind that we were not friends and that I was -- he was

2    attempting to take advantage of me.

3            MS. GAFFNEY-PAINTER:  Your Honor, may I have a

4    moment to confer?

5            THE COURT:  Yes.

6            MS. GAFFNEY-PAINTER:  No further questions.  Thank

7    you.

8            THE COURT:  Very well.  On behalf of

9    Mr. Householder?

10           MR. GLICKMAN:  No questions, Judge.

11           THE COURT:  Very well.  On behalf of Mr. Borges?

12           MR. LONG:  Yes, Your Honor.  May I approach?

13           THE COURT:  Yes.

14           MR. LONG:  Thank you.

15        Good afternoon.

16           THE WITNESS:  Good afternoon.

17                      **CROSS-EXAMINATION**

18    **BY MR. LONG:**

19    **Q**    Ms. Painter just asked you about the impact this whole

20    situation had on your view of Matt Borges, right?

21    **A**    Correct.

22    **Q**    And you said you felt like he was trying to take

23    advantage of you, what he knew about your personal

24    situation, right?

25    **A**    Yes.

1  **Q**    I think you also testified that you felt he was using

2  knowledge of your personal circumstances as leverage against

3  you, fair to say?

4  **A**    Yes.

5  **Q**    And you felt that way before you went to the FBI,

6  right?

7  **A**    Yes.

8  **Q**    After that first meeting with Matt in early September

9  of 2019, you know, at that point, though, he was -- you

10  still considered him to be a friend and a mentor, right?

11  **A**    No.

12  **Q**    Okay.  Now, who was the friend that you mentioned on

13  direct that you met with before going to the FBI?

14  **A**    I didn't meet with anyone before going to the FBI, but

15  I made a phone call to a good friend.

16  **Q**    Who was the friend?

17  **A**    Mike Adery.

18  **Q**    And so the FBI, Agent Wetzel, asked you if you would

19  be willing to reach back out to Matt, right?

20  **A**    Yes.

21  **Q**    Okay.  Now, Agent Wetzel also set you up with the

22  ability to record your telephone calls with Matt, correct?

23  **A**    Yes, he did.

24  **Q**    And you had two calls on September 5th with Matt; do

25  you remember those?

1    **A**    Vaguely.

2    **Q**    Vaguely?

3    **A**    (Nodding head.)

4    **Q**    Do you recall?

5         MR. LONG:  Your Honor, could we publish to the

6    witness Government Exhibit 614 B?  It's a transcript of the

7    first call on September 5th, 2019.

8         THE COURT:  Yes.  Excuse me, Ms. Chin, will you

9    approach the law clerk, please.  Go ahead, Counsel.

10         MR. LONG:  Now, if we can go to page 2, please.

11   **Q**    If you can just read to yourself that -- that page, to

12   get re-familiarized with that conversation.

13   **A**    (Witness complies.)  Um-hmm.

14   **Q**    Do you recall that conversation?

15   **A**    Yes, I do.

16   **Q**    Okay.  You'd agree with me that it was you who brought

17   up having legal stuff involving your daughter that you

18   needed to take care of, right?

19   **A**    In this instance, yes, however, we had talked about it

20   at length in the past.  It was information he was well aware

21   of prior to this conversation.

22   **Q**    Well, during this conversation, Matt actually -- you

23   brought up having legal stuff you needed to take care of,

24   having financial needs, and Matt then asked you, well, can

25   you explain more of that, right; do you remember that?

1    **A**    I think he asked for more detail, however, again, it

2    was information that we had discussed at length in the past

3    on multiple occasions.

4         MR. LONG:  Go to page 4, please.

5    **Q**    You see in the middle of the page it says:  Borges,

6    what happened with your lawyer, what's going on; do you see

7    that?

8    **A**    I do.

9    **Q**    And so at that point, you see toward the bottom where

10   you say:  You know, I got screwed big time.  You see that?

11   **A**    Um-hmm.

12   **Q**    And then over the next, the rest of that page, the

13   whole next page, and onto the top of page 6, you launch into

14   a lot of detail about what's going on with your legal

15   situation and your financial needs, correct?

16   **A**    Um-hmm, yes.

17   **Q**    Now, when you had met with Agent Wetzel prior to that

18   meeting, had you discussed sharing those kinds of details in

19   your conversations with Agent Wetzel, was that part of the

20   strategy with Matt?

21   **A**    I'm sorry, can you clarify?

22   **Q**    Yeah.  It may have been a bad question.  I'll ask it

23   another way.

24        Whose idea was it for you to provide such great detail

25   about all of your life challenges to Matt when you called

1   him?

2   **A**    I don't know that it was anyone's idea.  It was my

3   personal choice to discuss things that Matt and I had

4   discussed in the past in detail.

5   **Q**    And you felt that that would make you more sympathetic

6   to Matt, right, by sharing all of those details?

7   **A**    I felt that it -- we had discussed, again, in the past

8   my general circumstance related to child support arrears

9   related to a messy divorce.  I had never probably given him

10  detail on the wealthy family that funded my ex-wife's

11  divorce and all of that, and now that we were having deeper

12  conversations about this, it was information that I shared

13  in greater detail.

14  **Q**    You describe yourself as being close friends with Matt

15  at least prior to this, right?

16  **A**    Yes.

17  **Q**    So, you know, you knew Matt was married and had

18  children, right?

19  **A**    Um-hmm, yes.

20  **Q**    You knew he had a daughter?

21  **A**    Yes.

22  **Q**    You knew that his wife had gone through her own messy

23  divorce kind of like yours, right?

24          THE COURT:  Is there an objection?

25          MS. GAFFNEY-PAINTER:  Yes, Your Honor.  Objection,

1    relevance.

2            THE COURT:  Is this relevant?

3            MR. LONG:  Your Honor, it goes to kind of motive.

4            THE COURT:  I'll give you a little latitude, but

5    I'm not overwhelmed by the relevance.  The objection is

6    overruled at the time.  What was the question?

7            MR. LONG:  I'll move on.

8            THE COURT:  Very well.

9            MR. LONG:  So you can take that down, please.

10   Thank you.

11   **Q**    Ms. Painter asked you and showed you a copy of your

12   employment contract with AMT, right?

13   **A**    Yes.

14   **Q**    And played a call earlier on direct from September 5th

15   where Matt wanted to know if you had an employment contract,

16   right?

17   **A**    Yes.

18   **Q**    And you told him you did?

19   **A**    I did.

20   **Q**    And he wanted to know, do you have a nondisclosure

21   agreement, right?

22   **A**    Yes.

23   **Q**    And you told him you didn't sign anything specific

24   like that; do you recall that?

25   **A**    I said that I wasn't aware whether or not I had an

1    NDA.  I believe that was in the call.

2    **Q**    But your employment contract did have a nondisclosure

3    agreement, right?

4    **A**    It ended up that it did, yes.  Because I am not an

5    attorney, I probably did not read through that with a

6    fine-tooth comb the way that an attorney would.

7          MR. LONG:  Could we bring up Government Exhibit 624

8    B, Your Honor?  It has already been admitted.

9          THE COURT:  Yes.

10         MR. LONG:  Ask that it be published.

11         THE COURT:  Yes, publish it.

12         MR. LONG:  Go to page 4, please.

13   **Q**    Do you see in bold Section 9, confidential

14   information?

15   **A**    I do.

16   **Q**    As a lay person looking at what's in bold there, does

17   it seem to be a nondisclosure agreement, what's to be kept

18   confidential?

19   **A**    It would appear so, yes.

20   **Q**    You see about the middle of the page:  The

21   confidential information will not include information that,

22   and then there's a list; do you see that?

23   **A**    I do see that.

24   **Q**    Can you read B?

25   **A**    B:  Is now or subsequently becomes generally available

1    to the public through no wrongful act of the employee.

2    **Q**    But you hadn't read that prior to having this

3    conversation with Matt?

4    **A**    If there was -- one of the many things I learned from

5    this situation was that I should probably look at employment

6    contracts a little closer.

7    **Q**    So you hadn't read that before you had the

8    conversation with Matt?

9    **A**    No.  I was excited to accept a job and sign a

10   contract.

11   **Q**    Well, Matt then followed up on that call, same day,

12   again asking for a copy of your employment contract; do you

13   remember?

14   **A**    Yes.

15   **Q**    And he texted:  Make sure you didn't sign an NDA; do

16   you recall that?

17   **A**    I do recall that.

18   **Q**    Do you recall again texting Matt this time and telling

19   him:  I don't recall signing an NDA, checking on that too?

20   **A**    Yes.

21   **Q**    Did you check on it at that point?

22   **A**    I believe so.

23   **Q**    So at that point, you had read Section 9, confidential

24   information?

25   **A**    No.  I -- being almost four years ago, I cannot recall

1    whether or not I sat down and read my employment contract in

2    great detail.  He asked for a copy.  I told him I would send

3    him a copy.

4    **Q**    Well, he also asked:  Make sure you didn't sign an

5    NDA.

6           THE COURT:  What's the question?

7    **Q**    Correct?

8    **A**    Yes.

9    **Q**    You texted him again:  Just e-mailed you my contract.

10   Went through it, didn't see -- don't see an NDA.  Do you

11   recall that text?

12   **A**    I recall.

13   **Q**    That wasn't true, was it?

14   **A**    Again, at this point, I do not recall whether or not I

15   had gone through that employment contract at length.

16   **Q**    Well, this was a topic that was brought up several

17   times during these conversations with Matt, right, your NDA?

18   **A**    Yes.

19   **Q**    And Matt had told you he did not want you to violate

20   your NDA, right?

21   **A**    He stated that during one of our conversations, yes.

22   **Q**    Actually stated on that second call on September 5th:

23   If you can be bought out and you can and you have a

24   nondisclosure that you would not violate; do you recall

25   that?

TYLER FEHRMAN - CROSS-EXAM                    19-3017

1    **A**    I do.

2    **Q**    He also told you he did not want you to violate your

3    noncompete, correct?

4    **A**    I believe so.

5    **Q**    Were you aware that your employment contract had a

6    noncompete?

7    **A**    At the time, probably not.

8    **Q**    And during one of the meetings, Matt told you,

9    essentially, the best thing would probably be if you just go

10   ahead and take that OEC job, right?

11   **A**    Yes, he did state that.

12   **Q**    All right. And part of the reason was, he said:

13   Because taking another opportunity would be better than

14   going to work for a competitor, right?

15   **A**    I believe so. I believe that was also right around

16   the time he told me that the noncompete and NDA would be

17   completely unenforceable and that no judge would hold the

18   company to it.

19   **Q**    Well, he said the noncompete was unenforceable, right?

20   **A**    I believe so.

21   **Q**    Okay. He didn't reference in that part of the

22   conversation the nondisclosure agreement, he was talking

23   about the noncompete, right, that that was unenforceable?

24   **A**    I believe so, yes.

25   **Q**    Okay. When he said, you know, not going to work for a

1    competitor, was it your understanding that working for a

2    competitor meant, you know, buying out your contract and you

3    coming to work for him?

4    **A**    I -- at this point, I'm not sure what I understood

5    that to mean.

6    **Q**    Well, you talked about various options, right, with

7    Matt?

8    **A**    Yes.

9    **Q**    Okay.  One of which would be you'd go work for OEC,

10   leave your job, he'd hire you as a consultant, get some

11   information out of you, that was one option, right?

12   **A**    I believe so.

13   **Q**    Okay.  Another option was buy out your contract, you

14   come work for him and deal with the consequences of

15   potentially violating your noncompete agreement, right?

16   **A**    I believe so.  I don't know that we got that specific.

17   I haven't necessarily memorized the recordings, but if

18   that's what's in the recordings, then, that would be

19   accurate.

20   **Q**    Well, we listened to the recording from the

21   September 10th meeting where that was discussed?

22   **A**    Um-hmm.

23   **Q**    We listened to that recording today, didn't we?

24   **A**    We did.

25   **Q**    Okay.  You recall after that September 10th meeting,

1    you had a meeting set up where you were planning to meet

2    with Matt and it got canceled, right?

3    **A**    Yes.

4    **Q**    Okay.  And then on September 12th, Matt texted you:

5    We also need to take a different approach, want to hire you

6    to consult on an unrelated project; do you remember that?

7    **A**    I do.

8    **Q**    And then he texted you again on the following day:

9    Let's do a three-month agreement to work on political

10   projects; do you recall that text?

11   **A**    I do.

12   **Q**    Now, during the subsequent meeting on the 13th of

13   September, Matt talked to you about putting together a

14   Kasich reunion for Judy French; do you remember that?

15   **A**    Yes.

16   **Q**    And you testified on direct that that didn't make any

17   sense to you, right?

18   **A**    Yes.

19   **Q**    Well, but you were aware being in Ohio politics since

20   2008 and even being involved in John Kasich's campaigns,

21   that Governor Kasich had actually appointed Judy French to

22   the Ohio Supreme Court in 2013, right?

23   **A**    Yes.

24   **Q**    Okay.  And so you were aware that now, you know,

25   Former Governor Kasich, in 2019, former governor, right,

1    Kasich was not the governor in 2019?

2    **A**    Correct.

3    **Q**    But he had a political relationship with Judy French,

4    right?

5    **A**    I am aware that they knew each other.  I am not aware

6    of the details of their relationship.

7    **Q**    You knew he had appointed her to the Supreme Court,

8    that's a pretty big deal, isn't it?

9    **A**    Yes.

10   **Q**    Okay.  But it would make no sense that political

11   allies would get together for a fundraiser?

12   **A**    I watched Matt Borges and Larry Householder get

13   together for fundraisers knowing they greatly disliked each

14   other.  So no, that does not necessarily mean that they were

15   political allies or had a good relationship.

16   **Q**    But that didn't make any sense to you, right?

17   **A**    It did not, that a governor would want a staff reunion

18   with a Supreme Court justice and/or her staff, that did not

19   make sense to me.

20   **Q**    You recall giving an interview to Jeremy Pelzer at

21   cleveland.com in 2020?

22   **A**    I do.

23   **Q**    And Mr. Pelzer actually published an article based on

24   that conversation with you, right?

25   **A**    He did.

1    **Q**    That was:  Meet the man who helped the FBI expose Ohio

2    House Speaker Larry Householder and so forth, right?

3    **A**    I believe so.

4    **Q**    Had your picture published in the article?

5    **A**    Yes.

6    **Q**    Do you recall telling Mr. Pelzer, quote, I was hoping

7    my phone would ring and he'd go, quote, hey, now we can

8    start on the staff reunion, Fehrman said.  Do you recall

9    telling him that?

10   **A**    I do.

11   **Q**    Fair to say that when you talked to Jeremy Pelzer with

12   cleveland.com, you were conveying that you thought that

13   there really was going to be a staff reunion project that

14   you were going to work on, right?

15   **A**    Absolutely not.

16   **Q**    So he got it wrong?

17   **A**    No.  I was trying to convey to Jeremy that every day

18   on that campaign, I hoped I would get a phone call that

19   there was some form of legitimate work and I was not just

20   being asked to sell my team down the river for information

21   to sink a campaign.

22   **Q**    You specifically said:  "Hoping he would say now we

23   can start on the staff reunion"?

24   **A**    Because that is how Matt had framed the other work

25   that he claimed would take place.

TYLER FEHRMAN - CROSS-EXAM

19-3022

1    **Q**    Remember on the -- during the meeting on September

2    13th, one of the things Matt said was:  I don't want you to

3    do that other shit, I just don't care about it, right?

4    **A**    Yes, I do.

5    **Q**    And then you volunteered:  You know, I can still pull

6    the statewide for you, if you're interested; do you recall

7    that?

8    **A**    I do.

9    **Q**    You volunteered that to him, didn't you?

10   **A**    At that meeting, yes.  He did however reach out

11   multiple times afterwards requesting specific information

12   about inside details of the campaign.

13   **Q**    Well, let's talk about those multiple times.  So after

14   September 13th, you characterize multiple times, right?

15   **A**    Yes.

16   **Q**    And we listened to a call from September 19th, 2019,

17   it was Government Exhibit 618 B, where Matt asked you:  Do

18   you know a number?  Do you recall that?

19   **A**    Yes.

20   **Q**    So we'll count, that's one, right?

21   **A**    Yes.

22   **Q**    Then, on September 20th, he texted you:  We were told

23   you guys had 120,000 signatures, any idea if that's right?

24   Do you recall that?

25   **A**    Yes, I do.

19-3023

1    **Q**    So that's two, right?

2    **A**    Yes.

3    **Q**    And then on September 27th, 2019, he texted you:  Any

4    idea how many total signatures you guys have?  We were told

5    80,000 today; do you recall that one?

6    **A**    Yes.

7    **Q**    And then on October 2nd, he just asked:  Do you think

8    you're going to make it, right?

9    **A**    Yes.

10   **Q**    Okay.  And then in a call or two in October, he asked

11   again:  Do you think you're going to make it, right?

12   **A**    I believe so.

13   **Q**    Okay.  But there's three times when he actually asks

14   if you can either provide a number or confirm something that

15   he heard, right?

16   **A**    You just listed three specific instances, yes.

17   **Q**    Well, during your direct examination, did Ms. Painter

18   bring up any that I missed?

19   **A**    I don't believe so.

20   **Q**    Okay.  Now, each time, each of those three times after

21   September 13th, you evaded answering, giving him a specific

22   answer, right?

23   **A**    Yes.

24   **Q**    You kind of came up with excuses about meetings

25   rearranged and stuff like that, right?

1    **A**    Yes.

2    **Q**    And, you know, Matt's reaction was typically "okay,"

3    right?

4    **A**    I don't know what his -- I don't know what he was

5    thinking regarding my answers, but at face value, yes.

6         MR. LONG:  Well, can we bring up Government

7    Exhibit 622 Q, Your Honor?  It's already been admitted and

8    we would ask that it be published?

9         THE COURT:  Yes.

10   **Q**    Do you see this is the text where Matt asked -- told

11   you guys had 120,000 signatures, any idea if that's right?

12   **A**    Yes.

13   **Q**    Do you see that?

14   **A**    I do.

15   **Q**    And then below that is kind of the, you know, excuse:

16   Crazy day, don't know any more information, that's

17   essentially what you conveyed?

18   **A**    Yes.

19   **Q**    He never followed up on that and said, you know, now

20   have you figured it out, right?

21   **A**    I don't recall.  I'd need to see more of the specific

22   conversation.

23        MR. LONG:  Can we go, Your Honor -- the exhibit

24   sequentially has already been admitted, so if we could go to

25   the next exhibit following 622 Q?

```
1              THE COURT:  Yes.

2              MR. LONG:  So the next one after that, please.

3    Q    So you see on the screen there is your:  "Sorry, crazy

4    day, all I've known so far was the regional total I gave

5    you"?

6    A    Yes.

7    Q    And that had been the answer you gave in the prior

8    text, right?

9    A    Yes.

10   Q    So this is a continuation of that threat, correct?

11   A    I believe so, yes.

12   Q    Okay.  And so this time he asks about the -- can you

13   confirm 80,000, right?

14   A    Yes.

15   Q    And you never confirmed that, did you?

16   A    I'm not sure what message came after this message.

17             MR. LONG:  Your Honor, these have consequentially

18   been admitted.  We would ask that the next consequentially

19   admitted Government Exhibit be published?

20             THE COURT:  Yes.

21             MR. LONG:  If you can bring up the next.

22   Q    You see your response to his question about the

23   80,000?

24   A    I do.

25             MR. LONG:  If we can go to the next, please.
```

TYLER FEHRMAN - CROSS-EXAM                                      19-3026

1    **Q**    That would be great, thanks, and then you sent him an

2    emoji?

3    **A**    Um-hmm, yes.

4    **Q**    After that September 13th meeting --

5          MR. LONG:  And you can take that down.

6    **Q**    After that September 13th meeting, that check, that

7    $15,000 check was only brought up one time, right?

8    **A**    I don't recall --

9    **Q**    Well, you recall --

10   **A**    -- whether other instances it was brought up.

11   **Q**    You recall listening to a call earlier today where you

12   brought up:  Hey, by the way, do you know what happens when

13   you deposit a $15,000 check into your account?

14   **A**    Oh, yes.

15   **Q**    Okay.  Do you agree with me that that check never came

16   up again after that, did it?

17   **A**    I am unsure whether or not it came up again.  I

18   genuinely do not at this point recall if we discussed it

19   again after that.

20   **Q**    Well, in none of the recordings or text messages that

21   Ms. Painter went over with you today did that check ever

22   come up again, did it?

23   **A**    Again, I do not recall.  I have heard the recordings.

24   I have not memorized them.

25   **Q**    Listening to the things you listened to today, it only

1    came up the one time when you brought it up, right?

2    **A**    From what I heard today.

3    **Q**    Yes.

4    **A**    I heard it mentioned one time today.

5    **Q**    And you also said on direct that Matt had helped you

6    in the past, right?  You guys did have a history of him

7    helping you?

8    **A**    Of working together, yes.

9    **Q**    And that included, I think you testified in December

10   of '18, January of '19, he paid you to work on some

11   projects, right?

12   **A**    Yes.

13   **Q**    And you recall that he paid you in December like

14   $2,000 by check, right?

15   **A**    I can't recall at this point how much it was.  That

16   sounds accurate.

17   **Q**    Okay.  And in January of '19, he paid you 1750 to work

18   on another project, right?

19   **A**    I, again, cannot recall the exact amount, but that

20   doesn't sound out of the range of what it would have been.

21   **Q**    And he had actually helped lobby the Kasich

22   administration for you to get that job at DPS, right?

23   **A**    No.

24   **Q**    No?

25   **A**    The Kasich administration was long gone at that point.

TYLER FEHRMAN - CROSS-EXAM                          19-3028

1    **Q**    Would the Kasich administration be in the final days

2    in January of 2019?

3    **A**    Yes, actually, I began the job at the end of

4    December -- no, I began the job in January of 2019.

5    **Q**    Okay.  But you were hired by the Kasich

6    administration?

7    **A**    No.  I believe I was hired by the DeWine

8    administration.

9    **Q**    And you said you left that job at DPS in June of '19?

10   **A**    Yes.

11   **Q**    You didn't leave that job; you were forced to resign,

12   right?

13   **A**    I signed a resignation letter vacating my position.

14   **Q**    Now, on direct you mentioned Doug Price; do you recall

15   that?

16   **A**    Yes.

17   **Q**    And who was Doug Price?

18   **A**    Doug Price is the now former chairman of the Franklin

19   County Republican Party.

20   **Q**    Was he somebody that you also looked to as a mentor?

21   **A**    Yes.

22   **Q**    And you went to Doug in the spring of 2020 and asked

23   him to help you get a job at Roetzel, didn't you?

24   **A**    I don't recall.

25   **Q**    You recall trying to get a job with Roetzel & Andress?

1    **A**    I'm sorry, will you repeat when I supposedly went to

2    Doug?

3    **Q**    In early 2020.

4    **A**    In early 2020, I was working for Clean Fuels Ohio, had

5    just begun, so that does not seem accurate to me.

6    **Q**    So did you -- were you trying to get a job at Roetzel

7    at some other date?

8    **A**    I believe I applied for a position at Roetzel at some

9    point, but I don't recall when that would have been.

10   **Q**    Well, would it have been after 2019?

11   **A**    Oh, it definitely would have been after, after October

12   of 2019.

13   **Q**    Okay.  And that was the law firm that we heard that

14   Matt Borges worked at in 2019, right?

15   **A**    Yes.

16   **Q**    And you applied for a job there as well, correct?

17   **A**    I believe so.

18   **Q**    Now, you're aware that he, beginning in 2020, Matt had

19   opened his own consulting firm, right?

20   **A**    Yes.

21   **Q**    And that was 17 Consulting, was the name of that; do

22   you recall?

23   **A**    I don't recall the name.

24   **Q**    But you recall that he did open his own consulting

25   firm?

1    **A**    Yes, I do.

2    **Q**    Okay.  And were you aware of who his partners were?

3    **A**    I vaguely remember.  I know one specifically, Matt,

4    yes.

5    **Q**    Now, Doug Price, one of your mentors, somebody that

6    you went to for help, you also provided information on him

7    to the FBI, didn't you?

8             MS. GAFFNEY-PAINTER:  Objection, Your Honor.

9             THE COURT:  What's the relevance?  Relevance?

10            MS. GAFFNEY-PAINTER:  Yes.

11            MR. LONG:  It's impeachment, Your Honor.

12            THE COURT:  What?

13            MR. LONG:  It's impeachment evidence, Your Honor.

14            THE COURT:  I'll give you a little latitude.

15   Overruled.

16            MR. LONG:  Thank you, Judge.

17   **Q**    You reported information on Doug Price to Agent Wetzel

18   on September 25th, 2019, right?

19   **A**    I recall discussing or Doug's name coming up as one of

20   the individuals who paid me when I worked in the primary

21   campaigns in 2018 and probably that I had had a conversation

22   with Doug prior to taking the House Bill 6 repeal position.

23   **Q**    And you provided info on Doug Price, your friend,

24   again on October 1st, 2019, right?

25   **A**    I don't recall discussing Doug Price.

19-3031

1    **Q**    You don't recall again providing information on your

2    friend and mentor, Doug Price, on March 9th, 2020?

3    **A**    I do not recall the times I discussed Doug Price with

4    the FBI.

5    **Q**    But he was somebody you brought up frequently, right?

6    **A**    It was a name that came up related to past work.

7    **Q**    When exactly did your official role as a confidential

8    human source with the FBI terminate?

9    **A**    I don't know when the formal termination date was.

10   **Q**    Well, would it have been around October of 2019?

11   **A**    It was probably after that.

12   **Q**    You texted with Agent Wetzel pretty frequently, right?

13   **A**    Yes.

14   **Q**    Even texted him that confidential human sources get

15   paid a lot more in Michigan than they do in Ohio; do you

16   remember that?

17   **A**    I believe so.

18        MR. LONG:  Okay.  Your Honor, I have no further

19   questions.

20        THE COURT:  Very well.  Redirect, if any, from the

21   government?

22        MS. GAFFNEY-PAINTER:  Just briefly, Your Honor.

23        THE COURT:  Very well.

24        MS. GAFFNEY-PAINTER:  May I approach?

25        THE COURT:  Yes.

1              **REDIRECT EXAMINATION**

2    **BY MS. GAFFNEY-PAINTER:**

3    **Q**    Mr. Fehrman, on cross-examination, you were asked

4    about a September 12th text from Mr. Borges about hiring you

5    to consult on an unrelated project; do you recall those

6    questions?

7    **A**    Yes.

8    **Q**    Did you ever do any work on any project for Mr. Borges

9    during this time?

10   **A**    No.

11   **Q**    You were asked a series of questions about a statement

12   you made hoping that you would receive a call to work on a

13   staff reunion; do you recall those questions?

14   **A**    Yes, I do.

15   **Q**    Can you explain why you were hoping to receive that

16   call?

17   **A**    Yes.  Matt's requests of me were shocking.  I felt,

18   again, like I was being taken advantage of by someone I

19   trusted.  And as silly as it might sound for someone who had

20   worked in politics and probably should have known better, I

21   didn't want to believe that a trusted friend and mentor

22   would actually put me in this position.  And so that comment

23   to Mr. Pelzer that was running the article was intended to

24   express that I really did hope that maybe there was a

25   strange Kasich/French reunion, as little sense as that made

1    to me and I'd get a phone call and there would actually be

2    other work from Matt that maybe there was something

3    legitimate that the money and the requests were intended

4    for.  That call never came.

5    **Q**    You were asked a series of questions about your

6    evasion from giving a specific number in response to

7    Mr. Borges' inquiries.  Why did you evade providing a

8    specific number to Mr. Borges?

9    **A**    I didn't want to give him information that would

10   betray my team.

11           MS. GAFFNEY-PAINTER:  No further questions, Your

12   Honor.

13           THE COURT:  Very well.  Recross on redirect, if

14   any?

15           MR. GLICKMAN:  No thank you.

16           MR. LONG:  Very briefly, Your Honor.

17           THE COURT:  Very well.

18                        **RECROSS-EXAMINATION**

19   **BY MR. LONG:**

20   **Q**    Ms. Painter just asked you about never getting a call

21   to work on that unrelated project, right?

22   **A**    Yes.

23   **Q**    But do you remember texting Agent Wetzel in late

24   October, November of 2019, that you found out why Matt

25   hadn't called you; do you remember texting him that?

1    **A**    No, I do not.

2    **Q**    You don't recall that at all?

3    **A**    It's been a long time.

4    **Q**    Okay.  So there wasn't -- that's fine.

5          MR. LONG:  No further questions, Your Honor.

6          THE COURT:  Very well.  You may step down, sir.

7    You're free to go.

8        (Witness left the stand.)

9          THE COURT:  Where do we stand from the government's

10   perspective?

11         MS. GLATFELTER:  Your Honor, we're finished

12   presenting witness testimony.  I believe there are --

13   there's at least one stipulation that needs to be read to

14   the jury before we would close our evidence.

15         THE COURT:  What stipulation?

16         MS. GLATFELTER:  Regarding the interstate commerce.

17         THE COURT:  Regarding?

18         MS. GLATFELTER:  I'm sorry, there's three.  I'll

19   let my colleague Mr. Singer address those since he handled

20   those.

21         MR. SINGER:  Your Honor, there are three

22   stipulations the parties have entered into.

23         THE COURT:  Yeah.  I sent you an e-mail about that,

24   right?

25         MR. SINGER:  Apologize, Your Honor, I have not seen

```
 1    it.

 2              THE COURT:  I'm sorry?

 3              MR. SINGER:  I apologize, Your Honor, I have not

 4    seen the e-mail.

 5              THE COURT:  Sent it during the testimony.  In any

 6    case, we'll deal with the stipulation; and if they have to

 7    be read at this time in the presence of the jury, I will.

 8    They will certainly go with the jury up for their

 9    consideration, and I can read the stipulations when they

10    return.  Subject to the stipulations being addressed, where

11    do we stand from the government's perspective,

12    Ms. Glatfelter?

13              MS. GLATFELTER:  The government would rest subject

14    to the admission of our stipulations.

15              THE COURT:  Very well.  Government has rested

16    subject to some stuff coming in.  So this is a natural break

17    point, but we're not breaking for the day, but I've got a

18    fair amount of work to do on this case outside your

19    presence.  So I'm going to break for 45 minutes, until 3:15.

20    I'm not down here sleeping.  We're not watching movies.

21    We're not eating candy.  We're working on the case and we

22    need you to go to your room -- forgive me -- and enjoy your

23    break.  At the break, don't discuss the case with anyone,

24    including among yourselves.  No independent research.  No

25    checking out the media.  Continue to keep an open mind.
```

```
1    You've heard the government's evidence.  We're not done.

2    Out of respect for you, we'll rise as you leave for

3    45 minutes.

4              THE DEPUTY:  All rise for the jury.

5         (Jury exited the courtroom at 2:27 p.m.)

6              THE COURT:  Jury has left the room.  You may all be

7    seated.  We remain on the record.  So the government has

8    rested subject to my addressing the stipulations, another

9    issue I need to address.  But here we are at 2:30 with a

10   45-minute break.  Where do we stand from the defense's

11   perspective, Mr. Householder's counsel?

12             MR. OLESKI:  Judge, at this time we're prepared to

13   present our evidence.  And at this time, we also would move

14   pursuant to Rule 29 of the Federal Rules of Criminal

15   Procedure for judgment of acquittal because the government

16   presented insufficient evidence for each element of the

17   offense charged.

18             THE COURT:  Are you prepared to make that motion at

19   this time?

20             MR. OLESKI:  I just -- I just made it, Judge.

21             THE COURT:  Do you want to argue it?

22             MR. OLESKI:  Unless the Court has questions, I

23   would prefer just to make a general motion at this time.

24             THE COURT:  All right.  Government wish to respond?

25             MR. SINGER:  Your Honor, I'm happy to answer any
```

1    questions.  We believe the evidence satisfies all of the

2    elements of the charge.  I'm happy to walk through how that

3    evidence satisfies each -- how the evidence satisfies each

4    of those elements.  The defense has not presented any

5    argument other than to rest on the fact that they filed,

6    that they're presenting the motion.  So unless the Court has

7    questions or concerns, I will sit down.

8         THE COURT:  Very well.  Does Mr. Borges wish to be

9    heard on the issue?

10        MR. LONG:  Your Honor, we, too, would make a motion

11   pursuant to Federal Rule 29 for a judgment of acquittal

12   based on insufficient evidence; but we don't see the need at

13   this point for further argument, but if there are questions,

14   we would be happy to answer them.

15        THE COURT:  Very well.  Can you provide me with

16   what I have prepared, please?

17        Both defendants have moved for acquittal or dismissal

18   pursuant to Rule 29.  Rule 29(a) states that, quote:

19        "After the government closes its evidence or after the

20   close of all of the evidence, the Court on the defendant's

21   motion must enter a judgment of acquittal of any offense for

22   which the evidence is insufficient to sustain a conviction."

23        The test for determining sufficiency of the evidence

24   is, quote, "whether, viewing the evidence in the light most

25   favorable to the prosecution, any rational trier of fact

1   could find the essential elements of the crime beyond a

2   reasonable doubt." *Jackson versus Virginia*, United States

3   Supreme Court.

4       When resolving a Rule 29 motion, the Court may not make

5   determinations regarding the credibility of witnesses or the

6   weight of such evidence.  *United States versus Davis*, Sixth

7   Circuit.  Further, the Court -- the government must be given

8   the benefit of all reasonable inferences drawn from the

9   evidence, and the Court must resolve any conflicts in the

10  testimony in favor of the prosecution.  *United States versus*

11  *Tilton*, Sixth Circuit.

12      Here, viewing the light -- viewing the evidence in the

13  light most favorable to the prosecution, the Court finds

14  that the government has presented sufficient evidence to

15  sustain a conviction.  That is, after viewing the evidence

16  in the light most favorable to the prosecution, a rational

17  trier of fact could find the essential elements of the crime

18  beyond a reasonable doubt as to each defendant.

19  Accordingly, the Rule 29 motion is denied.

20      Could I see the co-conspirator statement we've

21  prepared?

22      I wish to rule finally on co-conspirator statements.

23  Pursuant to Rule 801(d)(2)(E), a statement is not hearsay

24  if, quote:  "The statement is offered against an opposing

25  party and was made by the party's co-conspirator during and

1    in furtherance of the conspiracy," end quote.

2        Alleged co-conspirator statements may be admitted into

3    evidence, quote:  "If the Court finds by a preponderance of

4    the evidence:  1, that a conspiracy existed; 2, that the

5    defendant was a member of the conspiracy; and, 3, that the

6    co-conspirator statements were made in the course of and in

7    furtherance of the conspiracy," end quote.  *United States*

8    *versus Presley*, Sixth Circuit.  In line with Sixth Circuit

9    practice and case law, this Court conditionally admitted the

10   statements of alleged co-conspirators subject to defendants'

11   continuing objection and conditioned upon the government

12   meeting its burden during its case-in-chief.  See

13   Document 161.

14       Now that the government has rested, the Court must rule

15   on admission of the statements.  *United States versus*

16   *Barrett*, Sixth Circuit.  In making this determination, the

17   Court considers the statements themselves, but those

18   statements must also be corroborated by independent

19   evidence.  Rule of Evidence 801(d)(2)(E), *United States*

20   *versus Payne*, Sixth Circuit.

21       And, here, the Court finds that the government has met

22   its burden by a preponderance of the evidence, as supported

23   by corroborating evidence and testimony that:  1, there was

24   a conspiracy; 2, defendants were members of that conspiracy;

25   and, 3, the challenged statements were made in furtherance

1    of the conspiracy.

2        Specifically, the Court considered:

3        The statements themselves.  Evidence of the

4    relationships between the alleged co-conspirators.  Evidence

5    of common goals among co-conspirators and the organizations

6    used to further those goals collectively, all constituting

7    the alleged enterprise.  Evidence of actions taken

8    demonstrating the fulfillment of acts in furtherance of the

9    goals of the alleged conspiracy.  Evidence of in-person

10   meetings as well as e-mail, text and telephone

11   communications between the alleged co-conspirators,

12   including defendants, as well as communications with support

13   staff and colleagues.  Evidence of campaign contributions,

14   including the timing and amounts of those contributions, as

15   well as evidence of how the alleged co-conspirators,

16   including defendants, used those funds.  The structure and

17   set-up of the various entities used to collect contributions

18   and make payments in furtherance of the goals of the alleged

19   conspiracy.  And evidence of attempted concealment of

20   communications and conduct.

21       Accordingly, the co-conspirator statements are

22   admissible pursuant to Rule 801(d)(2)(E) and defendants'

23   continuing objection is overruled.

24       I was required to deal with Rule 29 and the

25   co-conspirator statements at this stage, and I have done so.

```
 1    I'd ask that one attorney for each party touch base with my
 2    law clerk on the issue of the stipulations.
 3        And I'm prepared to break and reconvene soon.  Is there
 4    anything you need to address before I recess for a while,
 5    from the government's perspective?
 6             MS. GLATFELTER:  No, Your Honor.  Thank you.
 7             THE COURT:  From Mr. Householder's?
 8             MR. OLESKI:  No, thank you, Judge.
 9             THE COURT:  From Mr. Borges'?
10             MR. SCHNEIDER:  No, thank you, Judge.
11             THE COURT:  How long are we going to break for?
12             MS. FRANKIAN:  You said 45 minutes.
13             MR. LONG:  Your Honor, I believe it was
14    approximately 2:25 when the government rested and the jury
15    was excused.
16             THE COURT:  Well, I'm going to try and get them
17    down here, if we can, by 3.  Is that acceptable or do we
18    need the full break?
19             MS. FRANKIAN:  Rebecca says I think we told them
20    3:15.
21             THE COURT:  We'll break until 3:15.  During the
22    break, take a break.  We're in recess until that time.
23             THE DEPUTY:  All rise.  This court is in recess.
24        (Recess taken from 2:37 p.m. to 3:13 p.m.)
25             THE DEPUTY:  All rise.  This court is in session
```

1        pursuant to the recess.

2                THE COURT:  Thank you.  Please be seated.  Back on

3        the record outside the presence of the jury.  I need to make

4        a statement.  At the beginning of the break, when counsel

5        for the government and the defendants met with my law clerk,

6        the government noted its intent to raise a couple of

7        objections in anticipation of Mr. Seitz' upcoming testimony

8        momentarily.  I'll summarize the objections, get a

9        seat-of-the-pants reaction.  If you wish to be heard

10       further, I'll give you that opportunity.

11            First, the government stated that it would object to

12       Mr. Seitz testifying to anything Mr. Householder told him.

13       Assuming, of course, that it's not subject to any exception,

14       the parties' statements are hearsay unless they are authored

15       in the first instance by the opposing party.  So that

16       resolves that issue.

17            Second, the government would object to testimony

18       regarding the merits of House Bill 6.  This Judge has stated

19       in a number of my orders and pretrial rulings that the

20       merits of House Bill 6 are not relevant.  The fact that the

21       bill may have been good law or not is not a defense to the

22       charge of RICO conspiracy or to the predicate act.  That

23       being said, the government did introduce testimony that

24       undermined the merits of House Bill 6.

25            Now, to be fair, it did so in the context of testimony

1     regarding a witness' decision not to vote for it and the

2     repercussions of that decision.  However, the government

3     could have elicited, sited, that same testimony, not asking

4     for a detailed narrative disparaging the legislation.  For

5     instance, the government could have asked whether the

6     witness supported House Bill 6 or voted for House Bill 6 and

7     then simply asked what happened as a result.  But the

8     government specifically asked at least one witness that I

9     recall, why didn't you support House Bill 6, and in

10    response, the jury heard the negatives of the bill.

11         I think what's good for the goose is good for the

12    gander, so I'm inclined to allow the defense to ask that

13    same very limited question and then move on.  But I repeat

14    that the merits of House Bill 6 are not relevant, and if the

15    defense's witness decides to wax poetic about it or if you

16    elicit any further testimony about the merits, I will cut it

17    off, and if need be, I'll then give the jury a curative

18    instruction to explain that the merits are not relevant and

19    are not a defense.

20         So having said that, anybody -- does the government, in

21    the first instance, it's your objection, need to be heard

22    further given the Court's initial ruling?

23              MS. GLATFELTER:  Your Honor, thank you very much

24    for the preliminary ruling.  We understand that.  I would

25    just note for the record that, in addition to the merits of

1    House Bill 6, what had started with the cross-examination of

2    Agent Wetzel through almost every cross-examination in this

3    case has been the financial need and testimony in asking and

4    eliciting testimony about the state of emergency, what the

5    need of FirstEnergy was for this legislation, which is not

6    uncontroversial.

7         And so in addition to -- in addition to asking

8    witnesses directly about the merits, I think that those

9    types of questions do get into the merits, and so we have

10   been fighting this battle since the cross-examination of

11   Agent Wetzel, and I would just note for the record that

12   defense counsel objected to questions about the merits

13   during the witness' testimony, the legislator that the Court

14   has referred to, and those were sustained, is my

15   recollection.  But we will, of course, abide by the Court's

16   direction and so forth.  I understand it, Your Honor.

17        THE COURT:  All right.  Well, the direction of the

18   Court is that the defense will have an opportunity to ask

19   briefly about House Bill 6, pros and cons, the way the

20   government did, but it's not relevant, and I'm going to cut

21   it off and I'm going to give a curative instruction if it

22   proceeds.

23        Has the government been heard on the Court's initial

24   ruling?

25        MS. GLATFELTER:  Yes, Your Honor.  Thank you.

19-3045

```
1              THE COURT:  All right.  On behalf of
2    Mr. Householder, anything before we -- have you been heard
3    on my initial ruling?
4              MR. OLESKI:  We understand your ruling, Judge.  And
5    just to be clear, the question that I intend to ask
6    Mr. Seitz is simply, why did you vote yes for House Bill 6,
7    and that's it.
8              THE COURT:  Very well.  And you understand the
9    admonition that the statements of this witness as to what
10   Mr. Householder may or may not have said is hearsay and not
11   admissible?
12             MR. OLESKI:  Agreed that, in general, those
13   statements would be hearsay, unless there's some hearsay
14   exception that might apply, but yes, we agree.
15             THE COURT:  Very well.  Does counsel for Mr. Borges
16   need to be heard on this initial ruling before the witness
17   comes in?
18             MR. SCHNEIDER:  Nothing other than to say we agree
19   with the preliminary ruling.
20             THE COURT:  Very well.  We discussed with counsel
21   the stipulations and they're not going to be read at this
22   time.  They're going to be read at the time of the
23   instruction to the jury.  The government is amenable to that
24   approach; is that right?
25             MS. GLATFELTER:  Yes, Your Honor.  Thank you.
```

```
1              THE COURT:  Mr. Householder's counsel as well?

2              MR. OLESKI:  Yes, Judge.

3              THE COURT:  Mr. Borges' counsel as well?

4              MR. LONG:  Yes, Your Honor.

5              THE COURT:  All right.  We'll call for the jury.

6      If you need to communicate with your witness about the

7      Court's ruling, you'll have a chance before he comes into

8      the room.  If you don't, you're driving it, because you're

9      asking the questions.

10             MR. OLESKI:  Of course.  Thank you, Judge.  If I

11     could have a moment, then?

12             THE COURT:  Well, I'm going to call for the jury,

13     so jump on your moment.

14             MR. OLESKI:  Thank you, Judge.

15             THE COURT:  Very well.

16         (Pause.)

17             THE COURT:  Depending on the status of the jury,

18     I'd like to get that lawyer back in the room.

19             MR. GLICKMAN:  On my way.

20             THE COURT:  And the witness.

21             MR. GLICKMAN:  Sorry, Judge, did you say "and the

22     witness"?

23             THE COURT:  Yeah.  Just so we don't have to go

24     running out of the courtroom again.  Thank you.

25         (Pause.)
```

1    THE DEPUTY:  All rise for the jury.

2    (Jury entered the courtroom at 3:23 p.m.)

3    THE COURT:  You may all be seated.  Thank you.  14

4  Members of the Jury are back.  Thank you for your patience

5  and your close attention.  Government has rested.

6  Mr. Householder's team will begin to present testimony.

7    Where do we stand from Mr. Householder's perspective,

8  Counsel?

9    MR. OLESKI:  Thank you, Judge.  Larry Householder

10  calls Bill Seitz.

11    THE COURT:  If Mr. Seitz would be willing to

12  approach and follow the woman with red hair.  And,

13  Mr. Seitz, if you'd stop where you are, pivot and raise your

14  right hand for the oath to tell the truth.

15    (Witness took the stand and was sworn.)

16    THE COURT:  You can take the witness stand,

17  Mr. Seitz.  I tell everybody the chair tips back in spirit

18  of full disclosure.

19    THE WITNESS:  Thank you.

20    THE COURT:  Once you're settled and comfortable, we

21  need your mouth close to the fancy federal microphone.

22    On behalf of Mr. Householder, you may inquire.

23    MR. OLESKI:  Thank you, Judge.

24  Good afternoon, sir.

25    THE WITNESS:  Good afternoon.

WILLIAM SEITZ - DIRECT EXAM                    19-3048

```
1                         DIRECT EXAMINATION

2    BY MR. OLESKI:

3    Q     Would you please state and spell your name for the

4    record?

5    A     Yes.  It's William Seitz, S-E-I-T-Z.

6    Q     Are you are appearing here pursuant to a subpoena?

7    A     I am.

8    Q     Who issued that subpoena?

9    A     Your side, you did, Mr. Bradley maybe.

10   Q     Could you briefly explain your educational background?

11   A     Thank you.  Yes, I graduated from Western Hills High

12   School here in Cincinnati in 1972.  I then obtained my

13   undergraduate degree at the University of Cincinnati

14   graduating summa cum laude with honors in history.  I then

15   obtained my law degree at the University of Cincinnati, Law

16   School, where I finished first in my class and was on the

17   law review, and then I went on to my work experience.

18   Q     And where do you currently work, sir?

19   A     Currently, I am at Dinsmore & Shohl, a law firm here

20   in town, as partner of counsel.

21   Q     And where do you currently live?

22   A     I currently live in Green Township where I've lived

23   almost all of my life.

24   Q     Have you ever held elected office, sir?

25   A     Yes, I have.
```

WILLIAM SEITZ - DIRECT EXAM

19-3049

1    **Q**    What elected offices have you held?

2    **A**    Well, my other career beyond being a lawyer started in

3    1989 when I was elected to one term on the Cincinnati Public

4    School Board.  Thereafter, I was elected twice to Green

5    Township Trustee.  In 2000, when the term limits kicked in

6    and our current State Representative could no longer run, I

7    ran for State House of Representatives.  I was elected in

8    2000, 2002, 2004, 2006.  In October 2007, I was appointed to

9    the Ohio Senate.  I then ran for the Ohio Senate and won in

10   2008 and 2012.  After that four-year term ended in 2016, I

11   ran for the Ohio House again and was elected to the Ohio

12   House in 2016, 2018, 2020, and 2022.  So I am now serving my

13   final two-year term in the House.

14   **Q**    During your time in the House of Representatives, did

15   you hold any leadership positions?

16   **A**    Yes.  Yes, sir, I did.  Yes, I was, for relevance of

17   this proceeding, chair of both the Senate and House Public

18   Utilities Committees and I also have served in House

19   majority leadership under six different speakers of the Ohio

20   House, Speaker Husted, who's now our lieutenant governor,

21   Speaker Rosenberger, Speaker Smith, Speaker Householder,

22   Speaker Cupp, and now Speaker Stevens.

23   **Q**    You indicated that you served on the Public Utilities

24   Committee in the Ohio House of Representatives?

25   **A**    Yes.

1    **Q**    What does that committee do?

2    **A**    Well, that committee is charged with helping to

3    develop the policy that governs our utilities in Ohio, both

4    electric and gas, and telephone, to the extent they're still

5    regulated at all.

6    **Q**    When you were -- when did you first serve on that

7    committee?

8    **A**    Well, I actually testified on the Public Utilities

9    Committee in my very first session, 2001 to '2, and I served

10   on then, but then I really became much more involved in

11   public utility law from and after 2008 when I was in the

12   Senate.  So my expertise in the issues developed from 2008

13   through today.

14   **Q**    And in 2000, when you were first appointed to that

15   committee, who appointed you to that committee?

16   **A**    That would have been Speaker Householder because he

17   was our Speaker from 2001 to 2004.

18   **Q**    And as a result of your experience working on the

19   Public Utilities Committee in the early 2000s, did you come

20   to have an understanding of what Mr. Householder's views on

21   energy policy were?

22   **A**    Sure, I had --

23            MS. GLATFELTER:  Objection, Your Honor.

24            MR. OLESKI:  I'm asking for his understanding.

25            THE COURT:  The objection is overruled.

1    **Q**    And what was that understanding, sir?

2    **A**    Well, it was always my understanding that an essential

3    tenet of Mr. Householder's belief was for energy

4    independence both in the United States and the State of

5    Ohio, that goes back to his very first address to the Ohio

6    House when he was first sworn in as Speaker in 2001.

7    **Q**    And was --

8              THE COURT:  Excuse me, is there an objection?

9              MS. GLATFELTER:  Yes, I do.  I'd like to be heard

10   at sidebar, please.

11             THE COURT:  Very well.

12   **SIDEBAR CONFERENCE.**

13             MS. GLATFELTER:  Thank you, Your Honor.  I'm trying

14   not to be disruptive here.  Whether it's phrased as belief

15   or hearsay, it's still hearsay.  His hearsay, his belief, is

16   formed on understanding of discussions with Householder

17   about what his views are.  This is all hearsay.  And also he

18   has not been noticed as an expert, so I will object to the

19   extent that he is going to talk about his experience in

20   public utilities law and talking about the merits of

21   deregulation, regulation, all of this kind of stuff.

22             MR. OLESKI:  So I'll address that last part first.

23   I do not intend to try to qualify Mr. Seitz as an expert or

24   to ask him any opinion questions about the public utilities

25   laws in general.  I'm simply trying to get some background

1    for the jury.  But I do think it's permissible to ask him

2    questions about what his understanding is and whether -- I'm

3    not asking him how he formed that understanding, and I don't

4    think that his understanding -- the only way that he could

5    have come to an understanding of what Mr. Householder's

6    beliefs are would be through hearsay.  So I think that the

7    objection should be overruled, and, frankly, I'm moving on

8    to a different subject.

9              THE COURT:  I think it's back-dooring hearsay, and

10   I don't want you doing it again.

11             MR. OLESKI:  Okay.

12   **SIDEBAR CONCLUDED.**

13             THE COURT:  Once the court reporter is resituated,

14   you may proceed.

15   **Q**    Was Mr. Householder term limited out in 2004?

16   **A**    Yes, he was.

17   **Q**    In -- I want to fast-forward now to 2016.  You

18   indicated that you ran in 2016 for the Ohio House of

19   Representatives?

20   **A**    Yes, I did.

21   **Q**    And were you successful?

22   **A**    Yes, I was.

23   **Q**    And at that time, was Mr. Householder also running?

24   **A**    Yes.

25             MR. OLESKI:  Judge, permission to publish what's

1    been admitted as Government Exhibit 212?

2            THE COURT:  Yes.

3            MR. OLESKI:  And, PJ, if you could cull out that

4    November 10th, 2016, e-mail.

5    **Q**    Mr. Seitz, do you see that document on your screen?

6    **A**    Yes, I do.

7    **Q**    And what's the date of that e-mail?

8    **A**    November 10th, 2016.

9    **Q**    And could you just read the content of that e-mail?

10   **A**    Sure.  Tony, I discussed a game plan for utility

11   relief yesterday with Bill Seitz.  We are more than ready to

12   sit down and craft something with utilities that will make

13   sense, L.

14           MR. OLESKI:  You can take that down, PJ.

15   **Q**    After the general elections in November of 2016, was

16   there a retreat held by the Republican Caucus?

17   **A**    Yes, yes.  There's always a retreat held typically in

18   January of the new session.

19   **Q**    And where was that held?

20   **A**    Well, the retreat in '17 would have been in, north of

21   Columbus at Lewis Center at the Nationwide Center, I think.

22   **Q**    And after that, after that retreat, did you have

23   meetings with leadership in Florida?

24   **A**    Yes.  We had an annual fundraiser in the Bonita

25   Springs area of Florida and I was there for that and that

1    was in February of 2017, as memory serves.

2            MR. OLESKI:  Judge, may I show the witness

3    Householder Exhibit 481, which has not been admitted?

4            THE COURT:  Yes.  Show it to the witness and the

5    lawyers.

6            MR. OLESKI:  Judge, pursuant to our stipulation, I

7    would move to admit this document.

8            THE COURT:  Any objection?

9            MS. GLATFELTER:  No, Your Honor.

10           MR. SCHNEIDER:  No.

11           THE COURT:  It's admitted.

12           MR. OLESKI:  May I publish?

13           THE COURT:  Yes.

14           MR. OLESKI:  Thank you.  And, PJ, if you could just

15   cull out that 4:00 p.m. entry.

16   **Q**    Do you see that document on your screen, sir?

17   **A**    I do.

18   **Q**    And while you were in Florida for a fundraiser, did

19   you have meetings with FirstEnergy executives?

20   **A**    I did.  And we had an afternoon meeting and this shows

21   that it was at Ruth Chris Steak House with some of the folks

22   from FirstEnergy; Speaker Rosenberger, Speaker pro tempore

23   Shuring and myself.  And this says Finance Chair Ryan Smith.

24   I don't recall whether Ryan was there or not, but I know the

25   other three of us were.  And Mr. Jones was there and

1    Mr. Dowling was there.  I'm not sure I know who JDB is, and

2    TRP would be Ty Pine.

3    **Q**    Was Mr. Pine at that meeting?

4    **A**    I don't specifically recall that Pine was there.  I

5    know Jones and Dowling were there.

6    **Q**    And Mr. Jones is the CEO of FirstEnergy?

7    **A**    Yes, he was at the time.

8    **Q**    And Mr. Dowling was also an executive of FirstEnergy?

9    **A**    Yes, he was.

10   **Q**    And during the course of this meeting, what did you

11   discuss?

12   **A**    They --

13              MS. GLATFELTER:  Objection, Your Honor, hearsay.

14              THE COURT:  Sustained as to form.

15   **Q**    Is it unusual for members of House leadership to meet

16   with executives?

17              MS. GLATFELTER:  Objection, Your Honor, as to usual

18   and customary.

19              THE COURT:  Sustained pursuant to pretrial orders.

20   **Q**    And during the 2017 term of the General Assembly, were

21   you involved in a piece of legislation known as ZEN?

22   **A**    Yes.

23   **Q**    And what is ZEN?

24   **A**    ZEN stood for Zero Emission Nuclear.  It was a program

25   and a bill that was going to provide production credits to

1    the owners and operators of the two nuclear power plants

2    that were situated in Ohio.  It was being modeled at the

3    time after similar legislation that was being pursued in

4    Illinois, New York, New Jersey, and I believe Pennsylvania

5    had some on the docket as well, but it never passed in

6    Pennsylvania.

7    **Q**    And were there other components of the ZEN legislation

8    other than the subsidy?

9    **A**    Of that particular bill, not that I recall.

10   **Q**    And what about, were there other pieces of legislation

11   that --

12   **A**    There were.  I was chairman of the Public Utilities

13   Committee at the time, and there were -- I called it the

14   boxcar theory.

15   **Q**    And what's the boxcar theory?

16   **A**    The boxcar theory was, we're going to take these bills

17   one at a time because I had found in my experience in the

18   Senate that when you tried to put too much in a utility

19   bill, you couldn't get it passed because there would be too

20   many disagreements.  So the first boxcar was to cap or

21   eliminate various costly mandates that had been on

22   customers' bills since 2008.

23   **Q**    And in simple terms, what are the mandates?

24   **A**    The mandates were an energy efficiency mandate that

25   was requiring the utilities to reduce electric usage by

1    billing customers for energy efficiency programs that the

2    customers had no ability to opt out of, so that was one set

3    of mandates.  The other set of mandates was a mandate that

4    the utility companies purchase increasing, ever increasing

5    amounts of their electric fuel from renewable sources such

6    as wind and solar, which were, by the way, more expensive

7    than alternate fuels that they could have made electricity

8    with.  So there was the renewable mandate and the EE mandate

9    and my phrase for the both of them was the march up mandate

10   mountain because it was becoming expensive for consumers

11   both commercial, industrial and residential and that's why

12   we had a bill that was going to cap or eliminate those

13   mandates.

14   **Q**    And what was the second boxcar?

15   **A**    The second boxcar was the OVEC boxcar.

16   **Q**    What is OVEC?

17   **A**    OVEC is the Ohio Valley Electric Cooperative, that is

18   a consortium of about 15 to 16 different utility companies

19   from different states.

20          THE COURT:  Is there an objection?

21          MS. GLATFELTER:  Relevance.

22          THE COURT:  Sustained.

23          THE WITNESS:  Okay.  Well, that was the second box.

24          THE COURT:  Excuse me, the objection is sustained.

25   **Q**    What was the third box?

1        THE COURT:  Counsel, I want you to abide by the

2   spirit of my order before this witness came on.  You've used

3   up your leeway.

4        MR. OLESKI:  Understood, Judge.

5   **Q**    Ultimately, did these pieces of legislation go

6   anywhere?

7   **A**    The mandate bill I gave to my friend, Representative

8   Blessing, it passed the House.  It did not pass the Senate,

9   was not signed by the governor.  The OVEC bill did not pass

10  and the ZEN bill did not pass either in 2017.

11  **Q**    Was House leadership supportive of these pieces of

12  legislative at the time?

13  **A**    Well, they were certainly supportive of the mandates

14  bill because it passed the House.  I think they were

15  supportive of the OVEC bill.  The ZEN bill created a

16  division of responsibility within the House leadership

17  because it was clear that the governor was not supportive,

18  at the time Governor Kasich, and that's one reason that that

19  bill did not move forward during that term of the General

20  Assembly.

21  **Q**    During the 2017 to 2018 time period, were you aware of

22  a race to be elected Speaker to the Ohio House of

23  Representatives?

24  **A**    Yes, I was.

25  **Q**    And who was that race between?

1    **A**    Well, it was between Ryan Smith, who had been elected

2    Speaker after Speaker Rosenberger resigned in April of 2018,

3    and Larry Householder, who had come back in 2017, was newly

4    inducted into the House, and the two of them were vying for

5    who would be Speaker in the period 2019 and forward.

6    **Q**    And who did you support?

7    **A**    I was a part of Ryan Smith's leadership team.  I

8    supported Ryan Smith.  I voted for Ryan Smith.

9    **Q**    And after the General Elections in November of 2018,

10   was that race to be Speaker still ongoing?

11   **A**    It was indeed.  The warring camps were still at odds,

12   and, yes, it was very much a hot item.

13   **Q**    Did you do anything to try to bring those warring

14   camps together?

15   **A**    I did.

16   **Q**    What did you do?

17   **A**    My good friend, Representative James Butler from

18   Dayton, he was a big supporter of Larry Householder, and I

19   was supporting Ryan Smith.  And the two of us kept trying to

20   find a way to get Larry Householder and Ryan Smith to meet

21   and confer and mediate their differences going so far as to

22   say, listen, we'll put Larry in one room and we'll put Ryan

23   in the other room and we'll play shuttle diplomacy, but Mr.

24   Smith was not interested in any such meeting.

25   **Q**    Ultimately, there was a vote to be Speaker?

1    **A**    Ultimately, yes, there was a vote to be Speaker, yes,

2    sir, that's true and Mr. Householder was elected, yes.

3    **Q**    Who selects the leaders of the House?

4    **A**    Well, typically, what happens is, once a Speaker is

5    selected, the Speaker will nominate a slate of people to

6    serve on his leadership team, and most times, almost always,

7    the full House has to vote on that slate and most times,

8    they go along with whomever the Speaker determines to be his

9    slate.  It's kind of like football, you've got a head coach

10   and then the head coach gets to pick the assistant coaches.

11   **Q**    And how many leadership positions are there in the

12   Ohio House?

13   **A**    Well, there are six if you count the Speaker and there

14   are seven if you add in the finance committee chairman

15   because sometimes the finance committee chairman sits in on

16   leadership meetings.

17   **Q**    Did Mr. Householder appoint anybody who voted for Ryan

18   Smith to a leadership position?

19   **A**    Yes, he appointed me.  Retained me as majority leader

20   and he also appointed Representative Lanese who had been an

21   ardent supporter of Ryan Smith as well.

22   **Q**    After January of 2019, did the Republican Caucus hold

23   a retreat?

24   **A**    Yes, we did again hold another one of those retreats

25   up there at the Nationwide Center, Lewis Center, Ohio.

1    **Q**    And what's the purpose of these retreats?

2    **A**    The purpose of the retreats is No. 1, socialization

3    with the incoming members of the caucus.  No. 2, typically

4    the statewide elected officials will come and say hello.

5    No. 3, they'll bring in somebody to talk about the ethics

6    law.  No. 4, they'll bring in somebody to talk about the

7    open records and open meetings laws.  And then, No. 5, they

8    divide into groups and sort of spitball whiteboard ideas for

9    legislation that members would like to pursue during the

10    incoming two-year period of the General Assembly.

11    **Q**    And would these be priority pieces of legislation?

12    **A**    Well, from that whole long list of whiteboards, which,

13    by the way, I never found to be too revealing, because

14    people would say, I want to do something about education,

15    I'd say, yeah, okay, like what, right, so -- but

16    nonetheless, from all of those whiteboards, the Speaker

17    would then go back to his senior staff and determine which

18    particular pieces of legislation would be the priority

19    pieces of legislation.

20    **Q**    And was one of the priority pieces of legislation

21    energy legislation?

22    **A**    Yeah, yes.

23    **Q**    Did you ever meet with Mr. Householder about this

24    energy legislation?

25    **A**    Yes, I did.  That would have been after the retreat,

1    after the leadership slate was inducted.  My best guess is

2    probably late February or March of 2019.

3    **Q**    And ultimately, was House Bill 6 introduced?

4    **A**    Yes.

5    **Q**    And as introduced, could you briefly explain your

6    understanding of what that piece of legislation did?

7    **A**    Yes.  That legislation was principally composed of two

8    main points.  First --

9    **Q**    What's the first point?

10   **A**    The elimination or capping of the various mandates

11   that I previously talked about, energy efficiency and

12   renewables.  Second, the proposal was to set up a clean air

13   fund.  The amount of money put into that fund would be

14   sufficient to generate production credits for each kilowatt

15   of electricity generated by the two nuclear power plants

16   then existing in Ohio and additional money, significant

17   amount of money, to provide similar credits for any new or

18   existing renewable resources like wind and solar farms and

19   that was the gist of what that bill was aiming to

20   accomplish.

21   **Q**    And after House Bill 6 was introduced, were there

22   committee hearings?

23   **A**    Yes.  I was not on the committee to which that bill

24   was assigned, nor was I a sponsor of the bill.  Two other

25   people sponsored the bill, but yes, there were committee

WILLIAM SEITZ - DIRECT EXAM

19-3063

1    hearings and because of my prior role as chairman of the

2    House Public Utilities Committee and chairman of the Senate

3    Public Utilities Committee, many folks came to me and

4    bounced off ideas for improvement, amendment, modification,

5    to the bill.

6    **Q**    And to take these in order, who are the sponsors of

7    House Bill 6?

8    **A**    The two sponsors were Representative Callender and

9    Representative Wilkin.

10   **Q**    And is one of the nuclear power plants in

11   Representative Callender's district?

12   **A**    Yes.

13   **Q**    And these committee hearings, what happens at a

14   committee hearing?

15   **A**    Well, at a committee hearing, proponents, opponents,

16   interested parties, come in and testify about the merits or

17   perceived demerits of the legislation.

18   **Q**    And are these hearings recorded?

19   **A**    They are video, you can watch them on public TV if

20   anybody is really an insomniac, yeah.

21   **Q**    And were there a number of hearings?

22   **A**    Yes.

23   **Q**    As a result of those hearings and meetings and

24   meetings with other legislators and interested parties, were

25   there amendments to House Bill 6?

1   **A**   Yes.

2   **Q**   Were you involved in any of those amendments?

3   **A**   Yes.

4   **Q**   What amendments were you involved in?

5   **A**   There were three that I was principally involved in.

6   **Q**   What are those three?

7   **A**   The first one was we needed to beef up the amount --

8          THE COURT:  I'm going to interject myself and

9   indicate that I've already ruled on the depth of the

10  testimony here.  Move along.

11         MR. OLESKI:  Fair enough.

12  **Q**   When Mr. Householder became Speaker, were you named to

13  a leadership position?

14  **A**   Yes, I was retained as majority leader.

15  **Q**   And Mr. Householder made Ms. Lanese -- named her to a

16  leadership position?

17  **A**   Yes.

18  **Q**   Did Dave Greenspan vote for Ryan Smith to be Speaker?

19  **A**   Yes.

20  **Q**   Are you aware that Ms. Lanese and Mr. Greenspan

21  testified in this case?

22  **A**   I have read that in the newspaper, yes.

23  **Q**   And they testified that they each had a position

24  and -- strike that.

25         And do you remember that they voted -- that they each

1    voted no on House Bill 6?

2    **A**    That's correct.

3    **Q**    What did you vote on House Bill 6?

4    **A**    I voted yes.

5    **Q**    Why?

6    **A**    There are six reasons:  It preserved the jobs of those

7    two plants, the tax base upon which the local communities

8    depended.  It was going to provide carbon-free electricity

9    for the remaining useful life of the plants.  Those plants

10   provided 85 percent of the carbon-free electricity produced

11   in Ohio, even though they were only 15 percent of the

12   generated capacity.  No. 4, it was going to keep generating

13   the assets in Ohio, which we thought was important, because

14   even now Ohio imports about 30 percent of its electricity

15   from other states.

16        And then the two most important reasons for me were the

17   need to preserve diverse electric fuel supplies.  Our mother

18   always taught us, don't put all your eggs in one basket.

19   And so by preserving some coal and some nuclear, spurring

20   utility scale solar development, which the bill did, and

21   also encouraging the continued deployment of natural gas,

22   which we had in copious supply, we were preserving a diverse

23   fuel source with which to make electricity.  It proved to be

24   a very important thing that we did because gas was very

25   cheap at the time, but some of us were visionary enough to

1    see that it was --

2           THE COURT:  I'm going to interrupt and indicate the

3    question has been asked and answered.

4           THE WITNESS:  Well, the --

5           THE COURT:  You're done.  Question, next.

6           MR. OLESKI:  A moment to confer, Judge?

7           THE COURT:  Yes.

8           MR. OLESKI:  Judge, I believe that Mr. Seitz had

9    one more reason he was going to state.  I just ask

10   permission for him to state that last reason.

11          THE COURT:  Yes, you can state the sixth reason.

12          THE WITNESS:  Thank you, Your Honor.  The last

13   reason was the most important one, the Legislative Service

14   Commission, whom we charge with the coming up with a fiscal

15   impact of every bill we pass -- they're an independent

16   nonpartisan organization -- calculated that the bill over

17   its useful life would save the rate payors of Ohio

18   $2.3 billion.  So the net effect of the bill and all its

19   parts was to save rate payors over $2 billion over its

20   useful life.

21          MR. OLESKI:  Moment to confer?

22          THE COURT:  Yes.

23   Q    Sir, while House Bill 6 was pending in the House of

24   Representatives, did you participate in whip sessions with

25   Mr. Householder?

1    **A**    Yes.

2    **Q**    And what's a whip session?

3    **A**    Well, we would bring in small groups of people that we

4    hoped to persuade them to vote for House Bill 6 and hear

5    their reasons why they might not want to.

6    **Q**    And at any of those meetings that you attended with

7    Mr. Householder, did you observe him threaten any

8    legislator?

9    **A**    No.

10   **Q**    Did you view him trying to coerce any legislator?

11   **A**    No.

12            MR. OLESKI:  I don't have anything further, Judge.

13            THE COURT:  Very well.  The government wish to

14   cross-examine?

15            MS. GLATFELTER:  Yes.  I wasn't sure if I was

16   before or after.

17            THE COURT:  Mr. Borges wish to cross-examine, his

18   counsel?

19            MR. SCHNEIDER:  No questions for this witness, Your

20   Honor.

21            THE COURT:  Thank you.

22            MS. GLATFELTER:  Thank you, Your Honor.

23            THE COURT:  You're welcome.

24            MS. GLATFELTER:  Good afternoon, Mr. Seitz.

25            THE WITNESS:  Good afternoon.

<b>CROSS-EXAMINATION</b>

**BY MS. GLATFELTER:**

**Q**    So as I understand it, you have been in the General

Assembly for about 23 years?

**A**    Yes, ma'am.

**Q**    And the ZEN legislation that you were talking about

before from 2017 or the 2017 session, that ultimately didn't

pass, right?

**A**    That is correct.

**Q**    Okay.  And are you aware that FirstEnergy executives

told Mr. Householder that he needed to pull back and not

push ZEN legislation, they wanted you to take the lead

because it angered the current Speaker?

**A**    I'm not aware of that, no, ma'am.

**Q**    Do you recall -- and you said you were the chair of

the public utilities under Speaker Smith?

**A**    Under Speaker Rosenberger.

**Q**    Speaker Rosenberger, my apologies.  And do you recall

Mr. Householder attending the committee meetings for the ZEN

legislation even though he was not on the committee?

**A**    I do not specifically recall that, no.

        MS. GLATFELTER:  Okay.  Your Honor, permission to

show the witness what has been marked as Government

Exhibit 540?  And I have copies here for defense counsel.

        THE COURT:  Yes.

1    **Q**    Mr. Seitz, do you recognize this as a text message

2    that you provided in response to a subpoena to the House of

3    Representatives?

4    **A**    Yes, I do.

5    **Q**    Great.

6         MS. GLATFELTER:  Your Honor, permission to -- or

7    move to admit Government Exhibit 540 and publish?

8         THE COURT:  Any objection?

9         MR. OLESKI:  No.

10         MR. SCHNEIDER:  No.

11         THE COURT:  It's admitted.  You may publish.

12    **Q**    All right.  Mr. Seitz, this is the text message that

13    you were referring to?

14    **A**    Yes.

15    **Q**    Okay.  And if you can go ahead and tell us who this

16    text message involves, what communication?

17    **A**    Yes, ma'am.  That would be between me and Speaker

18    Householder.

19    **Q**    Okay.  And you see the date on that, July 25th?

20    **A**    Yes, I do.

21    **Q**    That's two days after the concurrence vote for House

22    Bill 6?

23    **A**    I believe you're right.

24    **Q**    Okay.  And if you can go ahead and read what you wrote

25    to Mr. Householder?

1    **A**    Sure.  I said:  What does it tell you that southwest

2    Ohio's delegation of GOP only had only one no vote on 6?

3    Representative Keller:  The highest percentage of any region

4    of the state and the farthest from FirstEnergy territory

5    with 11 yes votes.

6         And he wrote back and said:  They are smart.

7         And then I wrote back and said:  Thanks.  It tells me

8    we understand the team concept better than a lot of others

9    do.

10   **Q**    Okay.  And so your message there describes voting for

11   House Bill 6, right?

12   **A**    Yes, ma'am.

13   **Q**    And voting for House Bill 6 because you understand the

14   team concept?

15   **A**    Yes.  Our representatives from southwest Ohio did and

16   were convinced of its merits and happy to back this

17   important legislation.

18   **Q**    So that's not what you wrote.  You wrote that "they

19   understand the team concept," right?

20   **A**    We were a team trying to pursue legislation to save

21   rate payors a couple billion dollars, a good team to be on.

22   **Q**    All right.  Now, I wanted to ask you a few questions,

23   a few questions about bank accounts and your presence at

24   certain meetings.

25        So you were not present for a meeting in October of

1    2018 at the State Street office with Mr. Householder and

2    representatives from FirstEnergy Solution where they

3    presented him a check for $400,000, right?

4    **A**    No, ma'am, I was not.

5    **Q**    Okay.  And you weren't present for a meeting in

6    Mr. Jones' office at the FirstEnergy headquarters with Larry

7    Householder and Jeff Longstreth in October of 20 --

8    October 23rd, 2018, right?

9    **A**    No, I was not.

10   **Q**    Okay.  And you weren't present at the meetings during

11   the inauguration or the dinners at the inauguration between

12   FirstEnergy executives and Mr. Householder and Jeff

13   Longstreth?

14   **A**    No, I was not.

15   **Q**    Okay.  And were you on a call between Chuck Jones and

16   Larry Householder in 2020 where he asked for money to

17   support his term limits initiative?

18   **A**    No, I was not.

19   **Q**    Okay.  And do you have access to the Generation Now

20   bank account?

21   **A**    No, not even close.

22   **Q**    Okay.  And do you have access to the JPL & Associates

23   bank account?

24   **A**    No, ma'am.

25   **Q**    What about the Ohioans For Energy Security bank

1    account?

2    **A**    No, ma'am.

3    **Q**    Okay.  And you don't have access to the Growth and

4    Opportunity PAC bank account?

5    **A**    No.

6    **Q**    All right.

7           MS. GLATFELTER:  Just one moment, Your Honor.

8           THE COURT:  Very well.

9           MS. GLATFELTER:  All right.  Those are all of the

10   questions I have.  Thank you very much.

11           THE WITNESS:  Thank you.

12           THE COURT:  Very well.  Redirect?

13           MR. OLESKI:  Just briefly, Judge.

14       Good afternoon.

15           THE WITNESS:  Hello again.

16                        **REDIRECT EXAMINATION**

17   **BY MR. OLESKI:**

18   **Q**    You were asked some questions on cross-examination

19   about FirstEnergy support of the ZEN legislation; do you

20   recall those questions?

21   **A**    Yes.

22   **Q**    And was that why you were meeting with FirstEnergy

23   executives in Bonita Springs, Florida in February of 2017?

24   **A**    Well, they had asked for the meeting, so I accompanied

25   the Speaker and the Speaker pro tem to the meeting they had

```
 1    requested, yes.

 2            MR. OLESKI:  One moment to confer, Judge?

 3            THE COURT:  Yes.

 4            MR. OLESKI:  I don't have anything further for you,

 5    sir.  Thank you.

 6            THE WITNESS:  Thank you.

 7            THE COURT:  Anything further for this witness from

 8    Mr. Borges?

 9            MR. SCHNEIDER:  (Shaking head.)

10            THE COURT:  No.  Anything from the government?

11            MS. GLATFELTER:  No, Your Honor.

12            THE COURT:  Thank you, Mr. Seitz.  You're free to

13    go.

14            THE WITNESS:  Thank you.

15        (Witness left the stand.)

16            THE COURT:  Where do we stand from

17    Mr. Householder's perspective?

18            MR. GLICKMAN:  Your Honor, we're prepared to call

19    our next witness.  Unfortunately, because of the way of

20    rooms are situated for other witnesses, she's on another

21    floor.  Can we please go get her?

22            THE COURT:  I'm not available to go get her.

23            MR. GLICKMAN:  I said may we please go get her?

24            THE COURT:  Yes.

25            MR. GLICKMAN:  Thank you.
```

1          (Pause.)

2               MR. GLICKMAN:  Sorry about that.

3               THE COURT:  Who does the defense call at this time?

4     Who does the defense call at this time?

5               MR. GLICKMAN:  I'm sorry, Judge, I was just

6     coughing.  I apologize.

7               THE COURT:  Okay.

8               MR. GLICKMAN:  Caryn Boyer, Judge.

9               THE COURT:  If you would follow the woman with red

10    hair, please.  And, ma'am, if you would stop where you are

11    and raise your right hand for the oath to tell the truth.

12          (Witness took the stand and was sworn.)

13               THE COURT:  Come up to the witness stand.  I tell

14    everybody this seat tips back in the spirit of full

15    disclosure.  Once you're seated and comfortable, we need

16    your mouth close to that fancy federal microphone.  If you

17    wish, you can take your mask off; you don't have to.

18               THE WITNESS:  Okay.

19               THE COURT:  Lawyers for Mr. Householder will begin

20    with some questions of you.

21               MR. GLICKMAN:  Thank you, Judge.

22               THE COURT:  Yes.

23                         **DIRECT EXAMINATION**

24    **BY MR. GLICKMAN:**

25    **Q**    Ms. Boyer, could you state your name and spell your

1    last name, please?

2    **A**    Yeah.  Caryn Boyer, B-O-Y-E-R.

3    **Q**    Okay.  And, Ms. Boyer, what do you do for a living?

4    **A**    I'm a lawyer.

5    **Q**    Okay.  And as -- do you practice law under your maiden

6    name?

7    **A**    Yes.

8    **Q**    What is your maiden name?

9    **A**    Kaufman, K-A-U-F-M-A-N.

10   **Q**    And for whom are you employed?

11   **A**    Taft Stettinius & Hollister.

12   **Q**    Okay.  And in your capacity as an attorney at Taft

13   Stettinius & Hollister, were you instructed to perform any

14   legal services for Larry Householder and Jeff Longstreth?

15   **A**    Yes, for Mr. Householder.

16   **Q**    Okay.  And what were you instructed to perform?

17   **A**    I was asked to prepare a contribution agreement and an

18   operating agreement.  The terms --

19   **Q**    Go ahead.

20   **A**    The terms of the contribution agreement was that

21   Mr. Householder, Mr. Longstreth were going to -- going to go

22   into business together.  The contribution agreement

23   presented what each of them were going to contribute to that

24   new entity, and then the operating agreement was the

25   governing document.

1    **Q**    Okay.  Of the entity?

2    **A**    Um-hmm.

3    **Q**    Okay.  And was the entity going to be -- what

4    corporate form would the entity have?

5    **A**    Oh, an LLC, a limited liability company.

6    **Q**    In what state?

7    **A**    Florida.

8         MR. GLICKMAN:  Judge, just for the -- I apologize.

9    Just for the witness, could we -- and Counsel, could we

10   publish Householder Exhibit 20, please?

11        THE COURT:  Yeah.

12        MR. GLICKMAN:  Has not been admitted.

13        THE COURT:  We'll show the exhibit to the witness

14   and the lawyers.

15        MR. GLICKMAN:  PJ, can you just page through the

16   first four or five pages of that, please?

17   **Q**    Okay.  Do you recognize the document, ma'am?

18   **A**    Yes.

19   **Q**    Okay.  Could you tell us what it is?

20   **A**    It's the operating agreement for the entity.

21   **Q**    Okay.  Did that operating agreement -- were there

22   several drafts of the operating agreement?

23   **A**    A few.

24   **Q**    Is this one of them?

25   **A**    Yes.

CARYN BOYER - DIRECT EXAM

19-3077

1    **Q**    From what year?

2    **A**    2020.

3    **Q**    Okay.

4         MR. GLICKMAN:  I'm sorry, Judge, I'm just having

5    trouble getting my breath.

6         THE COURT:  All right.  Do you want to take a

7    break?  You're making me nervous.

8         MR. GLICKMAN:  No, it's not that bad.

9         THE COURT:  Would you like a bottle of water?

10        MR. GLICKMAN:  I have one, thank you.

11        THE COURT:  I've got a special one.

12   **Q**    Anyway, okay, so can you explain what type of company

13   this was?  I know you said a limited liability company, but

14   what was its business purpose?

15   **A**    So the limited liability company, its sole asset was

16   going to be a piece of property in Florida.

17   **Q**    Okay.  And is that reflected in the document?

18   **A**    I think so, in the purpose section, it would be 3.1.

19        MR. GLICKMAN:  So, Judge, ask that Householder

20   Exhibit 20 be admitted and published, please.

21        THE COURT:  Any objection?

22        MS. GAFFNEY-PAINTER:  No objection, Your Honor.

23        MR. SCHNEIDER:  No objection.

24        THE COURT:  It's admitted, you may publish.

25   **Q**    Okay.  And according to the instructions you received,

1   what was the -- what was Mr. Householder contributing to the

2   entity?

3   **A**   The property.

4   **Q**   Okay.  And what about Mr. Longstreth?

5   **A**   He was contributing cash.

6   **Q**   Okay.  And was that -- were those contributions then

7   reflected in the contribution agreement draft?

8   **A**   That's right.

9        MR. GLICKMAN:  Okay.  PJ, can we page down a couple

10  of pages, please?  Keep going.  Just a minute.

11  **Q**   Looking at page 4, Section 3.1, that says Purpose?

12  **A**   Um-hmm.

13  **Q**   Is that the -- is that the provision you were talking

14  about where the business would be defined?

15  **A**   Yeah.

16  **Q**   Okay.  So what was the purpose of the business?  And

17  if you need him to page one more down, we can do that.

18  **A**   To own and manage the property and to --

19        THE WITNESS:  If you can go to the next page.

20        MR. GLICKMAN:  Can you go to the next page, PJ?

21        THE WITNESS:  Yeah.  To manage additional property.

22  I do remember a discussion where the possibility they might

23  use this entity for other real property acquisitions.

24  **Q**   Okay.

25  **A**   And then to do any other lawful act allowed by limited

1    liability companies in Florida.

2         MR. GLICKMAN:  Thanks, PJ.  You can take this down.

3    This has not been admitted, Judge, just for the witness,

4    Court and Counsel.  PJ, could you please publish Householder

5    Exhibit 14?

6         THE COURT:  Yes.  We'll show it to the witness and

7    the lawyers.

8    **Q**    Okay.  Could you tell me what this document is?

9    **A**    Yeah.  This is the contribution agreement.

10   **Q**    Okay.  All right.  And from what year is this

11   agreement?

12   **A**    2020.

13   **Q**    Okay.  How long were -- how long did this engagement

14   go for you from start to finish, if you remember?  And if

15   you don't, we can show you some things to refresh, if that's

16   helpful.

17   **A**    The first draft of the documents were in July of 2018,

18   and then the last communication I had was sending drafts,

19   updated drafts in May of 2020.

20   **Q**    Okay.  So it went on for just shy of two years?

21   **A**    That's right.

22   **Q**    Okay.  All right.  And again, the purpose of the

23   contribution agreement?

24   **A**    So it would -- it's documenting what each party is

25   contributing to the entity.

CARYN BOYER - DIRECT EXAM

19-3080

1        MR. GLICKMAN:  Okay.  Judge, I'd ask that

2   Householder Exhibit 14 be admitted and published, please?

3        THE COURT:  Any objection?

4        MS. GAFFNEY-PAINTER:  No objection, Your Honor.

5        MR. SCHNEIDER:  No objection.

6        THE COURT:  It's admitted.  You may publish.

7        MR. GLICKMAN:  Okay.  All right.

8   **Q**    Your communications regarding this engagement, who was

9   your primary point of contact as far as the client was

10  concerned?

11  **A**    My partner, Steve Cuckler, and then -- yeah.

12  **Q**    Okay.  When I say "your point of contact with the

13  client," I mean, was your primary point of contact with

14  Mr. Longstreth, with Mr. Householder or both?

15  **A**    I didn't have any contact with Mr. Householder, but on

16  behalf of my client, Mr. Longstreth was his business

17  partner.

18  **Q**    So when you would communicate with Mr. Longstreth,

19  would it generally be in electronic form?

20  **A**    It's always electronic form, yes.

21  **Q**    E-mail?

22  **A**    Yes.

23       MR. GLICKMAN:  Could we please pull up Householder

24  Exhibit 28, which has not been admitted, for counsel and the

25  Court and the witness?

```
1              THE COURT:  Yes.

2    Q    Okay.  Do you recognize this document?

3    A    Yes.

4    Q    Okay.  So is it -- you're copied on this e-mail.  Who

5    else is on the e-mail?

6    A    My colleague, Steve Cuckler and Jeff Longstreth.

7    Q    Okay.  And this is -- when you said you practiced law

8    under Caryn Kaufman, Ms. Boyer, this is you, Caryn Kaufman?

9    A    Yes, that's right.

10   Q    All right.  And what's the date of this e-mail?

11   A    July 14th, 2018.

12   Q    Okay.  And what is this e-mail regarding?

13   A    When I sent the initial drafts of the documents, I had

14   a couple of questions regarding the terms of the operating

15   agreement and one of them was whether to include like a

16   buyout provision.

17   Q    What's a buyout provision?

18   A    Usually if you have two members, if they have a

19   fundamental disagreement on terms of how to manage the

20   company, there will be a provision that either party can

21   raise the dispute; and if they cannot resolve it, that one

22   of the parties can buyout the other party at fair market

23   value.

24   Q    Okay.  All right.  And so the top e-mail --

25   A    Um-hmm.
```

1   **Q**     -- from Mr. Longstreth, is the "Steve and Caryn," you

2   and your colleague at Taft?

3   **A**     That's right.

4   **Q**     Okay.  So is this Mr. Longstreth providing you

5   direction?

6   **A**     Yes.

7            MR. GLICKMAN:  Okay.  Judge, I'd ask that

8   Householder Exhibit 28 be admitted and published?

9            THE COURT:  Any objection?

10            MS. GAFFNEY-PAINTER:  Your Honor, we don't object

11   to the content, but we would request that the witness be

12   voir dired about the nature of her privilege relationship

13   because this is a communication between Mr. Longstreth and

14   attorneys about legal advice.  So we would need some factual

15   foundation that Mr. Longstreth doesn't hold the

16   attorney-client privilege here.

17            THE COURT:  Do you want to explore that or you want

18   me to?

19            MR. GLICKMAN:  I don't know that this witness is in

20   a position to answer but I can explore it, Judge.

21            THE COURT:  Who was your client?

22            THE WITNESS:  Mr. Householder.

23            THE COURT:  Was Mr. Longstreth a partner -- a

24   client?

25            THE WITNESS:  No.

CARYN BOYER - DIRECT EXAM

19-3083

1            THE COURT:  And we're getting into attorney-client

2      privilege.

3            MR. GLICKMAN:  I believe it's Mr. Householder's

4      privilege, Judge.

5            THE COURT:  Is the government satisfied with the

6      voir dire or do you wish to pursue it yourself now?

7            MS. GAFFNEY-PAINTER:  May I inquire just briefly,

8      Your Honor?

9            THE COURT:  Yes.

10           MS. GAFFNEY-PAINTER:  Ms. Boyer --

11           MR. GLICKMAN:  Can I have just one moment?  I don't

12      know that this is necessary.  I may just withdraw it.

13           THE COURT:  Okay.

14           MR. GLICKMAN:  Judge, I'll withdraw.

15           THE COURT:  All right.

16      **Q**    Was a -- was part of the -- was part of this, the

17      contribution agreement, did it involve contributing money to

18      obtain a satisfaction of judgment?

19      **A**    That's right.

20           MR. GLICKMAN:  Okay.  Judge, could we pull up

21      Householder Exhibit 25, just for the witness, Court and

22      counsel?

23           THE COURT:  Yes.

24      **Q**    Showing you Householder Exhibit 25, do you recognize

25      this judgment -- this satisfaction of judgment?

1    **A**    Yes.

2    **Q**    Okay.  As part of the contribution agreement, was

3    there -- was money to be contributed by Mr. Longstreth to

4    satisfy a judgment involving Union Bank?

5    **A**    Yes.

6    **Q**    Okay.  Is this that satisfaction of judgment

7    evidencing performance?

8    **A**    I believe so.

9             MR. GLICKMAN:  Judge, I'd ask that this exhibit be

10   admitted and published?

11            THE COURT:  Any objection?

12            MS. GAFFNEY-PAINTER:  No objection, Your Honor.

13            MR. SCHNEIDER:  None.

14            THE COURT:  It's admitted.  You can publish.

15            MR. GLICKMAN:  Just one moment, please, Judge.

16            THE COURT:  Yes.

17         (Pause.)

18            MR. GLICKMAN:  Judge, I'd ask -- there is one

19   e-mail that I would like to go into, so if there is -- if

20   there needs to be a voir dire, I guess now would be the

21   time.

22            THE COURT:  I don't know what you're talking about.

23            MR. GLICKMAN:  Just for Court and counsel, could

24   you pull up Householder Exhibit 31, please?

25   **Q**    Do you recognize this e-mail?

1   **A**    I do.

2   **Q**    Okay.  It's from whom?

3   **A**    From me.

4   **Q**    To?

5   **A**    To Jeff Longstreth.

6   **Q**    Okay.  And regarding?

7   **A**    Drafts of the documents.

8   **Q**    Okay.  So the documents, were the documents attached

9   to the e-mail?

10  **A**    They were.

11  **Q**    Okay.  And this is an e-mail -- you said this is an

12  e-mail from you to Mr. Longstreth?

13  **A**    That's right.

14  **Q**    Okay.  Was it regarding the documents related to the

15  limited liability company?

16  **A**    That's right.

17  **Q**    And the contribution agreement?

18  **A**    That's right.

19       MR. GLICKMAN:  Judge, I'd ask that Householder

20  Exhibit 31 be admitted and published.

21       THE COURT:  Any objection?

22       MR. SCHNEIDER:  No objection here.

23       MS. GAFFNEY-PAINTER:  Your Honor, may we just

24  briefly voir dire the witness about the nature of the

25  privilege potentially here?

CARYN BOYER - VOIR DIRE EXAM

19-3086

1     THE COURT:  Yeah.  You indicated Householder was

2   her client.  Go ahead.

3                   **VOIR DIRE EXAMINATION**

4   **BY MS. GAFFNEY-PAINTER:**

5   **Q**    So Mr. Householder paid your fees; is that correct?

6   **A**    We had the client engagement with Mr. Householder.  I

7   don't know about the fees.  The partner in charge would have

8   had that.

9   **Q**    Okay.  And I believe you testified that you never

10  spoke with Mr. Householder about this project?

11  **A**    I did not.

12  **Q**    You only spoke with Mr. Longstreth?

13  **A**    That's right.

14  **Q**    You, in your opinion as an attorney, do not believe

15  that there's any attorney-client privilege between you and

16  Mr. Longstreth?

17  **A**    No, no.  We represented Mr. Householder and Jeff was

18  the posing party to the transaction but not represented.

19          MS. GAFFNEY-PAINTER:  May I have a moment to

20  confer?

21          THE COURT:  Yes.

22          MS. GAFFNEY-PAINTER:  No objection to the admission

23  of the exhibit, Your Honor.

24          THE COURT:  Very well.

25          MR. GLICKMAN:  Ask that it be published?

1        THE COURT:  No objection from Mr. Borges as well.

2    Yes.  It's admitted and you may publish.

3        MR. GLICKMAN:  Thank you.

4        **DIRECT EXAMINATION (Continued.)**

5    **BY MR. GLICKMAN:**

6    **Q**    Okay.  So this e-mail, in the second paragraph, you

7    reference the contribution agreement?

8    **A**    Um-hmm.

9    **Q**    What do you ask Mr. Longstreth to do?

10   **A**    Have them both sign the document.

11   **Q**    All right.  And in the next, the operating agreement?

12   **A**    The same, that both need to be signed.

13   **Q**    Okay.  All right.  And what are articles for 226

14   Belville, LLC?

15   **A**    To create a new entity, you have to file articles of

16   organization with the state, Secretary of State's office.

17   So we would have filed that to create the entity on the

18   records in Florida.

19   **Q**    And the deed that's listed, would that be the deed to

20   the home --

21   **A**    That's right.

22   **Q**    -- that we discussed?

23        All right.  And was this your last communication with

24   Mr. Longstreth?

25   **A**    That's right.

1    **Q**    Okay.  All right.  And do you know whether or not

2    these documents were ever actually executed?

3    **A**    I'm not aware.

4         MR. GLICKMAN:  Okay.  All right.  Judge, I don't

5    have any further.

6         THE COURT:  Very well.  Counsel for Mr. Borges wish

7    to inquire?

8         MR. SCHNEIDER:  No inquiry.

9         THE COURT:  Government wish to examine?

10        MS. GAFFNEY-PAINTER:  Just briefly, Your Honor.

11        THE COURT:  Very well.

12        MS. GAFFNEY-PAINTER:  May I approach?

13        THE COURT:  Yes.  Thank you.

14        MS. GAFFNEY-PAINTER:  Good afternoon, Ms. Boyer.

15                    **CROSS-EXAMINATION**

16   BY MS. GAFFNEY-PAINTER:

17   **Q**    I believe you testified that you started work on this

18   project in 2018; is that correct?

19   **A**    That's right.

20   **Q**    And the project -- the last e-mail we just looked at,

21   Householder Exhibit 31, that was dated May of 2020; isn't

22   that right?

23   **A**    That's right.

24   **Q**    And in that intervening period between July -- or

25   excuse me, of 2018 through 2020, you had repeated

1    communications with Mr. Longstreth about this project,

2    right?

3    **A**    That's right.

4    **Q**    And at one point, this is in December of 2018,

5    Mr. Longstreth told you that he needed to get a couple of

6    questions answered by Larry Householder, right?

7    **A**    That's right.

8    **Q**    And you replied to him in May of 2019 following up,

9    trying to get the answers to those questions; isn't that

10   right?

11   **A**    That's right.

12   **Q**    And by November 12th, 2019, this project was still not

13   done, right?

14   **A**    That's right.

15   **Q**    Now, we just looked at Householder Exhibit 31, and in

16   that e-mail to Mr. Longstreth, you write:  We never

17   finalized this project, right?

18   **A**    That's right.

19   **Q**    And at the time that you sent that e-mail, there were

20   still a number of documents that required Mr. Householder's

21   signature; isn't that right?

22   **A**    That's right.

23   **Q**    So there was the contribution agreement, isn't that

24   right?

25   **A**    That's right.

CARYN BOYER - CROSS-EXAM

1    **Q**    And we already saw that as Householder Exhibit 14,

2    correct?

3    **A**    That's right.

4    **Q**    And you drafted that in 2018 for the first time,

5    right?

6    **A**    For the first time, correct.

7    **Q**    And then you redrafted it in 2020; is that right?

8    **A**    Yes.

9    **Q**    Okay.  And then you also needed to get

10   Mr. Householder's signature on the operating agreement;

11   isn't that right?

12   **A**    That's right.

13   **Q**    And we saw that as Householder Exhibit No. 20; isn't

14   that right?

15   **A**    That's right.

16   **Q**    And there were also the articles for 226 Belville,

17   LLC, that needed Mr. Householder's signature; isn't that

18   right?

19   **A**    Either him or Jeff Longstreth, they just need one

20   authorized representative to sign.

21   **Q**    So either Mr. Longstreth or Mr. Householder could have

22   signed those articles?

23   **A**    That's right.

24   **Q**    And that was to create the Florida entity; is that

25   right?

1    **A**    Um-hmm, that's right.

2    **Q**    And those were the entity organization documents that

3    you represented you would get to Mr. Longstreth in November

4    of 2019, right?

5    **A**    Um-hmm.

6    **Q**    And they were not executed in May of 2020 when you

7    sent that e-mail; isn't that right?

8    **A**    I'm not aware if they got -- if they were executed.

9    **Q**    But at the time that you sent that e-mail, Householder

10   Exhibit 20, that was one of the entries in that e-mail that

11   you said still required a signature; isn't that right?

12   **A**    That's right.

13   **Q**    And then the final document that still required

14   Mr. Householder's signature was the deed; is that right?

15   **A**    That's right.

16   **Q**    And that's the deed to that House in Florida at 226

17   Belville, correct?

18   **A**    Yes, that's right.

19   **Q**    And just to be clear, as you sit here today, as far as

20   you're aware, those documents have never been signed,

21   correct?

22   **A**    That's correct.

23        MS. GAFFNEY-PAINTER:  No further questions, Your

24   Honor.

25        THE COURT:  Very well.  Redirect, if any?

```
 1            MR. GLICKMAN:  No, thank you.

 2            THE COURT:  Very well.  Are you a litigator?

 3            THE WITNESS:  No.

 4            THE COURT:  You are free to go.

 5            THE WITNESS:  Okay.  Thank you.

 6        (Witness left the stand.)

 7            THE COURT:  It's a few minutes after 4:20.  Where

 8    are we from Mr. Householder's perspective?

 9            MR. GLICKMAN:  Judge, given the hour, I would

10    suggest recessing until tomorrow.

11            THE COURT:  I agree.  Ladies and Gentlemen of the

12    Jury, we're into the defendant's case.  You've heard two

13    witnesses, I think.  I want you to take your break now and

14    go home.  I want you to take a break from this because I

15    want you back tomorrow fired up and ready to go, as you have

16    been each and every day.  During the break, of course, don't

17    discuss the case with anyone, including among yourselves.

18    No independent research.  No checking out the media.

19    Continue to keep an open mind.

20        You know what I'm going to say now?  Out of respect for

21    you, we'll rise as you leave.

22            THE DEPUTY:  All rise for the jury.

23        (Jury exited the courtroom at 4:21 p.m.)

24            THE COURT:  Jury has left the room.  We remain in

25    session.  As always, we'll wait to hear that the jurors have
```

```
 1    cleared this floor before we recess.  You can stand or sit

 2    as you choose.

 3        Is there anything I need to address before we adjourn

 4    for the day after the jury has cleared the floor, first from

 5    the government?

 6            MS. GLATFELTER:  Only that we need to -- we would

 7    like to know the witnesses for tomorrow.

 8            THE COURT:  Are you in a position to be responsive

 9    in that regard?

10            MR. OLESKI:  Yes.  We intend to call Jim Trakas,

11    Nino Vitale, Brett Hillyer, and Steve Cuckler.

12            THE COURT:  And will that fill the day?

13            MR. OLESKI:  I believe so, Judge.

14            THE COURT:  All right.  Anything further from

15    Mr. Householder's perspective?

16            MR. OLESKI:  No.  And just to confirm, Judge, we're

17    breaking at 3:00 p.m. tomorrow?

18            THE COURT:  Good point.  I should have told the

19    jury; the juror commissioner will.  There's a juror who has

20    an unavoidable conflict.  We're going to have to break at 3.

21    I was advised that you would be able to deal with that; is

22    that right?

23            MR. OLESKI:  That's correct.  I just wanted to

24    confirm that.  I think we will fill up tomorrow until

25    3:00 p.m.
```

```
1          THE COURT:  Now confirmed.  Mr. Borges have

2     anything, Counsel?

3          MR. SCHNEIDER:  No.

4          THE COURT:  Very well.  All clear.  We are clear

5     and adjourned for the day.

6          THE DEPUTY:  All rise.  This court is adjourned.

7        (Proceedings concluded at 4:23 p.m.)

8                     C E R T I F I C A T E

9        I certify that the foregoing is a correct transcript of
      the record of proceedings in the above-entitled matter
10    prepared from my stenotype notes.

11         /s/   Lisa Conley Yungblut        03/02/2023
            LISA CONLEY YUNGBLUT, RMR, CRR, CRC       DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              *I N D E X*

2            **EXAMINATIONS**

3    **GOVERNMENT'S WITNESSES**            **PAGE**
                **TYLER FEHRMAN**
4    Direct Exam by Ms. Gaffney-Painter        2952
     Cross-Exam by Mr. Long                    3008
5    Redirect Exam by Ms. Gaffney-Painter      3032
     Recross-Exam by Mr. Long                  3033
6
     **DEFENDANT HOUSEHOLDER'S WITNESSES**     **PAGE**
7                **WILLIAM SEITZ**
     Direct Exam by Mr. Oleski                 3048
8    Cross-Exam by Ms. Glatfelter              3068
     Redirect Exam by Mr. Oleski               3072
9                **CARYN BOYER**
     Direct Exam by Mr. Glickman               3075
10   Voir Dire Exam by Ms. Gaffney-Painter     3086
     Direct Exam (cont.) by Mr. Glickman       3087
11   Cross-Exam by Ms. Gaffney-Painter         3088

12            **EXHIBITS**
          **GOVERNMENT EXHIBITS**        **PAGE ADMITTED**
13   No. 540                                   3069
          **HOUSEHOLDER EXHIBITS**       **PAGE ADMITTED**
14   No. 481                                   3054
     No. 20                                    3077
15   No. 14                                    3080
     No. 25                                    3084
16   No. 31                                    3087

17

18

19

20

21

22

23

24

25