```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                            -  -  -
 3
     UNITED STATES OF AMERICA,       : CASE NO. 1:20-CR-0077
 4                                   :
                      Plaintiff,     : JURY TRIAL, DAY 24
 5              vs.                  :
                                     : 7th day of March, 2023
 6   LARRY HOUSEHOLDER, et al.       :
                                     :
 7                    Defendant.     :

 8                            -  -  -
                       TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
                            -  -  -
10
     APPEARANCES:
11
     For the Plaintiff:
12                         Emily N. Glatfelter, Esq.
                           Matthew Charles Singer, Esq.
13                         Megan Gaffney Painter, Esq.
                           Assistant United States Attorneys
14                         221 East Fourth Street, Suite 400
                           Cincinnati, Ohio 45202
15
     For the Defendant, Larry Householder:
16
                           Nicholas R. Oleski, Esq.
17                         Robert T. Glickman, Esq.
                           McCarthy, Lebit, Crystal & Liffman Co.
18                         1111 Superior Avenue East, Suite 2700
                           Cleveland, Ohio 44114
19                                  and
                           Steven L. Bradley, Esq.
20                         Marein and Bradley
                           526 Superior Avenue, Suite 222
21                         Cleveland, Ohio 44114

22

23

24

25
```

```
 1   For the Defendant, Matthew Borges:

 2                              Karl Herbert Schneider, Esq.
                               Todd Aaron Long, Esq.
 3                             McNees Wallace & Nurick, LLC
                               21 East State Street, Suite 1700
 4                             Columbus, Ohio 43215

 5   Also present:         Larry Householder
                           Matthew Borges
 6                         Blane Wetzel, FBI Special Agent
                           Kelly Terry, paralegal
 7                         PJ Jensen, trial tech

 8   Law Clerk:            Cristina V. Frankian, Esq.

 9   Courtroom Deputy:   Rebecca Santoro

10   Stenographer:         Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                           United States District Court
11                         100 East Fifth Street
                           Cincinnati, Ohio 45202
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     **PROCEEDINGS**

2        (Proceedings held in open court at 8:59 a.m.)

3             THE DEPUTY:  All rise.  This United States District

4     Court for the Southern District of Ohio is now in session,

5     The Honorable Timothy S. Black, District Judge, presiding.

6             THE COURT:  Thank you.  Please be seated.  Back in

7     the open courtroom on the record outside the presence of the

8     jury.  The government team is here in full.  Defense team is

9     here.  Mr. Marein is excused.  Mr. Borges' team is here in

10    full.

11        Are we ready for the jury from the government's

12    perspective?

13            MR. SINGER:  Yes, Your Honor.

14            THE COURT:  And from Mr. Householder's?

15            MR. BRADLEY:  Yes, Judge.

16            THE COURT:  And from Mr. Borges'?

17            MR. SCHNEIDER:  Yes.

18            THE COURT:  Let's call for the jury, please.

19        (Pause.)

20            THE DEPUTY:  All rise for the jury.

21        (Jury entered the courtroom at 9:04 a.m.)

22            THE COURT:  Thank you.  You may all be seated.  14

23    Members of the Jury have joined us in the courtroom.  Good

24    morning.  Thank you for being here early today.  It's a big

25    day.  I'd ask that you give the attorneys your close

1    attention.  We're going to hear closing argument.  It's not

2    evidence; it's argument.  It's designed to assist you.  The

3    government goes first and last.  After the government,

4    Mr. Householder, and then Mr. Borges, and then the

5    government will close.

6        Let's proceed to closing argument.  On behalf of the

7    government.

8            MR. SINGER:  Yes, Your Honor.  Thank you.

9        Good morning.  May it please the Court --

10           THE COURT:  Yes.

11           MR. SINGER:  -- defense counsel, Members of the

12   Jury.  Larry Householder received almost $60 million from

13   FirstEnergy bank accounts.  He received that money into a

14   501(c)(4).  It was secret.  It was undisclosed, and it was

15   unreported.  And he received the money knowing that

16   FirstEnergy Corporation and FirstEnergy Solutions expected

17   legislation in return.  This is called bribery.

18       A public official has a duty to further the public's

19   interests, not the interests of a corrupt company.

20   Mr. Householder did not act alone, but he was at the top,

21   the top of the enterprise, the top of the criminal

22   conspiracy.  He benefitted the most because the enterprise

23   was set up to further his political machine.  It paid for

24   his staff.  It funded his hand-picked candidates, and it

25   propelled him to Speaker.  It tightened his grip on power,

1    and it was set up so that he could use that power into the

2    future.  And he enriched himself to the tune of about

3    $500,000.

4         Matthew Borges, he entered the enterprise, he entered

5    the criminal conspiracy, with his eyes open.  He knew about

6    Generation Now.  He knew about Householder's relationship

7    with Generation Now.  But, more important, he knew that

8    FirstEnergy Solutions was pumping millions of dollars into

9    Generation Now at the same time Mr. Householder had promised

10   to take official action for their benefit, to include

11   legislation, if necessary.

12        As Borges explained, FirstEnergy and Householder and

13   his own firm formed an unholy alliance.  Borges knew about

14   that corrupt bargain and he wanted in.  As he told Tyler

15   Fehrman:  Everybody's getting fat off this, why not us?  In

16   doing so, he received $1.62 million that flowed from

17   FirstEnergy to Generation Now to a company that he created

18   the day before, 17 Consulting.  And he used that money to

19   further the enterprise's purposes.  Some of that money he

20   used to bribe Mr. Fehrman for inside information about

21   Mr. Fehrman's employer to further the enterprise's efforts.

22   He also used the money to enrich himself, over $360,000 in

23   about six months.

24        This is the culmination of the case.  This is where you

25   take the evidence, you combine that with your instincts and

1    the same common sense you use in your everyday lives and you

2    apply that to the law.

3        This is where the government explains how all of this

4    evidence comes together.  Now, we are not going to go

5    through all of the evidence this morning, of course.  You

6    all just sat through six weeks and listened intently to six

7    weeks of witness testimony.  You saw thousands of pages of

8    records and e-mails and text messages.  You heard hours of

9    recordings.  But we're going to highlight the important

10   evidence and we're going to apply that to the law as the

11   Court instructed.

12       So what is the charge?  The charges are RICO

13   conspiracy, and as the Court instructed yesterday, there are

14   four elements:  That an enterprise existed; that the

15   enterprise was engaged or its activities affected interstate

16   commerce; that the defendant was employed by or associated

17   with the enterprise; and that the defendant conspired to

18   conduct or participate, directly or indirectly, in the

19   conduct of the affairs of the enterprise through a pattern

20   of racketeering activity.

21       We're going to start by going through those elements

22   and we're going to apply the facts to each one of those

23   elements.

24       All right.  That an enterprise existed.  An enterprise

25   is a group of persons associated together for a common

1    purpose of engaging in a course of conduct.  An enterprise

2    is a group of people associated together.  An enterprise has

3    three main features, as the Court instructed yesterday.  It

4    has a purpose.  There's a relationship among those who are

5    associated with the enterprise.  And longevity, that they

6    operated together enough -- long enough that they could work

7    towards those purposes.

8        And the purposes of the enterprise here were to

9    increase Mr. Householder's political power, to help him

10   become Speaker, and increase that power after he became

11   Speaker.  Another purpose was to enrich the members of the

12   enterprise, and they do those specifically through

13   undisclosed payments into Generation Now.  And some of those

14   payments you've seen are bribe payments from FirstEnergy and

15   FirstEnergy Solutions.  And a purpose was to conceal their

16   activities, to conceal their activities from the public, so

17   the public was not seeing the money that was coming in from

18   FirstEnergy as legislation was being passed, and to conceal

19   the activities from law enforcement.  You heard testimony

20   about deleting messages and instructing others to do so.

21       Now, the evidence relating to the enterprise, it

22   overlaps with the enterprise relating to the racketeering

23   activity, the bribery and money laundering and concealment.

24   But we're going to go through some of that same evidence

25   now, but keep that in mind as you listen to the evidence

1    relating to the underlying racketeering activities.

2        So there are five main members of the enterprise:

3    Larry Householder, Jeff Longstreth, Neil Clark, Juan

4    Cespedes, and later on in the enterprise, Matt Borges.

5    Starting with Mr. Householder, the Court's instructions made

6    clear yesterday that the enterprise need not have fixed

7    roles.  There's no hierarchy, there need not be a hierarchy.

8    Some members may have more involvement than others, but in

9    this case, one thing is clear, Mr. Householder was the head

10   of the enterprise.  He was at the top.  He was the person

11   everyone answered to.

12       You heard testimony from Jeff Longstreth and Juan

13   Cespedes.  You heard testimony from Megan Fitzmartin and

14   Anna Lippincott.  They all testified that Mr. Householder

15   was the one in charge.  He was the one they answered to.

16   Lippincott and Fitzmartin were hired by Mr. Householder.

17   Cespedes dealt directly with members of the enterprise, and

18   he knew that Generation Now was offered for his benefit and

19   offered and operated through his control.  And you saw

20   evidence of this in a recorded conversation with

21   undercovers.  Mr. Householder said himself when he was

22   describing the candidates that he would put up to help him

23   keep his power as Speaker:  We have a team, I put the team

24   together, we run the races and raise most of the money.

25   He's picking his candidates.  He's managing the team.  He's

1    running the races and he's raising the money, that is

2    consistent with the evidence you've seen throughout this

3    trial.

4         Again, the purpose of the enterprise revolved around

5    him, first, to help him become Speaker through Generation

6    Now, a central feature of the enterprise.  It allowed the

7    enterprise to receive unlimited, undisclosed money that they

8    used for their benefits, including the bribe payments.  You

9    saw this chart throughout trial.  Just the money into

10   Generation Now from FirstEnergy bank accounts, $59.9 million

11   from 2017 to 2020, a three-year period, $59 million.

12        After he became Speaker, the purpose shifted to pushing

13   through his legislative priorities and making sure they

14   became law.  The other enterprise members worked for his

15   benefit and at his control.  And they benefitted handsomely

16   from it based on their proximity to Mr. Householder and the

17   work that they did on his behalf.

18        Jeff Longstreth, $2.5 million.  Neil Clark, his

19   involvement started at the end of 2018, but really kicked up

20   around the House Bill 6 and the ballot referendum period,

21   $365,000.  Juan Cespedes, you recall Juan Cespedes is a

22   FirstEnergy Solutions lobbyist.  In 2019 during the ballot

23   referendum, the money flowed from FirstEnergy to Generation

24   Now to Mr. Cespedes totaling $600,000.  And Matthew Borges,

25   over $360,000 in just over six months.  The money from

1    Generation Now through Householder helped him pay for his

2    staff and helped him run his campaigns.

3        You also heard testimony from Jeff Longstreth, another

4    enterprise member.  Starting off, his job was to run

5    Householder's candidates, the Team Householder, the

6    candidates that they recruited, that they put up so that he

7    could become Speaker.  And he was responsible for the plan

8    early on.  That included documents that he created where

9    they planned on using a (c)(4) to recruit candidates and

10   fundraise, where they mapped out who was on the farm, who

11   were the people that they could rely on who were on their

12   team where they could seek funds and find allies.

13       They had team meetings involving Generation Now, a

14   501(c)(4), a 501(c)(4), the purpose of which 501(c)(4)s --

15   as you've heard, the purpose of the 501(c)(4)s are to be

16   social welfare organizations.  This 501(c)(4) was used and

17   controlled directly by a public official to bring in money

18   for his own benefit.

19       They had office space where Mr. Householder's office

20   was conveniently situated just next to the Generation Now

21   offices in the same facility, on the same floor, the same

22   area as Generation Now.  And you saw slide and e-mail and

23   document after document about Team Householder, the Team

24   Householder candidates, recruited and funded for his

25   benefit.

1        Mr. Longstreth testified about how his role was to

2    control the funds, to control the accounts.  He knew, as he

3    testified, that the money coming in from FirstEnergy was

4    with the expectation that Mr. Householder was going to pass

5    legislation for their benefit.  And he put that -- he

6    brought the money in and he controlled the money as it went

7    out.

8        And these charts are pretty, pretty complicated,

9    they're pretty complex.  And as my colleague mentioned in

10   opening statements, that's for a reason.  There's a reason

11   that they're complicated.  There's a reason that the money

12   is moved from different accounts into different entities,

13   and that's concealment.  Enterprise members and associates

14   were paid out of these accounts and they were used to

15   further the enterprise's purposes.

16       Now, you heard about Neil Clark, another enterprise

17   member.  Neil Clark was Householder's right-hand man.  You

18   heard him on recorded calls strategizing with

19   Mr. Householder about how to use 501(c)(4)s, who to

20   fundraise from, and strategy.  You heard him describe how

21   money spent into Generation Now was Householder's money and

22   how he used that money for the benefit of the people who

23   paid the money, namely, FirstEnergy.  You heard witnesses

24   testify about Mr. Clark's role.  Again, Anna Lippincott and

25   Mr. Fehrman, Juan Cespedes, Jeff Longstreth, they all

1    testified that Neil Clark was right next to Householder.

2    You heard testimony that he was Householder's proxy from a

3    number of people, including Mr. Clark himself.

4        And Mr. Cespedes in this text message to John Kiani,

5    board chairman of FirstEnergy Solutions, he references

6    Clark, he's the Speaker's proxy.  And you recall this

7    testimony, an incident where John Kiani called Householder

8    to talk to him.  Within minutes, Neil Clark called back and

9    said:  If you need something, you come through me.  You

10   heard Mr. Borges describe Neil Clark as Householder's proxy.

11   (Recording playing.)  He really is acting as his proxy.

12       And then how did Clark describe himself?  As he told

13   undercovers, every politician has got to have somebody that

14   is the hit man, that will go out there and do the dirty

15   shit, that's what he said.  That's what he viewed his role

16   to be, and based on the evidence, that is consistent with

17   the evidence that you've heard.

18       Juan Cespedes was an enterprise member.  Again, he was

19   a FirstEnergy Solutions lobbyist, and he served as a

20   middleman between FirstEnergy Solutions' executives and

21   enterprise members.  In particular, he worked closely with

22   Jeff Longstreth as they transferred the money from

23   FirstEnergy accounts into Generation Now, and he worked with

24   Mr. Longstreth.  Their goals were the same.  As he said in

25   this text message, let's get the deal done, let's get the

1    deal done.  Let's get the legislation passed.

2        And you heard testimony about Matt Borges and his role

3    in the enterprise.  Now, Borges was not involved in the

4    enterprise for the entire period, and the Court's

5    instructions make it clear that that is not required.  It's

6    also not required that co-conspirators be friends.  What the

7    law says is that they're working together for the same

8    purpose, knowingly and in agreement, and Mr. Borges

9    certainly was.  He quickly became a Team Householder member.

10   In this text message that you see here, he's referencing

11   "our candidate," a Team Householder candidate.

12       And Juan Cespedes testified Borges was one of his most

13   trusted confidants.  Mr. Cespedes told Mr. Borges about

14   Generation Now.  He told him how it benefitted Householder.

15   He told Borges how it was used for the benefit of

16   Mr. Householder and his candidates and that FirstEnergy

17   Solutions paid money for Householder's benefit into

18   Generation Now.

19       He told Mr. Borges how FirstEnergy Solutions agreed to

20   pay $15 million through Generation Now while House Bill 6

21   was pending.  So Mr. Borges entered the enterprise with his

22   eyes open, and you'll see that as we go through the

23   evidence.  He worked directly with Cespedes and Longstreth

24   and Householder and all of the enterprise members throughout

25   the ballot campaign, and he became a part of our team.  He

1    ran projects that were funded by the enterprise.  This

2    exhibit represents the million dollars paid into 17

3    Consulting and how it was to be spent, a portion of that.

4    After flowing from FirstEnergy to Generation Now to 17

5    Consulting, he started writing checks to himself.  And he

6    started writing checks to Mr. Cespedes, and, ultimately, he

7    used FirstEnergy money to write checks to Mr. Householder.

8        And he planned to use that relationship into the

9    future.  Although he started late, it was his intent to

10   continue to use this relationship.  As Mr. Cespedes says:

11   The truth is, the relationship with the Speaker and his

12   inner circle and candidates was the true win.  It was like a

13   front of the line pass to Team SLH.  Mr. Borges responded:

14   Yep, he called today as a matter of fact.  Mr. Borges became

15   part of Team SLH, and that's important to remember as you go

16   through this evidence.

17       You saw phone contact after phone contact after phone

18   contact between these same individuals.  This is one example

19   in a two-week period, Borges is talking to Cespedes and

20   Clark and Householder and Longstreth, all during an

21   important part of the ballot referendum campaign.  And when

22   an important event happened, here, Dave Yost, Attorney

23   General, who had to make a decision about whether signatures

24   could be collected that would impact their ballot referendum

25   effort, it was Juan that tasked Mr. Borges with letting the

1    folks know.

2        What does this evidence show?  That shows that these

3    five individuals were associated together, they were working

4    for the common purpose of advancing Householder's power and

5    enriching themselves and concealing their efforts, and they

6    were doing this over a matter of years and intended to do

7    this into the future.

8        The first element is satisfied beyond a reasonable

9    doubt.

10        The second element, the enterprise was engaged in or

11    its activities affected interstate or foreign commerce.

12    Now, as you heard in the instructions yesterday, the parties

13    agreed to a number of stipulations.  Those are on page 22

14    and 23 of your jury instructions.  And those stipulations

15    indicated that House Bill 6, the enactment of House Bill 6,

16    impacted interstate commerce; that the phone communications

17    between Mr. Householder and Mr. Borges were facilities of

18    interstate commerce; and that wire transfers from

19    FirstEnergy to Generation Now and Generation Now to 17 C,

20    Mr. Borges' company, all crossed state lines.

21        This satisfies this element of the offense.  It also

22    addresses the jurisdictional requirements that you've seen

23    in some of the racketeering activities, which we'll discuss.

24    The government has proved this element beyond a reasonable

25    doubt.

CLOSING ARGUMENT BY MR. SINGER                    24-3785

1          All right.  The third element, the defendant was

2     employed by or associated with the enterprise.  Now, a lot

3     of the evidence that satisfies this requirement we just went

4     through in describing the enterprise and the fact that the

5     enterprise existed.  And what that evidence shows clearly is

6     that Mr. Householder was associated with the enterprise.

7     Again, it was set up for his goals, to raise him money to

8     support his candidates, and to help him become Speaker.

9          And the same goes for Borges, all of the evidence that

10    I've just described relating to his involvement in the

11    enterprise show his association with the enterprise.  It

12    also shows his employment with the enterprise.  He was paid

13    money for services.  He was paid money from FirstEnergy

14    Solutions to Generation Now to 17 Consulting.  This shows

15    his employment with the enterprise and payments to him on

16    his behalf.  This element is satisfied.

17         So this leaves Element 4, the conspiracy, and this is

18    where we'll go through most of the evidence that you've

19    heard in this case.  It requires that the defendant

20    conspired to conduct or participate, directly or indirectly,

21    in the conduct of the enterprise's affairs through a pattern

22    of racketeering activity.  Let's unpack that.

23         As the Court instructed yesterday, a conspiracy is an

24    agreement, it's a criminal agreement, and the crime is the

25    agreement itself, not completion of what was intended to be

1    done.  It's the agreement itself is the crime, and the

2    agreement, the agreement to enter into the conspiracy, does

3    not require anything formal, a contract.  You assess that

4    based on all of the facts and circumstances, drawing all of

5    the reasonable inferences.  The law does not require, as the

6    Court instructed, that everyone involved in the conspiracy

7    agree to all of the facts.  It does not require proof that

8    everyone involved was there from the beginning.  Some

9    conspirators play major roles and some slight.  That's all

10   consistent with the law as the Court instructed.  But to

11   convict any defendant, the government must prove that an

12   individual knew the conspiracy's main purpose and

13   voluntarily joined it, intending to help or to achieve its

14   goals.

15       Knew the conspiracy's purpose and voluntarily joined it

16   to help advance or achieve its goals.  And what were the

17   goals here?  This brings us to the pattern of racketeering

18   activity.  The conspiracy charge in this case is conspiracy

19   to participate in the enterprise through a pattern of

20   racketeering activity.  What does that mean?  As the Court

21   instructed yesterday, a pattern of racketeering activity is

22   two acts of racketeering activity, so agreeing that the

23   enterprise will commit two acts of racketeering activity.

24       And what are the types of racketeering activity at

25   issue?  There are three main categories, the column on the

1   left, and you've heard the instructions and the elements of

2   each of these yesterday, but they fall into three categories

3   of types of activities.  The category on the left, public

4   official Honest Services Fraud, extortion under color of

5   official right, and Ohio bribery.  Essentially, this turns

6   on whether Mr. Householder took money knowing that it was

7   given in return for official action.  Did he receive the

8   money knowing that official action was expected in return?

9       The second category, the middle column, that's private

10  Honest Services bribery and Travel Act bribery.  There are

11  two statutes that address the same conduct, and that's the

12  offer and ultimate bribe of Tyler Fehrman.

13      And the third category is money laundering, two

14  different types of money laundering.  There's concealment

15  money laundering where the money is moved to conceal the

16  origins and nature of the money, and there's monetary

17  transactions and property derived from bribery.  So the

18  proceeds of the bribery when it is received, if it's

19  knowingly transacted in amounts over $10,000, that is a

20  racketeering activity.  So bribery comes into an account and

21  a defendant or a conspirator transacts the money out in an

22  amount over $10,000, that's two racketeering acts.

23      What the government must prove is that each defendant

24  either committed or agreed that another conspirator would

25  commit at least two acts of these types of activity.

1        All right.  So let's go through some examples here.

2    Clearly, if a defendant commits two acts of any one of these

3    types of activity himself, he is guilty.  Now, the acts

4    could be of the same type or they could be of a different

5    type, but if one defendant commits two acts, that satisfies.

6        So, for example, if you find that Mr. Householder

7    accepted two bribes to further the enterprise beyond a

8    reasonable doubt, this element is satisfied.  Or, for

9    example, if you find that Mr. Borges knowingly made two

10   financial transactions to conceal the nature or origin of

11   the proceeds of bribe money, that element is satisfied.

12       If a defendant commits one act and agrees that another

13   conspirator will commit another act, that also satisfies

14   this element.  So if you find that Mr. Householder accepted

15   one bribe payment into Generation Now and then agreed, for

16   example, that Jeff Longstreth would transfer $10,000 out of

17   Generation Now -- over $10,000 out of Generation Now's

18   account into another entity, that's two acts, an act

19   committed by Mr. Householder and an act that he agreed would

20   be committed by a co-conspirator.

21       Also, if you find that Mr. Borges joined the conspiracy

22   and offered Mr. Fehrman bribe money for information that he

23   would use to help defeat the ballot campaign, that's one

24   act.  And if he did so agreeing that Mr. Householder would

25   accept one bribe from FirstEnergy Solutions as a member of

1    the enterprise beyond a reasonable doubt, that is the two

2    acts.

3         Finally, a defendant may not personally commit any

4    racketeering acts at all.  You could find the defendant

5    guilty simply by agreeing that another conspirator would

6    commit two acts of racketeering activity and agreeing to be

7    part of the enterprise and further its efforts.  So if you

8    find that Mr. Borges joined the conspiracy to further its

9    purposes, and, in doing so, agreed that Mr. Householder

10   would receive money from FirstEnergy Solutions during the

11   ballot campaign in exchange for legislation, and that

12   Mr. Longstreth would transfer that money in amounts over

13   $10,000, the crime is committed.  The element is satisfied

14   if you find so beyond a reasonable doubt.

15        Now, as you can tell based on the evidence you've heard

16   and what is required to be proved, there are dozens of

17   racketeering acts in this case.  Mr. Householder accepted

18   through the enterprise $60 million from FirstEnergy,

19   FirstEnergy Solutions, over a three-year period, receiving

20   wires about every three months.  And the enterprise

21   transferred numerous transactions over $10,000 involving

22   those proceeds and conducted numerous wires intending to

23   conceal the origin and nature of the payments.

24        This chart lists the payments and the categories of

25   payments that qualify as racketeering acts, and the public

1  official bribery, private citizen bribery, the money

2  laundering, and the money laundering transactions over

3  10,000.  So, for example, focussing on the bottom column,

4  Generation Now transferred 59 transfers, based on the bank

5  records that you've seen, over $10,000 to JPL & Associates.

6  That's 59 separate racketeering acts.

7      All right.  Let's start with the first column, public

8  official bribery.  We're going to go through what the law

9  requires for these statutes, and then we're going to apply

10 the facts, the evidence that you've seen, to that law.

11 There are three public official bribery statutes, and

12 they're all very similar.  Under the Court's instructions,

13 the Honest Services and the Extortion Under Color of

14 Official Right require what's called an explicit quid pro

15 quo, this for that.  This requires a clear understanding

16 that the money was given in return for specific official

17 action.

18     Now, this clear understanding, this agreement, it need

19 not be expressed.  There are no formalities.  The law does

20 not require the bribe payor to say to the public official,

21 I'm giving you this money in return for your legislation.

22 That's not what the law requires.  The law anticipates that

23 that's not how people act, so subtle winks and nudges.

24     In your assessment based on your common sense and all

25 of the reasonable inferences that you can draw based on

1    every piece of evidence, including the volume of money, the

2    timing of payments, the circumstances of those payments, the

3    witnesses who you've heard testify, you consider all of that

4    in determining whether based on your common sense bribery

5    was committed, that money was given in return for official

6    action.

7        Now, bribery includes a public official soliciting

8    money in exchange for agreeing to perform official action,

9    and it includes receiving money when the public official

10   knows that the money is being given in return for official

11   action.  So when a public official receives money knowing

12   that the bribe payor is giving that money with the

13   expectation that they will get legislation or official

14   action, that's bribery.

15       What is official action?  You were given instructions

16   on that.  Official action is making a decision or agreeing

17   to make a decision on a specific question or matter, here,

18   enacting legislation, a specific and focused decision on a

19   question or matter.  It also includes pressuring or advising

20   other public officials to perform official action, but the

21   public official need not actually perform the official

22   action.  The law criminalizes the agreement to perform

23   official action, like agreeing to introduce legislation.

24   Now, actual commission of the official action is evidence of

25   the agreement, but it's not required under the law.

1    So boiled down, what do these statutes require?  That

2    the government prove that Mr. Householder solicited or

3    received money knowing it was given in return for specific

4    official action, knowing that it was given in return for

5    bailout legislation.  Did he receive the money knowing that

6    the expectation was legislation in return?  The answer is

7    yes, beyond a reasonable doubt.

8        Let's go through why.  The evidence shows that

9    Mr. Householder received over $60 million from FirstEnergy

10   bank accounts from 2017 to 2020 and he received the money

11   knowing its purpose.  The money was intended to help him

12   become Speaker, and the reason that FirstEnergy Solutions

13   and FirstEnergy wanted him to become Speaker was because he

14   would be in a position to pass the legislation they so

15   desperately needed.

16       Let's talk about the types of evidence you've seen to

17   support this conclusion.  Motive:  Householder needed to

18   raise money and he needed to raise a lot of it.  He had --

19   if he was going to become Speaker, he needed to fund

20   candidates, he needed to hire employees, and he needed to

21   raise it fast.  He also had personal financial issues,

22   including a $1.8 million judgment.  He had attorneys' fees

23   piling up that he could not pay on his own, and he needed

24   this out of the way in order to run for Speaker.

25       For its part, FirstEnergy Solutions needed a

1    legislative solution.  You heard testimony from Steven

2    Staub, a FirstEnergy executive, FirstEnergy was bleeding

3    money.  The shareholders were not making money.  The

4    prospects were grim, all because the nuclear power plants

5    were not competitive.  They could not operate at a profit,

6    and the only solution was to shut them down -- according to

7    FirstEnergy at the time, was to shut them down, enter

8    bankruptcy, or get a taxpayer-funded subsidy, a bailout.  So

9    they needed each other.  FirstEnergy had what

10   Mr. Householder needed, unlimited cash, and Householder

11   had -- could provide what FirstEnergy needed, the power to

12   enact and pass legislation.

13        Other evidence you've seen relates to concealment, an

14   essential purpose of the enterprise.  And why does

15   concealment matter?  Facts are not concealed for no reason,

16   they're not.  Concealment shows corrupt intent.  And what

17   concealment evidence have you seen?  First, Generation Now,

18   the very nature of the entity shows concealment.  Mr. Clark

19   described it in a recording.  (Recording playing.)

20        If you have a (c)(4), you can give as much money -- you

21   can receive as much money as you want and no one is never

22   going to know.  Mr. Clark repeated this to the undercover.

23   (Recording playing.)  The money was concealed.  It's not

24   reported, it's not recorded.

25        Other evidence of concealment, the very nature of the

1    enterprise that they created.  Eight different entities:

2    Generation Now, Growth and Opportunity PAC, Hardworking

3    Americans, Hardworking Ohioans, Ohioans For Energy Security,

4    the Coalition and Growth Opportunity PAC, 17 Consulting;

5    FirstEnergy had its own 501(c)(4), Partners For Progress.

6    All of these entities sending money around making it

7    difficult to determine the origin of the money, the control

8    of the money, and it did so for a reason.  This was not an

9    accident.  This concealment allowed them to receive millions

10   of dollars without public scrutiny.

11        You heard evidence that both Mr. Borges,

12   Mr. Householder, deleted messages.  According to Special

13   Agent Blane Wetzel's review of Mr. Borges' phone, he deleted

14   messages during important times relating to his meetings

15   with Tyler Fehrman.  And you heard Mr. Householder testify

16   he deleted every text message, every e-mail, every phone

17   contact from his phone routinely, every text message, every

18   e-mail, every phone contact.  Mr. Householder also failed to

19   report a $1.89 million judgment, his entity which was sued

20   to satisfy the judgment, and a $1,500 hotel expense paid by

21   Tony George, a middleman for FirstEnergy executives, on his

22   financial disclosures.

23        You also heard testimony from Mr. Longstreth and Ms.

24   Lippincott that they were instructed by Neil Clark to delete

25   everything that they had in their computers relating to the

1    ballot referendum, to delete it all after it was over.  This

2    is concealment, and it shows corrupt intent.

3         You also heard from enterprise members and statements

4    by enterprise members, and out of the five people we just

5    walked through, four of them admit either through testimony

6    or in recordings that Mr. Householder had a corrupt

7    relationship with FirstEnergy.  You heard Mr. Cespedes and

8    Mr. Longstreth both testify under oath that Mr. Householder

9    was involved in a bribery scheme, money in return for

10   legislation.  You heard Neil Clark say on recordings that

11   Mr. Householder received millions of dollars from

12   FirstEnergy and he went to war for them, that it was pay to

13   play.  And, again, you heard Mr. Borges characterize the

14   relationship between FirstEnergy and Householder and his

15   firm as an unholy alliance.  So the statements out of the

16   mouth of four of the five enterprise members support the

17   bribery agreement.

18        You also walked through and saw just a lot of

19   documents, a lot of e-mails, a lot of bank records, a lot of

20   phone records, they all support this same conclusion.  But

21   in the end, in the end, the volume of money, the sheer

22   volume of money, of the 64 million that was brought into --

23   that was received by Generation Now during this period,

24   there were 56 contributors who were not FirstEnergy.  Of

25   those 56 contributors, they combined gave $4.4 million.  So

1    56 entities gave $4.4 million and one entity gave $60

2    million.

3         Now, let's be clear, Mr. Householder did not take the

4    $60 million and put it in his pocket, and that's not what

5    was required.  The question is:  Was it a thing of value?

6    And, of course, it was, he made that clear on a recording.

7    Increasing political power is important.  (Recording

8    playing.)  Using the money to make sure that his political

9    power is intact was one of the purposes of the enterprise.

10   And he funded his candidates, he won his Speakership, he

11   paid for his staff, he funded his efforts, and he used it to

12   make sure that his priorities passed, and in the process,

13   kept some money aside for himself.

14        All right.  Let's walk through the first batch of

15   payments.  In early 2017, the plan became clear, FirstEnergy

16   was going to bankroll Householder's operation, his political

17   machine.  You heard testimony from Jeff Longstreth about the

18   inauguration, the meeting at Charlie Palmer steakhouse, the

19   meeting at the Palm that followed.  What did he testify?  He

20   testified that there was a dinner on January 18th, Mike

21   Dowling was there, Jeff Longstreth was there, Chuck Jones

22   was there, and Mr. Longstreth and Mr. Dowling talked about

23   the issues.  They talked about the fact that Longstreth

24   needed FirstEnergy to be supportive, and Mr. Dowling said

25   FirstEnergy would be very supportive of the Speaker, but

24-3797

```
 1    they need to get moving on this.  They need to set up an
 2    organization where they could receive undisclosed, unlimited
 3    contributions.
 4        The next night or the night after, there's a dinner
 5    with Householder and Longstreth and Chuck Jones and Mike
 6    Dowling and Tony George, Householder's team at the time and
 7    the top brass at FirstEnergy.  In that meeting, in that
 8    dinner, Householder laid out his plan for becoming Speaker:
 9    Recruit candidates, raise money, get elected, and have them
10    vote for him for Speaker.
11        At that same dinner, FirstEnergy executives laid out
12    what they needed.  They weren't profitable.  They needed a
13    solution, and they needed it at the federal level and the
14    state level, but they were going to need legislation, and
15    they laid out the problems with the plans.  Now, remember,
16    Mr. Longstreth testified that the whole reason for the
17    inauguration trip was so that they could raise money, that
18    was why they were there.  So Chuck Jones and Mike Dowling
19    knew that the Speaker needed money, they knew what he needed
20    money for.  And Mr. Householder knew they needed that --
21    that FirstEnergy needed legislative help.
22        And this testimony is consistent with the documents
23    that you've seen.  It was not an accident that Householder
24    and the FirstEnergy executives ended up together having this
25    discussion.  These are hotel receipts from Tony George,
```

1    identical for both Chuck Jones and Larry Householder, the

2    same hotel, the same day.  The reservations were made

3    literally within a minute of each other.  Those reservations

4    are from January 18th to January 21st, all paid for by

5    Chuck -- by Tony George.  So Tony George, a friend of Chuck

6    Jones, a FirstEnergy consultant, is floating

7    Mr. Householder's hotel room, a hotel room that he did not

8    include on his financial disclosure reports.

9        Householder took the jet, the FirstEnergy jet, to the

10   inauguration.  And you saw the itineraries of what they

11   planned to do.  This is an e-mail from Jeff Longstreth to

12   Householder.  They had dinner reservations at Charlie

13   Palmer, multiple dinner reservations at the Palm, all

14   matching up with Mr. Longstreth's testimony.  That itinerary

15   matches the itinerary from FirstEnergy listing those same

16   dinners with Larry Householder.

17       And then you saw the pictures, the photos from

18   January 18th, 2017, Mr. Householder with his son meeting

19   with Marcus Luttrell.  And then later, in a limo, on

20   January 18th, 2017 at 10:20 p.m., you can see the pants

21   Mr. Householder is wearing match the pants in the limo.  You

22   can see Mr. Householder's son in the limo next to Mike --

23   two people down from Mike Dowling.  You saw Mr. Householder

24   at 10:30 at night out with individuals who were in the same

25   limousine.  And you saw evidence that that picture from the

 1    limo was taken just outside of Charlie Palmer steakhouse.

 2    All of this consistent with what Mr. Longstreth described.

 3         But you heard a different story, and that story was

 4    during Mr. Householder's testimony.  His testimony is not

 5    consistent with this evidence.  He did not tell the truth in

 6    his testimony about his trip to Washington, DC.  He

 7    testified that he went with his son on January 18th, that he

 8    went to the Marcus Luttrell meeting and then went out with

 9    his son, went home early because his wife and his other sons

10    were coming the next day.  He testified that he only saw

11    Mike Dowling on the flight and at a luncheon on the 19th,

12    and that he did not go to Charlie Palmer steakhouse.

13         All of those statements are completely contradicted by

14    the evidence that you've seen, the evidence that you're

15    looking at right now.  He was out on January 18th at a bar,

16    in a limo, with Mike Dowling at the Charlie Palmer

17    steakhouse.  Mr. Householder's testimony was not true.

18         And so what -- what do you draw from that?  The

19    reasonable inference is that's concealment.  And what does

20    concealment show?  That there was something to hide.  And

21    why would he hide it?  Because it's evidence of his

22    corruption.  This is where you use your common sense.  He

23    flew on FirstEnergy's jet.  He stayed in a hotel funded by

24    FirstEnergy.  He went out to dinner and meetings with them

25    and talked about his need for money and their need for a

1    solution.  And then what happened next?  The money started

2    pouring in.

3        There are phone calls between Householder and Chuck

4    Jones directly after the meeting.  You heard Mr. Longstreth

5    testify, within shortly after the inauguration,

6    Mr. Householder walked into his office and said FirstEnergy

7    is going to give us a million dollars.  That is supported by

8    the documents, including phone records, meeting invites.

9    This is an e-mail from February 6th showing that Chuck Jones

10   talked to Larry Householder that day, the same day,

11   Generation Now incorporated and set up a bank account, the

12   same day that Jeff Longstreth e-mailed Mike Dowling about

13   Generation Now.  So on the same day that Chuck Jones and

14   Larry Householder are talking about legislation, they

15   created Generation Now and e-mailed Mike Dowling about

16   funding Generation Now.

17       A month later, it's approved, $1 million in four

18   $250,000 increments.  The documents and evidence paint a

19   pretty clear picture, FirstEnergy paid the money to

20   Householder so that he could help them with legislation.

21       And the text messages and documents backed that up.

22   Within a month later, several months later, Householder --

23   or Longstreth testified -- texted Mike Dowling:  Let me know

24   if there's anything that we can do for you guys.  And how

25   did he respond:  I know that you guys are there for us.  How

1   did he know they were there for us?  Because they had talked

2   about it, because they've already entered the agreement.

3        Shortly after that, you heard testimony from Longstreth

4   about the meeting at the Greenbrier between Chuck Jones and

5   Mike Dowling and Jeff Longstreth, and what did he say?  Jeff

6   Longstreth testified that they talked -- he gave an update

7   about the Speaker's plan, a deep, detailed summary of

8   candidate recruitment and where they were with the race.

9   And what did Chuck Jones say?  We need a state solution, we

10  need the legislation, we have to get Householder over the

11  line because he wouldn't let anything bad happen to us.

12  They had to get Householder into the Speakership.

13       And the documents back it up.  The Greenbrier, the

14  meeting with Chuck Jones and Longstreth and Dowling.  The

15  follow-up e-mail about the next $250,000 payment into

16  Generation Now.  And the meeting between Householder and

17  Chuck Jones that followed.  You're going to see a pattern as

18  we go through each of these payments:  Householder needs

19  money, he reaches out to FirstEnergy, and they come through.

20       All right.  Let's walk through how just this first

21  payment benefitted Mr. Householder personally.  So as you

22  can see, the beginning balance in February was zero.  They

23  had just opened the account.  It was funded by a $25,000

24  payment, and then the document on the other side shows

25  March 16th, $250,000 payment from Generation Now.  So at

1    this point, Generation Now is substantially funded by

2    FirstEnergy money.

3         What did Mr. Longstreth's bank records show?  They were

4    basically empty.  There's $5,000 in the bank account until

5    Generation Now started funding Jeff Longstreth's account,

6    including a $23,000 check and a $43,000 check.  So the money

7    flowed from FirstEnergy into Generation Now.  Generation Now

8    paid the money into Jeff Longstreth, and Jeff Longstreth

9    paid the money out to pay for Larry Householder's attorneys.

10   This $60,000 check -- these two $30,000 checks in May of

11   2017 are the direct result of the money from FirstEnergy

12   into Generation Now.  That's how they were funded.  So the

13   payment, with the expectation of legislation down the road,

14   was then used -- into Generation Now, was then used in these

15   two checks, both of which are more than $10,000.

16        The reasonable conclusion based on this evidence and

17   the testimony from Longstreth and all of the documents and

18   messages and witness testimony and your common sense are

19   that Householder knew that that million dollars, a million

20   dollars, was given with an expectation, and the expectation

21   was that he would use it to become Speaker, and he would

22   pass that state solution, just like Chuck Jones said at the

23   Greenbrier.

24        This is a racketeering predicate, and these two checks,

25   the proceeds of that bribe money, are racketeering

1    predicates that they are money laundering.  They are

2    monetary transactions over $10,000.

3        You saw these payments in the summary slide relating to

4    the benefits Mr. Householder received.  Based on this

5    evidence, as of 2017, the elements are satisfied for

6    Mr. Householder beyond a reasonable doubt, but there were

7    more, there were so many more.  Quite literally, every three

8    months or four months, Mr. Householder reached out for more

9    money and FirstEnergy sent more money in response.

10       Now, let's talk about how this shows an agreement.  As

11   the Court instructed and discussed before, every payment is

12   not required that there was a discussion about I'm going to

13   give you this and you're going to give me that in return.

14   To the contrary, the fact that every time Mr. Householder

15   reached out for money, it showed up in his account, it shows

16   that the agreement is there.  They would not be --

17   FirstEnergy would not be pumping this type of money into

18   Generation Now but for the fact that they expected the

19   money -- based on the evidence you've seen -- that they

20   expected the legislation, based on the evidence you've seen.

21   And there were three payments in the spring of 2018:  A

22   $300,000 payment from Partners For Progress, another

23   $100,000 payment, and then a $400,000 payment.  And we're

24   going to walk through each of those.

25       But before, let's hear what Mr. Clark says about

24-3804

1    FirstEnergy.  (Recording playing.)  He said:  We call
2    FirstEnergy the bank, they're the bank.  We just go to them
3    for money.  When we're running low, we go to FirstEnergy for
4    money.
5        All right.  So I mentioned Partners For Progress.
6    These payments went from Partners For Progress to Generation
7    Now.  And what's Partners For Progress?  It is a 501(c)(4)
8    that was set up days after the inauguration funded entirely
9    by a $5 million wire from FirstEnergy.  All of the money in
10   Partners For Progress is funded by FirstEnergy.  So the
11   money out of Partners For Progress is FirstEnergy money
12   going to Generation Now.  And Mike Dowling made that clear
13   in 2020 relating to a different payment where he mentioned
14   that we, FirstEnergy, are going to make a significant
15   contribution to Generation Now from Partners For Progress.
16   FirstEnergy controls the money.  They funded Partners For
17   Progress, and they determined how it's spent.
18       All right.  Let's look at these payments.  This is
19   March 2018, Generation Now has got $8,000.  Now, March 2018,
20   that is in the middle of the primary season.  This is when
21   they need money.  They've got their Team Householder
22   candidates.  They're trying to get Householder candidates to
23   win so that they can help him be Speaker.  They need money.
24   So what do they do?  Mr. Householder calls Mike Dowling,
25   they have a series of conversations, the same day.  And then

1    days later, a $300,000 check shows up in the Generation Now

2    account.  How did they use the money?  Pay staff, to fund

3    mailers against Team Householder opponents, to fund the

4    candidates who are Team Householder.

5        Now, it's important to recognize that this is in the

6    middle of the Team Householder versus the Team Smith primary

7    campaign, and it's a battle.  And you get the sense of that

8    through the recordings.  (Recording playing.)  So they're

9    talking about using (c)(4) money, how they're going to use

10   it.  They're going to use it against their opponents.

11   They're going to use it against people who are not

12   supportive of them.

13       The $100,000 payment was similar, just a month later,

14   they needed money, the money came.  You also heard testimony

15   about a payment from Hardworking Americans.  Hardworking

16   Americans is another PAC that was used, and the way that it

17   passed through was similar.  Householder meets with Jones,

18   he meets with Tony George, and this came on the heels of

19   Householder's own primary against Kevin Black where he was

20   neck and neck.  He had to win his primary in order to have

21   any chance of becoming Speaker.  So Jeff Longstreth sends a

22   One Ohio United contribution form.  That contribution form

23   was sent to Mike Dowling requesting a $400,000 contribution,

24   and then a convoluted pass-through, FirstEnergy pays

25   $400,000 to One Ohio United, which pays $575,000 to Citizens

1     For Working America, which pays $353,000 to the Hardworking

2     Americans committee, which pays $404,000 to New Day Media.

3     If that's a mouthful, it's because it is, all of these

4     different entities?  And what did it fund, a dirty money --

5     in part, a dirty money/dirty politics ad attacking

6     Mr. Householder's opponent.  Mr. Clark and Mr. Householder

7     discussed it.  (Recording playing.)

8         All right.  So that's Clark and Householder talking

9     about a dark money ad against their opponent.  And let's see

10    the ad.  (Video playing.)  So the Hardworking Americans

11    committee pays for this ad that Clark and Householder just

12    talked about that was funded by FirstEnergy money that

13    flowed through four different entities.  That's concealment.

14        The August 2018 payment, $500,000 from Partners For

15    Progress, less than three months later.  Householder needed

16    money, and he went back to the bank.  Rinse, wash, repeat.

17    $2,000 in the bank account.  Now, this came on the heels of

18    about $238,000 that was paid out of Jeff Longstreth's

19    account for Mr. Householder's personal benefit.  So they

20    paid over $200,000 for Mr. Householder, and their bank

21    account shrinks down to 2, so they reach back out.

22        And here's Mr. Dowling and Mr. Jones talking about

23    Householder's request on August 5th.  Chuck Jones says:

24    Householder looking for more money?  Mike Dowling says:  You

25    know the answer to the Householder question, but I don't

1     know how much he'll ask.  I'll get a list from Ty as to that

2     race he's most interested in winning, and I'll have

3     something for you.  He'll want hard money first and then

4     (c)(4) money for sure.  Mike Dowling then says:  Larry wants

5     to hear about us, status of the company, what's important,

6     money will come up, help with key races.

7          So they're going to meet, they're going to talk about

8     how Householder can help them, what specific needs they need

9     right now, what the legislation is going to look like, and

10    he's going to talk to them about what he needs for him to

11    become Speaker and how they can fund his races.  The next

12    day they meet, and, once again, $500,000 shows up in the

13    Generation Now account.

14         This text message between Householder and Jones

15    followed.  Chuck Jones says:  We're rooting for your team.

16    Householder says:  I'm rooting for you as well.  We're on

17    the same team.  They're on the same team all right, their

18    interests are aligned.  The money is being paid for a

19    reason.  There is only one reasonable conclusion, the team

20    that Householder is talking about is funding Householder's

21    efforts to become Speaker; and why are they doing it, so

22    that he can pass legislation to save the plants.  He

23    received it with that expectation and it is part of the

24    ongoing agreement.  These payments are acts of racketeering.

25         But there's more.  Two checks in October 2018.  Now,

1    this one is a little bit different.  These are FirstEnergy
2    Solutions' checks, and you'll recall that FirstEnergy Corp.
3    and FirstEnergy Solutions are starting to move in separate
4    directions.  That's why Mr. Cespedes was hired, who then
5    hired a team -- his own team to help further FirstEnergy
6    Solutions' interests.  And you'll recall his testimony.  The
7    information was one way.  FirstEnergy, they knew all about
8    what FirstEnergy Solutions was doing, but FirstEnergy
9    Solutions was kept in the dark about what Chuck Jones and
10   Mike Dowling were doing.

11        And Mr. Cespedes described a meeting that he had with
12   Householder on August 1st, and they met and they described
13   what they needed out of the legislation.  And shortly after,
14   Mr. Householder called Bob Klaffky, who was also there, and
15   during that call, according to Mr. Cespedes, Householder
16   asked for multiple hundred-thousand-dollar contributions.
17   And at the time, Bob Klaffky pushed back.  He didn't know,
18   as a company that was now in bankruptcy, if they could even
19   fund that.  And what did Householder say?  They have to
20   figure it out, they have to figure out how to come up with
21   the money.  And so they did.

22        And this led to the meeting on October 10th, 2018.  And
23   you saw the message Klaffky sent to Cespedes two days before
24   that:  Householder just called me, he's wondering if FES is
25   going to be doing anything.  Are they going to be providing

1   me any money?  The next day:  We will have a check for

2   Householder tomorrow.  And the check was a $400,000 check to

3   Generation Now that was handed to Mr. Householder,

4   Generation Now, a 501(c)(4), social welfare organization, or

5   at least it's supposed to be.

6       Mr. Cespedes described that meeting.  He said that they

7   split the checks up so that they had -- would have more

8   opportunity to get face time with Householder, more

9   opportunity to stress to Mr. Householder what they needed,

10  what specific things they wanted in legislation.  And in the

11  meeting, they laid out -- they discussed the Speaker race,

12  they discussed Householder's need for money, and a check was

13  provided to Mr. Householder.  And in doing that,

14  Mr. Cespedes testified that Bob Klaffky said, my client

15  cares very much about our issue, as he provided the check to

16  Householder and showed him how much was on the check.

17  Cespedes testified Householder looked at the check and said:

18  Why, yes, they do.

19      He knew why they were giving the money, they care about

20  their issue, they care about getting the legislation passed,

21  and he received it with that knowledge.  And after receiving

22  that check, they discussed specifically the nuclear

23  legislation, and Householder indicated that he would support

24  it.

25      You saw Mr. Cespedes testify.  You had the opportunity

1    to assess his credibility.  Everything that he testified

2    about is consistent with the evidence that you have seen.

3    Mr. Cespedes testified that he had no doubt Householder

4    would push for the bailout legislation after the

5    October 10th meeting.  After receiving the check, what does

6    Mr. Householder do?  He sends a message to Chuck Jones:

7    $400,000, thank you.

8         Now, you also saw Mr. Klaffky testify, testified he was

9    a longtime friend of Larry Householder, that he supported

10   him for Speaker, and, in fact, on election night spent it at

11   Generation Now's office with Mr. Householder and Ty Pine,

12   another FirstEnergy lobbyist.  Bob Klaffky testified he

13   couldn't remember what was said at the October 10th meeting.

14   He couldn't remember anything that was said at the

15   October 10th meeting.  He admitted that Householder received

16   a check for $400,000 from Generation Now.  And he later

17   admitted in his testimony that Juan Cespedes routinely

18   repeated in meetings with him, my client cares very much

19   about our issue, well, yes, they do, confirming that these

20   are the words that were spoken by -- during the meeting with

21   Householder and this was his response when he received that

22   check.

23        This is consistent with Mr. Cespedes.  This alone

24   shows, this exchange, this money in this context with this

25   backdrop, that Mr. Householder received that money knowing

1    that FirstEnergy Solutions expected legislation in return.

2    That is what Mr. Cespedes testified.

3         And that is what the instruction is in this case.  An

4    agreement was reached if the evidence shows that the public

5    official received a thing of value knowing it was given with

6    the expectation that the official would perform a specific

7    official act in return.  That's what happened here.

8         Now, Bob Klaffky also testified that he didn't see any

9    agreement, he didn't see any pay to play.  Of course, he

10   didn't have the benefit of the Court's instructions about

11   what is required under the law.  He also admitted that he --

12   if he testified that he was involved in pay to play, that

13   could end his career, it could end the career of one of the

14   most powerful lobbyists in Ohio.  So he had an interest in

15   distancing himself, distancing himself from the exchange, an

16   exchange that he couldn't remember what was said in.

17        The documents support Mr. Cespedes' testimony.  Shortly

18   after the meeting, he wrote a report that said:  If

19   Householder is successful, the effort will likely be led

20   from his chamber.  And then you saw this text message

21   exchange between Cespedes and Klaffky:  The $500,000

22   investment seems very wise right now, this is a good day.

23   This is the same day that Householder is elected Speaker,

24   the $500,000 investment.  How does Klaffky respond?  High

25   risk, high reward.  Sadly, I lived by that principle too

1    long, I'm exhausted.  High risk, $500,000 is a lot of money.

2    High reward, a legislative bailout worth a billion dollars.

3    That's a pretty big reward.

4        The evidence is clear, FirstEnergy Solutions invested

5    the $500,000 because they wanted the bailout, and

6    Householder knew that when he accepted it.  This is a

7    racketeering act.  But it wasn't enough.

8        Householder reached out again in October 2018, this was

9    at the end of the primary season, and they needed more

10   money.  So Householder reaches out to Chuck Jones, he sets

11   up a meeting on October 23rd.  That same day, Mr. Longstreth

12   sends wiring instructions for Hardworking Ohioans.

13   Hardworking Ohioans is the new entity that's being used for

14   concealment for the general election.  So there is

15   Hardworking Americans and Growth and Opportunity PAC in the

16   spring; Hardworking Ohioans, a new concealment method, in

17   the fall.

18       This is Chuck Jones describing why they need to raise

19   money for Householder, and he's describing what he's going

20   to tell Bob Murray, another energy guy.  We believe in Larry

21   and think he can and will be Ohio's next Speaker.  This is

22   important to all of us.  Why is it important?  He has a need

23   for a final push.  We've committed $700,000 to the effort

24   and I'd like to ask for your help with 100,000 more.

25       When Mike Carey, who works for Bob Murray, arranged for

1    the $100,000 just referenced, Chuck Jones says:  Make sure

2    he gets credit with Householder.  They all know the money is

3    going to Householder.  They all know it's going for his

4    purposes.

5         And in the end, the plan worked.  Householder used the

6    money to become Speaker.  He thanked Chuck Jones for his

7    support.  The day that he became Speaker, he created a

8    subcommittee on energy generation, and months later, a

9    billion-dollar legislative bailout for FirstEnergy

10   Solutions.

11        There's only one reasonable conclusion based on this

12   evidence, the money was for the legislation.  It is

13   supported by the testimony of Longstreth and Cespedes.  It's

14   supported by the documents.  And it's supported by Matt

15   Borges himself.  (Recording playing.)  Unholy alliance, it's

16   an unholy alliance between Larry and FirstEnergy and

17   Roetzel.  Matt Borges knows this agreement is corrupt.

18        Neil Clark says the same thing in different words.

19   (Recording playing.)  All right.  So Clark describes the

20   Speaker took this million, million-and-a-half, $2 million,

21   and he went to war for them.  And recall, Mr. Clark worked

22   for the enterprise during the Hardworking Ohioans part of

23   the campaign, so he's familiar with the money that was

24   received during that time.  He went to war and he beat them

25   to death.  Those guys that go to the wall can only do it

1    once a year, because if they do it all the time, everyone

2    knows that they're pay to play.  Clark is describing the

3    relationship between the FirstEnergy money to Larry

4    Householder as pay to play, this for that, money for

5    legislation.

6         And then there's Chuck Jones' e-mail -- text messages

7    with Mike Dowling the day that House Bill 6 passed, Mike

8    Dowling tells him it passed.  And how did Chuck Jones

9    respond?  We made a big bet and it paid off.  We made a big

10   bet and it paid off.  Actually, two big bets.  Dowling

11   responds:  Huge bet and we played it all right on the budget

12   and House Bill 6, so we can go back for more.  The next

13   message is a specific reference to a party with the Speaker.

14   It's pretty clear what the bet was, at least one of those

15   bets, the millions of dollars that FirstEnergy put in to get

16   Householder elected Speaker and the massive bailout that was

17   passed shortly thereafter.

18        All of these payments satisfy the elements.  But, of

19   course, the payments continued.  $15 million more.  And they

20   started when the Generation Now bank account was low.  Chuck

21   Jones and Larry Householder talked about providing money,

22   paying for ads to help provide cover for other public

23   officials so they could vote for House Bill 6, and he

24   convinced Chuck Jones to run the money through Generation

25   Now.  Householder says he's cheap.  I won't spend as much as

CLOSING ARGUMENT BY MR. SINGER                    24-3815

```
1    Rex does, the Strategy Group guy who's going to fund or

2    create the ads.  Chuck Jones says:  I would say you're a

3    bargain, not cheap.  Millions of dollars for a

4    billion-dollar bailout, that's a bargain.

5        You heard Mr. Cespedes talk about, and Mr. Longstreth

6    talk about, the switch from Dewey Square to Generation Now.

7    FirstEnergy Solutions had hired Dewey Square to run their

8    grassroots effort.  But because Larry Householder was upset

9    and because Householder wanted to run it himself so the

10   money could run through Generation Now so he could control

11   it, Longstreth instructed FirstEnergy Solutions that they

12   had to fire Dewey and they had to hire Generation Now now,

13   and they had to run $15 million through Generation Now so

14   they could run the grassroots campaign at a time when their

15   bank accounts were low.  And they used that money to create

16   mailers and ads to create cover for officials to vote for

17   House Bill 6, but they also used to pay for their staff,

18   millions of dollars transferred to Jeff Longstreth's

19   account.  And Mr. Cespedes told Mr. Borges about it.  Who

20   would think that a bankrupt company is willing to spend

21   $15 million?  Cespedes testified that he described to

22   Mr. Borges why they were paying the money, how they felt

23   like they had no choice.  Now, think about this, this is

24   legislation that is pending, and the Speaker of the House,

25   one of the most powerful people in the state of Ohio,
```

1   overseeing the legislation, goes to the company who's -- who

2   has most at stake and says you're going to have to pay me

3   and my company $15 million if you wanted this legislation to

4   pass, that's what Mr. Cespedes testified happened, and that

5   is consistent with the documents that you've seen.  Just

6   weeks after the bank account ran low, $1.5 million gets

7   pushed into the Generation Now bank account.

8        You also heard about official action and we talked

9   about official action.  You heard from different public

10  officials who were pressured and advised to vote for House

11  Bill 6, and you heard some questions about whether people

12  were threatened.  Keep in mind, being threatened is not an

13  element.  What is required is that these individuals felt

14  like they were pressured or that you find that

15  Mr. Householder intended to pressure them for their vote.

16  That's what the evidence shows through text messages like

17  this.  You also heard about how Mr. Householder instructed

18  another individual to delete text messages relating to the

19  pressure campaign to get House members who were pressured --

20  or a House member, Dave Greenspan, who was pressured, to

21  delete messages.

22       And you heard Mr. Clark describe the relationship

23  between FirstEnergy Solutions during this period, why they

24  were paying all of the money.  (Recording playing.)

25  FirstEnergy is the bank, they've got too much money, too

1    much power.  (Recording playing.)  The money is unlimited,

2    the money from FirstEnergy is unlimited, that's what Mr.

3    Clark says.  He says:  You can't compete with something like

4    that, and those guys are only doing it because they get on

5    House Bill $1.3 billion in free subsidies.  They're only

6    doing it because they're getting $1.3 billion in free

7    subsidies.  What do they care about putting $20 million into

8    this thing?  This is the bargain that Chuck Jones was

9    talking about in the e-mail we -- the text message we just

10   went through.  Mr. Householder received $20 million to a

11   secret entity that he controlled and provided a $1 billion

12   subsidy.  That is a racketeering predicate.

13        You also heard about the sports betting legislation,

14   the recordings between the undercovers and Mr. Clark.  Now,

15   clearly, based on the evidence that we saw, Mr. Clark's

16   position as a proxy, he had a very close relationship with

17   Householder, and you can see that.  This is just an example

18   of the volume of communications over a two-week period.

19   This is the two-week period that Clark was in Nashville with

20   the undercovers.

21        And the sports betting legislation involved a bill that

22   was being run by Dave Greenspan, and the goal was to allow

23   the undercovers to run a sports book out of a hotel to make

24   sure that that language was included in the legislation.  So

25   they hired Mr. Clark as a lobbyist, and on those calls, Mr.

1    Clark immediately references direct line to Householder.

2    The first meeting they had, he told him that Mr. Householder

3    took money through a (c)(4) and the best path to influence a

4    legislation was payments into Householder's (c)(4), among

5    others.  Recordings show Clark discussing the undercovers

6    paying the money into the (c)(4) to progress the

7    legislation, and he recommended that they write a $5,000

8    check to Generation Now.

9        You saw these recordings, you heard them.  We'll go

10   through a couple.  (Recording playing.)  So the money was to

11   go to Generation Now, which is the Speaker's (c)(4), they're

12   going to hand-deliver him the check.  And, later, he advised

13   a $50,000 check that they give to Householder at a meeting.

14   The meeting took place.  You heard the recordings from the

15   meeting.  Ultimately, individuals other than Mr. Householder

16   came, including Jay Edwards and Bryan Gray, and Jeff

17   Longstreth didn't come to collect the check.  And based on

18   the recording, Mr. Clark said, you didn't tell him to give

19   him the check because he was protecting his boss.  He was

20   protecting his boss.

21       But there was a follow-up call the next day,

22   Householder talked to Clark for 36 minutes, and then later

23   that day, there was a call.  (Recording playing.)  So they

24   had a meeting, they talked about the compromise legislation

25   that the undercovers wanted.  The next day, Clark calls

1  Householder.  This leads to a conversation with the

2  undercover where he says:  Here's what you want to give,

3  here's the check, the legislation is on its way, the check

4  should go to Generation Now or an entity relating to term

5  limits, and we'll get that legislation, the one that we

6  talked about last night.

7      Now, this shows the enterprise.  This shows Clark and

8  Householder working together to further the goals, to

9  further the goals of getting more money into Generation Now.

10 And ultimately, the FBI and undercover determined that it

11 was not in the best interest to write that check.  Remember,

12 RICO punishes the conspiracy, not the completed act, and the

13 racketeering of Honest Services Fraud involves the scheme to

14 solicit money.  So when Clark calls the undercover the next

15 day and says, you'll write the check and you'll write it to

16 Generation Now under the term limits initiative and we'll

17 have the compromise, that is a part of a scheme, that is

18 part of a scheme to advance legislation in exchange for

19 money.

20     Ballot referendum, more money, a massive amount of more

21 money, over $36 million of more money, the ballot

22 referendum.  House Bill 6 passed, and a ballot campaign was

23 initiated that, if enough signatures were collected, would

24 potentially put House Bill 6 on the ballot and overturn the

25 legislation.  The evidence shows that there was a phone call

1    with John Kiani and Larry Householder and Juan Cespedes on

2    July 29th, 2019, and in that meeting, Householder laid out

3    his plan.  The ballot referendum would be funded through

4    him.  He would take charge, and ultimately, if the ballot

5    campaign is successful, he will pursue alternate

6    legislation.

7         Again, step back from this for a moment.

8    Mr. Householder is an elected public servant.  He is one of

9    the most powerful individuals in the state of Ohio.  In a

10   call with a FirstEnergy executive with a billion-dollar

11   bailout on the line, he's negotiating paying millions of

12   dollars into his 501(c)(4) to run through his company while

13   at the same time promising legislation, potentially multiple

14   pieces of legislation, that would make sure that the

15   legislation -- that the bailout is protected.

16        He's using his ability to pass legislation to enrich

17   the enterprise, to pay his staff, to increase his political

18   power.  And he knew that if FirstEnergy Solutions was going

19   to pay that kind of money into Generation Now, $36 million,

20   that they are going to expect the legislation in return.

21   This is bribery under the Court's instructions.

22        Mr. Cespedes testified, he said, Mr. Householder didn't

23   have any experience defeating ballot campaigns.  Generation

24   Now didn't have any experience defeating ballot campaigns.

25   Householder's team didn't have experience defeating ballot

24-3821

1    campaigns.  There was a lot on the line, but they didn't

2    have any choice.  They put the money through him if they

3    wanted to protect themselves.

4        And the documents support this.  Here's Householder

5    telling Longstreth in June before the ballot referendum even

6    started:  Let's stay on the good side of FES and we'll do

7    the defend.  We'll run the ballot campaign, the money will

8    run through us.  Mike Dowling:  Don't put your checkbook

9    away, John -- to John Kiani.  But Mike Dowling had concerns,

10   who's going to run point on this?  He tells John Kiani:  I'm

11   concerned about the referendum.  He says at the bottom:  You

12   guys are all smart, but there's a lot of strategy that goes

13   into this, you need really smart people with experience to

14   defeat a ballot campaign.  Kiani responds:  We're taking

15   Householder's lead.

16       Dowling's tune changed a bit after he talked to

17   Householder, though.  You see a call on July 26th where

18   Dowling -- where Householder talks with Jones and then

19   Dowling talks with Householder.  Mike Dowling writes:  I had

20   a good conversation with Speaker H today re the referendum

21   issue.  I think you're in excellent hands.  I know more

22   about his personal involvement and engagement.  We should

23   all be following his lead, I know you and FES are as well.

24       So he had real concerns about who's going to run this

25   campaign.  Then, he talks to Householder, and now he says we

1    should follow his lead.  Kiani says the same thing the day

2    after the July 29th call:  Had a good call with the Speaker

3    yesterday about the referendum.

4        And so what happened after that?  They talked about the

5    legislation, as $36 million poured into Generation Now.

6    Chuck Jones says:  Before we make any strategy steps, we

7    want to make sure Householder is on board.  He seems pretty

8    confident in his referendum strategy and plans to pass it as

9    a tax if they get enough signatures.  The plan, the plan is

10   if you keep pumping this money in, he'll save it ultimately,

11   regardless of what happens with the ballot campaign.  He's

12   got a tax bill on the way.  You heard from Pat Tully who

13   testified about the legislation that he drafted that would

14   protect House Bill 6 at Householder's direction.

15       And you saw multiple messages relating to legislation.

16   Just spoke to the big guy, he's got the tax bill ready to

17   go.  Householder has a quick fix.  The Speaker will correct

18   any adverse decision.  He will not let us fail.  He will not

19   let us fail. Even Mr. Borges:  Householder is going to

20   introduce this piece of legislation, start the whole process

21   over.  The tax bill is ready to go.  The $38 million

22   would -- Mr. Cespedes testified, it would not have paid the

23   money but for the fact that he was the Speaker.  He would

24   not have paid the money but for the fact that he had the

25   ability to save them with legislation.

1    Let's talk about Mr. Borges.  What did he know about

2    this?  Mr. Cespedes testified that he knew about the

3    $400,000 check in October 2018, that he talked about it.

4    Again, Mr. Borges was Cespedes' most trusted confidant in

5    the field.  He knew about the $15 million in the spring of

6    2019 to pass House Bill 6.  He knew that the money was

7    funneled from FirstEnergy Solutions to Generation Now.  He

8    knew that Generation Now was Householder.

9    With that knowledge, he said I want in.  Like he told

10   Tyler Fehrman:  Everyone is getting fat on this, why not us.

11   So he arranged his own company where FirstEnergy money would

12   pump into Generation Now, which would be paid into his

13   company so that he could use that money to further the

14   enterprise's efforts and defeat the ballot campaign.  See

15   the wiring communications with Jeff Longstreth and the flow

16   of the money from these entities and ultimately to himself.

17   And one of the objectives of Mr. Borges being part of

18   the team was because of his close relationship with certain

19   public officials who were involved in the ballot campaign.

20   Cespedes writes to Borges:  We need you on this referendum

21   thing ASAP, please get to Yost.  So why was the Attorney

22   General Yost important to this effort?  Recall, the ballot

23   campaign needed to collect a certain number of signatures,

24   265,000 signatures; if it made the ballot, then, the bailout

25   would not go into effect.  If Yost denied the signatures, if

1    he said that their summary petition was inadequate, then, it

2    failed and House Bill 6 became law.

3        So one of the reasons Mr. Borges was on this team and

4    working in coordination with Householder was to convince

5    Dave Yost to deny the petition at the start.  And here's

6    their communications.  Yost and Householder connected

7    yesterday.  Borges says:  I'll follow up with Dave.  Just

8    showing his coordination with the enterprise, his activities

9    in support of it.  Again, Householder is asking if you, Matt

10   Borges, have spoken with Dave Yost today; he said he hasn't.

11       And this shows the contact, the flow of communication,

12   between Householder and Borges and Householder and Yost and

13   Yost and Borges.  Cespedes testified they are working in

14   concert, they are working in coordination.  Borges knows

15   what's going on, and he's entered the conspiracy, and he's

16   working to further it, and he knew about the legislation

17   that was backdropping it all.

18       So what did he do with the money?  Documents like this

19   lay out exactly how he intended to spend this FirstEnergy to

20   Generation Now to 17 Consulting money, and that included

21   payments to other public officials, contributions.  The

22   document on the left is from Juan Cespedes, which is

23   $100,000 in contributions, and it mirrors a document created

24   by Matt Borges with the same $100,000.  This is money that

25   was flowing from FirstEnergy to Generation Now to 17

1    Consulting to their own personal accounts and then being

2    paid the public officials who were involved in the

3    referendum effort.  And you saw checks from Matt Borges to

4    Dave Yost.  And Cespedes testified we are paying people who

5    are working hard on the ballot campaign, public officials,

6    that's who they were writing checks to.  This is how they

7    were using money.  This is one of the roles that Borges was

8    doing to further the enterprise.

9         All right.  So October 21st, 2019, Team Householder

10   prevailed, the enterprise prevailed.  They defeated the

11   ballot campaign.  House Bill 6 will go into effect.  That's

12   October 21st, 2019.  The next day, there was another

13   $3 million payment into Generation Now from Partners For

14   Progress.  Let's follow the path of that money.  $3 million

15   wired from Partners For Progress to Generation Now.

16   2.9 million of that dollars was transferred out from

17   Generation Now to Jeff Longstreth's account, and that was

18   conveniently sent at a time where Jeff Longstreth's account,

19   just weeks before, was at $15.  It went from $15 to a

20   $2.9 billion insurgence of FirstEnergy money paid to

21   Generation Now, paid into Jeff Longstreth's account.

22        And, recall, how are the benefits, personal benefits,

23   to Householder and other enterprise members paid?  Out of

24   the JPL account.  You can see in December 2019, about

25   $60,000 was paid for the house, Householder's house in

1    Florida.  Another $20,000 in credit cards was paid out of

2    the same JPL account.  All told, all of the money, all of

3    the close to $500,000 that was paid for Householder's

4    personal benefit was paid out of Jeff Longstreth accounts.

5         The final payment that the enterprise received from

6    FirstEnergy relates to the term limit initiative.  This was

7    a $2 million payment in 2020, and you heard Mr. Cespedes

8    talk about that.  He had two conversations with enterprise

9    members about raising money for the term limits initiative.

10   The first was with Jeff Longstreth about the size of the

11   payment, and the second was with Neil Clark.

12        And he described his conversation with Neil Clark as

13   follows:  He said FirstEnergy Solutions wanted additional

14   years on the subsidy.  It was currently at six years, they

15   wanted it at ten years.  And Clark expressly discussed

16   exchanging those four years -- he knew FirstEnergy Solutions

17   wanted those four years, and he said if we can get the term

18   limits initiative through, if you can send the millions of

19   dollars that we need from you and other public utilities

20   like FirstEnergy Corp. to fund the term limits initiative,

21   we will get you the extra four years on the subsidy.  That's

22   what Cespedes testified that Clark told him.  He made very

23   clear, he said he was very strongly worded that the four

24   years was tied to the ability to get that term limits

25   initiative passed and tied the money that FirstEnergy

CLOSING ARGUMENT BY MR. SINGER                    24-3827

1    Solutions would pay into the term limit initiative.

2         This is consistent with the messages that you saw from

3    Chuck Jones relating to the call that Householder made to

4    him about that same initiative.  He texts -- Chuck Jones

5    texts Tony George:  I talked to the Speaker, he's an

6    expensive friend.  And then he describes the term limit

7    initiative, 16 years max, no need to switch houses.  This

8    followed a call between Larry Householder and Chuck Jones.

9    And how does he describe it?  He'll get a lot more done in

10   16 years.  You saw a number of messages relating to the

11   Speaker calling Householder -- or calling Chuck Jones and

12   asking for money, wanting support, and ultimately Chuck

13   Jones told Householder that they're going to do $2 million

14   next week, and there it is, Generation Now, Partners For

15   Progress.

16        They want the consistency in leadership, they wanted

17   Householder in charge.  They knew that it was in their best

18   interest to do that.  And, in fact, Clark specifically told

19   Cespedes that he was going to pursue the four years of extra

20   subsidy if they can fund the initiative.

21        In the end, all of these payments, $60 million,

22   applying your common sense to the testimony and the evidence

23   and drawing all evidence -- all reasonable inferences, the

24   evidence is clear, Mr. Householder received that money

25   knowing what it was for.  FirstEnergy and FirstEnergy

1    Solutions would not have paid that money into Generation Now
2    for Longstreth's benefit if they didn't know they were
3    getting legislation in return, if they didn't know specific
4    official action would be the result.

5        And Mr. Borges, again, he agreed to join this
6    conspiracy with his eyes open.  He knew about the corrupt
7    relationship.  He knew about the unholy alliance.  He knew
8    that FirstEnergy was pumping millions of dollars into
9    Generation Now for Householder's benefit, and he knew that
10   Householder was pursuing legislation in return.  And he said
11   I want in, I want to get fat off it too.  So he joined, and
12   he did, and he made money off of it.  The predicate acts are
13   satisfied beyond a reasonable doubt.

14       Moving to Private Honest Services Fraud and the Travel
15   Act.  This relates to the Tyler Fehrman bribe.  Private
16   Honest Services Fraud requires a different kind of bribery
17   agreement.  It's a private bribery agreement.  It's where an
18   individual solicits or offers a bribe to someone to violate
19   their duty to their employer.  Money to exchange information
20   that the employee -- that the employer wants to keep secret,
21   that it wants to protect, and that the person who offers the
22   money reasonably believes will hurt the employer.  That's
23   what happened here.

24       And the Travel Act is similar.  It's where a defendant
25   knowingly, or a conspirator knowingly, uses a facility in

1    interstate commerce -- here, the wire transfers that

2    funded -- to promote unlawful activity, such as offering or

3    giving or providing a valuable thing to a person who works

4    for a ballot campaign, for the purpose of influencing the

5    employer agent with respect to the discharge of their

6    duties.  So again, it's a quid pro quo.  It's money for

7    information that will hurt the efforts of the ballot

8    campaign, the employer of Tyler Fehrman.

9         Here are the wire transfers that funded the bribe.  You

10   saw the text messages between Mr. Borges and Mr. Cespedes

11   before the meeting setting it up.  Cespedes testified this

12   was the plan.  They knew Tyler Fehrman was working for AMT,

13   the signature collection company.  We're going to pay him

14   off.  We're going to get information.  We're going to use

15   that to further the enterprise and to help them defeat the

16   ballot campaign.  They sketched it out on the white board,

17   $25,000, that's what they wanted to pay him.

18        And you heard Tyler Fehrman testify about what happened

19   at that meeting, the meeting on September 1st, how shooken

20   he was that a friend, a trusted colleague, would make that

21   offer.  He said I can take care of your debts, I can pay off

22   your loan on your car, we just need information that we can

23   use to help defeat your effort, that we can use to keep your

24   employer from doing what you were hired to do.

25        So what did Mr. Fehrman do?  He sent this e-mail, sent

1    this text message, and it's telling.  He said:  I'd love to

2    have those debts wiped out, to be debt-free and not have to

3    worry, but I can't put a price tag on my integrity or my

4    word.  He said:  My word is my word, my integrity is

5    literally all I've got, I'm not willing to sell it.  This is

6    before Fehrman called the FBI.  This is his response to the

7    offer Matt Borges made on September 1st.  You don't write a

8    text message like this to a friend unless the meeting shook

9    you, and I think that that's what Mr. Fehrman testified.

10        Mr. Borges' response is telling:  No matter what, don't

11   ever let anyone -- don't ever tell anyone about our

12   conversation from earlier.  Why, why wouldn't he want him to

13   tell anyone?  It's because he offered him money for

14   information, he offered him a bribe.  That's what Tyler

15   Fehrman testified.  That's what the substance of this text

16   message is, and all of the later conversations should be

17   viewed in the context of this exchange.  This is -- the

18   offer was rejected, and it wasn't just any rejection.  This

19   is a pretty scathing rejection of the offer, and the

20   message -- the communications that you saw in response show

21   that it put Mr. Borges on his heels.  (Recording playing.)

22             THE COURT:  You've been at it for a long time.  We

23   need to take a break.  I was hoping not to interrupt, but

24   we're going to take a break.  Lunch is upstairs.  It's

25   early, think of it as brunch.  Have your brunch, take a

CLOSING ARGUMENT BY MR. SINGER                              24-3831

1    break, come on back, and we will proceed.  Don't talk about

2    the case among yourselves or with anyone else.  No

3    independent research.  No checking out the media.  We'll

4    rise as you leave for an hour.

5              THE DEPUTY:  All rise for the jury.

6              (Jury left the courtroom.)

7              THE COURT:  Jury has left the room.  As always,

8    we'll wait in the courtroom until we've been advised that

9    they have cleared the floor, and then we'll take a one-hour

10   break.

11        (Pause.)

12             THE COURT:  All right.  We're in recess until an

13   hour from now.

14             THE DEPUTY:  All rise.  This court is in recess.

15        (Recess taken from 11:13 a.m. to 12:13 p.m.)

16             THE DEPUTY:  All rise.  This court is in session

17   pursuant to the recess.

18             THE COURT:  You may be seated.  Thank you.

19   Mr. Bradley, Mr. Bradley, I want you to give some

20   consideration to whether you want to break in the midst of

21   your closing argument; if you do, tell me.

22             MR. BRADLEY:  Very good.  Thank you.

23             THE COURT:  Are we ready for the jury from the

24   government's perspective?

25             MR. SINGER:  Yes, Your Honor.

CLOSING ARGUMENT BY MR. SINGER                    24-3832

```
 1              THE COURT:  Mr. Householder's?

 2              MR. BRADLEY:  Yes, Judge.

 3              THE COURT:  Mr. Borges'?

 4              MR. SCHNEIDER:  Yes.

 5              THE COURT:  Let's call for the jury, please.

 6         (Pause.)

 7              THE DEPUTY:  All rise for the jury.

 8         (Jury entered the courtroom at 12:18 p.m.)

 9              THE COURT:  You may all be seated.  Thank you.  The

10    jury has returned.  Thank you for your service.  We will

11    continue to hear closings.

12         Mr. Singer, you may proceed.

13              MR. SINGER:  Thank you, Your Honor.

14         Before the break, we were talking about how Mr. Fehrman

15    responded to the offer from Mr. Borges on September 1st to

16    provide signatures that were being gathered by the ballot

17    campaign and information that Mr. Borges and his team could

18    then use to defeat the ballot campaign that Mr. Fehrman was

19    working for.  And note Mr. Borges' response to the rather

20    scathing e-mail from Mr. Fehrman, and it was that, no matter

21    what, don't tell anyone about our conversation.  Now, this

22    is evidence of concealment, and we've talked a lot this

23    morning about how concealment is evidence of intent and

24    corrupt intent.  And that's not the only evidence.

25         Special Agent Blane Wetzel testified that when he did
```

1    an extraction on Mr. Borges' phone, what he found was that a

2    number of the text messages between Mr. Borges, Mr. Fehrman

3    were deleted, and that as far as the relevant messages with

4    Mr. Fehrman goes, they didn't start until September 18th,

5    which did not include the message that we just saw, which

6    did not include Mr. Fehrman's response to that September 1st

7    offer which rejected it, but also in the very substance of

8    the response indicated the nature of it, that indicated that

9    what was offered on September 1st was inappropriate, and it

10   shook Mr. Fehrman.  And that corroborates Mr. Fehrman's

11   testimony that what was offered on that day was, in fact,

12   money for information to be used to defeat the ballot

13   campaign.  And Mr. Borges' response in conversations with

14   Mr. Fehrman illustrate this, illustrate the fact that

15   Mr. Fehrman's text message put him on his heels.

16        (Recording playing.)  So this is part of a recording

17   after Mr. Fehrman went to the FBI, told the FBI what

18   happened, and then he was subsequently given recording

19   devices to record conversations.  And this response by

20   Mr. Borges showed that he was suspicious, he was suspicious

21   of Mr. Fehrman, what his intent was for reaching back out,

22   and not exactly the words of the friend telling him that,

23   listen, if this came out, if what happened on September 1st

24   becomes public, it's going to be bad for me, but it's going

25   to be worse for you.  And he admits that he was creeped out

1    by the fact that Fehrman reached back out after that

2    e-mail -- after that text message.

3        Mr. Borges made the same comment in a subsequent

4    meeting.  (Recording playing.)  And then in another meeting,

5    he tells Mr. Fehrman:  If I get a call from Randy Ludlow --

6    a reporter -- about this, I'm going to blow up your house.

7    Now, these are threats, and they also show consciousness of

8    guilt.  They show that the conversation that they had on

9    September 1st is one that Mr. Borges did not want out, and

10   there's a reason for that, it's because the conversation was

11   a bribe.

12       Now, Mr. Borges continued to seek information, and the

13   reason is simple, they needed the information.  The ballot

14   campaign needed the information.  They were obsessed with

15   the signature math, how many signatures are they collecting,

16   how many signatures does the ballot campaign have, because

17   if they can keep them from collecting enough signatures,

18   then, they're scot-free, the bailout is in effect, and they

19   will have won.  And as Mr. Cespedes says in his message:

20   What's Tyler saying, a Tyler update would be great.

21       Now, you heard testimony from Michael Roberson, who was

22   an executive for AMT, the company that Mr. Fehrman worked

23   for, and he talked about the signatures and their effort,

24   and he testified that they would never publicize realtime

25   signature information.  It's something that they hold close

1    because if they were to allow their opponents to know the

2    status of their campaign, well, that's information that

3    their opponents would use to increase their efforts to send

4    more blockers out, to buy out more of the people who they

5    had trying to collect signatures, to obstruct what they were

6    trying to do.  So there was no way that they would ever want

7    that information to be public.  The only time that they

8    publicize their signature information was when the campaign

9    was concluded, that's what Mr. Roberson testified.  He also

10   testified that, by failing to collect signatures in this

11   campaign, that it was bad for business.  It hurt their

12   reputation.

13        And so the actions of Mr. Borges and his attempts to

14   get the signature information, to get that information and

15   then use it for purposes of the enterprise so they could use

16   that to keep them -- the ballot campaign from collecting

17   enough signatures, doing that was -- that was harmful to the

18   ballot campaign, and they know it.  That's the reason that

19   they wanted to do it.  That's the reason why they wanted the

20   information.  And so Mr. Borges reached out again and again,

21   any idea what the count looks like, just want to nail down

22   the opportunity we discussed.

23        So after Mr. Fehrman reengaged with Borges, Borges

24   wanted to know what information do you have for me, what can

25   you give me, any chance you can give me a number.  They want

1    to know they have the right source, so a data point here

2    will help me get finalized.  They just want to know.  Who is

3    "they"?  "They" is the enterprise.  "They" are the people

4    who are working to defeat the ballot campaign.

5        This led to a meeting on September 10th.  (Recording

6    playing.)  So throughout the recordings, there was a

7    conversation about how to avoid violating an employment

8    contract and what that meant to the offer, but, essentially,

9    Mr. Borges laid out two options.  One was the one like you

10   said in the original conversation, structuring it with a

11   $15,000 payment and then a $10,000 payment when it's over.

12   So $25,000 altogether in a private transaction.  So he stays

13   working for AMT, he provides the information, and he gets

14   $25,000.

15       The other option they discussed was he downloads the

16   information, he gets the signature information that they so

17   desperately want, and then he quits, and then he provides

18   the information to them, and then gets paid money for that

19   information.

20       Both situations are bribe offers.  They are asking him

21   to violate the duty that he has with his employer, take the

22   information that is of value to his employer that is -- that

23   will damage his employer if it becomes public, and then

24   provide it to Borges in exchange for money.  These are

25   offers that violate the Private Honest Services and the

1    Travel Act.  They are solicitations for information in

2    exchange for money.

3         Throughout the call, Mr. Borges explained exactly what

4    they want.  Just so they were clear, he said:  Obviously,

5    they'll help us if you're still there and you telling us

6    what's going on, but the one thing they're dying to know is

7    how many signatures they've got so far, they're dying to

8    know that.  (Recording playing.)

9         This is exactly what Mr. Roberson testified to.  If

10   they think you're going to make it, they're going to get

11   aggressive.  If they think you have enough signatures, then,

12   they're going to up their efforts.  It shows how valuable

13   this information is and why they would go to such extremes.

14   (Recording playing.)  All right.  These recordings are

15   clear, Mr. Borges wants information he can use to defeat the

16   ballot campaign, and he's offering money in return.

17        And then he switches it up, sends messages that he

18   wants to take a different approach; maybe he's spooked, but

19   it changes his tone.  So he claims that he's going to pay

20   the money for help on a Kasich reunion and that the

21   information that they talked about before -- he was going to

22   pay money for it, but he keeps asking for that same

23   information.  What's the statewide number?  Do you know what

24   the number is?  And he gives him the $15,000.  So the result

25   is the same, he provides the $15,000, and then he asks for

1    the information.  Do you have a number?  Do you know what

2    the region looks like?  Over and over and over again,

3    messages, phone conversations.

4        What Mr. Borges never asked Tyler Fehrman to do was to

5    do any work for that $15,000 other than provide information

6    that he could use to defeat the ballot campaign.  Never

7    asked him to work on a Kasich and Judy French story -- or

8    Kasich and Judy French reunion.  And Tyler Fehrman testified

9    it didn't seem legitimate to him.  It was a cover.  The

10   evidence shows that Borges' true intention was the money was

11   for the same information he repeatedly asked for both before

12   he provided the money and after.  The evidence shows that

13   Mr. Borges' cover story was just that, a cover.

14       But in the end, it doesn't really matter.  The

15   racketeering acts that you were instructed on that are at

16   issue here, the cover attempts, offers, and solicitations,

17   and the testimony that you heard and the evidence that

18   you've seen show that on September 2nd and September 10th in

19   the recorded conversations that we just listened to that

20   Mr. Borges was soliciting and offering money in exchange for

21   information.

22       So whether or not the ultimate payment was for some

23   other reason or no reason at all or for what the evidence

24   suggests, was for the same information that he made the

25   offers for previously, the elements are satisfied, because

1   on September 2nd when he made that offer, the crime is

2   complete.  On 10th when he made those offers that you just

3   heard, the crime is complete.

4       In circling back to that plan, Mr. Cespedes testified

5   that whiteboard photo that showed:  Employ $25,000 for Tyler

6   Fehrman.  It mirrors exactly the offer that was made on

7   September 10th, 15,000 now, $10,000 later.  These predicates

8   have been proved beyond a reasonable doubt.

9       The last set of racketeering acts relate to money

10  laundering, and as described before, there are two types of

11  money laundering.  There's concealment of money laundering,

12  which, as the Court instructed, is where a defendant or a

13  co-conspirator knowingly engaged in a wire transfer or bank

14  transactions of bribe money designed to conceal the source

15  or control of the bribe money, transactions to conceal the

16  money.

17      The other type are transactions of bribe proceeds over

18  $10,000.  So as we described before, bribe money comes into

19  an account, an individual who knows that it's bribe money

20  for purposes of the enterprise sends the money out in

21  increments over $10,000, that is a separate predicate act in

22  itself.  The transfer of the illegal funds is a racketeering

23  act.

24      And as you can see in the box at the bottom, there are

25  a lot of those racketeering acts, which makes sense, $60

CLOSING ARGUMENT BY MR. SINGER                    24-3840

1    million in bribe money flowed through these accounts.

2    There's a lot of transactions, but, remember, you only need

3    two acts of racketeering to convict.  There are dozens and

4    dozens and dozens that have been proven, but each defendant

5    only needs to complete or agree that another conspirator

6    will complete two acts of racketeering activity.

7         And the concealment of these transactions are

8    illustrated in the flow charts that we've seen throughout

9    trial.  The Generation Now money going into the Growth and

10   Opportunity PAC, and then the money being disbursed through

11   different accounts using these different entities as a

12   buffer for the media spends.  You saw an example of the wire

13   transfers.  This is a $250,000 transfer and a $750,000

14   transfer from Generation Now to the Growth and Opportunity

15   PAC.  Those are two separate racketeering acts.

16        And then the transfer from the Storytellers Group are

17   from the Growth and Opportunity PAC to the Storytellers

18   Group, all of these transactions furthering the enterprise.

19   And how did they use the money?  They used it for mailers to

20   attack Team Smith candidates, folks that were on the other

21   side of Team Householder.

22        You saw the Hardworking Ohioans account and the way

23   that Generation Now used it and transferred the funds in the

24   fall of 2018.  That's the same deal.  The money comes from

25   FirstEnergy and FirstEnergy Solutions, either through

1    Generation Now, or towards the end of the campaign, when

2    time was tight, straight to Hardworking Ohioans, and then

3    it's disbursed.  The money being used, it says "Hardworking

4    Ohioans" on the mailers on the media; the source of the

5    funds, the origin of the funds, concealed.

6         There's checks, increments over $10,000, each of these

7    racketeering predicates.  These slides show all of the money

8    that flowed from Generation Now and FirstEnergy Solutions

9    all used to further the goals of the enterprise.  It's the

10   same in the House Bill 6 period, you see these wire

11   transfers from FirstEnergy Services to Generation Now

12   circled in the ovals, and then the rectangles show the spend

13   out of the Generation Now campaign -- out of the Generation

14   Now accounts.  Each of them a separate predicate, each of

15   them over $10,000.

16        Same in the Ohioans For Energy Security.  Recall,

17   Ohioans For Energy Security was set up as a separate entity

18   by the enterprise, by Jeff Longstreth.  As illustrated in

19   this e-mail, working through enterprise members at the

20   direction of Larry Householder, they used Ohioans For Energy

21   Security to funnel the FirstEnergy money to Generation Now

22   to Ohioans For Energy Security.  So when the ads were

23   purchased, when the media was purchased, it didn't go back

24   to Generation Now, concealed that the money flowed in the

25   way that it did.

24-3842

1      Ohioans For Energy Security was 100-percent funded by

2    Generation Now.  And, again, the wire transfers tell the

3    story.  FirstEnergy to Generation Now, Generation Now to

4    Ohioans For Energy Security, and then Ohioans For Energy

5    Security makes the buys.  Each one of those transactions is

6    a separate racketeering count.

7      And you can see 17 Consulting, Mr. Borges' entity, he's

8    the recipient of the bribe money.  He is a recipient of the

9    scheme.  He knows about the $10,000 transfers, and he made

10   over $10,000 transfers.  This is the money outflowing from

11   17 Consulting, bribe money from FirstEnergy to Generation

12   Now to 17 Consulting, and then leaving 17 Consulting in

13   increments of over $10,000.

14      Finally, there's a Growth and Opportunity PAC in 2020.

15   Again, the new campaign, they're ramping up, they've got new

16   candidates.  Mr. Householder is approving the messaging and

17   the money flows.  This time they included an extra layer of

18   buffer.  Jeff Longstreth testified about this.  He testified

19   that he controlled all of these accounts, all of the money

20   that was flowing in.  He was in charge.  He knew that the

21   money coming in was with the expectation of Householder

22   taking action, and he transferred the money for

23   Householder's benefit, and he did it in this way for a

24   reason, to protect the enterprise, to protect "Generation

25   Now" from being on public filings and public mailers.

1        And the bank transactions again tell the story.

2    Generation Now receives the money.  It sends the money out

3    to the Coalition for Growth and Opportunity.  The Coalition

4    for Growth and Opportunity then sends the money to the

5    Growth and Opportunity PAC.  And the name on the federal FEC

6    filing for the Growth and Opportunity PAC is that the money

7    came from the Coalition For Growth and Opportunity.  The

8    fact that the money came from Generation Now is concealed.

9    That's the purpose, that's the whole reason that the money

10   moved in the way that it did, and that's what Jeff

11   Longstreth testified.

12        And then you've heard a lot of evidence, you have been

13   presented a mountain of evidence, and today you have seen a

14   fraction of it, but what the evidence does show is that

15   there was an enterprise.  The purpose of the enterprise was

16   to fulfill and to push forward Larry Householder's political

17   ambitions, to enrich the members, those individuals who were

18   involved in helping Householder become Speaker and pursue

19   his agenda, and to conceal those actions.  And they did

20   this, Larry Householder, the other enterprise members, with

21   Matt Borges, they did this to further this political machine

22   and to enrich themselves.  They paid for staff.  They funded

23   candidates.  They pushed an agenda all for their own benefit

24   and the benefit of those they were working with.  They truly

25   were an enterprise associated together working for a common

1    purpose.

2        The second element was met, these activities affected

3    interstate commerce.  As we just described, both defendants

4    were employed by or associated with the enterprise, and both

5    of these defendants conspired to participate in the affairs

6    through a pattern of racketeering activity.  You saw the

7    unlimited amount of money that was coming from FirstEnergy

8    flowing to Generation Now.  You saw what they got in return,

9    a massive subsidy, a massive piece of legislation for the

10   benefit of the benefactors, for the benefit of those who

11   were providing $60 million.

12       And you saw the official action, they introduced the

13   legislation, they pushed the legislation through.  They

14   created subcommittees and assigned specific members to those

15   subcommittees.  They set the vote date so that it was in the

16   best interest of FirstEnergy.  And then during the bailout

17   period, they created multiple pieces of alternate

18   legislation.  This is an elected public official drafting

19   multiple pieces of legislation while receiving $36 million

20   in the fall of 2019.  And they were pressuring, pressuring

21   Attorney General Yost, to make sure that their efforts were

22   successful.  And you just saw the payments and the offers to

23   Tyler Fehrman, and you saw the money, how it flowed to

24   conceal their activities.

25       These are all predicate acts, and the defendants, this

1    evidence shows, committed racketeering conspiracy.  And all

2    of these elements have been established beyond a reasonable

3    doubt.

4        I want to thank you for your time and attention over

5    the past six weeks.  It can be difficult to sit on a jury

6    for many reasons, and in the end, you've heard weeks of

7    testimony, reviewed thousands of pages of exhibits, and

8    heard hours of recordings.  But the case comes down to this:

9    What does your common sense tell you was happening?  You've

10   heard the evidence.  You draw all of your reasonable

11   inferences, and you rely on the common sense you use in your

12   daily lives and ask yourself:  What was the purpose of all

13   of that money, did Mr. Householder receive it with the

14   expectation -- $60 million, did he receive it with the

15   expectation, knowing that the expectation was to provide

16   legislation in return?  The only reasonable answer is yes.

17       In the opening, Ms. Glatfelter asked for three things:

18   That you pay attention to the evidence; that you follow

19   Judge Black's instructions on the law; and that you use your

20   common sense in applying the law to the evidence.  The

21   government submits that, based on these three things, the

22   evidence, the law, and your common sense, there's only one

23   reasonable conclusion in this case, that both Defendant

24   Householder and Defendant Borges are guilty beyond a

25   reasonable doubt for their participation in the racketeering

1   conspiracy.  Thank you.

2        THE COURT:  Thank you, Mr. Singer.

3      Members of the Jury, we're going to take a short break

4   while they swap out who's presenting.  By the time you get

5   upstairs, we'll be ready to call you back, almost.  Take a

6   break.  Don't discuss the case among yourselves or with

7   anyone else.  No independent research.  And we will call for

8   you soon.  Rise out of respect for you as you leave for a

9   short break, maybe 10 minutes.

10       THE DEPUTY:  All rise for the jury.

11     (Jury exited the courtroom at 12:51 p.m.)

12       THE COURT:  As always, the jury has now left the

13  room, we'll remain in the courtroom until they've cleared

14  the floor, and we're going to go back into session in about

15  10 minutes after the lawyers swap out their stuff, and

16  that's at the lawyers' request that we take this short

17  break, which makes sense, as long as they don't get stuck in

18  the elevator.  Short recess.  Thank you for your

19  understanding.

20       THE DEPUTY:  This court is in recess.

21     (Recess taken from 12:52 p.m. to 1:00 p.m.)

22       THE DEPUTY:  All rise.  This court is in session

23  pursuant to the recess.

24       THE COURT:  Thank you.  Please be seated.  Jury

25  Commissioner is checking with the jurors to see if they're

1    able to stay after 4:30.  There's a reasonable chance we'll

2    have to break at the normal time.

3        Are we ready for the jury from the government's

4    perspective?

5            MR. SINGER:  Yes, Your Honor.

6            THE COURT:  From Mr. Householder's perspective?

7            MR. BRADLEY:  Yes, Judge.

8            THE COURT:  Mr. Borges'?

9            MR. SCHNEIDER:  Yes.

10           THE COURT:  Let's call for the jury, please.

11       (Pause.)

12           THE DEPUTY:  All rise for the jury.

13       (Jury entered the courtroom at 1:03 p.m.)

14           THE COURT:  You may all be seated.  Thank you.

15   Members of the Jury have rejoined us.  Thank you for your

16   understanding.  Now you see how generous I've been on break

17   time.

18       We're ready to continue to hear closing argument.  It's

19   not evidence.  It's designed to assist you.  On behalf of

20   Mr. Householder.

21           MR. BRADLEY:  Thank you, Judge.

22           THE COURT:  Yes.

23           MR. BRADLEY:  May it please the Court --

24           THE COURT:  Yes, thank you.

25           MR. BRADLEY:  -- opposing counsel.  Good afternoon.

1    Ladies and gentlemen, the government has alleged that Larry

2    Householder advanced energy legislation that was beneficial

3    to Ohio's two nuclear power plants in exchange for political

4    contributions.  In simple terms, that he was bribed.  But

5    that theory -- and it's just a theory, an allegation --

6    simply isn't true, and it's certainly not borne out by the

7    evidence that's been presented to you over the last six

8    weeks or so.

9         Larry supported legislation that was beneficial to

10   these power plants because he believed that it was good

11   policy, that it was consistent with his long-held political

12   views regarding the importance of energy generation in Ohio.

13        And you heard testimony from a number of witnesses

14   regarding Larry's political views regarding all things

15   energy.  You heard from Pat Tully, senior policy advisor to

16   all things energy in the Ohio House of Representatives and

17   the person who was primarily responsible for drafting House

18   Bill 6.  You heard from Bill Seitz, House majority leader,

19   former chairman of the public utilities committees in both

20   the House and the Senate.  You heard from the government's

21   cooperating witness, Jeff Longstreth, himself.  All of whom

22   described Larry as somebody who was an advocate for Ohio's

23   utilities, who believed in the importance of generating

24   energy in Ohio.  And those are all the reasons that Larry

25   supported this legislation, not because he was bribed,

1    because it was good for Ohioans.

2        And that's borne out, his beliefs that this was good

3    policy, as early as November of 2016, and we can see that in

4    what is Government Exhibit 212.  And this is an e-mail dated

5    November 5th of 2016 sent from Chuck Jones, CEO of

6    FirstEnergy, to Tony George, attaching an article that was

7    in the *Akron Beacon Journal.*  And the message:  Pass this on

8    to Larry Householder.  I don't have contact information for

9    him.  We were talking a few days ago -- referencing the

10   World Series Game 7 -- about the problems that the power

11   plants were experiencing and the need for some sort of

12   legislative solution.  And here's Larry's response, four or

13   five days later, sent to Tony George:  Tony, I discussed the

14   game plan for utility relief yesterday with Bill Seitz.  We

15   are more than ready to sit down and craft something with

16   utilities that will make sense.

17       And it made sense that Larry would be talking to Bill

18   Seitz because, as I indicated a few moments ago, House

19   majority leader and sat on as chairman of the public

20   utilities committee in both the House and the Senate.  And

21   the game plan for utility relief that he's referencing in

22   here was the taking the framework of the ZEN legislation

23   that had been introduced previously in the House and the

24   Senate -- and that ZEN legislation was effectively a subsidy

25   for the two nuclear power plants, and it was never

1      successfully passed through either the House or the Senate,

2      it failed.  And Larry's idea was to eliminate these energy

3      efficiency mandates, which were effectively a subsidy in

4      their own right, that he believed were costly and

5      ineffective, and to take the elimination of those mandates,

6      meld it together with a piece of legislation that would have

7      as a framework what was proposed in ZEN, meld them together.

8      The savings from eliminating the mandates would effectively

9      pay for the cost of the subsidy to preserve the energy

10     generation associated with the power plants, and it's

11     win/win.

12         And you can see that he had just met Chuck Jones a week

13     before these e-mail exchanges.  And there's no evidence that

14     when they were sitting in that booth a week earlier at Game

15     7 of the World Series that there was any discussion of any

16     bribery, no discussion of this for that.  He had just met

17     the guy.

18         Now, the government would suggest to you throughout the

19     last six weeks that that's not entirely true.  They would

20     say that, hmm, I don't believe that you just met Chuck Jones

21     a week before, and they point to Government's Exhibit 201 C.

22     This is a Word document.  You saw that during -- this

23     exhibit throughout trial, and this was created not by Larry

24     Householder, this was created by Jeff Longstreth.  And you

25     can see it was created in October of 2016, so before the

1    World Series.  And in the upper left-hand corner, the "on

2    the farm" reference to friends, and there's Chuck Jones.

3    And that doesn't add up because I thought you said you

4    didn't meet him until November, and, yet, a document created

5    in October says you're identifying Chuck Jones as a friend,

6    that seems suspicious.  But you can also see the last

7    modified date, that's September of 2017, so clearly this

8    document is a work in progress.

9         And look who else is listed as somebody on the farm, a

10   friend, Anna, in reference to Anna Lippincott.  Anna

11   Lippincott wasn't involved in any of these matters in

12   October of 2016.  And we know that, in part, because Anna

13   testified to that effect, but also because of this

14   Government Exhibit 204 E.  And these are calendar notes, the

15   ones on the left for Jeff, the one on the right for Larry,

16   and referencing in January 3rd and 4th, Jeff's meeting with

17   Anna, and then on the 4th, Jeff, Larry meets with Anna and

18   Anna comes on board as a member of the team.

19        But the point is that, when we go back here, that's

20   proof and evidence that this document is a work in progress.

21   The fact that Chuck Jones is listed as a friend, even though

22   the document was created on October of 2016, is not evidence

23   that Larry knew Chuck Jones before Game 7 of the World

24   Series.

25        So now we go back to Larry's response to Chuck's

1       e-mail:  I discussed the game plan for utility relief

2       yesterday with Bill Seitz.  We're ready to move forward and

3       craft something that makes sense.  And consider that he

4       sends that e-mail long before Jeff Longstreth is hired,

5       because that happens in December of 2016, and Larry sends

6       that e-mail expressing an interest in crafting legislation

7       well before Jeff Longstreth decides to establish Gen Now as

8       a 501(c)(4).  And Larry sends that e-mail in November saying

9       let's move forward with some legislation that makes sense to

10      preserve these nuclear power plants well in advance of any

11      of the events at the Presidential Inauguration in the middle

12      of January.  And that e-mail saying I spoke with Bill, we're

13      ready to sit down and do something, four months before any

14      contribution from FirstEnergy into Gen Now.

15          So how can it be said that Larry's interests in

16      introducing this legislation was the product of a bribery

17      agreement, when a week after he meets Chuck, he's expressing

18      an interest in moving forward with this legislation?

19          So Government's Exhibit 212 is a very important

20      exhibit, and you will have access to that exhibit when you

21      deliberate this case.  And I encourage you, I urge you, to

22      review it, to consider it, to discuss it amongst yourselves

23      because it is a window into Larry's mindset, his intent, why

24      he supported this legislation, and it's because he believed

25      that it was good policy, believed in the importance of

1    getting the -- getting rid of the mandates, believed in the

2    importance of preserving Ohio's nuclear power plants, not

3    because he was bribed.  Government Exhibit 212 is proof that

4    he wasn't bribed.

5        Let me move on.  The government maintains that,

6    notwithstanding Government's Exhibit 212, that Larry was in

7    fact bribed; that there was an agreement, that quid pro quo,

8    this for that, we'll give a political contribution, and in

9    exchange, you promise to introduce and advance this

10    legislation.  And they believe that bribery scheme was

11    hatched in Washington, DC, at the Presidential Inauguration.

12    That was the whole point of the government making a big

13    deal, he flew on the FirstEnergy private jet, he had dinner

14    with Chuck at the fancy steakhouse.  That's their theory,

15    and you heard the only evidence of that was from the

16    testimony of Jeff Longstreth, and Jeff testified that on the

17    first day they were in DC, January 18th, they went to

18    Charlie Palmer's steakhouse.

19        And remember how vivid his description of that date,

20    that night was?  We were at a big table, it was -- that

21    seated 20 people or so, and it was in the center of the

22    restaurant, and people were coming and going.  And I -- I,

23    Jeff Longstreth -- sat at one end of the table with Mike

24    Dowling, and I remember looking down at the other end of the

25    table and seeing Larry talking to Chuck.  I couldn't hear

1    what they were saying, but they were whispering amongst

2    themselves.  And the government would have you believe

3    that's the origin of the bribery scheme, that they were

4    talking about this for that, but the only problem is that's

5    not true, that didn't happen.

6         And how do we know that?  Because of Householder

7    Exhibit 479, which is the flight itinerary that shows that

8    Chuck Jones on the 18th was in Naples, Florida with his wife

9    and that he flew on a FirstEnergy private jet into Dulles

10   International Airport, which is right outside of Washington

11   and I think Arlington, Virginia, and arrived on the 19th at

12   9:27 a.m.  There it is.

13        Now, the government says, hmm, that could be false,

14   that could have changed, but they don't have any proof of

15   that.  If there was another flight itinerary showing that

16   Chuck flew into DC on the 18th, you can be assured that the

17   government would have presented that exhibit to you, but

18   they didn't; and there's a reason why they didn't, because

19   that's the itinerary that took Chuck Jones into Washington,

20   DC on the morning of the 19th.

21        So they point to this exhibit, Householder 479, which

22   is the hotel bill for Tony George, not the hotel bill for

23   Chuck Jones, the hotel bill for Tony George, and they note a

24   charge on the 18th for the Skyline Lounge, presumably a very

25   nice dinner.  And it's paid for with Chuck's credit card,

1    and the government would say, ah-ha, that's proof that he

2    was in DC on the 18th.  But if that were true, then where's

3    the credit card charge for Chuck and his wife?  He didn't

4    spend any money in DC on the 18th, assuming he was even

5    there?

6        So this document proves that Chuck bought Tony George

7    his dinner on the 18th, but that doesn't mean Chuck was in

8    DC, because the flight record shows he was in Naples on the

9    18th.  And, again, if there's another flight record, you can

10   be assured that the government would have presented it to

11   you because there's only one flight record.

12       But if you're still not sure, I'm not so sure if he was

13   really there on the 18th or the 19th, then, let's look at

14   Government Exhibit 724, another very important exhibit.  And

15   this is Chuck Jones' cell phone record.  And this cell phone

16   record would reflect that the last call on the 18th took

17   place at 8:25 p.m. on January 18th and originating from

18   Naples, Florida.  And then the first call on the following

19   morning, the 19th, is at 9:57 a.m., originating from

20   Arlington, Virginia.

21       So compare those documents.  Let's look at the flight

22   itinerary that we just looked at a moment ago juxtaposed to

23   Chuck Jones' cell phone records.  According to the flight

24   itinerary, he arrives on the 19th at 9:27, and the first

25   call on the 19th is 30 minutes later in Arlington, Virginia.

CLOSING ARGUMENT BY MR. BRADLEY                    24-3856

1      So when you consider these two documents in tandem, is there

2      any doubt in your mind that Chuck Jones was in Naples,

3      Florida on the 18th and flew into DC at 9:30 in the morning

4      just as that itinerary says?  No doubt.

5           And here's the significance of that, that when Jeff

6      Longstreth sits in that witness stand and describes to you

7      in these vivid terms, oh, the restaurant was crowded, me and

8      Mike down here, there's Chuck and Larry talking at the other

9      end of the table, it didn't happen.  That's fantasy, that's

10     false, that's not true.  And that's the government's whole

11     theory that that's when the bribery scheme was hatched, and

12     these documents prove not true.

13          Okay.  So you might say, well, that's -- my gosh,

14     that's going back five, six years, so maybe he's mistaken,

15     maybe it was not the 18th but it was the 19th.  Wrong.  It

16     can't be.  Let me explain.  He describes seeing Chuck and

17     Larry on the 18th at Charlie Palmer steakhouse, and the next

18     night on the 19th, he describes dinner at a completely

19     different restaurant, the Palm.  And he says -- "he" being

20     Jeff -- that it was a much more intimate affair, that it was

21     me, Jeff, Tony George, Mike Dowling, Chuck Jones, Larry

22     Householder, and we were all at the Palm.

23          But that's not true either, and Householder Exhibit 479

24     proves it.  And this -- let me blow that up for you -- is

25     from Chuck Jones' expense report.  The expense report that

1    the government never saw until the middle of this trial.

2    They never secured these documents as part of their

3    investigation; we did.  And right there it is, that Chuck

4    Jones and his wife and Tony George and his wife had dinner

5    at the Four Seasons hotel, not the Palm restaurant, the Four

6    Seasons hotel, at the Bourbon Steakhouse.  And they left --

7    or they paid the bill, I should say, at 8:46 p.m., there it

8    is.  So Chuck and Tony aren't having dinner with Jeff at the

9    Palm restaurant on the 19th because they're having dinner

10   with their wives at the Bourbon Steakhouse.

11        Now, the government would say, well, hold on here, the

12   itinerary -- I should say that Jeff had circulated before

13   everybody got to DC showed the reservations at the Palm

14   restaurant were at 9:30.  So isn't it possible that they

15   finished dinner at the Bourbon Steakhouse and then

16   presumably had their wives walked back to their hotel and

17   said, you know what, I'm not -- I'm still hungry, let's go

18   for a second steak dinner at the Palm.

19        No. 1, that's ridiculous.  But, No. 2, here's more of

20   Chuck Jones' expense reports, and, again, you're going to

21   have -- these are all admitted into evidence.  You will have

22   these exhibits.  I encourage you, I urge you, to scrutinize

23   every page, and you will see there's no charge at the Palm,

24   no charge.  Who paid for dinner at the Palm, if it took

25   place?  Well, maybe it wasn't Chuck, maybe it was Mike

CLOSING ARGUMENT BY MR. BRADLEY                    24-3858

1    Dowling, how about that?  No, because here's Mike Dowling's

2    expense reports from the 19th, no charge at the Palm.  And

3    you can look at Jeff Longstreth's credit card records, too,

4    they're in evidence, no charge at the Palm.

5         So what can we conclude from all of this that we're

6    looking at concerning the Presidential Inauguration,

7    January 18th, January 19th, when the government says that's

8    when the bribery scheme was hatched?  It never happened, not

9    on the 18th, not on the 19th.  It's fantasy.  It's false.

10        It seems if you didn't know any better and you were

11   just looking, as you did, to Jeff Longstreth as he testified

12   in these vivid descriptive terms, God, it seems so real and

13   believable, and they've got records to show that

14   reservations were there, so it stands to reason -- I have no

15   reason to disbelieve it, until you look at all of these

16   documents.  And now we're not relying on some cooperating

17   witness' word about what happened in DC, we're looking at

18   the documentation, the records, the proof, the evidence, and

19   all fantasy, didn't happen.

20        So the government's whole theory that Larry was bribed,

21   notwithstanding what we just talked about in Government

22   Exhibit 212, the whole theory that Larry was bribed and it

23   all happened in DC when he flew on the private jet and went

24   to the fancy steakhouse, not true.

25        Let me move on.  So you'll recall the testimony of Juan

CLOSING ARGUMENT BY MR. BRADLEY                    24-3859

1    Cespedes, the government's other cooperating individual, the

2    government's other witness that is hoping for a deal.  And

3    he testified that on October 10th, 2018, that he -- "he"

4    being Juan -- Bob Klaffky, Geoff Verhoff, and Dave Griffing

5    all went to the State Street offices where JPL, Gen Now and

6    Larry's campaign office were all housed, and they had that

7    check for 400 grand.  And you'll recall that he described

8    everybody going into a conference room delivering the check

9    to Larry, delivering the check to Larry, and describing it

10   in very nefarious and culpatory, you know, this was the quid

11   pro quo, if it didn't happen in DC, it happened here on

12   October 10th.  Here's 400 grand, in exchange you give us

13   that legislation.  That's, in essence, what he testified and

14   described to you.

15        And, remember Government Exhibit 200, the State Street

16   offices, that's where all of these guys went and met with

17   Larry.  And remember Juan's testimony, he said the meeting

18   took place in the conference room, and you may recall he

19   described where everybody was sitting around the table, and

20   I made sure to put Dave Griffing, the client from FES, close

21   to Larry.  And he described Bob Klaffky, by all accounts a

22   well-respected lobbyist who was there, sliding the

23   envelope -- look at this, sliding the envelope, right under

24   Larry's hand.  Very vivid, very memorable, and one of those

25   details that paints a mental picture for you, my God, that

1    seems so real.  And he described these verbal and nonverbal

2    cues from Larry that he agreed that he would introduce the

3    legislation presumably in exchange for 400 grand.

4         But then we presented the testimony of Bob Klaffky

5    himself, and Bob, according to Juan, was at this meeting and

6    Bob acknowledges, oh, yeah, I was at the meeting, and in

7    simple terms described it completely differently, completely

8    different.  Let's start with we weren't at the conference

9    room.  We were right in the lobby.  Nobody even sat down.

10   And I -- "I" being Bob Klaffky -- I didn't give him the

11   check; it was Dave Griffing, the client.  And he handed it

12   to him, nobody slid it across the table under his hand, that

13   didn't happen.  And I saw nothing that would suggest pay to

14   play.  So when you only hear Juan's testimony, that sounds

15   pretty believable.  And then you listen to Bob Klaffky, and,

16   oh, why is Juan describing it so differently?

17        And here's another key point to consider regarding Bob

18   Klaffky, the FBI never interviewed him as part of this

19   investigation.  You know, the government referenced,

20   correctly so, that you were presented with a gazillion pages

21   of documents, that's correct, bank records, e-mails, texts,

22   and I'll talk about this more a little further into my

23   presentation, but this was a woefully incomplete

24   investigation.  The stuff that really matters, the

25   government ignored, they turned a blind eye.  And the reason

1    being is government bias, that's the explanation.

2         They don't want evidence that is inconsistent with

3    their theory of the case, because if you interviewed Juan

4    Cespedes -- "you" being the FBI -- and he's describing,

5    whoa, this is the bribery and there were three other guys

6    present and participating, why in the world, what plausible,

7    possible explanation could there be that, hey, do you think

8    it's a good idea for us to go out and talk to those guys and

9    see what their account of this event was; no, I'm good with

10   what Juan says.

11        They never talked to Bob Klaffky, and I'll talk about

12   it further, but they never talked to Geoff Verhoff either,

13   because Geoff -- excuse me, Juan provides a narrative that's

14   consistent with their theory of the case and they don't want

15   to know any more, and by extension, they don't want you to

16   know any more.  That's government bias, and when they don't

17   follow through and interview key people about key events,

18   that's what I'm talking about when I say an incomplete

19   investigation, and it's on full display regarding the events

20   of October 10th.

21        Juan's description isn't true because he's a

22   cooperating witness, and he wants a deal.  He wants to avoid

23   prison.

24        I'll move on.  So the government talked quite a bit

25   throughout the course of the trial about the payments that

1    Jeff Longstreth made on behalf of Larry Householder, and,

2    specifically, the payments to settle the litigation

3    associated with the coal mine, the payments associated with

4    the repair of the house in Florida, and the payments

5    associated with the credit cards.  And they characterize

6    that as Larry's cut of the ill-gotten gains, his piece of

7    the bribery money.  Recall all that?

8        But their own witness, their own cooperating witness,

9    Jeff Longstreth, says, well, no, that was a loan and Larry

10   agreed to repay me that money from the proceeds from the

11   sale of the house.  And I, as Jeff Longstreth, accepted

12   that, understood that, I was okay with that.  I trusted that

13   Larry would repay me out of the proceeds from the sale of

14   the house.

15       Now, over time, that agreement changed, and instead of

16   it being a loan, they said, let's do this.  There was some

17   discussion amongst themselves where Larry was just going to

18   turn the deed to the home over to the bank to satisfy the

19   lien associated with the judgment.  And Jeff and Larry

20   agreed, well, that's stupid, the house is worth a lot more

21   money than the judgment and the lien, so let's go into

22   business together.  And Larry's contribution to the business

23   will be the home, the deed to the house, and Jeff's

24   contribution to the business will be the moneys that he

25   contributed and paid on behalf of Larry's benefit associated

24-3863

1   with the judgment, the repair of the house, and the credit

2   cards.

3       And you recall they said, well, if we're going to do

4   this, if we're going to go into business together, we've got

5   to do this right, and they hired Taft law firm.  And you

6   heard Caryn Kaufman testify that she's the one who drafted

7   the operating agreement and the contribution agreement.

8       So this money isn't proceeds of bribery, it's not

9   Larry's cut of the ill-gotten gains, it's a loan that

10   eventually turns into a business agreement.

11      And look at that e-mail, Householder Exhibit 480, and

12   that's from Steve Myli, and you recall Mr. Myli testified in

13   the trial, he's the Florida contractor.  And he sends an

14   e-mail May 27th of 2020, that's six weeks or so before they

15   were arrested, and they're just finishing the project.

16   Final amount owed is about 37 grand, hope you guys like the

17   final project, I think it turned out great.

18      And then here is -- in Householder 20, Exhibit 20, this

19   is part of what the attorney from Taft talked about, Caryn

20   Kaufman, and this is the articles of organization and

21   operating agreement for the company that they were forming.

22   And read the highlighted portions, the purpose of the

23   company:  We're going to own and manage the real property

24   located at 226 Beleville, that's the Florida home, and then

25   we're going to acquire, own, and manage additional real

1    property as determined by the members, Jeff and Larry.  So

2    it's all documented.  And then here's another exhibit, all

3    admitted into evidence, that was the warranty deed

4    associated with the sale.

5        So bottom line, Larry sold the house in April of 2022,

6    so 18 months or so after they were arrested.  And the

7    government makes a big deal and says, you never paid Jeff

8    back, that's proof that this was never a loan.  And you

9    heard Larry's explanation.  No. 1, I have a no-contact

10   order, I can't have any contact with Jeff Longstreth.  And,

11   No. 2, can you imagine what would happen if Larry sent a

12   cooperating witness a check for 3, 4, 500 grand, that the

13   government would be saying you're obstructing justice,

14   you're tampering with a witness.

15       So all of this talk about the moneys that Jeff paid, am

16   I missing something?  This is Larry's cut of the ill-gotten

17   gains?  Then, why didn't Jeff Longstreth say that?  He's

18   cooperating with the government.  Why didn't he tell them

19   that?  Because this was all just a loan that they documented

20   that turned into, hey, let's go into business and flip

21   houses together.  What, I don't understand what -- I don't

22   understand what we're talking about here.  This is a nothing

23   burger.

24       Let me move on.  So I was talking a little bit ago

25   about the government's failure to interview Bob Klaffky and

1    how can that be, and why would they fail to do that, such an

2    important component of their investigation, and the reason

3    being just what I said, it's government bias.  They're not

4    conducting an independent, objective investigation, hey,

5    we're going to go wherever the evidence takes us.  That's

6    not what's going on here.  And that's why I say,

7    notwithstanding the fact that a mountain of evidence was

8    collected, it's not the meaningful stuff, the stuff that's

9    going to address was Larry bribed.  They missed all of that.

10   So let's go through some of that.

11       You know, they make this huge deal out of Team

12   Householder as if there's something nefarious about that.

13   No, there's not.  He was running a slate of candidates just

14   like Ryan Smith was.  And you heard the government talk

15   about Larry wanted casket carriers, like he's a mob boss or

16   something, a loyalty pledge, you'll go to the grave for me.

17   And they didn't interview a one of them 20-plus legislators,

18   and they didn't -- it didn't occur, hey, did he want a

19   loyalty pledge, did he ask that you vote for House Bill 6,

20   did he ask that you will support his legislation?  Didn't

21   talk to one of them, and that's evidence of an incomplete

22   investigation, and the reason being because they don't

23   want -- they want to talk to Ryan Smith's people, they want

24   to talk to the people who voted no on House Bill 6, but they

25   don't want to talk to the people on the other side of the

1    aisle because they don't want to hear what they've got to

2    say, and by extension, they don't want you to hear what

3    they've got to say.

4         Failed to interview Bob Klaffky, I've already touched

5    on that.

6              THE COURT:  Excuse me, you are not to refer to

7    George Verhoff.  He did not testify, nothing he may or may

8    not have said is in evidence.  Move along.  Take that down.

9              MR. BRADLEY:  Could I have a brief sidebar, Judge,

10   very brief?

11             THE COURT:  Yeah.

12   **SIDEBAR CONFERENCE.**

13             MR. BRADLEY:  There was testimony elicited from

14   Agent Wetzel that they never interviewed Geoff Verhoff, and

15   that's my only point.

16             THE COURT:  I ruled, I'm sticking with it.  There

17   was all of the Fifth Amendment stuff and you're not going to

18   mislead this jury.  I ruled.  Proceed.

19             MR. BRADLEY:  So the only other issue, Judge, is --

20             THE COURT:  Yeah.

21             MR. BRADLEY:  I've got in this exhibit, I've got a

22   number of bullet points that flow after that, and I don't

23   know if I can take that down, just the Geoff Verhoff stuff.

24   Can you do that?

25             THE COURT:  Remove that bullet point.

1          MR. OLESKI:  It would take me a couple of minutes,

2     Judge, to remove that one bullet point.

3          THE COURT:  Do you want me to instruct the jury why

4     they should not listen to anything about Verhoff, that he's

5     prepared to plead the Fifth and talked to the government

6     lawyers?

7          MR. BRADLEY:  No.  Give us a minute.

8          THE COURT:  Take it, you've got it.

9     **SIDEBAR CONCLUDED.**

10         (Pause.)

11         MR. BRADLEY:  More examples of the government's

12    incomplete investigation, they never obtained any of the

13    expense reports of either Chuck Jones or Mike Dowling, and

14    think how important that is.  Their whole theory is that the

15    bribery plot was hatched in DC and Jeff is describing these

16    various dinners, there's issues about when Chuck got there.

17    And as executives at FirstEnergy, they expense everything.

18    Why wouldn't you get their expense reports?  Then you're not

19    just relying on the memory and word of Jeff Longstreth.  And

20    they never bothered; we did.  And that's some of what the

21    exhibits I was showing you, the Bourbon Steakhouse receipt,

22    et cetera, but that's all -- we got that.  They never

23    bothered.

24         Ditto with their credit card statements.  So we know

25    exactly what they're doing before they get to DC, while

1    they're at DC.  These are critical moments in their

2    investigation, didn't bother, because they don't want that

3    information.  That's part of the government bias.  If it

4    doesn't fit their narrative, they don't want it.

5        Failed to obtain any Title III warrants.  You know that

6    the Title III warrants allow the government to listen and

7    record telephone communications, and we know they can do it

8    because they got a Title III for Neil Clark's phone for an

9    unrelated investigation and that's some of the recordings

10   that we've listened to in this trial.  But how about getting

11   a Title III for Larry Householder's phone?  Then we're not

12   just looking at phone records and saying, look, there's all

13   these attempted calls, but we don't know what was said.  Get

14   a Title III warrant.  Or for any of the other important

15   witnesses in this case.  Didn't do it.

16       They never interviewed any of the sponsors of House

17   Bill 6, Jamie Callendar and Shane Wilkin, to question them

18   why did you introduce this legislation, tell me about your

19   dealings with Larry Householder, what he said, was he

20   pressuring you, didn't bother.  They don't want to know.

21       They chose not to call anybody representing --

22   representatives from the Legislative Service Commission, and

23   you heard during some of their cross-examination, I think it

24   was Ms. Glatfelter actually that was suggesting in her

25   questions that Legislative Service Commissions conducted a

1    financial analysis of proposed legislation, including House

2    Bill 6.  So we know whether, for example, in this case,

3    whether it actually saves rate payors money or if it's a

4    wash, get rid of the mandates versus -- or whether it

5    actually costs rate payors more money.  They conduct that

6    financial analysis and generate a big, thick report, and

7    they never presented any of that testimony to you.

8         They chose not to call the Senate President Larry Obhof

9    because we know that, you know, again, the government talks

10   about Larry passing the bill, that's not how it works.  All

11   right, we've got the House, the Senate, and the governor.

12   And we heard from Juan Cespedes that on that October 10th

13   date I was talking to you about earlier that they went and

14   met with Larry Householder -- "they" being FES

15   representatives, lobbyists, including Juan Cespedes -- and

16   then they also met that same day with Mr. Obhof, Senate

17   President Larry Obhof.  So wouldn't it be interesting to

18   hear what Senator Obhof would say about October 10th?  And

19   wouldn't it be interesting to hear what Senator Obhof would

20   say about his dealings with Mr. Householder concerning HB 6

21   and the legislative process in the Senate?  The government

22   chose not to call that, chose not to present that testimony

23   to you.  In fact, chose not to call anybody from the Senate.

24        Didn't hear from anybody in the governor's office.

25   Same thing.  When Juan and other lobbyists working for

CLOSING ARGUMENT BY MR. BRADLEY                24-3870

1    FirstEnergy met with Mr. Householder, Senator Obhof, they

2    met with Governor DeWine as well, the same day,

3    October 10th.  Wouldn't it be interesting to hear what was

4    discussed at that meeting?  And we know that Governor DeWine

5    signed HB 6 into law the same day the concurrence vote

6    passed in the House, same day.  Why, why was it signed on

7    the same day?  Why so quickly?  Why did you support it?  You

8    didn't hear any of that testimony.

9        Chose not to call Tony George.  Tony, according to

10   Jeff, was one of the people at the Palm restaurant on the

11   5th, that intimate restaurant.  Let's hear Tony's account of

12   what happened on the 19th.  Was he at the Bourbon Steakhouse

13   with Chuck or was he at dinner at the Palm with Jeff?  But

14   we didn't hear from Tony.

15       Didn't hear from Tony's wife, Tony George's wife.

16   Didn't hear from Chuck Jones' wife.  Were you out to dinner

17   with your husband that night at the Bourbon Steakhouse in

18   the Four Seasons hotel?  Did your husbands leave the Bourbon

19   Street -- or Bourbon Steakhouse and then go out to dinner

20   for a second steak dinner afterwards?  We don't know.  We

21   didn't hear that testimony.  The government chose not to

22   call those witnesses.

23       Chose not to call Attorney General Dave Yost.  And

24   we've heard much testimony regarding and seen the telephone

25   contact, the telephone records, that show contact between,

1    well, Larry and Attorney General Yost, and Matt Borges and

2    Attorney General Yost. But we didn't hear from Attorney

3    General Yost about, okay, I see that you had a 13-minute

4    call on such-and-such a day, tell us about that

5    conversation, Attorney General Yost. Was there anything

6    improper or nefarious had in that conversation? Tell us

7    about it. Didn't hear it, and all because that doesn't fit

8    their narrative. That is government bias on full display.

9        So just expounding on no Title III warrants, and this

10   is Government Exhibit 733 that shows all of the contacts

11   between Larry and Chuck, Larry and Mike, Jeff and Chuck, and

12   Jeff and Mike, Mike Dowling. Right. And we've seen now

13   many of these exhibits, but we don't know what was said

14   because the government didn't get Title III warrants to

15   intercept and record those conversations. So amazingly,

16   when the defense called several legislators as defense

17   witnesses, on cross-examination, they were asked, well, do

18   you know what was said during some telephone conversation

19   between Larry and Mike -- Chuck, to which of course they say

20   no. But neither does the government because they didn't get

21   a Title III warrant, and, by extension, neither do you

22   because their investigation is biased and incomplete.

23       And then look at these records showing all of the

24   contacts between, as I said, Jeff and Mike, Jeff and Chuck,

25   Larry and Chuck, Larry and Mike, and want to leave the

1    impression with you that, holy cow, look how much these guys

2    are talking.  Okay.  But many of these calls are -- they're

3    either zero seconds or 15 seconds or less where it's clear

4    there's no conversation, and look what happens when you --

5    all of the ones in the red are 15 seconds or less, so

6    there's no communication had here.  And don't those exhibits

7    look much different?  It's misleading.

8        More misleading, you heard testimony from Blane Wetzel

9    about this article:  State airplane sent to Chicago to pick

10   up Ohio House members for the HB 6 vote.  But, but Agent

11   Wetzel never testified, on direct examination at least, that

12   it was the governor's office that approved the plane, and in

13   the end, it never went to Chicago, the plane never took off.

14   But they want to leave that impression in your mind, again,

15   suggesting that there's funny business going on.  It's just

16   misleading.

17       As I said, they want to argue to you that Larry wants

18   casket carriers, he's pressuring people to vote for House

19   Bill 6, he's pressuring people to support his bid for

20   Speaker, but they never talked to any of them.  And the only

21   witnesses the government called -- legislators I'm referring

22   to -- are the ones who voted against House Bill 6 or voted

23   for Ryan Smith and against Larry for Speaker.  Why is that?

24   They only want half the story, and by extension, they only

25   want to present half the story to you.

```
 1         So we called some of the legislators, Brett Hillyer,
 2    and he testified that there was no loyalty pledge and Larry
 3    never asked me or pressured me to vote for him for Speaker,
 4    and ditto for the energy legislation, that didn't happen.
 5    And we called Nino Vitale, he said the same thing.  And Jim
 6    Trakas said the same thing.  And we heard from Anna
 7    Lippincott, and she was involved in candidate recruitment,
 8    she said the same thing.  Megan Fitzmartin, working for JPL
 9    and Gen Now, involved in candidate recruitment, she said the
10    same thing.
11         We also heard testimony about the FBI's investigation
12    utilizing undercover agents regarding the issue of legalized
13    gambling, and that's where you heard the undercover
14    recordings at the Aubergine private dinner club in Columbus.
15    And we heard how the government expended considerable
16    resources, both financial and manpower, into this
17    investigation.  They paid Neil Clark 5 grand a month for
18    10 months, 50 grand, took him down to Tennessee for the
19    weekend, all to gain that trust.  Set up this dinner meeting
20    at Aubergine's with Larry and others.  You heard some of
21    those recordings.  Make the big point, hey, how much was the
22    bill for that dinner, 2700, but it was actually the FBI,
23    undercover FBI agents, that suggested they go there.  They
24    had a check for a contribution with them at that dinner,
25    never presented it.  And then after that dinner, they just
```

 1    dropped it.  Nothing ever came of it.  They never followed

 2    up and talked to Larry.  They never followed up to talk to

 3    Jeff.  They never had any future contact with Neil.  And the

 4    point is, why are we hearing about that, what's that -- in

 5    this trial, what's that got to do with why Larry introduced

 6    and advocated for the passage of House Bill 6, what does

 7    that have to do with anything?  And the answer is, they want

 8    to just sling a little mud, have you listen to these

 9    undercover recordings that just sound bad.  If somebody was

10    reading from the newspaper, if it's on one of these

11    recordings, it would just sound bad.  You must be doing

12    something bad if there are undercover agents and they're

13    recording your conversation.  And nothing comes of that

14    investigation.  Why are we hearing that evidence in this

15    trial?

16         And then more examples of just misleading evidence, and

17    that's this exhibit.  We already talked through this a

18    little bit, but want to suggest to you that Larry's

19    testimony regarding just meeting Chuck Jones for the first

20    time at Game 7 of the World Series is somehow not true by

21    pointing to the fact that, you know, it was created in

22    October before the game.  But we know that it was modified

23    in September, all the way through September of 2017, and,

24    thus, a work in progress.  The reference to Anna Lippincott,

25    everything I just talked to you about earlier, and they know

1    this, they know this, but they don't point that out.  It's

2    misleading.

3         I'm just asking, do you want to take a break at any

4    point?

5              THE COURT:  It's your call.

6              MR. BRADLEY:  I'll keep going, if you don't mind.

7         So we heard -- the government presented these JLEC

8    forms, financial disclosure forms, that are required for all

9    public officials to complete.  And why are we hearing about

10   these?  This isn't a campaign finance violation case.  Why

11   are we hearing about this?  And just another attempt to kind

12   of muddy Larry up a little bit.  And you heard Larry testify

13   and explain that, look, I had an attorney help me with these

14   forms, I'm relying on what he's telling me.  And there is

15   part of the exhibit, is proof that he's got an attorney

16   that's helping him do this.

17        And they make a big deal that one of Larry's

18   businesses, Householder, LTD, is not identified.  And the

19   form requires that you list all of the names of the

20   businesses that are doing business, and that business is

21   dormant.  It's not doing business.  It doesn't need to be

22   included there.  But what's this got to do with whether

23   Larry was bribed as part of HB 6?

24        And then just another example.  On these JLEC forms,

25   list all of the names of creditors residing or transacting

1    business in Ohio, and you didn't include the judgment that

2    Union Bank had against you in connection with the Alabama

3    coal mine.  And you heard testimony that Union Bank is in

4    Louisiana and doing business in Alabama, not Ohio.  So that

5    doesn't need to be listed there.  This isn't a campaign

6    finance violation case.  Why are we hearing this testimony?

7    Why is the government choosing to present this to you?

8        There's been a lot of testimony as well about

9    Generation Now and that Larry controlled Generation Now.

10   Jeff controlled Generation Now, not Larry.  And just looking

11   at all of those bullet points, you can knock them off.  Jeff

12   is the one who created Generation Now, controlled all of the

13   bank accounts, never shared any of the financial information

14   with either Anna or Larry.  Anna testified about that.  I

15   kept asking Jeff can I get access to some of the financial

16   information, huh-uh.  And Longstreth is the one who decided

17   how much he was going to pay himself; Larry knew nothing

18   about that.  And Longstreth is the one who decided how the

19   money was going to get spent.  No doubt that Larry was

20   aligned with Generation Now, we know that because he

21   fundraised money in there.  And we know Jeff is the one that

22   paid himself $5.4 million from Generation Now.  So who's in

23   control of Generation Now, Larry?  No.

24       Here's another exhibit, Government Exhibit, that we've

25   seen during the course of the trial that shows that

24-3877

1    FirstEnergy and/or Partners For Progress deposited $60

2    million into the Generation Now accounts and that's all

3    bribe money.  But, again, that's so misleading because it's

4    important to understand and appreciate that the goals of

5    Generation Now changed over time.

6         In 2017/2018, that's the time period leading up to the

7    2018 general election, and that's when the slate of

8    candidates known as Team Householder were operating their

9    campaigns marching towards the general election.  And much

10   of the money that was contributed into Gen Now's accounts

11   was used to support, directly and indirectly, the campaigns

12   of the slate of candidates that's known as Team Householder.

13        But then after the 2018 general election and shortly

14   thereafter, Larry gets elected Speaker.  Shortly thereafter,

15   House Bill 6 gets introduced, and the bulk of the money

16   that's contributed into the Generation accounts is used to

17   support a public education campaign, first, advocating for

18   the benefits of House Bill 6, and then later as part of an

19   education campaign to defeat the referendum efforts.  And

20   then once the referendum effort failed and we move into

21   2020, the goals of the organization changed again, and now

22   another public education campaign regarding the term limits

23   initiative.

24        So it's important when you look at the money that was

25   contributed into Generation Now to appreciate and understand

1    that the goals changed and the reason the money is

2    contributed changes in accordance with the goals.  And we

3    can see that right here, 2017/2018, there's about 4.5,

4    $4.6 million that was contributed to Generation Now, and all

5    of that money -- or most of that money was used to support

6    the campaigns of the slate of candidates.

7        And then when you move to 2019, that's the big bucks

8    there, 55, $56 million -- 57 actually, and that's not bribe

9    money.  That's money that was used to fund a statewide

10   education campaign.  And then when you move to 2020, same

11   thing, funding a public education campaign regarding the

12   term limits initiative.  So the government's

13   characterization that this is all bribe money is just not

14   true.

15       So going back, just talk a little bit more about the

16   2017/2018 time period, that's the period of time where the

17   slate of candidates needs financial support, needs

18   assistance.  And the government's theory would be that Larry

19   was so desperate to return to power that he's willing to

20   sell his soul to the devil, so to speak, and that the only

21   way that he can do that is to recruit this slate of

22   candidates, but he needs millions of dollars to support this

23   slate of candidates, and that the only way he can get that

24   money is through FirstEnergy.  And, thus, okay, I'm so

25   desperate for the power, I'll take your money knowing that

24-3879

1    I've got to agree to give you the legislation you need,

2    that's that quid pro quo.  But none of that's true, because

3    look at all of the people in that 2017/2018 period that were

4    contributing to Generation Now and big bucks.

5        And we heard about testimony that Larry was a long-time

6    supporter of unions, and as a result, look how many unions

7    contributed big bucks to Larry's campaign:  United

8    Brotherhoods; AFL-CIO; the ACN Ohio Foundation, that's a

9    union; Political Education Partners, that's a union.  Again

10   on the right, Political Education Partners, that's a union.

11   And that's not bribe money, that's money that the unions are

12   supporting Larry's bid for Speaker, because in a campaign of

13   Team Smith and Team Householder, Team Householder is the guy

14   that's known for supporting unions.  Who do you think

15   they're going to support?  Of course.  It's not bribe money.

16   It's political contributions.  We support team -- or we

17   support Larry's bid for Speaker.

18       And then the same thing with energy.  Larry's a

19   long-time supporter of Ohio's utilities, a long-time

20   supporter and believer in the importance of energy

21   generation in Ohio.  Who do you think energy companies want

22   to see in the Speaker's gig, Ryan Smith or Larry

23   Householder?

24       So all of the money that's contributed in that

25   2017/2018 period was intended to support the slate of

1    candidates that would hopefully go on to support Larry's bid

2    for Speaker.  It's not bribe money.

3        And there's another thing we've heard from the

4    government throughout the last six weeks of trial, it's all

5    a secret.  No, it's not.  No, it's not.  Here's an example.

6    This is an e-mail from Matt Smith from the AFL-CIO, they

7    contributed 175 grand to Generation Now.  Here's his e-mail

8    from February of 2018 to Jeff Longstreth:  Hoping you can

9    send me a list of Team Householder candidates once the

10   filing deadline is over.  We want to be helpful in some

11   races where we can.  So they know where their money is going

12   and they know what the purpose of those contributions are.

13   They understand that there's a slate of candidates that is

14   identified as "Team Householder."  They understand there's a

15   slate of candidates for Team Ryan Smith.  There's no secrets

16   here.

17       And then look at this:  Please cut a check for 175

18   grand to the following 501(c)(4), Generation Now.  Why does

19   the government keep telling you that this is all a secret?

20   No, it's not.  And how is all of this money that's used to

21   support this slate of candidates bribe money?  And that's

22   why I bring us back to this e-mail, Government Exhibit 212.

23   Here we are in November of 2016 and Larry is saying I'm all

24   in favor of legislation as long as it makes sense for

25   utility relief.  And that's all months before any of these

1    contributions that we're seeing, which aren't even bribes to

2    begin with, they're moneys that are used to support Larry's

3    bid for Speaker because that's who they prefer over Ryan

4    Smith.

5        And then when we move to after the general election,

6    Larry is now Speaker, House Bill 6 gets introduced, and as

7    it's moving through the legislature, which is the House and

8    then the Senate, there's opponents. You heard testimony,

9    that's how it works in politics, there's always somebody on

10   each side of the issue. So there's people in organizations

11   that support House Bill 6 and there's people in

12   organizations that oppose House Bill 6.

13       And the people that were opposing it ran statewide

14   advertising to educate the public against House Bill 6, this

15   is bad legislation. So the people that stood to benefit

16   from House Bill 6, primarily FirstEnergy Solutions, says,

17   well, we want our own educational campaign. What they're

18   saying isn't true, we want to combat that. And that costs

19   money, big money, and all of that money was spent on those

20   public education campaigns. It's not bribe money.

21       In fact, this is all money that's approved by the

22   independent board of directors at FirstEnergy Solutions.

23   And here's an e-mail, this is Householder Exhibit 399 from

24   John Judge, a FirstEnergy Solutions executive, to the

25   various members of the board of directors at FirstEnergy

```
1    Solutions.  As we discussed at the last meeting, Generation
2    Now is a 501(c)(4) group supporting House Bill 6.  They're
3    providing media support in critical markets to offset
4    negative advertising being done by our opponents.  We
5    believe that spending the money on advertising to support
6    good policy in Ohio and offset negative advertising is a
7    valid tactic and a worthwhile expenditure.
8         So again, no secret, transparent.  This isn't bribe
9    money.  It's money spent to counteract a negative
10   advertising campaign, because they want to see House Bill 6
11   signed into law because that's going to help preserve the
12   two nuclear power plants.  Of course, they want that.  Of
13   course, they're going to spend money for that.
14        And then here's the board resolutions.  There was two.
15   One in May of 2019, a formal resolution:  Upon
16   recommendation of the company's review committee, we propose
17   to donate to Generation Now in support of House Bill 6 up to
18   $15 million.  And then here's the second resolution in July
19   of 2019, essentially, these advertising campaigns are big
20   bucks, we need more money.  This makes sense for the
21   company.  It's not bribe money.
22        And the same would be said in 2020 regarding the public
23   education campaign for the term limit initiative, same
24   thing.  This isn't bribe money.
25        I'm watching the time.  I'll keep going, if that's all
```

1     right.

2          THE COURT:  Yeah, it's up to you until it gets too

3     long.

4          MR. BRADLEY:  So we looked at this exhibit at some

5     point during the trial, and we heard quite a bit of

6     testimony and seen quite a few documents, e-mails, text

7     messages about all of these individuals, Chuck Jones, CEO;

8     Mike Dowling; Kiani and Judge from FES; everybody there.

9     But we didn't hear any testimony from Chuck Jones.

10          MR. SINGER:  Can we have a sidebar, Your Honor?

11          THE COURT:  Yes.

12     **SIDEBAR CONFERENCE.**

13          MS. GLATFELTER:  Your Honor, we've sat here and

14     listened to way improper argument.  I mean, I think there

15     needs to be a curative instruction about why -- the only

16     reason the government didn't call people is because people

17     have Fifth Amendment, just like these defendants.  So when

18     they're suggesting that the only reason we didn't call some

19     of these people is because we're hiding stuff from the jury,

20     we didn't object, extremely misleading, and now they put up

21     there we didn't talk to Chuck Jones.  Are we serious?

22          MR. BRADLEY:  I didn't say that.  I said you didn't

23     call them as a witness.  Is that improper?  I don't think

24     so.

25          THE COURT:  You know why they didn't call him.

```
1              MR. BRADLEY:  I don't know why.

2              THE COURT:  Well, I do or I infer it.  If you wish

3   to present a proposed curative instruction, I'll consider

4   it.  I think you need to be careful.  Is that sufficient at

5   this time?

6              MS. GLATFELTER:  Yes, as long as he doesn't go

7   there in terms of the people that haven't been witnesses

8   here.  They have Fifth Amendment rights just like the

9   defendant who didn't testify.  And so they file a motion for

10  a missing witness instruction, which is completely

11  inappropriate, and now we're in between a rock and a hard

12  place because they've suggested to this jury that we haven't

13  met our burden because we didn't call people with Fifth

14  Amendment rights.

15             THE COURT:  I'm prepared to consider a curative

16  instruction.  If you give me a moment, I want to talk to my

17  law clerk.

18             MS. GLATFELTER:  I would like to talk to our team.

19        (Pause.)

20             THE COURT:  Why don't we reassemble, if I can see

21  the lawyers.  I'm inclined to take a break and give you an

22  opportunity to figure out how you're going to deal with

23  this.  Any objection?

24             MR. BRADLEY:  No.

25             MR. SINGER:  No.
```

1          THE COURT:  All right.  We'll take a mid afternoon

2     break.

3     **SIDEBAR CONCLUDED.**

4          THE COURT:  Ladies and gentlemen, it's time for our

5     afternoon break.  During the break, take a break.  Don't

6     discuss the case with anyone else or among yourselves.  No

7     independent research.  Continue to wait until you've heard

8     all closing arguments.  We'll rise as you leave for a

9     20-minute break.

10         THE DEPUTY:  All rise for the jury.

11       (Jury exited the courtroom at 2:36 p.m.)

12         THE COURT:  Jury has left the room.  As always,

13    we'll wait for anybody to leave the courtroom until we're

14    advised the jury has cleared the floor.  Then we're taking a

15    20-minute mid afternoon break.  That will bring us back a

16    little before 3.

17       (Pause.)

18         THE COURT:  The jury is not present.  You may

19    consider rearranging your slides.

20         MR. BRADLEY:  (Nodding head.)

21         THE DEPUTY:  All clear, Judge.

22         THE COURT:  20-minute break.

23         THE DEPUTY:  Court is in recess.

24       (Recess taken from 2:37 p.m. to 3:00 p.m.)

25         THE DEPUTY:  All rise.  This court is in session

```
 1    pursuant to the recess.

 2         THE COURT:  Please be seated.  Outside the presence

 3    of the jury, I've given it some thought and I have a

 4    curative instruction that I'm considering giving.  What's

 5    the government's position at this time?

 6         MS. GLATFELTER:  Government submitted a curative

 7    instruction to chambers.  We believe that it should be read

 8    now in the context of defendant's closing.

 9         THE COURT:  Very well.  I need to see a copy of it,

10    and I'll recess until I get that done.  Stay where you are.

11       (Off the record from 3:03 p.m. to 3:08 p.m.)

12         THE DEPUTY:  Court is in session.

13         THE COURT:  Please be seated.  Back on the record

14    outside the jury's -- jury is not here.  I've read the

15    government's proposed curative instruction and the

16    defendant's response and its proposed curative instruction.

17    I intend to give the government's curative instruction,

18    which is Modeled Federal Jury Instructions Criminal 6.056-7.

19       Mr. Householder's counsel need to be heard before I

20    proceed?

21         MR. OLESKI:  Yes, Judge, just briefly.  We oppose

22    any further instruction.  We object to the Court giving this

23    instruction, but to the extent the Court -- for a couple of

24    reasons.  No. 1, we're not in the power to immunize

25    witnesses.  We don't have that power; the government does.
```

1    All Mr. Bradley was doing in closing argument was commenting

2    on the government didn't call certain witnesses.

3         Having said that, if the Court is inclined to give

4    further instruction, we do think it is necessary for the

5    Court to include as part of any curative instruction again

6    instruct the jury, remind the jury, I'm quoting here, that:

7    The jury must always bear in mind that the law never imposes

8    on a defendant in a criminal case the burden or duty of

9    calling any witnesses or producing any evidence.

10        I think that the government's instruction fails to

11   convey that, and I think it is necessary for the Court as

12   part of any curative instruction, which we oppose, but to

13   include that instruction.

14             THE COURT:  Government wish to be heard in response

15   to that argument?

16             MS. GLATFELTER:  Only that the entire argument has

17   been extremely misleading.  And so to argue essentially to

18   this jury, which before the Court interrupted, the defense

19   counsel, that they were going to fault the government for

20   not calling a witness that asserted his Fifth Amendment

21   right and that's why we didn't hear from them and that we

22   should be faulted for that is incredibly misleading.  And so

23   while I really would prefer the instruction that the Court

24   drafted about Fifth Amendment rights and that they would

25   apply equally to witnesses and the defendant, I think it's

CLOSING ARGUMENT BY MR. BRADLEY                    24-3888

1    more appropriate to give the instruction that the

2    government -- the more neutral instruction the government

3    provided.  It is all over the instruction that the defendant

4    does not need to call any witnesses, but clearly in this

5    case, the defendant has chosen to call witnesses and

6    faulting the government for not calling the same witnesses

7    that asserted their Fifth.  So I think what we've proposed

8    is appropriate and should be read now.

9             THE COURT:  Last word.

10            MR. OLESKI:  Briefly respond, Judge.  First of all,

11   with respect to the witness who did indicate that he would

12   assert his Fifth Amendment Right, all Mr. Bradley was doing

13   was indicating that the government didn't interview that

14   witness, not that either the government or the defense

15   didn't call that witness to testify at trial.  There's no

16   evidence in the record with respect to any other witness or

17   parties' Fifth Amendment rights.  And we would, you know,

18   stand on our objection.  And also, if the Court is inclined

19   to instruct further to again instruct, again, that the law

20   never imposed a duty on a defendant to produce any evidence.

21            THE COURT:  What's the defense make of the Court's

22   proposed instruction?  Should I just go with that?

23            MR. GLICKMAN:  Judge, I know you don't like lawyers

24   speaking serially.

25            THE COURT:  Go ahead.

```
 1          MR. GLICKMAN:  But I guess my question to the Court

 2    would be --

 3          THE COURT:  I'm not answering questions.  Do you

 4    want me to read mine or theirs?

 5          MR. GLICKMAN:  There's a question mark on yours,

 6    Judge, and it appears to imply additions.

 7          THE COURT:  I'm going to go with the government's

 8    so that I'm not the one who made the curative instruction

 9    up.  I think it's absolutely appropriate to cure the error,

10    and I intend to do so when the jury returns.

11        Question marks on the Court's instruction were to

12    indicate that the Court wants the government to identify

13    people specifically, but it's a moot point because I'm going

14    with the model instruction, which is perfectly appropriate.

15        I'm going to recess for 5 minutes.

16        (Recess taken from 3:13 p.m. to 3:18 p.m.)

17          THE DEPUTY:  All rise.  This court is back in

18    session.

19          THE COURT:  Please be seated.  I intend to proceed

20    to present the curative instruction reflected in the model

21    instructions, and the model instruction number is Model

22    Federal Jury Instructions Criminal 6.04, 6 to 7, All

23    Uncalled Witnesses Equally Available.

24        You wish to be heard further, from Mr. Householder's

25    perspective?
```

```
1              MR. OLESKI:  We stand on our previous objection,

2    Judge.

3              THE COURT:  Very well.  Call for the jury.

4              THE DEPUTY:  Yes, Judge.

5         (Pause.)

6              THE DEPUTY:  All rise for the jury.

7         (Jury entered the courtroom at 3:22 p.m.)

8              THE COURT:  You may all be seated.  Thank you.  14

9    Members of the Jury have rejoined us.  Hope you had a decent

10   break.

11        I need to give you an instruction.  During closing

12   argument, you heard defense counsel refer to witnesses who

13   were not called at trial.  I instruct you that each party

14   had an equal opportunity, or lack of opportunity, to call

15   any of these witnesses.  Therefore, you should not draw any

16   inferences or reach any conclusions as to what they would

17   have testified to had they been called.  Their absence

18   should not affect your judgment in any way.

19        We will continue with closing arguments.  Mr. Bradley.

20             MR. BRADLEY:  Thank you, Judge.

21             THE COURT:  Very well.

22             MR. BRADLEY:  Good afternoon again.  As I indicated

23   at the outset, the government has alleged that Larry

24   Householder advanced energy legislation that was favorable

25   to the nuclear power plants in exchange for political
```

1    contributions.  In simple terms, a bribe.  At its core,

2    that's what this case is about.  And to that end, there's

3    really two key witnesses that the government's presented

4    that speak to that issue, whether there was a quid pro quo,

5    a this for that, an agreement, and those two witnesses are

6    Jeff Longstreth and Juan Cespedes.  And you've heard their

7    testimony that they've entered into plea agreements with the

8    government, and as part of their plea agreements, they've

9    agreed to testify as prosecution witnesses.  And they're

10   doing so with the hope that they will satisfy the government

11   that they've been truthful and, in exchange, that the

12   government will make a recommendation to the Court at the

13   time they are sentenced.

14        And in one of the instructions that you've received and

15   that -- you'll have all of the instructions with you -- is

16   the one we have up on the screen, the testimony of

17   cooperating codefendants, you should consider their

18   testimony with more caution than the testimony of the other

19   witnesses you've heard and consider whether their testimony

20   may have been influenced by the government's promise.  And I

21   highlight this because those are really the two key

22   witnesses that the government's presented to you regarding

23   the question of whether there's been a bribery here.

24        And the reason why you need to closely examine their

25   testimony, be more careful in examining their testimony, is

1    what's on the screen now.  You heard Mr. Cespedes testify

2    and describe what occurred on October 10th in that very

3    nefarious, inculpatory manner.  And then when you weigh that

4    against Mr. Klaffky, who testified -- who was present at the

5    same meeting and described a completely different meeting,

6    and you have to pause and consider why is that, why is that,

7    and is it because Mr. Cespedes is shading or slanting his

8    testimony to satisfy the government to ensure that he puts

9    himself in the best position possible to avoid a prison

10   sentence altogether.  And when you consider Mr. Klaffky's

11   testimony juxtaposed to Mr. Cespedes, something doesn't add

12   up here.

13        And the same can be said about Jeff Longstreth's

14   testimony.  When you consider his testimony about the dinner

15   at Charlie Palmer's steakhouse on the 18th when he so

16   vividly describes seeing at the other end of the table Larry

17   and Chuck talking quietly amongst themselves, and we know

18   from these flight records and telephone records that didn't

19   happen.  And why is Jeff Longstreth testifying from that

20   witness stand about matters that are false, why is that?

21   What are his motivations?  And that's why that instruction

22   is so important for you to consider when you deliberate this

23   case and when you discuss their testimony, because it's so

24   important.

25        Here's another instruction that should serve as really

1    the backdrop to your entire deliberations in this case.  The

2    government bears the burden of proof, and that is proof

3    beyond a reasonable doubt.  Proof beyond a reasonable doubt

4    means proof which is so convincing that you would not

5    hesitate to rely and act upon it in the most important

6    decisions in your lives.

7        So think about that, think about what would be amongst

8    the most important decisions in your lives.  Of course, that

9    could vary from person to person.  Maybe it's making a

10   decision on how to invest your life savings or making a

11   decision about whether to get a medical procedure performed

12   on one of your children, the most important of your own

13   affairs.  And then imagine in making that decision, you were

14   relying on somebody like Jeff Longstreth and you heard Jeff

15   Longstreth testify about A, B, and C, and then you later

16   learn that there's documentation, telephone records, flight

17   records, whatever, that prove what he's saying is not true.

18   And ask yourself if you would be relying on the quality of

19   that sort of testimony in making a decision that is amongst

20   the most important decisions in your life.

21       And the same could be said about Juan Cespedes.  If you

22   were considering the testimony of Juan Cespedes describing

23   the October 10th incident and then you heard from somebody

24   who was at that very same meeting who describes it

25   completely different and you learned that there's special

```
 1    motives for him, he wants something in exchange for his
 2    testimony, you ask yourself, would I be willing to rely on
 3    the quality of that testimony and that information in making
 4    a decision that is amongst the most important in your entire
 5    life.
 6         Ultimately, that's a decision that you'll answer
 7    yourself, but it's important that you understand that it is
 8    the government that bears the burden of proof here, not the
 9    defense, the government.  And it's a heavy burden, proof
10    beyond a reasonable doubt, and that, again, should serve as
11    the backdrop for all of your deliberations throughout this
12    case.
13         Here's another instruction that's important.  As I
14    said, at its core, this is a bribery case, and a bribery
15    case requires that quid pro quo, an explicit agreement, this
16    for that.  And has the government proven beyond a reasonable
17    doubt that Larry Householder advanced House Bill 6 as part
18    of an explicit agreement, a this for that?  And when you
19    think about that, remember Government's Exhibit 212, the
20    November e-mail, November of 2016 e-mail, when Larry a week
21    after he's met Chuck Jones saying we're ready and willing to
22    move forward with legislation for utility relief as long as
23    it makes sense.  Months before any contributions from
24    FirstEnergy are made into Generation Now, before the
25    Presidential Inauguration, before Jeff Longstreth is hired.
```

1    Very important to understand and appreciate how the law

2    defines a bribery.  It must be an explicit agreement, both

3    sides have to be in agreement, this for that.

4        And we went through earlier, before the break, the

5    2017/2018 contributions from FirstEnergy and all of those

6    other individuals.  Those are contributions made to support

7    the slate of candidates to help Larry become elected

8    Speaker, and FirstEnergy and all of those other people that

9    contributed want to see -- he's the preferred candidate,

10   that's why they're contributing those moneys, including

11   FirstEnergy.  That's not a bribe.  That's not evidence of an

12   explicit quid pro quo agreement.

13       Here's another instruction for you to consider.  It's

14   not a defense to bribery -- in simple terms, taking a bribe

15   is unlawful, of course.  Even if the public official would

16   have performed the official action anyway or even if the

17   official action is desirable or beneficial to the public,

18   that's not a defense.  Of course, that's a correct statement

19   of the law.  That's included in the Court's jury

20   instructions.

21       And I point this out to make something perfectly clear,

22   that there was no bribery.  So the fact that Larry was

23   motivated to enact House Bill 6 because he believed that

24   this was good legislation, that's the only reason that he

25   advanced and supported this legislation.  There's no

1    evidence of a bribery.  That is not our defense.  Well, he

2    did it, but he would have done it anyway and, therefore, he

3    should be excused.  No, that's not what we're saying.  To be

4    clear, there's no evidence of a bribery here.  The only

5    reason he advanced this legislation was because he believed

6    this was good.  So I point that out so that you're not

7    confused as to exactly what our position is.

8        You've heard much discussion from the government's

9    initial closing argument and from the Court's instructions

10   regarding racketeering activities and all of these predicate

11   offenses.  And to be clear, at its core, as I said, this is

12   a bribery case, and if there is no bribery, then, there

13   can't be money laundering because the money laundering

14   requires that there be proceeds of illegality.  So if

15   there's no bribery, there can't be money laundering.

16       Moving on, some of the other predicate offenses,

17   Private Honest Services, Wire Fraud, and a Travel Act

18   violation.  Unlawful interference with a ballot referendum

19   effort, and these all relate to Tyler Fehrman and the

20   payment of $15,000 to Tyler Fehrman.  And what's important

21   here from Larry Householder's perspective is the testimony

22   that -- from Juan Cespedes that he and Matt Borges wanted to

23   keep everything about Tyler Fehrman secret between the two

24   of them.  And at some point, Mr. Borges somehow let it slip

25   to John Kiani, and he became aware of it, and Cespedes was

1    angry and upset.  You shouldn't have done that.  This is a

2    secret between the two of us.  So I'll leave it to

3    Mr. Borges' counsel to address the merits of that $15,000

4    payment, whether that was tantamount to a bribe or not, but

5    the point is, from Mr. Householder's perspective, that's not

6    our business.  We're not involved in that.  That was a

7    secret between Cespedes and Borges.

8        And what's important is this instruction:  The

9    government must prove beyond a reasonable doubt that the

10   defendant agreed that either he or another member of the

11   conspiracy would commit at least two of these racketeering

12   acts.  Clearly, he had nothing to do with Tyler Fehrman, and

13   he didn't even know about this $15,000 payment.  So how

14   could he have agreed that somebody else, i.e., Cespedes or

15   Borges, were going to do something when he had no idea what

16   they were doing?  He wasn't involved in that.  And he

17   shouldn't be legally accountable for any of those acts,

18   assuming they're criminal acts, and that's what's important

19   from Mr. Householder's perspective.

20       As you have heard in the Court's instructions, the

21   merits of House Bill 6 aren't relevant to this case.  You've

22   heard some testimony from several legislators that they

23   voted against it, and they explained to you their reasons

24   why.  And you've heard from several legislators who voted in

25   favor of it, and you've heard their reasons why.  But

1    ultimately, none of that matters for purposes of your

2    verdict decision in this case.  But what does matter is:

3    Why Larry Householder supported House Bill 6, whether he

4    believed it was good legislation, whether he believed it was

5    important to preserve the nuclear power plants, whether he

6    believed it was important to preserve thousands of jobs

7    associated with it, whether he believed it was important to

8    eliminate what he perceived and believed to be costly and

9    ineffective energy efficiency mandates.

10         In short, that's all, that's all the evidence is, that

11    Larry believed this was good legislation, good for all

12    Ohioans, good for Bob and Betty Buckeye.  That's why he

13    supported this legislation, not because he entered into some

14    explicit quid pro quo, this for that, agreement with the

15    government.  There's no evidence of that, none.  And I keep

16    coming back to Government Exhibit 212, that's all of the

17    proof you need what his motivations were, what his beliefs

18    were.

19         And the fact that FirstEnergy Solutions or FirstEnergy,

20    for that matter, makes contributions that ultimately support

21    that slate of candidates with the hope that they'll help him

22    become Speaker, that's not a crime.  The fact that Larry

23    advances legislation favorable to FirstEnergy Solutions as

24    the owner of the power plants, that's not a crime.  It's

25    only a crime if there's evidence -- not some evidence, proof

1    beyond a reasonable doubt of that explicit quid pro quo

2    agreement, and it doesn't exist.

3         The indictment itself alleges a conspiracy to engage in

4    racketeering activities with members of an enterprise, but

5    there's no evidence that Larry voluntarily and knowingly

6    agreed with anybody to engage in a criminal conspiracy.

7    There's no evidence that he knowingly, voluntarily agreed

8    with anybody to engage in racketeering activities.

9         Bottom line is that Larry Householder was engaged in

10   political activity, not criminal activity, and that's

11   precisely why you'll receive this verdict form charging a

12   single count in this indictment.  And the government has

13   failed to present evidence to meet their burden of proof of

14   beyond a reasonable doubt, and the appropriate verdict has

15   to be not guilty.

16        Let me conclude with one final thought.  Yesterday the

17   judge expressed the Court's gratitude and appreciation to

18   all of you for your dedication and commitment to what has

19   been a long trial.  And as part of the Court's expression,

20   he made the comment that that's what democracy requires, and

21   that really resonated with me.  And so on behalf of

22   everybody from the Householder defense team, we join in

23   offering our thanks and gratitude for your commitment and

24   your dedication to what is a most important case.  I thank

25   you very much.

1          Could I just have a moment here, Judge?

2          THE COURT:  Thank you, Mr. Bradley.

3          (Pause.)

4          THE COURT:  Mr. Bradley has concluded

5     Mr. Householder's closing argument.  Does counsel for

6     Mr. Borges want to take a short recess; do you want to make

7     a proposal, where do you stand?

8          MR. SCHNEIDER:  I can proceed, Your Honor.

9          THE COURT:  Very well.

10         MR. SCHNEIDER:  If the Court is --

11         THE COURT:  Yes.

12         MR. SCHNEIDER:  Okay, fine.  Thank you.

13    Your Honor, Counsel, Ladies and Gentlemen of the Jury,

14    good afternoon.  You've worked hard all day and for six

15    weeks.  You just heard two-and-a-half hours of the

16    government's closing argument.  You heard two hours roughly

17    of Mr. Householder's counsel's argument.

18         And let me help you with this.  One is, Mr. Borges

19    didn't engage in a racketeering conspiracy.  And you saw a

20    graphic that Mr. Bradley put up I think within the last half

21    hour that was -- it said "bribe" and then it said "money

22    laundering," and if there isn't a bribe, then, there can't

23    be money laundering.  And the reason for that is, to launder

24    money, the money has to be dirty, it has to be derived from

25    criminal activity; and in this case, the government has

CLOSING ARGUMENT BY MR. SCHNEIDER                    24-3901

1    alleged that's bribe money.  So if there isn't a bribe --

2    and you'll determine that -- but if there isn't a bribe,

3    there isn't money laundering.

4         You need to look no further, and you will, I'm sure you

5    will, but if you go to page 27 really of the jury

6    instructions that the Judge gave you yesterday, that deals

7    with the connection of the conspiracy, that's what it's

8    titled.  And the conspiracy instruction is longer, but in

9    the connection to the conspiracy argument, the key to the

10   entire government's case lies on that page.  It says the

11   government -- essentially, the government must prove beyond

12   a reasonable doubt that Matt knew the conspiracy's main

13   purpose and that he voluntarily joined it intending to

14   advance or achieve the goals.

15        So what were the purposes and the goals?  If there was

16   a conspiracy, what was the purposes and the goals?  Well,

17   Mr. Singer told you today that the conspiracy's goal, that

18   the enterprise's goal, was growing Larry Householder's

19   political power through bribery, money in exchange for House

20   Bill 6, and then laundering the bribe money through Gen Now

21   and other entities.

22        Ms. Glatfelter during cross-examination of several of

23   the legislators that came in, and there was some push-back

24   and they came in in -- I mean, they came in in the defense's

25   case, Mr. Householder's case, so the government

1    cross-examined.  But when there was some push-back on

2    whether or not there might be a bribe, she asked a series of

3    questions of each one of those witnesses, which was, well,

4    sir -- and this was Mr. Seitz in particular.  Sir, were you

5    at the inaugural by chance?  You weren't at the inaugural,

6    were you, in January of '17?  Of course, she's trying to say

7    you don't know what happened there.  You weren't at the

8    Greenbrier, were you, Mr. Seitz?  Were you at the Greenbrier

9    in August of '17?  Were you in State Street offices, 65 East

10   State Street, the campaign office, the JPL office, the

11   Strategy Group office, were you there on October 10th, 2018;

12   you weren't, were you?  Were you with Mr. Jones and

13   Mr. Householder perhaps up in Akron at the FirstEnergy

14   headquarters a couple of weeks after the October 10th, '18

15   meeting in the Strategy Group offices?  And were you on any

16   calls with Chuck Jones and Larry Householder?  And they all

17   said no, and the government made its point.

18        But then I asked the same questions of Mr. Householder,

19   and, guess what, same answers as it relates to Matt Borges.

20   Matt wasn't at the inaugural in '17.  He wasn't at the

21   Greenbrier in '17.  He wasn't in the State Street offices in

22   2018 in October.  He certainly wasn't at FirstEnergy's

23   headquarters with Chuck Jones and Larry in the fall of '18.

24        The other question that I think Ms. Glatfelter asked --

25   or maybe it was Ms. Painter or Mr. Singer, that, well, you

1    weren't on the Gen Now account either, were you?  I also

2    asked that.  There's no evidence, right, that Matt had

3    anything to do with Generation Now.

4         Again, the heart of the government's case as relates to

5    Matt is that he knowingly and voluntarily joined a

6    conspiracy, purposes of which were to -- the purposes of

7    which were to promote Larry Householder's political power

8    and to use bribe money and launder it through entities to

9    conceal it.  That's the heart of the case.

10        Now, opening statement six weeks ago, government's

11   changed a little bit, admittedly, during the course of the

12   evidence, but the government made sort of a bold claim, that

13   Matt worked alongside Larry Householder to help pass House

14   Bill 6.  Six weeks ago, same day, my colleague, Todd Long,

15   gave a contrary opening statement.  And again, the opening

16   statements are not evidence.  What I'm telling you right now

17   is not evidence.  You're going to be the sole determining

18   factors of what the facts are in this case.

19        But the preview or the snapshot, Mr. Long, my

20   colleague, gave six weeks ago I think is borne out.  He said

21   Matt was anything but a Team Householder person.  He was

22   never on the farm, and the evidence will show that he was

23   never a casket carrier, and the evidence will show it.  And,

24   in fact, the evidence has shown that Matt Borges -- I mean,

25   just think of this.  Matt Borges supported Team Ryan Smith.

1    He didn't support Team Householder in the Speaker's race in

2    early 2019, absolutely not, which is interesting because

3    he's caught up in some racketeering conspiracy from someone

4    that they both -- that he, that Mr. Householder, even

5    admitted he didn't care for, the country club Republican

6    versus the country Republican.

7         Anna Lippincott testified.  She's part of JPL.  She

8    worked with Gen Now.  She said back in the day, Matt didn't

9    fit in.  I don't know if Matt liked hearing that, but she

10   also said he was not of the right demographic, and she

11   called him an outsider.

12        Megan Fitzmartin came in -- and these are all witnesses

13   in the government case.  And Megan came in and she said Matt

14   wasn't invited on Team Householder calls.  He wasn't invited

15   to team events.  And then sort of an interesting moment, I

16   didn't even prompt, I don't even think I prompted this, you

17   remember Megan Fitzmartin waving her finger and saying, no,

18   Mr. Borges and the Speaker didn't even like each other.

19   Again, that's what my colleague said was going to be the

20   evidence in this case, and I think, I think you'll determine

21   it, but I think that's what it is.

22        You heard from several legislators in this case, in

23   particular, several that came in on the government's case.

24   Mr. Greenspan, individual that went to the FBI, individual

25   that testified at some length about issues relating to

 1    Mr. Householder.  And I got up on cross-examination and I

 2    said:  Do you know Matt?  Yeah, I know Matt, and I used to

 3    go to the Roetzel offices where Matt worked.  One of his

 4    partners, Melissa Hoeffel, is a good friend of mine.  And,

 5    yes, Matt knew, Matt knew I was a no vote on House Bill 6.

 6    He didn't ask me, he didn't even talk about it, he didn't

 7    ask me to change my vote.

 8        The most you see in the evidence at all in this case

 9    relative to the enactment of House Bill 6 is that Matt might

10    have been on a whip count at one point in time, just

11    checking in.  He was not an enterprise member, and he

12    certainly didn't sit, as the government said in opening

13    statement, alongside Larry Householder to pass House Bill 6.

14    Nothing could be further from the truth.

15        Even Juan Cespedes, he testified that there was a point

16    in time when the Speaker had all hands on deck, pulled a

17    meeting together with the team, Matt wasn't invited to that,

18    Matt wasn't included in that.  How does the government get

19    that wrong?  Why the bold claim six weeks ago?  And it just

20    falls flat.

21        Matt Borges was never an insider, and if he wasn't an

22    insider, he wasn't an enterpriser.  He was an outsider.  Mr.

23    Long was spot on in the opening statement.  You can

24    associate -- you'll look at the jury instructions, but you

25    can associate with members of an enterprise and not be a

1    member of the enterprise.  I mean, just think for a second,

2    you're on Capitol Square and you've got six people that are

3    doing something collusive and illegal, but you know them and

4    you talk to them, you see them on the street corner.  You're

5    associating with members of an enterprise, but you're not

6    part of the enterprise and you don't know the inner workings

7    of the enterprise.

8         What evidence is there that Matt Borges knew that

9    FirstEnergy and Larry Householder engaged in a bribe

10   sometime in Washington, DC in January of '17, what evidence

11   is there?  There's none.  There's zip, zero, nada, evidence

12   of that.  And again, no bribe, no money laundering.

13        Now, let me move beyond that, though, for just a

14   second.  Let's -- if there's an enterprise here in the

15   instruction and there's a common goal, the allegations that

16   you'll see in your jury instructions indicate that the

17   purpose of the enterprise was to grow Larry Householder's

18   political power through bribery and that Gen Now was used as

19   a mechanism to conceal that.  Well, again, I don't want to

20   create a fight in the courtroom, but Mr. Householder and

21   Mr. Borges don't like each other, and I can assure you that

22   Mr. Borges didn't join an enterprise to help promote Larry

23   Householder's political prestige at all.

24        All right.  Enter Matt Borges at some point in time,

25   because House Bill 6 has passed, passes the House, goes into

1    the Senate, the Senate makes some changes, comes back to the

2    House for a concurrent vote.  Governor signs it into law,

3    and there's rumblings, as you would expect, at the

4    Statehouse that there might be a ballot challenge, they

5    might put this up for referendum.

6        The government brought in Josh Altic as an expert.  You

7    have an expert witness instruction in your jury instructions

8    where those kind of witnesses can express opinions.  But you

9    heard Mr. Altic talk about ballot challenges and oppositions

10   to ballot challenges are rough and can be rough and they can

11   be tough, and that those that oppose the referendum do

12   things like challenge the credentials of signature

13   gatherers.  It's not uncommon.  It might seem uncommon to

14   all of you until -- maybe not now after six weeks, but, you

15   know, might even sound a little sleazy, but that happens.

16       In Ohio, you heard this, there's Form 15s, those

17   specifically have to be filed so that the Secretary of

18   State, Secretary of State chooses to, can check the

19   credentials of signature-gatherers because you can't have --

20   not everybody can go out and circulate signatures.  There

21   are certain disqualifying things, like being a criminal

22   offender.

23       Mr. Altic indicated that that's not unusual, checking

24   those credentials.  It's not at all unusual to try to

25   inhibit signature gatherers' progress.  It's rough, it's

1    tough politics.  It's not unlawful.

2        Then you heard blogger educators.  To be honest with

3    you, I didn't know what a blogger educator was until I got

4    involved in this case.  And Mr. Altic helped you, I presume,

5    through his testimony understanding that, but that is where

6    people at the street corner, you know, they convene at

7    Walmarts, large libraries, places of large assembly, and

8    you're opposing the referendum, you don't want to get it on

9    the ballot, and so people go over there and say, why are you

10   signing that petition, are you getting the straight scoop,

11   hey, let me tell you about that before you sign that, let me

12   tell you about that.  Again, rough, tough politics, but not

13   unlawful, and actually customary.

14       The other thing we know now is that the government has

15   used this, a lot of money was spent in opposition to the

16   referendum, millions of dollars were spent, well, millions

17   of dollars were spent on the referendum.  Remember Mr.

18   Roberson, he came in and testified, he's the CEO of AMT, the

19   signature-gathering firm.  By the way, let's make sure we

20   understand, AMT is the vendor for the ballot initiative.

21   It's not the campaign committee that put the ballot on or

22   sought to put the ballot on.  It's a vendor, it's in

23   contract with the committee to gather signatures.  And I

24   think I did the cross-examination on Mr. Roberson, I lose

25   track now, but you remember he was coy about I don't really

1    know who funded it, the ballot challenge.  He knew exactly,

2    yeah, it was oil and gas, and it was in the millions.

3    Mr. Bradley talked about some things that are sort of

4    misleading in this case.  Mr. Roberson getting on the stand

5    and not really being forthright and candid about that, ask

6    yourself why.

7         Is there an economic harm at AMT?  Well, this is really

8    interesting because on direct examination -- and, again, you

9    chalk it up to what you want, misleading or just didn't

10   understand.  But the government was getting into, well, you

11   know, you had -- if you didn't get the signatures, if you

12   hit -- didn't hit the threshold -- he didn't hit a

13   threshold, there was going to be a claw-back of money that

14   you were entitled to under the contract.  And, of course,

15   the government was trying to establish that AMT would have

16   some financial harm if it didn't meet the threshold,

17   whatever that was.  Mr. Roberson finally on

18   cross-examination admitted, well, we negotiated the

19   claw-backs out.  Government didn't tell you that through the

20   direct.  Mr. Roberson didn't tell you that through the

21   direct.  Why?  There is no economic harm to AMT.  Mr.

22   Roberson kind of sat back a little smug in his chair and

23   said, well, number-one man, we're still number one.  Mr.

24   Singer talked about reputational harm.  Well, if Mr.

25   Roberson's reputation and his company's reputation was

1    harmed, he wouldn't have given you that demeanor in that

2    witness stand pounding his chest.

3        You're going to see in the jury instructions an issue

4    as to whether or not there could be some economic harm and

5    I'll address that in a second.  This was a red herring, a

6    term that my colleague uses.  Maybe you can call it

7    misleading.  But Mr. Roberson testified at some length as to

8    the measures AMT took to protect the petitions.  He didn't

9    take measures to protect the number, the count.  It's the

10   physical possession of the petitions because they can be

11   filed some day, if they get there, and they've got to be

12   inspected, make sure the signatures are valid.  It was that

13   process that was securitized, not the number.

14       And that then leads me to sort of Tyler Fehrman's

15   employment contract, which you'll have as an exhibit.  Mr.

16   Roberson testified that he is not only the CEO and general

17   counsel for AMT, but that he created and drafted all of the

18   contracts.  He also testified that there's training involved

19   for their employees.  And they hire employees, they don't

20   just use independent contractors.  A lot of the other

21   signature firms around the country just use 1099 folks, but

22   AMT, number-one man, still number one apparently as of a

23   couple of weeks ago, they hire people on an employee basis,

24   like Tyler Fehrman.

25       Mr. Roberson also acknowledged -- you heard it in

1    court -- that the numbers, the signature count numbers, were

2    going to be made public subsequently.  That's what was going

3    to happen.  Mr. Wetzel testified to the same thing, yeah,

4    those numbers were going to be public.  Well, the

5    contract -- let me ask you this.  So Tyler's job -- this is

6    Private and Honest Services.  Tyler Fehrman's job duties,

7    his job duties are defined by what?  Defined by his

8    contract.  He had a written contract, and that contract

9    provided that he had to do this, he was going to get paid

10   that.  But there was a whole section in that contract, it's

11   paragraph 9, I ask you to look at it.  Paragraph 9, it's

12   actually subparagraph B, but the paragraph says here's the

13   following information -- the following information will be

14   confidential and then the following won't be confidential.

15        And 9B says information that may or will subsequently

16   become available to the public, assuming Tyler Fehrman's job

17   duties are defined by his contract, and his contract says

18   the signature count itself, that knowledge is not

19   confidential if it's going to become public, and if Roberson

20   says it's going to become public, and Special Agent Wetzel

21   says it's going to become public, then, it's not

22   confidential and it's not insider information.  And if Tyler

23   were to give that information to Matt -- he never did, he

24   never did, he was just evasive the whole time -- but had he

25   done it, he would not have been depriving -- you can read

1    the instruction -- he would not be depriving AMT of Honest

2    Services.  He would not have a fiduciary duty to maintain

3    that information because the contract says otherwise.

4        Now, Mr. Roberson drafted the contract.  You read it

5    for yourself when you deliberate.  But there were several

6    bold, all capitalized paragraphs in that employment

7    contract, not 9B.  You know what is, unauthorized expenses.

8    He wanted to make it very clear to his employees, you know,

9    you eat out, you spend too much money, I'm not reimbursing

10   you.  Another provision is, if we get into a conflict and

11   there's a dispute, we have to arbitrate; you can't submit.

12   Those are bold provisions that this lawyer put in that.

13       Does anybody sitting here -- using your common sense,

14   like Mr. Singer said, do you think that Mr. Roberson had the

15   ability by virtue of a contract to confidentialize the

16   signature count, even if it was going to become available to

17   the public some day?  Of course, he could have, but he

18   didn't.  That knocks out Private Honest Services Fraud

19   because Tyler didn't have a fiduciary duty to maintain that

20   information to AMT, and if he didn't have a fiduciary duty

21   to maintain that information, then, AMT was not deprived

22   Honest Services from Tyler.  Shame on AMT for not putting it

23   in the contract, but it wasn't deprived any Honest Services

24   at all.

25       Let me talk about Tyler for a minute.  This strikes me

1    as just odd, for whatever it's worth in your deliberations,

2    but if Matt Borges intended to bribe Tyler -- we'll use that

3    term, I think we just negated that, but I'm going to use

4    that term.  If he intended to bribe Tyler Fehrman, why would

5    he ask if he had a nondisclosure agreement, why would he ask

6    if he had a contract?  If you're going to bribe somebody,

7    why do you care if someone has a contract?  You're going to

8    bribe them.  It makes no sense.  Yeah, use your common

9    sense, ask yourself those questions, hear yourself out in

10   discussions among yourselves on some of those pointed

11   issues, if you care to.  I encourage you that you do, but if

12   you care to.

13        Look, asking for that information doesn't sit well, may

14   be a little slimy, it's just not unlawful, it's not

15   unlawful.

16        And let me ask you this, too, this is a point for your

17   common sense because I'm struggling with this.  Matt gives

18   Mr. Fehrman the 15 grand.  Does Matt put a full court press

19   on at any time, what are those numbers, I already gave you

20   money, where is it, what, you've got to be specific.  Any

21   time there were any discussions, it was, oh -- Mr. Fehrman:

22   Oh, I got to talk to my man, I don't know, somebody is up

23   north.  If I had paid -- if any of you had paid -- for that

24   information, wouldn't you be all over on a full court press

25   to Tyler Fehrman to get the information?  Or might it be

1    reasonably possible, more than likely, that when Matt said,

2    I'm going to change directions, I've got some projects for

3    you, he even says let's just get past the 21st, that's the

4    referendum deadline, isn't it reasonably possible that he

5    really was advancing Tyler money to help him clean up some

6    of his issues and going to put him on some special projects

7    when he had the chance?  And if that's reasonably possible,

8    particularly because he didn't ask for numbers -- in fact,

9    you can go back and you'll see the texts, he didn't ask for

10   any numbers after September 27th, that's still almost a

11   month away from the referendum period.  Just questions I

12   think that you ought to ask yourself.

13        Now, I guess what I heard today is that if there wasn't

14   a bribe in January -- of Mr. Householder -- '17 on or near

15   the inaugural, then, maybe there was a bribe on

16   October 10th, 2018 at 65 East State Street.  And this is

17   where you heard the Klaffky and the Juan Cespedes different

18   versions.  I'm going to suggest something to you that you

19   ought to think about.  But Mr. Singer who did the direct on

20   Mr. Cespedes asked him, well, you know, after talking about

21   the $400,000 check and giving it to the Speaker, and, you

22   know, saying that, you know, FirstEnergy Solutions has this

23   interest in this legislation, and Mr. Householder supposedly

24   says I guess or I'm sure based on this, yes.  Kind of as a

25   curve ball, Mr. Singer asked Mr. Cespedes, well, did Matt

1    know about that, did Matt know about it; and he said, oh,

2    yes.  Well, how did he know about that?  He was my sounding

3    board, I told him everything.  Matt knew -- there's

4    testimony Matt knew what I knew.  Well, I mean, some or most

5    of you are married, you have siblings, I mean, I can assure

6    you that I don't -- I don't suggest that my wife knows

7    everything I know or vice versa.  That's as detailed as he

8    got.

9          And Mr. Bradley showed you the jury instruction that

10   Judge Black gave you yesterday about a cooperator and having

11   to exercise more caution in analyzing that.  Well, on direct

12   Mr. Cespedes maintained, oh, Matt knew everything, never

13   gave a detail, not.  And then they show him the October 11th

14   text, and that's the text that you have in evidence, and

15   that's the day after, and that's the text where Cespedes

16   writes to Matt meeting yesterday, was SLH, DeWine, Husted,

17   Obhof, went well.  Mr. Singer said:  Mr. Cespedes, what were

18   you saying, what did you mean by that?  And he sits there in

19   that stand, the person who's supposed to exercise more

20   caution or should exercise more caution, sort of sits back

21   in his chair and says:  Oh, that meant check well received.

22   Well, I can tell you we didn't know that coming into trial.

23   And Mr. Long gets up on cross-examination with Mr. Cespedes

24   and tries to test that.  What do you mean that means check?

25   Your text doesn't say there's a check involved.  What do you

1    mean by that?  Well, and he sort of maintained that, you

2    know, that thought.

3         Don't you think, though, that if you told your good

4    friend who's your sounding board, who knows everything you

5    know, that you would remember in detail where you were, what

6    you did, how you communicated it, and, more importantly,

7    what Matt's reaction was to being informed that there was a

8    bribe at 65 East State Street to the tune of $400,000 on

9    October 10, 2018.  No, we have to live with Matt knows

10   everything I would have known and that meeting went well

11   yesterday is somehow code for check well received.

12        Now, are you going to actually rely on that in the most

13   important of your daily affairs?  I suggest you wouldn't.

14   I'm also going to suggest to you that Mr. Cespedes, who is

15   under the cooperation agreement for all of the reasons

16   Mr. Bradley told you, manufactured that and probably after

17   this trial started.  It's just -- just think about that.

18        Remember, Mr. Long gets up and he said:  Well, you

19   never said this in four or five proffer sessions with

20   government lawyers and Mr. Agent -- or Mr. Wetzel, Agent

21   Wetzel.  Well, I'm sure.  And then my colleague says, well,

22   do you want to see your 302s, do you want to see your

23   summaries, would that help refresh your recollection?  No, I

24   didn't write it.  Well, would you like to see it?  No.  What

25   do you make of that?  Do you think this October 10th, 2018,

1    trying to lay it on Matt Borges is some sort of epiphany?

2    Do you think he's motivated to say that because there's no

3    knowledge Matt knew anything about FirstEnergy, Chuck Jones,

4    Larry Householder, Gen Now, Longstreth in Washington in '17?

5    But in order to convict him, somehow we've got to tie him to

6    something, and October 2018 seems like a perfect

7    opportunity.  I suggest that was fabricated.

8         Just think of this for a second.  The October 11th text

9    to Matt saying meeting well received or meeting went well,

10   doesn't mention a check, and then he says that's code.  Did

11   the same thing with -- I think it was 602 D or B where

12   you've got the $25,000 employee and he said, oh, that's code

13   for bribe.  You get to check his credibility and assess it

14   when you're back in the deliberation room.

15        Let me say something else on that point, though.

16   Mr. Cespedes was pressed, I think it was on cross, but it

17   was during his consideration on -- that he -- that black

18   ops, remember that term, that was John Kiani, chairman of

19   the board, executive CEO, FirstEnergy Solutions, and he sent

20   a text message to Cespedes, Matt's not on it, but the text

21   message said where are we on black ops, and that was like on

22   August 31st of '19, might have been September 1st.  You'll

23   have the text.  Mr. Cespedes was asked what does that mean;

24   well, it meant Tyler Fehrman.  Really, it meant Tyler

25   Fehrman?  Mr. Cespedes testified earlier that Kiani didn't

1    know anything about Tyler Fehrman until Matt somehow let it

2    slip on a phone call, which was weeks later. Mr. Long gets

3    up and presses Mr. Cespedes on it; says, well, yeah, I guess

4    you're right. Then, Mr. Long shows him, what's this --

5    you're reaching out to Matt saying where are we on the

6    employment lawyers, I'm getting some questions here. And

7    this is after Mr. Cespedes had testified there was no way in

8    heck that they were ever going to consider hiring Tyler.

9         Think about cross-examination. Mr. Cespedes said,

10   well, yeah, we were -- you know, we were looking at ways we

11   could get this done, but we just abandoned it. I'm going to

12   suggest to you that Mr. Cespedes' credibility is undermined

13   and largely undermined through cross-examination, and if not

14   undermined solely on cross-examination, undermined by the

15   instruction that you have.

16        "Unholy alliance," now, we've heard that, that's

17   nefarious, sounds bad. Matt mentions unholy alliance in

18   reference to FirstEnergy, Larry Householder, and Roetzel &

19   Andress, the law firm for which he at one point in time

20   worked. Any of you going to go to the bank on the fact that

21   using that expression is proof beyond a reasonable doubt

22   that you knew of a bribe? You know what the expression

23   means, people that don't normally do things together. And

24   then just color maybe, maybe not anything to probe, but a

25   color. That comment is made by Matt in conversations with

1    Mr. Fehrman.  Mr. Fehrman after the referendum period

2    expires, doesn't get on, he makes a job application at

3    Roetzel & Andress, one of the holy -- unholy alliancers, if

4    you will.  Does that strike you as odd?

5         And because you know the Attorney General and because

6    you have worked on the Attorney General's campaign, what

7    evidence is there, ladies and gentlemen, honestly, what

8    evidence, what tangible evidence, let alone proof beyond a

9    reasonable doubt, is there that Matt ever pressured Dave

10   Yost, what evidence is there?  What's the nature of that

11   pressure, what was it?

12        Look, you're going to have the instructions as you go

13   back.  I'm going to tell you Matt's no racketeer --

14   racketeeringer, racketeerer?  I don't even know the term.

15   He's not a co-conspirator, didn't have the knowledge.  He's

16   got political experience.  He got thrown into an opposition

17   to a referendum.  He did some things that maybe he's not

18   proud of in terms of what it looks like on the surface, but

19   they're not unlawful.

20        When I sit down, I don't get a chance to get back up.

21   The government has an opportunity because the government has

22   the burden of proof and they can engage in a rebuttal

23   argument, should the government choose to; I expect that

24   they will.  But before I sit down, I want to remind you of

25   what I think I said in maybe the shortest voir dire that

1    I've ever engaged in, and that was the amputation issue as

2    to whether or not anyone would hesitate to get a second

3    opinion, medical opinion or otherwise, if they were told a

4    limb had to be amputated after an athletic event.  And I

5    think at the time we had 53 of prospective jurors, not

6    one -- you're 14 now, but not one said, yeah, I'd go do it,

7    I wouldn't want a second opinion.

8         And just think about Judge Black's instruction

9    yesterday, which is the law, what Mr. Bradley implored on

10   you here a little bit ago:  It's doubt that you wouldn't

11   hesitate to act and rely on in your most important daily

12   affairs, and that's what I'm asking you to do in this

13   overcharged case.  Matt Borges did not engage in a

14   conspiracy to violate a racketeering -- he is not a

15   racketeering co-conspirator.

16        Like Mr. Bradley and like Mr. Singer, look, we're doing

17   our jobs.  The sacrifice that you made over six weeks and

18   many of you having to commute in not-so-fun traffic is

19   unbelievable, and the attention that you've given this case,

20   we've all observed it, you know, from the bottom of my heart

21   and all, we appreciate your time and your attention.  Remind

22   you of your oath, the Judge will do it again.  Thank you.

23   Nothing further.

24             THE COURT:  Thank you.  I'd like to see counsel at

25   sidebar.

1   **SIDEBAR CONFERENCE.**

2           THE COURT:  I think we should recess for the day.

3   I, for one, am whipped.  If we're going to continue, we need

4   to give the jury a break for 15 minutes and then we'll come

5   back for rebuttal.  We'll be here beyond 6:00 p.m.  Does

6   anybody object to breaking now?

7           MS. GAFFNEY-PAINTER:  I apologize, Your Honor, I

8   had difficulty hearing you.  You said a 15-minute break and

9   then end?

10          THE COURT:  No.  Does the government object?  Sort

11  of in your lap.  You're giving the rebuttal, correct?

12          MS. GAFFNEY-PAINTER:  I am.

13          THE COURT:  My mistake.  I think we ought to break.

14  If you have a different perspective, articulate it.  We'll

15  be here until after 6.

16          MS. GAFFNEY-PAINTER:  No objection.

17          THE COURT:  Mr. Householder?

18          MR. BRADLEY:  We don't object.

19          THE COURT:  Where's --

20          MR. LONG:  I don't think we'll be alone in this,

21  Judge, but I was curious as to how long Ms. Painter's

22  rebuttal would be.

23          THE COURT:  How long would the rebuttal be?

24          MS. GAFFNEY-PAINTER:  I stand on what the Court's

25  guidance was, 30 minutes.

```
 1              THE COURT:  30 minutes?  I think that's ridiculous.
 2    If you want to do it now, express it strongly.
 3              MS. GAFFNEY-PAINTER:  No, I don't want to overrule
 4    the Court's preferences.
 5              THE COURT:  Is that right, Ms. Glatfelter?
 6              MS. GLATFELTER:  I'm conflicted because I think we
 7    could be here for just 30 minutes and get it done, but --
 8              THE COURT:  Well, we're going to take a 15-minute
 9    break for purposes of the jury, and then we come back and
10    it's 30 minutes.  I've not been impressed with the ability
11    to hit your estimates, and these guys are supposed to be
12    gone at 4:30.  I'm whipped.  The government has the burden.
13    I don't think it's difficult to take a break and come back
14    and do it properly within the time frame, and then we'll get
15    it to the jury.
16        One more time, does Mr. Householder object or have a
17    preference?
18              MR. BRADLEY:  I do not have a preference, Judge.
19              MR. SCHNEIDER:  I don't think I exceeded my
20    estimation.
21              THE COURT:  No.  Let the record reflect that -- I
22    won't say it fully.  You're a class act.
23              MR. SCHNEIDER:  We won't object.
24              MS. GAFFNEY-PAINTER:  No objection.
25              THE COURT:  All right.  We're going to break.
```

1     **SIDEBAR CONCLUDED.**

2          THE COURT:  It's after 4:30.  Members of the Jury,

3     to be perfectly frank, I'm whipped.  I can't imagine how

4     you're doing.  The government has an opportunity to have the

5     last word in rebuttal.  We would need to take a break and

6     come back and hear that.  I think you would be here for a

7     while, and I am inclined, and have leaned on the parties,

8     and am ordering that we break for the day.  You'll come back

9     tomorrow refreshed.  The government will get the last word

10    because they have the burden of proof.  They'll do it

11    expeditiously.  We'll send you to your room early tomorrow

12    morning, and you will begin your deliberations.  So we're

13    going to break.

14         During the break, I want you to take a break.  I want

15    you to find some joy at home.  You can't talk about it yet.

16    They're going to want to know at home, but this is when you

17    muscle up and you tell them you can't discuss it, otherwise,

18    the federal judge will be annoyed, to put it mildly.  You've

19    been great.  You deserve a break.  We're going to break for

20    the day.  During the break, put it out of your mind.  Get a

21    decent meal.  Spend time with your loved ones.  Don't do any

22    investigation, no independent research.  Wait for the last

23    word in closing, come in here refreshed and ready to be sent

24    to your room.  I love to say that.  So I'm going to send you

25    home rather than to your room.  I want you to take a break.

24-3924

```
 1    I am so grateful to you.

 2         Out of respect for you, I and everyone in the room will

 3    rise for you while you break for the day.

 4         THE DEPUTY:  All rise for the jury.

 5    (Jury exited the courtroom at 4:35 p.m.)

 6         THE COURT:  Jury is leaving the room.  As always,

 7    we'll wait for word that they have cleared the floor and

 8    then we will recess for the day.

 9    (Pause.)

10         THE DEPUTY:  All clear.

11         THE COURT:  Before we adjourn for the day and while

12    we're on the record, is there anything that requires my

13    attention before we adjourn for the day, from the

14    government?

15         MS. GLATFELTER:  No, Your Honor.

16         THE COURT:  From Mr. Householder's team?

17         MR. SCHNEIDER:  No, Judge.

18         THE COURT:  Counsel for Mr. Borges?

19         MR. SCHNEIDER:  No.

20         THE COURT:  We're adjourned for the night.

21         THE DEPUTY:  This court is now adjourned.

22    (Proceedings continued in progress at 4:36 p.m.)

23

24

25
```

```
 1              C E R T I F I C A T E

 2        I certify that the foregoing is a correct transcript of
      the record of proceedings in the above-entitled matter
 3    prepared from my stenotype notes.

 4    /s/  Lisa Conley Yungblut                    03/09/2023
           LISA CONLEY YUNGBLUT, RMR, CRR, CRC     DATE
 5

 6                    I N D E X

 7            CLOSING ARGUMENTS                     PAGE
      Government's closing by Mr. Singer            3773
 8    Defendant Householder's closing by Mr. Bradley   3847
      Defendant Borges' closing by Mr. Schneider    3900
 9
```